# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT
C.A. No. 04-4548

JAY S. REIN,                                    )
                                                )
            Plaintiff,                          )
                                                )
    v.                                          )        **COMPLAINT AND**
                                                )        **DEMAND FOR JURY TRIAL**
MOTOROLA, INC., JURGEN                          )
STARK, Individually, and CLYDE                  )
KOFMAN, Individually,                           )
                                                )
            Defendants.                         )

## PARTIES

1.      Plaintiff, Jay S. Rein ("Rein") is an individual residing at 75 Johnson Drive, Holliston, Massachusetts.

2.      Defendant, Motorola, Inc. ("Motorola") is a Delaware corporation with a principal place of business at 1301 E. Algonquin Road, Schaumburg, Illinois.

3.      Defendant, Juergen Stark ("Stark") is an individual residing at 930 Vernon Avenue, Glencoe, Illinois.

4.      Defendant Clyde Kofman ("Kofman") is an individual residing at 1826 Kiest Avenue, Northbrook, Illinois.

## JURISDICTION

5.      The Court has subject matter jurisdiction of this matter pursuant to G.L.c. 212 §4 of the Massachusetts General Laws.  It has personal jurisdiction over Motorola

pursuant to G.L.c. 223A §3 and personal jurisdiction over Stark and Kofman pursuant to G.L.c. 223A §3.

6.    Venue is proper pursuant to G.L.c. 223 §8(4) of the Massachusetts General Laws.

## FACTS

7.    On June 12, 2002, after utilizing Russell Reynolds, Inc., a prominent executive recruiting firm, to recruit Rein, Motorola offered him the position of Principal of North America in the Motorola Professional Services ("MPS") group. In connection with this offer Motorola agreed to pay Rein a base salary of One Hundred and Ninety Thousand Dollars ($190,000) a year, granted him stock options for Twenty Thousand (20,000) shares of Motorola stock (that vested at the rate of 25% per year over the next four years), offered him a sales incentive bonus (target) of Eighty Five Thousand Dollars ($85,000) and gave him various other health and pension benefits.

8.    Motorola further agreed that Rein would not relocate to Motorola Headquarters in Illinois and Rein would not relocate to Florida where Rein's superior worked. Instead, Rein would work out of his home in Holliston, Massachusetts; with Motorola agreeing to reimburse him for certain business expenses he incurred in operating out of his home. Rein accepted Motorola's offer and commenced working for the company on or about June 24, 2002.

9.    As a Principal in the MPS group Rein was responsible for developing, selling and delivering value-added services and solutions ("Professional Services") to Motorola's existing voice and data product customers; as well as developing relationships

with new prospective clients for Motorola. He reported to Len DeBarros ("DeBarros"), a Senior Vice President of Motorola.

10.     Despite Rein's best efforts, and the best efforts of the entire leadership team at MPS, the MPS group was unable to achieve its budgeted sales goals for the 2002 fiscal year. However, Rein's 2002 Performance Review, written by his supervisor, DeBarros, praised Rein's individual performance, noting that Rein "always meets and often exceeds predefined goals". In fact, Motorola was sufficiently impressed with Rein's individual performance that, at year's end, it awarded him stock options for an additional Four Thousand (4,000) shares of Motorola stock. Motorola also increased Rein's annual salary from $190,000 to $194,200.

11.     In February of 2003 Motorola further recognized Rein's contributions to the company by giving him its Bravo Award and Five Thousand Dollars ($5,000).

12.     In February of 2003 DeBarros' supervisor, Kevin Loosemore ("Loosemore"), Executive Vice President of Motorola and Global head of MPS left Motorola to become Chief Operating Officer of Cable & Wireless Plc. ("Cable & Wireless").

13.     As a result of Loosemore's departure in early 2003 Motorola and the company decided to reorganize the MPS group. As a result of this reorganization approximately three quarters of the initial team of MPS employees were either deployed to other operating units of Motorola or were laid off. Of the remaining employees approximately twenty six, including Rein, were assigned to Motorola's Commercial, Government, Industrial Solutions Sector ("CGISS"). DeBarros was also assigned to CGISS and became the general manager of the MPS group.

14.    In April of 2003 Motorola again recognized Rein's continuing contributions and efforts to the company by awarding him options on an additional Six Thousand Five Hundred (6,500) shares of stock.

15.    In May of 2003, DeBarros left Motorola and subsequently joined Loosemore at Cable & Wireless. For the next several months the MPS group was forced to operate with little to no guidance from Motorola's executive management.

16.    In approximately August of 2003 Motorola hired Juergen Stark ("Stark"). In addition to having management responsibility for the MPS group, Stark was also made the General Manager of the Integrated Solutions Division of CGISS ("ISD") and the head of CGISS' Strategy Organization. Initially, Stark focused his energies on these other duties. He did not meet with the MPS group until October of 2003.

17.    On October 14, 2003 Stark held his first substantive meeting with the MPS group. The purpose of this meeting was to develop a business plan for the 2004 fiscal year. The group's initial plan, which was primarily developed and presented by Kofman, one of Rein's peers, was summarily rejected by Stark. At that point Rein assumed primary responsibility for the development and presentation of a revised business plan.

18.    On October 17, 2003 Rein, and other key members of the MPS group, again met with Stark and obtained his approval of a revised business plan. During this meeting Stark told each of the members of the MPS group, all of whom were senior personnel, that he wanted them to be "excited about their future with the company" and to know that they had Motorola's full support. He assured them that they would be given until at least June 30, 2004 to demonstrate positive trends in business activity indicative

4

of the MPS group's ability to fulfill the commitments set forth in their business plan. He then warned them that if these trends were not evident by June 30th the company might be forced to make some hard decisions about the future of the MPS group.

19.     During his meetings with the MPS group, Stark also indicated that he wanted the group to designate a single person who would serve as his main contact with the group and report directly to him. Because Kofman was the only member of the group who, like Stark, worked out of Motorola's main corporate offices in Schaumburg, Illinois, Kofman was selected by his peers to fill this role.

20.     Upon conclusion of these October meetings and before the start of 2004, the MPS group was further reorganized by Stark so that only Rein, Kofman, John Gillardi ("Gillardi"), Michael Humpleby ("Humpleby") and Clay Brice ("Brice") remained. Of these five remaining employees, three - Rein, Kofman, Gillardi had a salary grade of E-15, which meant their base compensation was, by company guidelines, supposed to have been between One Hundred Seventeen Thousand and Eight Hundred Dollars ($117,800) and One Hundred Ninety Four Thousand and Two Hundred Dollars ($194,200) per year. Notwithstanding these ranges, which were established by Motorola, Kofman received a base salary in excess of Three Hundred Thousand Dollars ($300,000) per year.

