## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAY S. REIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 04-12580 NG |
| | ) | |
| MOTOROLA, INC., CLYDE KOFMAN | ) | |
| and JUERGEN STARK | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AFFIDAVIT OF KRISTIN GLENNAN McGURN

I, Kristin Glennan McGurn ("McGurn"), declare under penalty of perjury:

1.      I am a member of the Bar of this Court and a member of the firm of Seyfarth Shaw LLP, attorneys for Motorola, Inc., Clyde Kofman and Juergen Stark (collectively, "Defendants") in the above-captioned case. This affidavit is based on my personal knowledge in support of the Defendants' Motion to Compel Plaintiff's Continued Deposition and for Sanctions.

2.      Annexed hereto as Exhibit A is a true and correct copy of Jay Rein's ("Rein") Employment Agreement dated June 24, 2002.

3.      Annexed hereto as Exhibit B is a true and correct copy of February 25, 2004 email from Rein to Peter Tobin regarding return of the laptop.

4.      Annexed hereto as Exhibit C is a true and correct copy of excerpts of the August 16, 2005 deposition of Jay S. Rein.

5.      Annexed hereto as Exhibit D is a true and correct copy of excerpts of Motorola's discovery requests to the Plaintiff.

6.      Annexed hereto as Exhibit E is a true and correct copy of August 16, 2005 McGurn letter to John Coster ("Coster") demanding Rein's return of the Motorola laptop.

7.    Annexed hereto as <u>Exhibit F</u> is a true and correct copy of August 19, 2005 Coster letter resisting Motorola's request for return of the laptop and citing shipping costs as an impediment to the laptop's return.

8.    Annexed hereto as <u>Exhibit G</u> is a true and correct copy of August 22, 2005 McGurn letter to Coster demanding Rein's return of his Motorola laptop, with shipping instructions.

9.    Annexed hereto as <u>Exhibit H</u> is a true and correct copy of the Evidence Control and Chain of Custody communications concerning the receipt and handling of the Motorola laptop returned by Rein.

10.    Annexed hereto as <u>Exhibit I</u> is a true and correct copy of Motorola's MIPS INDC2005-06-0001 Final Report.

11.    Annexed hereto as <u>Exhibit J</u> is a true and correct copy of October 14, 2005 McGurn letter to Coster requesting an explanation as to the condition of the laptop.

12.    Annexed hereto as <u>Exhibit K</u> is a true and correct copy of Rein's Notice of Continued Deposition scheduled for October 27, 2005.

13.    Annexed hereto as <u>Exhibit L</u> is a true and correct copy of Rein's July 1, 2002 Motorola Award Agreement.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 31st day of October, 2005 at Boston, Massachusetts.

KRISTIN GLENNAN MCGURN

2

BO1 15744768 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JAY S. REIN                   )
                                       )
                Plaintiff,        )
                                         )
v.                                        )    CIVIL ACTION NO. 04-12580 NG
                                         )
MOTOROLA, INC., CLYDE KOFMAN     )
and JUERGEN STARK            )
                                         )
                Defendants.      )
                                         )

## AFFIDAVIT OF KRISTIN GLENNAN McGURN

I, Kristin Glennan McGurn ("McGurn"), declare under penalty of perjury:

1.    I am a member of the Bar of this Court and a member of the firm of Seyfarth Shaw LLP, attorneys for Motorola, Inc., Clyde Kofman and Juergen Stark (collectively, "Defendants") in the above-captioned case. This affidavit is based on my personal knowledge in support of the Defendants' Opposition to Plaintiff's Motion to Compel.

2.    Plaintiff did not serve a Request for Inspection pursuant to Rule 34 prior to filing his Motion to Compel.

3.    Upon receipt of Plaintiff's Motion, I contacted Plaintiff's counsel to attempt to reach a satisfactory resolution regarding additional discovery concerning the laptop computer used by the Plaintiff during his employment with Motorola (the "Laptop").

4.    A week passed before Plaintiff's counsel was able to discuss the Motion. I then offered Plaintiff's counsel a mirror image of the Laptop's hard drive, but he rejected the proposal. He persisted in demanding the discovery that his Motion seeks.

5.    Annexed hereto as Exhibit A is a true and correct copy of a letter dated February 27, 2006 from Kristin G. McGurn to John G.H. Coster.

6.    Annexed hereto as <u>Exhibit B</u> is a true and correct copy of excerpts of the deposition of Jay S. Rein.

7.    Annexed hereto as <u>Exhibit C</u> is a true and correct copy of Exhibit 3 to Plaintiff's deposition, comprising Plaintiff's Employment Agreement requiring return of the Laptop.

8.    Annexed hereto as <u>Exhibit D</u> is a true and correct copy of an excerpt of Exhibit 44 to Plaintiff's Deposition, comprising an email in which he acknowledged his obligation to return the Laptop.

9.    Annexed hereto as <u>Exhibit E</u> is a true and correct copy of an excerpt of Exhibit 9 to Plaintiff's deposition, comprising his Option Award Agreement.

10.    Annexed hereto as <u>Exhibit F</u> is a true and correct copy of Exhibit 29 to Plaintiff's deposition, comprising Plaintiff's email to Invoke dated January 18, 2004 sent from the Laptop.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 24th day of March, 2006 at Boston, Massachusetts.

_____

KRISTIN GLENNAN MCGURN

BO1 15769381.1

# EXHIBIT A

# SEYFARTH
### ATTORNEYS SHAW LLP

World Trade Center East

Two Seaport Lane

Suite 300

Boston, MA  02210-2028

617-946-4800

fax 617-946-4801

www.seyfarth.com

Writer's direct phone
617-946-4858

Writer's e-mail
kmcgurn@seyfarth.com

February 27, 2006

**VIA FACSIMILE**
(617) 338-0919

John G.H. Coster, Esq.
92 State Street
Suite 900
Boston, Massachusetts 02109

Re:    *Jay S. Rein v. Motorola, Inc., Clyde Kofman and Juergen Stark*
        United States District Court, C.A. No. 04-12580 NG

Dear John:

I was surprised by the tone and content of your February 23, 2006 letter.  You profess to be "dumbfounded" by Motorola's February 17, 2006 correspondence.  In it, Motorola merely insisted that you clarify your intentions, and comply with applicable rules of procedure, if you intend to attempt to pursue additional discovery in this action.  I disagree with your characterizations of Motorola's request as "fundamentally irrational," and am confident that the Court would also.

In order to evaluate your requests for additional discovery, especially since discovery closed months ago and this case is poised for filing summary judgment motions, Motorola unquestionably was entitled to understand its nature and scope.  For example, Motorola deserved to understand whether one or more witnesses would need to be designated, based on the categories of testimony that you identified pursuant to Rule 30(b)(6).  I note that those categories have expanded markedly since you initially suggested that you might attempt to pursue additional discovery relating to Motorola's laptop.  Moreover, since Motorola has no doubt that the damage to its laptop computer occurred while it was in Mr. Rein's possession, Motorola understandably is cautious about relinquishing control of its property to him.  Motorola is entitled to know whether he has in fact engaged an expert to assist in some purported examination of the computer.  You unreasonably continue to ignore Motorola's request for this information.

As you know, Motorola's obtained further testimony from Mr. Rein regarding its laptop because the Court granted Defendants' Motion to Compel, based on overwhelming forensic and other evidence, which remains unrebutted, that he destroyed relevant evidence stored on it.  In

BRUSSELS

WASHINGTON, D.C.

SAN FRANCISCO

SACRAMENTO

NEW YORK

LOS ANGELES

HOUSTON

CHICAGO

BOSTON

ATLANTA



contrast, Mr. Rein's fictitious musings about alternative explanations for the data's destruction and the computer's condition are illogical and not credible, lack factual foundation, and do not warrant the discovery that you seek. Further, to the extent that you believed that such discovery would have been beneficial or necessary, you were free to seek it in a timely fashion such as in connection with the parties' joint motion to extend the discovery deadline for certain discovery events, or the motion to compel. You did not.

Under the circumstances, Motorola objects to your discovery requests, which collectively are vague, overbroad, duplicative, unduly burdensome and expensive, harassing, and which call for information that is not reasonably calculated to lead to the discovery of admissible evidence. If you intend to pursue the discovery as you have outlined it, Motorola will be forced to seek the court's intervention. I am available, however, if you would like to discuss and attempt to reconcile the parties' respective positions.

Very truly yours,

SEYFARTH SHAW LLP

Kristin G. McGurn

cc:     Manuel Cuevas. Esq.

P. 1

* * * COMMUNICATION RESULT REPORT ( FEB. 27. 2006 5:12PM ) * * *

FAX HEADER 1:
FAX HEADER 2:

TRANSMITTED/STORED : FEB. 27. 2006 5:05PM

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
|---|---|---|---|---|---|
| 9892 | MEMORY TX | | 6173380919 | OK | 3/3 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL
E-2) BUSY
E-3) NO ANSWER
E-4) NO FACSIMILE CONNECTION

SEYFARTH SHAW LLP
ATTORNEYS

World Trade Center East
Two Seaport Lane
Suite 300
Boston, MA 02210-2028
(617) 946-4800
Fax (617) 946-4801
www.seyfarth.com

# Facsimile Transmission

Date: February 27, 2006

| RECIPIENT | COMPANY | PHONE NO. | FAX NO. |
|---|---|---|---|
| John G. H. Coster, Esq. | Law Offices | 617-423-2224 | 617-338-0919 |

FROM: Kristin G. McGurn
PHONE: 617-946-4858
RE:
REPLY FAX NO.: (617) 946-4801

File No: 11726-000600 Number of Pages, Including Cover: 3

☐ Hard copy to follow
☐ Per your request
☐ Please telephone me
☒ Hard copy will not follow
☐ Please review and revise if necessary

MESSAGE:

THE INFORMATION CONTAINED IN THIS FACSIMILE IS CONFIDENTIAL AND MAY ALSO CONTAIN PRIVILEGED ATTORNEY-CLIENT INFORMATION OR WORK PRODUCT. THE INFORMATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THE FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ADDRESS ABOVE VIA THE U.S. POSTAL SERVICE. THANK YOU.

ANY TAX INFORMATION OR WRITTEN TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED TO BE AND CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER. (THE FOREGOING LEGEND HAS BEEN AFFIXED PURSUANT TO U.S. TREASURY REGULATIONS GOVERNING TAX PRACTICE.)

