## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAY S. REIN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION NO. 04-12580 NG |
| | ) |
| MOTOROLA, INC., CLYDE KOFMAN | ) |
| and JUERGEN STARK | ) |
| | ) |
| Defendants. | ) |
| | ) |

### AFFIDAVIT OF KRISTIN GLENNAN McGURN

I, Kristin Glennan McGurn ("McGurn"), declare under penalty of perjury:

1.      I am a member of the Bar of this Court and a member of the firm of Seyfarth Shaw LLP,

attorneys for Motorola, Inc., Clyde Kofman and Juergen Stark (collectively, "Defendants") in the

above-captioned case.  This affidavit is based on my personal knowledge in support of the

Defendants' Renewed Motion for Sanctions.

2.      Annexed hereto as Exhibit A is a true and correct copy of Jay Rein's ("Rein")

Employment Agreement dated June 24, 2002.

3.      Annexed hereto as Exhibit B is a true and correct copy of February 25, 2004 email from

Rein to Peter Tobin.

4.      Annexed hereto as Exhibit C is a true and correct copy of excerpts of Plaintiff's

Responses to Motorola's discovery requests.

5.      Annexed hereto as Exhibit D is a true and correct copy of excerpts of the August 16,

2005, August 26, 2006 and January 13, 2006 deposition transcripts of Jay S. Rein.

6.      Annexed hereto as <u>Exhibit E</u> are true and correct copies of the:  August 16, 2005 McGurn letter to John Coster ("Coster") demanding Rein's return of the Motorola laptop; August 19, 2005 Coster response; and August 22, 2005 McGurn letter to Coster regarding shipping instructions.

7.      Annexed hereto as <u>Exhibit F</u> is a true and correct copy of the: October 14, 2005 McGurn letter to Coster requesting an explanation as to the condition of the laptop.

8.      Annexed hereto as <u>Exhibit G</u> is a true and correct copy of an Account (User 10) Record Information Report regarding deactivation.

9.      Annexed hereto as <u>Exhibit H</u> is a true and correct copy of excerpts of the June 21, 2006 deposition transcript of Charles Lehwald.

10.      Annexed hereto as <u>Exhibit I</u> is a true and correct copy of Rein's July 1, 2002 Motorola Award Agreement.

11.      Annexed hereto as <u>Exhibit J</u> is a true and correct copy of Kroll Ontrack's Investigative Analysis dated May 16, 2006.

12.      Annexed hereto as <u>Exhibit K</u> is a true and correct copy of the Chain of Custody documents.

13.      Annexed hereto as <u>Exhibit L</u> is a true and correct copy of Kroll Ontrack invoices dated October 4, 2005, December 21, 2005 and May 24, 2006.

14.      Annexed hereto as <u>Exhibit M</u> is a true and correct copy of the invoice from Legal Link for the Rein deposition transcript dated January 13, 2006

15.      Annexed hereto as <u>Exhibit N</u> is a true and correct copy of the invoice from Legal Link for the Lehwald deposition transcript dated June 21, 2006.

16.     Annexed hereto as <u>Exhibit O</u> is a true and correct copy of Motorola's Progressive Discipline Policy.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 5th day of July, 2006 at Boston, Massachusetts.

_____
KRISTIN GLENNAN MCGURN

BO1 15788322.1

## EXHIBIT A



J. Rein
**EXHIBIT NO.** 3
8/16/05
L. LONDON

 **MOTOROLA** | **EMPLOYMENT AGREEMENT**

In consideration of my employment, or continued employment by Motorola, or its subsidiaries (referred to separately or together as "Motorola") and the salary or wages paid to me, I understand and agree to the following provisions for the protection of Motorola property rights:

1. Not to disclose to Motorola, or to use in my work at Motorola (a) any confidential information belonging to others, including my prior employers (unless written authorization is first obtained), or (b) any prior inventions made by me which Motorola is not otherwise entitled to learn of or to use.

2. Not to use, or publish, or to otherwise disclose to others, either during or subsequent to my employment by Motorola, any confidential information of Motorola or its customers, except as my Motorola duties my require.

3. Upon termination of my employment by Motorola, to promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola, or any other materials which belong to Motorola.

4. To assign and I hereby assign to Motorola as its exclusive property the entire right, title and interest in all my inventions, innovations, or ideas developed or conceived by me solely, or jointly with others, at any time during the term of my employment and which inventions, innovations, or ideas relate to the actual or anticipated business activities of Motorola, or result from, or are suggested by, work which I do for Motorola.

5. To make and maintain written records of all inventions, innovations, or ideas referred to in paragraph 4 above and to submit promptly such records, and supplemental oral disclosures, to designated representatives of Motorola.

6. To execute all papers, and otherwise provide proper assistance, at Motorola's request and expense, during and subsequent to my employment by Motorola to enable Motorola or its nominees to obtain patents, copyrights, and legal protection for inventions or innovations in any country.

7. I represent that the inventions identified in the ___O___ pages I attach hereto comprise all the unpatented inventions which I have made or conceived prior to my employment by Motorola, which inventions shall be excluded from this agreement. (It is only necessary to list the title of such inventions and the purpose thereof, but not details of the invention itself per paragraph 1(b)). IF THERE ARE NO SUCH UNPATENTED INVENTIONS TO BE EXCLUDED, EMPLOYEE INTIAL HERE ___JSR___.

8. I further represent that I have attached hereto a copy of any agreement which presently affects my compliance with the terms of this present agreement. (Such copy must specify the other contracting party or employer, the date of such agreement, the date of termination of any employment). IF THERE IS NO SUCH AGREEMENT, EMPLOYEE INITIAL HERE ___JSR___.

This agreement replaces any existing employee agreement between Motorola and me regarding patents and/or confidential information and shall be binding on my executors, administrators, heirs, legal representatives or assigns.

This agreement may not be modified except in writing with approval of an officer of Motorola.

| WITNESS | EMPLOYEE |
|---|---|
| SIGNATURE _Sharon Comer_ | SIGNATURE _JSR_ |
| TYPED OR PRINTED NAME _Sharon Comer_ | TYPED OR PRINTED NAME _JAY S. REIN_ |
| DATE _6-24-02_ | DATE _6-24-02_ |

*Distribution: White - Patent Dept, Canary - Personnel Folder, Pink - Employee Copy*

CONFIDENTIAL

000015    SPD 14434 (7/84)

Involuntary Severance Plan yet.  He has been actively looking for other jobs and still maintaining on payroll status.  [I hope my facts are accurate and I have not been mislead.]

The reason for raising this point is to reiterate that fact that what I am looking for is similar fairness and treatment as I have observed with other ex-employees of MPS, and probably others if I were to look at bit harder.  The "optics" are such that it looks like when another manager was doing the position eliminations within MPS there was more consideration given to the needs of the affected employee.

Thanks again for your support and the work you are doing on my behalf.

JSR


508-893-6926 - office
847-761-4814 - fax
617-899-2699 - cell
Rein@Motorola.com


[Rein Jay-REIN]  -----Original Message-----
**From:** Rein Jay-REIN
**Sent:** Wednesday, February 25, 2004 3:22 PM
**To:** Tobin Peter-APT010
**Subject:** Follow-Up to Our Call Today
**Importance:** High
**Sensitivity:** Confidential


Peter,

Thank you for taking my call earlier today and thank you for working on my behalf to assist in this transitionary period.  To restate what I think we both agreed you were going to work on:

- converting the 8.5 weeks plus the 2 weeks of "severance" lumpsum payout into an on payroll status whereby I could be considered an employee of record of Motorola through a to be determined date in June.
- for the same period of time, all eligible benefits (Oct 2003 --> March 2004 MotShare participation and similar) are made available to me as a regular employee.  I assume (though we did not discuss) that I would similarly pay Health, Dental, Life and other at group rates as I am today.
- upon completion of this time period, access to programs such as COBRA, rollover of my 401K, eligibility for MA Unemployment insurance, and Drake Beam Moran outplacement services (which we did not discuss) will be made available.
- Not Discussed, but I am assuming that if you are successful in getting approval of this "Individual ISP" that I will be able to utilize the Motorola Network, email and other resources to continue to communicate with others on my quest for future employment opportunities.  All associated resources belonging to Motorola would be returned upon the completion of the aforementioned time period.

As we talked, all of the above is being requested in order to provide me with an opportunity to [re]enter the marketplace without the prejudices often associated with an unemployed worker.  Additionally, resulting from various performance reviews and a retention bonus paid just weeks ago, I chose to forego a non-Motorola job opportunity, which today no longer exists.

I am looking forward to talking on Friday (or sooner) to hear how things are proceeding.

Sincerely,

JSR

**MI000304**

---------------------------------------------------

**Jay S. Rein**

508-893-6926 - office
617-899-2699 - cell
Rein@Motorola.com

MI000305

**EXHIBIT C**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAY S. REIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 04-12580 NG |
| | ) |
| MOTOROLA, INC., CLYDE | ) |
| KOFMAN, and JUERGEN STARK, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### PLAINTIFF'S ANSWERS AND OBJECTIONS TO
### DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Jay

S. Rein ("Rein" or the "Plaintiff"), responds and objects to the Defendant Motorola's

First Set of Interrogatories to Plaintiff as follows:

*General Objection No. 1* – Plaintiff objects to each and every interrogatory to the

extent that they purport to impose requirements or obligations on the Plaintiff beyond

those imposed under the Federal Rules of Civil Procedure.

*General Objection No. 2* – Plaintiff objects to each and every interrogatory to the

extent it seeks disclosure of information protected by the attorney/client privilege, the

physician/psychotherapist privilege, the spousal privilege, the work product doctrine, trial

preparation materials or other materials protected by Rule 26(b) of the Federal Rules of

Civil Procedure.

*General Objection No. 3* – Plaintiff objects to each and every interrogatory to the extent that it is overly broad, unduly burdensome, vague, ambiguous or unreasonable in time or scope.

*General Objection No. 4* – Plaintiff objects to each and every interrogatory to the extent that it seeks information that is neither relevant to the claims or defenses presented in this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing General Objections and specifically incorporating those General Objections into each of the following responses, Plaintiff responds to each of the individually numbered interrogatories as follows:

## SPECIFIC RESPONSES TO INTERROGATORIES

Interrogatory No. 1

Please provide the name, address, telephone number, place of employment or business relationship, and position or duties of any person who has, claims to have, or whom you believe may have, knowledge or information pertaining to any fact alleged in the pleadings (as defined in Fed.R.Civ.P. 7(a)) filed in this action, or any fact underlying the subject matter of this action, and for each such person, state the specific nature and substance of the knowledge that you believe he or she has.

Answer to Interrogatory No. 1

In addition to the parties to this action, Rein believes the individuals identified below may have knowledge or information pertaining to one or more of the facts alleged in the pleadings:

| Name | Address | Subject |
|------|---------|---------|
| John Gillardi | Motorola, Inc.<br>1301 E. Algonquin Rd.<br>Schaumburg, IL 60196 | Rein's performance as part of the MPS Group; and the commitments made to the MPS Group by Motorola. |

| Name (cont.) | Address (cont.) | Subject (cont.) |
|---|---|---|
| Clay Brice | (Same) | Rein's performance as part of the MPS Group; and the commitments made to the MPS Group by Motorola. |
| Chuck Roark | (Same) | Rein's performance. |
| Keith England | (Same) | Rein's performance. |
| Vera Tsekeris | (Same) | Rein's performance. |
| Eric Abbott | (Same) | Rein's performance and the performance of other employees in the MPS Group. |
| Gabriel Saa | (Same) | Rein's performance. |
| Ed Glover | (Same) | Rein's performance related to cross-company initiatives and efforts. |
| Lindsay Smith | (Same) | Rein's performance related to cross-company initiatives and efforts to find alternate employment within BCS. |
| Janiece Webb | (Same) | Rein's efforts to find alternate employment within Motorola. |
| Peter Tobin | (Same) | Rein's efforts to find alternate employment within Motorola. |
| Warren Holtsberg | (Same) | Rein's efforts to find alternate employment within Motorola |
| Lindsay Smith | (Same) | Rein's efforts to find alternate employment within Motorola |
| Matt Aiden | (Same) | Rein's efforts to find alternate employment within Motorola |

3

| Name (cont.) | Address (cont.) | Subject (cont.) |
|---|---|---|
| Len DeBarros | Unknown | Rein's performance and the performance of other employees in the MPS Group. |
| Paul Zellner | Russell Reynolds 200 S. Wacker Dr. Chicago, IL 60606 | Rein's advantageous relations with the recruiting firm of Russell Reynolds. |
| Simon Blanks | Reilly Partners 200 W. Madison St. Suit 770 Chicago, IL 60606 | Offer of employment from Invoke Solutions, Inc. |
| Ken Coleman | LA Safe One Gateway Plaza Mail Stop 99-11-3 Los Angeles, CA 90012 | Rein's performance. |
| Byron Lee | (Same as above) | Rein's performance. |
| Robert Humphreys | ExpressLink, Inc. 16501 Ventura Blvd. Suite 300 Encino, CA 91436 | Rein's performance. |

Interrogatory No. 2

Where anything has been deleted or redacted from a document produced in response to Defendant Motorola's First Request for the Production of Documents, or where a document has been withheld because of a claim of privilege:

      a. specify the nature of the material deleted or withheld;

      b. specify the reasons for the deletion or withholding;

      c. identify the person responsible for the deletion or withholding; and,

      d. identify where the complete and undeleted or unredacted document is maintained.

4

Interrogatory No. 7

Identify each employer from whom you have worked since February 23, 2004, including in your answer the date(s) you were employed, the name(s) of your supervisors, your duties, and the reason(s) for your separation from said employment, if applicable.

Answer to Interrogatory No. 7

Rein objects to this Interrogatory to the extent that it is overbroad and is neither

relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding the foregoing objection and without waiver thereof, Rein answers that

since as follows, Rein has been employed as a Senior Director by GTSI since October 18,

2004.  His duties are related to the marketing and sales of technology products and

solutions to federal, state and local government.

Interrogatory No. 8

Describe in detail your efforts to find employment outside the Motorola Professional Services Group, from October 2003 to the present, whether or not such efforts were directed to positions outside Motorola, including in your description:

      a.  the specific jobs for which you applied or about which you inquired,

      b.  any interviews in which you participated,

      c.  the names of the employers,

      d.  the names of any headhunter(s), public or private employment service or agency that contacted you or that you contacted to assist you in seeking or obtaining employment,

      e.  the dates of any applications, inquiries or interviews,

      f.  the outcome of such applications, inquiries (including whether you were offered a job); and

      g.  if you were offered a job, the type of position, salary/benefits offered, whether you accepted the position, the date on which you accepted or rejected the position, and the reason(s) for your decision.

<u>Answer to Interrogatory No. 8</u>

Rein objects to this Interrogatory to the extent that requiring him to identify each and every prospective job he applied for, the dates he applied for such positions, etc. is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing objections, and without waiver thereof, Rein answers that, after being notified by Defendants that his employment was being terminated he made a diligent and comprehensive effort to find alternate employment, both within Motorola and with other prospective employers. With respect to Motorola, these efforts included networking among the various groups and divisions within the company (including but not limited to Janiece Webb, Warren Holtsberg, Lindsay Smith, Matt Aiden and Jann Melman, in an effort to find alternate employment, contacting and following up with representatives of the Human Resources Department and demanding that Motorola submit his name to the bi-weekly Leadership and Talent supply meeting to see if there were any potential positions available for which he was qualified. None of these efforts were successful in finding another position for Rein within Motorola.

With respect to other prospective employers, these efforts included, but were not limited to contacting potential "headhunters" and private employment agencies, reviewing various internet sites, such as hotjobs.com and execunet.com for potential listings, reviewing classified listings in local newspapers, and networking. Due to the number of applications made by Rein, it is impossible for him to recall each and every job for which he applied. Moreover, in many cases, the identity of the prospective employer was not revealed in the listing, and therefore Rein is unable to set forth the

identity of these employers.  A partial listing of the jobs to which Rein applied, together

with date of each such application are set forth in the documents produced by Rein in

response to Request No. 16 of Defendant Motorola's First Request for Production of

Documents.

As a result of Rein's efforts, he received an offer of employment from Kronos for

$135,000 a year and an offer from GTSI for a salary of $150,000 per year.  Rein accepted

the position at GTSI as a Senior Director and commenced working on October 18, 2004.

Interrogatory No. 9

If, between February 23, 2004 and the date you answer this interrogatory, there
was any period during which you were not employed and were not making any active
attempt to obtain employment, state the reason why you were not making any active
attempt to obtain employment and the relevant dates.

Answer to Interrogatory No. 9

At no time between February 23, 2004 and the present was Rein unemployed and

not making an active attempt to obtain employment.

Interrogatory No. 10

Identify all civil, criminal and administrative actions to which you have been a
party, witness or an affiant, including the dates, identifying case numbers, the court or
other venue in which the action was brought, the parties to each action, if known, and
your role in each action.

Answer to Interrogatory No. 10

Rein objects to this Interrogatory to the extent that it is overbroad and is neither

relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding the foregoing objection and without waiver thereof, Rein answers that

other than this action, and the complaint he filed with the Massachusetts Commission

Against Discrimination prior to commencing this action, he has never been involved in another civil, criminal or administrative action, either as a party, witness or affiant.

<u>Interrogatory No. 11</u>

If you have ever complained to any employer other than Motorola about any form of discrimination or harassment, please state as to each complaint:

      a.    the name and address of the employer to whom you complained;

      b.    the date of your complaint;

      c.    the date of the alleged discrimination;

      d.    the details of the alleged discrimination;

      e.    the name and title of the person with whom you lodged your complaint;

      f.    each action taken pursuant to your complaint;

      g.    the determination, if any, as to your complaint.

<u>Answer to Interrogatory No. 11</u>

Rein objects to this Interrogatory to the extent that it is overbroad and is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing objection and without waiver thereof, Rein answers: None.

<u>Interrogatory No. 12</u>

Provide the name, address, telephone number, place of employment or business relationship and position or duties of any person to whom you have spoken about this action or who you claim or believe has knowledge of information concerning the defendants' alleged wrongdoing, or about any fact alleged in any pleading (as defined in Fed.R.Civ.P. 7(a)) filed in this action, and state the specific nature and substance of any such conversations, when and where you communicated with him or her, the scope of his or her information, whether any statements have been taken from him or her, whether you intend to call him or her to testify as a witness in this case, and identify all documents that relate to the foregoing answers.

<u>Answer to Interrogatory No. 12</u>

See Plaintiff's Answer to Interrogatory No. 1.

<u>Interrogatory No. 13</u>

Describe your duties during your employment at Motorola.

<u>Answer to Interrogatory No. 13</u>

Rein was hired as a Principal within Motorola's Professional Services Organization. He reported directly to Len DeBarros, Senior Vice President and Head of Motorola Professional Services for the Americas. His duties included business development, sales and marketing and the delivery of professional services to enterprise customers of Motorola.

<u>Interrogatory No. 14</u>

Identify every instance in which you allege that the defendants discriminated against you or any other current or former Motorola employee, or treated you or another employee differently on account of age, including in your answer:

   a.  the name of the employee;

   b.  the date of such incident;

   c.  a detailed description of the incident;

   d.  who was involved in or responsible for the incident;

   e.  who witnessed the incident;

   f.  identify any documents concerning the incident.

<u>Answer to Interrogatory No. 14</u>

Rein is currently aware of at least five incidents of discrimination. They are:

1.  <u>The termination of Rein's employment by Motorola</u>

   a.  Rein

14

Signed under the pains and penalties of perjury this ____ day of April, 2005.

Jay S. Reir

As to objections:

John G. H. Coster
(BBO #101450)
92 State Street, Suite 900
Boston, Massachusetts 02109
(617) 423-2224

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of this documents was served on the attorney of record for each of the other parties by first class mail on April 8, 2005.

John G. H. Coster

23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAY S. REIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 04-12580 NG |
| ) | |
| MOTOROLA, INC., CLYDE ) | |
| KOFMAN, and JUERGEN STARK, ) | |
| ) | |
| Defendants. ) | |

PLAINTIFF'S RESPONSES AND OBJECTIONS TO
DEFENDANTS' REQUEST FOR DOCUMENTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Jay

S. Rein ("Rein" or the "Plaintiff") responds and objects to the Defendant Motorola's First

Request for Production of Documents to the Plaintiff as follows:

*General Objection No. 1* – Plaintiff objects to each and every request for the

production of documents to the extent that they purport to impose requirements or

obligations on the Plaintiff beyond those imposed under the Federal Rules of Civil

Procedure.

*General Objection No. 2* – Plaintiff objects to each and every request for the

production of documents to the extent that they seek documents that are not within the

Plaintiff's custody or control.

*General Objection No. 3* – Plaintiff objects to each and every request for the

production of documents to the extent that they call for the production of documents

protected by the attorney/client privilege, the physician/psychotherapist privilege, the

spousal privilege, the work product doctrine, trial preparation materials or other materials

protected by Rule 26(b) of the Federal Rules of Civil Procedure.

*General Objection No. 4* - Plaintiff objects to each and every request for the

production of documents to the extent that it is overbroad, unduly burdensome, and

neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

## DOCUMENTS REQUESTED

### Request No. 1

All documents concerning your employment or termination from employment at
Motorola, including any contracts, agreements, terms and conditions of employment,
personnel records or files, descriptions of job duties , and performance evaluations.

### Response to Request No. 1

Plaintiff objects to this Request on the grounds that it is overbroad, unduly

burdensome and neither relevant nor reasonably calculated to lead to the discovery of

admissible evidence. Notwithstanding the foregoing objection, and without waiver

thereof, the Plaintiff will produce those non-privileged documents in his possession,

custody or control concerning any contracts or agreements relating to his employment,

the terms and conditions of his employment, his personnel files, his job duties and his

performance evaluations.

### Request No. 2

All documents that pertain to Motorola's personnel or employment policies,
practices or procedures, including any handbooks, guidelines, manuals and other
publications.

<u>Response to Request No. 2</u>

Plaintiff will produce those non-privileged documents in his possession, custody

or control responsive to this Request.

<u>Request No. 3</u>

All documents, including minutes, notes or summaries of meetings reflecting
discussions or communications between, or attended by, you and any officer, employee,
representative or agent of Motorola, in the course of your employment with Motorola,
concerning the subject(s) of alleged harassment, discrimination or bias based on age,
against you or any other current or former Motorola employee.

<u>Response to Request No. 3</u>

Plaintiff will produce those non-privileged documents in his possession, custody

or control responsive to this Request.

<u>Request No. 4</u>

All documents concerning any promises, guarantees or assurances made by
Motorola, Clyde Kofman or Juergen Stark, concerning the terms and conditions of your
employment.

<u>Response to Request No. 4</u>

Plaintiff will produce those non-privileged documents in his possession, custody

or control responsive to this Request.

<u>Request No. 5</u>

All documents, items, objects and effects that you took with you from Motorola
following your termination.

<u>Response to Request No. 5</u>

Plaintiff objects to this Request on the grounds that it is neither relevant nor

reasonably calculated to lead to the discovery of admissible evidence.

3

Request No. 6

All documents you received from or sent to Russell Reynolds, Inc. or that concern your communications or relationship with Russell Reynolds, Inc.

Response to Request No. 6

Plaintiff objects to this Request to the extent it is overbroad and neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing objection, and without waiver thereof, the Plaintiff will produce those non-privileged documents in his possession, custody or control concerning communications between himself and Russell Reynolds with respect to his efforts to find another position after the termination of his employment from Motorola.

Request No. 7

All documents, including but not limited to diaries, calendars, appointment books, journals or notebooks reflecting or concerning meetings in which you participated, in person or otherwise, while employed by Motorola, regarding the Motorola Professional Services Group ("MPS"), its reorganization, its business plans or the performance of MPS or its members.

Response to Request No. 7

Plaintiff objects to this Request on the grounds that it is vague, unclear, overbroad, unduly burdensome and neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Request No. 8

All documents that evidence benefits and income earned and/or paid to you from January 1, 2000 through the present, whether received or not, including pay stubs, Form W-2's, Form 1099's, state and federal tax returns, dividend statements, commission statements, unemployment compensation, Social Security benefits, workers' compensation, veteran's benefits and any other compensation and/or benefit paid or earned whether through employment, self-employment or otherwise.

4

Request No. 16

All documents concerning your efforts to find employment, including self-employment, from February 23, 2004 to the present, including any cover letters, resumes, log books, return and follow-up correspondence, diaries, calendars, appointment book or notebooks and all other similar documents.

Response to Request No. 16

Plaintiff objects to this Request to the extent that it is unduly burdensome, overbroad and neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Notwithstanding the foregoing objection, and without waiver thereof, Plaintiff will produce computer generated printouts of the positions for which he has applied through several "internet" job listing sites.

Request No. 17

All documents concerning your termination from employment at Motorola and the events, circumstances and/or investigations leading to or concerning your termination from employment at Motorola.

Response to Request No. 17

Plaintiff will produce those non-privileged documents in his possession, custody or control responsive to this Request.

Request No. 18

All documents that in any way relate to any communication between any persons and you concerning any allegation in your Complaint and/or any incidents, events, facts, or occurrences that support or relate to said allegations and/or your alleged damages.

Response to Request No. 18

Plaintiff objects to this Request to the extent that it calls for the production of documents protected by the attorney-client privilege and the work product doctrine. Notwithstanding the foregoing objection, and without waiver thereof, the Plaintiff does not have any non-privileged documents responsive to this Request.

<u>Response to Request No. 24</u>

Plaintiff objects to this Request on the grounds that the information requested is neither relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request on the grounds that the information requested is confidential medical information protected from disclosure under state and federal law.

JAY S. REIN

By his attorney,

John G. H. Coster
(BBO #101450)
92 State Street, Suite 900
Boston, Massachusetts 02109
(617) 423-2224

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of this documents was served on the attorney of record for each of the other parties by mail on April 8, 2005.

John G. H. Coster

11

**EXHIBIT D**

1

1    CERTIFIED ORIGINAL            Volume:      I
          LEGALINK BOSTON

2                                  Pages:      1-225

3                                  Exhibits:  1-14

4            UNITED STATES DISTRICT COURT

5        FOR THE DISTRICT OF MASSACHUSETTS

6            Civil Action No. 04-12580 NG

7    - - - - - - - - - - - - - - - - - - - x

8    Jay S. Rein,

9                    Plaintiff,

10        v.

11    Motorola, Inc., Clyde Kofman,

12    and Juergen Stark,

13                    Defendants.

14    - - - - - - - - - - - - - - - - - - - x

15

16            DEPOSITION OF JAY STUART REIN

17            Tuesday, August 16, 2005

18                10:23 a.m.

19            SEYFARTH SHAW LLP

20            World Trade Center East

21        Two Seaport Lane, Suite 300

22        Boston, Massachusetts 02210-2028

23

24    Reporter:  Lori-Ann London, RPR



Jay Stuart Rein                                              08/16/2005

30

1      Q     Did you produce any documents in

2  response to Motorola's request for the production

3  of documents in connection with this case?

4      A     I believe so, yes.

5      Q     Okay.  Where did you search for

6  documents in order to do that?

