## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **JAY S. REIN,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 04-12580 NG** |
| | ) | |
| **MOTOROLA, INC., CLYDE** | ) | |
| **KOFMAN, and JUERGEN** | ) | |
| **STARK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

### AFFIDAVIT OF JOHN G. H. COSTER

I, John G. H. Coster ("Coster") do declare under pains and penalty of perjury that:

1.      I am a member of the Commonwealth of Massachusetts and this Court, and am the attorney for the Plaintiff Jay S. Rein ("Rein" or the "Plaintiff") in the above captioned case. This affidavit is based upon my personal knowledge.

2.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the depositions of Jay S. Rein.

3.      Attached hereto as Exhibit 2 is a true and correct copy Defendant Motorola's First Request for Production of Documents to Plaintiff.

4.      Attached hereto as Exhibit 3 is a true and correct copy of an August 22, 2005 letter from Kristin McGurn to John Coster.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a July 13, 2005 letter from John Coster to Kristin McGurn.

6.      Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the deposition of Charles Lehwald, dated June 21, 2006.

7.      Attached hereto as Exhibit 6 is a true and correct copy the specifications for a Hitachi DK23DA-20F hard drive that I downloaded from Hitachi's website.

8.      Attached hereto as Exhibit 7 is a true and correct copy of a "Summary of Recovery Steps" prepared by Kroll Ontrack.

9.      Attached hereto as Exhibit 8 is a true and correct copy of Defendant Motorola, Inc.'s Answers to Plaintiff's First Set of Interrogatories.

10.      Attached hereto as Exhibit 9 is a true and correct copy of Plaintiff's Responses and Objections To Defendants First Request For Production Of Documents.

Signed under the pains and penalties of perjury this 19th day of July, 2006.


/s/ John G. H. Coster
John G. H. Coster

Exhibit 1

1

1                               Volume:    I

2                               Pages:    1-225

3                             Exhibits:  1-14

4            UNITED STATES DISTRICT COURT

5         FOR THE DISTRICT OF MASSACHUSETTS

6           Civil Action No. 04-12580 NG

7  - - - - - - - - - - - - - - - - - - - - - - - x

8  Jay S. Rein,

9                Plaintiff,

10       v.

11  Motorola, Inc., Clyde Kofman,

12  and Juergen Stark;

13              Defendants.

14  - - - - - - - - - - - - - - - - - - - - - - - x

15

16        DEPOSITION OF JAY STUART REIN

17         Tuesday, August 16, 2005

18            10:23 a.m.

19          SEYFARTH SHAW LLP

20        World Trade Center East

21       Two Seaport Lane, Suite 300

22      Boston, Massachusetts 02210-2028

23

24  Reporter:  Lori-Ann London, RPR

42

1    about June 24th, 2002?

2        A    On June 24th, 2002.

3        Q    Did that coincide with the start of your

4    employment with Motorola?

5        A    Yes.

6        Q    And directing your attention to

7    subparagraph 3, was it your understanding that

8    upon termination you were expected to deliver

9    documents and records and other items pertain --

10   or materials belonging to Motorola?

11       A    As I read that now, yes.

12       Q    Did you have that understanding at the

13   time?

14       A    On June --

15            MR. COSTER:   Objection.

16       A    On June 24th, 2002?

17       Q    Right.

18       A    Yes.

19       Q    And did you maintain that understanding

20   at the time you terminated your -- or your

21   employment was terminated at Motorola?

22            MR. COSTER:   Objection.

23       A    At the time my employment was terminated

24   at Motorola on February 23rd, yes.

Jay Stuart Rein                                                    08/16/2005

43

1        Q     Okay.  What about in the March or April

2    time period?

3        A     Nobody from Motorola was talking with

4    me --

5        Q     Okay.

6        A     -- in the April time period.

7        Q     What do you mean by that?

8        A     When discussions terminated and I sought

9    counsel, there was no more designated -- no one --

10   there was nobody for me to -- I was not in active

11   dialogue with any representatives from Motorola to

12   return any materials to.

13       Q     Did you understand that to relieve you

14   of your obligations to return Motorola's items?

15       A     Those items are prepared and ready to be

16   returned to Motorola --

17       Q     Okay.

18       A     -- when an individual is identified.

19       Q     Okay.  How old were you at the time that

20   you were hired by Motorola?

21       A     38 -- 38?  38.

22             MR. COSTER:  Do the math.

23       A     I have to do the math.

24       Q     What's your date of birth?

215

1              MS. McGURN:  That's fine.

2              MR. COSTER:  -- because he's going

3     to miss his plane.

4              MS. McGURN:  Okay.  Understood.  And

5     as we discussed earlier off the record, we will

6     reconvene his deposition at another time to finish

7     up, since we're not able to --

8              MR. COSTER:  I do have a concern

9     with what appears to be the glacial pace at which

10    we are moving, and it is also my understanding,

11    although I haven't looked at them recently, but my

12    memory is that under the federal rules there is

13    ordinarily a six-hour limitation imposed per

14    deponent.  We are clearly going to exceed that.

15             If you can give me an indication of

16    what you anticipate, how much, because it seems to

17    me, again, a lot of the time we have spent here

18    today has not been constructive, and whether it's

19    deliberate on your part, I don't know, but, again,

20    we are making such glacial progress here.  So if

21    you can give me an indication of what you

22    anticipate needing to complete Mr. Rein's

23    deposition.

24             MS. McGURN:  Okay.  When we

Jay Stuart Rein                                              08/16/2005

216

1    conclude, I'll try and give you that assessment

2    off the record, but for the record --

3              MR. COSTER:  Okay.

4              MS. McGURN:  -- I will disagree both

5    with the federal rules citing that you've made and

6    also with the pace.  This is the plaintiff and,

7    you know, serious litigation with Motorola.  We

8    take his charges very seriously and have three

9    defendants to defend.  He's made a number of

10   claims, and we intend to pursue his deposition in

11   a methodical way in order to get answers to the

12   questions that we need.

13             We also have taken numerous breaks

14   today, some of which were necessitated by, you

15   know, business needs, and, you know, I'm not even

16   sure what the time span on the record has been

17   today, but I would venture to say that we've, you

18   know, lost some time.  So --

19             MR. COSTER:  I would venture to say

20   it was in excess of five hours.  As far as

21   numerous breaks, I think we took a brief break in

22   the morning.  We did take about a 15- or 20-minute

23   break in the afternoon and we took a 45-minute

24   break for lunch, and other than those three, I'm

217

 1    not aware of any breaks that we took.

 2                    And, again, you and I may disagree

 3    as to the relevancy of some of your questions,

 4    but, I mean, we've spent the entire morning, and

 5    we hadn't even completed Mr. Rein's background.

 6    We discussed where his wife's parents live, we

 7    discussed the ages of his children.  Again, I

 8    don't see that as being constructive or really

 9    relevant to any of the underlying claims in this

10    litigation.

11                    MS. McGURN:  Well, I disagree with

12    you as to relevance, and I think we needn't

13    dialogue it on the record, but we intend to

14    conclude the deposition as quickly as we can.

15    We're obviously all here spending time that we

16    could be spending somewhere else, and at the

17    conclusion of today's session, I'll let you know

18    what I think about how much time we're going to

19    need for his second day.

20                    But given it's a short day to begin

21    with due to the flight arrangements, we will need

22    a second day.

23                    MR. COSTER:  All right.  Well, when

24    we go off the record, you can tell me.

218

```
 1              MS. McGURN:  Sure.

 2              MR. COSTER:  I mean, you know, we're

 3   going to go off the record in seven minutes

 4   presumably.  You should have a pretty good idea --

 5              MS. McGURN:  That's fine.

 6              MR. COSTER:  -- but let's go ahead.

 7              MS. McGURN:  I mean, I can tell you

 8   I think we're going to need several additional

 9   hours and we are halfway through the exhibits.  So

10   we've marked 14 exhibits, we've got another 14 at

11   least to go, and I think we're going to need

12   several additional hours on a subsequent day.

13              Back on the record -- or we're still

14   on the record.

15        Q    How long did the meeting on October 14th

16   with Stark last?

17        A    I'm not certain.  It may have been an

18   hour.

19        Q    What do you remember saying at that

20   meeting yourself?

21        A    I don't recall.

22        Q    Do you recall being called upon to make

23   your piece of the presentation?

24        A    I'm certain there were pieces of the
```

587

1    identify it?

2                      (Document marked as Exhibit No. 49.)

3                      (Document exhibited to witness.)

4    A    This is the communication that we

5    discussed.

6                      MR. COSTER:  You should probably

7    wait for her to ask a --

8                      THE WITNESS:  Sorry.

9                      MR. COSTER:  -- question.

10                     MS. McGURN:  I just asked if he can

11   recognize it.

12                     MR. COSTER:  Oh, I'm sorry.  I --

13   A    This is two e-mail communications from

14   myself to Mr. Kofman seeking payment for the

15   cookies that he had agreed to buy from my daughter

16   for -- from the Girl Scouts.

17   Q    And did you have any follow-up

18   discussions with Kofman relating to this issue?

19   A    It wasn't until the e-mail -- the second

20   e-mail dated March 17th went out that I actually

21   received a check two days later in the mail from

22   him.

23   Q    So he did pay you for the cookies?

24   A    After this second e-mail communication,

588

1    yes.

2        Q    Okay.

3            MR. COSTER:  So that's not a part of

4    our damages.

5            THE WITNESS:  I was trying to figure

6    out...

7            MS. McGURN:  Just clearing things

8    up.  I'm done.  I have no further questions for

9    this witness.

10            MR. COSTER:  And I'm going to make

11   your day and say I don't have any questions

12   either.

13            (Off record at approximately

14            5:40 p.m.)

15

16

17

18

19

20

21

22

23

24

695

 1    that was being used by Motorola and by me to try and

 2    find a way to work together to resolve issues.

 3         Q.    And you told Peter Tobin that you would

 4    return the laptop to him when it was time for you to

 5    do so; did you not?

 6              MR. COSTER:  Objection.

 7         A.    I do not recall that conversation.

 8         Q.    Directing your attention that we marked

 9    previously as Exhibit 44 --

10              MR. COSTER:  Exactly, a document we marked

11    previously and there's already been testimony on.

12         Q.    -- do you recognize it?

13         A.    A message from Peter Tobin to me with a

14    string of e-mails attached to it.

15         Q.    On the second page of the document, there's

16    an e-mail from you to Peter Tobin, dated February

17    25, 2004; is that right?

18         A.    Yes.

19         Q.    The fourth bullet point on that indicates

20    that you agreed to return the Motorola laptop to

21    Peter Tobin upon completion of the time period

22    referenced in the e-mail; is that fair?  Is that

23    what the document says?

24              MR. COSTER:  Objection.  The document

696

1    speaks for itself.

2        Q.   Did you convey to Peter on February 25th by

3    e-mail that you would return the Motorola laptop to

4    him?

5             MR. COSTER:   Objection.

6        A.   As I previously testified, the day I

7    notified Peter Tobin, I would not be signing any

8    documents, and Motorola terminated communication

9    with me for purposes of this discussion.  As I

10   previously testified, I also believe I indicated

11   that nobody let me know where, to whom, at whose

12   expense and how it should be shipped to them.  So

13   the PC remained with me until such point in time

14   where someone made that request and indicated how to

15   return this.

16       Q.   But you had already agreed to do so --

17       A.   As I previously testified, I was in a

18   position where I was unemployed, without income,

19   without money, that I was not willing to start

20   shipping things back, and since Motorola had

21   indicated they were no longer talking to me, the

22   laptop went into a box and sat waiting.