21.     On January 2, 2004 Motorola paid Rein what it characterized as a "retention bonus" in the amount of Fourteen Thousand Dollars ($14,000). Kofman, told Rein he was being paid this bonus to: (i) demonstrate Motorola's gratitude for his hard work in 2003 by, providing him with a bonus comparable to what other peers within Motorola were receiving; (ii) to motivate Rein to remain with the MPS group and to

achieve the goals and objectives set forth in the 2004 business plan; and, (iii) to insure that Rein remained committed to the company and to Stark.

22.    On January 13, 2004 Rein received a performance evaluation from Kofman covering the period from DeBarros departure in May 2003 through December 2003. The performance evaluation was very positive. It noted that Rein "consistently achieves high levels of commendable performance and is recognized as highly effective by management team and key work partners". It also recognized that because of the recent re-organizations and changes in leadership "2003 was a challenging year" for the MPS group; but assured Rein that "2004 brings an opportunity for Jay's capabilities to come through more clearly and for MPS to continue to create value for CGISS". Kofman telephoned Rein in Holliston, Massachusetts to discuss and explain this performance review.

23.    At the same time that Rein was being paid a retention bonus to remain with Motorola, being praised for his "commendable performance" and being promised that in 2004 he would have the opportunity to create further value for the company, he was also being heavily recruited to serve as a Vice President of Invoke Solutions, Inc. ("Invoke") - a start-up company funded by Bain Capital and run by one of Rein's former managers.

24.    In early January Invoke formally made an offer to Rein, which included a substantial base salary, the opportunity for a six figure performance bonus, lucrative stock options and a number of other employee benefits.

25.    On January 18, 2004, based on: (i) Stark's representations that he would have until June 30th to show progress in achieving the goals set forth in the business plan

he had developed for 2004; (ii) the "retention bonus" he had just received from Motorola; (iii) Kofman's explanation of the reasons he had received this bonus; and, (iv) the favorable performance review he had just received - including Kofman's commitment that in 2004 he would have the opportunity to create further value for the company, Rein declined Invoke's offer of employment.

26.      On February 13, 2004 Stark issued a Memorandum to all Integrated Solutions Division Associates worldwide entitled "State of the Division". After congratulating the division for having "met its numbers" for that month, Stark concluded by stating that "overall it is clear that the future for CGISS and ISD is bright and that our core leadership team is energized for 2004".

27.      On February 14, 2004 Rein left on a previously scheduled and approved vacation, with plans to return to work on February 23rd.

28.      Rein returned to work on February 23rd, flying into Chicago to attend a series of meetings that had been specifically scheduled for after his vacation to insure that he would be in attendance. Upon landing in Chicago, Rein telephoned Kofman to respond to the voice-mail messages Kofman had left for him while he was on vacation. During this telephone conversation Kofman advised Rein that his employment was being terminated - effective immediately. This was the first indication Rein had received from anyone at Motorola that his employment was in jeopardy.

29.      During this telephone conversation, Kofman told Rein that there was a salary imbalance in the group and that they had decided to eliminate his position to reduce costs.

30.    That same day Rein met with Stark to discuss his termination.  Stark told
Rein that he was being terminated because there was a "salary imbalance" in the MPS
group and that Motorola intended to replace him by hiring two "less expensive"
individuals who would assume some portion of Rein's job duties.   He also informed
Rein that he had never liked the fact that Rein was based in Massachusetts.  This was the
first indication Rein has received from anyone at Motorola that the location of his office
in Holliston posed a problem for the leadership team at Motorola.

31.    Rein reminded Stark that he had previously made a commitment to the
MPS group that they would have until June 30th, 2004 to show progress towards meeting
the commitments in their business plan.  He also pointed out that only last month he had
received a positive performance review and that he had never received any warnings
about his performance.  Finally he told Stark that the reasons given for his termination
were not credible, that he felt he was being unfairly singled out, that he was concerned
that there was a potentially unlawful motivation for his termination and that he was
considering contacting an attorney.

32.    Stark responded to Rein's comments by implying/threatening that, if Rein
wanted to make an issue of it, Motorola (specifically Stark) would manufacture the
documentation necessary to support the termination of his employment based on
performance.

33.    Within days of being notified of his termination Rein began contacting
other individuals within Motorola in an effort to find an alternate position within the
company.  He also began discussing with the company what would be a fair and
appropriate severance package should he be unable to find such a position.

34.    Upon information and belief, Motorola customarily makes an effort to find alternate positions for executives whose employment has been terminated as a result of a corporate restructuring or a reduction in force. For example, Motorola holds a bi-weekly Leadership and Talent Supply meeting to discuss if there are any prospective openings in other parts of the company for which recently downsized executives might potentially be qualified. It is the responsibility of the terminated employee's supervisor to inform him of this program and forward his resume for consideration.

35.    Motorola neither told Rein about these bi-weekly Leadership and Talent Supply meetings nor forwarded his name for consideration until Rein specifically asked about the program some three weeks after he had been terminated, after having learned of its existence from a recently retired Motorola employee. Moreover, even after Rein brought this program to the attention of Peter Tobin ("Tobin"), in the company's human resources department, and indicated his desire to participate in it, Motorola delayed in forwarding Rein's name for consideration.

36.    By mid-March, Rein had neither found another position within Motorola nor come to an agreement on what would be a fair severance package. On March 18th, Stark telephoned Rein at his home and stated that he wanted to have an "off the record" conversation with Rein. Although Rein refused to agree to their conversation being "off the record" Stark continued the conversation, telling Rein that Motorola was unhappy he had not agreed to the severance package they had offered him and had refused to sign a release. Stark then stated that he was concerned Rein was going to retain a lawyer and "come after" Motorola. Stark warned Rein that he should not "burn his bridges" and threatened that if Rein retained counsel Motorola would come back at him with "an army

of lawyers" and an equal number of human resources personnel and would "take all severance packages off the table", thereby depriving Rein of even the standard severance benefits to which he was entitled.

37.    Within days of speaking to Stark, Rein learned that both Stark and Kofman were deliberately undermining his efforts to find another position within Motorola. For example, Stark told at least one Senior Vice President at Motorola that Rein did not have the necessary skills for a position he had been pursuing, despite being unfamiliar with Rein's prior background and training. Kofman also repeatedly sabotaged Rein's efforts to find a position by telling other managers at Motorola that Rein was "not a team player" and did not work well with others. It was at this time that, Rein first discovered the existence of the Leadership and Talent Supply Meetings and that neither Stark nor Kofman had forwarded his name for consideration.