If you do not receive all the pages, please phone (617) 946-4800 as soon as possible.

BO1 15718444.1

# EXHIBIT B

Jay Stuart Rein                                          8/16/05

```
 1                           Volume:   I

 2                           Pages:    1-225

 3                           Exhibits: 1-14

 4              UNITED STATES DISTRICT COURT

 5          FOR THE DISTRICT OF MASSACHUSETTS

 6             Civil Action No. 04-12580 NG

 7     - - - - - - - - - - - - - - - - - - - - - x

 8   Jay S. Rein,

 9                     Plaintiff,

10       v.

11   Motorola, Inc., Clyde Kofman,

12   and Juergen Stark,

13                     Defendants.

14     - - - - - - - - - - - - - - - - - - - - - x

15

16           DEPOSITION OF JAY STUART REIN

17            Tuesday, August 16, 2005

18                  10:23 a.m.

19              SEYFARTH SHAW LLP

20            World Trade Center East

21           Two Seaport Lane, Suite 300

22          Boston, Massachusetts 02210-2028

23

24   Reporter:  Lori-Ann London, RPR
```

    1        Q    Did you produce any documents in

    2   response to Motorola's request for the production

    3   of documents in connection with this case?

    4        A    I believe so, yes.

    5        Q    Okay.  Where did you search for

    6   documents in order to do that?

    7        A    I went back to past tax records, went

    8   back to past pay stubs.  That's about all I

    9   recall.

   10        Q    Okay.  Did you produce any -- do you

   11   recall producing any other documents besides some

   12   pay stubs and tax records?

   13        A    I believe I produced copies of e-mails.

   14        Q    Where did you obtain those e-mails from?

   15        A    They were copies that I had in my files.

   16        Q    Where were those files located?

   17        A    Computer.

   18        Q    Okay.  Did you have a computer from

   19   Motorola which you used for the purpose of your

   20   employment with the company?

   21        A    Yes.

   22        Q    And is that the computer on which you

   23   searched for e-mails?

   24        A    Yes.

1       Q    Do you still have that computer?

2       A    Yes.

3       Q    Okay.  Did you produce anything aside

4    from past tax records, pay stubs, and copies of

5    e-mails?

6       A    I don't think so.

7       Q    Okay.  Did you search anywhere other

8    than on your computer for documents in response to

9    that request?

10       A    I may have searched for benefits books

11    or, you know, any policy or procedure documents

12    that may have been provided to me.

13       Q    And where would you have maintained

14    those?

15       A    If I was given them by Motorola, I would

16    have maintained them in a file, a personal file.

17       Q    During your employment with Motorola,

18    you worked from your home at Holliston; is that

19    correct?

20       A    Yes.

21       Q    Was that true for the entire tenure at

22    Motorola?

23       A    When I wasn't on site at Motorola,

24    correct.

```
 1        Q     Did you retain -- aside from the

 2   documents that you've described, that being copies

 3   of e-mails and benefits information, do you recall

 4   retaining any Motorola documents following your

 5   departure from the company?

 6        A     Can you define Motorola documents?

 7        Q     Any documents that you received or sent,

 8   you know, were to or from Motorola, pertaining to

 9   your employment?

10        A     Pertaining to my employment?

11        Q     Um-hm.

12        A     I don't think so.

13        Q     Okay.  Do you recall any other --

14   retaining any other documents following your

15   departure from Motorola that were sent to Motorola

16   or received by you from Motorola whether or not

17   they pertained to your employment?

18        A     Yes.

19        Q     What are those documents?

20        A     I believe I have some PowerPoint

21   presentations presented to Stark on or around

22   October 14th and again on October 17th.

23        Q     And did you maintain those also on your

24   computer?
```

Jay Stuart Rein, Vol. 1                          8/16/05
                                                 Page 33

     1      A    I'm sure they're there.

     2      Q    Okay.  Did you retain them also in hard

     3   copy?

     4      A    Yes.

     5      Q    The computer on which these PowerPoint

     6   presentations are maintained, is that the same

     7   Motorola computer that you used during your

     8   Motorola employment?

     9      A    Yes.

    10      Q    Did you have an agreement with anyone to

    11   return Motorola's computer upon your termination?

    12      A    No.

    13      Q    Did you have any communications with

    14   anyone at Motorola regarding the return of that

    15   computer?

    16      A    No.

    17      Q    Did you undertake the search personally

    18   for documents responsive to Motorola's request for

    19   the production of documents on that computer?

    20      A    When Motorola's request for documents

    21   from that computer came through, the computer was

    22   inactive.

    23      Q    Why is that?

    24      A    I do not know.  I assume that Motorola

     1                    MR. COSTER:  Objection.

     2        A    I'd have to spend some time reading it

     3    if you want to --

     4        Q    Okay.  Did you in fact solicit or induce

     5    colleagues to leave Motorola after you left the

     6    company?

     7        A    I did not personally solicit anybody to

     8    leave the company.

     9        Q    Did you encourage them to look for

    10    employment outside of Motorola?

    11        A    I did not encourage them to look for

    12    employment outside of Motorola.

    13        Q    Did you communicate in any way with

    14    former colleagues about departing from Motorola,

    15    their departing from Motorola?

    16                    MR. COSTER:  Objection.

    17        A    I did not communicate with them about

    18    them departing from Motorola.

    19        Q    Did you have any communications with

    20    former colleagues about opportunities outside of

    21    Motorola?

    22        A    I may have forwarded from time to time

    23    information forwarded to me about opportunities

    24    available.

```
 1        Q      To whom did you forward such

 2   information?

 3        A      I don't recall all communications.

 4        Q      Do you recall any specific

 5   communications with any particular person about

 6   that issue?

 7        A      There may have been communications sent

 8   to any one of a number of ex-MPS colleagues of

 9   mine.

10        Q      Who are those colleagues?

11        A      Ex-colleagues.

12        Q      Um-hm.

13               MR. COSTER:  Objection.  Are you

14   asking who he communicated with or who he may have

15   communicated with or who his ex-colleagues are?

16               MS. McGURN:  I'm asking if he

17   recalls communications with any number of

18   ex-colleagues, which is the way you described

19   it --

20        A      Um-hm.  And my answer was yes, I may

21   have forwarded communications to ex-colleagues.

22        Q      Do you recall any specifically?

23        A      I recall sending communications.  If I

24   receive a communication someone has a job
```

 1    opportunity, I forward it on and that's it.  So I

 2    didn't save messages.  I don't know exactly when

 3    or who it was forwarded to.

 4         Q    Okay.  Do you have a recall that you did

 5    in fact -- you have a recall that you did in fact

 6    forward such communications back to Motorolans?

 7         A    For 20 years when job opportunities come

 8    to me it's fairly standard practice to keep

 9    friends in the recruiting industry, do you know of

10    anybody that might be interested.  I don't know

11    but I will forward a communication on if these

12    people are willing to accept it.

13         Q    And you did that following your

14    termination at Motorola?

15         A    Um-hm.

16         Q    Okay.  Did you have an understanding of

17    the range of compensation for principals at MPS

18    when you joined the company?

19         A    When I joined the company?

20         Q    Um-hm.

21         A    No.  You mean prior to when I joined --

22    when I joined the company means what date?

23         Q    Upon joining the company in June of

24    2002, did you have an understanding of the range

Jay Stuart Rein, Vol. 1                                        8/16/05
                                                              Page 165

    1        Q    But you don't specifically recall?

    2        A    I don't -- I don't recall what was on my

    3   calendar back then.

    4        Q    Do you have a calendar from back then?

    5        A    I had a calendar on their system.

    6        Q    Okay.  And do you currently maintain a

    7   calendar?

    8             MR. COSTER:  For his current job?

    9             MS. McGURN:   Yeah.

   10        A    I maintain an electronic calendar --

   11        Q    Okay.

   12        A    -- for as long as they've been around.

   13        Q    So during the time period of your

   14   Motorola employment you maintained your calendar

   15   electronically?

   16        A    Yes.

   17        Q    Okay.  And in your calendar do you

   18   record -- personally record for yourself meetings?

   19        A    Record meetings.  What does that mean?

   20        Q    Reflect meetings in your calendar.

   21        A    You mean scheduled?

   22        Q    Um-hm.

   23        A    I believe so.

   24        Q    Does anyone do that work for you?

591

1                                    VOLUME: III

2                                    PAGES: 591-846

CERTIFIED ORIGINAL
3          LEGALINK BOSTON            EXHIBITS: 50-55

4

5               UNITED STATES DISTRICT COURT

6            FOR THE DISTRICT OF MASSACHUSETTS

7     - - - - - - - - - - - - - - - - - x

8     JAY S. REIN,

9                         Plaintiff,

10       v.                                Civil Action

11    MOTOROLA, INC., CLYDE KOFMAN,        No. 04-12580 NG

12    and JUERGEN STARK,

13                         Defendants.

14    - - - - - - - - - - - - - - - - - x

15

16       CONTINUED DEPOSITION of JAY STUART REIN

17                   January 13, 2006

18                      9:15 a.m.

19                  Seyfarth Shaw LLP

20               World Trade Center East

21                   Two Seaport Lane

22               Boston, Massachusetts

23

24       Reporter: Michael D. O'Connor, RPR

Jay Stuart Rein, Vol. 3                          01/13/2006

595

1    August 26th?

2         A.    Yes, it was.

3         Q.    Do you recall when in June you received the

4    laptop in relation to your start?

5         A.    It was probably June 22 or 23rd.  It was

6    either the first or second day of my employment.

7         Q.    And you used that laptop throughout your

8    employment with Motorola?

9         A.    Yes, I did.

10        Q.    And after your termination with Motorola?

11             MR. COSTER:  Objection.

12        A.    After the date I was notified I was

13   terminated, I still used that laptop, yes.

14        Q.    Who issued it to you?  Who did you receive

15   it from?

16        A.    I do not recall.

17        Q.    Was it from someone in HR or from someone

18   in NPS?

19        A.    I do not recall.

20        Q.    At that time you knew you would be working

21   remotely from your home in Holliston?

22        A.    Yes.

23        Q.    And Motorola knew that as well?

24        A.    Yes.

597

1       Q.    Was it Microsoft Office that had been

2   utilized by the company and installed on your

3   computer?  Is that the suite you're referring to?