7      A     I went back to past tax records, went

8  back to past pay stubs.  That's about all I

9  recall.

10      Q     Okay.  Did you produce any -- do you

11  recall producing any other documents besides some

12  pay stubs and tax records?

13      A     I believe I produced copies of e-mails.

14      Q     Where did you obtain those e-mails from?

15      A     They were copies that I had in my files.

16      Q     Where were those files located?

17      A     Computer.

18      Q     Okay.  Did you have a computer from

19  Motorola which you used for the purpose of your

20  employment with the company?

21      A     Yes.

22      Q     And is that the computer on which you

23  searched for e-mails?

24      A     Yes.

Jay Stuart Rein                                              08/16/2005

31

1      Q    Do you still have that computer?

2      A    Yes.

3      Q    Okay.  Did you produce anything aside

4   from past tax records, pay stubs, and copies of

5   e-mails?

6      A    I don't think so.

7      Q    Okay.  Did you search anywhere other

8   than on your computer for documents in response to

9   that request?

10     A    I may have searched for benefits books

11  or, you know, any policy or procedure documents

12  that may have been provided to me.

13     Q    And where would you have maintained

14  those?

15     A    If I was given them by Motorola, I would

16  have maintained them in a file, a personal file.

17     Q    During your employment with Motorola,

18  you worked from your home at Holliston; is that

19  correct?

20     A    Yes.

21     Q    Was that true for the entire tenure at

22  Motorola?

23     A    When I wasn't on site at Motorola,

24  correct.

32

1    Q    Did you retain -- aside from the

2 documents that you've described, that being copies

3 of e-mails and benefits information, do you recall

4 retaining any Motorola documents following your

5 departure from the company?

6    A    Can you define Motorola documents?

7    Q    Any documents that you received or sent,

8 you know, were to or from Motorola, pertaining to

9 your employment?

10    A    Pertaining to my employment?

11    Q    Um-hm.

12    A    I don't think so.

13    Q    Okay.  Do you recall any other --

14 retaining any other documents following your

15 departure from Motorola that were sent to Motorola

16 or received by you from Motorola whether or not

17 they pertained to your employment?

18    A    Yes.

19    Q    What are those documents?

20    A    I believe I have some PowerPoint

21 presentations presented to Stark on or around

22 October 14th and again on October 17th.

23    Q    And did you maintain those also on your

24 computer?

Jay Stuart Rein                                                        08/16/2005

33

```
 1        A    I'm sure they're there.

 2        Q    Okay.  Did you retain them also in hard

 3   copy?

 4        A    Yes.

 5        Q    The computer on which these PowerPoint

 6   presentations are maintained, is that the same

 7   Motorola computer that you used during your

 8   Motorola employment?

 9        A    Yes.

10        Q    Did you have an agreement with anyone to

11   return Motorola's computer upon your termination?

12        A    No.

13        Q    Did you have any communications with

14   anyone at Motorola regarding the return of that

15   computer?

16        A    No.

17        Q    Did you undertake the search personally

18   for documents responsive to Motorola's request for

19   the production of documents on that computer?

20        A    When Motorola's request for documents

21   from that computer came through, the computer was

22   inactive.

23        Q    Why is that?

24        A    I do not know.  I assume that Motorola
```

Jay Stuart Rein                                                08/16/2005

34

1    deactivated my log-in while it was on the network,

2    so I do not have access to that computer.

3        Q    Do you continue to use it in some

4    capacity?

5        A    No.

6        Q    Where is it located?

7        A    In a box.

8        Q    Okay.  When is it -- at what point do

9    you understand the computer to have been

10   deactivated?

11       A    I assume the computer was deactivated

12   when I gave notice to Motorola that I was not

13   going to be signing the waiver.

14       Q    But you became aware of that

15   deactivation at the time that you sought to

16   produce documents in response to Motorola's

17   document request?

18            MR. COSTER:  Objection.

19       A    No.

20       Q    At what point did you become aware of

21   that?

22       A    The next morning, as I was still an

23   employee, I went to sign on to the network with

24   the computer and I was unsuccessful.

Jay Stuart Rein                                                08/16/2005

41

1      Q      Did you ask anyone -- any third parties

2   to produce documents back to you for purposes of

3   responding to Motorola's requests?

4      A      No.

5      Q      Did you have any assistance in looking

6   for documents responsive to the requests?

7      A      No.

8      Q      Would you -- did you maintain documents

9   pertaining to Motorola at anyplace other than your

10  home office in Holliston?

11     A      No.

12            MS. McGURN:   I'm going to mark

13  another document as Exhibit 3 and ask if you can

14  identify it.

15            (Document marked as Exhibit No. 3.)

16            (Document exhibited to witness.)

17     A      This says "Employment Agreement."

18     Q      Do you recognize the document?

19     A      I recognize it as Motorola's Employment

20  Agreement.

21     Q      Is that your signature on the bottom of

22  the page?

23     A      Yes, it is.

24     Q      And did you sign this document on or

42

1    about June 24th, 2002?

2         A    On June 24th, 2002.

3         Q    Did that coincide with the start of your

4    employment with Motorola?

5         A    Yes.

6         Q    And directing your attention to

7    subparagraph 3, was it your understanding that

8    upon termination you were expected to deliver

9    documents and records and other items pertain --

10   or materials belonging to Motorola?

11        A    As I read that now, yes.

12        Q    Did you have that understanding at the

13   time?

14        A    On June --

15             MR. COSTER:   Objection.

16        A    On June 24th, 2002?

17        Q    Right.

18        A    Yes.

19        Q    And did you maintain that understanding

20   at the time you terminated your -- or your

21   employment was terminated at Motorola?

22             MR. COSTER:   Objection.

23        A    At the time my employment was terminated

24   at Motorola on February 23rd, yes.

Jay Stuart Rein                                              08/16/2005

43

1          Q       Okay.    What about in the March or April

2     time period?

3          A       Nobody from Motorola was talking with

4     me --

5          Q       Okay.

6          A       -- in the April time period.

7          Q       What do you mean by that?

8          A       When discussions terminated and I sought

9     counsel, there was no more designated -- no one --

10     there was nobody for me to -- I was not in active

11     dialogue with any representatives from Motorola to

12     return any materials to.

13          Q       Did you understand that to relieve you

14     of your obligations to return Motorola's items?

15          A       Those items are prepared and ready to be

16     returned to Motorola --

17          Q       Okay.

18          A       -- when an individual is identified.

19          Q       Okay.    How old were you at the time that

20     you were hired by Motorola?

21          A       38 -- 38?   38.

22                  MR. COSTER:   Do the math.

23          A       I have to do the math.

24          Q       What's your date of birth?

44

```
 1        A      January 1st, 1964.

 2        Q      Okay.  What's your Social Security

 3    number?

 4        A      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.

 5        Q      Are you presently married?

 6        A      Yes.

 7        Q      What's your spouse's name?

 8        A      Amy.

 9        Q      How long have you been married to Amy?

10        A      11 and a half years.

11        Q      Were you previously married?

12        A      No.

13        Q      Do you have children with Amy?

14        A      Yes.

15        Q      How many children?

16        A      Three.

17        Q      What are their names?

18        A      Lauren, Marni, Sydney.

19        Q      How old is Lauren?

20        A      Nine.

21        Q      How old is Marni?

22        A      Seven.

23        Q      And how old is Sydney?

24        A      Four.
```

Jay Stuart Rein

08/16/2005

59

1    Q    How did you attain this position at
2    Worldspan?

3    A    A recruiter contacted me.

4    Q    Who was that?

5    A    A fellow by the name of Cliff West.

6    Q    Where does Cliff work?

7    A    Where does he work?

8    Q    Um-hm.  What company does he work for?

9    A    I believe it's a company called Trimark.

10    Q    Have you ever previously been placed in
11    employment by Cliff West?

12    A    No.

13    Q    When did you first become aware of the
14    position at Worldspan?

15    A    When he contacted me.

16    Q    When was that?

17    A    April or May of 2005.

18    Q    Following your departure from Motorola
19    and prior to your Worldspan position, which you
20    attained it sounds like ten days ago, did you have
21    any other employment?

22    A    Yes.

23    Q    Where was that?

24    A    A company called GTSI.

Case 1:04-cv-12382-RCL    Document 80-2    Filed 07/05/2006    Page 1 of 34

60

1      Q      And when did you begin to work at GTSI?

2      A      October of 2004.

3      Q      And when did you leave?

4      A      June of 2005.

5      Q      Between June of --

6      A      No, sorry, July of 2005.

7      Q      Do you recall the date in July?

8      A      July 22nd.

9      Q      Between July 22nd and --

10     A      August 1st.

11     Q      -- August 1st, did you have any other

12 intervening employment?

13     A      You mean for six days?

14     Q      Sorry.  Thank you for clarifying.  I was

15 thinking we had a month because I heard you say

16 June.

17            What is the address and phone number

18 of your supervisor at GTSI?

19     A      3901 Stonecroft Boulevard, Chantilly,

20 Virginia 20151.

21     Q      And your supervisor's name?

22     A      Scott Edwards.

23     Q      And what's Scott's phone number?

24     A      I do not have that with me.

117

1              MR. COSTER:   Objection.

2        A    I'd have to spend some time reading it

3    if you want to --

4        Q    Okay.  Did you in fact solicit or induce

5    colleagues to leave Motorola after you left the

6    company?

7        A    I did not personally solicit anybody to

8    leave the company.

9        Q    Did you encourage them to look for

10   employment outside of Motorola?

11       A    I did not encourage them to look for

12   employment outside of Motorola.

13       Q    Did you communicate in any way with

14   former colleagues about departing from Motorola,

15   their departing from Motorola?

16             MR. COSTER:   Objection.

17       A    I did not communicate with them about

18   them departing from Motorola.

19       Q    Did you have any communications with

20   former colleagues about opportunities outside of

21   Motorola?

22       A    I may have forwarded from time to time

23   information forwarded to me about opportunities

24   available.

118

1     Q     To whom did you forward such

2  information?

3     A     I don't recall all communications.

4     Q     Do you recall any specific

5  communications with any particular person about

6  that issue?

7     A     There may have been communications sent

8  to any one of a number of ex-MPS colleagues of

9  mine.

10     Q     Who are those colleagues?

11     A     Ex-colleagues.

12     Q  Um-hm.

13          MR. COSTER:  Objection.  Are you

14  asking who he communicated with or who he may have

15  communicated with or who his ex-colleagues are?

16          MS. McGURN:  I'm asking if he

17  recalls communications with any number of

18  ex-colleagues, which is the way you described

19  it --

20     A     Um-hm.  And my answer was yes, I may

21  have forwarded communications to ex-colleagues.

22     Q     Do you recall any specifically?

23     A     I recall sending communications.  If I

24  receive a communication someone has a job

Jay Stuart Rein                                                    08/16/2005

119

1    opportunity, I forward it on and that's it.  So I

2    didn't save messages.  I don't know exactly when

3    or who it was forwarded to.

4         Q    Okay.  Do you have a recall that you did

5    in fact -- you have a recall that you did in fact

6    forward such communications back to Motorolans?

7         A    For 20 years when job opportunities come

8    to me it's fairly standard practice to keep

9    friends in the recruiting industry, do you know of

10   anybody that might be interested.  I don't know

11   but I will forward a communication on if these

12   people are willing to accept it.

13        Q    And you did that following your

14   termination at Motorola?

15        A    Um-hm.

16        Q    Okay.  Did you have an understanding of

17   the range of compensation for principals at MPS

18   when you joined the company?

19        A    When I joined the company?

20        Q    Um-hm.

21        A    No.  You mean prior to when I joined --

22   when I joined the company means what date?

23        Q    Upon joining the company in June of

24   2002, did you have an understanding of the range

LegaLink Boston
(617) 542-0039

160

1       Q    When was that meeting?

2       A    It was either end of August or

3  September.  It was before the October meeting but

4  after he had joined the company.

5       Q    Do you recall any other meetings with

6  him during that time?

7       A    We had -- when he first joined the

8  company we had a phone teleconference for the

9  group that was under his responsibility where he

10  introduced himself.  So that was a telcon.  And

11  there might have been one or two other meetings

12  that probably had client or prospective client

13  content associated with them.

14      Q    With respect to the ExpressLink meeting,

15  what was the purpose for that meeting?

16      A    To review the current status of the sale

17  opportunity, to gain any direction or insight he

18  might want to provide, and to make sure that we

19  were going down a path that made sense for him and

20  where he wanted to take the group, though we still

21  hadn't heard from him where the group was headed.

22      Q    What precipitated that call -- that

23  meeting?

24      A    I think I may have just suggested, Hey,

161

1    it's a good idea to have it since we've got a

2    leader, because the sales effort was going to take

3    a lot of time and energy, so let's make sure we

4    should invest that time and energy.

5        Q    So I take it that during this meeting

6    you described the ExpressLink opportunity to him?

7        A    There was a PowerPoint presentation

8    provided to him.

9        Q    And do you recall his reaction to your

10   presentation?

11       A    Vaguely remember that didn't have

12   specific direction for the group yet, keep

13   proceeding forward with where you are on this.

14       Q    On this being the ExpressLink

15   opportunity?

16       A    Proceed forward.

17       Q    Were you and he the only people in

18   attendance at that meeting?

19       A    I don't recall if Kofman and Gillardi

20   were there.  Brice may have been.  I don't -- I

21   don't recall.  I mean Brice and I were working on

22   it -- Clay Brice and I, I believe, were working on

23   it together, and we were all discussing the

24   opportunities as a team.  I'm not sure if anybody

162

```
 1    else was in the room or not.

 2         Q    Did you prepare the PowerPoint?

 3         A    Yes, I did.

 4         Q    Did you have anyone else offer input to

 5    the PowerPoint?

 6         A    I believe I may have.

 7         Q    Who -- do you know who that would have

 8    been?

 9         A    Whoever would have attended in support

10    of it --

11         Q    Okay.

12         A    -- would have had input.

13         Q    Okay.  And was the group at that time

14    cohesive behind pursuing the ExpressLink

15    opportunity?

16              MR. COSTER:  Objection.

17         A    I don't -- I mean not everybody was

18    making the sales calls.  Clay Brice and I were on

19    the West Coast for the LA County, the LA Safe

20    opportunity, so we were starting to engage

21    together on that.  So he and I were cohesive,

22    using your words, on that opportunity, but I can't

23    speak for whether everybody in the group agreed

24    that that was the right opportunity to pursue.
```

Jay Stuart Rein

08/16/2005

165

1    Q    But you don't specifically recall?

2    A    I don't -- I don't recall what was on my

3    calendar back then.

4    Q    Do you have a calendar from back then?

5    A    I had a calendar on their system.

6    Q    Okay.  And do you currently maintain a

7    calendar?

8              MR. COSTER:  For his current job?

9              MS. McGURN:  Yeah.

10   A    I maintain an electronic calendar --

11   Q    Okay.

12   A    -- for as long as they've been around.

13   Q    So during the time period of your

14   Motorola employment you maintained your calendar

15   electronically?

16   A    Yes.

17   Q    Okay.  And in your calendar do you

18   record -- personally record for yourself meetings?

19   A    Record meetings.  What does that mean?

20   Q    Reflect meetings in your calendar.

21   A    You mean scheduled?

22   Q    Um-hm.

23   A    I believe so.

24   Q    Does anyone do that work for you?

166

1    A   No.

2    Q   Okay.  Do you in your calendar reflect

3  teleconferences as well?

4    A   If they're scheduled in advance and

5  they're not ad hoc, I would.

6    Q   Okay.  And throughout the course of your

7  employment with Motorola, did you maintain an

8  electronic calendar for the entire period that you

9  worked there?

10    A   I believe I did.

11    Q   Okay.  And was that an Outlook calendar?

12    A   If that's the tool that we had there.

13    Q   Did you get along with Stark?

14         MR. COSTER:  Objection.

15    A   I had probably three or four maybe

16  interactions before our October meetings, and I

17  would say the interactions were professional in

18  nature.

19    Q   Do you believe he's treated you fairly?

20         MR. COSTER:  Objection.

21    A   I don't know what you mean by that

22  question.

23    Q   Do you understand the meaning of the

24  word "fairly"?

Jay Stuart Rein, Vol. 2                          08/26/2005

226

1   CERTIFIED ORIGINAL          Volume:    II
    LEGALINK BOSTON
2                               Pages:     226-590

3                               Exhibits:  15-49

4          UNITED STATES DISTRICT COURT

5       FOR THE DISTRICT OF MASSACHUSETTS

6          Civil Action No. 04-12580 NG

7   - - - - - - - - - - - - - - - - - - - - - - x

8   Jay S. Rein,

9                    Plaintiff,

10       v.

11  Motorola, Inc., Clyde Kofman,

12  and Juergen Stark,

13                   Defendants.

14  - - - - - - - - - - - - - - - - - - - - - - x

15

16      DEPOSITION OF JAY STUART REIN

17       Friday, August 26, 2005

18            10:00 a.m.

19         SEYFARTH SHAW LLP

20        World Trade Center East

21      Two Seaport Lane, Suite 300

22      Boston, Massachusetts 02210-2028

23

24  Reporter:  Lori-Ann London, RPR

Jay Stuart Rein, Vol. 2                          08/26/2005

525

1   successful with Stark in extending the terms of

2   that; that it would give him some flexibility and

3   leeway as he was learning about the approvals for

4   his numbers in his group.

5       Q    And what did you say in connection with

6   that conversation with respect to the terms of

7   your separation?

8       A    That I would keep him posted.

9       Q    When was the conversation with Warren?

10      A    I believe it was February 24th.

11      Q    So right after?

12      A    Immediately after.

13      Q    Okay.  And you in fact did negotiate

14  with Stark to stretch out the timing of your

15  separation, didn't you?

16      A    No, I did not.

17      Q    Did you request to remain on payroll at

18  Motorola following your termination, following the

19  date that Kofman informed you of your termination?

20      A    I requested to stay on payroll with or

21  without salary -- with salary for the period of

22  the severance, and possibly without salary for the

23  period beyond the severance.

24      Q    And were you permitted to remain on

Jay Stuart Rein, Vol. 2                           08/26/2005

526

1    payroll for some period of time after the date

2    that was initially set as your effective date of

3    termination?

4                    MR. COSTER:   Objection.

5        A    I think I was taken off payroll when I

6    was given checks by the company for severance.

7        Q    Okay.  Did you have an understanding

8    that Motorola agreed to your request to remain on

9    payroll for some period of time in order to

10   accommodate your efforts to seek other employment?

11       A    My request to remain on payroll was for

12   a period of time longer than the period they were

13   willing to grant me.

14       Q    Okay.  But they granted you some

15   additional time, didn't they?

16       A    I do not believe they granted me

17   additional time above the standard severance time.

18       Q    But they gave you that time on payroll,

19   and then they gave you the severance, didn't they?

20                   MR. COSTER:   Objection.

21       A    They're not related that I understand,

22   that I know.

23       Q    Did you receive -- strike that.  We'll

24   get to it.

Jay Stuart Rein, Vol. 2                          08/26/2005

550

1    you not, an opportunity to remain on payroll

2    through May 31st?

3         A    That's what the letter says, correct.

4         Q    Did you in fact remain on payroll

5    through that period of time?

6         A    I do not believe so.

7         Q    Okay.  But you remained on payroll,

8    didn't you, during the negotiations relating to

9    enhancing the severance package, right?

10        A    I do not know.

11        Q    Okay.  Why is that?

12        A    Because I have no knowledge whether I'm

13   on their payroll systems or not.

14        Q    Okay.  Did you receive compensation from

15   them reflecting payroll earnings after

16   February 24th, 2004?

17        A    I assume I did, but I don't know if it's

18   because I'm on the payroll system or they were

19   beginning to fulfill the terms of this agreement

20   which I had not agreed to yet.

21        Q    Okay.  So you have no awareness at this

22   point of whether you received both an enhanced

23   payroll term as well as an involuntary separation

24   package from Motorola?

591

VOLUME: III

PAGES: 591-846

EXHIBITS: 50-55

CERTIFIED ORIGINAL
LEGALINK BOSTON

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

JAY S. REIN,

                    Plaintiff,

    v.                              Civil Action

MOTOROLA, INC., CLYDE KOFMAN,       No. 04-12580 NG

and JUERGEN STARK,

                    Defendants.

- - - - - - - - - - - - - - - - - - x


CONTINUED DEPOSITION of JAY STUART REIN

January 13, 2006

9:15 a.m.

Seyfarth Shaw LLP

World Trade Center East

Two Seaport Lane

Boston, Massachusetts


Reporter: Michael D. O'Connor, RPR

594

1             P R O C E E D I N G S

2

3             JAY STUART REIN

4

5    having been satisfactorily identified by the

6    production of his driver's license, and duly sworn

7    by the Notary Public, was examined and testified as

8    follows:

9

10           MS. McGURN:  Do you want to use the same

11   stipulations, John?

12           MR. COSTER:  That's fine.

13           MS. McGURN:  Objections and motions to

14   strike will be reserved.  The witness will read and

15   sign the deposition.  We'll waive the requirement of

16   the notary.

17           MR. COSTER:  That's fine.

18                CONTINUED DIRECT EXAMINATION

19     BY MS. McGURN:

20     Q.   Mr. Rein, were you issued a laptop by

21   Motorola when you commenced your employment in June

22   of 2002?

23     A.   Yes, I was.

24     Q.    Is that the laptop you returned to me on

595

| 1 | August 26th? |
|---|---|

1   August 26th?

2       A.   Yes, it was.

3       Q.   Do you recall when in June you received the

4   laptop in relation to your start?

5       A.   It was probably June 22 or 23rd.  It was

6   either the first or second day of my employment.

7       Q.   And you used that laptop throughout your

8   employment with Motorola?

9       A.   Yes, I did.

10      Q.   And after your termination with Motorola?

11           MR. COSTER:  Objection.

12      A.   After the date I was notified I was

13  terminated, I still used that laptop, yes.

14      Q.   Who issued it to you?  Who did you receive

15  it from?

16      A.   I do not recall.

17      Q.   Was it from someone in HR or from someone

18  in NPS?

19      A.   I do not recall.

20      Q.   At that time you knew you would be working

21  remotely from your home in Holliston?

22      A.   Yes.

23      Q.   And Motorola knew that as well?

24      A.   Yes.

Jay Stuart Rein, Vol. 3                          01/13/2006

596

1      Q.    Was it ever contemplated that your

2  principal work for the company would be conducted in

3  a location other than Holliston, Massachusetts?

4      A.    If I understand the question, when I wasn't

5  working in front of clients, customer sites, client

6  sites, or if I wasn't on site at Schaumburg or Fort

7  Lauderdale or some other remote facility, then

8  Holliston is where I would be working.

9      Q.    And you were never assigned to an office?

10     A.    No.

11     Q.    Are you currently working in an office?

12     A.    Yes.

13         MR. COSTER:  Objection.

14     Q.    When you received the laptop from Motorola,

15  what programs had been installed on it for you?

16     A.    To my recollection, there was Word,

17  PowerPoint, Excel, Microsoft Outlook, there was VPN

18  software for connectivity to the Motorola intranet,

19  there was dial-up software to use a modem, to dial

20  up into the Motorola intranet, there might have been

21  Microsoft Access on it, there might have been Visio

22  on it, and then any other application that comes

23  with the Microsoft Windows suite of software.  I do

24  not recall any others that I would have used.

Jay Stuart Rein, Vol. 3                          01/13/2006

597

1      Q.    Was it Microsoft Office that had been

2   utilized by the company and installed on your

3   computer?  Is that the suite you're referring to?

4          MR. COSTER:  Objection.

5      A.    Yes.  It's PowerPoint, Excel, Outlook.  I

6   don't know whether we used Office or XP or NT, but

7   it was a Microsoft platform.

8      Q.    And those were installed locally on your

9   laptop?

10     A.    I don't know where they were installed.

11  They were on the laptop when it was given to me.

12     Q.    And those were applications, with the

13  exception of Outlook, that you could use without

14  accessing Motorola servers?

15     A.    When I had the laptop and it was a

16  functioning laptop, I could use PowerPoint, Excel,

17  Word, Visio, without access to Motorola, correct.

18     Q.    And you did?

19     A.    While I was employed with Motorola, yes.

20     Q.    What is Visio?

21     A.    Visio is like a -- I don't know how to

22  describe it.  It allowed me to create org. charts

23  and presentations easier than you could create with

24  PowerPoint.

Jay Stuart Rein, Vol. 3                          01/13/2006

600

1       A.   Because we saved folders out to that

2    directory for review by others.

3       Q.   When you say "we," to whom are you

4    referring?

5       A.   To colleagues of Motorola Professional

6    Services.

7       Q.   Do you recall saving folders to that

8    directory for use by others within Motorola

9    Professional Services?

10      A.   Yes.

11      Q.   What do you recall saving to that

12   directory?

13      A.   When Len DeBarros was running the

14   organization, we had, I think, either monthly or

15   quarterly reviews with him in Fort Lauderdale, and

16   we were asked to drop our presentations for those

17   reviews onto that server before we arrived in town

18   so that whoever was gathering up all the

19   presentations could consolidate them for one big

20   presentation.

21      Q.   Do you recall storing any other documents

22   on that directory?

23      A.   No.

24      Q.   So aside from those documents, the storage

601

1    that you did occurred on your hard drive?

2        A.    Correct.

3        Q.    Did you receive instructions from anyone at

4    Motorola about the use of that computer?

5        A.    Can you define "instructions"?

6             MR. COSTER:  Objection.

7        Q.    Did anyone tell you how to turn it on and

8    start it up when you initially started employment

9    with Motorola?

10        A.    How to turn it on and start it up, no.

11        Q.    You knew how to deal with that on your own?

12        A.    Yes.  Someone probably showed me -- someone

13    did show me how to dial on to the Motorola network

14    while I wasn't in a Motorola facility with the

15    laptop.

16        Q.    Who was that?

17        A.    I do not recall.

18        Q.    Was it somebody from the IT department?

19        A.    I honestly don't recall.

20        Q.    Do you recall them showing you anything

21    else about the laptop?

22        A.    No.  It was basically how to connect.

23        Q.    Did you have any assistance setting up the

24    home office?

Jay Stuart Rein, Vol. 3                    01/13/2006

603

1        A.    Yes.

2        Q.    Were there firewalls installed applicable

3    to your laptop?

4              MR. COSTER:  Objection.

5        A.    I wouldn't know.

6        Q.    You didn't have any awareness you had to

7    pass through firewalls in order to access Motorola

8    servers?

9              MR. COSTER:  Objection.

10        A.    My knowledge is firewalls are managed by IT

11    and employees don't know about them until they bump

12    into them.

13        Q.    And you don't recall bumping into them?

14        A.    No.

15        Q.    Did you take the laptop with you when you

16    traveled for business?

17        A.    Yes.

18        Q.    Initially, when you were using dial-up

19    access, what were the steps that you took to achieve

20    access to Motorola servers?

21              MR. COSTER:  Objection.

22        A.    I can try to recollect those steps as best

23    I can.

24        Q.    Thank you.

Jay Stuart Rein, Vol. 3                    01/13/2006

607

1    right?