23       Q.   When did it go into a box?

24       A.   I don't know.  It was disabled the day

Jay Stuart Rein, Vol. 3                                    01/13/2006

757

1    basement in Atlanta?

2         A.   Correct.

3         Q.   And the first time you tried to power it up

4    was between the first and second days of your

5    deposition?

6         A.   That's correct.

7         Q.   So when you received discovery requests in

8    this case, which you previously testified was either

9    late '04 or early '05, you did not try to access the

10   computer to determine whether you could get

11   documents from it for production, right?

12        A.   I could not get documents from it --

13        Q.   But you didn't try to, did you?

14        A.   That's correct, I did not try to.

15        Q.   Okay.  Going back to the basement in

16   Atlanta, you say you plugged it in, and then what

17   happened?

18        A.   You want to know what happened after I

19   plugged it in?

20        Q.   Yes.

21        A.   I walked away from it.

22        Q.   For how long?

23        A.   For a couple of days.

24        Q.   Why?

758

```
 1              MR. COSTER:  Go ahead and answer.

 2        A.    Because I wasn't going to sit there and

 3   watch the battery charge or not charge.  I had the

 4   rest of my life I wanted to live for those couple of

 5   days.  I honestly forgot that I had plugged it in.

 6        Q.    So it was plugged into your basement --

 7        A.    Yes.

 8        Q.    -- for several days before you went back

 9   to determine whether you could retrieve data from

10   it?

11        A.    Yes.

12        Q.    Do you recall the day on which --

13        A.    No, no.  Your implication was I was trying

14   to retrieve data from it.  I was not trying to

15   retrieve data from it.

16        Q.    What were you trying to do?

17        A.    I was turning it on out of curiosity.

18        Q.    So you were curious about what might be on

19   there?

20        A.    Yes.  I was not necessarily retrieving

21   anything from it and I was not doing anything to it.

22   I was curious.  It had been a year and a half since

23   I touched that computer.  That's all.

24        Q.    Okay.  So having testified about it at your
```

759

1    deposition, your curiosity was peaked, and you

2    decided to go look at the computer for the first

3    time in a while, right?

4        A.    Correct.

5        Q.    Did you have an understanding that if you

6    booted it up, it would change the data on the

7    computer and the access date would be affected?

8              MR. COSTER:    Objection.

9        A.    I had no understanding of anything.  I

10   agreed on August 16th to return the computer to you,

11   and I was curious as to what I was handing back to

12   you, or August 17th.

13       Q.    When you went back to the basement to check

14   on the computer several days later, what happened

15   next?

16       A.    Prior to going back, remember, all I do is

17   plug it in, and that was it.  I went back, I pushed

18   the "On" button.

19       Q.    Then what happened?

20       A.    Nothing.

21       Q.    Okay.  What happened next?

22       A.    I folded the computer up, and I stuck it in

23   my Tumi bag and brought it up two days later or

24   three days later to the deposition and handed it

760

1    over to you.

2        Q.   Did you look at the computer to determine

3    why nothing was happening?

4        A.   I don't understand the question.

5        Q.   Did you try to investigate why it wasn't

6    working?

7        A.   The only thing I could look at was the

8    screen.  The only thing I could do that I ever did

9    to get onto the computer was alt, control and

10   delete.  Did I hit alt, control and delete?  Yes.

11   Did I hit them simultaneously like I'm supposed to?

12   Yes.  Did anything happen?  Was I given a log-in

13   screen?  No.

14       Q.   Did it make any unusual sounds?

15       A.   I do not recall.

16       Q.   Did it have any unusual screen display?

17       A.   I believe it was a blue screen.

18       Q.   Did you do anything else to the computer to

19   determine why the screen remained blue and you

20   couldn't access anything?

21       A.   Aside from hitting alt, control and delete,

22   no.

23       Q.   So after you hit alt, control and delete,

24   nothing happened, and you folded the computer up,

761

1      put it in a bag at that point, and prepared to bring

2      it back to Boston?

3           A.   I left it in the basement, and when I came

4      up here for the deposition, it went into my bag.  I

5      can't say it was right after I folded it up that it

6      went into the bag.

7           Q.   Did you speak to anybody after trying to do

8      this with the computer and realizing you couldn't

9      access it?

10          A.   No.

11          Q.   Did you talk to your wife about it?

12               MR. COSTER:  Objection.  That should be

13     covered by the spousal privilege.

14          A.   I talked to my wife about a lot of things.

15          Q.   Was this among them?

16          A.   I don't know.

17               MR. COSTER:  Objection.

18          Q.   Do you recall discussing it with any IT

19     person or any technology professional?

20          A.   No.

21          Q.   Did you seek any assistance from anybody to

22     try to determine what the problem with the computer

23     was?

24          A.   No, I did not.

762

1      Q.   Have you ever purchased a utility to clean

2  a hard drive's computer?

3      A.   No, I have not.

4      Q.   Have you ever purchased a new hard drive

5  for a laptop or a computer?

6      A.   Yes, I have.

7      Q.   When was that?

8      A.   For my wife's HP 8650, whose hard drive had

9  failed.

10      Q.   When did that happen?

11      A.   I do not recall exactly.

12      Q.   How about generally?

13      A.   It was either in 2003, 2004 or 2005.

14      Q.   Was it while you were still employed by

15  Motorola?

16      A.   I don't recall at this point in time.

17      Q.   And you purchased the new hard drive

18  because the hard drive on her HP had died?

19      A.   Yes.

20      Q.   What does that mean?

21      A.   Turned on the computer and nothing

22  happened.

23      Q.   How did you know you needed a new hard

24  drive?

771

1        Q.    Were you surprised to learn that Motorola
2   was unable to access data on that computer?
3        A.    I couldn't access data on that computer.
4   Why would I be surprised Motorola couldn't access
5   data on the computer.
6        Q.    But the reason you couldn't access data on
7   the computer, you've previously testified, was
8   because your access to Motorola accounts had been
9   denied?
10       A.    My understanding was the day after I
11  notified Peter Tobin, I was denied access.
12       Q.    But that didn't render the computer
13  inoperable at that point, did it?
14       A.    I do not know what it did.  I could not use
15  that laptop from that point forward.
16       Q.    Because you needed a log-in, as you've
17  testified, to do so; that's your testimony, right?
18       A.    My testimony is --
19             MR. COSTER:  Objection.
20       A.    -- the machine would not let me get passed
21  the security screen with a password to use the
22  machine.  That's my testimony.
23       Q.    But you didn't understand that fact to mean
24  that the computer itself was not functioning from

772

```
 1    that day forward, did you?

 2              MR. COSTER:  Objection.

 3         A.   No, I did not say that, and I'm not going

 4    to agree to that.  Those are not my words.

 5         Q.   So what I'm saying is, you had no reason to

 6    believe when you were denied access on that date

 7    after you told Peter you were not going to sign the

 8    severance agreement, you had no reason to believe

 9    that by Motorola shutting down your access, that the

10    computer was no longer functioning?

11              MR. COSTER:  Objection.

12         A.   My understanding is that Motorola could

13    have sent a bullet over the network the first time I

14    logged on after they disabled me that did disable

15    that computer.

16         Q.   Do you think that's what happened here?

17         A.   I do not know.

18         Q.   A bullet?  What do you mean by that?

19         A.   It's a technical term.  It's like a worm or

20    a virus.  They disabled the computer.  Why they did

21    it, how they did it, and the net impact of what they

22    did, I do not know.  I did not pick up the phone to

23    call Motorola to ask them why I did not have access.

24    I just told Motorola I was not signing, I didn't
```

Exhibit 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAY S. REIN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CIVIL ACTION NO. 04-12580 NG |
| | ) |
| MOTOROLA; INC., CLYDE KOFMAN | ) |
| and JUERGEN STARK | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANT MOTOROLA'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF

Defendant Motorola, Inc. ("Motorola"), by its attorneys and pursuant to Rule 34 of the

Federal Rules of Civil Procedure, hereby requests that Plaintiff Jay S. Rein produce the

following documents for inspection and copying at the offices of Seyfarth Shaw, Two Seaport

Lane, Suite 300, Boston, Massachusetts 02210, within 30 days after service. The instructions

and definitions to be utilized in complying with this request are:

### INSTRUCTIONS AND DEFINITIONS

As used herein, the following terms shall have the meaning indicated below.

A.   **Uniform Definitions.** Motorola incorporates by reference the uniform definitions
set forth in Rule 26.5 of the Local Rules of the United States District Court for the
District of Massachusetts:

1.   **Communication.** The term "communication" means the transmittal of
information (in the form of facts, ideas, inquiries, or otherwise).

2.   **Document.** The term "document" is defined to be synonymous in
meaning and equal in scope to the usage of this term in Fed.R.Civ.P.
34(a). A draft or non-identical copy is a separate document within the
meaning of this term.

3.   **Parties.** The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name, or pronoun referring to a party, means the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

4.   **Person.** The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

.5.   **Concerning.** The term "concerning" means referring to, describing, evidencing, or constituting.

B.   **Additional Definitions**

1.   The term "Complaint," except where context does not permit, includes the Plaintiff's Complaint filed in the Superior Court Department of the Trial Court of the Commonwealth of Massachusetts in Middlesex County as Civil Action Number 04-4548 and removed to the U.S. District Court for the District of Massachusetts on or about December 9, 2004, in the pending action *Rein v. Motorola, Inc., Clyde Kofman and Juergen Stark.,* Civil Action No. 04-12580 NG.

2.   The term "relating to" shall include, but shall not be limited to, referring to, reflecting, bearing upon, pertaining to, being relevant to, and connecting with the matter set forth.

3.   "Plaintiff," "you," or "your" as used herein refers to Plaintiff Jay S. Rein, any consultants, experts, investigators, agents or other persons acting on Plaintiff's behalf and, unless privileged, Plaintiff's attorneys.

4.   The term "Motorola" as used herein refers to Defendant Motorola, Inc., and any officers, directors, employees, consultants, agents or other persons acting or purporting to act on its behalf.

5.   The term "date" means the exact day, month and year if ascertainable or, if not, the best approximation (including relationship to other events).

6.   Except where the context does not permit, the word "and" and the word "or" shall be construed to mean "and/or," and except where the context does not permit, words used in the singular shall be deemed to include the plural. Words used in the plural shall, except where the context does not permit, be deemed to include the singular. The masculine gender shall, except where the context does not permit, be deemed to include the feminine and neuter genders.

7.   All other terms and definitions are to be interpreted in their common, ordinary sense.

2

C.    **Instructions**

1.    **Claims of Privilege.** As to each document requested herein which is withheld by the Plaintiff under a claim of privilege or other rule protecting against disclosure, the Plaintiff is directed to identify the document as follows:

   a.    State the paragraph number (and subparagraph number where applicable) of the request wherein the document is described;

   b.    Set forth the date of the document;

   c.    State the name, address (if known), and title or position of each addressor, addressee, recipient and drafter of the document;

   d.    Describe the type of document (e.g., memo, letter);

   e.    Describe the general subject matter of the document;

   f.    State the name and address of each present custodian of the document;

   g.    State the specific basis for your claim that the document is privileged or otherwise protected against disclosure.

2.    **Time Period.** Unless specifically indicated in the document request, the documents sought by each request will cover the period from January 1, 2002 to the present.

3.    If Plaintiff knows of no documents which are responsive to a particular request, so state and identify such request.

4.    If any documents responsive to any request have been lost, mutilated, rendered illegible or destroyed, so state and identify each such document, and state to which request(s) the document would have been responsive.

5.    Any document responsive to any request should be identified as being responsive to the specific request involved. If the same document is responsive to more than one request, all requests to which it is responsive should be identified.