38.    With both Stark and Kofman deliberately undermining his ability to find another position within Motorola, Rein's efforts ultimately proved unsuccessful.

39.    Since the termination of his employment by Motorola, effective February 23, 2004, Rein remained unemployed until October 18, 2004. Although Rein is currently employed, he is earning substantially less than he did when working for Motorola.

## COUNT I - AGE DISCRIMINATION UNDER M.G.L.c. 151B (MOTOROLA)

40.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 39 above and incorporates them by reference herein.

41.    Rein is over forty (40) years of age and a member of a class protected by the provisions of G.L.c. 151B of the Massachusetts General Laws.

42.    Rein was qualified to perform his job and was performing it in a competent and professional manner.

43.    Motorola discriminated against Rein on the basis of his age in violation of G.L.c. 151B, Section 4 by terminating his employment on or about February 23, 2004.

44.    Motorola further discriminated against Rein, in violation of G.L.c. 151B §4, by retaliating against him for expressing concern that the decision to terminate him was unlawful and indicating that he was considering contacting an attorney.

45.    Motorola further discriminated against Rein, in violation of G.L.c. 151B §4, and G.L.c. 12 §11H by attempting to coerce, intimidate, and threaten Rein into releasing any potential claims he had against Motorola under the statute.

46.    Rein filed a timely Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC").

47.    Subsequent to the expiration of ninety days after the filing of such Charge of Discrimination Rein withdrew the Charge and commenced the instant action.

48.    As a direct and proximate result of Motorola's wrongful discrimination and wrongful retaliation Rein has suffered and continues to suffer damage, including, but not limited to, lost wages, bonuses, stock options, health, disability, and pension benefits and other benefits, and substantial emotional distress.

## COUNT II – AGE DISCRIMINATION UNDER ADEA (MOTOROLA)

49.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 48 above and incorporates them by reference herein.

50.     Rein is over forty (40) years of age and a member of a class protected by the provisions of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 seq.

51.     Rein was qualified to perform his job and was performing it in a competent and professional manner.

52.     Motorola discriminated against Rein on the basis of his age in violation of 29 U.S.C. §623 by terminating his employment on or about February 23, 2004.

53.     Motorola further discriminated against Rein, in violation of 29 U.S.C. §623 and §626 by retaliating against him for expressing concern that the decision to terminate him was unlawful and indicating that he was considering contacting an attorney.

54.     Rein filed a timely Charge of Discrimination with the MCAD and the EEOC concerning Motorola's unlawful and discriminatory conduct.

55.     Subsequent to the expiration of ninety days after the filing of such Charge of Discrimination Rein withdrew the Charge and commenced the instant action.

56.     As a direct and proximate result of Motorola's wrongful discrimination and retaliation Rein has suffered and continues to suffer damage, including, but not limited to, lost wages, bonuses, stock options, health, disability, and pension benefits and other benefits, and substantial emotional distress.

**COUNT III – AGE DISCRIMINATION UNDER M.G.L.c. 151B (STARK)**

57.     Rein hereby re-alleges each of the averments contained in paragraphs 1 through 56 above and incorporates them by reference herein.

12

58.    Stark discriminated against Rein on the basis of his age in violation of G.L.c. 151B, §4 by aiding and abetting in the decision to terminate Rein's employment on or about February 23, 2004.

59.    Stark further discriminated against Rein, in violation of G.L.c. 151B §4, by retaliating against him for expressing concern that the decision to terminate him was unlawful and indicating that he was considering contacting an attorney.

60.    Stark further discriminated against Rein, in violation of G.L.c. 151B §4 and G.L.c.12 §11H by attempting to coerce, intimidate, and threaten Rein into releasing any potential claims he had against Motorola under the statute.

61.    Rein filed a timely Charge of Discrimination with the MCAD and the EEOC concerning Stark's unlawful and discriminatory conduct.

62.    Subsequent to the expiration of ninety days after the filing of such Charge of Discrimination Rein withdrew the Charge and commenced the instant action.

63.    As a direct and proximate result of Stark's wrongful discrimination and retaliation Rein has suffered and continues to suffer damage, including, but not limited to, lost wages, bonuses, stock options, health, disability, and pension benefits and other benefits, and substantial emotional distress.

## COUNT IV – AGE DISCRIMINATION UNDER M.G.L.c.151B (KOFMAN)

64.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 63 above and incorporates them by reference herein.

66.    Stark discriminated against Rein on the basis of his age in violation of G.L.c. 151B, Section 4 by aiding and abetting in the decision to terminate Rein's employment on or about February 23, 2004.

13

67.    Stark further discriminated against Rein, in violation of G.L.c. 151B §4, by retaliating against him for expressing concern that the decision to terminate him was unlawful and indicating that he was considering contacting an attorney.

68.    Stark further discriminated against Rein, in violation of G.L.c. 151B §4, and G.L.c. 12 §11H by attempting to coerce, intimidate, and threaten Rein into releasing any potential claims he had against Motorola under the statute.

69.    Rein filed a timely Charge of Discrimination with the MCAD and the EEOC concerning Stark's unlawful and discriminatory conduct.

70.    Subsequent to the expiration of ninety days after the filing of such Charge of Discrimination Rein withdrew the Charge and commenced the instant action.

71.    As a direct and proximate result of Stark's wrongful discrimination and retaliation Rein has suffered and continues to suffer damage, including, but not limited to, lost wages, bonuses, stock options, health, disability, and pension benefits and other benefits, and substantial emotional distress.

**COUNT V – BREACH OF CONTRACT (MOTOROLA)**

72.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 71 above and incorporates them by reference herein.

73.    On or about October 17, 2003 Motorola entered into an oral agreement with Rein wherein Motorola agreed that if Rein agreed to continue working at Motorola and remained committed to the company he would have until at least June 30, 2004 to demonstrate positive trends in business activity indicative of the MPS group's ability to fulfill the commitments set forth in their business plan.

74.     Rein fulfilled his obligations under the agreement by continuing to work for Motorola, devoting his best efforts to generate revenue for the company, and rejecting an offer of employment from another company.

75.     On February 23, 2004 Motorola breached its obligations under the agreement, without justification, by summarily terminating Rein's employment.

76.     As a result of Motorola's breach Rein has been damaged.

### COUNT VI – PROMISSORY ESTOPPEL (MOTOROLA)

77.     Rein hereby re-alleges each of the averments contained in paragraphs 1 through 76 above and incorporates them by reference herein.

78.     In October of 2003 Motorola made certain promises and commitments to Rein concerning the security of his employment to induce him to remain at the company, continue working and forego other potential job opportunities.