4             MR. COSTER:   Objection.

5       A.    Yes.  It's PowerPoint, Excel, Outlook.  I

6   don't know whether we used Office or XP or NT, but

7   it was a Microsoft platform.

8       Q.    And those were installed locally on your

9   laptop?

10      A.    I don't know where they were installed.

11  They were on the laptop when it was given to me.

12      Q.    And those were applications, with the

13  exception of Outlook, that you could use without

14  accessing Motorola servers?

15      A.    When I had the laptop and it was a

16  functioning laptop, I could use PowerPoint, Excel,

17  Word, Visio, without access to Motorola, correct.

18      Q.    And you did?

19      A.    While I was employed with Motorola, yes.

20      Q.    What is Visio?

21      A.    Visio is like a -- I don't know how to

22  describe it.  It allowed me to create org. charts

23  and presentations easier than you could create with

24  PowerPoint.

Jay Stuart Rein, Vol. 3                        01/13/2006

600

1        A.    Because we saved folders out to that

2   directory for review by others.

3        Q.    When you say "we," to whom are you

4   referring?

5        A.    To colleagues of Motorola Professional

6   Services.

7        Q.    Do you recall saving folders to that

8   directory for use by others within Motorola

9   Professional Services?

10       A.    Yes.

11       Q.    What do you recall saving to that

12  directory?

13       A.    When Len DeBarros was running the

14  organization, we had, I think, either monthly or

15  quarterly reviews with him in Fort Lauderdale, and

16  we were asked to drop our presentations for those

17  reviews onto that server before we arrived in town

18  so that whoever was gathering up all the

19  presentations could consolidate them for one big

20  presentation.

21       Q.    Do you recall storing any other documents

22  on that directory?

23       A.    No.

24       Q.    So aside from those documents, the storage

Jay Stuart Rein, Vol. 3                    01/13/2006

601

1    that you did occurred on your hard drive?

2         A.    Correct.

3         Q.    Did you receive instructions from anyone at

4    Motorola about the use of that computer?

5         A.    Can you define "instructions"?

6              MR. COSTER:  Objection.

7         Q.    Did anyone tell you how to turn it on and

8    start it up when you initially started employment

9    with Motorola?

10        A.    How to turn it on and start it up, no.

11        Q.    You knew how to deal with that on your own?

12        A.    Yes.  Someone probably showed me -- someone

13   did show me how to dial on to the Motorola network

14   while I wasn't in a Motorola facility with the

15   laptop.

16        Q.    Who was that?

17        A.    I do not recall.

18        Q.    Was it somebody from the IT department?

19        A.    I honestly don't recall.

20        Q.    Do you recall them showing you anything

21   else about the laptop?

22        A.    No.  It was basically how to connect.

23        Q.    Did you have any assistance setting up the

24   home office?

Jay Stuart Rein, Vol. 3                        01/13/2006

626

1    access?

2        A.    I do not know.

3        Q.    Do you recall utilizing documents prepared

4    by anyone else at Motorola which you considered to

5    be sensitive and proprietary?

6        A.    That's a different question.

7        Q.    Will you answer it?

8              MR. COSTER:   Just answer.

9        A.    Restate the question.

10       Q.    Do you recall ever accessing or utilizing

11   documents prepared by anyone else at Motorola that

12   contained information that you considered to be

13   sensitive or proprietary?

14       A.    I utilized material sent to me by other

15   Motorola colleagues that was material being

16   developed on behalf of Motorola to drive Motorola

17   business, which would, therefore, be sensitive and

18   proprietary to Motorola.

19       Q.    Okay.  Did you use your laptop for work

20   with Motorola daily while employed there?

21       A.    Yes.

22       Q.    Did you use it to prepare client materials,

23   materials for clients?

24       A.    Yes.

Jay Stuart Rein, Vol. 3                                01/13/2006

629

1    access to that computer.

2        Q.    Okay.  But you recall inquiring of IT to

3    take a look at your laptop at any point?

4        A.    On this specific laptop, I do not recall if

5    I did or didn't.

6        Q.    And you don't recall giving anyone else

7    access, authorized or otherwise, to the laptop; is

8    that fair?

9        A.    I never gave anybody that wasn't authorized

10   access to that computer.

11       Q.    When you last used the computer, company

12   confidential documents resided on the hard drive,

13   right?

14            MR. COSTER:   Objection.

15       A.    When I last used the computer, there were

16   presentations -- as we listed out before, there were

17   presentation materials to customers, presentation

18   materials, forecast materials, quarterly reports and

19   other documents similar on the computer.

20       Q.    Let's go through them.  What do you recall

21   specifically was on the hard drive relating to

22   presentations for customers?

23       A.    I can't recall specifics that were on the

24   hard drive, but I saved materials on the hard drive

Jay Stuart Rein, Vol. 3                                01/13/2006

632

1   minutes in it, save the document, come back to it,

2   complete it, send it off.  So if that 45-minute

3   effort is considered a draft for you, then there was

4   a draft which got replaced by a final.

5        Q.    Are you aware of similar drafts of the

6   client presentations that you previously testified

7   about being prepared on that laptop?

8             MR. COSTER:  Objection.

9        A.    Again, a client -- to create a client

10  presentation takes thinking.  You start with a blank

11  slate, with a blank PowerPoint presentation, and you

12  think and you put something down.  You save it, you

13  come back to it later and you put more down.  You

14  save it, you come back to it later.  So would there

15  have been drafts?  I assume so.

16       Q.    In fact, those presentations were

17  collaborative with MPS; is that fair?

18       A.    No.

19       Q.    So the presentations you were describing on

20  your hard drive is only presentations that you

21  contributed to?

22       A.    No.

23       Q.    So there were other folks contributing to

24  those presentations to clients in addition to your

Jay Stuart Rein, Vol. 3                                    01/13/2006

633

 1    contributions to the PowerPoints; is that right?

 2        A.    For some presentations they were

 3    collaborative.  For other presentations they were

 4    not.

 5        Q.    And when they were collaborative, your

 6    PowerPoint presentation saved on your hard drive was

 7    revised to the extent that others offered

 8    collaboration that got incorporated into the

 9    PowerPoint presentation; is that fair?

10             MR. COSTER:  Objection.

11        A.    When there was collaboration, if I was

12    engaged in an effort and I had finished my

13    contribution of what I could achieve, I would e-mail

14    that document to whoever else was participating, and

15    then they would make those changes and all on their

16    hard drive with the document in their possession.

17        Q.    So the document would change into a new

18    version incorporating their collaboration?

19        A.    Sure.

20        Q.    And your version would remain on your hard

21    drive?

22        A.    Not necessarily.

23        Q.    Why is that?

24        A.    Because if we were moving to another

Jay Stuart Rein, Vol. 3                                01/13/2006

634

1    version of the document, there was no need to save a

2    draft version.

3         Q.    Do you recall deleting draft versions of

4    such presentations?

5         A.    I do not recall.

6         Q.    So you can't say whether they remained on

7    your hard drive or not?

8         A.    No.

9         Q.    And sometimes you were the one responsible

10   for receiving the collaborative work from others and

11   incorporating it into your PowerPoint presentations

12   on your hard drive; is that fair?

13        A.    No.  Collaborative work received from

14   others may not be incorporated into files on mine.

15   The files that I receive may become the prevailing

16   files that survived on my drive.

17        Q.    I need you to take that a little bit

18   slower.  Were there ever situations in which you

19   took responsibility for client presentations to

20   incorporate work provided by others?

21        A.    Let me try and answer it a different way.

22        Q.    You can't answer that?

23        A.    I'm going to try to be helpful, so let me

24   try and be helpful.

Jay Stuart Rein, Vol. 3                                    01/13/2006

635

1        Q.    That's great.

2        A.    A master copy is not necessarily -- what

3    you're asking, it's not necessarily true that I

4    would own the master copy.  So if someone sent knee

5    a file with changes in it, with their collaborative

6    effort added to it, I wouldn't necessarily have to

7    take what they did in that file and add it to my

8    file.

9        It was much easier to make the file that

10   they sent over the prevailing master -- the eventual

11   file.  So the file that winds up being finally

12   presented to a customer could ping pong from

13   employee to employee to employee.

14       Nobody makes updates to anything that's on

15   their hard drive.  They make up dates to a file

16   that's delivered to them, and then I may send it to

17   someone else, and they may make updates to that and

18   send it back to me and ask what do you think, and I

19   may send it to another person.  But the file itself

20   that is moving around that lives in the e-mail

21   server that's attached to our e-mails is, by

22   default, the master.

23       Q.    But there are other iterations of that

24   master residing on other people's computers because

Jay Stuart Rein, Vol. 3                    01/13/2006

636

1   of the collaborative effort that's going on?

2       A.   I don't know if it resides on other

3   people's computers because of the collaborative

4   effort.  They may choose to delete everything.

5       Q.   But they could reside there?

6       A.   Yes.

7       Q.   And, in fact, you can't recall whether you

8   deleted such iterations from your hard drive?

9       A.   I do not know.

10      Q.   You also mentioned that there were

11  quarterly reports on the hard drive the last time

12  you accessed it.  What do you mean by that?

13      A.   The last time I accessed -- these quarterly

14  reports, as I said, the quarterly and monthly

15  reports that we were doing were basically done under

16  the leadership of Len DeBarros.

17      Q.   That's the same as the forecast material?

18      A.   Yes, that is.

19      Q.   You also mentioned other documents that you

20  recalled being on the hard drive the last time you

21  accessed it.  Can you tell me what other documents

22  you're referring to?

23      A.   I think I already stated that.  Customer

24  presentations, reports -- I mean, the presentations,

Jay Stuart Rein, Vol. 3                                01/13/2006

642

1      Q.    Did you folder your e-mails using any

2  particular system in Outlook?

3      A.    No.   I retained the default system, which

4  was inbox, sent box, and delete box.

5      Q.    So you didn't maintain your e-mails in any

6  sort of customer folders or any other segregated

7  folders?

8      A.    I don't believe I did, no.

9      Q.    But you don't know?

10         MR. COSTER:   Objection.

11     A.    Again, I've used e-mail systems at many

12  employers, and I do not recall, but I do not believe

13  that I did in this case.