2        A.    Yes.  On the airplane, yes.

3        Q.    I should have used that word.  What other

4    times do you recall routinely working off line?

5            MR. COSTER:  Objection.

6        A.    Basically it was whenever there was not

7    access to a connection, which would be on airplanes.

8    I would say probably just on airplanes.

9        Q.    In hotels?

10       A.    No.  In hotels, most of the hotels that

11   Motorola put us at, I believe they were only putting

12   us in hotels that had broadband or some sort of

13   dial-up connection so we could remain productive

14   while we were on the road.

15       Q.    Forgive me if I asked this question

16   already, but was this the only laptop that you used

17   on behalf of Motorola?

18       A.    Yes.

19       Q.    Were there any other computers on which you

20   worked performing work for Motorola?

21       A.    No.

22       Q.    Did you have a home computer aside from the

23   laptop?

24           MR. COSTER:  Objection.

608

1          A.    My wife had a home computer.

2          Q.    Did you ever perform any work for Motorola

3     on that computer?

4          A.    No.

5          Q.    Did you use that computer in any capacity?

6          A.    Yes.

7          Q.    Do you currently have a home computer?

8          A.    Yes.

9          Q.    For what do you recall using your wife's

10    home computer?

11              MR. COSTER:  I'm going to object to this

12    line of questioning, because again, it's my

13    understanding that the focus of this deposition is

14    the laptop computer issued to Mr. Rein by Motorola,

15    and not other computers that his wife may have had

16    in their home.  I don't see what possible relevance

17    questioning Mr. Rein about his wife's computer,

18    which he has testified he did not use for any

19    Motorola work, has to this deposition or to this

20    litigation.

21              MS. McGURN:  He previously testified that

22    he communicated with a prospective employer in

23    January of 2002 on his wife's computer, and --

24              MR. COSTER:  Again, under the terms of the

Jay Stuart Rein, Vol. 3                    01/13/2006

620

1      Q.   Do you recall when you delivered it to your

2   lawyer?

3      A.   I do not recall when this was delivered to

4   my lawyer, no.

5      Q.   Do you recall whether it was in the past

6   month?

7      A.   I do not know.

8      Q.   Directing your attention to Page 2 of the

9   handbook, which is Page 5 of the exhibit, it says

10  "Customer Information" and directs employees to

11  protect customer information that's sensitive,

12  private or confidential; is that right?

13     A.   Yes, I see that paragraph.

14     Q.   Did you have an awareness while you were an

15  employee of Motorola that that was an obligation

16  that they expected of you?

17     A.   Yes.

18     Q.   Directing your attention to the next page

19  of the exhibit, at the top of the page it discusses

20  protecting Motorola assets.

21     A.   I see that paragraph.

22     Q.   Did you have an understanding while you

23  were an employee of Motorola that you had an

24  obligation to protect Motorola assets entrusted to

Jay Stuart Rein, Vol. 3                          01/13/2006

621

1     you for loss, damage, misuse and theft?

2          A.   Yes.

3          Q.   And that Motorola assets included funds,

4     products and computers?

5          A.   Yes.

6          Q.   And that those were to be used for business

7     purposes or purposes approved by management?

8          A.   Yes.

9          Q.   And you understood that when you were an

10    employee of Motorola, right?

11         A.   Yes.

12         Q.   Directing your attention to the next

13    paragraph which discusses proprietary information.

14    You understood that it was your obligation to

15    safeguard company proprietary information; is that

16    right?

17         A.   Yes.

18         Q.   Including marketing and client information?

19         A.   Yes.

20         Q.   And you understood that that obligation

21    continued after your employment with the company

22    ended?

23         A.   Yes.

24         Q.   Directing your attention to the bottom of

Jay Stuart Rein, Vol. 3                          01/13/2006

622

1    that page, the paragraph entitled "Recording and

2    Retaining Business Communications," you understood,

3    did you not, that records were to be retained and

4    destroyed only according to Motorola's retention

5    policies; is that fair?

6         A.   That's what it says, yes.

7         Q.   And you had that understanding when you

8    were an employee there?

9         A.   Yes.

10        Q.   Directing your attention to the next

11   document which we will mark as Exhibit 51.

12             (Document marked as Exhibit 51

13             for identification)

14        Q.   Do you recognize the document?

15        A.   No, I do not.  It says "Motorola Standard

16   Operating Procedure, Appropriate Use of Computer

17   Resources."

18        Q.   And you produced this in discovery in this

19   litigation?

20        A.   I assume so.  I don't know.  Can I clarify

21   something?

22        Q.   Sure.

23        A.   I found a whole host of documents a couple

24   weeks ago during the Christmastime when I was

623

1   unpacking boxes in my basement as a result of my

2   move.  When I immediately recognized Motorola

3   documents, I put them in a box and sent them to my

4   attorney.  I did not go through those documents.  I

5   did not look at them.  So if I am answering that I

6   don't know if this was produced in the past week or

7   not, it is because I found documents, put them in a

8   FedEx box and I shipped them to Mr. Coster.

9        Q.    When did that occur?

10       A.    That occurred a week ago, a week and a half

11  ago.  Sometime in the past week or so.

12       Q.    Okay.  We'll get back to that later.  I

13  will represent to you that Exhibit 51 is a document

14  that came from the stack of documents that was

15  produced to me two days ago, made available to me

16  two days ago, which I received yesterday, and

17  purports to be -- you recognize it to be, do you

18  not, the standard operating procedure from Motorola

19  regarding appropriate use of its computer resources?

20            MR. COSTER:  Objection.  If you recognize

21  it or remember ever having seen it before.

22       A.    I don't remember having seen it.  It states

23  it's the standard operating procedure E-62,

24  appropriate use of computer resources.

Jay Stuart Rein, Vol. 3                                    01/13/2006

624

1      Q.   Did you have an awareness of appropriate

2   use of computer resources and Motorola's policy with

3   respect thereto while you were an employee for the

4   company?

5           MR. COSTER:  Objection.

6      A.   Without having recollection of this

7   document, it was my understanding, as with every

8   other employer I've worked for, that this computer

9   is for company use.

10     Q.   Okay.  And had access to confidential

11  information?

12          MR. COSTER:  Objection.

13     A.   I don't know what access that computer had

14  to confidential information.

15     Q.   Did you consider the work that you were

16  doing on that computer to contain Motorola

17  sensitive, proprietary or confidential information?

18     A.   The work that I did was work that I

19  created, which was sensitive and belonged to

20  Motorola.  But the computer itself didn't have

21  access without my participating in it to sensitive

22  material.

23     Q.   When you participated using that laptop,

24  you accessed sensitive materially, is that fair?

Jay Stuart Rein, Vol. 3                          01/13/2006

626

1    access?

2        A.    I do not know.

3        Q.    Do you recall utilizing documents prepared

4    by anyone else at Motorola which you considered to

5    be sensitive and proprietary?

6        A.    That's a different question.

7        Q.    Will you answer it?

8              MR. COSTER:    Just answer.

9        A.    Restate the question.

10       Q.    Do you recall ever accessing or utilizing

11   documents prepared by anyone else at Motorola that

12   contained information that you considered to be

13   sensitive or proprietary?

14       A.    I utilized material sent to me by other

15   Motorola colleagues that was material being

16   developed on behalf of Motorola to drive Motorola

17   business, which would, therefore, be sensitive and

18   proprietary to Motorola.

19       Q.    Okay.  Did you use your laptop for work

20   with Motorola daily while employed there?

21       A.    Yes.

22       Q.    Did you use it to prepare client materials,

23   materials for clients?

24       A.    Yes.

Jay Stuart Rein, Vol. 3                    01/13/2006

627

1          Q.    Did you use it to prepare business plans?

2          A.    Yes.

3          Q.    Did you use it to prepare sales forecasts?

4          A.    Yes.

5          Q.    Did you use it to prepare presentations for

6    MPS?

7          A.    Yes.

8          Q.    Did you use it to prepare presentations for

9    clients?

10         A.    Yes.

11         Q.    What other purposes did you use it for?

12         A.    E-mail communication with colleagues of

13   Motorola, e-mail communication with customers of

14   Motorola, e-mail communication with prospective

15   customers of Motorola, e-mail communication with

16   partners or vendors associated with us generating

17   business for Motorola.

18         Q.    Any other purposes?

19         A.    Not that I can recall.

20         Q.    And you protected the computer, because it

21   contained information that you considered to be

22   sensitive, proprietary and confidential; is that

23   fair?

24                MR. COSTER:  Objection.  What do you mean

Jay Stuart Rein, Vol. 3                    01/13/2006

628

1    protected the computer.

2        Q.   You protected the computer and its

3    contents, did you not?

4             MR. COSTER:  Objection.

5        A.   I needed that computer for my everyday

6    business functionality.  I took care of that

7    computer.

8        Q.   You didn't allow and authorize access to

9    it?

10       A.   I never allowed unauthorized access to it.

11            MR. COSTER:  Objection.

12       Q.   You were the only one who used the

13   computer?

14       A.   I do not know that I was the only one who

15   used the computer.

16       Q.   If you didn't allow unauthorized access,

17   how is it that you do not know that?

18       A.   Because at times sometimes laptops aren't

19   functioning the way you expect them to be while

20   you're on the road.  So when you arrive at

21   headquarters, you might turn it over to an IT user

22   to take a look at a wireless network router or a

23   wireless component or some other functionality.

24            So I never allowed anybody unauthorized

Jay Stuart Rein, Vol. 3                    01/13/2006

630

1   from presentations to customers.

2        Q.   But you can't recall any of the

3   presentations that you saved to the hard drive?

4        A.   Well, there would be presentations to LA

5   Safe, there would be presentations to Boeing, there

6   would be presentations to Disney, and at times

7   moving on, but it's the same list that we probably

8   reviewed this summer of all the customers that I was

9   working on behalf of Motorola to generate business

10  with.

11       Q.   So you think there were presentations with

12  respect to each of those customers on the hard drive

13  computer?

14       A.   That's what I would assume, yes.

15       Q.   And you also mentioned that there were

16  forecast materials on the hard drive when you last

17  accessed it.  What do you mean by forecast

18  materials?

19       A.   The only forecast materials that I believe

20  would have been on that hard drive were materials

21  from the Len DeBarros era, when we met on a monthly

22  basis with Len, typically down in Fort Lauderdale,

23  where each principal, of which I was one, reviewed

24  their opportunity pipeline.

Jay Stuart Rein, Vol. 3                    01/13/2006

631

1     Q.    When was that occurring with Len DeBarros?

2     A.    From probably around July of 2002 until I

3  think the last presentations and reviews with did

4  with him, I believe, were in April of '03.

5     Q.    With respect to those forecasts, did you

6  prepare drafts on your hard drive of your input to

7  those quarterly meetings?

8     A.    I prepared PowerPoint presentations that

9  were turned over to Mr. DeBarros' assistant for

10 those meetings.

11    Q.    Did you prepare drafts on your hard drive?

12          MR. COSTER:  Objection.

13    A.    I don't know what a draft is.

14    Q.    Did you ever prepare a forecast that you

15 intended to forward to Mr. DeBarros for purposes of

16 a quarterly meeting that you subsequently revised?

17          MR. COSTER:  Objection.

18    A.    Let me try to respond.  If I was creating a

19 presentation -- if I was creating a PowerPoint

20 presentation of which had a forecast, the PowerPoint

21 presentation starts with a blank document.  It might

22 take me some number of hours to prepare that

23 document, but I may have only had 45 minutes to

24 start that work effort.  So I would start, invest 45

Jay Stuart Rein, Vol. 3                          01/13/2006

636

1    of the collaborative effort that's going on?

2        A.    I don't know if it resides on other

3    people's computers because of the collaborative

4    effort.  They may choose to delete everything.

5        Q.    But they could reside there?

6        A.    Yes.

7        Q.    And, in fact, you can't recall whether you

8    deleted such iterations from your hard drive?

9        A.    I do not know.

10       Q.    You also mentioned that there were

11   quarterly reports on the hard drive the last time

12   you accessed it.  What do you mean by that?

13       A.    The last time I accessed -- these quarterly

14   reports, as I said, the quarterly and monthly

15   reports that we were doing were basically done under

16   the leadership of Len DeBarros.

17       Q.    That's the same as the forecast material?

18       A.    Yes, that is.

19       Q.    You also mentioned other documents that you

20   recalled being on the hard drive the last time you

21   accessed it.  Can you tell me what other documents

22   you're referring to?

23       A.    I think I already stated that.  Customer

24   presentations, reports -- I mean, the presentations,

632

1   minutes in it, save the document, come back to it,

2   complete it, send it off.  So if that 45-minute

3   effort is considered a draft for you, then there was

4   a draft which got replaced by a final.

5       Q.  Are you aware of similar drafts of the

6   client presentations that you previously testified

7   about being prepared on that laptop?

8           MR. COSTER:  Objection.

9       A.  Again, a client -- to create a client

10  presentation takes thinking.  You start with a blank

11  slate, with a blank PowerPoint presentation, and you

12  think and you put something down.  You save it, you

13  come back to it later and you put more down.  You

14  save it, you come back to it later.  So would there

15  have been drafts?  I assume so.

16      Q.  In fact, those presentations were

17  collaborative with MPS; is that fair?

18      A.  No.

19      Q.  So the presentations you were describing on

20  your hard drive is only presentations that you

21  contributed to?

22      A.  No.

23      Q.  So there were other folks contributing to

24  those presentations to clients in addition to your

Jay Stuart Rein, Vol. 3                    01/13/2006

633

1    contributions to the PowerPoints; is that right?

2        A.    For some presentations they were

3    collaborative.  For other presentations they were

4    not.

5        Q.    And when they were collaborative, your

6    PowerPoint presentation saved on your hard drive was

7    revised to the extent that others offered

8    collaboration that got incorporated into the

9    PowerPoint presentation; is that fair?

10               MR. COSTER:  Objection.

11       A.    When there was collaboration, if I was

12   engaged in an effort and I had finished my

13   contribution of what I could achieve, I would e-mail

14   that document to whoever else was participating, and

15   then they would make those changes and all on their

16   hard drive with the document in their possession.

17       Q.    So the document would change into a new

18   version incorporating their collaboration?

19       A.    Sure.

20       Q.    And your version would remain on your hard

21   drive?

22       A.    Not necessarily.

23       Q.    Why is that?

24       A.    Because if we were moving to another

Jay Stuart Rein, Vol. 3                          01/13/2006

634

1   version of the document, there was no need to save a

2   draft version.

3       Q.   Do you recall deleting draft versions of

4   such presentations?

5       A.   I do not recall.

6       Q.   So you can't say whether they remained on

7   your hard drive or not?

8       A.   No.

9       Q.   And sometimes you were the one responsible

10  for receiving the collaborative work from others and

11  incorporating it into your PowerPoint presentations

12  on your hard drive; is that fair?

13      A.   No.  Collaborative work received from

14  others may not be incorporated into files on mine.

15  The files that I receive may become the prevailing

16  files that survived on my drive.

17      Q.   I need you to take that a little bit

18  slower.  Were there ever situations in which you

19  took responsibility for client presentations to

20  incorporate work provided by others?

21      A.   Let me try and answer it a different way.

22      Q.   You can't answer that?

23      A.   I'm going to try to be helpful, so let me

24  try and be helpful.

642

1      Q.   Did you folder your e-mails using any

2    particular system in Outlook?

3      A.   No.  I retained the default system, which

4    was inbox, sent box, and delete box.

5      Q.   So you didn't maintain your e-mails in any

6    sort of customer folders or any other segregated

7    folders?

8      A.   I don't believe I did, no.

9      Q.   But you don't know?

10          MR. COSTER:  Objection.

11     A.   Again, I've used e-mail systems at many

12   employers, and I do not recall, but I do not believe

13   that I did in this case.

14     Q.   Okay.  Do you know how long Motorola

15   retained e-mails on the server that were in your

16   inbox?

17     A.   No, I do not.

18     Q.   Did you ever ask?

19     A.   No, I did not.

20     Q.   Did you ever print e-mails?

21          MR. COSTER:  Objection.

22     A.   Not that I recall.

23     Q.   Did you use the electronic calendar

24   provided through Outlook while you were working at

Jay Stuart Rein, Vol. 3                          01/13/2006

651

1    Motorola laptop, and to that you responded, I can't

2    tell.  I don't know.

3        A.    My response to that is, I heard the

4    question in my head, so you can restate it again.

5    Can I tell from looking at this document from where

6    it was sent?

7        Q.    Did you send this document, Exhibit 41,

8    from your Motorola laptop?

9        A.    No, I did not.

10       Q.    How do you know?

11       A.    Because I did not have a Motorola laptop

12   that was functioning on May 4th of 2004.

13       Q.    Why was it not functioning?

14       A.    I do not know why it was not functioning.

15   I do know that the day after I extent an e-mail from

16   my Motorola laptop to Peter Tobin, indicating to him

17   that I would not be signing the waiver to pursue

18   claims against Motorola, and I would not be

19   accepting their additional package, the next day I

20   did not have a functioning computer after that

21   e-mail was sent from my e-mail account to him.

22       Q.    When you say it wasn't functioning, what do

23   you mean specifically?

24       A.    When I pushed the "on" button, I got a

Jay Stuart Rein, Vol. 3                    01/13/2006

652

1    screen that asked me to hit alt, control and delete

2    and enter a password.  The password I had been using

3    came become with a message of "unauthorized access."

4         Q.   What were you trying to access at that

5    time?

6         A.   I was trying to get access to e-mail to

7    have continued dialogue or see where I was with Mr.

8    Lindsay Smith on job opportunities with Mr. Warren

9    Holtzberg on job opportunities.

10        Q.   You were trying to access Motorola's

11   Outlook e-mail?

12        A.   Yes.

13        Q.   And your access was denied because your

14   employment had been terminated?

15             MR. COSTER:  Objection.

16        A.   My access was denied because I indicated at

17   that point in time I was not willing to sign a

18   waiver.

19        Q.   So you rejected the individual severance

20   pay that you and Peter had been negotiating for some

21   period of months, and you informed him of that

22   rejection, and after that, your access to Motorola's

23   Outlook e-mail was terminated; is that fair?

24             MR. COSTER:  Objection.

657

1    answer?

2              MR. COSTER:  I will let you answer that

3    one, and it's time to move on, counsel.

4         A.    The HP Pavilion was not replaced.  My wife

5    told me to go get a computer of my own, that the HP

6    was dedicated to the kids and to her.  Since I was

7    in a full-time job search, I needed to go out and

8    find a computer and we needed to go out as a family

9    and spend the money to acquire a system which I

10   could work on without the kids challenging me for it

11   so that they could go onto Disney.com.

12        Q.    When did you purchase the Sony computer?

13             MR. COSTER:  Objection.

14        A.    It was sometime the end of April, early May

15   of 2004.

16        Q.    Do you still have it?

17        A.    Yes, I do.

18        Q.    Do you still have the HP?

19        A.    No, I do not.

20        Q.    What happened to that?

21             MR. COSTER:  Objection.

22        A.    The HP was purchased in April of 1998.  It

23   was an old computer.  We didn't feel it was

24   necessary to move it with us to Atlanta.  We donated

658

1    it to our cleaning people in Framingham, and I

2    assume they still have it.

3        Q.   When did you donate it?

4            MR. COSTER:  Objection.

5        A.   We gave it to them before we left for

6    Atlanta.

7        Q.   That was in August of 2005?

8        A.   I don't know if we gave it to them in

9    August or July of 2005.

10       Q.   But it was one of those?

11       A.   Yes.

12       Q.   Did you clean the hard drive before you

13   gave it to them?

14           MR. COSTER:  Objection.  That's it.  No

15   more.  I'm instructing you not to answer.  Enough is

16   enough.

17           MS. McGURN:  We'll come back to that.

18       Q.   Directing your attention to another

19   document we've marked as Exhibit 39 at your

20   deposition, do you recognize it?

21       A.   This is an e-mail dated May 24th from me to

22   Jann Mellman.

23       Q.   From what computer did you send this

24   e-mail?

Jay Stuart Rein, Vol. 3                          01/13/2006

662

1          MR. COSTER:  Objection.

2     A.    I do not believe so.

3     Q.    Aside from the e-mails that you've just now

4     reviewed relating to communications from the Yahoo

5     account to Lindsay Smith and Mellman, do you recall

6     sending any other e-mails from that Yahoo account?

7          MR. COSTER:  Objection and instruct him not

8     to answer.

9          MS. McGURN:  I reserve my rights.

10    Q.    How did you determine which e-mails to

11    print for purposes of discovery when you were going

12    through your Yahoo account?

13         MR. COSTER:  Objection and instruct him not

14    to answer.

15    Q.    Were there e-mails that you did not print

16    from that Yahoo account?

17         MR. COSTER:  Objection and instruct him not

18    to answer.

19    Q.    You testified previously that you prepared

20    Word documents on your Motorola laptop; is that

21    right?

22    A.    Yes.

23    Q.    Did you routinely print the Word documents

24    that you prepared on your laptop?

663

1    A.    No.

2    Q.    Did you ever print them?

3          MR. COSTER:  Objection.

4    A.    Sure.

5    Q.    What caused you to make the decision to

6    print or not to print?

7          MR. COSTER:  Objection.

8    A.    If they were being reviewed within a group

9    of people in a room where our laptops weren't

10   available, we would print them and bring printed

11   copies with us to those meetings.

12   Q.    Where did you store those printed copies?

13   A.    I'm sorry, I don't understand.

14   Q.    When you printed a Motorola Word document,

15   where did you retain it?

16   A.    After it was printed?

17   Q.    Yes.

18   A.    Typically I would destroy it afterwards.

19   Q.    Why is that?

20   A.    Because we are an e-mail and computer

21   centric society, and if I would save every piece of

22   paper that I printed, I wouldn't have room to walk

23   around my office.

24   Q.    Did you save those Word documents on the

Jay Stuart Rein, Vol. 3                          01/13/2006

664

1    hard drive of the laptop?

2        A.    The work that I did, Word documents,

3    PowerPoint and Excel documents were on my laptop,

4    yes.

5        Q.    On the hard drive?

6        A.    I think that's the only place it could be,

7    unless there was some other place the computer

8    decided to put it.

9        Q.    Did you have a practice of deleting the

10   electronic version of the Word document from your

11   laptop?

12           MR. COSTER:  Objection.

13       A.    I don't understand, the practice of

14   deleting documents?

15       Q.    Did you have a routine practice of culling

16   through your Word documents and selecting some for

17   deletion like you testified you did for e-mail?

18       A.    The reason I testified I did for e-mail was

19   because there was a limit to the e-mail box, and I

20   was forced to do that.  The documents, PowerPoint,

21   Word and Excel documents that were saved were ones

22   that were deemed relevant by me for continuing to

23   drive business opportunities for Motorola.

24       Q.    So you did not have a practice for

Jay Stuart Rein, Vol. 3                                01/13/2006

665

1    routinely culling through those and determining

2    which could be deleted?

3        A.    No.

4        Q.    But at times you did, in fact, delete

5    electronic Word, PowerPoint and other documents?

6            MR. COSTER:   Objection.

7        A.    Yes.

8        Q.    You testified that you typically destroyed

9    the printed version after its use was completed; is

10   that fair?

11       A.    If I did not have a need for the printed

12   version, I eliminated the printed version.

13       Q.    If you elected to retain the printed

14   version, what would you do with it?

15       A.    It would live in a file.

16       Q.    Where?

17       A.    In a folder, in my possession, either in my

18   briefcase traveling with me or my home office.

19       Q.    How many such folders did you maintain

20   during the course of your employment at Motorola?

21           MR. COSTER:   Objection.

22       A.    Very few.

23       Q.    What do you mean by "very few"?

24       A.    There was a limited number of files that I

Jay Stuart Rein, Vol. 3                    01/13/2006

666

1   actually printed and saved.  Typically they were

2   final client presentations.

3        Q.   Did you maintain them in a single file

4   cabinet in your home in Holliston?

5        A.   They were maintained in a file cabinet in

6   my home in Holliston, yes.

7        Q.   Did you review all of those files in the

8   course of responding to discovery in this

9   litigation?

10           MR. COSTER:  Objection.  I will let you

11  answer that one.

12       A.   I believe I did, yes.

13       Q.   Did you?

14           MR. COSTER:  He said he believes he did.

15       A.   Yes.

16       Q.   When did you finish your work in going

17  through those documents for purposes of producing

18  that in discovery?

19       A.   I believe that I finished that work on

20  whatever time line my attorney indicated I needed to

21  finish that work by and produced all of those

22  documents in response to whatever is there.

23       Q.   Do you recall producing documents when you

24  delivered the laptop computer to me on August 26th?

Jay Stuart Rein, Vol. 3                          01/13/2006

667

1        A.    Yes, I do.

2        Q.    **Had you reviewed files prior to your**

3    **production of those documents on August 26th?**

4             MR. COSTER:  Objection.  I'm going to

5    instruct him not to answer.  Again, we are not

6    dealing with the laptop computer.  You are using

7    this as an opportunity to revisit a whole host of

8    other issues.  How is this related to information

9    that has been allegedly destroyed on his laptop

10   computer that Motorola doesn't have access to?

11   You're asking him about documents he has produced.

12            MS. McGURN:  John, I'm asking him about

13   documents that bear on his discovery obligations in

14   this case.  Those discovery obligations were clear

15   to Mr. Rein long before August of 2005.  That issue

16   is absolutely unequivocally on the table in this

17   case as evidenced by Judge Gertner's order.

18            Moreover, one of the arguments, as I

19   understand it, in response to the motion to compel

20   was that there was no harm, because these documents

21   were printed, retained and produced.  The production

22   in this case has happened four times, once as

23   recently as two days ago, and to the extent that I

24   have the right, pursuant to the orders, to explore

Jay Stuart Rein, Vol. 3                          01/13/2006

672

1        A.   I had to review them before August 26th,

2   otherwise you wouldn't have received all of the

3   material that you would have received when you

4   received it as part of our response to document

5   production.

6        Q.   So the answer to the question is, those

7   were the hard copy files that you reviewed for

8   purposes of producing documents?

9        A.   No, that is not the answer to the question.

10        Q.   Okay.  Can you clarify your last response,

11   please?

12        A.   The documents that were produced on August

13   26th, when I handed over the laptop to you, as was

14   stated before we broke, were documents that I came

15   across as part of the unpacking process in Atlanta,

16   so I immediately threw all of those documents in my

17   bag and brought them with me here.

18        Q.   Some of those were produced on August 26th

19   with the laptop?

20        A.   No.  All of them -- all of the documents

21   that I found were produced on August 26th and not

22   some of them.

23        Q.   But then there were additional documents

24   produced two days ago also, according to you, lost

Jay Stuart Rein, Vol. 3                          01/13/2006

678

1    session of your deposition, right?

2        A.   On August 26th, I recall that I had a

3    laptop with me.  I do not recall if I had any other

4    attachments or related material, but I do recall

5    probably very soon thereafter, there was a box with

6    a pager and all of this other material that you

7    described that was sent directly to your attention.