6.    Plaintiff is under the continuing duty and obligation to supplement his responses to these documents requests.

## DOCUMENT REQUESTS

1.     All documents concerning your employment or termination from employment at Motorola, including any contracts, agreements, terms and conditions of employment, personnel records or files, descriptions of job duties, and performance evaluations.

2.     All documents that pertain to Motorola's personnel or employment policies, practices or procedures, including any handbooks, guidelines, manuals and other publications.

3.     All documents, including minutes, notes or summaries of meetings reflecting discussions or communications between, or attended by, you and any officer, employee, representative or agent of Motorola, in the course of your employment with Motorola, concerning the subject(s) of alleged harassment, discrimination or bias based on age, against you or any other current or former Motorola employee.

4.     All documents concerning any promises, guarantees or assurances made by Motorola, Clyde Kofman or Juergen Stark concerning the terms and/or conditions of your employment.

5.     All documents, items, objects and effects that you took with you from Motorola following your termination.

6.     All documents you received from or sent to Russell Reynolds, Inc. or that concern your communications or relationship with Russell Reynolds, Inc.

7.     All documents, including but not limited to diaries, calendars, appointment books, journals or notebooks, reflecting or concerning meetings in which you participated, in person or otherwise, while employed by Motorola, regarding the Motorola Professional Services Group ("MPS"), its reorganization, its business plans or the performance of MPS or its members.

8.     All documents that evidence benefits and income earned and/or paid to you from January 1, 2000 through the present, whether received or not, including pay stubs, Forms W-2's,

Form 1099's, state and federal tax returns, dividend statements, commission statements, unemployment compensation, Social Security benefits, workers' compensation, veterans' benefits and any other compensation and/or benefit paid or earned whether through employment, self-employment or otherwise.

9.      All statements, oral or transcribed, signed or unsigned, recordings and affidavits prepared by or on behalf of you or any other witness(es) to any fact or event giving rise to the allegations in your Complaint, including without limitation, any statements provided to:

  a.  the Massachusetts Commission Against Discrimination,

  b.  the Massachusetts Attorney General's Office, Fair Labor & Business Practices Division,

  c.  the Equal Employment Opportunity Commission,

  d.  the Massachusetts Department of Employment and Training,

  e.  the Massachusetts Division of Unemployment Assistance, and

  f.  the Massachusetts Department of Industrial Accidents.

10.     All documents that you have received from any federal, state, and/or local entity or agency that relate in any manner to your employment with Motorola or the termination of your employment with Motorola, including, but not limited to, documents received from:

  a.  the Massachusetts Commission Against Discrimination,

  b.  the Massachusetts Attorney General's Office, Fair Labor & Business Practices Division,

  c.  the Equal Employment Opportunity Commission,

  d.  the Massachusetts Department of Employment and Training,

  e.  the Massachusetts Division of Unemployment Assistance, and

    f.   the Massachusetts Department of Industrial Accidents.

11.    All documents concerning your claims for damages including, but not limited to, your claims for compensatory damages, emotional distress damages, attorneys' fees and any other category of damages, including how these damages were calculated and by whom, as well as documents concerning any physical or mental injuries you allege to have sustained as a result of any actions or omissions by defendants Motorola, Clyde Kofman or Juergen Stark.

12.    All documents concerning any consultations, therapy, assistance, diagnoses, impressions, examinations, opinions, and/or any medical, psychiatric, psychological, or emotional treatment of you by any Health Care Providers during the period January 1, 2002, to the present, including but not limited to any and all records retained by any Health Care Providers.

13.    All documents concerning any non-medical expenses incurred, anticipated or projected to be incurred by you as a result of any alleged acts or omissions to act by defendants Motorola, Clyde Kofman or Juergen Stark.

14.    A copy of your personnel file from each employer for whom you have worked since February 23, 2004.

15.    All documents concerning any offers of alternate employment that you received during your employment at Motorola, including any offer letters, term sheets, salary and/or benefits information and/or any other communications.

16.    All documents concerning your efforts to find employment, including self-employment, from February 23, 2004 to the present, including any cover letters, resumes, log books, return and follow-up correspondence, diaries, calendars, appointment books or notebooks and all other similar documents.

17.    All documents concerning your termination from employment at Motorola and the events, circumstances and/or investigation leading to or concerning your termination from employment at Motorola.

18.    All documents that in any way relate to any communication between any person and you concerning any allegation in your Complaint and/or any incidents, events, facts, or occurrences that support or relate to said allegations and/or your alleged damages.

19.    All documents, including any transcripts of testimony, concerning any civil, criminal or administrative action, state or federal, to which you have been a party, witness or affiant.

20.    All documents relied upon, examined by, provided to or received from an expert witness in connection with your Complaint and any report and all other documents prepared, edited, authored or drafted by such expert witness.

21.    Correspondence, statements or notes from any witness, including any current or former employee(s), agent(s) or contractor(s) of defendants, concerning this lawsuit or any allegation made in the Complaint.

22.    All documents not already produced in response to the above requests that relate to, bear upon, or purport to provide evidence concerning the matters and allegations set forth in the Complaint or in any pleading (as defined in Fed.R.Civ.P. 7(a)) filed in this action.

23.    All documents identified in, or that you consulted or reviewed, or upon which you relied, to answer, in whole or in part, any of your answers to Defendant Motorola's First Set of Interrogatories and not otherwise produced in response to these document requests.

24.    Please execute the attached authorization for the release of your medical and

psychological records to counsel for Motorola.

<div style="margin-left:50%;">

Respectfully submitted,
MOTOROLA, INC.
By its Attorneys,


Richard L. Alfred (BBO# 015000)
Kristin G. McGurn (BBO# 559687)
Yvette Politis (BBO# 644986)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:    (617) 946-4800
Telecopier:    (617) 946-4801

</div>

Dated: March 3, 2005

---

**Certificate of Service**

I hereby certify that a true copy of the above document was served upon the attorney of record for the plaintiff by mailing a copy of same, postage prepaid, to John G. H. Coster, Attorney at Law, 92 State Street, Suite 900, Boston, MA 02109 on March 3, 2005.

Kristin Glennan McGurn

---

8

## AUTHORIZATION FOR RELEASE OF INFORMATION

Patient Name: Jay S. Rein          Date of Birth: _____

                                   Social Security #: _____

I hereby authorize _____
           *(name of physician, hospital or health care provider)*

to release my personal health and medical information as described below to the following person(s)
Kristin G. McGurn, Esq.
Seyfarth Shaw LLP
World Trade Center
Two Seaport Lane, Suite 300
Boston, MA 02210
(617) 946-4800

for the following purpose(s):  __Litigation_____
_____

Information to be disclosed:

☒ complete health record(s)              ☒ progress notes

☒ discharge summary                      ☒ laboratory tests

☒ history & physical examination         ☒ X-ray reports

☒ consultation reports

☒ other (please specify) All films, including but not limited to, MRIs, C-Scans, myelograms and x-rays

covering the period(s) of health care

From (date) __all_____ to (date) __all_____

From (date) _____ to (date) _____

I understand that this will include information relating to (check if applicable):

☒ acquired immunodeficiency syndrome (AIDS) or infection with human immunodeficiency virus (HIV)

☒ behavioral health services/psychiatric care

☒ diagnosis/treatment for alcohol and/or drug abuse

The patient or the patient's representative must read and initial the following statements:

a.  I understand that this authorization is voluntary. I understand that I may
    refuse to sign this authorization and that my refusal to sign will not affect my      Initials _____
    ability to obtain treatment or payment or my eligibility for benefits.

b.  I understand that I may inspect or receive a copy of the information described
    on this form if I ask for it, and that I will receive a copy of this form after I      Initials _____
    sign it.

c. Unless otherwise cancelled, I understand that this authorization will expire on the following date, event, or condition: <u>disposition of 04-12580NG</u>    Initials _____

d. I understand that I may cancel this authorization at any time by notifying the providing health care provider in writing, but if I do, it won't have any effect on actions taken prior to receipt of the cancellation.    Initials _____

e. I understand that if the person or entity that receives the above information is not a health care provider or a health plan covered by federal privacy regulations, the released information may be redisclosed by such person or entity and will likely no longer be protected by the federal privacy regulations. The recipient may otherwise be prohibited under federal law from redisclosing substance abuse information, AIDS/HIV status, or mental health information unless another authorization is obtained from me or unless such use or disclosure is specifically required or permitted by law.    Initials _____

A photocopy of this document has the same force and effect as the original.

_____    Date_____
Signature of patient/parent/guardian/patient representative

If signed by other than patient, indicate relationship: _____

Printed name of patient's representative: _____

BO1 15700550.1

Exhibit 3

# SEYFARTH
**ATTORNEYS** SHAW LLP

<div align="right">
World Trade Center East

Two Seaport Lane

Suite 300

Boston, MA  02210-2028

617-946-4800

fax 617-946-4801

www.seyfarth.com
</div>

Writer's direct phone
617-946-4858

Writer's e-mail
kmcgurn@seyfarth.com

August 22, 2005

**VIA FACSIMILE AND**
**FIRST CLASS MAIL**

John G. H. Coster, Esq.
92 State Street
Suite 900
Boston, Massachusetts 02109

      Re:   *Rein v. Motorola, et al.*
            Civil Action No. 04-12580

Dear John:

      This will confirm our agreement that Mr. Stark will appear in Boston for his deposition on September 7th, commencing at 12:00 noon. As we discussed on Friday, we will agree to stay until 6:00 p.m., if necessary, in order to complete the session. Mr. Kofman also has made travel arrangements to appear in Boston for his deposition at 10:00 a.m. on September 14th.

      As we also discussed, and in light of our Notice of Plaintiff's deposition, we intend to complete it prior to commencing Defendants' depositions. While we will continue to be accommodating so that it can be resumed on a date and time that is acceptable to the Plaintiff, we request that you kindly provide a date during the next two weeks on which we can complete his deposition.

      Thank you.

                  Cordially,

                  SEYFARTH SHAW LLP

                  Kristin G. McGurn

cc:   Manuel Cuevas, Esq.
       Richard L. Alfred, Esq.

BRUSSELS  WASHINGTON, D.C.  SAN FRANCISCO  SACRAMENTO  NEW YORK  LOS ANGELES  HOUSTON  CHICAGO  BOSTON  ATLANTA

Exhibit 4

# JOHN G. H. COSTER
ATTORNEY AT LAW
92 STATE STREET, SUITE 900
BOSTON, MASSACHUSETTS 02109

## FACSIMILE COVER SHEET

Please deliver the following pages to:

NAME:              Kristin G. McGurn, Esq.
COMPANY:           Seyfarth Shaw LLP
FAX NUMBER:        (617) 946-4801

FROM:              John G. H. Coster
PHONE:             (617) 423-2224
FAX:               (617) 338-0919

PAGES INCLUDING
COVER PAGE:        10 pgs.
DATE:              July 13, 2005
TIME:              3:30 P.M.

COMMENTS:

**IF THIS TRANSMISSION IS NOT COMPLETE OR FULLY LEGIBLE, PLEASE
CALL (617) 423-2224 TO ARRANGE FOR RE-TRANSMISSION.  THANK YOU.**

The original of this document will be sent by:
     ( x ) First Class Mail
     (  ) Express Mail/Federal Express
     (  ) Messenger
     (  ) **This will be the only form of delivery**

## CONFIDENTIALITY

The document(s) accompanying this cover page contain(s) information which is confidential and
privileged.  The information is only intended for the use of the individual or entity named on this
cover page and may contain information that is privileged, confidential and exempt from disclosure under
applicable law.  If you are not the intended recipient, be aware that disclosure, dissemination, copying,
distribution or use of the contents of this faxed information is strictly prohibited.  If you have received this
information in error, please notify us by telephone immediately so that we can arrange for the retrieval of
the original documents at no cost to you.  Thank you.