79.     In early January of 2004 Motorola paid Rein what it characterized as a "retention bonus". Rein was told by Motorola, and understood, that one of the purposes of the "retention bonus" was to induce him to remain at Motorola and the MPS group to help it achieve the goals and objectives set forth in the 2004 business plan.

80.     On January 13th, 2004, during Rein's performance review, Motorola again renewed the commitments it had made the previous October by again promising Rein that he would be given the opportunity to continue to create value for the company in 2004. Rein understood this to mean that he would have until at least June 30th to demonstrate progress towards meeting the commitments set forth in the MPS group's 2004 business plan.

81.    Rein reasonably relied on these promises and commitments, to his detriment, by declining a lucrative job offer from Invoke on January 18, 2004.

82.    On February 23, 2004 Motorola breached its promises and commitments to Rein by summarily terminating his employment without cause.

83.    As a result of Motorola's breach, Rein has been damaged.

## COUNT VII – INTERFERENCE WITH ADVANTAGEOUS RELATIONS (STARK)

84.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 83 above and incorporates them by reference herein.

85.    Rein was a full time employee of Motorola and had an ongoing advantageous relationship with the company.

86.    Stark knowingly interfered with Rein's advantageous relationship with Motorola by, inter alia.: (i) inducing the company to terminate Rein's employment; and, (ii) deliberately undermining his efforts to find another position within Motorola.

87.    Stark's interference with Rein's advantageous relations was motivated by malice, including, inter alia,: (i) an unlawful bias against Rein, based upon his age; and, (ii) a desire to punish Rein for refusing to accept Motorola's offered severance package and sign a general release, and expressing concern that there was a potentially unlawful motive for his termination.

88.    As a result of Stark's knowing and intentional interference with Rein's advantageous relationship with Motorola, Rein was terminated from his position and was unsuccessful in obtaining another position within the company.

16

## COUNT VIII - INTERFERENCE WITH
## ADVANTAGEOUS RELATIONS (KOFMAN)

89.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 88 above and incorporates them by reference herein.

90.    Rein was a full time employee of Motorola and had an ongoing advantageous relationship with the company.

91.    Kofman knowingly interfered with Rein's advantageous relationship with Motorola by, inter alia.: (i) inducing the company to terminate Rein's employment; and, (ii) deliberately undermining his efforts to find another position within Motorola.

92.    Kofman's interference with Rein's advantageous relations was motivated by malice, including, inter alia.,: (i) an unlawful bias against Rein, based upon his age; (ii) a desire to punish Rein for refusing to accept Motorola's offered severance package and sign a general release and expressing concern that there was a potentially unlawful motive for his termination; and, (iii) a desire to eliminate a peer whose underlying job performance and contributions to the company were demonstrably superior.

93.    As a result of Kofman's knowing and intentional interference with Rein's advantageous relationship with Motorola, Rein was terminated from his position and was unsuccessful in obtaining another position within the company.

## COUNT IX – INTERFERENCE WITH
## ADVANTAGEOUS RELATIONS (MOTOROLA)

94.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 83 above and incorporates them by reference herein.

95.    As a senior executive with substantial salary requirements and many years of experience, many positions for which Rein is qualified are filled by executive level

17

recruiting firms. Frequently potential positions are not even advertised, and promising candidates are first identified and then solicited by the recruiting firm.

96.     Once a recruiting firm has identified a promising executive, it is advantageous for the firm to maintain a continuing business relationship with him throughout his career. Not only can this individual potentially be recruited to fill another position, he can also be used as a point of contact with the company in which he has been placed. Recruiters therefore ordinarily attempt to maintain and cultivate their relationship with the executives they have placed.

97.     Similarly, from the executive's standpoint, it is advantageous to maintain a continuing business relationship with the recruiting firms because such firms can be instrumental is assisting the executive to find other positions or advance his career.

98.     Rein had precisely such a mutually advantageous relationship with Russell Reynolds, the company that recruited him to fill a position with Motorola, and a senior Russell Reynolds Partner, regularly contacted Rein for an update on what was happening at Motorola. On those occasions when Rein telephoned or e-mailed this Partner, his messages were usually returned within 24 hours. In fact, several weeks before Rein's employment was terminated, he was contacted by another representative of Russell Reynolds, who told him that he was meeting with Motorola. Russell Reynolds was seeking information from Rein on the various resignations, departures and reorganizations that had occurred at MPS since Rein joined Motorola in June 2004. Rein objectively presented facts to Russell Reynolds about the changes that had occurred.

99.     Since the termination of his employment by Motorola, Rein has repeatedly telephoned and e-mailed his primary contact at Russell Reynolds as part of his efforts to

find another position. Russell Reynolds has virtually ignored Rein, failed to return all of his phone calls, and been of no assistance in finding potential employment.

100.    Upon information and belief, Motorola, has knowingly interfered with Rein's advantageous relationship with Russell Reynolds.

101.    Upon information and belief, Motorola's interference with Rein's advantageous relations was motivated by malice, including, inter alia.,: (i) an unlawful bias against Rein, based upon his age; and (ii) a desire to punish Rein for refusing to sign a general release, and to retaliate against him for having filed a complaint with the MCAD.

102.    As a result of Motorola's knowing and intentional interference with Rein's advantageous relationship with Russell Reynolds, Rein efforts to find another position have been severely compromised.

## REQUESTS FOR RELIEF

WHEREFORE, Rein requests that this Court:

(i)     Enter judgment on his behalf as to Counts I through IX;

(ii)    Award him compensatory damages in an amount to be determined at trial, with respect to Count I through IX;

(iii)   Award him multiple and/or liquidated damages in an amount to be determined at trial with respect to Counts I, III and IV, pursuant to G.L.c. 151B of the Massachusetts General Laws;

(iv)    Award him multiple and/or liquidated damages in an amount to be determined at trial with respect to Count II, pursuant to 29 U.S.C. §626

(v)     Award him costs and reasonable attorney's fees, pursuant to G.L.c. 151B of the Massachusetts General Laws and 29 U.S.C. §626;

(vi)    Award him interest; and,

(vii)    Award him such other relief as the Court shall deem just and reasonable.