14     Q.    Okay.   Do you know how long Motorola

15  retained e-mails on the server that were in your

16  inbox?

17     A.    No, I do not.

18     Q.    Did you ever ask?

19     A.    No, I did not.

20     Q.    Did you ever print e-mails?

21         MR. COSTER:   Objection.

22     A.    Not that I recall.

23     Q.    Did you use the electronic calendar

24  provided through Outlook while you were working at

657

1    answer?

2              MR. COSTER:  I will let you answer that

3    one, and it's time to move on, counsel.

4         A.   The HP Pavilion was not replaced.  My wife

5    told me to go get a computer of my own, that the HP

6    was dedicated to the kids and to her.  Since I was

7    in a full-time job search, I needed to go out and

8    find a computer and we needed to go out as a family

9    and spend the money to acquire a system which I

10   could work on without the kids challenging me for it

11   so that they could go onto Disney.com.

12        Q.   When did you purchase the Sony computer?

13             MR. COSTER:  Objection.

14        A.   It was sometime the end of April, early May

15   of 2004.

16        Q.   Do you still have it?

17        A.   Yes, I do.

18        Q.   Do you still have the HP?

19        A.   No, I do not.

20        Q.   What happened to that?

21             MR. COSTER:  Objection.

22        A.   The HP was purchased in April of 1998.  It

23   was an old computer.  We didn't feel it was

24   necessary to move it with us to Atlanta.  We donated

Jay Stuart Rein, Vol. 3                                01/13/2006

658

1    it to our cleaning people in Framingham, and I

2    assume they still have it.

3        Q.   When did you donate it?

4             MR. COSTER:  Objection.

5        A.   We gave it to them before we left for

6    Atlanta.

7        Q.   That was in August of 2005?

8        A.   I don't know if we gave it to them in

9    August or July of 2005.

10       Q.   But it was one of those?

11       A.   Yes.

12       Q.   Did you clean the hard drive before you

13   gave it to them?

14            MR. COSTER:  Objection.  That's it.  No

15   more.  I'm instructing you not to answer.  Enough is

16   enough.

17            MS. McGURN:  We'll come back to that.

18       Q.   Directing your attention to another

19   document we've marked as Exhibit 39 at your

20   deposition, do you recognize it?

21       A.   This is an e-mail dated May 24th from me to

22   Jann Mellman.

23       Q.   From what computer did you send this

24   e-mail?

Jay Stuart Rein, Vol. 3                                01/13/2006

                                                           663

1       A.    No.

2       Q.    Did you ever print them?

3             MR. COSTER:   Objection.

4       A.    Sure.

5       Q.    What caused you to make the decision to

6   print or not to print?

7             MR. COSTER:   Objection.

8       A.    If they were being reviewed within a group

9   of people in a room where our laptops weren't

10  available, we would print them and bring printed

11  copies with us to those meetings.

12      Q.    Where did you store those printed copies?

13      A.    I'm sorry, I don't understand.

14      Q.    When you printed a Motorola Word document,

15  where did you retain it?

16      A.    After it was printed?

17      Q.    Yes.

18      A.    Typically I would destroy it afterwards.

19      Q.    Why is that?

20      A.    Because we are an e-mail and computer

21  centric society, and if I would save every piece of

22  paper that I printed, I wouldn't have room to walk

23  around my office.

24      Q.    Did you save those Word documents on the

Jay Stuart Rein, Vol. 3                          01/13/2006

664

1    hard drive of the laptop?

2          A.    The work that I did, Word documents,

3    PowerPoint and Excel documents were on my laptop,

4    yes.

5          Q.    On the hard drive?

6          A.    I think that's the only place it could be,

7    unless there was some other place the computer

8    decided to put it.

9          Q.    Did you have a practice of deleting the

10   electronic version of the Word document from your

11   laptop?

12               MR. COSTER:    Objection.

13         A.    I don't understand, the practice of

14   deleting documents?

15         Q.    Did you have a routine practice of culling

16   through your Word documents and selecting some for

17   deletion like you testified you did for e-mail?

18         A.    The reason I testified I did for e-mail was

19   because there was a limit to the e-mail box, and I

20   was forced to do that.  The documents, PowerPoint,

21   Word and Excel documents that were saved were ones

22   that were deemed relevant by me for continuing to

23   drive business opportunities for Motorola.

24         Q.    So you did not have a practice for

Jay Stuart Rein, Vol. 3                          01/13/2006

665

1    routinely culling through those and determining

2    which could be deleted?

3        A.    No.

4        Q.    But at times you did, in fact, delete

5    electronic Word, PowerPoint and other documents?

6            MR. COSTER:  Objection.

7        A.    Yes.

8        Q.    You testified that you typically destroyed

9    the printed version after its use was completed; is

10   that fair?

11       A.    If I did not have a need for the printed

12   version, I eliminated the printed version.

13       Q.    If you elected to retain the printed

14   version, what would you do with it?

15       A.    It would live in a file.

16       Q.    Where?

17       A.    In a folder, in my possession, either in my

18   briefcase traveling with me or my home office.

19       Q.    How many such folders did you maintain

20   during the course of your employment at Motorola?

21           MR. COSTER:   Objection.

22       A.    Very few.

23       Q.    What do you mean by "very few"?

24       A.    There was a limited number of files that I

Jay Stuart Rein, Vol. 3                           01/13/2006

666

1     actually printed and saved.    Typically they were

2     final client presentations.

3         Q.    Did you maintain them in a single file

4     cabinet in your home in Holliston?

5         A.    They were maintained in a file cabinet in

6     my home in Holliston, yes.

7         Q.    Did you review all of those files in the

8     course of responding to discovery in this

9     litigation?

10            MR. COSTER:    Objection.    I will let you

11    answer that one.

12        A.    I believe I did, yes.

13        Q.    Did you?

14            MR. COSTER:    He said he believes he did.

15        A.    Yes.

16        Q.    When did you finish your work in going

17    through those documents for purposes of producing

18    that in discovery?

19        A.    I believe that I finished that work on

20    whatever time line my attorney indicated I needed to

21    finish that work by and produced all of those

22    documents in response to whatever is there.

23        Q.    Do you recall producing documents when you

24    delivered the laptop computer to me on August 26th?

682

1      Q.    When you were working at Motorola, did you

2    use your laptop to prepare correspondence with

3    clients?

4      A.    I think I previously answered that

5    question, yes.

6      Q.    Did you retain drafts of correspondence to

7    clients?

8      A.    I don't believe e-mail allows you to do

9    that.

10     Q.    Thank you for clarification.  When I'm

11   saying correspondence, not specifically e-mail, but

12   rather, letters, draft of letters to clients.  Did

13   you use your laptop to prepare letters to clients?

14     A.    Yes.

15     Q.    Did you retain copies of those letters on

16   your hard drive?

17     A.    Yes.

18     Q.    Did you routinely print those letters?

19     A.    No.

20          MR. COSTER:  Objection.  I don't mean to be

21   difficult.  At some point he must have printed them

22   to send them, right?

23          MS.

24          MS. McGURN:  Maybe.  Maybe he used e-mail

683

1    attachments.  I'm not sure.

2        Q.    Did you ever print them?

3        A.    Yes.  For purposes of sending to customers,

4    but not for purposes of saving them and archiving

5    them.

6        Q.    So you did not maintain your own set of

7    hard copy files of letters to customers?

8        A.    I maintained soft copies on the hard drive.

9        Q.    Did you prepare letters to recruiters on

10   your Motorola hard drive?

11           MR. COSTER:  Objection.

12       A.    No.

13       Q.    Did you prepare correspondence to Russell

14   Reynolds from that laptop computer?

15       A.    Correspondence regarding what?

16       Q.    Anything.

17       A.    Did I ever communicate with Russell

18   Reynolds from that computer?

19       Q.    The question is, did you correspond, and by

20   that I mean, did you prepare letters, as distinct

21   from e-mails, to Russell Reynolds from that Motorola

22   laptop?

23       A.    No.

24       Q.    But you communicated by e-mail with Russell

Jay Stuart Rein, Vol. 3                    01/13/2006

684

1    Reynolds from that laptop?

2         A.   Occasionally I may have, yes.

3         Q.   Did you prepare letters to prospective

4    employers using the Motorola laptop?

5         A.   No.

6         Q.   Did you communicate from the Motorola

7    laptop in any way with prospective employers?

8         A.   No.

9         Q.   Did you communicate electronically during

10   your exploration of a job opportunity at Invoke with

11   them?

12             MR. COSTER:   Objection.

13        A.   No.

14        Q.   You didn't send e-mails to Invoke relating

15   to your prospective opportunity there?

16        A.   Restate the question.

17        Q.   Did you communicate with Invoke

18   electronically?

19        A.   Yes.

20        Q.   What computer did you use to do that?

21        A.   My home computer.  My wife's home computer.

22        Q.   Why did you use your wife's computer?

23        A.   Because it was non-Motorola business, that

24   communication with Invoke.

701

1    was no longer usable by me, yes.

2        Q.    Did you prepare a resume on your laptop

3    after February 23, 2004?

4        A.    Probably.

5        Q.    And you stored that on your hard drive?

6        A.    Presumably, yes.

7        Q.    And that would have described your

8    experiences and expertise at Motorola?

9        A.    Which was forwarded to the Motorola

10   employees for which I was having discussions with

11   about job opportunities.

12       Q.    Did you prepare any prior drafts or

13   subsequent drafts of the resume on the laptop that

14   was not so forwarded?

15       A.    No.

16       Q.    Who else did you forward the resume to?

17       A.    I believe Lindsay Smith, Warren Holtzberg,

18   Jann Mellman, and there was some woman's name in

19   this executive leadership council that we discussed

20   in detail months ago that got a copy of my resume.

21   There were a lot of people within Motorola that

22   received my resume.

23       Q.    And you sent it to people outside Motorola

24   as well?

Jay Stuart Rein, Vol. 3                                      01/13/2006

702

1        A.    From that laptop, no.

2        Q.    Did you use a different resume or edited

3    version of the resume when you were searching for

4    positions outside Motorola as compared to what you

5    used when you were searching for a position within

6    the company?

7              MR. COSTER:   Objection.   What's the

8    relevance of this and are we asking on his laptop or

9    are we asking in general?