8        Q.   And what were the circumstances of your

9    discovery of that additional equipment?

10            MR. COSTER:  Objection.

11       A.   I don't remember the circumstances.  I just

12   recall that I had an obligation to return it, and I

13   did so.

14       Q.   Did you find those in the box in which the

15   laptop had been kept?

16       A.   No, I did not.

17       Q.   Do you recall when you were first served

18   with the discovery request in this case?

19       A.   No, I don't recall an exact date.

20       Q.   Do you recall when you first produced

21   documents in response to discovery in this case?

22       A.   I don't recall if it was early in '05 or

23   late in '04.

24       Q.   But it was many months before your move to

Jay Stuart Rein, Vol. 3                          01/13/2006

679

1    Atlanta; is that fair?

2        A.   Yes.

3        Q.   When you embarked on your very first

4    attempt to make the production in late '04 or early

5    '05 in response to discovery, you were aware that

6    you maintained the Motorola laptop and this

7    equipment and additional hard copy documents in your

8    possession; is that right?

9        A.   Could you restate the question.

10       MR. COSTER:   Objection.

11       A.   Restate the front and the back end of the

12   question for me, please.

13       Q.   When you embarked on your first attempt to

14   produce documents in response to discovery, which

15   you testified that you did in late '04 or early '05,

16   you were aware then that you had a laptop, a

17   Motorola laptop, and other equipment and hard copy

18   documents in your possession?

19       MR. COSTER:   Objection.   You're saying that

20   he was aware that he had other documents in his

21   possession as well?

22       MS. McGURN:   The documents that

23   subsequently were produced.

24       A.   No.   I was aware I had a Motorola laptop,

Jay Stuart Rein, Vol. 3                              01/13/2006

680

1    pager and battery and related devices in my

2    possession.   I was not aware of any other folders,

3    files or printed documents in my possession.

4        Q.    Because you hadn't looked in boxes for

5    them, and you had looked only in files in your

6    Holliston home office?

7            MR. COSTER:   Objection.

8        A.    No.   Because I was not aware that anything

9    else existed.

10       Q.    Which leads to the question of where you

11   looked and where you failed to look initially in

12   responding to discovery?

13       A.    I looked everywhere that I suspected I had

14   documentation relevant and responsive to the

15   document request.

16       Q.    Where was that?

17       A.    Throughout my entire house.

18           MR. COSTER:   Objection.

19       Q.    But nevertheless, there were boxes

20   containing Motorola -- boxes or some other location

21   containing Motorola documents of which you were not

22   aware within your house?

23           MR. COSTER:   Objection.   I will let you

24   answer that one, but I think we are pretty much at

Jay Stuart Rein, Vol. 3                    01/13/2006

682

1      Q.   When you were working at Motorola, did you

2   use your laptop to prepare correspondence with

3   clients?

4      A.   I think I previously answered that

5   question, yes.

6      Q.   Did you retain drafts of correspondence to

7   clients?

8      A.   I don't believe e-mail allows you to do

9   that.

10      Q.   Thank you for clarification.  When I'm

11   saying correspondence, not specifically e-mail, but

12   rather, letters, draft of letters to clients.  Did

13   you use your laptop to prepare letters to clients?

14      A.   Yes.

15      Q.   Did you retain copies of those letters on

16   your hard drive?

17      A.   Yes.

18      Q.   Did you routinely print those letters?

19      A.   No.

20      MR. COSTER:  Objection.  I don't mean to be

21   difficult.  At some point he must have printed them

22   to send them, right?

23      MS.

24      MS. McGURN:  Maybe.  Maybe he used e-mail

683

1   attachments.  I'm not sure.

2        Q.   Did you ever print them?

3        A.   Yes.  For purposes of sending to customers,

4   but not for purposes of saving them and archiving

5   them.

6        Q.   So you did not maintain your own set of

7   hard copy files of letters to customers?

8        A.   I maintained soft copies on the hard drive.

9        Q.   Did you prepare letters to recruiters on

10  your Motorola hard drive?

11            MR. COSTER:  Objection.

12       A.   No.

13       Q.   Did you prepare correspondence to Russell

14  Reynolds from that laptop computer?

15       A.   Correspondence regarding what?

16       Q.   Anything.

17       A.   Did I ever communicate with Russell

18  Reynolds from that computer?

19       Q.   The question is, did you correspond, and by

20  that I mean, did you prepare letters, as distinct

21  from e-mails, to Russell Reynolds from that Motorola

22  laptop?

23       A.   No.

24       Q.   But you communicated by e-mail with Russell

Jay Stuart Rein, Vol. 3                                01/13/2006

684

1    Reynolds from that laptop?

2        A.    Occasionally I may have, yes.

3        Q.    Did you prepare letters to prospective

4    employers using the Motorola laptop?

5        A.    No.

6        Q.    Did you communicate from the Motorola

7    laptop in any way with prospective employers?

8        A.    No.

9        Q.    Did you communicate electronically during

10   your exploration of a job opportunity at Invoke with

11   them?

12           MR. COSTER:  Objection.

13       A.    No.

14       Q.    You didn't send e-mails to Invoke relating

15   to your prospective opportunity there?

16       A.    Restate the question.

17       Q.    Did you communicate with Invoke

18   electronically?

19       A.    Yes.

20       Q.    What computer did you use to do that?

21       A.    My home computer.  My wife's home computer.

22       Q.    Why did you use your wife's computer?

23       A.    Because it was non-Motorola business, that

24   communication with Invoke.

Jay Stuart Rein, Vol. 3                    01/13/2006

696

1    speaks for itself.

2        Q.   Did you convey to Peter on February 25th by

3    e-mail that you would return the Motorola laptop to

4    him?

5            MR. COSTER:   Objection.

6        A.   As I previously testified, the day I

7    notified Peter Tobin, I would not be signing any

8    documents, and Motorola terminated communication

9    with me for purposes of this discussion.  As I

10   previously testified, I also believe I indicated

11   that nobody let me know where, to whom, at whose

12   expense and how it should be shipped to them.  So

13   the PC remained with me until such point in time

14   where someone made that request and indicated how to

15   return this.

16       Q.   But you had already agreed to do so --

17       A.   As I previously testified, I was in a

18   position where I was unemployed, without income,

19   without money, that I was not willing to start

20   shipping things back, and since Motorola had

21   indicated they were no longer talking to me, the

22   laptop went into a box and sat waiting.

23       Q.   When did it go into a box?

24       A.   I don't know.  It was disabled the day

697

1    after it became an ineffective resource for me in

2    any way, shape or form.

3        Q.   When did you box it?

4        A.   I don't know when it was boxed.  It was set

5    aside for some period of time, and that was that.

6        Q.   Where was it set aside?

7        A.   Within my house in Holliston,

8    Massachusetts.

9        Q.   Where within your house?

10       A.   Eventually it wound up sitting in the

11   basement.

12       Q.   In a box in the basement?

13       A.   I don't know if it was on a table in the

14   basement for some period of time, maybe in a box for

15   some period of time.  I didn't track it.

16       Q.   Did you perform online job searches during

17   March and April using your Motorola laptop?

18            MR. COSTER:  Go ahead and answer the

19   question.

20       A.   You have to define online job searches.

21       Q.   Did you use the internet to search for

22   employment from your Motorola laptop during March

23   and April of 2004?

24       A.   I did not use the Motorola laptop to search

Jay Stuart Rein, Vol. 3                                    01/13/2006

712

1    create a Word document on your laptop in preparation

2    for a meeting with Kofman, Stark or MPS?

3         A.    I don't know.

4              MR. COSTER:  Answer as best you can.

5         A.    I don't know.

6              MR. COSTER:  That's all you can do.  Answer

7    as best you can.

8         Q.    Did you ever prepare Excel spreadsheets in

9    preparation for a meeting with Kofman, Stark or MPS

10   using your Motorola laptop?

11        A.    No.

12        Q.    Did you ever prepare any Excel spreadsheets

13   during the course of your employment for Motorola?

14        A.    Yes.

15        Q.    Did you use your Motorola laptop?

16        A.    Yes.

17        Q.    Did you store those on your hard drive?

18        A.    Yes.

19        Q.    What were the purposes of those Excel

20   spreadsheets?

21        A.    Forecast and revenue activity associated

22   with the Len DeBarros meetings that we previously

23   discussed two hours ago.

24        Q.    Did you ever prepare any other Excel

Jay Stuart Rein, Vol. 3                                      01/13/2006

713

1    spreadsheet after Len DeBarros' departure?

2        A.    Did I ever use Excel again?

3        Q.    In connection with your Motorola

4    employment.

5        A.    I'm sure I did.

6        Q.    For what purpose?

7        A.    I do not know the exact purpose.  But if it

8    was Excel, it was probably for the purpose of

9    managing, measuring or charting numbers.

10       Q.    Could those numbers have included sales

11   targets, revenue?

12       A.    Yes, they could have.

13       Q.    And those were saved on your hard drive?

14       A.    Yes, they were.

15       Q.    Did you produce any Excel spreadsheets in

16   hard copy in connection with this litigation?

17       A.    I don't recall.

18       Q.    You previously testified that you used your

19   laptop to produce PowerPoints, to prepare

20   PowerPoints, right?

21       A.    Yes.

22       Q.    You used your laptop to prepare PowerPoints

23   for your October meetings with Juergen Stark; is

24   that right?

Jay Stuart Rein, Vol. 3                          01/13/2006

714

1      A.    Yes.

2      Q.    And you used your laptop to prepare client

3   presentation PowerPoints, correct?

4      A.    Yes.

5      Q.    Are there any other PowerPoint

6   presentations that you can recall, aside from client

7   presentations and October presentations for Stark,

8   that you prepared on your Motorola laptop?

9      A.    Again, prospective client presentations --

10  this is the same question.  Presentations and

11  discussions based around partners of Motorola to

12  help us win business.

13     Q.    So those four categories?

14     A.    Yes.

15     Q.    Aside from the October presentations to

16  Stark, did you prepare other PowerPoints for him?

17     A.    Yes.

18     Q.    What were those?

19     A.    I believe that there was a presentation

20  about ExpressLink and whether we should continue

21  forward with that opportunity or not.

22     Q.    When was that?

23     A.    I don't recall.

24          MR. COSTER:  I don't mean to interrupt, but

715

1    I want the record to be clear, because we keep using

2    "you," and I think there may be some ambiguity

3    whether it's Mr. Rein or just Mr. Rein in

4    conjunction with what other MPS people were

5    preparing, in particular, the PowerPoints we are

6    talking about for presentations to Stark and Kofman.

7         So I don't want there to be some ambiguity,

8    because I think there is with the term "you" as we

9    have been using it in the questions and the answers.

10        Q.   To that point, were all the PowerPoints

11   prepared in October for Stark prepared in

12   collaboration with others working for MPS?

13        A.   Yes.

14        Q.   So the PowerPoints that you prepared either

15   incorporated or had incorporated into them

16   information from other people?

17        A.   The PowerPoints that were prepared for

18   Stark for the October presentation, as you're

19   referencing, were not prepared by me.

20        Q.   I just want to stop you there and ask you

21   to focus on the question, because the question was,

22   were those PowerPoints prepared in October

23   incorporating comments of others or did they have

24   your comments incorporated into other presentations?

Jay Stuart Rein, Vol. 3                          01/13/2006

716

1        A.    Yes and yes.

2        Q.    Okay.  So we've got two yeses.  That's

3    good.  So for purposes of the October 14th meetings,

4    during which these PowerPoint presentations were

5    being prepared, who created the initial draft?

6        A.    John Gillardi and myself.

7        Q.    Did you work together in Holliston sitting

8    at your hard drive to prepare this draft?

9            MR. COSTER:  Objection.  Those questions

10   have been asked and answered and in considerable

11   detail, and I mean considerable detail, in prior

12   depositions.

13       Q.    So when you say that you and John

14   conjunctively prepared the initial draft, did you

15   save drafts of that on your hard drive?

16       A.    He and I were trading documents via the

17   e-mail system for which we collaborated on the first

18   draft of this presentation.

19       Q.    Okay.  Did you retain copies of that

20   PowerPoint in any form on your hard drive?

21       A.    How could I have answered yes to the

22   previous question if I didn't retain it on my hard

23   drive?

24       Q.    So the answer is, yes.

724

1    drafts of the presentation that was made to Mr.

2    Stark on the first meeting and some drafts of the

3    PowerPoint presentation that was made to Mr. Stark

4    on the second meeting on the hard drive of the

5    computer?

6         Q.    How about the ExpressLink presentation,

7    that, too, was saved on your hard drive, correct?

8         A.    Yes.  Because it was a document that I

9    printed and showed to him.

10        Q.    Did you produce the printed copy of that in

11   discovery in this case?

12        A.    If I had saved the printed copy for myself,

13   then it would have been produced.  I do not recall

14   all the documents that I produced.

15        Q.    So you don't know if you produced it or

16   not?

17             MR. COSTER:  Ask a better question, because

18   he didn't produce anything.  He turned it over to

19   me.

20        Q.    Did you turn it over to your counsel?

21        A.    I turned over all printed documents that I

22   have for Motorola, as I previously stated.  I have

23   no more documents.

24        Q.    Was it among them?

Jay Stuart Rein, Vol. 3                                    01/13/2006

725

1       A.   I do not recall.  I turned over documents.

2       Q.   Okay.  What did you do to ensure that the

3   drafts, that your counsel has just alluded to, of

4   these presentations that were on your hard drive

5   were produced in discovery in this case?

6       A.   As I stated, I don't save drafts.  When I

7   get to a final version, typically I have no reason

8   to save work in process.  The final version is what

9   was saved on my hard drive.

10       Anything I produced to my attorney in

11   response to that document request, or whatever that

12   process was, was based on whatever I had printed out

13   and available to me, because I no longer had access

14   to a working laptop where anything else would have

15   been saved.

16       Q.   If the document was one that you worked on

17   and was a draft that was final to you, but then was

18   incorporated into another presentation or another

19   collaborative work, what did you do to ensure that

20   those drafts were produced in connection with

21   litigation in this case?

22       A.   I produced all the paper that I had printed

23   and available to me in connection with this

24   litigation.  That's all I could do.

726

1    Q.   So were all such drafts in those documents

2  or do you not know?

3    A.   Any paper that I had printed and saved was

4  in that request.

5    Q.   I've heard you say that several times I'm

6  asking you whether you can be sure that all of those

7  types of drafts were among those printed documents?

8    A.   I can be sure I turned over every printed

9  document that I had available to me.  That answer is

10  broad enough to answer your more narrow question,

11  which is not very sensible.

12    Q.   I'm asking for a specific answer.  Are you

13  sure that all drafts that you considered final, and

14  therefore, they were the copy that you saved on your

15  hard drive, were produced in connection with this

16  litigation?

17        MR. COSTER:  Objection.

18    A.   How do I consider a draft final?

19    Q.   What you have testified, Mr. Rein, is that

20  you were collaboratively working with other

21  colleagues in MPS to make certain presentations,

22  including to your clients and to Stark and to

23  prospectives and to others.  What I'm asking you is,

24  when you consider a draft, your piece of that draft,

727

1  to be completed, even if it was going to go on to

2  have further changes made to it for purposes of a

3  final presentation to someone, did you retain the

4  draft on your hard drive that you considered final

5  for your contribution purposes?

6      A.    Typically not, because when I sent it to

7  someone, it gets saved in the sent box of the

8  Microsoft e-mail server and the attachment lives

9  there.  There is typically no reason -- if I knew

10 something was going to be reworked downstream and I

11 was going to be receiving it back, I did not have to

12 save it in both the e-mail server and the hard

13 drive.  But I can't tell you for the October 14th

14 presentation exactly what I did.

15     Q.    Whether it was in the e-mail box only or on

16 the hard drive?

17     A.    Well, it was certainly in the e-mail box,

18 because I know I was sending and I know I was

19 receiving.  So between all of us, it was in our

20 inboxes and our sent boxes.

21     Q.    But you can't say whether it was also

22 retained and/or produced off of your hard drive?

23     A.    I don't understand the question.  It had to

24 come from my hard drive, because Microsoft

Jay Stuart Rein, Vol. 3                    01/13/2006

728

1    PowerPoint needs the hard drive to work when I'm

2    creating a document, and in order to e-mail the

3    document, I have to save the document first to the

4    hard drive to then add it as an attachment to the

5    e-mail, which is going to go out to my colleagues

6    I'm collaborating with.

7          So, yes, there's a point when the document

8    is saved on the hard drive so that I can create an

9    attachment to send to whoever I'm collaborating with

10   to continue to work on the document.  After that

11   point that it's sent, it lives in the sent e-mail

12   box, and it lives on my hard drive.  It's in two

13   different places taking up space.  There's no reason

14   to have it in two different places.  If I knew it

15   was coming back in a diversion and mine wasn't the

16   final, final, final version, not using the word

17   "draft" any more, then I would save it.

18   Q.   Where?

19   A.   On the hard drive, if it was a final

20   document.

21   Q.   You testified previously you had prepared a

22   PowerPoint regarding ExpressLink for Stark.  What

23   was the purpose of that presentation?

24         MR. COSTER:  Objection.

Jay Stuart Rein, Vol. 3                          01/13/2006

741

1    received or created relating to the focused

2    feedback?

3        A.    Yes.

4        Q.    Where did you print them?

5        A.    I don't understand the question.

6        Q.    Where did you print them from?  Did you

7    print them in Holliston?

8        A.    I have no idea.

9        Q.    Okay.  You don't recall whether you printed

10   them in your home or some other location?

11       A.    That's correct.  But I do know I delivered

12   them to you as part of the document request.

13       Q.    Do you know that you delivered all of them?

14       A.    Yes, I do.

15       Q.    Was there a printer hooked up to your

16   laptop?

17       A.    Yes, there was.

18       Q.    Was that Motorola's printer?

19       A.    No, it wasn't.

20       Q.    Did you have a fax machine in your home

21   office?

22       A.    The printer doubled as a fax machine for

23   some period of time.

24       Q.    What period of time?

Jay Stuart Rein, Vol. 3                    01/13/2006

750

1      A.   I'm sure I have.  I don't remember and I do

2  not remember who.

3      Q.   Do you remember why?

4      A.   No, I do not.

5      Q.   Did you ever take your laptop outside of

6  Motorola for any kind of work or repairs?

7      A.   No.

8      Q.   Did you ever solicit external outside of

9  Motorola IT department's support or feedback

10  regarding the use of that laptop?

11      A.   No.

12      Q.   Did you solicit that kind of support from

13  Motorola's IT department, setting aside repairs?

14      A.   When I had dial-up connection issues, I

15  would pick up the phone and call them.

16      Q.   Who did you speak with?

17      A.   I have no idea.

18      Q.   Prior to the date on which you attempted to

19  get access to Motorola's accounts using your laptop

20  and were denied, when was the next prior date that

21  you had utilized the laptop?

22      A.   I don't understand the question, get access

23  to Motorola's accounts?

24      Q.   You testified that you one day tried to

751

1    access Motorola systems in order to send an e-mail,

2    and were denied access; is that right?

3         MR. COSTER:  Objection.  I think that

4    mischaracterizes his testimony.

5         A.   What I said was the day after I let

6    Motorola know, Peter Tobin specifically, that I

7    would not be signing documents accepting waivers, I

8    tried turning on the computer and logging on so I

9    could continue my job search within Motorola, the

10   dialogue that had previously been started with the

11   people we already discussed, Lindsay Smith, Warren

12   Holtzberg, Jann Mellman, and Janiece Webb.

13        I was not trying to access Motorola's

14   system.  I was trying to use their e-mail to

15   continue the dialogue within Motorola.

16        Q.   Prior to that day, when was the last day

17   that you had used the laptop; the day before, a week

18   before, a month before?

19        A.   The day I sent that e-mail to Peter Tobin.

20        Q.   What day was that?

21        A.   Sometime in March or April.

22        Q.   Okay.

23        A.   The e-mail of which was turned over to you

24   when we discussed this e-mail in August again, it

Jay Stuart Rein, Vol. 3                    01/13/2006

752

1   was the next morning, when I woke up to continue my

2   hunt to find a job within Motorola that I learned I

3   was being denied access.

4        Q.    Okay.  After you learned of your

5   termination on February 23, did you use the laptop

6   every day until this day on which you tried to

7   access e-mail and could not?

8            MR. COSTER:  Objection.

9        A.    Was the question did I turn the computer on

10  every day since that day up until today to try to

11  use the computer?

12       Q.    No, that is not the question.  I will

13  restate it.  After the date that you learned that

14  you were terminated, February 23, 2004, did you

15  power up the laptop every day until the day after

16  you told Peter that you were not going to sign the

17  severance agreement?

18       A.    Let me be clear.

19       Q.    Did you use it every day?

20       A.    On day one of the week, whatever that day

21  is, I told Peter I wasn't going to be signing.  Day

22  two, they turned me off.  Did I use it for every day

23  up to that?  I've testified to you that I used that

24  PC, that laptop, every day in my career.

753

1          Q.     Even after the date you were terminated?

2          A.     I was communicating with Peter Tobin after

3    the day I was terminated.  So you know that I used

4    the computer.

5          Q.     But I don't know whether you used it every

6    day.  That's what I'm asking.  Did you use it every

7    day?

8          A.     Yes.  I used it every single day.

9          Q.     Thank you very much.  So now we can move

10   on.  During that period, during the period from

11   February 23, 2004 through that day in March or

12   April, when the day after you told Peter you were

13   not going to sign the severance agreement, other

14   than for purposes of sending e-mail, what did you

15   use the laptop for?

16         A.     We've discussed this already.  I had a

17   resume, which was modified, which was sent to

18   Lindsay, to Jann, to Warren, and there were e-mail

19   communications.

20         Q.     Aside from the resume and e-mail

21   communications, did you use the laptop for any other

22   purpose?

23         A.     I do not believe so.

24         Q.     No presentations, no Word documents?

754

1      A.   Presentations and Word documents to who?

2      Q.   I don't know.  I'm asking you if you

3  prepared any?

4      A.   I said I do not believe so, no.

5      Q.   Any Excel spreadsheets during that period?

6      A.   I don't know.

7      Q.   When you received the request for

8  production of documents in this case, did you

9  attempt to power up the computer in order to search

10  it?

11      A.   No, I did not.

12          (Ms. Blitis joins the deposition)

13      Q.   After that day, following the day on which

14  you told Peter you were not going to sign the

15  severance agreement, the day on which you lost

16  access, did you ever try and power up the laptop?

17      A.   Yes.

18      Q.   When was that?

19      A.   Sometime between our first deposition in

20  August and our second deposition in August.

21      Q.   And that was the first time you tried to

22  power it up since the day on which you lost access?

23      A.   Yes.

24      Q.   What did you do when you tried to power it

756

1     Q.   And you plugged it in in your basement?

2     A.   Yes, I did.

3     Q.   Where it had been stored or sitting since

4 that day on which you lost access; is that right?

5     A.   No.  The day which I lost access, you will

6 recall, I lived in Holliston, Massachusetts.  From

7 that point in time to the point in time where I

8 tried powering it on, that machine was now in a

9 basement in Atlanta, Georgia.

10    Q.   When did the laptop get transported to

11 Atlanta?

12    A.   It got transported to Atlanta mid-August.

13    Q.   When it was in Holliston, where did you

14 have it after the day on which you lost access?

15    A.   As I previously testified, in the basement.

16    Q.   I'm trying to get clarity on basements

17 here.  Now we've got two basements here, so bear

18 with me while I ask you specific questions about

19 basements.

20    A.   Okay.

21    Q.   So when the computer was in your basement

22 in Holliston, you never tried to power it up, right?

23    A.   No.

24    Q.   Then it was moved from Holliston to the

Jay Stuart Rein, Vol. 3                          01/13/2006

757

1     basement in Atlanta?

2          A.   Correct.

3          Q.   And the first time you tried to power it up

4     was between the first and second days of your

5     deposition?

6          A.   That's correct.

7          Q.   So when you received discovery requests in

8     this case, which you previously testified was either

9     late '04 or early '05, you did not try to access the

10    computer to determine whether you could get

11    documents from it for production, right?

12         A.   I could not get documents from it --

13         Q.   But you didn't try to, did you?

14         A.   That's correct, I did not try to.

15         Q.   Okay.  Going back to the basement in

16    Atlanta, you say you plugged it in, and then what

17    happened?

18         A.   You want to know what happened after I

19    plugged it in?

20         Q.   Yes.

21         A.   I walked away from it.

22         Q.   For how long?

23         A.   For a couple of days.

24         Q.   Why?

Jay Stuart Rein, Vol. 3                    01/13/2006

758

1          MR. COSTER:  Go ahead and answer.

2      A.   Because I wasn't going to sit there and

3  watch the battery charge or not charge.  I had the

4  rest of my life I wanted to live for those couple of

5  days.  I honestly forgot that I had plugged it in.

6      Q.   So it was plugged into your basement --

7      A.   Yes.

8      Q.   -- for several days before you went back

9  to determine whether you could retrieve data from

10  it?

11      A.   Yes.

12      Q.   Do you recall the day on which --

13      A.   No, no.  Your implication was I was trying

14  to retrieve data from it.  I was not trying to

15  retrieve data from it.

16      Q.   What were you trying to do?

17      A.   I was turning it on out of curiosity.

18      Q.   So you were curious about what might be on

19  there?

20      A.   Yes.  I was not necessarily retrieving

21  anything from it and I was not doing anything to it.

22  I was curious.  It had been a year and a half since

23  I touched that computer.  That's all.

24      Q.   Okay.  So having testified about it at your

Jay Stuart Rein, Vol. 3                              01/13/2006

759

1    deposition, your curiosity was peaked, and you

2    decided to go look at the computer for the first

3    time in a while, right?

4        A.    Correct.

5        Q.    Did you have an understanding that if you

6    booted it up, it would change the data on the

7    computer and the access date would be affected?

8              MR. COSTER:  Objection.

9        A.    I had no understanding of anything.  I

10   agreed on August 16th to return the computer to you,

11   and I was curious as to what I was handing back to

12   you, or August 17th.

13       Q.    When you went back to the basement to check

14   on the computer several days later, what happened

15   next?

16       A.    Prior to going back, remember, all I do is

17   plug it in, and that was it.  I went back, I pushed

18   the "On" button.

19       Q.    Then what happened?

20       A.    Nothing.

21       Q.    Okay.  What happened next?

22       A.    I folded the computer up, and I stuck it in

23   my Tumi bag and brought it up two days later or

24   three days later to the deposition and handed it

Jay Stuart Rein, Vol. 3                          01/13/2006

762

1        Q.    Have you ever purchased a utility to clean

2    a hard drive's computer?

3        A.    No, I have not.

4        Q.    Have you ever purchased a new hard drive

5    for a laptop or a computer?

6        A.    Yes, I have.

7        Q.    When was that?

8        A.    For my wife's HP 8650, whose hard drive had

9    failed.

10       Q.    When did that happen?

11       A.    I do not recall exactly.

12       Q.    How about generally?

13       A.    It was either in 2003, 2004 or 2005.

14       Q.    Was it while you were still employed by

15   Motorola?

16       A.    I don't recall at this point in time.

17       Q.    And you purchased the new hard drive

18   because the hard drive on her HP had died?