# JOHN G. H. COSTER

Attorney at Law
92 State Street
Suite 900
Boston, Massachusetts 02109

(617) 423-2224                                                        Fax (617) 338-0919

July 13, 2005

**BY FACSIMILE**
Kristin G. McGurn, Esq.
Seyfarth Shaw LLP
World Trade Center East
Two Seaport Lane
Boston, Massachusetts 02210-2028

Re:   *Rein v. Motorola, et al*
      Civil Action No. 04-12580 NG

Dear Kristin:

Enclosed please find the Stipulated Confidentiality Agreement. I have made one minor change, to correct a missing parenthesis.

Based on our prior conversations, it is my understanding that you have some additional documents that you have not produced either because of their volume or because Motorola wishes to designate them as "Confidential", but that they are available for inspection at your offices once we have agreed on a stipulation of confidentiality. I would like arrange to inspect these documents tomorrow afternoon. Could you or your assistant give me a call back so we can set up a mutually convenient time? I do not anticipate it taking me more than an hour to go through these documents.

Also, I would like to confirm our telephone conversation this afternoon. You have advised me that your client has recently provided you with additional e-mails concerning Mr. Rein; that you are in the process of reviewing these e-mails; and that there is a possibility that you may want to question Mr. Rein about some of these e-mails. Since I suspect that most, if not all, of these e-mails are also responsive to my outstanding document request, I find the eleventh hour discovery e-mails troublesome. Essentially, if Mr. Rein's deposition goes forward on Friday they will be available for your use, but I will have been deprived of the opportunity to review these e-mails with my client to prepare him for his upcoming deposition. At the very least, these e-mails should be made available to me tomorrow, when I inspect the other documents Motorola has not yet produced.

You have also advised me that Motorola is either trying to obtain or plans on trying to obtain documents from two of Mr. Rein's former employers, Epsilon and Logica. (At the time we spoke you were unclear whether subpoenas for these records had gone out yet - particularly after learning that I had received no notice of these subpoenas). Based on the foregoing, you warned me that, if we go forward with Mr. Rein's deposition on Friday, it is possible that you will be suspend the deposition and he will have to come back up to Boston at some later date so that you can question him about these additional documents.

As I told you this afternoon, Mr. Rein no longer works in Boston. To make himself available he has to take time off from work and travel up here. Requiring my client to make a second trip, simply because Motorola has been unable to secure all the documents it wants to question him about would place a significant burden on Mr. Rein and be fundamentally unfair.

My preference would be to go forward with Mr. Rein's deposition on Friday. However, if Motorola plans on reserving its right to suspend Mr. Rein's deposition - to be resumed at some later date simply to question him about a few documents it does not yet have in its possession, I must insist that this deposition be postponed, to avoid my client having to assume the wholly unnecessary burden and expense of taking an additional day off of work and making an additional trip to Boston.

Please advise me how you wish to proceed as soon as possible, so I can contact my client and he can adjust his schedule accordingly.

Very truly yours,

John G. H. Coster

Cc:  Jay S. Rein

Exhibit 5



1

1                              Volume: I

2                              Pages: 1-190

3                              Exhibits: 1-14

4

5               UNITED STATES DISTRICT COURT

6           FOR THE DISTRICT OF MASSACHUSETTS

7                  CA No. 04-12580 NG

8

9       - - - - - - - - - - - - - - - - - -x

10      JAY S. REIN,

11                          Plaintiff,

12      vs.                                   **CERTIFIED ORIGINAL**
                                              **LEGALINK BOSTON**
13      MOTOROLA, INC., CLYDE KOFMAN and

14      JUERGEN STARK,

15                          Defendants.

16      - - - - - - - - - - - - - - - - - - x

17

18           DEPOSITION OF CHARLES LEHWALD

19                  June 21, 2006

20                    9:55 a.m.

21        Law Office of John G. H. Coster

22               92 State Street

23            Boston, Massachusetts

24         Reporter:  Nancy L. Russo

Charles Lehwald                                06/21/2006

                                                            95

 1    litigation support for Motorola in conjunction with the

 2    claim that Mr. Rein brought against the company?

 3         A.   I don't believe so.

 4         Q.   How about a gentleman named Clyde Kofman?

 5    Have you ever had any dealings with Mr. Kofman during

 6    the time you have been employed by Motorola?

 7         A.   I don't believe so.

 8         Q.   Did you ever have any direct communications

 9    with Mr. Kofman?

10         A.   Not that I'm aware of.

11         Q.   Did you ever have occasion to work on

12    anything with him?

13         A.   No.

14         Q.   I take it you don't have any reporting

15    relationship to Mr. Kofman that you're aware; is that

16    correct?

17         A.   No.

18         Q.   How about a gentleman named Juergen Stark?

19    Do you know who Mr. Stark is?

20         A.   Yes.

21         Q.   Who is Mr. Stark?

22         A.   He is the GEMS business.

23         Q.   That is a division or group within Motorola;

24    is that correct?

Charles Lehwald                                      06/21/2006

96

1        A.   Yes.

2        Q.   Have you ever had any occasion to have any

3    dealings with Mr. Stark?

4        A.   Yes.

5        Q.   On how many occasions have you had dealings

6    with Mr. Stark?

7        A.   Two.

8        Q.   When was the first occasion you had to deal

9    with Mr. Stark?

10       A.   Both litigation support.

11       Q.   You provided litigation support to Mr. Stark;

12   is that correct?

13       A.   Yes.

14       Q.   With respect to the first area of litigation

15   support, what was the particular claim you provided

16   support for him?

17       A.   It was a litigation matter for Motorola.

18       Q.   I take it not involving Mr. Rein?

19       A.   No.

20       Q.   How about the second?

21       A.   The same.

22       Q.   What were the nature of your communications

23   with Mr. Kofman -- excuse me -- Mr. Stark?

24                MS. MCGURN:   Objection.

Charles Lehwald                                          06/21/2006

                                                              115

 1   computer, what did you do next?

 2       A.   Attached a nine millimeter adapter to the

 3   drive which is needed for the adapter on the write

 4   block device and attached the drive to the write block

 5   device.

 6       Q.   You had in stock a nine millimeter adapter

 7   that fits this particular hard drive?

 8       A.   Yes.

 9       Q.   So now you have attached the hard drive to

10   the write block device.  What did you do after that?

11       A.   I would have connected the write block device

12   to my examiner, would have opened Encase, would have

13   turned on the write block device, turning the drive on

14   so it would spin so I could mount the drive and acquire

15   it within Encase.

16       Q.   I believe you testified previously in

17   conjunction with the operation of the Encase software,

18   you had to enter certain data; is that correct?

19       A.   Yes.

20       Q.   What was the data you had to enter?

21       A.   In this particular case, none.

22       Q.   Why is that?

23       A.   Because when the write block device turned on

24   to turn the drive on, the drive made a rhythmic

Charles Lehwald                                    06/21/2006

116

1    clicking sound and did not mount which told me there

2    was physical damage to the drive.

3        Q.    When you say the drive did not mount, for

4    those of us who are non-technical, what does that mean?

5        A.    It doesn't show up.  It doesn't come up.

6        Q.    So ordinarily what would happen if the drive

7    was functioning properly?

8        A.    You would end up with two new drive letters

9    perhaps a D and an E.

10       Q.    On your screen?

11       A.    Yes.

12       Q.    And that would indicate that the computer

13   recognized that there was a drive attached to it,

14   correct?

15       A.    Yes.

16       Q.    And, in this case, those letters did not

17   appear?

18       A.    Actually I didn't even wait because I know

19   that sound.

20       Q.    Okay.  So you didn't even wait.  Based on the

21   sound, you felt confident that the drive would not

22   mount properly?

23       A.    Yes, from experience absolutely.

24       Q.    So you powered it down immediately as you

Charles Lehwald                                        06/21/2006

117

1    turned off the write block device?

2        A.    Yes.

3        Q.    What did those rhythmic clicking noises

4    indicate to you based on your experience?

5        A.    They were potentially damaged drive heads.

6        Q.    Are you aware of there being any other

7    possible explanation for the clicking noises you heard

8    when you powered up the write block device?

9        A.    Not from my experience.

10       Q.    What are damaged drive heads?

11       A.    They are the heads that sweep across the disk

12   that read the data.

13       Q.    This is a physical mechanism of some kind; is

14   that correct?

15       A.    Yes.

16       Q.    You said they read the data off the disk; is

17   that correct?

18       A.    Read in.  I'm not an expert at this.  So I

19   can't fully say.  Read and write.

20       Q.    Based on your experience, you understood if

21   one or more of those drive heads were damaged, you

22   would not be able to complete the duplication process

23   through this Encase software?

24       A.    Not safely, no.

Charles Lehwald                                    06/21/2006

118

1       **Q.   What could potentially happen if you had**

2   **continued trying to do that?**

3       A.   Potential further damage to the drive.

4       **Q.   What kind of damage?**

5       A.   Additional physical damage.

6           MS. MCGURN:   Objection.

7       **Q.   It would be to the drive heads?**

8       A.   To data sectors.

9       **Q.   That is different than the drive head,**

10  **correct?**

11      A.   Yes.

12      **Q.   What are data sectors?**

13      A.   Sectors are where data is stored.

14      **Q.   That would be on the hard drive itself; is**

15  **that correct?**

16      A.   Correct.

17      **Q.   As opposed to the head that reads the hard**

18  **drive?**

19      A.   Correct.

20      **Q.   Is it your understanding that a damaged drive**

21  **head would cause damage to the hard drive itself?**

22          MS. MCGURN:   Objection.

23      A.   Not implicitly, but I knew this was in

24  litigation.  I didn't want to risk it.

Charles Lehwald                                    06/21/2006

119

1    Q.   Is there a potential danger for a damaged --

2    a potential for a damaged drive head to cause damage to

3    a hard drive disk?

4              MS. MCGURN:    Objection.

5    A.   Possibly.

6    Q.   That is why you turned the -- why you didn't

7    continue your forensics analysis?

8    A.   Correct.

9    Q.   Were you able based on what you heard or did

10   to determine what had caused damage to the drive heads?

11   A.   No.

12   Q.   Based on your physical inspection of the hard

13   drive, were you able to determine what had caused

14   damage to the drive heads?

15   A.   No.

16   Q.   So after powering down this write block

17   device, what did you do next in conjunction with your

18   examination of Mr. Rein's computer?

19   A.   Consulted with Motorola legal and, I believe,

20   outside counsel.

21   Q.   Did you do anything else with respect to the

22   laptop portion of the computer?

23   A.   Can you rephrase?

24   Q.   We have the hard drive which you have been

Charles Lehwald                                    06/21/2006

139

1        Q.   What is this document?

2        A.   This was their recovery steps taken to

3   recover the hard drive.

4        Q.   This was something that was provided to you

5   by Kroll?

6        A.   Yes.

7        Q.   Was it designed to summarize what they had

8   done -- the work they had done on Mr. Rein's hard

9   drive?

10                  MS. MCGURN:   Objection.

11       A.   Yes.

12       Q.   Directing your attention to the summary of

13  recovery steps, it notes "No external damage found."

14  Is that consistent with what you observed when you

15  reviewed Mr. Rein's hard drive?

16       A.   No.

17       Q.   In what way is it inconsistent?

18       A.   When I received the hard drive, the pins were

19  bent.

20       Q.   Did you bend them back before you sent the

21  hard drive to Kroll?