## PLAINTIFF DEMANDS A JURY
## TRIAL AS TO ALL ISSUES SO TRIABLE

JAY S. REIN

By his attorney,

John G. H. Coster
(BBO #101450)
92 State Street, Suite 900
Boston, Massachusetts 02109
(617) 423-2224

Dated:  November 16, 2004

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.                                    SUPERIOR COURT
                                                 C.A. No. 04-4548

|                                        |   |
|----------------------------------------|---|
| JAY S. REIN,                           | ) |
|                                        | ) |
|              Plaintiff,                | ) |
|                                        | ) |
| v.                                     | ) |
|                                        | ) |
| MOTOROLA, INC., JUERGEN                | ) |
| STARK, Individually, and CLYDE         | ) |
| KOFMAN, Individually,                  | ) |
|                                        | ) |
|              Defendants.               | ) |

**AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL**

## PARTIES

1.    Plaintiff, Jay S. Rein ("Rein") is an individual residing at 75 Johnson

Drive, Holliston, Massachusetts.

2.    Defendant, Motorola, Inc. ("Motorola") is a Delaware corporation with a

principal place of business at 1301 E. Algonquin Road, Schaumburg, Illinois.

3.    Defendant, Juergen Stark ("Stark") is an individual residing at 930 Vernon

Avenue, Glencoe, Illinois.

4.    Defendant Clyde Kofman ("Kofman") is an individual residing at 1826

Kiest Avenue, Northbrook, Illinois.

## JURISDICTION

5.    The Court has subject matter jurisdiction of this matter pursuant to G.L.c.

212 §4 of the Massachusetts General Laws.  It has personal jurisdiction over Motorola

pursuant to G.L.c. 223A §3 and personal jurisdiction over Stark and Kofman pursuant to G.L.c. 223A §3.

6.     Venue is proper pursuant to G.L.c. 223 §8(4) of the Massachusetts General Laws.

## FACTS

7.     On June 12, 2002, after utilizing Russell Reynolds, Inc., a prominent executive recruiting firm, to recruit Rein, Motorola offered him the position of Principal of North America in the Motorola Professional Services ("MPS") group. In connection with this offer Motorola agreed to pay Rein a base salary of One Hundred and Ninety Thousand Dollars ($190,000) a year, granted him stock options for Twenty Thousand (20,000) shares of Motorola stock (that vested at the rate of 25% per year over the next four years), offered him a sales incentive bonus (target) of Eighty Five Thousand Dollars ($85,000) and gave him various other health and pension benefits.

8.     Motorola further agreed that Rein would not relocate to Motorola Headquarters in Illinois and Rein would not relocate to Florida where Rein's superior worked. Instead, Rein would work out of his home in Holliston, Massachusetts; with Motorola agreeing to reimburse him for certain business expenses he incurred in operating out of his home. Rein accepted Motorola's offer and commenced working for the company on or about June 24, 2002.

9.     As a Principal in the MPS group Rein was responsible for developing, selling and delivering value-added services and solutions ("Professional Services") to Motorola's existing voice and data product customers; as well as developing relationships

2

with new prospective clients for Motorola. He reported to Len DeBarros ("DeBarros"), a
Senior Vice President of Motorola.

10.     Despite Rein's best efforts, and the best efforts of the entire leadership
team at MPS, the MPS group was unable to achieve its budgeted sales goals for the 2002
fiscal year. However, Rein's 2002 Performance Review, written by his supervisor,
DeBarros, praised Rein's individual performance, noting that Rein "always meets and
often exceeds predefined goals". In fact, Motorola was sufficiently impressed with
Rein's individual performance that, at year's end, it awarded him stock options for an
additional Four Thousand (4,000) shares of Motorola stock. Motorola also increased
Rein's annual salary from $190,000 to $194,200.

11.     In February of 2003 Motorola further recognized Rein's contributions to
the company by giving him its Bravo Award and Five Thousand Dollars ($5,000).

12.     In February of 2003 DeBarros' supervisor, Kevin Loosemore
("Loosemore"), Executive Vice President of Motorola and Global head of MPS left
Motorola to become Chief Operating Officer of Cable & Wireless Plc. ("Cable &
Wireless").

13.     As a result of Loosemore's departure in early 2003, Motorola decided to
reorganize the MPS group. As a result of this reorganization approximately three
quarters of the initial team of MPS employees were either deployed to other operating
units of Motorola or were laid off. Of the remaining employees approximately twenty
six, including Rein, were assigned to Motorola's Commercial, Government, Industrial
Solutions Sector ("CGISS"). DeBarros was also assigned to CGISS and became the
general manager of the MPS group.

3

14.     In April of 2003 Motorola again recognized Rein's continuing contributions and efforts to the company by awarding him options on an additional Six Thousand Five Hundred (6,500) shares of stock.

15.     In May of 2003, DeBarros left Motorola and subsequently joined Loosemore at Cable & Wireless. For the next several months the MPS group was forced to operate with little to no guidance from Motorola's executive management.

16.     In approximately August of 2003 Motorola hired Juergen Stark ("Stark"). In addition to having management responsibility for the MPS group, Stark was also made the General Manager of the Integrated Solutions Division of CGISS ("ISD") and the head of CGISS' Strategy Organization. Initially, Stark focused his energies on these other duties. He did not meet with the MPS group until October of 2003.

17.     On October 14, 2003 Stark held his first substantive meeting with the MPS group. The purpose of this meeting was to develop a business plan for the 2004 fiscal year. The group's initial plan, which was primarily developed and presented by Kofman, one of Rein's peers, was summarily rejected by Stark. At that point Rein assumed primary responsibility for the development and presentation of a revised business plan.

18.     On October 17, 2003 Rein, and other key members of the MPS group, again met with Stark and obtained his approval of a revised business plan. During this meeting Stark told each of the members of the MPS group, all of whom were senior personnel, that he wanted them to be "excited about their future with the company" and to know that they had Motorola's full support. He assured them that they would be given until at least June 30, 2004 to demonstrate positive trends in business activity indicative

4

of the MPS group's ability to fulfill the commitments set forth in their business plan. He then warned them that if these trends were not evident by June 30th the company might be forced to make some hard decisions about the future of the MPS group.

19.    During his meetings with the MPS group, Stark also indicated that he wanted the group to designate a single person who would serve as his main contact with the group and report directly to him. Because Kofman was the only member of the group who, like Stark, worked out of Motorola's main corporate offices in Schaumburg, Illinois, Kofman was selected by his peers to fill this role.

20.    Upon conclusion of these October meetings and before the start of 2004, the MPS group was further reorganized by Stark so that only Rein, Kofman, John Gillardi ("Gillardi"), Michael Humpleby ("Humpleby") and Clay Brice ("Brice") remained. Of these five remaining employees, three - Rein, Kofman, Gillardi had a salary grade of E-15, which meant their base compensation was, by company guidelines, supposed to have been between One Hundred Seventeen Thousand and Eight Hundred Dollars ($117,800) and One Hundred Ninety Four Thousand and Two Hundred Dollars ($194,200) per year. Notwithstanding these ranges, which were established by Motorola, Kofman received a base salary in excess of Three Hundred Thousand Dollars ($300,000) per year.