10             MS. McGURN:   I'm asking in general did he

11   use more than one resume for his job search

12   following February 23, 2004 and through April, 2004?

13             MR. COSTER:   Objection.   I will let you

14   answer that to avoid another ten-minute cycle.

15       A.    Restate the question.

16       Q.    Did you use more than one resume, a

17   different resume, for your job search for outside

18   opportunities as compared to the resume that you

19   used for your internal Motorola job search?

20       A.    Yes.   And to be explicit, the objective

21   statement or goals statement, whatever it was

22   labeled on my Motorola resume, was to attain a

23   position within Motorola as an executive using blah,

24   blah, blah experience, and on resumes used for

Jay Stuart Rein, Vol. 3                              01/13/2006

703

1    non-Motorola opportunities, it was to attain a

2    position as an executive without mention to within

3    Motorola, because I was no longer searching with

4    those opportunities within Motorola.  So in that

5    case, there were multiple versions.

6         Q.    Did you target your objective to the

7    employer you were submitting the resume to?

8              MR. COSTER:  Objection.  It's outside the

9    scope.

10        A.    It doesn't have to do with the computer,

11   but, yes.  My goal was to get a job.  My resume, my

12   appearance during interviews, needed to be targeted

13   toward a successful conclusion toward whatever form

14   of dialogue I was having with a prospective

15   employer.

16        Q.    So how many different such resumes did you

17   use during that period?

18              MR. COSTER:  Objection.  Outside the scope.

19        A.    I have no recollection.

20        Q.    And those resumes were prepared on your

21   Motorola laptop?

22        A.    No.  The resumes for Motorola positions

23   were maintained on the Motorola laptop.  The resumes

24   for other positions, non-Motorola, were on the HP

Jay Stuart Rein, Vol. 3                                 01/13/2006

704

1    laptop.

2        Q.    Did you use the model of the Motorola

3    resume for purposes of creating the other one?

4        A.    I used the model of a New York University

5    business school resume from 1989, which has been my

6    model for a resume ever since.

7        Q.    When you were specifically preparing the

8    Motorola resume and decided to change the objectives

9    on that resume to target outside employers, how did

10   you create the second version of the resume; what

11   steps did you take?

12       A.    I will answer this.  I don't understand

13   where we are going, but I will answer it.

14            MR. COSTER:  I'm going to object again.

15       A.    I had a resume that I produced for Motorola

16   when they hire me.  I had an electronic copy of that

17   resume on my wife's HP computer before Motorola ever

18   entered the picture.  That resume was modified to

19   get me and secure me a job at Motorola.

20            When it came time and it became apparent

21   that I needed to resurface a resume, either to find

22   a new job within Motorola or to find a job outside

23   of Motorola, that resume came from my HP computer

24   and went onto the Motorola computer, was updated for

713

1    spreadsheet after Len DeBarros' departure?

2        A.    Did I ever use Excel again?

3        Q.    In connection with your Motorola

4    employment.

5        A.    I'm sure I did.

6        Q.    For what purpose?

7        A.    I do not know the exact purpose.  But if it

8    was Excel, it was probably for the purpose of

9    managing, measuring or charting numbers.

10       Q.    Could those numbers have included sales

11   targets, revenue?

12       A.    Yes, they could have.

13       Q.    And those were saved on your hard drive?

14       A.    Yes, they were.

15       Q.    Did you produce any Excel spreadsheets in

16   hard copy in connection with this litigation?

17       A.    I don't recall.

18       Q.    You previously testified that you used your

19   laptop to produce PowerPoints, to prepare

20   PowerPoints, right?

21       A.    Yes.

22       Q.    You used your laptop to prepare PowerPoints

23   for your October meetings with Juergen Stark; is

24   that right?

Jay Stuart Rein, Vol. 3                          01/13/2006

714

1      A.    Yes.

2      Q.    And you used your laptop to prepare client

3  presentation PowerPoints, correct?

4      A.    Yes.

5      Q.    Are there any other PowerPoint

6  presentations that you can recall, aside from client

7  presentations and October presentations for Stark,

8  that you prepared on your Motorola laptop?

9      A.    Again, prospective client presentations --

10  this is the same question.  Presentations and

11  discussions based around partners of Motorola to

12  help us win business.

13      Q.    So those four categories?

14      A.    Yes.

15      Q.    Aside from the October presentations to

16  Stark, did you prepare other PowerPoints for him?

17      A.    Yes.

18      Q.    What were those?

19      A.    I believe that there was a presentation

20  about ExpressLink and whether we should continue

21  forward with that opportunity or not.

22      Q.    When was that?

23      A.    I don't recall.

24          MR. COSTER:  I don't mean to interrupt, but

Jay Stuart Rein, Vol. 3                          01/13/2006

715

1    I want the record to be clear, because we keep using

2    "you," and I think there may be some ambiguity

3    whether it's Mr. Rein or just Mr. Rein in

4    conjunction with what other MPS people were

5    preparing, in particular, the PowerPoints we are

6    talking about for presentations to Stark and Kofman.

7              So I don't want there to be some ambiguity,

8    because I think there is with the term "you" as we

9    have been using it in the questions and the answers.

10        Q.    To that point, were all the PowerPoints

11   prepared in October for Stark prepared in

12   collaboration with others working for MPS?

13        A.    Yes.

14        Q.    So the PowerPoints that you prepared either

15   incorporated or had incorporated into them

16   information from other people?

17        A.    The PowerPoints that were prepared for

18   Stark for the October presentation, as you're

19   referencing, were not prepared by me.

20        Q.    I just want to stop you there and ask you

21   to focus on the question, because the question was,

22   were those PowerPoints prepared in October

23   incorporating comments of others or did they have

24   your comments incorporated into other presentations?

Jay Stuart Rein, Vol. 3                          01/13/2006

716

1       A.    Yes and yes.

2       Q.    Okay.  So we've got two yeses.  That's

3   good.  So for purposes of the October 14th meetings,

4   during which these PowerPoint presentations were

5   being prepared, who created the initial draft?

6       A.    John Gillardi and myself.

7       Q.    Did you work together in Holliston sitting

8   at your hard drive to prepare this draft?

9           MR. COSTER:  Objection.  Those questions

10  have been asked and answered and in considerable

11  detail, and I mean considerable detail, in prior

12  depositions.

13      Q.    So when you say that you and John

14  conjunctively prepared the initial draft, did you

15  save drafts of that on your hard drive?

16      A.    He and I were trading documents via the

17  e-mail system for which we collaborated on the first

18  draft of this presentation.

19      Q.    Okay.  Did you retain copies of that

20  PowerPoint in any form on your hard drive?

21      A.    How could I have answered yes to the

22  previous question if I didn't retain it on my hard

23  drive?

24      Q.    So the answer is, yes.

Jay Stuart Rein, Vol. 3                                01/13/2006

753

1        Q.    Even after the date you were terminated?

2        A.    I was communicating with Peter Tobin after

3    the day I was terminated.   So you know that I used

4    the computer.

5        Q.    But I don't know whether you used it every

6    day.   That's what I'm asking.   Did you use it every

7    day?

8        A.    Yes.   I used it every single day.

9        Q.    Thank you very much.   So now we can move

10   on.   During that period, during the period from

11   February 23, 2004 through that day in March or

12   April, when the day after you told Peter you were

13   not going to sign the severance agreement, other

14   than for purposes of sending e-mail, what did you

15   use the laptop for?

16       A.    We've discussed this already.   I had a

17   resume, which was modified, which was sent to

18   Lindsay, to Jann, to Warren, and there were e-mail

19   communications.

20       Q.    Aside from the resume and e-mail

21   communications, did you use the laptop for any other

22   purpose?

23       A.    I do not believe so.

24       Q.    No presentations, no Word documents?

Jay Stuart Rein, Vol. 3                                  01/13/2006

754

1       A.    Presentations and Word documents to who?

2       Q.    I don't know.  I'm asking you if you

3   prepared any?

4       A.    I said I do not believe so, no.

5       Q.    Any Excel spreadsheets during that period?

6       A.    I don't know.

7       Q.    When you received the request for

8   production of documents in this case, did you

9   attempt to power up the computer in order to search

10  it?

11      A.    No, I did not.

12            (Ms. Blitis joins the deposition)

13      Q.    After that day, following the day on which

14  you told Peter you were not going to sign the

15  severance agreement, the day on which you lost

16  access, did you ever try and power up the laptop?

17      A.    Yes.

18      Q.    When was that?

19      A.    Sometime between our first deposition in

20  August and our second deposition in August.

21      Q.    And that was the first time you tried to

22  power it up since the day on which you lost access?

23      A.    Yes.

24      Q.    What did you do when you tried to power it

Jay Stuart Rein, Vol. 3                          01/13/2006

762

1      Q.    Have you ever purchased a utility to clean

2  a hard drive's computer?

3      A.    No, I have not.

4      Q.    Have you ever purchased a new hard drive

5  for a laptop or a computer?

6      A.    Yes, I have.

7      Q.    When was that?

8      A.    For my wife's HP 8650, whose hard drive had

9  failed.

10     Q.    When did that happen?

11     A.    I do not recall exactly.

12     Q.    How about generally?

13     A.    It was either in 2003, 2004 or 2005.

14     Q.    Was it while you were still employed by

15  Motorola?

16     A.    I don't recall at this point in time.

17     Q.    And you purchased the new hard drive

18  because the hard drive on her HP had died?

19     A.    Yes.

20     Q.    What does that mean?

21     A.    Turned on the computer and nothing

22  happened.

23     Q.    How did you know you needed a new hard

24  drive?

Jay Stuart Rein, Vol. 3                                    01/13/2006

765

1        A.    I don't know.

2        Q.    Did you obtain any assistance from anyone

3    to install the new hard drive on your wife's HP?

4              MR. COSTER:  Objection.

5        A.    I think a neighbor might have helped me,

6    but I don't recall.

7        Q.    Who was that?

8        A.    I said I think I don't recall.  I talked to

9    a lot of people before I changed out had the hard

10   drive.

11       Q.    Who did you talk to?

12       A.    I talked to somebody at Best Buy, and I

13   don't remember that rep's name --

14       Q.    Maybe somebody at Comp USA?

15       A.    Maybe somebody at Comp USA and maybe a

16   neighbor.  The HP 8650 is a very easy device to

17   change out equipment on.  It has four big screws

18   that don't even require a screwdriver.  You untwist

19   them, pull the hard drive straight out of it and

20   drop a new one in.