19       A.    Yes.

20       Q.    What does that mean?

21       A.    Turned on the computer and nothing

22   happened.

23       Q.    How did you know you needed a new hard

24   drive?

Jay Stuart Rein, Vol. 3                          01/13/2006

765

1      A.   I don't know.

2      Q.   Did you obtain any assistance from anyone

3  to install the new hard drive on your wife's HP?

4           MR. COSTER:  Objection.

5      A.   I think a neighbor might have helped me,

6  but I don't recall.

7      Q.   Who was that?

8      A.   I said I think I don't recall.  I talked to

9  a lot of people before I changed out had the hard

10 drive.

11     Q.   Who did you talk to?

12     A.   I talked to somebody at Best Buy, and I

13 don't remember that rep's name --

14     Q.   Maybe somebody at Comp USA?

15     A.   Maybe somebody at Comp USA and maybe a

16 neighbor.  The HP 8650 is a very easy device to

17 change out equipment on.  It has four big screws

18 that don't even require a screwdriver.  You untwist

19 them, pull the hard drive straight out of it and

20 drop a new one in.

21     Q.   If you spoke to a neighbor, who would it

22 have been?

23          MR. COSTER:  Objection.

24     A.   I don't recall.

766

1     Q.   Was there more than one neighbor that you

2  discussed the changing out of the hard drive with?

3          MR. COSTER:   Objection.

4     A.   I don't recall.   You're asking me to answer

5  honestly, and I'm giving you the most honest answers

6  I know.   I would be lying if I made up a name right

7  now.

8     Q.   You said you thought you spoke to a

9  neighbor, and I'm asking you who that was?

10    A.   Everybody has at least one computer in

11 their house and everybody has problems day in and

12 day out, and when you happen to be the person

13 encountering the problem, you may look left or right

14 in the office, left or right in your neighborhood

15 and say have you ever experienced this, and what do

16 you think I need to do.

17          I'm sure over the course of either plowing

18 a driveway or mowing a lawn, somewhere along the way

19 I would say to someone, hey, I've got a problem.   Do

20 I recall who it was with?   No.

21    Q.   Do you recall whether anyone physically

22 assisted in the turning of the screws with you?

23    A.   No.   I turned the screws with me.

24    Q.   Did you ever turn the screws on the laptop

772

1    that day forward, did you?

2          MR. COSTER:  Objection.

3     A.    No, I did not say that, and I'm not going

4    to agree to that.  Those are not my words.

5     Q.    So what I'm saying is, you had no reason to

6    believe when you were denied access on that date

7    after you told Peter you were not going to sign the

8    severance agreement, you had no reason to believe

9    that by Motorola shutting down your access, that the

10   computer was no longer functioning?

11         MR. COSTER:  Objection.

12    A.    My understanding is that Motorola could

13   have sent a bullet over the network the first time I

14   logged on after they disabled me that did disable

15   that computer.

16    Q.    Do you think that's what happened here?

17    A.    I do not know.

18    Q.    A bullet?  What do you mean by that?

19    A.    It's a technical term.  It's like a worm or

20   a virus.  They disabled the computer.  Why they did

21   it, how they did it, and the net impact of what they

22   did, I do not know.  I did not pick up the phone to

23   call Motorola to ask them why I did not have access.

24   I just told Motorola I was not signing, I didn't

Jay Stuart Rein, Vol. 3                                01/13/2006

773

1    have access, and Motorola cared not to communicate

2    with me, and I did not call them to ask them what

3    they had done.

4        Q.   Where did you learn this technical term

5    "bullet"?

6        A.   You can read any computer journal, and

7    you'll find it in every other journal.

8        Q.   Have you done that?

9        A.   Do I read computer journals?

10       Q.   Yes.

11           MR. COSTER:  Objection.

12       A.   It's part of my job with Motorola to read a

13   whole host of journals.

14       Q.   Was this information that you possessed

15   prior to your termination?

16           MR. COSTER:  Objection.

17           MS. McGURN:  Let me rephrase the question.

18       A.   Do I read "The Wall Street Journal" and

19   other computer journals to have knowledge of things

20   that happen out there, yes.

21       Q.   Was this concept of bullet being sent over

22   the wires something that you were aware of while you

23   were an employee of Motorola?

24       A.   No.  This is something -- you read

Jay Stuart Rein, Vol. 3                    01/13/2006

776

1      Q.   Did you read this report when it was shared

2   with you this morning?

3      A.   Not in detail, no.

4      Q.   Did you, when you powered up the laptop in

5   your basement, detect a rhythmic clicking sound?

6      A.   No, I did not.

7      Q.   Can you explain why the data sectors on the

8   imaged hard drive that was taken off of your laptop

9   were zeroed out?

10          MR. COSTER:  Objection.

11     A.   I don't know what data sectors are and I

12  don't know what "zeroed out" means.

13     Q.   Was August 22 the date on which you went

14  back to the computer after having plugged it in your

15  basement in Atlanta to determine whether you could

16  access or when your curiosity was peaked?

17     A.   I don't know.

18     Q.   Where were you on August 22, do you know?

19     A.   What day of the week was August 22?  By my

20  calendar, it was a Monday.

21     Q.   Where were you then?

22     A.   Atlanta.  So that could have been the day.

23     Q.   Was anyone home with you on that date?

24          MR. COSTER:  Objection.  At night?  During

Jay Stuart Rein, Vol. 3                    01/13/2006

777

1   the day?

2          MS. McGURN:  At any point during the day.

3      Q.   Were you at home during the day?

4      A.   I was at work during the day.

5      Q.   When you arrived home, was anyone home?

6      A.   My family was home.

7      Q.   Do you specifically recall that that was

8   the date on which you went back to the computer

9   because your curiosity had been peaked?

10     A.   Between the time of the first deposition

11  and the second deposition, I turned the computer on.

12  Do I know if that was the day?  No, I do not.

13     Q.   Okay.  That's all I'm asking.  Do you have

14  any understanding of why the access data on the hard

15  drive that was imaged from your computer bears a

16  date of August 22?

17     A.   I don't know the mechanics of the computer,

18  and I can't say that was the time and the day that I

19  turned the computer on.

20     Q.   Okay.

21     A.   I don't know.

22          MR. COSTER:  The question is if you know --

23     A.   I don't know.

24     Q.   But at that time it was still in your

778

1   possession?

2      A.   Yes, it was.

3      Q.   And you didn't return it until four days

4   later on August 26th, right?

5      A.   Whenever the day of that second deposition

6   was, yes.

7      Q.   Which was ten days after the first

8   deposition as which you were asked to return it,

9   right?

10      A.   Yes, it was.

11      Q.   Did you maintain the laptop in your

12   possession?  You threw it in your travel bag, is

13   that right, and maintained it in your possession to

14   bring it up to Boston, and took it out of your

15   travel bag at the deposition on the 26th; is that

16   right?

17      A.   Yes.

18      Q.   You took it out of your bag during a break

19   if the deposition and put it on the conference room

20   table?

21      A.   No.  Before the deposition had begun, when

22   we walked into the room together, I took it out of

23   the bag, and I gave it to you, and I said, instead

24   of incurring costs, because you told me to expense,

779

1    send you the receipt for shipping it to you, I said,

2    I thought I carried it up, and you smiled, and we

3    were not on the record yet, and you said, I figured

4    you might do it this way.  Thank you very much, and

5    you took it.

6        Q.   Prior to that we had agreed to pay for the

7    shipping and requested that you ship it, right?

8        A.   You agreed to pay the shipping, and you had

9    requested to receive it back.

10       Q.   And we gave you shipping instructions,

11   didn't we?

12       A.   I do not recall if you gave me specific

13   shipping instructions.  You told me to incur the

14   costs.

15       Q.   But then we agreed to pay it and we gave

16   instructions to your counsel as to how you should do

17   that, did we not?

18           MR. COSTER:  I don't know if he knows what

19   instructions you gave me, just to be clear.

20       A.   My view was --

21       Q.   Did your counsel share instructions with

22   you regarding shipping?

23           MR. COSTER:  Objection.

24       A.   I do not know.

785

1    them.  Is that what you're asking, when we filed a

2    written response?

3          MS. McGURN:  Yes.

4       A.  My attorney received the document request

5    and I got everything to my attorney.

6       Q.  Do you recall when that happened?

7       A.  Probably immediately thereafter I sprung

8    into action to help him achieve whatever time line

9    he needed to keep us on.

10      Q.  Did you have an awareness at that time,

11   when you received the document request, that there

12   were documents on the laptop that might be called

13   for?

14      A.  No, I did not.

15      Q.  Why?

16      A.  I don't know.  I don't know why the brain

17   does what it does.

18      Q.  What do you mean by that?

19      A.  I don't know why I didn't think about the

20   computer.  The computer was inactive to me.

21      Q.  Did you mention the computer to your

22   attorney in connection with trying to pull things

23   together?

24          MR. COSTER:  Objection.  I'm going to

Jay Stuart Rein, Vol. 3                    01/13/2006

786

1    instruct you not to answer.

2        Q.    Without getting into the substance of any

3    discussions that you had with your counsel, was your

4    counsel aware that you had a laptop in your

5    possession from Motorola?

6            MR. COSTER:  Objection.  I don't know how

7    he can -- other than having a conversation with me,

8    I don't know how he can make me aware one way or

9    another of having a laptop computer.  I instruct him

10   not to answer.

11       Q.    In connection with your efforts to pull

12   documents together for responding to the document

13   requests, you searched your wife's computer; is that

14   right?

15           MR. COSTER:  Objection.

16       A.    No, that is not right.

17       Q.    How did you come to produce documents from

18   your Yahoo account?

19       A.    From a computer that I had functioning in

20   my house.  I don't know whether that was my wife's

21   computer or the other computer that we've already

22   discussed that I had to go out and purchase.

23       Q.    But so you did search some computer in

24   order to respond to that --

787

1    A.   No, I did not search any computer.   I

2    searched Yahoo's server.   The computer, again, is

3    just a vehicle to a central repository not onboard

4    the computer.   There was no search of the computer

5    to gather the Yahoo files to print and give to you.

6    Q.   Tell me the steps that you took in order to

7    get those Yahoo e-mails printed?

8    A.   You're kidding?

9    Q.   No.

10    A.   Turn on the computer, click on internet

11    explorer, www.Yahoo.com, and I would enter my e-mail

12    user ID and my e-mail password.   Then I would select

13    all of the files or all of the e-mails that were

14    associated with this, and I would hit print for each

15    one, print it to a printer which was connected via a

16    cable to the computer, and then I had the paper

17    documents.

18    Q.   Did you search for any other electronic

19    documents in response to the document request that

20    you received from Motorola?

21    MR. COSTER:   Objection.

22    Q.   When I say electronic documents, I mean any

23    documents stored on a computer, meaning e-mail?

24    A.   Again, not stored on a computer, I printed

Jay Stuart Rein, Vol. 3                                    01/13/2006

794

1        A.    Yes.

2        Q.    Were there occasions -- well, when the

3    plane takes off you have to shut down the computer;

4    is that right?  The pilot instructs you to shut it

5    down; is that right?

6        A.    Yes.

7        Q.    So you need to power it back up in order to

8    use it on the airplane, right?

9        A.    Yes.

10       Q.    When you're on the airplane, you can't use

11   wireless capabilities in order to access Motorola

12   systems, right?

13       A.    Yes.

14       Q.    It's prohibited, right?

15       A.    It's not any more if the aircraft has been

16   approved for and has this technology, but that

17   technology was not there then.

18       Q.    So at those times when you were using your

19   laptop on the airplane, without any kind of

20   connectivity, you were working off line?

21       A.    Correct.

22       Q.    And you did that how?  You powered up your

23   computer and you started to use Word?

24       A.    Power it up, and again, you still have to

Jay Stuart Rein, Vol. 3                                    01/13/2006

795

1     do alt, control, delete, enter a security password

2     to get to a desktop.  Word, PowerPoint and Excel,

3     those type of programs, they are, by virtue of the

4     fact that they are installed on the computer,

5     off-line programs, even if the computer is online,

6     they are, in effect, resident on the off-line

7     programs.  So they are always off line.  Nobody can

8     actually access them, I believe, while I'm accessing

9     them at the same time.  They are off line.

10         Q.   When you say Word and Excel and those

11    programs, are you referring to all the Windows-based

12    programs on the laptop?

13              MR. COSTER:  Objection.

14         A.   I'm referring -- I mean, the ones that I

15    use frequently are Word, Excel and PowerPoint, and

16    the Microsoft e-mail program.  On the plane, the

17    Microsoft e-mail program is off line.

18         Q.   But you were still capable of using other

19    programs?

20         A.   The Word, the PowerPoint, the Excel, yes.

21         Q.   Did you ever use a cache'd login to log

22    into the laptop without using the Motorola control,

23    alt delete and password security access?

24              MR. COSTER:  Objection.

Jay Stuart Rein, Vol. 3                         01/13/2006

796

1       A.   I don't understand the question.

2       Q.   Did you ever access the laptop without

3  pressing control, alt and delete and entering your

4  password?

5       A.   I never knew of a way to do that.

6       Q.   But you never knew if there was such a way?

7       A.   I do not know.

8       Q.   You testified that you had learned of this

9  bullet concept in computer journals and elsewhere.

10 I'm just directing your attention back to that phase

11 of testimony.  My question is, is it your

12 understanding that that function or that activity

13 would zero out the data on a hard drive?

14       MR. COSTER:  Objection.  If you know.

15       A.   I do not know.

16       Q.   Is it your understanding that that type of

17 activity would affect the mechanics of the hard

18 drive?

19       MR. COSTER:  Again, if you know.

20       A.   I do not know.

21       Q.   You testified previously that you used an

22 Outlook calendar while employed at Motorola?

23       A.   Yes.

24       Q.   Subsequent to that, when you no longer had

811

1          MR. COSTER:  What relevance is that?

2     Q.   Where was the seminar conducted?

3          MR. COSTER:  Objection again.  Go ahead.

4     A.   I think it was some office in the

5   Prudential Center.  I don't even remember.

6   Somewhere downtown.

7     Q.   When you packaged the laptop up for

8   delivery or when you put it in your -- is it a Tumi

9   bag; is that what you're saying?

10    A.   Yes.

11    Q.   When you put it in your Tumi bag to bring

12  it to Boston, did you notice that there was anything

13  loose or displaced on the hard drive of the

14  computer?

15    A.   I didn't notice that there was anything

16  loose or displaced on the computer.  My

17  understanding, the hard drive is inside the

18  computer.  So I wouldn't see anything.

19    Q.   Did you notice any screws missing or

20  adapters or plugs bent when you packaged up the

21  computer to bring it back to Boston?

22    A.   As I testified, I closed the computer up

23  when my curiosity couldn't be satisfied, and I left

24  it there until it wound up in my bag and came to

812

1    you.  Did I examine the computer for its state of

2    being?  No.  So I did not notice anything about it.

3         Q.   Because we can't access the hard drive now,

4    we can't determine whether there were any documents

5    saved on there that are not similarly saved or

6    otherwise saved on Motorola's systems; isn't that

7    right?

8              MR. COSTER:  Objection.

9         A.   I have no idea.

10        Q.   You do not know?

11        A.   I do not know.

12        Q.   So if we wanted to see all of the documents

13   that you stored on your hard drive, whether or not

14   they were ultimately transferred to Motorola through

15   some system in some capacity, we couldn't do that

16   now, could we?

17             MR. COSTER:  Objection.  Again, he doesn't

18   know what the capacity is.

19        A.   I have no idea what the state of that hard

20   drive is, to answer that question.

21        Q.   Assuming for purposes of this question that

22   the hard drive is as reported in Motorola's outside

23   expert's report, and there's no recoverable data,

24   it's true, is it not, that we cannot now determine

813

1    or see those documents that you had stored on your

2    hard drive, can we?

3              MR. COSTER:  Objection.

4        A.    I am not a computer expert, so I do not

5    know what you can see and cannot see.

6              MS. McGURN:  If you want to take a

7    five-minute break, I will be closing down, at least

8    for today.  I will look through my notes and take a

9    walk for a few minutes.

10             MR. COSTER:  Do you want to go off the

11   record?

12       A.    Closing down at least for today?

13       Q.    John and I are going to have a -- can we go

14   off the record.

15             (Discussion off the record)

16             (Recess)

17             MS. McGURN:

18       Q.    I'm going to direct your attention to a

19   document that we marked last time as Exhibit 2, and

20   direct your attention specifically to the response

21   to request No. 1.  Do you have an understanding that

22   documents concerning your employment and termination

23   were stored on the hard drive of your laptop

24   computer?

Jay Stuart Rein, Vol. 3                              01/13/2006

827

1    ever stored or accessed or retained other documents

2    which reference similar communications from your

3    Yahoo account or otherwise relating to your attempts

4    to bring other potential job opportunities to the

5    attention of Motorola colleagues?

6              MR. COSTER:  Objection.

7        A.    We've talked about this document in the

8    past.

9              MR. COSTER:  Yes, we have.

10       A.    Repeat the question.

11       Q.    Are you aware of other documents that were

12   maintained, created or accessed from your home

13   computer that similarly bring to the attention of

14   Motorola colleagues potential job opportunities?

15       A.    No, I'm not aware.

16             MR. COSTER:  Again, I continue to object,

17   to the extent that you're talking about a computer

18   other than Mr. Rein's laptop computer.

19       Q.    Directing your attention to a document we

20   marked previously as Exhibit 29, do you recognize

21   it?

22       A.    Yes, I do.

23       Q.    What is it?

24       A.    It's a message from me to Simon Blanks,

828

1    telling him that I was not interested in the
2    opportunity.
3        Q.    This was the Invoke opportunity?
4        A.    That's correct.
5        Q.    And you sent this from your Motorola
6    laptop, right?
7        A.    Yes, I did.
8        MR. COSTER: Listen to the question again.
9        A.    This was my telling Invoke that as a
10   Motorola employee I'm not going to accept their job
11   opportunity.
12       MR. COSTER: You sent it from your Motorola
13       --
14       THE WITNESS: Yes.
15       (Document marked as Exhibit 55
16       for identification)
17       Q.    Directing your attention to the document
18   that we've marked as Exhibit 55, do you recognize
19   it?
20       A.    It looks like a Word document with my notes
21   around the fringes of the document. "Question for
22   Motorola" it's titled.
23       Q.    This is a document that you prepared?
24       A.    Looks like it.

**EXHIBIT E**



World Trade Center East

Two Seaport Lane

Suite 300

Boston, MA  02210-2028

617-946-4800

fax 617-946-4801

www.seyfarth.com

Writer's direct phone
617-946-4858

Writer's e-mail
kmcgurn@seyfarth.com

August 16, 2005

**VIA FACSIMILE AND
FIRST CLASS MAIL**

John G. H. Coster, Esq.
92 State Street
Suite 900
Boston, Massachusetts 02109

      Re:  *Rein v. Motorola, et al.*
           Civil Action No. 04-12580

Dear John:

      According to Mr. Rein's sworn testimony yesterday, he retained the laptop that Motorola provided to him for use during his employment. Motorola policy requires employees to return Motorola property upon separation from employment. Mr. Rein also testified that he has not used the computer since his access to Motorola's network was terminated, and that it is presently boxed and stored at his home in Holliston. Kindly ensure that the computer is not booted up or used in any other way, and arrange for it to be appropriately protected for shipping. Then please return the computer immediately to Motorola via traceable overnight delivery. It should be shipped attention to: Margaret Hockenberry, Senior Paralegal, Motorola, Inc., 1303 East Algonquin Road, Schaumburg, IL 60196-1079. Thank you for your prompt attention. If you have any questions, please contact me.

      Cordially,

      SEYFARTH SHAW LLP

      Kristin G. McGurn

cc:    Manuel Cuevas, Esq.
       Richard L. Alfred, Esq.

BRUSSELS · WASHINGTON, D.C. · SAN FRANCISCO · SACRAMENTO · NEW YORK · LOS ANGELES · HOUSTON · CHICAGO · BOSTON · ATLANTA

# JOHN G. H. COSTER
Attorney at Law
92 State Street
Suite 900
Boston, Massachusetts 02109

(617) 423-2224                                                Fax  (617) 338-0919

August 19, 2005

**BY FACSIMILE**
Kristin G. McGurn, Esq.
Seyfarth Shaw LLP
World Trade Center East
Two Seaport Lane
Boston, Massachusetts 02210-2028

    Re: *Rein v. Motorola, et al*
      Civil Action No. 04-12580 NG

Dear Kristin:

   I am in receipt of your August 16th letter concerning the return of Motorola's computer. As you know, until now Mr. Rein has not received any communications from Motorola about whether they want this computer back, and if so, to whom it should be sent. My client advises me that the computer has been sitting in a storage box since Motorola deactivated it approximately a year and a half ago.

   Mr. Rein also has a "docking station" and other associated equipment that goes with this computer, which I assume Motorola wants returned as well. The cost of purchasing the appropriate boxes and packing material and shipping this equipment to Motorola is likely to be substantial, particularly if Motorola wants this equipment sent via "traceable overnight delivery". How does your client propose to cover these costs?

   I look forward to hearing from you.

              Very truly yours,

              John G. H. Coster



SEYFARTH SHAW LLP

World Trade Center East
Two Seaport Lane
Suite 300
Boston, MA 02210-2028
617-946-4800
fax 617-946-4801
www.seyfarth.com

Writer's direct phone
617-946-4858

Writer's e-mail
kmcgurn@seyfarth.com

August 22, 2005

**VIA FACSIMILE**

John G. H. Coster, Esq.
92 State Street
Suite 900
Boston, Massachusetts 02109

      Re:   *Rein v. Motorola, et al.*
              Civil Action No. 04-12580

Dear John:

      In response to your letter dated August 19th regarding arrangements and payment for shipping Motorola's laptop and related materials that Mr. Rein failed to return upon his departure from the Company, please ship the materials immediately via FedEx or UPS ground to Margaret Hockenberry, Senior Paralegal, Motorola, Inc., 1303 East Algonquin Road, Schaumburg, IL 60196-1079. You may forward the invoice for shipping, and packing supplies, to my attention.

      Cordially,

      SEYFARTH SHAW LLP

      Kristin G. McGurn

cc:    Manuel Cuevas, Esq.
       Richard L. Alfred, Esq.

BRUSSELS
WASHINGTON, D.C.
SAN FRANCISCO
SACRAMENTO
NEW YORK
LOS ANGELES
HOUSTON
CHICAGO
BOSTON
ATLANTA

BO1 15732562.1

**EXHIBIT F**



SEYFARTH
ATTORNEYS SHAW LLP

World Trade Center East

Two Seaport Lane

Suite 300

Boston, MA 02210-2028

617-946-4800

fax 617-946-4801

www.seyfarth.com

Writer's direct phone
617-946-4858

Writer's e-mail
kmcgurn@seyfarth.com

October 14, 2005

**VIA FACSIMILE - (617) 338-0919**
John Coster, Esq.
92 State Street
Boston, Massachusetts 02109

Re:   *Rein v. Motorola, et al*
      Civil Action No. 04-12580 NG

Dear John:

This letter follows up my message to you this afternoon.

I received confirmation today from a third-party forensic computer expert that, as we had suspected, Mr. Rein tampered with the hard drive of Motorola's laptop computer prior to returning it to the Company. On August 22, 2005, he "wiped clean" the hard drive, and rendered its data unrecoverable.

There can be no doubt that Mr. Rein's discovery obligations were crystal clear on August 22, 2005 given the pending litigation, the Court's discovery order, and the fact that at the first session of Mr. Rein's deposition (on August 16, 2005) he unequivocally testified that there were relevant electronic documents stored on the hard drive. Indeed, he ran the utility to wipe the drive, intentionally destroying potentially relevant evidence, on the very date that I demanded in writing that he finally return Motorola's computer, which he had wrongfully retained.

Needless to say, my client and I are extremely troubled, disappointed, and dismayed by this development. As you know, the implications of such intentional conduct are serious. Motorola was incensed to learn of this development and intends to vigorously pursue all available remedies. Today, I was able to prevail upon my client to permit Mr. Rein an opportunity to account for his actions and to provide complete disclosure of the actions he took with respect to the laptop. Kindly respond at your earliest convenience.

Sincerely,

SEYFARTH SHAW LLP

Kristin M. Goum (M.M.)

Kristin G. McGurn

cc:   Manuel Cuevas, Esq.
      Richard L. Alfred, Esq.

BRUSSELS   WASHINGTON, D.C.   SAN FRANCISCO   SACRAMENTO   NEW YORK   LOS ANGELES   HOUSTON   CHICAGO   BOSTON   ATLANTA

**EXHIBIT G**

```
========= Account (UserID) Record Information =========
USERID............. REIN
STATUS............. I (Inactive)
DISPLAY............ Y
DATA_SOURCE........ HDMBMGT
SOURCE_DATE........ 4/8/2004 6:04:46 PM
DISABLE_DATE....... 4/8/2004 6:04:46 PM
CATEGORY........... O (Other Employee Accounts)
AUTHORITY.......... O
DISPLAY_FIRST...... Jay
DISPLAY_LAST....... Rein
INFO............... new hire
DEPARTMENT......... FW554
PHYSICAL_LOCATION.. IL01
PRIMARY_ORG........ CGISS
SECONDARY_ORG...... INTGR SOL DV
---------- Commerce ID (TWIN) Record Information  ----------
COMMERCE_ID........ 12026815
DATA_SOURCE........ TWIN
SOURCE_DATE........ 4/9/2004 8:32:57 AM
LAST_UPD_ID........ SAP-M000
EMPLOYMENT_ACTIVITY T
FIRST_NAME......... Jay
LAST_NAME.......... Rein
FULL_NAME.......... Jay Rein
SUPERVISOR_ID...... 12027346
DEPARTMENT......... CQ798
PAY_LOCATION....... IL01
TELEPHONE_NUMBER... 1-508-893-6926
PRIMARY_ORG........ CGISS
SECONDARY_ORG...... INTGR SOL DV
```

CONFIDENTIAL

MSP0138

**EXHIBIT H**

1

1       Volume: I

2       Pages: 1-190

3       Exhibits: 1-14

4

5       UNITED STATES DISTRICT COURT

6       FOR THE DISTRICT OF MASSACHUSETTS

7       CA No. 04-12580 NG

8

9   - - - - - - - - - - - - - - - - - -x

10  JAY S. REIN,

11                      Plaintiff,

12  vs.

13  MOTOROLA, INC., CLYDE KOFMAN and

14  JUERGEN STARK,

15                      Defendants.

16  - - - - - - - - - - - - - - - - - x

17

18           DEPOSITION OF CHARLES LEHWALD

19               June 21, 2006

20               9:55 a.m.

21       Law Office of John G. H. Coster

22               92 State Street

23           Boston, Massachusetts

24       Reporter:  Nancy L. Russo

Charles Lehwald                                          06/21/2006

49

1      Q.    Are there specific procedures or protocols

2   you use when making a bit image copy of a computer hard

3   drive?

4      A.    Yes, our own internal best practices.

5      Q.    Are those best practices in writing

6   memorialized in some written document?