22       A.   No.

23       Q.   The next sentence "Drive had internal

24  mechanical problem, bad heads and one bad sector."  We

Charles Lehwald                                    06/21/2006

140

1    have already talked about that.  So I won't ask you to

2    repeat that testimony.  Would it be fair to say this

3    conclusion confirmed the preliminary hypotheses you

4    made when you initially heard the hard drive making

5    those clicking sounds?

6        A.   Yes.

7        Q.   The document also notes there is one bad

8    sector.  What does that mean?

9        A.   There was one bad data sector.

10       Q.   That is something on the hard drive itself?

11       A.   On every drive, yes.

12       Q.   How many data sectors does a hard drive have?

13       A.   I have no idea.  Many.  It varies.

14       Q.   It could be thousands?

15       A.   Absolutely.

16       Q.   So one bad sector is not particularly

17   significant?

18               MS. MCGURN:   Objection.

19       A.   No.

20       Q.   Now, could the damage to the apparent bad

21   head on this hard drive, could that account for what

22   Kroll found with respect to the data on the hard drive?

23               MS. MCGURN:   Objection.

24       A.   I don't know.

Charles Lehwald                                        06/21/2006

141

1     Q.   So you don't know if the damaged head could

2   be responsible for what happened to the hard drive?

3              MS. MCGURN:    Objection.

4     A.   In my opinion, no.

5     Q.   What leads you to that conclusion?

6     A.   There was no data on the hard drive at all.

7     Q.   What leads you to believe a bad head would

8   not be responsible for that result?

9     A.   Because they were successful in imaging

10  99.99 percent of the drive with one bad sector.

11    Q.   Okay.   I don't understand that, but I'm going

12  to have to ask the right questions.   When they said

13  they imaged 99.99 percent of the drive, what does that

14  mean?

15    A.   They were successful in recovering

16  99.99 percent of the sectors on that hard drive.

17    Q.   Do you understand the technology Kroll uses

18  to image or recover damaged hard drives?

19    A.   No.

20    Q.   Why does the fact that they were able to

21  image 99.99 percent of the hard drive lead you to

22  believe a bad head was not responsible for the deleted

23  or zeroed out data on the hard drive?

24             MS. MCGURN:    Objection.

Charles Lehwald                                          06/21/2006

142

1        A.    Because they were successful in recreating

2   99.99 percent of the data sectors on that drive.

3        Q.    So a bad head could not zero out data or be

4   responsible for zeroing out data in your opinion?

5        A.    Not in my experience.

6        Q.    Focusing on the bad heads, did Kroll ever

7   indicate how many bad heads there were?

8              MS. MCGURN:    Objection.

9        A.    No.

10       Q.    I think you testified previously that you

11  didn't want to continue operating or investigating the

12  hard drive because you were concerned there were bad

13  heads, correct?

14             MS. MCGURN:    Objection.

15       A.    I was concerned with preserving the integrity

16  of the data.

17       Q.    Now, if there are damaged or bad heads on a

18  hard drive, does that affect the operation of the hard

19  drive?

20             MS. MCGURN:    Objection.

21       A.    Yes, it can.

22       Q.    Does it affect your ability to run software

23  on the hard drive?

24             MS. MCGURN:    Objection.

163

1    are the metadata files that are created at the time a

2    partition is formatted and a few system added files and

3    folders." Let's go back.   What systems added files

4    and folders were found?

5        A.    Those are all on the file listing that was

6    generated in my original report.

7        Q.    Would those be also things that would be

8    created as a result of the hard drive being formatted?

9        A.    Yes, specifically with NTFS.

10       Q.    When you say specifically with NTFS, again,

11   what is that?

12       A.    That is the Windows NT file system.

13       Q.    It says "The date and time used for all

14   metadata files is 8/22/05" and then there is a specific

15   time.  Is it your understanding this is the time the

16   hard drive was formatted?

17       A.    That was my understanding.

18       Q.    Was Kroll able to determine the date that

19   the -- strike that.

20             Was Kroll able to determine whether the

21   files had been zeroed out as you had originally

22   indicated in your findings?

23             MS. MCGURN:   Objection.

24       A.    I believe that is in their report.

164

1    Q.    So they concluded definitively that the files

2    had been zeroed out; is that correct?

3                    MS. MCGURN:    Objection.

4    A.    They definitively concluded that all

5    unallocated data sectors of the hard drive contained a

6    hex 0x00 pattern.

7    Q.    That is not the question I asked.    The

8    question I asked is did they definitively determine

9    that the hard drive had been wiped and the data had

10   intentionally been zeroed out?

11   A.    I don't know.

12   Q.    Well, directing your attention to paragraph

13   one of specific conclusions.

14   A.    Yes.    They mentioned in that paragraph that

15   either -- that would be either indicative of a new

16   factory formatted partition or all previous data

17   sectors were wiped before the new partitions were

18   formatted.

19   Q.    So focusing on paragraph one -- first, do you

20   agree with that conclusion or statement?

21   A.    Not entirely.

22   Q.    To what extent do you disagree with Kroll's

23   specific conclusions?

24   A.    The hard drive itself after my own research

165

1    was found to have been OEM hard drive at the same time

2    frame that laptop was manufactured which led me to

3    believe that was more than likely not definitively the

4    original hard drive that shipped with that particular

5    laptop.  I don't think -- based on this sentence they

6    may not have done that research as well.

7         **Q.    What specific research did you do with**

8    **respect to the hard drive?**

9         A.    By use of the -- there is an OEM sticker on

10   that drive which shows that it's an OEM drive.

11        **Q.    OEM standing for what?**

12        A.    It's an industry term for original

13   manufacturer.  The model number going back to Hitachi's

14   website referred that particular model -- size and

15   model of that Hitachi hard drive to have been a model

16   number that would have been an EOM hard drive in that

17   2002 time frame when that laptop was originally

18   manufactured.

19        **Q.    So you took the model number from the hard**

20   **drive and based on that you did some research to**

21   **ascertain when those hard drives were manufactured?**

22        A.    Attempting to ascertain whether or not that

23   was the original hard drive that shipped with the

24   laptop.

Charles Lehwald                                    06/21/2006

166

1      Q.   Based on the model number of the hard drive,

2  were you able to reach a definitive conclusion?

3                 MS. MCGURN:   Objection.

4      A.   Definitively, no.  It fell within the right

5  time frame.  It was definitely an OEM drive.

6      Q.   So, again, based on the model number, it

7  appears that was a drive that was utilized by Dell

8  laptop computers.  Is that what your testimony is?

9      A.   No.  It was an OEM hard drive that would have

10 been manufactured for an original manufacturer.

11     Q.   That could be Dell, HP, Gateway?

12     A.   Absolutely.

13     Q.   Going back to Kroll's conclusions it

14 appears -- am I reading this correctly -- that Kroll

15 concluded that another explanation for the 0x00 hex

16 pattern on the hard drive was that it was a new hard

17 drive, one that had not been utilized at all; is that

18 correct?

19                 MS. MCGURN:   Objection.

20     A.   Their conclusion states it could have been

21 only zeroed out according to Kroll either because it

22 was a new factory format with that pattern or that it

23 had been wiped.

24     Q.   So based on their analysis, they could not

Charles Lehwald                                    06/21/2006

167

1    conclude if it was one or the other; is that correct?

2        A.   I would say that would be correct.

3        Q.   Kroll indicates in their specific conclusions

4    that the hard drive was formatted according to the BIOS

5    date and time of 8/22/05.  What is your understanding

6    of that particular sentence?

7        A.   That fits in line with my original findings.

8    It's believed that the drive had been removed because

9    the drive did not have the adapter which was required

10   for the drive to run.  So the drive would have been

11   removed and whatever computer that the drive was

12   formatted by its BIOS date and time was this time of

13   8/22/05.

14       Q.   So that was the date or time if the -- the

15   drive was formatted, correct?

16       A.   Can you rephrase that?

17       Q.   Sure.   Your conclusion or their conclusion

18   was that according to the BIOS date, the drive was

19   formatted on 8/22/05, correct?

20       A.   Yes.

21       Q.   That date applies to the action of formatting

22   the drive; is that correct?

23       A.   Yes.

24       Q.   Could Kroll make a determination or are there

Charles Lehwald                                          06/21/2006

168

1    any dates associated with a potential deletion or

2    zeroing out of information on the drive?

3              MS. MCGURN:    Objection.

4         A.    No.

5         Q.    What is a BIOS date?

6         A.    I'm drawing a blank what the acronym is.    If

7    someone can feed me that, I can explain it better to

8    you.    Internal operating system basically.    It's the

9    computer's own internal operating system.    Every

10   computer has its own BIOS which has its own internal

11   system clock associated with that.

12        Q.    The BIOS has an internal system clock

13   associated with it?

14        A.    Yes.

15        Q.    So the computer has somewhere within it some

16   kind of an internal clock mechanism; is that correct?

17        A.    Yes.

18        Q.    How is that clock mechanism on a laptop

19   powered?

20        A.    By the internal battery on a laptop.

21        Q.    With respect to a laptop computer, what

22   happens if you don't recharge the laptop for a lengthy

23   period of time?    Can the battery run out?

24              MS. MCGURN:    Objection.

Charles Lehwald                              06/21/2006

                                                    169

1        A.    Absolutely.

2        Q.    Do you know how long it takes for a battery

3   on a laptop computer that powers a BIOS clock to run

4   out?

5        A.    I don't know.

6        Q.    Do you know what happens to a BIOS clock or

7   the internal clock of a computer when the battery

8   powering it runs out?

9        A.    Can you restate that?

10       Q.    You said there is some sort of internal clock

11   on a laptop computer and it's powered by an internal

12   battery.  Like any battery eventually it can lose

13   power.  What I'm trying to ascertain is what happens

14   when the battery that is powering an internal clock

15   goes dead.

16              MS. MCGURN:    Objection.

17       A.    It has to be replaced.

18       Q.    What happens to the clock when the battery

19   powering it goes dead?

20              MS. MCGURN:    Objection.

21       A.    That depends on the manufacturer of the

22   computer.  Typically it's reset to the UNIX start date

23   which is January -- I think it's January 1st, 1970 or

24   the original date of manufacture of a computer.

Charles Lehwald                                          06/21/2006

170

1      Q.    So it certainly stops telling the correct

2  time?

3                  MS. MCGURN:    Objection.

4      A.    Exactly which is interesting about this case.

5  It had been clear the drive had been removed from the

6  computer.  So that may explain why.

7      Q.    Did you at any time examine the internal

8  clock on Mr. Rein's laptop computer?

9      A.    No.  There was no need to.

10     Q.    Why was there no need to?

11     A.    Because I couldn't do any type of analysis on

12 the original drive and the drive had been removed, but

13 I couldn't do any analysis.

14     Q.    So you didn't find it necessary to ascertain

15 whether the BIOS clock on the laptop computer was

16 operating or not?

17     A.    Not in this case because the drive was not

18 functioning and I couldn't perform any analysis on my

19 own.

20     Q.    Did Kroll make an effort to ascertain whether

21 the BIOS clock on the laptop computer was operating?

22                 MS. MCGURN:    Objection.

23     A.    I don't believe they did and I don't believe

24 it was necessary as well.

Charles Lehwald                                    06/21/2006

171

1      Q.    Where is the internal clock on a laptop
2  located?
3      A.    That's in the mother board.
4      Q.    Which is part of the main computer, not the
5  hard drive; is that correct?
6      A.    Correct.
7      Q.    So Kroll never even had the main computer,
8  did it?
9      A.    That is correct.
10     Q.    So, the date 8/22/05, that comes from some
11 computer's internal clock; is that correct?
12     A.    That is correct.  That came from the computer
13 that this drive was connected to when it was formatted.
14     Q.    And you don't know what computer that was?
15     A.    No.
16     Q.    You have not had the opportunity presumably
17 to examine the internal clock of that computer; is that
18 correct?
19     A.    Of what computer?
20     Q.    Of the computer you seem to think was
21 responsible for formatting the hard drive on Mr. Rein's
22 hard drive?
23     A.    No, clearly not.
24     Q.    You don't know if the clock on that computer

Charles Lehwald                                          06/21/2006

172

1    was accurate?