21.    On January 2, 2004 Motorola paid Rein what it characterized as a "retention bonus" in the amount of Fourteen Thousand Dollars ($14,000). Kofman, told Rein he was being paid this bonus to: (i) demonstrate Motorola's gratitude for his hard work in 2003 by, providing him with a bonus comparable to what other peers within Motorola were receiving; (ii) to motivate Rein to remain with the MPS group and to

5

achieve the goals and objectives set forth in the 2004 business plan; and, (iii) to insure that Rein remained committed to the company and to Stark.

22.     On January 13, 2004 Rein received a performance evaluation from Kofman covering the period from DeBarros departure in May 2003 through December 2003. The performance evaluation was very positive. It noted that Rein "consistently achieves high levels of commendable performance and is recognized as highly effective by management team and key work partners". It also recognized that because of the recent re-organizations and changes in leadership "2003 was a challenging year" for the MPS group; but assured Rein that "2004 brings an opportunity for Jay's capabilities to come through more clearly and for MPS to continue to create value for CGISS". Kofman telephoned Rein in Holliston, Massachusetts to discuss and explain this performance review.

23.     At the same time that Rein was being paid a retention bonus to remain with Motorola, being praised for his "commendable performance" and being promised that in 2004 he would have the opportunity to create further value for the company, he was also being heavily recruited to serve as a Vice President of Invoke Solutions, Inc. ("Invoke") - a start-up company funded by Bain Capital and run by one of Rein's former managers.

24.     In early January Invoke formally made an offer to Rein, which included a substantial base salary, the opportunity for a six figure performance bonus, lucrative stock options and a number of other employee benefits.

25.     On January 18, 2004, based on: (i) Stark's representations that he would have until June 30th to show progress in achieving the goals set forth in the business plan

6

he had developed for 2004; (ii) the "retention bonus" he had just received from Motorola; (iii) Kofman's explanation of the reasons he had received this bonus; and, (iv) the favorable performance review he had just received - including Kofman's commitment that in 2004 he would have the opportunity to create further value for the company, Rein declined Invoke's offer of employment.

26. On February 13, 2004 Stark issued a Memorandum to all Integrated Solutions Division Associates worldwide entitled "State of the Division". After congratulating the division for having "met its numbers" for that month, Stark concluded by stating that "overall it is clear that the future for CGISS and ISD is bright and that our core leadership team is energized for 2004".

27. On February 14, 2004 Rein left on a previously scheduled and approved vacation, with plans to return to work on February 23rd.

28. Rein returned to work on February 23rd, flying into Chicago to attend a series of meetings that had been specifically scheduled for after his vacation to insure that he would be in attendance. Upon landing in Chicago, Rein telephoned Kofman to respond to the voice-mail messages Kofman had left for him while he was on vacation. During this telephone conversation Kofman advised Rein that his employment was being terminated - effective immediately. This was the first indication Rein had received from anyone at Motorola that his employment was in jeopardy.

29. During this telephone conversation, Kofman told Rein that there was a salary imbalance in the group and that they had decided to eliminate his position to reduce costs.

7

30.   That same day Rein met with Stark to discuss his termination. Stark told Rein that he was being terminated because there was a "salary imbalance" in the MPS group and that Motorola intended to replace him by hiring two "less expensive" individuals who would assume some portion of Rein's job duties. He also informed Rein that he had never liked the fact that Rein was based in Massachusetts. This was the first indication Rein has received from anyone at Motorola that the location of his office in Holliston posed a problem for the leadership team at Motorola.

31.   Rein reminded Stark that he had previously made a commitment to the MPS group that they would have until June 30th, 2004 to show progress towards meeting the commitments in their business plan. He also pointed out that only last month he had received a positive performance review and that he had never received any warnings about his performance. Finally he told Stark that the reasons given for his termination were not credible, that he felt he was being unfairly singled out, that he was concerned that there was a potentially unlawful motivation for his termination and that he was considering contacting an attorney.

32.   Stark responded to Rein's comments by implying/threatening that, if Rein wanted to make an issue of it, Motorola (specifically Stark) would manufacture the documentation necessary to support the termination of his employment based on performance.

33.   Within days of being notified of his termination Rein began contacting other individuals within Motorola in an effort to find an alternate position within the company. He also began discussing with the company what would be a fair and appropriate severance package should he be unable to find such a position.

8

34.    Upon information and belief, Motorola customarily makes an effort to find alternate positions for executives whose employment has been terminated as a result of a corporate restructuring or a reduction in force. For example, Motorola holds a bi-weekly Leadership and Talent Supply meeting to discuss if there are any prospective openings in other parts of the company for which recently downsized executives might potentially be qualified. It is the responsibility of the terminated employee's supervisor to inform him of this program and forward his resume for consideration.

35.    Motorola neither told Rein about these bi-weekly Leadership and Talent Supply meetings nor forwarded his name for consideration until Rein specifically asked about the program some three weeks after he had been terminated, after having learned of its existence from a recently retired Motorola employee. Moreover, even after Rein brought this program to the attention of Peter Tobin ("Tobin"), in the company's human resources department, and indicated his desire to participate in it, Motorola delayed in forwarding Rein's name for consideration.

36.    By mid-March, Rein had neither found another position within Motorola nor come to an agreement on what would be a fair severance package. On March 18th, Stark telephoned Rein at his home and stated that he wanted to have an "off the record" conversation with Rein. Although Rein refused to agree to their conversation being "off the record" Stark continued the conversation, telling Rein that Motorola was unhappy he had not agreed to the severance package they had offered him and had refused to sign a release. Stark then stated that he was concerned Rein was going to retain a lawyer and "come after" Motorola. Stark warned Rein that he should not "burn his bridges" and threatened that if Rein retained counsel Motorola would come back at him with "an army

9

of lawyers" and an equal number of human resources personnel and would "take all severance packages off the table", thereby depriving Rein of even the standard severance benefits to which he was entitled.

37.    Within days of speaking to Stark, Rein learned that both Stark and Kofman were deliberately undermining his efforts to find another position within Motorola. For example, Stark told at least one Senior Vice President at Motorola that Rein did not have the necessary skills for a position he had been pursuing, despite being unfamiliar with Rein's prior background and training. Kofman also repeatedly sabotaged Rein's efforts to find a position by telling other managers at Motorola that Rein was "not a team player" and did not work well with others. It was at this time that, Rein first discovered the existence of the Leadership and Talent Supply Meetings and that neither Stark nor Kofman had forwarded his name for consideration.