21       Q.    If you spoke to a neighbor, who would it

22   have been?

23             MR. COSTER:  Objection.

24       A.    I don't recall.

Jay Stuart Rein, Vol. 3                          01/13/2006

766

1      Q.    Was there more than one neighbor that you

2   discussed the changing out of the hard drive with?

3            MR. COSTER:   Objection.

4      A.    I don't recall.  You're asking me to answer

5   honestly, and I'm giving you the most honest answers

6   I know.  I would be lying if I made up a name right

7   now.

8      Q.    You said you thought you spoke to a

9   neighbor, and I'm asking you who that was?

10     A.    Everybody has at least one computer in

11  their house and everybody has problems day in and

12  day out, and when you happen to be the person

13  encountering the problem, you may look left or right

14  in the office, left or right in your neighborhood

15  and say have you ever experienced this, and what do

16  you think I need to do.

17            I'm sure over the course of either plowing

18  a driveway or mowing a lawn, somewhere along the way

19  I would say to someone, hey, I've got a problem.  Do

20  I recall who it was with?  No.

21     Q.    Do you recall whether anyone physically

22  assisted in the turning of the screws with you?

23     A.    No.  I turned the screws with me.

24     Q.    Did you ever turn the screws on the laptop

Jay Stuart Rein, Vol. 3                           01/13/2006

776

1    Q.   Did you read this report when it was shared

2   with you this morning?

3    A.   Not in detail, no.

4    Q.   Did you, when you powered up the laptop in

5   your basement, detect a rhythmic clicking sound?

6    A.   No, I did not.

7    Q.   Can you explain why the data sectors on the

8   imaged hard drive that was taken off of your laptop

9   were zeroed out?

10          MR. COSTER:  Objection.

11   A.   I don't know what data sectors are and I

12   don't know what "zeroed out" means.

13   Q.   Was August 22 the date on which you went

14   back to the computer after having plugged it in your

15   basement in Atlanta to determine whether you could

16   access or when your curiosity was peaked?

17   A.   I don't know.

18   Q.   Where were you on August 22, do you know?

19   A.   What day of the week was August 22?  By my

20   calendar, it was a Monday.

21   Q.   Where were you then?

22   A.   Atlanta.  So that could have been the day.

23   Q.   Was anyone home with you on that date?

24          MR. COSTER: Objection.  At night?  During

Jay Stuart Rein, Vol. 3                                    01/13/2006

780

1          Q.   When did you first consider engaging

2     counsel in connection with this case?

3               MR. COSTER:   Objection.   What relevance

4     does this have to --

5               MS. McGURN:   Because part of the discovery

6     obligations go to counsel, and discovery obligations

7     in this case, in our view, were not complied with,

8     and when those obligations kick in is an express

9     part of Judge Gertner's January 5th order.

10              MR. COSTER:   Clearly the discovery

11    obligations kicked in at some point after he brought

12    the lawsuit, so he had retained counsel by then,

13    because you had a copy of my complaint.

14              MS. McGURN:   I would like the witness to

15    testify about when he retained counsel and not your

16    surmise.

17              MR. COSTER:   How is it surmised when I file

18    a complaint.

19              MS. McGURN:   So he had counsel at least at

20    that point.   There was some point prior to that that

21    he had counsel unbeknownst to me.   That's the

22    question I'd like him to answer.

23         Q.   When did you first consider engaging

24    counsel in this case?

Jay Stuart Rein, Vol. 3                           01/13/2006

781

1              MR. COSTER:  Objection.

2         A.    Probably sometime in March or April of '04.

3         Q.    Had you previously engaged counsel in

4    connection with any other employment dispute?

5         A.    No, which I testified to last year as well.

6         Q.    Did you previously consult with counsel

7    relating to any other employment dispute?

8              MR. COSTER:  Objection.

9         A.    I testified to that as well.

10        Q.    Can you answer the question?

11        A.    No.

12        Q.    Did you have a relationship with any

13   employment counsel at the time that you decided to

14   engage counsel in connection with this case?

15        A.    I'm sorry, I don't understand the question.

16             MR. COSTER:  Objection.

17        Q.    Did you have any kind of relationship,

18   business or personal, with counsel at the time you

19   decided to engage counsel in this case?

20             MR. COSTER:  Objection.  I'm going to

21   instruct you not to answer.

22        Q.    Was Attorney Coster the first attorney you

23   consulted in connection with this case?

24        A.    No, he was not.

Jay Stuart Rein, Vol. 3                                    01/13/2006

785

1    them.  Is that what you're asking, when we filed a

2    written response?

3              MS. McGURN:  Yes.

4         A.   My attorney received the document request

5    and I got everything to my attorney.

6         Q.   Do you recall when that happened?

7         A.   Probably immediately thereafter I sprung

8    into action to help him achieve whatever time line

9    he needed to keep us on.

10        Q.   Did you have an awareness at that time,

11   when you received the document request, that there

12   were documents on the laptop that might be called

13   for?

14        A.   No, I did not.

15        Q.   Why?

16        A.   I don't know.  I don't know why the brain

17   does what it does.

18        Q.   What do you mean by that?

19        A.   I don't know why I didn't think about the

20   computer.  The computer was inactive to me.

21        Q.   Did you mention the computer to your

22   attorney in connection with trying to pull things

23   together?

24             MR. COSTER:  Objection.  I'm going to

Jay Stuart Rein, Vol. 3                                01/13/2006

786

1    instruct you not to answer.

2        Q.   Without getting into the substance of any

3    discussions that you had with your counsel, was your

4    counsel aware that you had a laptop in your

5    possession from Motorola?

6            MR. COSTER:   Objection.   I don't know how

7    he can -- other than having a conversation with me,

8    I don't know how he can make me aware one way or

9    another of having a laptop computer.   I instruct him

10   not to answer.

11       Q.   In connection with your efforts to pull

12   documents together for responding to the document

13   requests, you searched your wife's computer; is that

14   right?

15           MR. COSTER:   Objection.

16       A.   No, that is not right.

17       Q.   How did you come to produce documents from

18   your Yahoo account?

19       A.   From a computer that I had functioning in

20   my house.   I don't know whether that was my wife's

21   computer or the other computer that we've already

22   discussed that I had to go out and purchase.

23       Q.   But so you did search some computer in

24   order to respond to that --

Jay Stuart Rein, Vol. 3                                01/13/2006

787

1        A.    No, I did not search any computer.    I

2    searched Yahoo's server.   The computer, again, is

3    just a vehicle to a central repository not onboard

4    the computer.   There was no search of the computer

5    to gather the Yahoo files to print and give to you.

6        Q.    Tell me the steps that you took in order to

7    get those Yahoo e-mails printed?

8        A.    You're kidding?

9        Q.    No.

10       A.    Turn on the computer, click on internet

11   explorer, www.Yahoo.com, and I would enter my e-mail

12   user ID and my e-mail password.   Then I would select

13   all of the files or all of the e-mails that were

14   associated with this, and I would hit print for each

15   one, print it to a printer which was connected via a

16   cable to the computer, and then I had the paper

17   documents.

18       Q.    Did you search for any other electronic

19   documents in response to the document request that

20   you received from Motorola?

21            MR. COSTER:   Objection.

22       Q.    When I say electronic documents, I mean any

23   documents stored on a computer, meaning e-mail?

24       A.    Again, not stored on a computer, I printed

Jay Stuart Rein, Vol. 3                           01/13/2006

793

1    period?

2        A.    I do not recall.

3        Q.    What is that device called that you're

4    referring to; is it a thumb drive?

5        A.    I've never heard that term used.

6        Q.    Is it a USB?

7        A.    I believe it's a USB flash disk or

8    something.  USB flash drive, flash disk.  For every

9    manufacturer, I think everyone has their own name.

10       Q.    Did you ever store Motorola documents on a

11   CD-ROM?

12       A.    No.

13       Q.    Did you ever have a CD burner on the

14   laptop?

15       A.    There was a CD drive that was given to me

16   with the laptop, which I also returned to you at

17   some point in this process.  I never used it.  I

18   don't know if it had burn capabilities or not.

19       Q.    Did you ever store Motorola documents on a

20   floppy disk?

21       A.    No.

22       Q.    You previously testified that you would, on

23   occasion, for example, when you were on an airplane,

24   work on your laptop off line, right?

Jay Stuart Rein, Vol. 3                                01/13/2006

794

1          A.    Yes.

2          Q.    Were there occasions -- well, when the

3     plane takes off you have to shut down the computer;

4     is that right?  The pilot instructs you to shut it

5     down; is that right?

6          A.    Yes.

7          Q.    So you need to power it back up in order to

8     use it on the airplane, right?

9          A.    Yes.

10         Q.    When you're on the airplane, you can't use

11    wireless capabilities in order to access Motorola

12    systems, right?

13         A.    Yes.

14         Q.    It's prohibited, right?

15         A.    It's not any more if the aircraft has been

16    approved for and has this technology, but that

17    technology was not there then.

18         Q.    So at those times when you were using your

19    laptop on the airplane, without any kind of

20    connectivity, you were working off line?

21         A.    Correct.

22         Q.    And you did that how?  You powered up your

23    computer and you started to use Word?

24         A.    Power it up, and again, you still have to

Jay Stuart Rein, Vol. 3                                    01/13/2006

795

1    do alt, control, delete, enter a security password

2    to get to a desktop.  Word, PowerPoint and Excel,

3    those type of programs, they are, by virtue of the

4    fact that they are installed on the computer,

5    off-line programs, even if the computer is online,

6    they are, in effect, resident on the off-line

7    programs.  So they are always off line.  Nobody can

8    actually access them, I believe, while I'm accessing

9    them at the same time.  They are off line.

10        Q.   When you say Word and Excel and those

11   programs, are you referring to all the Windows-based

12   programs on the laptop?

13        MR. COSTER:  Objection.

14        A.   I'm referring -- I mean, the ones that I

15   use frequently are Word, Excel and PowerPoint, and

16   the Microsoft e-mail program.  On the plane, the

17   Microsoft e-mail program is off line.

18        Q.   But you were still capable of using other

19   programs?