7      A.    No, not in detailed format.

8      Q.    What's your understanding of what the best

9   practices are as far as performing or making a bit

10  image copy of a computer hard drive?

11     A.    A hard drive is removed from a computer.  It

12  is connected to a write block device.  The write block

13  device is attached to an examiner work station.  The

14  Encase application is then opened and used to acquire

15  that write protected device as evidence.

16     Q.    Breaking down that answer, you say the hard

17  drive is removed from the computer.  When you're

18  performing this function for Motorola, would you be the

19  individual who removes a hard drive from a computer?

20              MS. MCGURN:    Objection.

21     A.    Yes.

22     Q.    On how many occasions since you have been

23  employed at Motorola have you performed this protocol

24  to make a bit image copy of a computer's hard drive?

Charles Lehwald                                                06/21/2006

50

1          MS. MCGURN:    The entire protocol or the

2    removal of the hard drive?

3          MR. COSTER:    Entire protocol.

4      A.   A couple of hundred times or more.

5      Q.   **What would lead you to make -- to perform**

6    **this procedure on a particular computer?**

7      A.   A request from legal or HR.

8      Q.   **In all the cases that you have performed this**

9    **function, has it been on computers of either current or**

10   **former employees of Motorola?**

11         MS. MCGURN:    Objection.

12     A.   Yes.

13     Q.   **On some occasions has it been of employees**

14   **who were involved in litigation with the company?**

15     A.   Yes.

16     Q.   **If you know, on how many occasions have you**

17   **done this where it's been individuals involved in**

18   **litigation with Motorola?**

19     A.   I don't know.

20     Q.   **Can you give me a rough estimate?**

21         MS. MCGURN:    Objection.

22     A.   I don't know.

23     Q.   **Would you say the majority of the times you**

24   **have done it, it's been where employees were involved**

51

1    in litigation with Motorola?

2                    MS. MCGURN:    Objection.

3        A.    No.

4        Q.    When you perform this investigation, is there

5    some procedure you utilize for actually obtaining

6    access to the computer?

7        A.    Yes.

8        Q.    What procedure do you use?

9        A.    The procedure changed since the time frame

10    we're talking about.  A standard procedure has always

11    been in place that a request comes from legal or HR and

12    where there is physical access required to the device,

13    it's been turned over by legal or HR.

14        Q.    So someone from the legal department or the

15    human resources department physically transports the

16    computer to you; is that correct?

17                    MS. MCGURN:    Objection.

18        A.    Not in all cases, no.

19        Q.    How else do you obtain access to a computer?

20        A.    After hours.

21        Q.    When the computer is transferred to you by

22    human resources or the legal department, do they

23    physically bring the computer to you or do you go to

24    them?  Is it shipped to you?  Just mechanically how

Charles Lehwald                                      06/21/2006

53

1   you?

2              MS. MCGURN:    Objection.

3       A.   Did you ask after hours?

4       Q.   **When it's not being done after hours.**

5              MS. MCGURN:    Objection.

6       A.   I would normally pick up the computer.

7       Q.   **Pick it up where?**

8       A.   From human resources or the legal

9   representative assigned.

10      Q.   **At the time you pick it up, is there any kind**

11  **of paperwork that is prepared to document the transfer**

12  **of the computer to you?**

13      A.   A chain of custody form -- evidence seizure

14  form we call it.

15      Q.   **Who is responsible for filling out the**

16  **evidence seizure form ordinarily?**

17      A.   I am or the individual working the particular

18  case.

19      Q.   **To go back, you said the first step you take**

20  **is you remove the hard drive from the computer; is that**

21  **correct?**

22              MS. MCGURN:    Objection.

23      A.   Yes.

24      Q.   **That's the protocol you utilize when --**

54

1      A.    Yes.

2      Q.    Now, does the protocol require the computer

3   to be turned off, turned on.  What's the status of the

4   computer when you do that?

5      A.    Turned off with the battery removed.

6      Q.    Do you physically remove the battery as well?

7      A.    Yes.

8      Q.    Again, just for the nontechnical among us,

9   how does one remove a hard drive from a laptop

10  computer?

11     A.    It varies greatly from computer model to

12  computer model.

13     Q.    So different laptops have different ways of

14  removing hard drive?

15     A.    Yes.

16     Q.    At any time when you use these protocols, do

17  you actually power up or turn on the laptop computer?

18  Do you have to do that in order to follow the protocol?

19     A.    No.

20     Q.    So would it be fair to say the laptop

21  computer is never physically turned on or powered up;

22  is that correct?

23           MS. MCGURN:    Objection.

24     A.    That is correct.

Charles Lehwald                                          06/21/2006

55

1    Q.    Do you ever recharge the laptop computer as

2    part of your protocol?

3    A.    No.

4    Q.    I think you said the next step after removing

5    the hard drive is you connect it to a write block

6    device; is that correct?

7    A.    That is correct.

8    Q.    What is a write block device?

9    A.    It maintains the integrity of the data in the

10   device you are acquiring by not allowing writes to the

11   device.

12   Q.    So it's a piece of equipment?

13   A.    Yes, piece of hardware.

14   Q.    How does that connect up to a hard drive?  Is

15   there a port that you plug it into?

16   A.    Yes.  It's an EIDE interface.

17   Q.    You would plug that into that port of the

18   hard drive?

19   A.    Correct.

20   Q.    Why is it important to do that?  Why is that

21   part of the protocol?  Why do you need a write block

22   device?

23         MS. MCGURN:    Objection.

24   A.    To maintain the integrity of the device you

Charles Lehwald                                          06/21/2006

56

1    are acquiring.

2         Q.   And if you didn't have the write block

3    device, what would happen?

4                   MS. MCGURN:   Objection.

5         A.   You would have bad evidence.

6         Q.   Why would you have bad evidence?

7         A.   It's not write protected.  You could

8    potentially write to the device and alter the data.

9         Q.   Simply by trying to extract or make a bit

10   image of the hard drive, you could potentially transmit

11   data to the hard drive; is that correct?

12                  MS. MCGURN:   Objection.

13        A.   If it weren't connected to a write block

14   device, yes.

15        Q.   What kind of data would be transmitted to the

16   hard drive, if you know?

17                  MS. MCGURN:   Objection.

18        A.   Primarily system file access dates are

19   modified.  Metadata gets altered.

20        Q.   System file access, what is that?

21        A.   Date and time stamps of files can change.

22        Q.   That is what you refer to when you say

23   metadata?

24        A.   Yes.

57

1      Q.   It would reflect the date that the computer

2   was hooked up or some function was performed on the

3   computer?

4                 MS. MCGURN:   Objection.

5      A.   Possibly.

6      Q.   I think you said the write block device is

7   connected to an examined work station?

8      A.   Examiner.

9      Q.   What is an examiner work station?

10      A.   It is the work station used to actually

11   examine the evidence file that is created by Encase --

12   by the bit image, if you will.

13      Q.   Is that some sort of a computer system that

14   differs from a standard desktop computer?

15      A.   No.  Other than it's designated for that

16   purpose.

17      Q.   So what kind of software would be installed

18   on this examiner station --

19                 MS. MCGURN:   Objection.

20      A.   Forensic related tools.

21      Q.   Is there a particular brand name?

22      A.   Encase.

23      Q.   Other than Encase, would there be any other

24   kind of software necessary to perform this function?

Charles Lehwald                                    06/21/2006

60

1   minutes or ten hours?

2       A.    30 minutes to two hours.

3       Q.    **After you complete making a bit image copy of**

4   **the hard drive, what do you do next as far as the**

5   **protocol is concerned or best practices?**

6       A.    That would depend on the case.

7       Q.    **What are the alternatives?**

8       A.    Typically there is an analysis involved in

9   performing computer forensics, but that depends on the

10  request by HR or legal.

11      Q.    **What kind of analysis can you perform?**

12      A.    It's all case specific.  Various Internet

13  email images.

14      Q.    **So what you would be doing is you would then**

15  **having made this bit image copy, I assume you**

16  **disconnect everything?**

17      A.    Yes.

18      Q.    **Then you perform the analysis on the copy; is**

19  **that correct?**

20      A.    Not exactly.  The exact steps according to

21  our best practices would be the original evidence is

22  then placed back in an anti-static bag and stored.

23      Q.    **So the original evidence you have this**

24  **removed hard drive, are you talking about just the hard**

Charles Lehwald                                    06/21/2006

69

1              MS. MCGURN:    Objection.

2         A.   Possibly.

3         Q.   **Is there some uncertainty?  Might he still be**

4    **able to access the Motorola network after his core ID**

5    **has been terminated or disabled?**

6         A.   The network, no.  His laptop computer

7    possibly.

8         Q.   **So he might still be able to access his**

9    **laptop computer, correct?**

10        A.   Possibly.

11        Q.   **How would he be able to do that?**

12             MS. MCGURN:    Objection.

13        A.   The standard means of logging in.

14        Q.   **So he may still be able to log in and access**

15   **his computer?**

16             MS. MCGURN:    Objection.

17        A.   Possibly.

18        Q.   **What would determine if he could or couldn't?**

19        A.   If he were on the Motorola network at the

20   time this entry was made for a long enough period for

21   this record to be replicated out to his computer, then

22   he would at that point not be able to log in to his

23   computer.  If he were not on the network at the time

24   this error was updated, it would have never been

Charles Lehwald                                                    06/21/2006

70

1    replicated to his computer.  So he would still be able

2    to then log into his computer.

3        Q.    Now, if Mr. Rein were to attempt to log in to

4    the network at some point after 4/8/04, again, I assume

5    his access would be denied; is that correct?

6                MS. MCGURN:    Objection.

7        A.    Yes.

8        Q.    If at the time he did that, would

9    Motorola -- at the time he did that, would Motorola be

10   able to disable his access to his laptop computer?

11               MS. MCGURN:    Objection.

12       A.    Can you rephrase?

13       Q.    Sure.  If he connected out some point after

14   April 8, 2004 simply by connecting up and now his

15   laptop is in some way linked or he is trying to log

16   into the Motorola system, would Motorola be able to

17   disable his password to the laptop computer?

18               MS. MCGURN:    Objection.

19       A.    No.  He can't log into the network.

20       Q.    If Motorola -- and let's assume Mr. Rein had

21   been logged in on April 8, 2004 -- if Motorola had been

22   able to disable the password to Mr. Rein's laptop

23   computer, what would Mr. Rein have been able to do with

24   the computer after that date, if anything?

71

1                    MS. MCGURN:    Objection.

2          A.    You can still possibly log into your

3    computer.

4          Q.    **How could he have done that?**

5          A.    By means of a local account on the computer.

6          Q.    **What is a local account?**

7          A.    It's an account stored locally specifically

8    local to that particular device.

9          Q.    **Is that something that the user would have to**

10   **create himself?**

11         A.    Possibly.

12         Q.    **Is there some other way it could get on his**

13   **computer?**

14         A.    There is also a local administrator account

15   on every computer.

16         Q.    **What is a local administrator account?**

17         A.    Same thing, a local account specific to that

18   computer.

19         Q.    **Who creates that?**

20         A.    The systems software, Windows, Microsoft.

21         Q.    **The local administrator account, what is that**

22   **I guess?**

23         A.    That's the account used for administrating

24   the computer typically.

83

1      A.    I believe.

2            MS. MCGURN:    The hard drive?

3            MR. COSTER:    Yes.

4      A.    The computers are, yes.

5      Q.    **And that is who Motorola leases its computers**

6  **from?**

7      A.    Currently today, yes.

8      Q.    **Do you know what Motorola did with respect to**

9  **the hard drives of computers that were not being**

10 **leased?**

11           MS. MCGURN:    What time?

12     Q.    **During Mr. Rein's employment.**

13     A.    No.

14     Q.    **Are you aware of Motorola ever having a**

15 **policy of wiping or deleting information from the hard**

16 **drives of its former employees?**

17     A.    Of the computers that are returned?

18     Q.    **Yes.**

19     A.    I would have to say we would normally because

20 there is data that belongs to Motorola, but I don't

21 know the answer to that.

22     Q.    **Does Motorola have the software necessary to**

23 **delete or zero out information from the hard drive?**

24     A.    No.

Charles Lehwald                                                    06/21/2006

102

1      Q.    I think the other person you mentioned was

2  Margaret Hockenberry; is that right?

3      A.    Yes.

4      Q.    Now, is Miss Hockenberry an attorney?

5      A.    I believe a parallel.

6      Q.    I take it that Paulette Hradnansky she is not

7  an attorney; is that correct?

8      A.    Correct.

9      Q.    Do you recall which of these two individuals

10 initially contacted you about reviewing Mr. Rein's

11 computer?

12              MS. MCGURN:    Objection.

13     A.    I don't recall.

14     Q.    Do you recall the substance of the first

15 conversation you had about reviewing Mr. Rein's

16 computer?

17     A.    I believe it was only for data recovery.

18     Q.    Were there any discussions of the litigation

19 Mr. Rein had brought against Motorola?

20     A.    No.

21     Q.    Were you aware this was in conjunction with a

22 litigation Mr. Rein had brought against Motorola?

23     A.    Yes.

24     Q.    How did you become aware of that?

Charles Lehwald                                     06/21/2006

103

1          A.    Through the request.

2          Q.    **What did they tell you about the litigation**

3    **Mr. Rein had brought against Motorola?**

4          A.    The emails just come with the subject line

5    litigation support usually.

6          Q.    **So there was a re: or some subject that**

7    **indicated this was in conjunction with litigation?**

8          A.    Yes.

9          Q.    **Was there any discussion of the information**

10   **they wanted you to try to obtain from the hard drive of**

11   **his computer?**

12         A.    No.  That was not my job.

13         Q.    **What was your job or task as it was described**

14   **to you in those initial communications?**

15         A.    Recover Motorola data.

16         Q.    **What did you understand that to mean?**

17         A.    Provide back mail files and all office

18   automation files.

19         Q.    **Mail files, are you referring to email files?**

20         A.    PST files, yes.

21         Q.    **What is a PST file?**

22         A.    A local mail file where local mail is stored.

23         Q.    **These would be the emails that were sent from**

24   **this computer?**

Charles Lehwald                                          06/21/2006

110

1      Q.    Why don't you describe for me step by step

2    what it is you did after you brought the laptop

3    computer into the lab?

4      A.    I first would -- I would have first unscrewed

5    the drive bezel screw, retention screw, remove the hard

6    drive and follow my own best practices.

7      Q.    So you didn't plug the computer in; is that

8    correct?

9      A.    Correct.

10      Q.    So if you didn't plug it in, I assume you

11    didn't power it up?

12      A.    Absolutely.

13      Q.    What was the condition of the computer when

14    you first took a look at it?

15      A.    Dirty.

16      Q.    Dust on it?

17      A.    Yes, on the keyboard.

18      Q.    Other than there being dust on the keyboard,

19    was there anything else that stood out in your mind

20    about the computer?

21      A.    Not the computer itself.

22      Q.    So there was no obviously damage to the case

23    or to some portion of the computer.  Is that a fair

24    statement?

111

1          MS. MCGURN:    Objection.

2     A.   No.

3     Q.   **What did you observe visually when you**

4  **examined the computer?**

5     A.   Having removed the hard drive, the hard drive

6  was missing a nine millimeter adapter that fits on the

7  pins of the hard drive which slide into the slot within

8  the laptop itself which enables the drive to function.

9  It was missing that adapter and the last two pins in

10  the drive were just crooked a little bit.

11     Q.   **Now, this adapter, does it have a name or**

12  **designation?**

13     A.   I believe it is a EIDE nine millimeter

14  adapter, I believe.

15     Q.   **How large is it?**

16     A.   A little less than an inch I would say or

17  right around an inch.

18     Q.   **What function does this adapter perform?**

19     A.   It is what enables the drive to start and

20  spin and function properly when it's inserted into the

21  computer.

22     Q.   **Is this adapter something you need to connect**

23  **the hard drive to the computer?**

24     A.   Yes.

112

1      Q.    So absent the hard drive -- absent this

2    adapter, the hard drive is not physically connected to

3    the computer?

4      A.    Correct.

5      Q.    Was this EIDE adapter missing all together or

6    simply disconnected from the hard drive?

7      A.    It was missing all together.

8      Q.    So it wasn't in the computer at all?

9      A.    No.

10      Q.    Did you have a computer case?  Did the

11    computer come in any kind of a case?

12      A.    I don't recall.  I don't believe so.

13      Q.    Did the computer come with -- I assume these

14    computers have cords for recharging purposes.  Did the

15    computer come with any kind of a power cord?

16      A.    I don't recall.

17      Q.    Do you recall other than the laptop itself

18    there being any kind of other peripheral devices when

19    you were given the laptop computer?

20      A.    I believe there were, but they were shipped

21    later.

22      Q.    Did you eventually receive those?

23      A.    Yes.

24      Q.    Did those contain the EIDE adapter?

Charles Lehwald                                          06/21/2006

113

1      A.   No.

2      Q.   And you don't recall whether the laptop

3    computer came in a shipping box or not when you got it?

4      A.   I don't, no.

5      Q.   Other than this missing EIDE adapter, is

6    there anything else -- strike that.

7           You also described there being a bent

8    pin of some kind; is that correct?

9               MS. MCGURN:   Objection.

10     A.   Yes, the last two pins.

11     Q.   Where were these pins located, on the laptop

12   or on the hard drive?

13     A.   On the hard drive.

14     Q.   Did you take any kind of a picture of the

15   pins when you observed this?

16     A.   No.

17     Q.   Did you do anything else to document the fact

18   these two pins appeared to be bent?

19     A.   Yes.

20     Q.   What did you do?

21     A.   I documented that in my initial findings.

22     Q.   How significantly were they bent?

23              MS. MCGURN:   Objection.

24     A.   Not very.

Charles Lehwald                                                06/21/2006

114

1       Q.   Other than what you have testified to the

2  missing adapter and bent pins, is there anything else

3  that stood out in your mind about the physical

4  condition of the laptop computer?

5       A.   Not from an appearance perspective.

6       Q.   I think you testified you unscrewed the hard

7  drive from the laptop, correct?

8              MS. MCGURN:   Objection.

9       A.   I unscrewed the retention --

10      Q.   Screw?

11      A.   Yes.

12      Q.   So would it be fair to say the only thing

13  that was attaching the hard drive to the laptop was

14  this retention screw?

15      A.   The drive bezel and the retention screw, yes.

16      Q.   Are there one or two retention screws?

17      A.   Just one.

18      Q.   Did the hard drive appear to be loose when

19  you unscrewed it?

20      A.   Yes.

21      Q.   Because it wasn't attached to the EIDE

22  adapter?

23      A.   Yes.

24      Q.   After removing the hard drive from the laptop

115

1    computer, what did you do next?

2        A.    Attached a nine millimeter adapter to the

3    drive which is needed for the adapter on the write

4    block device and attached the drive to the write block

5    device.

6        Q.    You had in stock a nine millimeter adapter

7    that fits this particular hard drive?

8        A.    Yes.

9        Q.    So now you have attached the hard drive to

10   the write block device.  What did you do after that?

11       A.    I would have connected the write block device

12   to my examiner, would have opened Encase, would have

13   turned on the write block device, turning the drive on

14   so it would spin so I could mount the drive and acquire

15   it within Encase.

16       Q.    I believe you testified previously in

17   conjunction with the operation of the Encase software,

18   you had to enter certain data; is that correct?

19       A.    Yes.

20       Q.    What was the data you had to enter?

21       A.    In this particular case, none.

22       Q.    Why is that?

23       A.    Because when the write block device turned on

24   to turn the drive on, the drive made a rhythmic

Charles Lehwald                                          06/21/2006

116

1  clicking sound and did not mount which told me there

2  was physical damage to the drive.

3      Q.   When you say the drive did not mount, for

4  those of us who are non-technical, what does that mean?

5      A.   It doesn't show up.  It doesn't come up.

6      Q.   So ordinarily what would happen if the drive

7  was functioning properly?

8      A.   You would end up with two new drive letters

9  perhaps a D and an E.

10     Q.   On your screen?

11     A.   Yes.

12     Q.   And that would indicate that the computer

13 recognized that there was a drive attached to it,

14 correct?

15     A.   Yes.

16     Q.   And, in this case, those letters did not

17 appear?

18     A.   Actually I didn't even wait because I know

19 that sound.

20     Q.   Okay.  So you didn't even wait.  Based on the

21 sound, you felt confident that the drive would not

22 mount properly?

23     A.   Yes, from experience absolutely.

24     Q.   So you powered it down immediately as you

120

1    talking about and there is a balance of the computer

2    which is the screen and keyboard and other components.

3    So what I'm trying to ascertain is did you do any kind

4    of an analysis or inspection other than what we already

5    discussed of the laptop portion of the computer?

6        A.    No.

7        Q.    You continued to not power it up or recharge

8    it or anything like that; is that correct?

9        A.    That would be correct.

10       Q.    So after powering down the write block

11   device, I assume you detached the hard drive from the

12   write block device; is that correct?

13       A.    Correct.

14       Q.    When you detached it, did you leave the EIDE

15   adapter in or did you detach the hard drive from the

16   adapter as well?

17       A.    I left the adapter attached.

18       Q.    What did you do with the hard drive after

19   detaching it from the write block device?

20       A.    It would have been placed back in an

21   antistatic bag, an evidence bag and marked and put back

22   into storage.

23       Q.    When you say marked, what are you referring

24   to?

121

1    A.    With the identifiers identifying what drive

2    it was, what case.

3        Q.    This is all part of this evidence seizure

4    form we have previously been talking about?

5        A.    And my own practices.

6        Q.    You have a separate document you filled out

7    in your own practices?

8        A.    We have a bag that drives are placed into and

9    sealed and it has identifier forms on the bag itself

10    that you can fill out so you know what drive it is.

11        Q.    So you were to fill those out as well?

12        A.    Yes.

13        Q.    You did it by hand or with a pen or pencil?

14        A.    Yes, with a Sharpie.

15        Q.    You did that with the hard drive.  After

16    putting it in the bag and filling out that form, what

17    did you do next?

18        A.    It would have gone back into the safe.

19        Q.    With respect to the other portion of the

20    laptop computer, the keyboard and screen, what did you

21    do with that?

22        A.    That would have gone into the safe if there

23    is room or my locked overhead.

24        Q.    What is a locked overhead?

Charles Lehwald                                          06/21/2006

                                                                122

1        A.   It is an overhead cabinet.

2        Q.   That you have in your office?

3        A.   Yes.

4        Q.   In this particular case, do you remember

5    which of the two things you did?

6        A.   I don't.

7        Q.   Is there some sort of a record you keep of

8    what you did with the keyboard -- the nonhard drive

9    portion of the laptop?

10       A.   It would be bagged and it's not sealed

11   because there is no evidentiary data, but it would have

12   been bagged with a name on it.

13       Q.   So you placed it in some kind of a bag and

14   indicated that it was Mr. Rein's computer as opposed to

15   Mr. Jones or Mr. Smith?

16       A.   Yes.

17       Q.   I think you then indicated that you wanted to

18   get further some instruction or directions about what

19   you would do after having discovered this clicking

20   noise the hard drive was making; is that correct?

21            MS. MCGURN:    Objection.

22       A.   Yes.

23       Q.   Who did you contact?

24            MS. MCGURN:    Objection.

Charles Lehwald                                          06/21/2006

                                                                    124

1    general, the laptop computer?

2         A.    Yes.

3         Q.    **After having these discussions with counsel,**

4    **what did do you next?**

5         A.    I believe the chain of custody form was

6    updated.   I believe that the hard drive was packaged

7    for shipment and that it was shipped to Kroll Ontrack

8    in Eden Prairie, Minnesota.

9                    (Exhibit No. 7 marked for

10   identification.)

11        Q.    **I show you what's been marked as Exhibit 7 to**

12   **your deposition.   Is this the evidence seizure form**

13   **that you previously testified about?**

14        A.    Yes.

15        Q.    **Is this a document that you prepared?**

16        A.    Yes.

17        Q.    **Directing your attention to the top**

18   **right-hand portion it says "incident number."**

19        A.    Yes.

20        Q.    **What is an incident number?**

21        A.    That's our own internal record identifier for

22   a particular case.

23        Q.    **And the four initial numerical digits, does**

24   **that indicate the date or the year that this incident**

Charles Lehwald                                      06/21/2006

134

1   computer, you then took the hard drive and put it in

2   some kind of a static free bag?

3       A.   Antistatic bag.

4       Q.   Then you arranged for it to be transported to

5   Kroll Ontrack; is that correct?

6       A.   That is what this document says.

7       Q.   Do I read this accurately saying it appears

8   the hard drive was shipped to Kroll Ontrack on

9   September 30, 2005?

10      A.   That would be correct.

11      Q.   Were you the person who actually arranged for

12  the transportation of the hard drive to Kroll?

13      A.   Yes.

14      Q.   Did you actually physically box up the hard

15  drive and ship it to Kroll?

16      A.   Yes.

17      Q.   Prior to shipping the hard drive to Kroll

18  Ontrack, did you have any discussions with anyone at

19  Kroll?

20      A.   I would have, yes.

21      Q.   Who did you have discussions with?

22      A.   That would be Rick Meurer.

23      Q.   Do you know if Mr. Meurer has a particular

24  title or position at Kroll?

Charles Lehwald                                          06/21/2006

141

1      Q.   So you don't know if the damaged head could

2   be responsible for what happened to the hard drive?

3               MS. MCGURN:   Objection.

4      A.   In my opinion, no.

5      Q.   What leads you to that conclusion?

6      A.   There was no data on the hard drive at all.

7      Q.   What leads you to believe a bad head would

8   not be responsible for that result?

9      A.   Because they were successful in imaging

10  99.99 percent of the drive with one bad sector.

11     Q.   Okay.  I don't understand that, but I'm going

12  to have to ask the right questions.  When they said

13  they imaged 99.99 percent of the drive, what does that

14  mean?

15     A.   They were successful in recovering

16  99.99 percent of the sectors on that hard drive.

17     Q.   Do you understand the technology Kroll uses

18  to image or recover damaged hard drives?

19     A.   No.

20     Q.   Why does the fact that they were able to

21  image 99.99 percent of the hard drive lead you to

22  believe a bad head was not responsible for the deleted

23  or zeroed out data on the hard drive?

24              MS. MCGURN:   Objection.

Charles Lehwald                                              06/21/2006

147

1      Q.    When was the next time that you had occasion

2  to take the hard drive out of the safe?

3      A.    I don't recall.  I don't believe it was until

4  we shipped it to opposing counsel's expert witness.

5      Q.    So you're not aware of the hard drive leaving

6  the safe between the time you put it in there and

7  apparently sometime in the middle of October of 2005

8  and the date it was shipped to the plaintiff's expert?

9      A.    That is correct.

10     Q.    Who made arrangements to ship the hard drive

11 to plaintiff's expert?

12     A.    I did.

13     Q.    Did you box up the hard drive and send it out

14 to our expert?

15     A.    Yes.

16     Q.    With respect to the laptop computer, where

17 was the laptop computer being kept during this period

18 of time prior to it being sent to plaintiff's expert?