2        A.    No.

3        Q.    If the clock on the computer is inaccurate,

4    that date is inaccurate; isn't that correct?

5                MS. MCGURN:    Objection.

6        A.    All I can say is that according to the date

7    and time of whatever computer this drive was formatted

8    on, that BIOS said 8/22/05, 21:54:04.

9        Q.    That is correct, and the BIOS gets the date

10   and time from the computer's internal clock; is that

11   correct?

12       A.    Right.

13       Q.    So the date and time is only as accurate as

14   the date and time on the internal clock; is that

15   correct?

16       A.    Absolutely.

17       Q.    Can a computer's internal clock be altered?

18       A.    Yes, absolutely.

19       Q.    And is that a difficult thing to do?

20                MS. MCGURN:    Objection.

21       A.    Not for me.

22                (Exhibit No. 13 marked for

23   identification.)

24       Q.    I show you what's been marked as Exhibit 13

Exhibit 6

hitachi.com



⊚ **Hitachi Global Storage Technologies**

| home | products | services | » support | partners | about us | how to buy |    Search hitachi

Technical Li

Downloads

Warranty/Rl

Rebates & F

Contact Sup

### DK23DA-20F

Specifications
- 20.00 GB total capacity
- 9.5 mm high drive for maximum capacity slimline portable applications
- Giant MR head and MEEPRML read channel technology
- 32-bit RISC microprocessor, shock sensor, S.M.A.R.T



| Total Capacity | | 20.00 GB |
|---|---|---|
| Z-Height | | 9.5 mm |
| Number of Disks | | 2 |
| Interface | | ATA-5 (Enhanced IDE) |
| Average Seek Time | | 13 ms |
| Internal Transfer Rate | | 18.7 - 34.7 MB/s |
| Interface Transfer Rate | | 16.6 MB/s max. (PIO Mode 4/ Multiword DMA Mode 2) /100 MB/s max.(Ultra DMA 5) |
| Data Buffer | | 2048 kB |
| Rotational Speed | | 4,200 rpm |
| Areal Density | | 17.2 Gb/in² |
| Power Requirements | | +5V ±5% |
| Shock | Operating | 180 G or less (2 ms half sine wave) |
| | Non-Operating | 800 G or less (1 ms half sine wave) |
| Weight | | 95 g |

Acoustic Noise                           25 dBA (typ.)


| Terms of Use | Privacy Policy | Contact Us |          © 2006, Hitachi Global Storage Te

Exhibit 7

 **Legal Technologies**

**Customer**: Motorola
**Project SO number**: 1809789
**Kroll Ontrack Media ID**: A01

**Summary of recovery Steps**:
1) Clean room recovery
-No external damage found. Drive had internal mechanical problem, bad heads and one bad sector. Imaged 99.99% of the drive.

2) Review of the hard drive image
-Structurally the drive image is fine but there are very few file records in the MFT and no others located on the drive. The area outside of the MFT predominantly looks like zeroed out space.

3) Created an EnCase image of the hard drive image and put it to CD-ROM and shipped it to the customer.

Exhibit 8

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAY S. REIN ))) | |
| Plaintiff, ) | |
| v. ) | CIVIL ACTION NO. 04-12580 NG |
| MOTOROLA, INC., CLYDE KOFMAN ) and JUERGEN STARK ) | |
| Defendants. ) | |

## DEFENDANT, MOTOROLA, INC.'S ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33, the Defendant, Motorola, Inc. ("Defendant" or "Motorola"), hereby answers and objects to Plaintiff Jay S. Rein's ("Rein" or "Plaintiff") First Set of Interrogatories as follows:

### GENERAL STATEMENT AND OBJECTIONS

A.    Motorola objects to each interrogatory to the extent that it seeks to expand the scope of discovery beyond that provided for in Rules 26 and 33 of the Federal Rules of Civil Procedure.

B.    Motorola objects to each interrogatory to the extent that it seeks disclosure of an attorney's legal theories or other trial preparation materials.

C.    Motorola objects to each interrogatory to the extent that it inquires about information subject to a privilege from production, including, without limitation, the attorney-client privilege and/or the work product doctrine.

D.      Motorola objects to each interrogatory to the extent that it is unlimited in time as oppressive, unduly burdensome or expansive, and/or neither relevant nor reasonably calculated to lead to the discovery of admissible information.

E.      Motorola objects to each interrogatory to the extent that it seeks confidential, proprietary business information.

F.      Motorola objects to each interrogatory to the extent that it seeks information and/or documents that are personal and confidential that would violate the reasonable expectation of privacy of third parties to the litigation, including Motorola employees and former employees.

The following responses and objections are based upon information now available.  Motorola has not yet completed preparation for trial in this action, and therefore reserves the right to amend, modify, or supplement the objections or responses stated herein as additional information becomes known during discovery.

<u>DEFINITION OF SPECIFIC OBJECTIONS</u>

As used in the specific responses below, the following terms include objections based upon their respective definitions:

A.      "Vague" means the Defendant objects on the basis that the request is vague, uncertain or ambiguous.

B.      "Overly broad" means the Defendant objects on the basis that the interrogatory is overbroad and calls for an expansive potential breadth of information that is unreasonable in scope.

C.      "Calls for irrelevant information" means the Defendant objects on the basis that the interrogatory is not likely to lead to the discovery of information relevant to

the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

D.      "Burdensome" means the Defendant objects on the basis that the request is so broad and uncertain that it creates an unreasonable and undue burden upon the Defendant. Burdensome also means that the Defendant objects to the interrogatory because the information sought is more readily attainable through other, more convenient, less burdensome and less expensive sources or discovery procedures.

E.      "Calls for privileged information" means the Defendant objects on the basis that the request seeks information protected by the attorney/client privilege, the attorney work product privilege, or consists of trial preparation materials and documents containing mental impressions, conclusions, opinions, and legal theories of counsel, and/or requests information which is otherwise protected under the Federal Rules of Civil Procedure or any other valid privilege.

F.      "Calls for confidential information" means the Defendant objects on the basis the interrogatory seeks confidential personnel and other private information about the Defendant's former and present employees, or seeks trade secret or other research, development or commercial information.

Subject to these conditions and objections, and without waiving and without repeating any of them in any of the specific objections and answers, Defendant responds as follows:

## RESPONSES AND OBJECTIONS TO INDIVIDUAL INTERROGATORIES

## INTERROGATORY NO. 1

Please identify each and every person answering these interrogatories, setting forth for each such person the interrogatory(ies) they answered or assisted in answering.

3

**ANSWER NO. 1**

Motorola objects to this interrogatory to the extent that it is vague, overly broad

and calls for privileged information. Subject to and without waiving the foregoing

objection, Defendant states that the following Motorola employees provided information

in connection with preparing Defendant's responses to the Interrogatories: Peter Tobin

("Tobin"), Ana Maria Lopez ("Lopez"), Clyde Kofman ("Kofman") and Juergen Stark

("Stark").

**INTERROGATORY NO. 2**

Please identify each and every communication between or among two or more

employees of Motorola relating to Rein's performance.

**ANSWER NO. 2**

Motorola objects to this interrogatory to the extent that it is vague, overly broad

and unduly burdensome, and to the extent that it calls for irrelevant information.

Defendant further objects to this interrogatory to the extent that it calls for privileged

information. Subject to and without waiving the foregoing objections, Motorola states

that Leonard deBarros met with Plaintiff in the first quarter of 2003 to discuss Plaintiff's

2002 review and that Kofman and Plaintiff conferred by telephone in or about January

2004 to discuss Plaintiff's 2003 performance review. Kofman also spoke with Chris

Banakas ("Banakas") and Paul Lanci ("Lanci") regarding their professional interactions

and experiences with Plaintiff. Pursuant to Fed. R. Civ. P. 33(d), Motorola further refers

Plaintiff to the documents produced with its Response to Plaintiff's Request for

Production of Documents, Request Nos. 1 and 4.

**INTERROGATORY NO. 3**

Please identify each and every communication between or among two or more employees of Motorola relating to the decision to terminate Rein's employment.

**ANSWER NO. 3**

Motorola objects to this interrogatory to the extent that this interrogatory is vague, overly broad and unduly burdensome, and to the extent that it calls for irrelevant information. Defendant further objects to this interrogatory to the extent that it calls for privileged information. Subject to and without waiving the foregoing objections, Motorola states that on or about February 12, 2005, Kofman and Stark discussed the decision to terminate Plaintiff's employment in connection with a reorganization of the Motorola Professional Services Group ("MPS"). Kofman also consulted with Tobin and the Motorola legal department concerning the termination.

**INTERROGATORY NO. 4**

Please identify the individual(s) who made the decision to terminate Rein's employment, setting forth for each such individual the role they played and/or the input they had in the decision.

**ANSWER NO. 4**

Motorola objects to this interrogatory to the extent that it is vague and to the extent it calls for privileged information. Subject to and without waiving the foregoing objections, Motorola states that Kofman, as group leader of MPS, made the decision to eliminate Plaintiff's position in connection with a reorganization of MPS. Stark, as the general manager of MPS, approved Kofman's recommendation to terminate Plaintiff's employment.

**INTERROGATORY NO. 5**

Please identify each and every reason Rein's employment was terminated.

**ANSWER NO. 5**

Motorola objects to this interrogatory to the extent that it is vague, overly broad and unduly burdensome, and to the extent that it calls for irrelevant information. Defendant further objects to this interrogatory to the extent that it calls for privileged information. Subject to and without waiving the foregoing objections, Motorola states that sometime in or about early February 2004, Kofman determined that MPS had a "mix" problem within the group. Kofman knew that 2003 was not a good year for MPS financially, and he realized that given the group's composition (four executive-level sales employees), MPS was not well-positioned for the future. Specifically, MPS did not have the resources to actively service new business generated by the sales employees. Most of the MPS employees at that time were focused on business generation, which left two employees to attend to the delivery of post-sale services. Kofman's recommendation was to reduce MPS's headcount by one executive level position and to hire one or two associates who could efficiently perform delivery tasks for existing and future clients.

In determining which member of his staff to terminate, Kofman solicited feedback from employees and other business organizations (i.e. clients) within Motorola. Early feedback from Motorola employees confirmed what Kofman already had observed as a manager – Plaintiff was sometimes difficult to work with. Kofman also reviewed the performance reviews or Relative Performance Assessments ("RPA") of the MPS employees. Although Plaintiff's RPA indicated that his work was in the "solidly effective" category, as were all of the MPS employees, Plaintiff's performance appraisal also indicated that he needed improvement in several areas. Moreover, Kofman determined that

6

Plaintiff's assessment of his own performance in key areas was widely divergent from his former manager's perception of his performance, including teamwork skills.

Kofman also considered the prior work experience of all of the MPS employees. To Kofman's knowledge, all the MPS employees except for Plaintiff had meaningful prior work experience in Field Service Mobility. Based on all of these factors, Kofman selected Mr. Rein for termination.

## INTERROGATORY NO. 6

If you contend that there were problems or deficiencies with Rein's performance please identify each and every problem and for each such problem set forth:

(a)     how you became aware of such problem;

(b)     the identity of every individual who has knowledge of such problem;

(c)     every communication between Rein and an employee of Motorola relating to such problem; and,

(d)     any documents relating to such problem, including not limited to any warnings, reprimands, negative reviews or evaluations and Performance Improvement Plans.