38.    With both Stark and Kofman deliberately undermining his ability to find another position within Motorola, Rein's efforts ultimately proved unsuccessful.

39.    Since the termination of his employment by Motorola, effective February 23, 2004, Rein remained unemployed until October 18, 2004. Although Rein is currently employed, he is earning substantially less than he did when working for Motorola.

## COUNT I - AGE DISCRIMINATION UNDER M.G.L.c. 151B (MOTOROLA)

40.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 39 above and incorporates them by reference herein.

41.    Rein is over forty (40) years of age and a member of a class protected by the provisions of G.L.c. 151B of the Massachusetts General Laws.

10

42.    Rein was qualified to perform his job and was performing it in a competent and professional manner.

43.    Motorola discriminated against Rein on the basis of his age in violation of G.L.c. 151B, Section 4 by terminating his employment on or about February 23, 2004.

44.    Motorola further discriminated against Rein, in violation of G.L.c. 151B §4, by retaliating against him for expressing concern that the decision to terminate him was unlawful and indicating that he was considering contacting an attorney.

45.    Motorola further discriminated against Rein, in violation of G.L.c. 151B §4, and G.L.c. 12 §11H by attempting to coerce, intimidate, and threaten Rein into releasing any potential claims he had against Motorola under the statute.

46.    Rein filed a timely Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC").

47.    Subsequent to the expiration of ninety days after the filing of such Charge of Discrimination Rein withdrew the Charge and commenced the instant action.

48.    As a direct and proximate result of Motorola's wrongful discrimination and wrongful retaliation Rein has suffered and continues to suffer damage, including, but not limited to, lost wages, bonuses, stock options, health, disability, and pension benefits and other benefits, and substantial emotional distress.

### COUNT II – AGE DISCRIMINATION UNDER ADEA (MOTOROLA)

49.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 48 above and incorporates them by reference herein.

11

50. Rein is over forty (40) years of age and a member of a class protected by the provisions of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 seq.

51. Rein was qualified to perform his job and was performing it in a competent and professional manner.

52. Motorola discriminated against Rein on the basis of his age in violation of 29 U.S.C. §623 by terminating his employment on or about February 23, 2004.

53. Motorola further discriminated against Rein, in violation of 29 U.S.C. §623 and §626 by retaliating against him for expressing concern that the decision to terminate him was unlawful and indicating that he was considering contacting an attorney.

54. Rein filed a timely Charge of Discrimination with the MCAD and the EEOC concerning Motorola's unlawful and discriminatory conduct.

55. Subsequent to the expiration of ninety days after the filing of such Charge of Discrimination Rein withdrew the Charge and commenced the instant action.

56. As a direct and proximate result of Motorola's wrongful discrimination and retaliation Rein has suffered and continues to suffer damage, including, but not limited to, lost wages, bonuses, stock options, health, disability, and pension benefits and other benefits, and substantial emotional distress.

**COUNT III – AGE DISCRIMINATION UNDER M.G.L.c. 151B (STARK)**

57. Rein hereby re-alleges each of the averments contained in paragraphs 1 through 56 above and incorporates them by reference herein.

12

58.    Stark discriminated against Rein on the basis of his age in violation of G.L.c. 151B, §4 by aiding and abetting in the decision to terminate Rein's employment on or about February 23, 2004.

59.    Stark further discriminated against Rein, in violation of G.L.c. 151B §4, by retaliating against him for expressing concern that the decision to terminate him was unlawful and indicating that he was considering contacting an attorney.

60.    Stark further discriminated against Rein, in violation of G.L.c. 151B §4 and G.L.c.12 §11H by attempting to coerce, intimidate, and threaten Rein into releasing any potential claims he had against Motorola under the statute.

61.    Rein filed a timely Charge of Discrimination with the MCAD and the EEOC concerning Stark's unlawful and discriminatory conduct.

62.    Subsequent to the expiration of ninety days after the filing of such Charge of Discrimination Rein withdrew the Charge and commenced the instant action.

63.    As a direct and proximate result of Stark's wrongful discrimination and retaliation Rein has suffered and continues to suffer damage, including, but not limited to, lost wages, bonuses, stock options. health, disability, and pension benefits and other benefits, and substantial emotional distress.

### COUNT IV – AGE DISCRIMINATION UNDER M.G.L.c.151B (KOFMAN)

64.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 63 above and incorporates them by reference herein.

65.    Kofman discriminated against Rein on the basis of his age in violation of G.L.c. 151B, Section 4 by aiding and abetting in the decision to terminate Rein's employment on or about February 23, 2004.

13

66.    Kofman further discriminated against Rein, in violation of G.L.c. 151B §4, by retaliating against him for expressing concern that the decision to terminate him was unlawful and indicating that he was considering contacting an attorney.

67.    Kofman further discriminated against Rein, in violation of G.L.c. 151B §4, and G.L.c. 12 §11H by attempting to coerce, intimidate, and threaten Rein into releasing any potential claims he had against Motorola under the statute.

68.    Rein filed a timely Charge of Discrimination with the MCAD and the EEOC concerning Kofman's unlawful and discriminatory conduct.

69.    Subsequent to the expiration of ninety days after the filing of such Charge of Discrimination Rein withdrew the Charge and commenced the instant action.

70.    As a direct and proximate result of Kofman's wrongful discrimination and retaliation Rein has suffered and continues to suffer damage, including, but not limited to, lost wages, bonuses, stock options, health, disability, and pension benefits and other benefits, and substantial emotional distress.

## COUNT V – BREACH OF CONTRACT (MOTOROLA)

71.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 70 above and incorporates them by reference herein.

72.    On or about October 17, 2003 Motorola entered into an oral agreement with Rein wherein Motorola agreed that if Rein agreed to continue working at Motorola and remained committed to the company he would have until at least June 30, 2004 to demonstrate positive trends in business activity indicative of the MPS group's ability to fulfill the commitments set forth in their business plan.

14

73.     Rein fulfilled his obligations under the agreement by continuing to work for Motorola, devoting his best efforts to generate revenue for the company, and rejecting an offer of employment from another company.

74.     On February 23, 2004 Motorola breached its obligations under the agreement, without justification, by summarily terminating Rein's employment.

75.     As a result of Motorola's breach Rein has been damaged.

## COUNT VI – PROMISSORY ESTOPPEL (MOTOROLA)

76.     Rein hereby re-alleges each of the averments contained in paragraphs 1 through 75 above and incorporates them by reference herein.

77.     In October of 2003 Motorola made certain promises and commitments to Rein concerning the security of his employment to induce him to remain at the company, continue working and forego other potential job opportunities.