20        A.   The Word, the PowerPoint, the Excel, yes.

21        Q.   Did you ever use a cache'd login to log

22   into the laptop without using the Motorola control,

23   alt delete and password security access?

24        MR. COSTER:  Objection.

Jay Stuart Rein, Vol. 3                                    01/13/2006

816

1          Q.    Okay.

2          A.    Regarding my employment, if you're going to

3    broadly define "employment" as PowerPoint

4    presentations which I created over the course of my

5    employment as documents concerning my employment,

6    then, yes, there were documents on that hard drive,

7    such as customer presentations, prospective customer

8    presentations, Excel spreadsheets, all the forms of

9    documents that we discussed multiple times

10   throughout the day.

11         Q.    Likewise, there were documents concerning

12   your efforts to obtain alternate employment

13   following the notification of your termination from

14   Motorola stored on the hard drive as well?

15              MR. COSTER:  Objection.  Listen to the

16   question.

17         A.    Say the question again.

18              MS. McGURN:  Could you read it back,

19   please.

20              (Reporter read back pending question)

21         A.    The only documents stored on the hard drive

22   after my termination from Motorola concerning

23   seeking alternate employment was alternate

24   employment within Motorola, and that would be the

Jay Stuart Rein, Vol. 3                           01/13/2006

817

1    resume that we've previously discussed.

2        Q.   And likewise, documents concerning your

3    efforts to seek alternate employment outside

4    Motorola resided on other computers that you

5    maintained in your home; isn't that right?

6            MR. COSTER:  Objection.  Again, listen to

7    the question.

8        A.   There are multiple e-mail communications

9    from me to seek alternate employment outside of

10   Motorola that do not reside on any computer that I

11   own.  They reside within the e-mail servers or the

12   Execunet or Six Figure or other applications that I

13   used that were not on computers regarding other

14   documents.  There were resumes that were stored on

15   computers in the house that were non-Motorola

16   computers to seek employment outside of Motorola.

17       Q.   And those documents, aside from the Six

18   Figure and Execunet documents that you previously

19   produced, were not produced in connection with this

20   litigation; isn't that right?

21           MR. COSTER:  Objection.  What documents?

22       A.   I don't understand the question.

23       Q.   Directing your attention to the document

24   that we've marked as Exhibit 48, and I'm reluctant

Jay Stuart Rein, Vol. 3                                    01/13/2006

828

1    telling him that I was not interested in the

2    opportunity.

3         Q.    This was the Invoke opportunity?

4         A.    That's correct.

5         Q.    And you sent this from your Motorola

6    laptop, right?

7         A.    Yes, I did.

8              MR. COSTER:  Listen to the question again.

9         A.    This was my telling Invoke that as a

10   Motorola employee I'm not going to accept their job

11   opportunity.

12             MR. COSTER:  You sent it from your Motorola

13   --

14             THE WITNESS:  Yes.

15             (Document marked as Exhibit 55

16             for identification)

17        Q.    Directing your attention to the document

18   that we've marked as Exhibit 55, do you recognize

19   it?

20        A.    It looks like a Word document with my notes

21   around the fringes of the document.  "Question for

22   Motorola" it's titled.

23        Q.    This is a document that you prepared?

24        A.    Looks like it.

Jay Stuart Rein, Vol. 3                                01/13/2006

829

1          Q.    Do you know the date on which you prepared

2    it or estimated date on which you prepared it?

3          A.    Well, the title says, "These questions

4    follow the general flow of the offer letter," and

5    they are questions about my opportunity to join

6    Motorola.  So it was sometime before June 22 and

7    sometime after the first offer that they made me of

8    employment with them.

9          Q.    Do you recall when that first offer was

10   made?

11         A.    No, I do not.

12         Q.    To whom did you direct these questions?

13               MR. COSTER:  Objection.

14         A.    These were questions that were asked of

15   whoever I was working with or whoever was involved

16   in my offer of employment.  I do not recall.

17         Q.    In them you sought to ask questions

18   regarding performance reviews as evidenced by a

19   numbered Line 5?

20         A.    That's a very smart question to ask before

21   you accept a job, yes.

22         Q.    Next to that section of the document it

23   says, "Severance policy question"; is that right?

24         A.    Yes.

# EXHIBIT C

T. Rein
EXHIBIT NO. 3
8/16/05
L. LONDON

 **MOTOROLA**

# EMPLOYMENT AGREEMENT

In consideration of my employment, or continued employment by Motorola, or its subsidiaries (referred to separately or together as "Motorola") and the salary or wages paid to me, I understand and agree to the following provisions for the protection of Motorola property rights:

1. Not to disclose to Motorola, or to use in my work at Motorola (a) any confidential information belonging to others, including my prior employers (unless written authorization is first obtained), or (b) any prior inventions made by me which Motorola is not otherwise entitled to learn of or to use.

2. Not to use, or publish, or to otherwise disclose to others, either during or subsequent to my employment by Motorola, any confidential information of Motorola or its customers, except as my Motorola duties my require.

3. Upon termination of my employment by Motorola, to promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola, or any other materials which belong to Motorola.

4. To assign and I hereby assign to Motorola as its exclusive property the entire right, title and interest in all my inventions, innovations, or ideas developed or conceived by me solely, or jointly with others, at any time during the term of my employment and which inventions, innovations, or ideas relate to the actual or anticipated business activities of Motorola, or result from, or are suggested by, work which I do for Motorola.

5. To make and maintain written records of all inventions, innovations, or ideas referred to in paragraph 4 above and to submit promptly such records, and supplemental oral disclosures, to designated representatives of Motorola.

6. To execute all papers, and otherwise provide proper assistance, at Motorola's request and expense, during and subsequent to my employment by Motorola to enable Motorola or its nominees to obtain patents, copyrights, and legal protection for inventions or innovations in any country.

7. I represent that the inventions identified in the _____O_____ pages I attach hereto comprise all the unpatented inventions which I have made or conceived prior to my employment by Motorola, which inventions shall be excluded from this agreement. (It is only necessary to list the title of such inventions and the purpose thereof, but not details of the invention itself per paragraph 1(b)). IF THERE ARE NO SUCH UNPATENTED INVENTIONS TO BE EXCLUDED, EMPLOYEE INTIAL HERE _____JSR_____

8. I further represent that I have attached hereto a copy of any agreement which presently affects my compliance with the terms of this present agreement. (Such copy must specify the other contracting party or employer, the date of such agreement, the date of termination of any employment). IF THERE IS NO SUCH AGREEMENT, EMPLOYEE INITIAL HERE _____JSR_____

This agreement replaces any existing employee agreement between Motorola and me regarding patents and/or confidential information and shall be binding on my executors, administrators, heirs, legal representatives or assigns.

This agreement may not be modified except in writing with approval of an officer of Motorola.

| WITNESS | EMPLOYEE |
|---|---|
| SIGNATURE *Sharon Comer* | SIGNATURE *JSR* |
| TYPED OR PRINTED NAME Sharon Comer | TYPED OR PRINTED NAME JAY S. REIN |
| DATE 6-24-02 | DATE 6-24-02 |

# EXHIBIT D

508-893-6926 - office
847-761-4814 - fax
617-899-2699 - cell
Rein@Motorola.com

[Rein Jay-REIN]  -----Original Message-----
**From:** Rein Jay-REIN
**Sent:** Wednesday, February 25, 2004 3:22 PM
**To:** Tobin Peter-APT010
**Subject:** Follow-Up to Our Call Today
**Importance:** High
**Sensitivity:** Confidential

Peter,

Thank you for taking my call earlier today and thank you for working on my behalf to assist in this
transitionary period.  To restate what I think we both agreed you were going to work on:

- converting the 8.5 weeks plus the 2 weeks of "severance" lumpsum payout into an on payroll status
  whereby I could be considered an employee of record of Motorola through a to be determined
  date in June.
- for the same period of time, all eligible benefits (Oct 2003 --> March 2004 MotShare participation
  and similar) are made available to me as a regular employee.  I assume (though we did not discuss)
  that I would similarly pay Health, Dental, Life and other at group rates as I am today.
- upon completion of this time period, access to programs such as COBRA, rollover of my 401K,
  eligibility for MA Unemployment insurance, and Drake Beam Moran outplacement services (which
  we did not discuss) will be made available.
- Not Discussed, but I am assuming that if you are successful in getting approval of this "Individual
  ISP" that I will be able to utilize the Motorola Network, email and other resources to continue to
  communicate with others on my quest for future employment opportunities.  All associated
  resources belonging to Motorola would be returned upon the completion of the aforementioned time
  period.

As we talked, all of the above is being requested in order to provide me with an opportunity to [re]enter the
marketplace without the prejudices often associated with an unemployed worker.  Additionally, resulting
from various performance reviews and a retention bonus paid just weeks ago, I chose to forego a non-
Motorola job opportunity, which today no longer exists.

I am looking forward to talking on Friday (or sooner) to hear how things are proceeding.

Sincerely,

JSR

---

**Jay S. Rein**

508-893-6926 - office
617-899-2699 - cell
Rein@Motorola.com

000155

3/17/2004

# EXHIBIT E

EXHIBIT L

EXHIBIT NO. 9
J. Rein
8-16-05
L. LONDON

# MOTOROLA, INC.
## AWARD DOCUMENT
### For the
### COMPENSATION/ACQUISITION PLAN OF 2000
**Terms and Conditions Related to Employee Nonqualified Stock Options**
**Award ID: 370447**

| Name : | Jay Rein | Expiration Date : | July 01, 2012 |
|---|---|---|---|
| Commerce ID : | 12026815 | Number of Options : | 10,000 |
| Grant Date : | July 01, 2002 | Exercise Price : | $14.42 (USD) |

Motorola, Inc. ("Motorola") is pleased to grant you options to purchase shares of Motorola's common stock under the Motorola Compensation/Acquisition Plan of 2000 (the "Plan"). The number of options ("Options") awarded to you and the Exercise Price per Option, which is the Fair Market Value on the Date of Grant, are stated above. Each Option entitles you to purchase one share of Motorola's common stock on the terms described below and in the Plan.