19           MS. MCGURN:    Objection.

20     A.    Probably in my overhead locked.

21     Q.    Were you the person who made arrangements to

22 ship the laptop portion of the computer -- the nonhard

23 drive portion to plaintiff's expert?

24     A.    Yes.

152

1    more to this report.

2        Q.    What in addition do you recall?

3        A.    I don't recall without looking.

4              (Discussion off the record.)

5        Q.    I show you what's been marked as

6    Exhibit 12 that contains now two pages because we have

7    added a second page and I will also make a note that

8    there were -- I think this was part of an exhibit that

9    was submitted by counsel in one of their defendant's

10   motions.  And there are additional pages to the exhibit

11   that I am not including or attaching as part of the

12   exhibit to this deposition.  And I will be happy to go

13   on the record and make a notation of that.

14             Referring now to Exhibit 12 with the

15   additional page, were those the findings that you were

16   referring to in your prior testimony?

17       A.    Yes.

18       Q.    On the second page of Exhibit 12, I note you

19   make an indication or reach a conclusion that

20   Mr. Rein's hard drive appears to have been wiped; is

21   that correct?

22       A.    Correct.

23       Q.    What led you to that conclusion?

24       A.    That conclusion was drawn based on all

153

1  unallocated space data sectors being nothing but zero's

2  and the drive having been reformatted.

3      Q.   Is that a conclusion that you reached or is

4  that a conclusion Kroll reached initially?

5              MS. MCGURN:    Objection.

6      A.   This was my conclusion.

7      Q.   Was it based on the fact all the data Kroll

8  was able to extract appeared to be zero's?

9      A.   Yes.  My experience led me to believe that

10 based on all the zero's the drive had been wiped.

11     Q.   Now, going back to Exhibit 11, directing your

12 attention to page three of the report which is MSP0166,

13 the second bullet point "All unallocated data sectors

14 on the hard drive have a hex 0x00 pattern."  What does

15 that mean?

16             MS. MCGURN:    Objection.

17     Q.   If you know?

18     A.   That all data sectors are zero.

19     Q.   That is the equivalent to what you testified

20 that all the data -- unallocated data sectors appeared

21 to be zeroed out?

22     A.   Correct.

23     Q.   That is what led you to believe the hard

24 drive had been, as you put it, wiped; is that correct?

Charles Lehwald                                    06/21/2006

162

1       A.    Yes.

2                  MS. MCGURN:    Objection.

3       Q.    Directing your attention to paragraph three

4    of the specific factual findings, it says "There is

5    currently one Windows NTFS partition on the image of

6    the B01 media."  What does that mean?  What do you

7    understand that to mean?

8       A.    That the image file which was derived from

9    the original piece of media was found to contain one

10   Windows system file system which was NTFS which is

11   created upon formatting.

12      Q.    So Windows NTFS, is that a particular

13   software like Windows XP or Windows 2000?

14      A.    No.  That stands for Windows NT file system.

15   It is the file system security.

16      Q.    The NTFS partition, they are referring to

17   some indication that the hard drive has been formatted;

18   is that correct?

19      A.    That would be correct.

20      Q.    It says "There are no active or deleted files

21   on the partition."  What does that mean, if you know?

22                 MS. MCGURN:    Objection.

23      A.    There was no additional data found.

24      Q.    "The only existing files on the hard drive

163

1    are the metadata files that are created at the time a

2    partition is formatted and a few system added files and

3    folders."  Let's go back.   What systems added files

4    and folders were found?

5         A.   Those are all on the file listing that was

6    generated in my original report.

7         Q.   Would those be also things that would be

8    created as a result of the hard drive being formatted?

9         A.   Yes, specifically with NTFS.

10        Q.   When you say specifically with NTFS, again,

11   what is that?

12        A.   That is the Windows NT file system.

13        Q.   It says "The date and time used for all

14   metadata files is 8/22/05" and then there is a specific

15   time.  Is it your understanding this is the time the

16   hard drive was formatted?

17        A.   That was my understanding.

18        Q.   Was Kroll able to determine the date that

19   the -- strike that.

20             Was Kroll able to determine whether the

21   files had been zeroed out as you had originally

22   indicated in your findings?

23             MS. MCGURN:   Objection.

24        A.   I believe that is in their report.

167

1    conclude if it was one or the other; is that correct?

2        A.   I would say that would be correct.

3        Q.   Kroll indicates in their specific conclusions

4    that the hard drive was formatted according to the BIOS

5    date and time of 8/22/05.  What is your understanding

6    of that particular sentence?

7        A.   That fits in line with my original findings.

8    It's believed that the drive had been removed because

9    the drive did not have the adapter which was required

10   for the drive to run.  So the drive would have been

11   removed and whatever computer that the drive was

12   formatted by its BIOS date and time was this time of

13   8/22/05.

14       Q.   So that was the date or time if the -- the

15   drive was formatted, correct?

16       A.   Can you rephrase that?

17       Q.   Sure.   Your conclusion or their conclusion

18   was that according to the BIOS date, the drive was

19   formatted on 8/22/05, correct?

20       A.   Yes.

21       Q.   That date applies to the action of formatting

22   the drive; is that correct?

23       A.   Yes.

24       Q.   Could Kroll make a determination or are there

Charles Lehwald                                    06/21/2006

175

1    bites.

2        Q.   And that's true for the logical size as well?

3        A.   Yes.

4        Q.   It says "Unallocated clusters."  What is

5    that, the last entry?

6        A.   That is the space that has not been allocated

7    to any -- it's not used.  There is nothing there.

8        Q.   So there is some space that was allocated

9    because there was some information extracted; is that

10   correct?

11             MS. MCGURN:   Objection.

12       A.   I don't understand the question.

13       Q.   The unallocated clusters are clusters that

14   have not been used on the hard drive; is that correct?

15             MS. MCGURN:   Objection.

16       A.   That would be correct.

17       Q.   In this instance, there were at least some

18   clusters that were used on the hard drive because there

19   was some data extracted from it?

20             MS. MCGURN:   Objection.

21       A.   There were definitely some bites that were

22   being occupied by file records from the file system.

23       Q.   Does Motorola have the capacity to zero out a

24   hard drive or wipe a hard drive that is connected to

176

1    its network?

2         A.   No.

3         Q.   I think we previously talked about Motorola

4    having some concern about sensitive proprietary

5    information, trade secrets, that sort of thing.   Is

6    that a fair statement there is a concern on Motorola's

7    part about safeguarding that information?

8                   MS. MCGURN:   Objection.

9         A.   Yes.

10        Q.   How does Motorola safeguard that information

11   when it is contained on the laptops of its employee?

12                  MS. MCGURN:   Objection.

13        A.   Repeat the question.

14        Q.   Would it be fair to say that there are

15   certain information -- proprietary information or trade

16   secrets or confidential information that from time to

17   time is stored on the laptops of Motorola's employees?

18        A.   Yes.

19        Q.   When these employees, let's say, leave the

20   company, for example, what does Motorola do to

21   safeguard that information to ensure that it's not

22   duplicated or disseminated to competitors or released

23   to the general public?

24                  MS. MCGURN:   Objection.

Charles Lehwald                                              06/21/2006

177

1      A.    I don't know.  I don't have that

2  responsibility.

3      **Q.    So you don't know what they do to protect**

4  **that information?**

5      A.    No.

6      **Q.    Do you know one way or the other whether they**

7  **zero out or delete the information contained on those**

8  **hard drives when they are hooked up to Motorola's**

9  **computer networks?**

10     A.    We don't have that capability.

11     **Q.    And you're certain of that?**

12     A.    Absolutely.

13     **Q.    You don't know what precautions Motorola does**

14  **take; is that correct?**

15                  MS. MCGURN:    Objection.

16     A.    Are we talking about technological

17  precautions or are we talking about processes?

18     **Q.    Either.**

19     A.    There are processes in place for employees

20  typically we get computers back.  As far as

21  technologies, we recently deployed some technologies

22  that allows -- we have drives that have very sensitive

23  data that are now encrypted, but that is as of the last

24  eight months.

Legalink Boston, A Merrill Company
(617) 542-0039

Charles Lehwald                                        06/21/2006

178

1       Q.    Does Motorola have the ability to image or

2   duplicate or download data contained on a hard drive

3   when it is hooked up to its network?

4       A.    Yes.  We do today.

5       Q.    Is that true for the time period April or

6   May of 2004?

7       A.    No.

8             (Exhibit No. 14 marked for

9   identification.)

10      Q.    I show you what's been marked as Exhibit 14.

11  Have you ever seen this document before?

12      A.    Yes, I believe so.

13      Q.    Directing your attention to -- I think it's

14  the final two pages.  My copy only has two pages.

15  There is a signature line with your signature on it; is

16  that correct?

17      A.    Yes.

18      Q.    Did you participate in answering these

19  interrogatories?

20      A.    Yes, I did.

21      Q.    Is that your signature --

22      A.    Yes, it is.

23      Q.    -- on page 12.  Directing your attention to

24  page six which is answer interrogatory number six.  You

# EXHIBIT I

J. Rein
EXHIBIT NO. 9
8-16-05
L. LONDON

## MOTOROLA, INC.
## AWARD DOCUMENT
### For the
### COMPENSATION/ACQUISITION PLAN OF 2000
## Terms and Conditions Related to Employee Nonqualified Stock Options
### Award ID: 370447

| Name : | Jay Rein | Expiration Date : | July 01, 2012 |
|---|---|---|---|
| Commerce ID : | 12026815 | Number of Options : | 10,000 |
| Grant Date : | July 01, 2002 | Exercise Price : | $14.42 (USD) |

Motorola, Inc. ("Motorola") is pleased to grant you options to purchase shares of Motorola's common stock under the Motorola Compensation/Acquisition Plan of 2000 (the "Plan"). The number of options ("Options") awarded to you and the Exercise Price per Option, which is the Fair Market Value on the Date of Grant, are stated above. Each Option entitles you to purchase one share of Motorola's common stock on the terms described below and in the Plan.

## Vesting Schedule

| Percentage | Date |
|---|---|
| 25.00 | July 01, 2003 — VESTED |
| 25.00 | July 01, 2004 |
| 25.00 | July 01, 2005 |
| 25.00 | July 01, 2006 |

**Vesting and Exercisability**

You cannot exercise the Options until they have vested.

*Regular Vesting* — The Options will vest in accordance with the aforementioned schedule (subject to the other terms hereof):

*Special Vesting* — You may be subject to the Special Vesting Dates described below if your employment or service with Motorola or a Subsidiary (as defined below) terminates.

*Exercisability* — You may exercise Options at any time after they vest and before they expire as described below.

**Expiration**

All Options expire on the earlier of

(1) the tenth anniversary of the Date of Grant as stated above or

(2) any of the Special Expiration Dates described below. Once an Option expires, you no longer have the right to exercise it.

**Special Vesting Dates and Special Expiration Dates**

There are events that cause your Options to vest sooner than the schedule discussed above or to expire sooner than the tenth anniversary of the Date of Grant. Those events are as follows:

Motorola Confidential Proprietary.

(End of page 1 of the Award Document)

C00039

CONFIDENTIAL

*Retirement* – If your employment or service with Motorola or a Subsidiary is ended because of your Retirement, Options that were granted at least one year prior to your Retirement that are not vested will automatically become fully vested upon your Retirement. Any remaining unvested Options will be forfeited. All your vested Options will then expire on the earlier of the third anniversary of ending your employment or service because of your Retirement or the Date of Expiration stated above. Retirement means your retirement from Motorola or a Subsidiary as follows:

*(i)* Retiring at or after age 55 with 20 years of service;

*(ii)* Retiring at or after age 60 with 10 years of service;

*(iii)* Retiring at or after age 65, without regard to years of service.

*Disability* – If your employment or service with Motorola or a Subsidiary is terminated because of your Total and Permanent Disability (as defined below), Options that are not vested will automatically become fully vested upon your termination of employment or service. All your Options will then expire on the earlier of the third anniversary of your termination of employment or service because of your Total and Permanent Disability or the Date of Expiration stated above. Until that time, the Options will be exercisable by you or your guardian or legal representative.

*Death* – If your employment or service with Motorola or a Subsidiary is terminated because of your death, Options that are not vested will automatically become fully vested upon your death. All your Options will then expire on the earlier of the third anniversary of your death or the Date of Expiration stated above. Until that time, with written proof of death and inheritance, the Options will be exercisable by your legal representative, legatees or distributees.

*Change In Control* – If there is a Change In Control of Motorola (as defined in the Plan), all the unvested Options will automatically become fully vested as described in the Plan. If Motorola or a Subsidiary terminates your employment or service other than for Serious Misconduct within two years of consummation of a Change In Control, all of your vested Options will be exercisable until the Date of Expiration.

*Termination of Employment or Service Because of Serious Misconduct* – If Motorola or a Subsidiary terminates your employment or service because of Serious Misconduct (as defined below) all of your Options (vested and unvested) expire upon your termination.

*Change in Employment in Connection with a Divestiture* – If you accept employment with another company in direct connection with the sale, lease, outsourcing arrangement or any other type of asset transfer or transfers of any portion of a facility or any portion of a discrete organizational unit of Motorola or a Subsidiary (a "Divestiture"), all of your unvested Options will automatically expire upon termination in direct connection with a Divestiture and your vested Options will expire 12 months after such Divestiture or such shorter period remaining until expiration as set forth above.

*Termination of Employment or Service by Motorola or a Subsidiary Other than for Serious Misconduct or a Divestiture* – If Motorola or a Subsidiary on its initiative, terminates your employment or service other than for Serious Misconduct or a Divestiture, all of your unvested Options will automatically expire upon termination and your vested Options will expire twelve months after your termination of employment or such shorter period remaining until expiration as set forth above.

*Termination of Employment or Service for any Other Reason than Described Above* – If your employment or service with Motorola or a Subsidiary terminates for any reason other than that described above, including voluntary resignation of your employment or service, all of your Options (vested and unvested) will automatically expire on the date of termination.

## Leave of Absence/Temporary Layoff

If you take a Leave of Absence from Motorola or a Subsidiary that your employer has approved in writing in accordance with your employer's Leave of Absence Policy and which does not constitute a termination of employment as determined by Motorola, or you are placed on Temporary Layoff (as defined below) by Motorola or a Subsidiary the following will apply:

*Vesting of Options* – Options will continue to vest in accordance with the vesting schedule set forth above.

*Exercising Options* – You may exercise Options that are vested or that vest during the leave of absence or layoff.

000050

http://esps.mot.com/pls/ESPSP/SOSieNot.awardDoc?Token=3333373338373831211657&... 2/24/2004

*Effect of Termination of Employment or Service* – If your employment or service is terminated during the Leave of Absence or Temporary Layoff, the treatment of your Options will be determined as described under "Special Vesting Dates and Special Expiration Dates" above.

### Other Terms

*Method of Exercising* – You must follow the procedures for exercising options established by Motorola from time to time. At the time of exercise, you must pay the Exercise Price for all of the Options being exercised and any taxes that are required to be withheld by Motorola or a Subsidiary in connection with the exercise. Options may not be exercised for less than 50 shares unless the number of shares represented by the Option is less than 50 shares, in which case the Option must be exercised for the remaining amount.

*Transferability* – Unless the Committee provides, Options are not transferable other than by will or the laws of descent and distribution.

*Tax Withholding* – Motorola or a Subsidiary is entitled to withhold an amount equal to the required minimum statutory withholding taxes for the respective tax jurisdictions attributable to any share of common stock deliverable in connection with the exercise of the Options. Employee may satisfy any withholding obligation in whole or in part by electing to have Motorola retain Option shares having a Fair Market Value on the date of exercise equal to the minimum amount required to be withheld.

### Definition of Terms

If a term is used but not defined, it has the meaning given such term in the Plan.

*Fair Market Value* is the closing price for a share of Motorola common stock on the last trading day before the grant. The official source for the closing price is the New York Stock Exchange Composite Transaction as reported in the Wall Street Journal, Midwest edition.

*Serious Misconduct* means any misconduct identified as a ground for termination in the Motorola Code of Business Conduct, or the human resources policies, or other written policies or procedures.

*Subsidiary* means an entity of which Motorola owns directly or indirectly at least 50% and that Motorola consolidates for financial reporting purposes.

*Total and Permanent Disability* means for (x) U.S. employees, entitlement to long-term disability benefits under the Motorola Disability Income Plan, as amended and any successor plan and (y) non-U.S. employees, as established by applicable Motorola policy or as required by local regulations.

*Temporary Layoff* means a layoff or redundancy that is communicated as being for a period of up to twelve months and as including a right to recall under defined circumstances.

### Consent to Transfer Personal Data

By accepting this award, you voluntarily acknowledge and consent to the collection, use, processing and transfer of personal data as described in this paragraph. You are not obliged to consent to such collection, use, processing and transfer of personal data. However, failure to provide the consent may affect your ability to participate in the Plan. Motorola, its Subsidiaries and your employer hold certain personal information about you, that may include your name, home address and telephone number, date of birth, social security number or other employee identification number, salary, nationality, job title, any shares of stock held in Motorola, or details of all options or any other entitlement to shares of stock awarded, canceled, purchased, vested, unvested or outstanding in your favor, for the purpose of managing and administering the Plan ("Data").

Motorola and/or its Subsidiaries will transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of your participation in the Plan, and Motorola and/or any of its Subsidiaries may each further transfer Data to any third parties assisting Motorola in the implementation, administration and management of the Plan. These recipients may be located throughout the world, such as the United States. You authorize them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of shares of stock on your behalf to a broker or other third party with whom you may elect to deposit any shares of stock acquired pursuant to the Plan. You may, at any time, review Data, require any necessary amendments to it or withdraw the consents herein in writing by contacting Motorola; however, withdrawing your consent may affect your ability to participate in the Plan.

000091

### Acknowledgement of Discretionary Nature of the Plan; No Vested Rights

You acknowledge and agree that the Plan is discretionary in nature and limited in duration, and may be amended, cancelled, or terminated by Motorola or a Subsidiary, in its sole discretion, at any time. The grant of awards under the Plan is a one-time benefit and does not create any contractual or other right to receive an award in the future. Future grants, if any, will be at the sole discretion of Motorola, including, but not limited to, the timing of any grant, the amount of the award, vesting provisions, and the exercise price.

### Agreement Following Termination of Employment

As a further condition of accepting the Options, you acknowledge and agree that for a period of two years following your termination of employment or service, you will not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, or to communicate in support of Motorola or a Subsidiary to terminate his/her employment with Motorola or a Subsidiary and/or to seek employment with your new or prospective employer, or any other company.

You agree that upon termination of employment with Motorola or a Subsidiary, you will immediately inform Motorola of

*(i)* the identity of your new employer (or the nature of any start-up business or self-employment),

*(ii)* your new title, and

*(iii)* your job duties and responsibilities.

You hereby authorize Motorola or a Subsidiary to provide a copy of this Award Document to your new employer. You further agree to provide information to Motorola or a Subsidiary as may from time to time be requested in order to determine your compliance with the terms hereof.

### Acceptance of Terms and Conditions

By accepting the Options, you agree to be bound by these terms and conditions, the Plan and any and all rules and regulations established by Motorola in connection with awards issued under the Plan.

### Other Information about Your Options and the Plan

You can find other information about options and the Plan on the Motorola website http://hr2.mot.com/stockadmin. If you do not have access to the website, please complete the order form included with these Terms and Conditions to receive the information.

Motorola Confidential Proprietary    (End of page 4 of the Award Document)

000002

**EXHIBIT J**



# INVESTIGATIVE ANALYSIS REPORT

Client:  Motorola
Computer Forensics Engineer:  Jason Bergerson
Project Manager:  Rick Meurer
Date:  May 16, 2006, 2006
Job #: 1809789

CONFIDENTIAL

MSP0164



**Electronic Evidence Services**
Investigative Analysis Report

## Table of Contents

Executive Summary ........................................................................................................................ 3

Evidence & Source .......................................................................................................................... 3

Requested Analysis ........................................................................................................................ 3

Specific Factual Findings ............................................................................................................... 4

Specific Conclusions ...................................................................................................................... 4

Disposition of Evidence .................................................................................................................. 5

CONFIDENTIAL          MSP0165

# Kroll Ontrack™    Electronic Evidence Services
## Investigative Analysis Report

## Executive Summary

Kroll Ontrack has examined and analyzed investigative evidence submitted by Motorola in connection with the aforementioned project. Findings have only been provided regarding media or data relevant to the case or where specifically requested by the client.

Kroll Ontrack's findings are summarized as follows:

- The format date and time of the current partition is 08/22/2005 21:54:04.

- All unallocated data sectors on the hard drive have a hex 0x00 pattern.

## Evidence & Source

The following computer hardware provided for examination is listed below:

| Kroll Ontrack Media ID | Original Media or Kroll Ontrack Media | Media Description (HDD, floppy, tape, etc) | Media Markings/ Label Info | Model No. | Serial Number |
|---|---|---|---|---|---|
| A01 | Original Media | Hard Drive | None | Hitachi DK23DA-20F | PH05K8094818026J0968 |
| B01 | Kroll Ontrack | CD-Rom | Kroll Ontrack SO 1809789 BM# 35882 | None | None |

1. The 'A01' media was received from Charles Lehwald at Motorola on October 3, 2005 via FedEx. The Hitachi laptop drive had an attached bracket and adaptor. It was received in sealed evidence bag, the outside of which was also used as a Chain of Custody form. The user name was reported to be Jay Rein.

2. The 'B01' media was received from Charles Lehwald at Motorola on April 20, 2006 via FedEx. The CD-Rom contained is the backup media that was produced by Kroll Ontrack after the recovery of the 'A01' media.

## Requested Analysis

1. Kroll Ontrack is to analyze the EnCase evidence file of the Hitachi hard drive to determine if there is any recoverable data. Additionally, Kroll Ontrack is to report on any findings.



CONFIDENTIAL

MSP0166

# Kroll Ontrack™ | Electronic Evidence Services
## Investigative Analysis Report

## Specific Factual Findings

Below are comments and findings that resulted from the examination and processing of all submitted hardware and software. Findings have only been provided regarding media or files that contain relevant information or at the specific request of the client:

1. The original "A01" media was imaged in the Kroll Ontrack clean room and the resulting image was converted into an EnCase evidence file on October 11, 2005. The recorded MD5 hash value for the complete EnCase image is 0x07F5A553B1E2DEAEE5B0CA175BD20507. The EnCase evidence files were submitted to the client on October 12, 2005 with the Backup Media ID Number: 35882.

2. The Kroll Ontrack created CD-Rom, BMID #: 35882, containing the EnCase evidence files was resubmitted to Kroll Ontrack on April 20, 2006 and designated with the media ID "B01". The MD5 hash value that was verified from the evidence files was: 0x07F5A553B1E2DEAEE5B0CA175BD20507. The EnCase evidence files stored the original date of October 10, 2005 as the date image acquire was made. The combination of the recorded image date and the matching hash value confirms that the evidence files submitted for review match the original data as recovered by Kroll Ontrack from the "A01" media.

3. There is currently one Windows NTFS partition on the image of the "B01" media. There are no active or deleted files on the partition. The only existing files on the hard drive are the metadata files that are created at the time a partition is formatted and a few system added files and folders. The date and time for all metadata files is 08/22/2005 21:54:04. The date and time for all other files and folders is 08/22/2005 21:54:38.

4. The date and time that is used for the metadata files when a partition is formatted is taken from the BIOS clock of the computer. The BIOS clock is stored in local date and time without regard to the time zone. The Windows NTFS file system stores dates and times according to Greenwich Mean Time (GMT) and is populated during formatting from the local time in the BIOS clock. The documented times for the format of the NTFS partition were calculated from the Central Time Zone as that is where the analysis computer resides.

5. All other unallocated data sectors of the hard drive contain a hex 0x00 pattern.

## Specific Conclusions

1. The hard drive was formatted according to the BIOS date and time of 08/22/2005 at 21:54:04. As all other data sectors are hex 0x00 the hard drive was either new and had a factory format pattern of hex 0x00, or had all previous data sectors wiped before the new partition was formatted.

CONFIDENTIAL                    MSP0167

# Kroll Ontrack ™

## Electronic Evidence Services
### Investigative Analysis Report

## Disposition of Evidence

1.  The original "A01" hard drive was returned to the client on October 12, 2005.

2.  The "B01" CD-ROM, with backup media # 35882, containing an Encase image of the hard drive, remains in Kroll Ontrack custody and will be returned upon client request.

> The Project Manager listed on the cover of this report is available to answer any questions the client may have about the contents of this report.

**THE ABOVE IS A COMPLETE DESCRIPTION OF KROLL ONTRACK'S EXAMINATION OF THE SUBMITTED EVIDENCE.**

*Jason Bergerson*

Jason Bergerson

Computer Forensics Engineer

5/16/2006

Date      May 16, 2006

--- End Analysis ---

CONFIDENTIAL

MSP0168

**EXHIBIT K**



**SEYFARTH SHAW LLP**
ATTORNEYS

**F I L E**

World Trade Center East
Two Seaport Lane
Suite 300
Boston, MA  02210-2028
617-946-4800
fax 617-946-4801
www.seyfarth.com

Writer's direct phone
(617) 946 4858

Writer's e-mail
kmcgurn@seyfarth.com

September 8, 2005

**By FedEx Express Saver**

Margaret Hockenberry
Senior Paralegal
Motorola, Inc.
1301 East Algonquin Road, 3rd Floor
Schaumburg, IL 60196

> Re:    Jay S. Rein v. Motorola, Inc., Clyde Kofman and Juergen Stark
>          United States District Court, C.A. No. 04-12580

Dear Margaret:

I enclose the laptop computer that Motorola provided to Jay Rein for his use during employment with the company.  Mr. Rein testified at his deposition that he retained the laptop, but did not use it, following the effective date of his termination.

Mr. Rein delivered the laptop to me on the second day of his deposition, August 26, 2005.  I have maintained the computer securely in my office since that date.  I have not turned it on, booted it up, or otherwise handled it since receiving it from Mr. Rein on August 26, 2005.

Upon receipt of the laptop, kindly make arrangements for Motorola's IT department to retain the laptop for further processing in connection with this litigation, and contact me to discuss those next steps.  Also, please prepare a chain of custody memorandum reflecting the steps that you, and the IT department, take with respect to this computer.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

SEYFARTH SHAW LLP

Kristin Glennan McGurn

KGM:dnl
Enclosure
cc:    Manuel Cuevas, Esq.
       Richard Alfred, Esq.