## ANSWER NO. 6

Motorola objects to this interrogatory to the extent that it is vague, overly broad and unduly burdensome, and to the extent that it calls for irrelevant information. Defendant further objects to this interrogatory to the extent that it calls for privileged information. Subject to and without waiving the foregoing objections, Motorola refers Plaintiff to its Answers to Plaintiff's First Set of Interrogatories, Answer Nos. 2 and 5.

**INTERROGATORY NO. 7**

Please identify each individual who had supervisory responsibility for Rein, setting forth for each such individual, the period of time they were responsible for supervising Rein and describing their supervisory duties.

**ANSWER NO. 7**

Motorola objects to this interrogatory to the extent that the undefined terms "supervisory responsibility" and "responsible for supervising" are vague and ambiguous, and to the extent that this interrogatory calls for irrelevant information. Subject to and without waiving the foregoing objections, Motorola states that the following Motorola employees were Plaintiff's managers or supervisors during his employment with Motorola:

- Leonard deBarros: June 2002 through May 2003;

- Tom Niersbach: May 2003 through July 2003;

- Stark: July 2003 through February 2004; and

- Kofman: December 2003 through February 2004.

**INTERROGATORY NO. 8**

Please identify each individual(s) who assumed any of the duties previously performed by Rein, setting forth for each such person:

(a)     their age;

(b)     their title;

(c)     their duties;

(d)     the date(s) they were hired, transferred or promoted;

(e)     the identity of the individual(s) who made the decision to hire, transfer or promote them;

(f)    their compensation, including but not limited to: salary, commissions, bonuses, stock options, pension, health insurance, etc.

**ANSWER NO. 8**

Motorola objects to this interrogatory to the extent that it is vague, overly broad and to the extent that it calls for irrelevant information. Subject to and without waiving the foregoing objections, Motorola states that no one was hired, transferred or promoted to assume any of the duties previously performed by Rein. In keeping with its business objectives, MPS shifted the focus toward certain clients and prospects and away from others, and did not pursue two business prospects Plaintiff had attempted to develop before his position was eliminated. After the elimination of Plaintiff's position, remaining members of the group continued to perform certain duties similar to those that Rein had performed.

**INTERROGATORY NO. 9**

Please set forth Motorola's policies or procedures with respect to the retention of electronic mail or other electronic communications, setting forth whether employees' electronic mail is copied, backed up, archived or otherwise stored or retained by Motorola, and if so for how long.

**ANSWER NO. 9**

Motorola objects to this interrogatory to the extent that it is vague, overly broad and to the extent that it calls for irrelevant information. Subject to and without waiving the foregoing objections and pursuant to Fed. R. Civ. P. 33(d), Motorola refers Plaintiff to documents produced with its Response to Plaintiffs Request for Production of Documents, Request No. 24.

**INTERROGATORY NO. 10**

Please identify each and every communication between Motorola and any employee, partner or representative of Russell Reynolds, Inc. concerning or relating to Rein.

**ANSWER NO. 10**

Motorola objects to this interrogatory to the extent that it is vague, overly broad and unduly burdensome, and to the extent that it calls for irrelevant information. Defendant further objects to this interrogatory to the extent that it calls for confidential and/or privileged information. Subject to and without waiving the foregoing objections, Motorola states that representatives of Motorola were in contact with Russell Reynolds at the time of Plaintiff's hire. Motorola is unaware of any contact with Russell Reynolds representatives at the time of, or following, his termination.

**INTERROGATORY NO. 11**

Please identify what, if any, efforts Motorola made to find an alternate position for Rein within the company after he had been told that he was being terminated from the MPS Group.

**ANSWER NO. 11**

Motorola objects to this interrogatory to the extent that it is vague, overly broad and unduly burdensome, and to the extent that it calls for irrelevant information. Defendant further objects to this interrogatory to the extent that it calls for confidential and/or privileged information. Subject to and without waiving the foregoing objections, Motorola states that Tobin forwarded Plaintiff's name to Paula Hubbard, the Motorola human resources representative responsible for Motorola's Talent and Leadership Supply meetings.

## INTERROGATORY NO. 12

If Rein was considered or proposed for any alternate positions at Motorola after he had been told that he was being terminated from the MPS Group, please identify each such position, setting forth:

      (a)     the title of the position;

      (b)     its compensation;

      (c)     the division or subsidiary of Motorola it was a part of

      (d)     the identity of the person responsible for filling the position;

      (e)     whether such position was offered to Rein;

      (1)     the identity of any person(s) who were offered the position; and,

      (g)     why such person(s) was deemed more qualified than Rein.

## ANSWER NO. 12

Motorola objects to this interrogatory to the extent that it is vague, overly broad and unduly burdensome, and to the extent that it calls for irrelevant information. Defendant further objects to this interrogatory to the extent that it calls for confidential and/or privileged information. Subject to and without waiving the foregoing objections, Motorola states that Plaintiff met with Janeice Webb, of IESS, and Jann Mellman and Warren Holtsberg, of Motorola Ventures. Plaintiff was not selected for any position in either IESS or Motorola Ventures.

## INTERROGATORY NO. 13

Please identify who approved the retention bonus Rein received in January of 2004 and explain the purpose of the retention bonus and why it was paid to Rein.

11

**ANSWER NO. 13**

Motorola objects to this interrogatory to the extent that the undefined term "retention bonus" is vague and ambiguous, and to the extent that this interrogatory calls for irrelevant information. Subject to and without waiving the foregoing objections, Motorola states that in the latter half of 2003, the MPS employees were placed on a Management Incentive Plan as a part of their total compensation package. Each MPS employee previously had been on a Sales Incentive Plan. Because of the timing of this change, and due to MPS's performance for much of calendar year 2003, MPS employees would not have been eligible for an incentive bonus for calendar year 2003 unless Kofman sought a discretionary bonus for each MPS employee. Kofman also sought bonuses for other employees whose jobs were eliminated. Due to limitations in Motorola's human resources information system, and because Motorola wanted the bonus to coincide with the end of the 2003 calendar year, Motorola's payroll notices referred to the bonuses as "retention" bonuses.

**INTERROGATORY NO. 14**

Please identify what, if any, bonuses, retention bonuses, commissions, or stock options each member of the MPS Group received from January 1, 2004 through the present, identify who authorized and/or recommended the payment of such bonuses, commission or stock options and explain how such payments were calculated.

**ANSWER NO. 14**

Motorola objects to this interrogatory to the extent that it is vague, overly broad and to the extent that it calls for irrelevant information. Defendant further objects to this interrogatory to the extent that it calls for confidential and/or privileged information.

Subject to and without waiving the foregoing objections and pursuant to Fed. R. Civ. P.

33(d), Motorola refers Plaintiff to the documents produced with its Response to

Plaintiff's Request for Production of Documents, Request No. 1.

## INTERROGATORY NO. 15

Please identify each and every employee who has filed a civil action or an

administrative complaint against Motorola alleging that they have been discriminated

against on the basis of their age for the period January 1, 2002 through the present,

setting forth the name and address of each plaintiff, any identifying case numbers, the

court or other venue in which the action was brought, any other individuals or entities

that were named as defendants or respondents, and the current disposition of each such

action.

## ANSWER NO. 15

Motorola objects to this interrogatory to the extent that it is vague, overly broad

and unduly burdensome and to the extent that it calls for irrelevant information.

Motorola further objects to this interrogatory to the extent that it calls for privileged

information. Defendant further objects to this interrogatory insofar as it seeks production

of public information readily available to the plaintiff.

## INTERROGATORY NO. 16

Please identify each person who you expect to call as a fact witness at trial and

describe the subject matter on which such person is expected to testify.

## ANSWER NO. 16

Motorola objects to this interrogatory to the extent that it calls for privileged

information. Subject to and without waiving the foregoing objections, Motorola states

that it has not yet determined who it will call as a fact witness, if and when a trial is held,

but Motorola reserves the right to supplement this response.  Pursuant to Fed. R. Civ. P.

33(d), Motorola further refers Plaintiff to its Initial Disclosures and the foregoing

Responses.

**INTERROGATORY NO. 17**

Please identify each person whom you expect to call as an expert witness at trial,

and describe the subject matter on which each such person is expected to testify, his/her

qualifications in that area, the substance of the facts and opinions to which he/she is

expected to testify, and a summary of the grounds for each such opinion.

**ANSWER NO. 17**

Motorola objects to this interrogatory to the extent that it calls for privileged

information.  Subject to and without waiving the foregoing objections, Motorola states

that it has not yet determined whether it will call an expert witness at the trial in this

matter.  Motorola reserves the right to supplement this response.

**INTERROGATORY NO. 18**

Please identify each person not identified in response to the preceding

interrogatories who has, or may have, discoverable information concerning any of the

allegations, claims, counterclaims or defenses in this case, identifying as to each such

person the subject(s) on which he or she has or may have information.

**ANSWER NO. 18**

Motorola objects to this interrogatory to the extent that it is vague, overly broad

and to the extent that this interrogatory calls for irrelevant information.  Defendant further

objects to this interrogatory to the extent that it calls for privileged information.  Subject

to and without waiving the foregoing objections, and pursuant to Fed. R. Civ. P. 33(d),

Motorola refers Plaintiff to its Initial Disclosures and the foregoing Responses.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS ___*22nd*___
DAY OF JUNE, 2005.

By: _____

MOTOROLA, INC.,

AS TO OBJECTIONS
MOTOROLA, INC.
By their attorneys,

_____

Richard L. Alfred (BBO# 015000)
Kristin G. McGurn (BBO# 559687)
Yvette Politis (BBO# 644986)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:      (617) 946-4800
Telecopier:     (617) 946-4801
Dated:

---

### Certificate of Service

I hereby certify that a true copy of the above document was served upon the attorney of record for the plaintiff by facsimile and mailing a copy of same, postage prepaid, to John G. H. Coster, Attorney at Law, 92 State Street, Suite 900, Boston, MA 02109 on June __, 2005.

_____
Yvette Politis

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _____
DAY OF JUNE, 2005.

By: _____

MOTOROLA, INC.,

AS TO OBJECTIONS
MOTOROLA, INC.
By their attorneys,

_Yvette Politis_

Richard L. Alfred (BBO# 015000)
Kristin G. McGurn (BBO# 559687)
Yvette Politis (BBO# 644986)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:    (617) 946-4800
Telecopier:   (617) 946-4801
Dated:

---

**Certificate of Service**

I hereby certify that a true copy of the above document was served upon the attorney of record for the plaintiff by mailing a copy of same, postage prepaid, to John G. H. Coster, Attorney at Law, 92 State Street, Suite 900, Boston, MA 02109 on June 22, 2005.

_Yvette Politis_

Yvette Politis

---

15

Exhibit 9

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAY S. REIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-12580 NG |
| | ) | |
| MOTOROLA, INC., CLYDE | ) | |
| KOFMAN, and JUERGEN STARK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### PLAINTIFF'S RESPONSES AND OBJECTIONS TO
### DEFENDANTS' REQUEST FOR DOCUMENTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Jay

S. Rein ("Rein" or the "Plaintiff") responds and objects to the Defendant Motorola's First

Request for Production of Documents to the Plaintiff as follows:

*General Objection No. 1* – Plaintiff objects to each and every request for the

production of documents to the extent that they purport to impose requirements or

obligations on the Plaintiff beyond those imposed under the Federal Rules of Civil

Procedure.

*General Objection No. 2* – Plaintiff objects to each and every request for the

production of documents to the extent that they seek documents that are not within the

Plaintiff's custody or control.