78.     In early January of 2004 Motorola paid Rein what it characterized as a "retention bonus". Rein was told by Motorola, and understood, that one of the purposes of the "retention bonus" was to induce him to remain at Motorola and the MPS group to help it achieve the goals and objectives set forth in the 2004 business plan.

79.     On January 13th, 2004, during Rein's performance review, Motorola again renewed the commitments it had made the previous October by again promising Rein that he would be given the opportunity to continue to create value for the company in 2004. Rein understood this to mean that he would have until at least June 30th to demonstrate progress towards meeting the commitments set forth in the MPS group's 2004 business plan.

80.    Rein reasonably relied on these promises and commitments, to his detriment, by declining a lucrative job offer from Invoke on January 18, 2004.

81.    On February 23, 2004 Motorola breached its promises and commitments to Rein by summarily terminating his employment without cause.

82.    As a result of Motorola's breach, Rein has been damaged.

## COUNT VII – INTERFERENCE WITH ADVANTAGEOUS RELATIONS (STARK)

83.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 82 above and incorporates them by reference herein.

84.    Rein was a full time employee of Motorola and had an ongoing advantageous relationship with the company.

85.    Stark knowingly interfered with Rein's advantageous relationship with Motorola by, inter alia: (i) inducing the company to terminate Rein's employment; and, (ii) deliberately undermining his efforts to find another position within Motorola.

86.    Stark's interference with Rein's advantageous relations was motivated by malice, including, inter alia,: (i) an unlawful bias against Rein, based upon his age; and, (ii) a desire to punish Rein for refusing to accept Motorola's offered severance package and sign a general release, and expressing concern that there was a potentially unlawful motive for his termination.

87.    As a result of Stark's knowing and intentional interference with Rein's advantageous relationship with Motorola, Rein was terminated from his position and was unsuccessful in obtaining another position within the company.

16

## COUNT VIII - INTERFERENCE WITH
## ADVANTAGEOUS RELATIONS (KOFMAN)

88.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 87 above and incorporates them by reference herein.

89.    Rein was a full time employee of Motorola and had an ongoing advantageous relationship with the company.

90.    Kofman knowingly interfered with Rein's advantageous relationship with Motorola by, inter alia.: (i) inducing the company to terminate Rein's employment; and, (ii) deliberately undermining his efforts to find another position within Motorola.

91.    Kofman's interference with Rein's advantageous relations was motivated by malice, including, inter alia..: (i) an unlawful bias against Rein, based upon his age; (ii) a desire to punish Rein for refusing to accept Motorola's offered severance package and sign a general release and expressing concern that there was a potentially unlawful motive for his termination; and, (iii) a desire to eliminate a peer whose underlying job performance and contributions to the company were demonstrably superior.

92.    As a result of Kofman's knowing and intentional interference with Rein's advantageous relationship with Motorola, Rein was terminated from his position and was unsuccessful in obtaining another position within the company.

## COUNT IX – INTERFERENCE WITH
## ADVANTAGEOUS RELATIONS (MOTOROLA)

93.    Rein hereby re-alleges each of the averments contained in paragraphs 1 through 92 above and incorporates them by reference herein.

94.    As a senior executive with substantial salary requirements and many years of experience, many positions for which Rein is qualified are filled by executive level

recruiting firms. Frequently potential positions are not even advertised, and promising candidates are first identified and then solicited by the recruiting firm.

95.    Once a recruiting firm has identified a promising executive, it is advantageous for the firm to maintain a continuing business relationship with him throughout his career. Not only can this individual potentially be recruited to fill another position, he can also be used as a point of contact with the company in which he has been placed. Recruiters therefore ordinarily attempt to maintain and cultivate their relationship with the executives they have placed.

96.    Similarly, from the executive's standpoint, it is advantageous to maintain a continuing business relationship with the recruiting firms because such firms can be instrumental is assisting the executive to find other positions or advance his career.

97.    Rein had precisely such a mutually advantageous relationship with Russell Reynolds, the company that recruited him to fill a position with Motorola, and a senior Russell Reynolds Partner, regularly contacted Rein for an update on what was happening at Motorola. On those occasions when Rein telephoned or e-mailed this Partner, his messages were usually returned within 24 hours. In fact, several weeks before Rein's employment was terminated, he was contacted by another representative of Russell Reynolds, who told him that he was meeting with Motorola. Russell Reynolds was seeking information from Rein on the various resignations, departures and reorganizations that had occurred at MPS since Rein joined Motorola in June 2004. Rein objectively presented facts to Russell Reynolds about the changes that had occurred.

98.    Since the termination of his employment by Motorola, Rein has repeatedly telephoned and e-mailed his primary contact at Russell Reynolds as part of his efforts to

18

find another position. Russell Reynolds has virtually ignored Rein, failed to return all of his phone calls, and been of no assistance in finding potential employment.

99.    Upon information and belief, Motorola, has knowingly interfered with Rein's advantageous relationship with Russell Reynolds.

100.    Upon information and belief, Motorola's interference with Rein's advantageous relations was motivated by malice, including, inter alia,: (i) an unlawful bias against Rein, based upon his age; and (ii) a desire to punish Rein for refusing to sign a general release, and to retaliate against him for having filed a complaint with the MCAD.

101.    As a result of Motorola's knowing and intentional interference with Rein's advantageous relationship with Russell Reynolds, Rein efforts to find another position have been severely compromised.

## REQUESTS FOR RELIEF

WHEREFORE, Rein requests that this Court:

(i)    Enter judgment on his behalf as to Counts I through IX;

(ii)    Award him compensatory damages, including damages for emotional distress to the extent that such damages are recoverable, in an amount to be determined at trial, with respect to Count I through IX;

(iii)    Award him multiple and/or liquidated damages in an amount to be determined at trial with respect to Counts I, III and IV, pursuant to G.L.c. 151B of the Massachusetts General Laws;

(iv)    Award him multiple and/or liquidated damages in an amount to be determined at trial with respect to Count II, pursuant to 29 U.S.C. §626

(v)    Award him costs and reasonable attorney's fees, pursuant to G.L.c. 151B of the Massachusetts General Laws and 29 U.S.C. §626;

(vi)    Award him interest; and,

19

(vii)    Award him such other relief as the Court shall deem just and reasonable.

**PLAINTIFF DEMANDS A JURY
TRIAL AS TO ALL ISSUES SO TRIABLE**

JAY S. REIN

By his attorney,

John G. H. Coster
(BBO #101450)
92 State Street, Suite 900
Boston, Massachusetts 02109
(617) 423-2224

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the this document was served on each of the above named defendants by first class mail on November 24, 2004.

John G. H. Coster