## Vesting Schedule

| Percentage | Date | |
|---|---|---|
| 25.00 | July 01, 2003 | VESTED |
| 25.00 | July 01, 2004 | |
| 25.00 | July 01, 2005 | |
| 25.00 | July 01, 2006 | |

### Vesting and Exercisability
You cannot exercise the Options until they have vested.

*Regular Vesting* – The Options will vest in accordance with the aforementioned schedule (subject to the other terms hereof).

*Special Vesting* – You may be subject to the Special Vesting Dates described below if your employment or service with Motorola or a Subsidiary (as defined below) terminates.

*Exercisability* – You may exercise Options at any time after they vest and before they expire as described below.

### Expiration
All Options expire on the earlier of

*(1)* the tenth anniversary of the Date of Grant as stated above or

*(2)* any of the Special Expiration Dates described below. Once an Option expires, you no longer have the right to exercise it.

### Special Vesting Dates and Special Expiration Dates
There are events that cause your Options to vest sooner than the schedule discussed above or to expire sooner than the tenth anniversary of the Date of Grant. Those events are as follows:

Motorola Confidential Proprietary.    (End of page 1 of the Award Document)

000039

CONFIDENTIAL

Retirement – If your employment or service with Motorola or a Subsidiary is ended because of your Retirement, Options that were granted at least one year prior to your Retirement that are not vested will automatically become fully vested upon your Retirement. Any remaining unvested Options will be forfeited. All your vested Options will then expire on the earlier of the third anniversary of ending your employment or service because of your Retirement or the Date of Expiration stated above. Retirement means your retirement from Motorola or a Subsidiary as follows:

(i) Retiring at or after age 55 with 20 years of service;

(ii) Retiring at or after age 60 with 10 years of service;

(iii) Retiring at or after age 65, without regard to years of service.

Disability – If your employment or service with Motorola or a Subsidiary is terminated because of your Total and Permanent Disability (as defined below), Options that are not vested will automatically become fully vested upon your termination of employment or service. All your Options will then expire on the earlier of the third anniversary of your termination of employment or service because of your Total and Permanent Disability, or the Date of Expiration stated above. Until that time, the Options will be exercisable by you or your guardian or legal representative.

Death – If your employment or service with Motorola or a Subsidiary is terminated because of your death, Options that are not vested will automatically become fully vested upon your death. All your Options will then expire on the earlier of the third anniversary of your death or the Date of Expiration stated above. Until that time, with written proof of death and inheritance, the Options will be exercisable by your legal representative, legatees or distributees.

Change In Control – If there is a Change In Control of Motorola (as defined in the Plan), all the unvested Options will automatically become fully vested as described in the Plan. If Motorola or a Subsidiary terminates your employment or service other than for Serious Misconduct within two years of consummation of a Change In Control, all of your vested Options will be exercisable until the Date of Expiration.

Termination of Employment or Service Because of Serious Misconduct – If Motorola or a Subsidiary terminates your employment or service because of Serious Misconduct (as defined below) all of your Options (vested and unvested) expire upon your termination.

Change in Employment in Connection with a Divestiture – If you accept employment with another company in direct connection with the sale, lease, outsourcing arrangement or any other type of asset transfer or transfers of any portion of a facility or any portion of a discrete organizational unit of Motorola or a Subsidiary (a "Divestiture"), all of your unvested Options will automatically expire upon termination in direct connection with a Divestiture and your vested Options will expire 12 months after such Divestiture or such shorter period remaining until expiration as set forth above.

Termination of Employment or Service by Motorola or a Subsidiary Other than for Serious Misconduct or a Divestiture– If Motorola or a Subsidiary on its initiative, terminates your employment or service other than for Serious Misconduct or a Divestiture, all of your unvested Options will automatically expire upon termination and your vested Options will expire twelve months after your termination of employment or such shorter period remaining until expiration as set forth above.

Termination of Employment or Service for any Other Reason than Described Above – If your employment or service with Motorola or a Subsidiary terminates for any reason other than that described above, including voluntary resignation of your employment or service, all of your Options (vested and unvested) will automatically expire on the date of termination.

**Leave of Absence/Temporary Layoff**

If you take a Leave of Absence from Motorola or a Subsidiary that your employer has approved in writing in accordance with your employer's Leave of Absence Policy and which does not constitute a termination of employment as determined by Motorola, or you are placed on Temporary Layoff (as defined below) by Motorola or a Subsidiary the following will apply:

Vesting of Options – Options will continue to vest in accordance with the vesting schedule set forth above.

Exercising Options – You may exercise Options that are vested or that vest during the leave of absence or layoff.

*Effect of Termination of Employment or Service* – If your employment or service is terminated during the Leave of Absence or Temporary Layoff, the treatment of your Options will be determined as described under "Special Vesting Dates and Special Expiration Dates" above.

### Other Terms

*Method of Exercising* – You must follow the procedures for exercising options established by Motorola from time to time. At the time of exercise, you must pay the Exercise Price for all of the Options being exercised and any taxes that are required to be withheld by Motorola or a Subsidiary in connection with the exercise. Options may not be exercised for less than 50 shares unless the number of shares represented by the Option is less than 50 shares, in which case the Option must be exercised for the remaining amount.

*Transferability* – Unless the Committee provides, Options are not transferable other than by will or the laws of descent and distribution.

*Tax Withholding* – Motorola or a Subsidiary is entitled to withhold an amount equal to the required minimum statutory withholding taxes for the respective tax jurisdictions attributable to any share of common stock deliverable in connection with the exercise of the Options. Employee may satisfy any withholding obligation in whole or in part by electing to have Motorola retain Option shares having a Fair Market Value on the date of exercise equal to the minimum amount required to be withheld.

### Definition of Terms

If a term is used but not defined, it has the meaning given such term in the Plan.

*Fair Market Value* is the closing price for a share of Motorola common stock on the last trading day before the grant. The official source for the closing price is the New York Stock Exchange Composite Transaction as reported in the Wall Street Journal, Midwest edition.

*Serious Misconduct* means any misconduct identified as a ground for termination in the Motorola Code of Business Conduct, or the human resources policies, or other written policies or procedures.

*Subsidiary* means an entity of which Motorola owns directly or indirectly at least 50% and that Motorola consolidates for financial reporting purposes.

*Total and Permanent Disability* means for (x) U.S. employees, entitlement to long-term disability benefits under the Motorola Disability Income Plan, as amended and any successor plan and (y) non-U.S. employees, as established by applicable Motorola policy or as required by local regulations.

*Temporary Layoff* means a layoff or redundancy that is communicated as being for a period of up to twelve months and as including a right to recall under defined circumstances.

### Consent to Transfer Personal Data

By accepting this award, you voluntarily acknowledge and consent to the collection, use, processing and transfer of personal data as described in this paragraph. You are not obliged to consent to such collection, use, processing and transfer of personal data. However, failure to provide the consent may affect your ability to participate in the Plan. Motorola, its Subsidiaries and your employer hold certain personal information about you, that may include your name, home address and telephone number, date of birth, social security number or other employee identification number, salary, nationality, job title, any shares of stock held in Motorola, or details of all options or any other entitlement to shares of stock awarded, canceled, purchased, vested, unvested or outstanding in your favor, for the purpose of managing and administering the Plan ("Data").

Motorola and/or its Subsidiaries will transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of your participation in the Plan, and Motorola and/or any of its Subsidiaries may each further transfer Data to any third parties assisting Motorola in the implementation, administration and management of the Plan. These recipients may be located throughout the world, such as the United States. You authorize them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of shares of stock on your behalf to a broker or other third party with whom you may elect to deposit any shares of stock acquired pursuant to the Plan. You may, at any time, review Data, require any necessary amendments to it or withdraw the consents herein in writing by contacting Motorola; however, withdrawing your consent may affect your ability to participate in the Plan.

## Acknowledgement of Discretionary Nature of the Plan; No Vested Rights

You acknowledge and agree that the Plan is discretionary in nature and limited in duration, and may be amended, cancelled, or terminated by Motorola or a Subsidiary, in its sole discretion, at any time. The grant of awards under the Plan is a one-time benefit and does not create any contractual or other right to receive an award in the future. Future grants, if any, will be at the sole discretion of Motorola, including, but not limited to, the timing of any grant, the amount of the award, vesting provisions, and the exercise price.

## Agreement Following Termination of Employment

As a further condition of accepting the Options, you acknowledge and agree that for a period of two years following your termination of employment or service, you will not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, or to communicate in support of Motorola or a Subsidiary to terminate his/her employment with Motorola or a Subsidiary and/or to seek employment with your new or prospective employer, or any other company.

You agree that upon termination of employment with Motorola or a Subsidiary, you will immediately inform Motorola of

*(i)* the identity of your new employer (or the nature of any start-up business or self-employment),

*(ii)* your new title, and

*(iii)* your job duties and responsibilities.

You hereby authorize Motorola or a Subsidiary to provide a copy of this Award Document to your new employer. You further agree to provide information to Motorola or a Subsidiary as may from time to time be requested in order to determine your compliance with the terms hereof.

## Acceptance of Terms and Conditions

By accepting the Options, you agree to be bound by these terms and conditions, the Plan and any and all rules and regulations established by Motorola in connection with awards issued under the Plan.

## Other Information about Your Options and the Plan

You can find other information about options and the Plan on the Motorola website http://hr2.mot.com/stockadmin. If you do not have access to the website, please complete the order form included with these Terms and Conditions to receive the information.

Motorola Confidential Proprietary

(End of page 4 of the Award Document)

000002

# EXHIBIT F

**From:** Rein Jay-REIN
**Sent:** Sunday, January 18, 2004 9:59 PM
**To:** Simon Blanks (E-mail)
**Cc:** Corey Torrence (E-mail); David J. Rubinstein (E-mail)
**Subject:** Thank You

Simon,

Hope you had a successful trip with Millward Brown over in Europe.

At this point, it looks as if we are just a bit apart from where I had to be [compensation-wise] and where the economics for my position needed to be on behalf of Invoke and its stakeholders.

Therefore, thank you for considering me for the opportunity to join the leadership team at Invoke. If opportunities evolve and it does make sense, please do not hesitate to call me. And if my situation changes maybe I too will give you a call, and we can explore what might exist at that point in time.

Take Care,
JSR

_____

**Jay S. Rein**
Motorola Professional Services
*Architects of Intelligent Mobility Solutions*

508-893-6926 - office
847-761-4814 - fax
617-899-2699 - cell
Rein@Motorola.com