BO1 15735733.1 / 11726-000600

BRUSSELS   WASHINGTON, D.C.   SAN FRANCISCO   SACRAMENTO   NEW YORK   LOS ANGELES   HOUSTON   CHICAGO   BOSTON   ATLANTA

FedEx | Ship Manager | Label 7923 7891 1740                                    Page 1 of 1

From:   Origin ID:   (617)946-4948
Denise Little
SEYFARTH SHAW
2 Seaport Lane
Suite 300
Boston, MA 02210



Ship Date: 08SEP05
Actual Wgt: 8 LB
System#: 1605713/INET2200
Account#: S *********

REF: 11726/600



Delivery Address Bar Code

SHIP TO:   (847)576-6944          BILL SENDER
**Margaret Hockenberry**
**Motorola, Inc.**
**1301 East Algonquin Road**
**3rd Floor**
**Schaumburg, IL 60196**



**EXPRESS SAVER PACKAGE**                    **MON**
                                             Deliver By:
TRK#   **7923  7891  1740**    FORM    12SEP05
                              0201
                                       **ORD**      A1

**60196**    -IL-US

**LF NOHA**



Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

## EVIDENCE SEIZURE FORM

Date Acquired: _____ N/A _____          Incident #: _____ INCD2005-06-00001

Time Acquired: _____ N/A _____

Person Obtaining Evidence: _Charles Lehwald (MIPS_    Phone: _847-523-2312_

Department: ___AC947_____

Person Authorizing Seizure: _____Manuel Cuevas-Trisán_____          Phone: _954-723-3681_

Person(s) Informed of Seizure: _Margaret Hockenberry_  Phone: _847-576-6944_

### EVIDENCE INFORMATION

Subject Name: ___Jay Rein_____          Core ID: _____ N/A _____

Phone (if known): _____          Dept. (if known): _____

**Computer Related Information**

Computer Make: _____ Dell Computer _____          Computer Model: _____ Lattitude C400 _____

**Laptop**/Desktop          Computer Serial #: ____ D2YQN11 _____

Hard Drive Standard: **IDE**/SCSI          O.S. (if known): _____ N/A _____

**Original Hard Drive Information**

Hard Drive Make: _____ Hitachi _____          Hard Drive Model: _____ DS23DA-20F _____

Size of Original Drive: _18.6 GB_____          Hard Drive Serial #:PH-05K809-48180-26J-0968

**Acquisition Hard Drive Information (If Used)**

Hard Drive Make: _____ N/A - OFR _____          Hard Drive Model: _____ N/A - OFR _____

Size of Acquisition Drive: N/A - OFR          Hard Drive Serial #: _____ N/A - OFR _____

Notes: _____

**Chain of Custody – All times based on Central Standard Time Zone**

Received From _Federal Express_          By: _Loretta Schumacher_

Date: _9/16/05_          Time: _N/A_

Received From: _Loretta Schumacher_          By: _Paulette Hradnansky_

Date: _9/20/05_          Time: _10:50 AM_

Received From: _Paulette Hradnansky_          By: _Charles Lehwald to SAFE IL93_

© **Copyright 1994-2002 Motorola, Inc. All Rights Reserved**
**Motorola Internal Use Only**



MSP0169

| Date: | 9/20/05 | Time: | 2:00 PM |
|---|---|---|---|
| Received From: | IL93 Safe | By: | Charles Lehwald- Remote Storage (Pelican Case for Transport) |
| Date: | 9/22/05 | Time: | 4:45 PM |
| Received From: | Charles Lehwald – Removed Drive for Acquisition * | By: | Charles Lehwald |
| Date: | 9/23/05 | Time: | 9:15 AM |
| Received From: | Charles Lehwald | By: | Charles Lehwald – Remote Storage (Pelican Case for Transport) |
| Date: | 9/23/05 | Time: | 10:30 AM |
| Received From: | Charles Lehwald | By: | Charles Lehwald – Storage (IL93 Safe) |
| Date: | 9/232/05 | Time: | 10:30 AM |
| Received From: | Storage – for Shipping to Kroll | By: | Federal Express – 7901 7248 6668 |
| Date: | 9/30/05 | Time: | 4:00 PM |
| Received From: | UPS-Kroll Ontrack | By: | Charles Lehwald |
| Date: | 10/13/05 | Time: | 11:45 AM |
| Received From: | Charles Lehwald | By: | Storage – IL93 Safe |
| Date: | 10/13/05 | Time: | 11:50 AM |
| Received From: | Storage – For Shipping | By: | Charles Lehwald – For Photographing and Shipping to Daniel Kalai, Dryptos Forensics, LLC Via-FedEx Airbill: 8569 1173 5835 Hard Drive retained in Kroll Evidence Bag #030081 (Receipt Retained), and Laptop Bagged, Tag #2175574 |
| Date: | 05/31/2006 | Time: | 11:24 AM |

* On 9/23/05 at 9:15 AM CST, the Laptop Hard Drive listed above was removed from the computer by Charles Lehwald. It is noted that the hard drive carrier retention screw was in place and was removed to take the hard drive out of the laptop. When the hard drive was removed from the laptop it was found that the EIDE Dell Adapter which is required for the computer to function had been removed from the hard drive. It is also noted that the pins were slightly bent which is very common when these adaptors are removed from the drive. The drive was then connected to an EIDE adaptor and connected to a Weibetech FireWire write block device for acquisition using the Encase Enterprise Edition software and connected to acquisition examiner workstation. Immediately upon powering on the write block device the drive spun and made a rhythmic clicking sound which is a common characteristic of a damaged hard drive. The drive did not mount and could not be acquired. Being that the drive appeared to be possibly damaged and was not able to be mounted, the write block device was powered off and the drive was disconnected, placed into an anti-static bag, marked as evidence and placed into a Motorola COC bag for storage and transport.

© Copyright 1994-2002 Motorola, Inc. All Rights Reserved
Motorola Internal Use Only

CONFIDENTIAL

MSP0170

| **Kroll Ontrack**™ | Evidence Control<br>And<br>Chain of Custody<br>Document | DATE GENERATED<br>27 Oct 2005  9:53 AM CDT |
| --- | --- | --- |
| | | ITEM TAG<br>A0001 |
| | | PROJECT NUMBER<br>1809789 |

DESCRIPTION OF ITEM (include model and serial numbers, unusual marks or scratches. For hard disks/images, include reference to computer from which obtained.)

Type: Hard Disk
Make: Hitachi
Model: DK23DA-20F
Serial Number: PH05K8094818026J0968
Computer User: Jay Rein
Visual Inspection: Hitachi lap top drive with attached bracket and adaptor
Description: lap top drive
Label: none
Notes: non

| RECEIVED FROM (contact, company location)<br>Charles Lehwald, Motorola | DATE / TIME RECEIVED<br>3 Oct 2005 10:40 AM CDT |
| --- | --- |

## CHAIN OF CUSTODY HISTORY

| Date/Time | Released By | Received By | Purpose | Comment |
| --- | --- | --- | --- | --- |
| 3 Oct 2005 10:40 AM Central | FEDERAL EXPRESS | Michael Peal | Acquisition of item | |
| 3 Oct 2005 10:41 AM Central | Michael Peal | EP2-SHIP-01 | Storage | |
| 3 Oct 2005 12:05 PM Central | EP2-SHIP-01 | Anthony Todd | Check-In | |
| 3 Oct 2005 12:58 PM Central | Anthony Todd | Carolyn Thompson | Storage | |
| 3 Oct 2005 6:12 PM Central | Carolyn Thompson | EP2-01-08-00 | Storage | |
| 6 Oct 2005 9:03 AM Central | EP2-01-08-00 | Dawn Stilinovich | Replication | |
| 6 Oct 2005 9:03 AM Central | Dawn Stilinovich | Jae Hangge | Replication | |
| 6 Oct 2005 10:42 AM Central | Jae Hangge | Gary Katzmarek | Replication | |
| 7 Oct 2005 3:59 PM Central | Gary Katzmarek | Andre Edwards | Replication | |
| 7 Oct 2005 4:10 PM Central | Andre Edwards | Carolyn Thompson | Storage | |
| 7 Oct 2005 6:11 PM Central | Carolyn Thompson | EP2-03-06-01 | Storage | |
| 12 Oct 2005 11:33 AM Central | EP2-03-06-01 | Carolyn Thompson | Disposal | |
| 12 Oct 2005 4:31 PM Central | Carolyn Thompson | Chris Besinger | Disposal | |
| 12 Oct 2005 4:31 PM Central | Chris Besinger | Disposal | Disposal | |

## AUTHORIZATION FOR FINAL DISPOSAL

*THE EVIDENCE/PROPERTY DESCRIBED ON THIS FORM IS NO LONGER REQUIRED AS EVIDENCE TO BE HELD BY KROLL ONTRACK AND MAY BE DISPOSED OF AS FOLLOWS:*

| ACTION<br>Ship To<br>Charlie Lehwald<br>Motorola<br>600 N US Highway 45<br>Libertyville, IL     60048-5343<br>US | NAME<br>Dawn Stockwell | DATE / TIME<br>12 Oct 2005 10:43 AM CDT |
| --- | --- | --- |

## CERTIFICATION OF FINAL DISPOSAL

*THE EVIDENCE/PROPERTY DESCRIBED ON THIS FORM WAS DISPOSED OF BY ME IN ACCORDANCE WITH THE AUTHORIZED FINAL DISPOSAL ACTION AT THE DATE AND TIME SPECIFIED.*

| NAME: Chris Besinger | DATE / TIME: 12 Oct 2005 4:31 PM CDT |
| --- | --- |

EXHIBIT L



**Computer Forensics**

Statement of Work

| Contact: | Customer (Billing): | Kroll Ontrack Contact: |
|---|---|---|
| Charles Lehwald<br><br><br>Motorola<br>600 N US Highway 45<br>Libertyville, IL 60048-5343<br><br>Phone: 847.523.2312<br>Cell: 847.812.6892<br>Email: c.lehwald@motorola.com<br>SO#: 1809789 | Margaret Hockenberry<br>Paulette Hradnansky<br>Bill Boni<br>Motorola<br>600 N US Highway 45<br>Libertyville, IL 60048-5343 | Rick Meurer<br><br>Kroll Ontrack Inc.<br>8995 Columbine Road<br>Eden Prairie, MN  55347<br><br>Phone: (952) 906-4972<br>Fax: (952) 974-4533<br>Email: rmeurer@krollontrack.com<br>Date:  Tuesday, October 04, 2005 |

## Project Overview

As discussed with Charles Lehwald ("Contact"), representing Motorola ("Customer"), on September 27, 2005, the project will follow the outline below.

The goal of this project is to: recover a full image copy from a nonworking hard drive and provide the client with one (1) copy of the data Encase format and one copy in native format.  Motorola is not authorizing Kroll Ontrack to perform any additional analysis of this physical drive or to repair the original physical disk that will be provided. At the completion of the project and email notification from the Contact, all data will be wiped from Kroll Ontrack's network.

Kroll Ontrack's computer forensic process will include performing a Forensic Recovery on the hard drive and a destruction of archived data. Estimated cost for this project is $6500 plus output media and freight costs.

Upon receipt of media and the signed contract, we estimate that deliverables will begin to be available in 7-10 business days at a standard service level or 3-5 calendar days at an emergency service level.  Should the scope of the project change, the timeline and total costs may change.

## Stage I:  Data Collection

**CHAIN OF CUSTODY:** Kroll Ontrack will maintain a chain of custody on the original media. As part of this chain of custody Kroll Ontrack will document the steps that were taken to complete the recovery should the recovery be successful and provide this documentation back to the customer.

**DATA COLLECTION:**
- Customer will ship to Kroll Ontrack's Eden Prairie, MN office one hard drive.

**MEDIA HANDLING:**
- Kroll Ontrack will perform a Forensic Image of the original media received. The imaging process assures that the original media and data are not altered during the recovery/analysis process, thus preserving evidentiary value.

# Kroll Ontrack™

**INVOICE**

**REPRINT**

9023 Columbine Road
Eden Prairie, MN 55347 USA
(952) 937-1107
(952) 937-5815 [FAX]

| | |
|---|---|
| **Invoice Number:** | 00126464 |
| **Order Number:** | 0135042 |
| **Invoice Date:** | 5/24/06 |
| **PO Number:** | NP2111345 |
| **Customer No:** | 488074 |
| **Amount Due:** | $2,490.00    USD |
| **Job Number:** | 1809789 |

**Sold To:**
Motorola
600 N US Highway 45
Libertyville, IL   600485343
USA
Attention: Bill Boni

**Ship To:**
Motorola
600 N US Highway 45
Libertyville, IL   600485343
USA
Attention:

**Sales Rep:**  RMEURER          **Terms: NET 30 DAYS**          **US DOLLARS**          **Due Date:**  6/23/06

| Ln No | Item Id | Line Description | Qty | UM | Net Unit Price | Extended Price |
|---|---|---|---|---|---|---|
| 1 | 30F000000 | CF ANALYSIS | 9.0 | HR | $275.00 | $2,475.00 |

| | | | | | |
|---|---|---|---|---|---|
| **Gross Amount:** | $2,475.00 | **Discount Amount:** | $0.00 | **Sub Total** | $2,475.00 |
| | | Freight | | | $15.00 |
| | | Tax | | | |
| | | **Invoice Amount:** | | | $2,490.00 |
| | | **Amount Paid:** | | | $0.00 |
| | | **Amount Due on or Before  6/23/06   USD** | | | $2,490.00 |

*For Questions, please contact AR@Ontrack.com*

*Kroll Ontrack*

# Kroll Ontrack™

9023 Columbine Road
Eden Prairie, MN 55347 USA
(952) 937-1107
(952) 937-5815 [FAX]

## INVOICE
## REPRINT

| | |
|---|---|
| **Invoice Number:** | 00105718 |
| **Order Number:** | 0111868 |
| **Invoice Date:** | 12/21/05 |
| **PO Number:** | NP2111345 |
| **Customer No:** | 488074 |
| **Amount Due:** | $500.00    USD |
| **Job Number:** | 1809789 |

**Sold To:**
Motorola
600 N US Highway 45
Libertyville, IL   600485343
USA
Attention: William Boni

**Ship To:**
Motorola
600 N US Highway 45
Libertyville, IL   600485343
USA
Attention: William Boni

**Sales Rep:** RMEURER      **Terms: NET 30 DAYS**      **US DOLLARS**      **Due Date:**  1/20/06

| Ln No | Item Id | Line Description | Qty | UM | Net Unit Price | Extended Price |
|---|---|---|---|---|---|---|
| 1 | 30I000001 | CF CERTIFIED DESTRUCTION OF ARCHIVED DATA | 1.0 | EA | $500.00 | $500.00 |

| | | | | | |
|---|---|---|---|---|---|
| **Gross Amount:** | $500.00 | **Discount Amount:** | $0.00 | **Sub Total** | **$500.00** |
| | | **Freight** | | | **$0.00** |
| | | **Tax** | | | |
| | | **Invoice Amount:** | | | **$500.00** |
| | | **Amount Paid:** | | | **$0.00** |
| | | **Amount Due on or Before  1/20/06   USD** | | | **$500.00** |

*For Questions, please contact AR@Ontrack.com*
*Kroll Ontrack*

**EXHIBIT M**

# I N V O I C E

**LEGALINK**

LegaLink Boston    tel (800) 822-3376
320 Congress Street    tel (617) 542-0039
4th Floor    fax (617) 542-2119
Boston, MA 02210    www.legalink.com

A WORDWAVE COMPANY  GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

| INVOICE NO. | INVOICE DATE | JOB NUMBER |
|---|---|---|
| 12021144 | 01/17/2006 | 1201-67665 |
| **JOB DATE** | **REPORTER(S)** | **CASE NUMBER** |
| 01/13/2006 | OCONMI | |

| CASE CAPTION | | |
|---|---|---|
| Rein vs. Motorola | | |

| TERMS |
|---|
| Payment due upon receipt |

Kristin G. McGurn, Esq.
Seyfarth Shaw
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210

---

```
ORIGINAL TRANSCRIPT OF:
   Jay Stuart Rein, Vol. 3                                          1,396.70

                                        TOTAL   DUE   >>>>           1,396.70

**Reporter's Jurat (Pursuant to Massachusetts Executive Order 455 (03-13), preparation,
issuance and recording of notarized and certified document)
LegaLink Boston now has a new payment address.  Please send your payments to:
LegaLink Boston
PO Box 3739
Boston, MA  02241-3739
```

TAX ID NO. : 04-3302306                                          (617) 737-1900

---

*Please detach bottom portion and return with payment.*

Kristin G. McGurn, Esq.
Seyfarth Shaw
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210

```
Invoice No.: 12021144
Date      : 01/17/2006
TOTAL DUE :    1,396.70


Job No.   : 1201-67665
Case No.  :
Rein vs. Motorola
```

Remit To:    **LegaLink Boston
PO Box 3739
Boston, MA 02241-3739**

LegaLink Boston
101 Arch Street, 3rd Floor
Boston, MA 02110
(617) 542-0039   Fax (617) 542-2119

# I N V O I C E

| INVOICE NO. | INVOICE DATE | JOB NUMBER |
|---|---|---|
| 12023206 | 07/03/2006 | 1201-69693 |
| **JOB DATE** | **REPORTER(S)** | **CASE NUMBER** |
| 06/21/2006 | RUSSNA | |

| CASE CAPTION | | |
|---|---|---|
| Rein vs. Motorola | | |
| **TERMS** | | |
| Payment due upon receipt | | |

Kristin G. McGurn, Esq.
Seyfarth Shaw
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210

```
 1 CERTIFIED COPY OF TRANSCRIPT OF:
    Charles Lehwald                                          880.50


                                TOTAL   DUE   >>>>           880.50


 **Reporter's Jurat (Pursuant to Massachusetts Executive Order 455 (03-13), preparation,
 issuance and recording of notarized and certified document)
 LegaLink Boston now has a new payment address.  Please send your payments to:
 LegaLink Boston
 PO Box 3739
 Boston, MA  02241-3739
```

TAX ID NO.:  20-2665382                                  (617) 737-1900

*Please detach bottom portion and return with payment.*

Kristin G. McGurn, Esq.
Seyfarth Shaw
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210

```
Invoice No.:  12023206
Date        :  07/03/2006
TOTAL DUE   :     880.50



Job No.   :  1201-69693
Case No.  :
Rein vs. Motorola
```

Remit To:   **LegaLink, Inc., A Merrill Company**
            **PO Box 3739**
            **Boston, MA 02241-3739**

## Progressive Discipline

### Statement of Policy

This policy sets forth Motorola's process for dealing promptly with employees who violate policies, whose actions are disruptive to a normal business environment, or whose conduct may have a negative impact on the employment relationship or Motorola's reputation and standing in the community.

### Scope

All Motorola employees based at locations within the United States.

### Application

Discipline may occur in any case where an employee's actions appear to be detrimental to the operation of the business or to other employees. Infractions (a single incidence of misconduct) are grouped into three categories (Class I, Class II and Class III), based on relative seriousness.

Each infraction results in a determination of discipline level, based on its seriousness, previous discipline and a review of the circumstances of the infraction. This determination is within the discretion of management and human resources, and may include an analysis of employee's entire work record, including attendance and performance. Each situation is given individual consideration and depending on the specific circumstances may deviate from the examples set forth in this policy. For example, a severe Class II infraction may be handled as a Class III, or a record or pattern of previous Class I infractions may result in a decision to discipline pursuant to the steps set forth for a Class II infraction.

On occasion, an employee may have both conduct and performance issues. In such situations, the supervisor may use this process, a performance improvement plan or a combination of both.

Classes of Infractions

Class I: These are minor infractions which require corrective action. The discipline for Class I infractions is normally:

1st infraction - First Written Warning or Documented Verbal Warning
2nd infraction - Second Written Warning
3rd infraction - Final Written Warning
4th infraction - Termination of employment

Examples of Class I infractions include (but are not limited to): Inattention to duties; disorderly conduct; inappropriate attire; minor infractions such as smoking in areas not

designated as smoking areas; misprocessing; isolated instances of failure to secure Motorola information under Motorola's Protection of Proprietary Information Standard Operating Procedure; abuse of personal privileges; and loitering.

All types of Class I infractions will be cumulative to determine the appropriate disciplinary steps. Once a Class I infraction has occurred, any subsequent Class I infraction will result in the next level of disciplinary documentation.

First and Second Written Warnings and Documented Verbal Warnings will remain active for purposes of documentation level for a period of 12 months from the date of issue. Once an employee progresses to a Final Written Warning, the documentation and disciplinary level will remain active for 12 months from the date of issue. Commission of another Class I infraction, or any Final Written Warning of any nature, during the 12-month period from date of issue of a Final Written Warning may result in termination of employment.

Class II: These infractions are serious in nature. Depending upon its severity, the first infraction may not, standing alone, be grounds for termination of employment. The discipline for a Class II infraction is normally:

1st infraction - Final Written Warning
2nd infraction - Termination of employment

Examples of Class II infractions include (but are not limited to): Inappropriate conduct; disregard of safe work procedures; making offensive remarks, including remarks based upon an individual's race, color, religion, sex, national origin, age, disability, sexual orientation, gender identity or expression, or veteran's status; using abusive, profane or sexually graphic language; inappropriate use of cameras; failure to secure Motorola confidential and proprietary materials under Motorola's Protection of Proprietary Information Standard Operating Procedure; misuse of Motorola resources or equipment (e.g., computers, telephone, pager, email, internet, software) under Standard Operating Procedure E-62.

Class II infractions will remain active for the duration of employment. Any subsequent Final Written Warning, of any nature, may result in termination of employment.

Class III: These infractions are very serious in nature and normally result in immediate termination of employment.

Examples of Class III infractions include (but are not limited to): Disruption of the workplace; willful spoilage, destruction or waste of Motorola property; possession, use or sale of narcotics, alcohol, or any other controlled substances; firearms or other weapons on company property; theft; gambling on Motorola premises; unauthorized disclosure of confidential company information or trade secrets; violation of security regulations and policies; conviction of a felony (including deferred adjudication, probation or any similar resolution of a felony charge in accordance with any state law limitations); violent acts or

threats of violence on Motorola property or toward a Motorola employee or the employee of a contractor; insubordination; job abandonment; <u>harassment</u> based upon race, color, religion, sex, national origin, age, disability, veteran, sexual orientation, gender identity or expression or any other status protected by law; falsification of Company documents (including employment application, work production records, timesheets, labor charging, travel statements, expense statements and documents related to illnesses and leaves of absence); making false accusations or providing untruthful information during any Company investigation; violation of Motorola's <u>Code of Business Conduct</u>.

Class III infractions that do not result in termination will remain active for the duration of employment. Any subsequent Final Written Warning, of any nature, may result in termination of employment.

<u>Effect on Salary Increases and Eligibility for Promotion or Transfer</u>

If an employee is issued a Final Written Warning, of any nature, he or she will not receive a merit or lump sum increase, and he or she will not be eligible to receive a promotion or to use the Career Management System (CMS) for a period of 12 months from the date of issue of the infraction.

<u>Comprehensive Final Written Warnings</u>

A Comprehensive Final Written Warning may be issued to an employee who has demonstrated a pattern or history of inappropriate behavior, attendance issues and/or other unacceptable conduct, but has not reached the point of termination under this policy.

Once an employee is issued a Comprehensive Final Written Warning, he or she will not receive a merit or lump sum increase, and he or she is ineligible to receive a promotion or to use the Career Management System (CMS) for a period of 12 months from the date of issue of the Comprehensive Final Written Warning.

Comprehensive Final Written Warnings will remain active for the duration of employment. Any subsequent Final Written Warning, of any nature, may result in termination of employment.

<u>Illegal Conduct/Conduct Detrimental to Motorola's Interests</u>

When an employee is charged or accused of violating the law or engaging in other conduct harmful to the general public interest, Motorola's action will vary depending on the individual circumstances of the case. Factors affecting Motorola's decision will include the seriousness of the allegations and the impact of the case on the employment relationship and Motorola's reputation in the community. In these situations, two members of management, one from the Human Resources Department and one from the Law Department, will review the circumstances and determine which of the following options is most appropriate under the circumstances:

- Personal <u>Leave of Absence</u>
- Transfer to another department or facility
- Termination
- Other disciplinary action
- Non-scheduling the employee with or without pay while the Human Resource and Law Department investigate the case and determine the course of action.
- No action, pending further proceeding or final disposition of the charge(s).

The employee may be required, as a condition of continued employment, to provide information on the status of court or other public proceedings.

<u>Preliminary Evaluation Period/New Employee Disciplinary Process</u>

Motorola provides for a Preliminary Evaluation Period and expedited disciplinary process for new employees. For all new employees with less than six months of service as a regular Motorola employee from the most recent date of hire the typical discipline is:

**Class I infraction:**

1st infraction - Final Written Warning
2nd infraction - Termination of employment

**Class II or Class III infraction:**

1st infraction - Termination of employment

New Employees may also be terminated during this Preliminary Evaluation Period for documented unacceptable performance, inappropriate behavior or excessive unexcused absences.

After the six-month Preliminary Evaluation Period expires, the employee will be subject to the Progressive Discipline process described earlier in this policy. If an employee has received a Final Written Warning for a Class I infraction during the six-month Preliminary Evaluation Period, the Final Written Warning will subsequently be treated as a 2nd Infraction Written Warning for Class I infractions.

<u>Documentation and Approvals</u>

Issuance of Final Written Warnings (for any class of infraction), Comprehensive Final Written Warnings, and all terminations require the prior review and concurrence of a Human Resource representative. Employees are requested to acknowledge by signature that the disciplinary documentation has been reviewed with them. Employees will be provided a copy of Class I, II, III and Comprehensive Final Written Warnings. If the employee refuses to sign the documentation, this refusal will be documented by at least two members of management, one of who may be from the Human Resources Department.

The employee will have the opportunity to explain his or her actions. If the employee disagrees with the disciplinary action, he or she may seek review of the action or termination through the Open Door process.

Documentation of a disciplinary action that is not reversed through the review process becomes a permanent part of the employee's Solutions Center file. Employees will be provided a copy of disciplinary documents that are placed in their employee file located at the Employee Solutions Center - Americas.

## Responsibilities

Management - Managers are responsible for applying discipline consistent with this policy. Managers are also responsible for ensuring that employees do not receive a merit or lump sum increase or promotion when on a Class I Final Written Warning, Class II, Class III or Comprehensive Final Written Warning.

Employee - The employee is expected to comply with the requirements and expectations contained in any disciplinary documentation issued under this policy.

Human Resources - Approval of Final Written Warnings (for any class of infraction), Comprehensive Final Written Warnings and all terminations pursuant to this policy. Human Resources are responsible for transferring documentation to the employee file at the Employee Solutions Center - Americas.

Leadership & Talent Supply (LTS) - LTS is expected to ensure that no employee who is ineligible inadvertently uses the Career Management System in violation of this policy.

## Cross Reference

- Attendance
- Code of Business Conduct
- Diversity and Equal Employment Opportunity
- Drug Free Workforce
- Open Door Process
- Personal Leave
- Reporting Relationships
- Senior Service
- Safe and Respectful Workplace
- Standard Operating Procedures E-62 - Appropriate Use of Computer Resources

**Version Date: 06/01/2005**
**Original Effective Date: 01/01/2002**

This policy does not constitute an employment contract or implied promise of any kind. The terms of this policy may be modified or eliminated by the Company at any time with or without notice. For more detailed information, see Notice to Employees Regarding Motorola's U.S. Human Resource Policies.

Site Created: 1 January 2002
Page Last Modified: 1 October 2004
Send any US Human Resources Policies related comments to The US HR Policy Committee

*Copyright © 2001 Motorola. All rights reserved.*
*Motorola Internal Use Only*