*General Objection No. 3* – Plaintiff objects to each and every request for the

production of documents to the extent that they call for the production of documents

protected by the attorney/client privilege, the physician/psychotherapist privilege, the

spousal privilege, the work product doctrine, trial preparation materials or other materials

protected by Rule 26(b) of the Federal Rules of Civil Procedure.

*General Objection No. 4* - Plaintiff objects to each and every request for the

production of documents to the extent that it is overbroad, unduly burdensome, and

neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

<div align="center">DOCUMENTS REQUESTED</div>

Request No. 1

All documents concerning your employment or termination from employment at
Motorola, including any contracts, agreements, terms and conditions of employment,
personnel records or files, descriptions of job duties , and performance evaluations.

Response to Request No. 1

Plaintiff objects to this Request on the grounds that it is overbroad, unduly

burdensome and neither relevant nor reasonably calculated to lead to the discovery of

admissible evidence.  Notwithstanding the foregoing objection, and without waiver

thereof, the Plaintiff will produce those non-privileged documents in his possession,

custody or control concerning any contracts or agreements relating to his employment,

the terms and conditions of his employment, his personnel files, his job duties and his

performance evaluations.

Request No. 2

All documents that pertain to Motorola's personnel or employment policies,
practices or procedures, including any handbooks, guidelines, manuals and other
publications.

<u>Response to Request No. 2</u>

Plaintiff will produce those non-privileged documents in his possession, custody

or control responsive to this Request.

<u>Request No. 3</u>

All documents, including minutes, notes or summaries of meetings reflecting
discussions or communications between, or attended by, you and any officer, employee,
representative or agent of Motorola, in the course of your employment with Motorola,
concerning the subject(s) of alleged harassment, discrimination or bias based on age,
against you or any other current or former Motorola employee.

<u>Response to Request No. 3</u>

Plaintiff will produce those non-privileged documents in his possession, custody

or control responsive to this Request.

<u>Request No. 4</u>

All documents concerning any promises, guarantees or assurances made by
Motorola, Clyde Kofman or Juergen Stark, concerning the terms and conditions of your
employment.

<u>Response to Request No. 4</u>

Plaintiff will produce those non-privileged documents in his possession, custody

or control responsive to this Request.

<u>Request No. 5</u>

All documents, items, objects and effects that you took with you from Motorola
following your termination.

<u>Response to Request No. 5</u>

Plaintiff objects to this Request on the grounds that it is neither relevant nor

reasonably calculated to lead to the discovery of admissible evidence.

3

Request No. 6

All documents you received from or sent to Russell Reynolds, Inc. or that concern your communications or relationship with Russell Reynolds, Inc.

Response to Request No. 6

Plaintiff objects to this Request to the extent it is overbroad and neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing objection, and without waiver thereof, the Plaintiff will produce those non-privileged documents in his possession, custody or control concerning communications between himself and Russell Reynolds with respect to his efforts to find another position after the termination of his employment from Motorola.

Request No. 7

All documents, including but not limited to diaries, calendars, appointment books, journals or notebooks reflecting or concerning meetings in which you participated, in person or otherwise, while employed by Motorola, regarding the Motorola Professional Services Group ("MPS"), its reorganization, its business plans or the performance of MPS or its members.

Response to Request No. 7

Plaintiff objects to this Request on the grounds that it is vague, unclear, overbroad, unduly burdensome and neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Request No. 8

All documents that evidence benefits and income earned and/or paid to you from January 1, 2000 through the present, whether received or not, including pay stubs, Form W-2's, Form 1099's, state and federal tax returns, dividend statements, commission statements, unemployment compensation, Social Security benefits, workers' compensation, veteran's benefits and any other compensation and/or benefit paid or earned whether through employment, self-employment or otherwise.

Response to Request No. 8

Plaintiff objects to this Request on the grounds that it is overbroad, unduly

burdensome and neither relevant nor reasonably calculated to lead to the discovery of

admissible evidence. Notwithstanding the foregoing objection, and without waiver

thereof, Plaintiff will produce his W-2 Forms and other payroll information for the years

2002 through the present.

Request No. 9

All statements, oral or transcribed, signed or unsigned, recordings and affidavits
prepared by or on behalf of you or any other witness(es) to any fact or event giving rise to
the allegations in your Complaint, including without limitation, any statements provided
to:

a.    the Massachusetts Commission Against Discrimination,

b.    the Massachusetts Attorney General's Office, Fair Labor &
      Business Practices Division,

c.    the Equal Employment Opportunity Commission,

d.    the Massachusetts Department of Employment and Training,

e.    the Massachusetts Division of Unemployment Assistance,

f.    the Massachusetts Department of Industrial Accidents.

Response to Request No. 9

Plaintiff objects to this Request to the extent that it calls for the production of

documents protected by the attorney-client privilege and the work product doctrine.

Notwithstanding the foregoing objection, and without waiver thereof, the Plaintiff has not

taken any statements, recordings or affidavits from any potential witness. Plaintiff will

produce any statements provided to those agencies set forth in subparts (a) through (f) of

the Request.

Request No. 10

All documents you have received from any federal, state, and/or local entity or agency that relate in any manner to your employment with Motorola or the termination of your employment with Motorola, including, but not limited to, documents received from:

      a.      the Massachusetts Commission Against Discrimination,

      b.      the Massachusetts Attorney General's Office, Fair Labor & Business Practices Division,

      c.      the Equal Employment Opportunity Commission,

      d.      the Massachusetts Department of Employment and Training,

      e.      the Massachusetts Division of Unemployment Assistance, and

      f.      the Massachusetts Department of Industrial Accidents.

Response to Request No. 10

Plaintiff will produce those non-privileged documents in his possession, custody or control responsive to this Request.

Request No. 11

All documents concerning your claim for damages, including, but not limited to, your claims for compensatory damages, emotional distress damages, attorney's fees and any other category of damages, including how these damages were calculated and by whom, as well as documents concerning any physical or mental injuries you allege to have sustained as a result of the actions or omissions by defendants Motorola, Clyde Kofman or Juergen Stark.

Response to Request No. 11

Plaintiff objects to this Request to the extent that it calls for the production of documents protected by the attorney-client privilege and the work product doctrine. Notwithstanding the foregoing objection, and without waiver thereof, the Plaintiff will produce those non-privileged documents in his possession, custody or control responsive to this Request.

6

Request No. 12

All documents concerning any consultations, therapy, assistance, diagnoses, impressions, examinations, opinions, and/or any medical, psychiatric, psychological, or emotional treatment of you by any Health Care Providers during the period January 1, 2002, to the present, including but not limited to any and all records retained by any Health Care Providers.

Response to Request No. 12

There are no documents responsive to this Request.

Request No. 13

All documents concerning any non-medical expenses incurred, anticipated or projected to be incurred by you as a result of any alleged acts or omissions to act by defendants Motorola, Clyde Kofman or Juergen Stark.

Response to Request No. 13

There are no documents responsive to this Request.

Request No. 14

A copy of your personnel file from each employer from whom you have worked since February 23, 2004.

Response to Request No. 14

Plaintiff objects to this Request on the grounds that it is overbroad and neither

relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Request No. 15

All documents concerning any offers of alternate employment that you received during your employment at Motorola, including any offer letters, term sheets, salary and/or benefits information and/or any other communications.

Response to Request No. 15

Plaintiff will produce those non-privileged documents in his possession, custody

or control responsive to this Request.

7

Request No. 16

All documents concerning your efforts to find employment, including self-employment, from February 23, 2004 to the present, including any cover letters, resumes, log books, return and follow-up correspondence, diaries, calendars, appointment book or notebooks and all other similar documents.

Response to Request No. 16

Plaintiff objects to this Request to the extent that it is unduly burdensome,

overbroad and neither relevant nor reasonably calculated to lead to the discovery of

admissible evidence.  Notwithstanding the foregoing objection, and without waiver

thereof, Plaintiff will produce computer generated printouts of the positions for which he

has applied through several "internet" job listing sites.

Request No. 17

All documents concerning your termination from employment at Motorola and the events, circumstances and/or investigations leading to or concerning your termination from employment at Motorola.

Response to Request No. 17

Plaintiff will produce those non-privileged documents in his possession, custody

or control responsive to this Request.

Request No. 18

All documents that in any way relate to any communication between any persons and you concerning any allegation in your Complaint and/or any incidents, events, facts, or occurrences that support or relate to said allegations and/or your alleged damages.

Response to Request No. 18

Plaintiff objects to this Request to the extent that it calls for the production of

documents protected by the attorney-client privilege and the work product doctrine.

Notwithstanding the foregoing objection, and without waiver thereof, the Plaintiff does

not have any non-privileged documents responsive to this Request.

Request No. 19

All documents, including any transcripts of testimony, concerning any civil, criminal or administrative action, state or federal, to which you have been a party, witness or affiant.

Response to Request No. 19

Plaintiff objects to this Request to the extent that it is overbroad and neither

relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding the foregoing objection, and without waiver thereof, Plaintiff does not

have any documents responsive to this Request.

Request No. 20

All documents relied upon, examined by, provided to or received from an expert witness in connection with your Complaint and any report and all other documents prepared, edited, authored or drafted by such expert witness.

Response to Request No. 20

Plaintiff objects to this Request to the extent that it calls for the production of

documents protected by the attorney-client privilege and the work product doctrine; and

to the extent that it seeks documents concerning any experts who have been retained by

the Plaintiff in anticipation of litigation or preparation for trial, but who are not expected

to be called as a witness at trial.  Notwithstanding the foregoing objections and without

waiver thereof, Plaintiff has not yet determined what, if any, expert witnesses will testify

on his behalf at trial and therefore, there are currently no responsive documents with

respect to such expert witnesses.   In accordance with the requirements of Fed.R.Civ. P.

26(e) the Plaintiff will supplement his response once such a determination has been

made.

Request No. 21

Correspondence, statements or notes from any witness, including any current or former employee(s), agent(s) or contractors of defendants, concerning this lawsuit or any allegation made in the Complaint.

Response to Request No. 21

There are no documents responsive to this Request.

Request No. 22

All documents not already produced in response to the above requests that relate to, bear upon, or purport to provide evidence concerning the matters and allegations set forth in the Complaint or in any pleading (as defined in Fed.R.Civ.P. 7(a)) filed in this action.

Response to Request No. 22

Plaintiff objects to this Request on the grounds that it is vague and unclear.

Notwithstanding the foregoing objection, and without waiver thereof, there are no

documents responsive to this Request.

Request No. 23

All documents identified in, or that you consulted or reviewed, or upon which you relied, to answer, in whole or in part, any of your answers to Defendant Motorola's First Set of Interrogatories, and not otherwise produced in response to these document requests.

Response to Request No. 23

Other than Plaintiff's Amended Complaint and Plaintiff's Required Disclosures

Pursuant to Rule 26(a) Fed.R.Civ. P., both of which have been previously served on the

Defendants, there are no documents responsive to this Request.

Request No. 24

Please execute the attached authorization for the release of your medical and psychological records to counsel for Motorola.

Response to Request No. 24

Plaintiff objects to this Request on the grounds that the information requested is neither relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request on the grounds that the information requested is confidential medical information protected from disclosure under state and federal law.

JAY S. REIN

By his attorney,

_____

John G. H. Coster
(BBO #101450)
92 State Street, Suite 900
Boston, Massachusetts 02109
(617) 423-2224

CERTIFICATE OF SERVICE

I hereby certify that a true copy of this documents was served on the attorney of record for each of the other parties by mail on April 8, 2005.

_____

John G. H. Coster