**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JAY S. REIN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     CIVIL ACTION NO. 04-12580 NG |
| | ) |
| MOTOROLA, INC., CLYDE KOFMAN | ) |
| and JUERGEN STARK | ) |
| | ) |
| Defendants. | ) |
| | ) |

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, the defendants Motorola, Inc. ("Motorola" or the "Company"), Clyde Kofman ("Kofman") and Juergen Stark ("Stark") (collectively "Defendants") submit this Statement of Material Facts in support of their Motion for Summary Judgment.

**I.     STATEMENT OF UNDISPUTED FACTS**

Defendants state that there is no genuine issue to be tried as to the following material facts:

**A.     The Parties.**

1.     Motorola is a global leader in wireless and broadband communications. It is headquartered in Schaumburg, Illinois, and employs over 65,000 employees worldwide. Affidavit of Peter Tobin ("Tobin Aff."), ¶ 2.

2.     Motorola hired the plaintiff, Jay S. Rein ("Rein"), in June of 2002, at age 38. He was notified of his termination on February 23, 2004, one month after he turned 40 years old.

Answer to Amended Complaint ("Answer"), ¶¶ 8, 39; Deposition of Jay S. Rein ("Rein Dep.") at 41-44, 369.

3.    Defendant Kofman has worked at Motorola since July of 2002.  Deposition of Clyde Kofman ("Kofman Dep.") at 50, 327-28.   At the time of Rein's termination, Kofman was his direct supervisor, and was 42 years of age.  Kofman Dep. at 148-151, 222.  Tobin Aff., ¶ 4.

4.    Defendant Stark has worked at Motorola since July of 2003.  Deposition of Juergen Stark ("Stark Dep.") at 37.  At the time of Rein's termination, Stark was Kofman's supervisor, and was 37 years of age.  Stark Dep. at 87-88; Tobin Aff., ¶ 4.

**B.    Motorola Starts Up "Motorola Professional Services."**

5.    In 2002, Motorola began a start-up professional services organization, called the Motorola Professional Services group ("MPS"), as part of its corporate division.  Professional services constituted a new business line for Motorola through which it sought to provide services, expertise and consulting to customers to complement its traditional core products and technologies.  Rein Dep. at 88-90, 105-107.

**C.    Motorola Hires Rein.**

6.    In 2002, Motorola engaged Russell Reynolds, a professional recruiting firm, to help MPS screen candidates with consulting backgrounds.  Rein learned of the MPS opportunity through Russell Reynolds.  Rein Dep. at 83; Deposition of Paul Zellner ("Zellner Dep.") at 11, 15-16.

7.    Motorola hired Rein and he began work on or about June 24, 2002 in the MPS group.  His title was "Principal" throughout his employment at Motorola.  Rein Dep. at 41-42, 93, 98.  As a Principal, Rein's duties included selling consulting and other services to customers. Rein Dep. at 89-90, 93.  At the time of his hire, Rein was not assigned to any particular industry, region, or client.  Rein Dep. at 121-22.

2

8.      Rein's starting base salary was $190,000, and he was offered various stock options and benefits, and a 45% Sales Incentive Target linked to meeting certain sales targets. Rein Dep. at 98, 101, 107-08, Rein Dep. Ex. 8.  Though Motorola was based in Illinois, Rein worked out of his home in Holliston, Massachusetts.  Rein Dep. at 31.

9.      The Application for Employment that Rein signed on or about June 24, 2002 stated:

> Nothing in this application nor in any prior or subsequent oral or written statement is intended to create any contract of employment or to create any rights in the nature of a contract of employment.  This application does not bind either party for a specific period of time regarding employment.  You understand that no one other than the Motorola Inc. Vice President and Director of Human Resources has any authority to enter into any agreement contrary to the foregoing.  If hired, nothing in this application shall restrict your right as an employee nor the right of Motorola as an employer to terminate your employment at any time.

Rein signed the application, directly below this paragraph.  Rein Dep. at 91, Rein Dep. Ex. 7.

10.     Rein understood that he was an employee at-will, and that the MPS group was a start-up.  Rein Dep. at 94, 473-74.

**D.     Rein's Prior Employment.**

11.     At the time Rein interviewed for the Motorola position, he was unemployed; he had been laid off by his previous employer, Epsilon Data Management, Inc. ("Epsilon"), after it was acquired.  Rein Dep. at 47-49, 67-68.

12.     Following his termination from Epsilon, Rein wrote to the CEO of the acquiring company to ask for an earn-out payment to which he claimed entitlement, for putting certain "groundwork" in place while at Epsilon.  He asked the CEO to consider that on the date of the acquisition "nobody indicated that there was any intention of [Rein] not being retained to continue as a leader of Epsilon" and claimed he had foregone other employment opportunities as a result.  Rein Dep. at 52-53, Rein Dep. Ex. 5.

3

13.    Prior to working at Epsilon, Rein had worked in a start-up at AT&T Solutions, which was eventually disbanded and the company shut down.  Rein Dep. at 73, 92.  He worked in a new division at Logica. Rein Dep. at 94.

**E.    Rein's Place within MPS.**

14.    At the time of Rein's hire at Motorola, the MPS group contained approximately 200 employees worldwide.  Rein Dep. at 93-94, 97.

15.    At the time of his hire, Rein reported to Len DeBarros ("DeBarros"), a senior vice president in charge of MPS in the Americas.  Rein Dep. at 87-88, 95-96.  Rein does not believe that DeBarros ever treated him unfairly.  Rein Dep. at 132.

16.    In July 2002, Motorola hired Kofman as a Managing Principal for the MPS group, also reporting to Len DeBarros.  Kofman Dep. at 50-52; Zellner Dep. at 27.

**F.    Rein's Performance for 2002.**

17.    MPS did not meet its revenue goals in 2002.  Deposition of Clay Brice ("Brice Dep.") at 65.  In 2002, Rein was ineligible for a Sales Incentive Plan bonus because he did not meet his individual sales goals.  Rein Dep. at 346, 573.

18.    Rein's 2002 performance review, written by DeBarros, indicates that Rein failed to meet key sales and financial targets for 2002.  The review states that Rein "falls short on making original S[ales] I[ncentive] P[lan] goals to Book and Bill business, I believe this to be a cycle of getting traction in his vertical and will continue to expect that with the new plan for 2003 . . . this will be remedied."  The review also states that Rein "needs to improve executing to the sales plan and envision the sales forecast; these will be key targets to meet in 2003."  Tobin Aff., ¶ 6, Ex. A; Rein Dep. at 402, 406.

19.    Rein does not believe that his 2002 performance review was motivated in any way by age discrimination.  Rein Dep. at 449-50.

4

**G.    MPS Is Reorganized and Downsized.**

20.    In March of 2003, the MPS group was reorganized and downsized.  Rein Dep. at 130-31, 143.

21.    Of the MPS group in the Americas, only about 26 members of the original group of 200, including Rein and Kofman, continued to operate as MPS.  Instead of reporting to Corporate, the new group of 26 instead reported to the Commercial Government and Industrial Solutions Sector ("CGISS") group.  Rein Dep. at 134-35.

22.    Also in mid-2003, Len DeBarros ("DeBarros"), the MPS manager to whom Rein initially reported, left Motorola.  Rein Dep. at 131-32.

**H.    Plaintiff Is Concerned the Group May Be Disbanded.**

23.    During 2003, Rein was concerned that the MPS group might be disbanded, and he and his coworkers in MPS discussed this shared concern.  Rein Dep. at 137-39, 154.

24.    During this time, Rein called Russell Reynolds and discussed the ongoing changes in the group and inquired about opportunities the recruiting firm might know of within Motorola or elsewhere.  Rein Dep. at 140-41; Zellner Dep. at 49.  Rein does not recall telling anyone at MPS of his conversations with Russell Reynolds. Rein Dep. at 179-180.

25.    Because Motorola was a Russell Reynolds client, it would have been a violation of Russell Reynolds policy to attempt to find another placement for Rein while he was still employed by Motorola.  Rein Dep. at 155; Zellner Dep. at 70.

**I.    Juergen Stark Arrives to Head the Reduced MPS Group.**

26.    Immediately following DeBarros's departure, Thomas Niersbach, MPS's controller, assumed interim responsibility for managing MPS.  Rein Dep. at 146; Kofman Dep. at 64.  Rein believes that Niersbach treated him fairly.  Rein Dep. at 147.

27.    In July 2003, Motorola hired Juergen Stark as a Corporate Vice President responsible for managing Motorola's Integrated Services Division and CGISS's strategic development, as well as the reduced MPS group.  Stark Dep. at 35-37.

28.    Stark then managed over 700 employees, approximately twenty-five of whom worked in MPS.  Rein Dep. at 135, 158-59; Stark Dep. at 43, 47; Kofman Dep. at 67.

**J.    MPS Renamed IMS: Stark Rejects the IMS Group's First Business Plan.**

29.    As of October 2003, Rein's group was losing money.  Stark Dep. at 57.  None of its members were generating revenue and they had not met their plan. Rein Dep. at 127; Kofman Dep. at 91.

30.    By October 2003, MPS had changed its name from MPS to Intelligent Mobility Solutions or "IMS" in an effort to re-brand itself and to distance the group from the prior unsuccessful "MPS" brand.  Rein Dep. at 340-41; Kofman Dep. at 98.

31.    IMS had its first group, in-person meeting with Stark on October 14, 2003.  Rein Dep. at 189; Kofman Dep. at 90.

32.    Rein and others in the group were concerned that Stark might "pull the plug" on IMS if he did not approve of the group's business plan.  Rein Dep. at 219-20.  In fact, one of Stark's purposes in holding the meeting was to determine if the fledgling MPS group would continue to operate a stand alone organization, or whether its members would be terminated or redeployed within other Motorola divisions.  Stark Dep. at 49-50, 53.

33.    Stark was disappointed in the IMS group's presentation.  Stark Dep. at 57-58.  He felt that the group's initial business plan lacked specificity with respect to financial targets and business development and did not seem bold enough.  Stark Dep. at 57-58, 68.

34.    He told the group the presentation was not the caliber of work he expected from them.  Rein Dep. at 253; Kofman Dep. at 115.  Stark said that based on the presentation, he was

not willing to move forward with the group's proposed plan. Rein Dep. at 219-20; Stark Dep. at 58, 68.

35.    At the conclusion of this meeting, Rein and other members of the group were concerned that Stark would disband IMS, and Stark himself had real doubts about whether to move forward with the group. Rein Dep. at 219; Stark Dep. at 68.

**K.    The Group Presents a Revised Business Plan to Stark.**

36.    Stark gave the group an opportunity to rethink the plan and to present a more specific and aggressive business plan to him several days later. Rein Dep. at 219-20; Kofman Dep. at 115; Stark Dep. at 59, 67-68.

37.    Rein believed that if the second presentation was not successful, the group would probably "live until the end of the fiscal year (2003) and then be gone." Rein Dep. at 222.

38.    The group made a second presentation to Stark. Stark was sufficiently satisfied that he let the group's experiment continue. Stark Dep. at 73.

39.    At the conclusion of the meeting, Stark gave the group a "pep talk," in which he acknowledged the group's past challenges, expressed his desire to see progress and his commitment to IMS, and he urged the group to apply their best efforts to achieving the revised plan to which they had committed. Rein Dep. at 273; Kofman Dep. at 134-36; Stark Dep. at 76-79.

40.    Stark also told the group that he would revisit the progress of IMS monthly as well as in June 2004 to see if they should "recalibrate" their goals. Rein Dep. at 273-274; Stark Dep. at 73, 77, 78-79; Kofman Dep. at 134-36.

41.    As of these October 2003 meetings, Rein had not told Stark that he was looking for jobs outside Motorola. Rein Dep. at 316.

42.    Rein believed the group's self-imposed targets were aggressive, but was relieved the group had even survived.  Rein Dep. at 275, 293.  Rein understood that if the group or any of its members did not execute on the plan, "Stark or anyone" was free to reassess before June of 2004.  Rein Dep. at 295-96; Brice Dep. at 79-80.  Further, Rein and the other members of IMS remained concerned and frequently discussed that the group's performance would be assessed against targets by mid-year and that the group could be disbanded.  Rein Dep. at 311-12.

**L.    IMS Is Further Restructured and Downsized.**

43.    In the final quarter of 2003, IMS again was reorganized and downsized.   Certain members of the group who focused on Latin America were transferred to a different group.  Rein Dep. at 290-91; Stark Dep. at 43-44.  One member of the U.S. group, Paul Lanci, transitioned to another Motorola business group.  Rein Dep. at 290-291; Stark Dep. at 44.

44.    Following this reorganization, only five members of the IMS group remained. Rein and John Gillardi, who were both Principals, and Kofman, who was a Managing Principal, were all level E-15 in Motorola's job grade classification system.  Michael Humpleby and Clay Brice were non-Principals at levels E-14 and E-12, respectively.  Tobin Aff., ¶ 7, Ex. C; Rein Dep. at 120, 291-93, 415; Kofman Dep. at 33, 72, 170-71, 285-86; Stark Dep. at 53-54; Brice Dep. at 54-55.

**M.    The Group Selects Kofman as Its Leader.**

45.    In late 2003, Stark asked the group of five to select one of its own members as manager and IMS's liaison to Stark.  Stark Dep. at 82-85; Kofman Dep. at 122, 140.  Stark felt the group would be more likely to support a leader whom they themselves had chosen and that, because the group was still experimental and represented only a narrow part of Stark's total responsibilities, it was more practical to forego the effort of finding an outside candidate.  Stark Dep. at 85.

8

46.     The group, including Rein, selected Kofman.  Rein Dep. at 193-94; Kofman Dep. at 143-144, 148.  Stark approved the decision.  Kofman Dep. at 149-50; Stark Dep. at 87.

47.     In his new managerial role, Kofman was responsible for the group's business decisions, results, and financial plan.  Stark Dep. at 83; Kofman Dep. at 151, 182-83.  He was responsible for performance reviews for the group's members, for discipline or termination of its members if necessary, and for hiring, subject to approval of the head count from Stark or the appropriate Chief Financial Officer.  Kofman Dep. at 152; Stark Dep. at 83-84.

**N.     The Group Further Hones Its Plan with A New Focus on Field Service Mobility.**

48.     Following the October 2003 meetings with Stark, IMS continued to refine its plans and periodically reported to Stark, as expected, regarding the group's progress.  Kofman Dep. at 182; Stark Dep. at 88; Brice Dep. at 97.  IMS was under substantial pressure to generate business and achieve the profitability that previously had eluded the group.  Rein Dep. at 310-12.

49.     Whereas in prior presentations there had been long lists of prospective clients, there was now an attempt to focus more narrowly on priorities.  Rein Dep. at 312-13.  The plan that Stark endorsed called for the group to narrow its business focus to "field service mobility." Rein Dep. at 258-261, 267-68, Rein Dep. Ex. 17 at 19, 21; Kofman Dep. at 125, 128-29, 133-34, 188-89; Brice Dep. at 164.  Field service mobility is the process of facilitating and enabling work processes and activities for a decentralized work force not physically tied to a network or other company systems and applications.  Rein Dep. at 80; Kofman Dep. at 130-31; Stark Dep. at 52.

50.     The group presented to Stark different scenarios with varying numbers of employees – or "head count" – in the group.  Rein Dep. at 296-98, 304, Rein Dep. Ex. 19.

51.     Rein was concerned that the "volume and velocity" of the group's activity was insufficient to meet the plan.  Rein Dep. at 320-21.  As of December 2003, Rein did not feel that the group was headed in the right direction to meet its goals for June 2004.  Rein Dep. at 337.

**O.     Rein's 2003 Performance Evaluation.**

52.     During 2003, Rein did not reach the goals set for him individually, and his team similarly failed to reach its goals.  Rein Dep. at 144-45, 348-49; Brice Dep. at 65.  Rein neither received nor became eligible for a Sales Incentive Bonus for 2003 because he did not meet his targets.  Rein Dep. at 346-50, 573-74.

53.     In January 2004, Kofman conducted Rein's 2003 performance review, which also included input from prior managers Niersbach and DeBarros.  Rein Dep. at 389-90, 412-14, 423-29; Kofman Dep. at 153-161; Tobin Aff., ¶ 6, Ex. B.

54.     Kofman's summary comments on plaintiff's 2003 review stated:

2003 was a challenging year.  Many changes and little leadership direction contributed to the challenges.  2004 brings an opportunity for Jay's capabilities to come through more clearly and for MPS to continue to create value for CGISS.

Rein Dep. at 426-27.  By "little leadership direction," Kofman was referring to the fact that the group had reported to several leaders, and that both Niersbach and Stark had higher priority responsibilities than IMS.  Kofman Dep. at 162.

55.     Rein's overall performance rating for 2003 was "meets expectations."  The other members of the IMS group also were rated "meets expectations" for 2003.  Tobin Aff., ¶ 6; Kofman Dep. at 72-73.

56.     Rein does not believe that his 2003 performance review was motivated in any way by age discrimination.  Rein Dep. at 449.

**P.    Rein's 2003 Relative Performance Assessment.**

57.    In addition to a self-assessment component included in the 2003 Review, Motorola also used a relative performance assessment ("RPA") tool.  Tobin Aff., ¶ 8, Ex. D; Kofman Dep. at 78-81.  In the 4-E's Assessment component of an RPA, an employee first rated his own performance in a variety of areas, and then a manager and one or more coworkers rated the employee's performance in the same areas.  Sometimes RPAs revealed "blind spots," where an employee rated himself higher in certain areas than his manager or coworkers did.  Kofman Dep. at 78-81, 85.

58.    Rein's 2003 4-E's Assessment revealed "blind spots" in the following eight categories:  (1) using personal leadership and influence to motivate people; (2) delivering on commitments to customers; (3) keeping promises to other Motorolans – making deadlines and delivering; (4) rallying people around common goals and building team spirit; (5) keeping the organization focused on executing the plan and meeting key short-term objectives; (6) honesty; (7) demonstrating constant respect for people regardless of position, membership in any group or culture or other difference; and (8) taking his share of responsibility for problems rather than blaming others.  The manager who contributed to Rein's RPA was Thomas Niersbach.  Tobin Aff., ¶¶ 9, 10, Ex. D; Kofman Dep. at 77.  While Clay Brice cannot recall if he was the coworker who completed Rein's 4-E's Assessment, he would have rated him exactly the same way.  Brice Dep. at 116-20.

**Q.    Rein Considers a Different Job.**

59.    In January 2004, Rein was offered a job, through a former colleague, at a company called Invoke.  Rein Dep. at 450-55.

60.    In an e-mail dated January 18, 2004, Rein told Invoke that he was declining the job, which was to pay approximately $130,000 in salary plus other benefits and bonus potential,

because "we are just a bit apart from where I had to be (compensation-wise)."  Rein Dep. at 456-59, 462-463, Rein Dep. Exs. 28 and 29.

61.     Rein did not tell Kofman or Stark that he was pursuing alternate employment or that he had received the offer.  Rein Dep. at 455-56.

**R.      Rein's Group Receives a Modest Bonus in January 2004.**

62.     At the end of 2003, Rein was not expecting any bonus because he had not met his targets.  Rein Dep. at 348-49.

63.     Kofman observed that although the IMS group as a whole had not met its goals for 2003, some of the original group of more than twenty IMS employees who had been transitioned to CGISS in 2003 were on Motorola's Incentive Plan ("MIP") and were slated to receive bonuses linked to corporate performance rather than individual or group sales goals.  By contrast, those on the Sales Incentive Plan ("SIP"), like Rein, were not scheduled to receive a bonus because their bonuses were tied to meeting individual and group sales goals that they had failed to achieve.  Rein Dep. at 347-48, 350-52; Kofman Dep. at 174-75, 230-31, 234-36.

64.     In January 2004, as a matter of fairness and to boost the team's morale, Kofman sought modest bonuses for those IMS employees on SIP whom he was managing, including Rein.  Kofman Dep. at 169-70, 173-81; Stark Dep. at 78-80.  Accordingly, Rein received a bonus of $14,000.   Rein Dep. at 102; Stark Dep. at  80.

65.     One employee, Aurelio Lobaton, received a bonus in January 2004 even though Motorola had terminated his employment in December 2003.  Kofman Dep. at 181, 234, 236.

**S.      IMS Is Once Again Restructured in February 2004.**

66.     In February of 2004, after having managed the group for a period of time and evaluated the marketplace and the group's plans, Kofman concluded that the group had an "organizational mix" problem and was poorly positioned for the future.  Kofman Dep. at 171,

254-55.  He determined that there were too few people dedicated to delivery of services to customers.  Kofman Dep. at 171, 212-13, 255-57, Kofman Dep. Ex. 8.  Kofman believed the solution was to shift the mix to make it more balanced between business development and delivery.  Kofman Dep. at 255.

67.     Rein and other members of the group understood that IMS did not have the resources to deliver on multiple simultaneous client engagements.  Brice Dep. at 106-07, 126, 141; Rein Dep. at 307-08.  In fact, Rein's self-assessment in his 2003 review reported that "headcount which I envisioned would assist in various funnel development and delivery activity was continuously disapproved – hence limiting success."  Rein Dep. at 417-18, 421-22, 425.  In January of 2004, Rein had told Kofman that the lack of delivery personnel was impeding his performance.  Rein Dep. at 425-26.

68.     As a result of these considerations, in February of 2004, Kofman determined that the group once again had to be reorganized in order to achieve its business plan for 2004.  Kofman Dep. at 255-58.  Kofman concluded that the best course was to eliminate one of the Principal positions.  Kofman Dep. at 257.   Kofman contemplated that the group would then hire one or two additional employees at a lower grade who would cost-effectively focus on delivery services.  Kofman Dep. at 257-58; Stark Dep. at 117-18.

69.     Kofman did not believe that simply adding delivery resources, without eliminating any positions, was prudent for achieving the business plan.  Kofman Dep. 272-73.

**T.     Kofman Recommends Eliminating Rein's Position.**

70.     After reviewing the skill sets and prior experience of both Principals, Kofman selected Rein as the IMS Principal whom he would recommend for termination.  Kofman Dep. at 265-66.

71.     Kofman believed that Rein had less experience than John Gillardi, the other Principal, in field service mobility.  Kofman Dep. at 265-66.  Others in the group shared this view.  Brice Dep. at 144-45, 164-65.

72.     Kofman also believed that Rein was not adequately focused on field service mobility.  For example, Rein continued to pursue a client prospect called ExpressLINK for an opportunity that fell outside the field service mobility focus, and Stark confirmed Kofman's instruction to transition the opportunity to another Motorola department.  Kofman Dep. at 197-200, 209-13, 239-40, Kofman Dep. Ex. 8; Rein Dep. at 241, 244-45, 357-58, 714, 733-34, Rein Dep. Ex. 23; Brice Dep. at 39, 42-43, 45, 82-83.  In an e-mail dated February 4, 2004, Kofman had written to Stark that he had "concerns over the [Rein's] ability to stay focused" on field service mobility.  Kofman Dep. at 245-46, Kofman Dep. Ex. 10; Stark Dep. at 107.

73.     Kofman also considered Rein's 2003 relative performance assessment, which had identified eight "blind spots" in which Rein's former manager Niersbach and a coworker had rated Rein significantly lower than he had rated himself.  Kofman Dep. at 280, 282, 284.

74.     Finally, Kofman considered feedback from at least four customer-facing Motorola employees, including managers Paul Lanci, who had been a member of the IMS group, and Chris Banakis, a sales leader at Motorola, which confirmed Kofman's own impression that Rein could be abrasive and difficult to work with.  Kofman Dep. at 201-04, 283-85, 287, Kofman Dep. Ex. 11; Stark Dep. at 134-35.

75.     Rein acknowledges that for the six months preceding his termination, he and Kofman did not "see eye to eye on how the business was evolving."  Rein Dep. at 248, 250.

**U.     Stark Approves Kofman's Recommendation.**

76.     Kofman presented his recommendation to Stark.  Kofman Dep. at 253-55, 266, Kofman Dep. Ex. 11.  The plan called for eliminating Rein's Level E-15 Principal position and

instead hiring delivery employees at a lower classification, Level E-11 to E-13.  Kofman Dep. at 276-77, Kofman Dep. Ex. 11.  In support of his recommendation to terminate Rein's position, Kofman discussed the organizational mix issue, Rein's lack of experience in and focus on field service mobility, the eight "blind spots," feedback from other managers at Motorola, and his own experience with Rein being abrasive.  Kofman Dep. Ex. 11.

77.     After reviewing the plan with Kofman at a meeting, Stark approved the recommendation.  Kofman Dep. at 253; Stark Dep. at 125-26.

78.     Stark agreed with Kofman's assessment that a rebalancing of the group was required.  He believed that additional delivery personnel were necessary, because the group presently had only enough delivery resources to deliver on one client engagement at a time, which Stark felt was not a viable or cost-effective long-term solution.  Stark also agreed with the assessment that the group was too "top heavy," akin to a consulting firm that had only partners but no associates to do hands-on work.  Stark believed using expensive senior executives to do junior level delivery work, such as the day to day tactical work on site with customers, was a poor allocation of resources.  Stark Dep. at 113-18, 132.  Stark felt comfortable that Kofman had substantial business justification to eliminate Rein's position.  Stark Dep. at 117, 124, 136.

79.     In addition to approving Rein's termination, Stark initially authorized Kofman to hire one additional delivery person, and agreed that the group could hire a second as new business was generated.  Kofman Dep. at 258.

**V.     Rein Discusses His Termination with Kofman and Stark.**

80.     On February 23, 2004, Kofman informed Rein of the termination decision.  Rein Dep. at 369-70.  Kofman explained to Rein the organizational mix problem and that IMS intended to hire one to two "delivery" employees that he believed the group badly needed.  Rein Dep. at 371; Kofman Dep. at 301.

81.    The same day, Rein requested and received a meeting with Stark to discuss the termination.  Rein Dep. at 373.  In Rein's conversation with Stark, Rein said that Kofman had terminated him because he disliked him.  Rein Dep. at 380-81; Stark Dep. at 145-46, 148-49.  However, prior to his termination, Rein had never complained to Stark or Human Resources of any unfair treatment by Kofman.  Rein Dep. at 252.

82.    Stark agreed to look further into the termination decision.  Rein Dep. at 172-73; Stark Dep. at 147-149.  He solicited and received feedback from at least two of Rein's coworkers, including Paul Lanci, a former IMS employee.  Stark Dep. at 147-48.   Based on this feedback, Stark was convinced that Kofman's decision to terminate Rein's employment was justified and was not based on a personality conflict or any inappropriate factors.  Stark Dep. at 148, 150.

83.    Rein and Kofman each separately told Rein's coworkers that Rein's position had been eliminated because of an imbalance in the group.  Rein Dep. at 377; Kofman Dep. at 323.  Rein does not recall telling them that he believed that the termination was motivated by age bias, or that Kofman had said anything about needing to hire younger employees.  Rein Dep. at 377-79

**W.    Rein's Coworkers and Superiors Were All of Similar Ages.**

84.    At the time of Rein's termination, Kofman was approximately 42 years of age.  Tobin Aff., ¶ 4.  Stark was approximately 37 years of age.  Tobin Aff., ¶ 4.

85.    At the time of Rein's termination, John Gillardi and Michael Humpleby were each approximately 37 years old and Clay Brice was approximately 29 years old.  Tobin Aff., ¶ 4**;** Brice Dep. at 7.

86.    Plaintiff does not contend younger employees were treated more favorably at Motorola.  Rein Dep. at 477.

16

87.    Rein never heard Stark make any reference to Rein's age.  Rein Dep. at 477.

88.    Rein does not contend that he was replaced by any younger employees.  Rein Dep. at 480

### X.    Rein's Negotiates His Severance with Motorola.

89.    Following Rein's termination, Peter Tobin, CGISS' Director of Human Resources ("Tobin"), sent a letter informing Rein that he was eligible for severance and benefits pursuant to Motorola's standard Involuntary Severance Plan ("ISP").  Tobin Aff., ¶ 12; Rein Dep. at 541-43, Rein Dep. Ex. 45.  The letter advised that the basic severance was $31,677.00 and that an additional supplemental severance of $7,453.00 was available upon the signing of a General Release.  Tobin Aff., ¶ 12.

90.    Instead of the standard package, Rein began negotiating for an enhanced package; for example, he sought to maintain active employee status for an extended period, to enable him to represent to prospective employers that he was still employed.  Rein Dep. at 544-45, 557-58; Tobin Aff., ¶ 13.

91.    Stark and Tobin came to believe that Rein was being excessively abrasive and demanding in the negotiations, which was consistent with the feedback that Stark had received about Rein in making the termination decision.  Stark Dep. at 175-76, 183; Tobin Aff., ¶ 17.  Stark counseled Rein not to "burn bridges" in the process of leaving the company, and opining that it was better for Rein's career to part the company on good terms.  Stark Dep. at 175-76; Rein Dep. at 171-72.

92.    After extended negotiations, Motorola offered Rein an enhanced package that would allow Rein to extend his termination date until May 31, 2004, in exchange for his signing a standard release.  Tobin Aff., ¶ 14.  Rein Dep. at 549-50, Rein Dep. Ex. 45.

93.    Rein refused the offer, and declined to sign the release.  Rein Dep. at 552-53.

94.     Rein was paid through April 9, 2004 (the date that he refused to sign the release) and received the entire standard severance package of $31,677.00.  Rein Dep. at 551-54, Rein Dep. Ex. 43.  Tobin Aff., ¶ 15.

95.     There was no mention of age in Tobin's discussions with Kofman or Stark concerning Rein's termination or severance.  Tobin Aff., ¶ 19.  Kofman was not involved in negotiating severance with Rein.  Kofman Dep. at 321-22.

96.     During the negotiations, on March 15, 2004, Rein sent Tobin an e-mail in which he purported to recount the circumstances surrounding his termination, and suggested alternative ways in which the department could have been reorganized without eliminating his position. Rein Dep. at 554, Rein Dep. Ex. 46.  Nowhere in this eleven paragraph e-mail did he mention that he believed his termination had anything to do with his age.  Rein Dep. at 554, Rein Dep. Ex. 46.

**Y.     Rein Attempts to Find Alternate Employment.**

97.     While Rein was negotiating his separation package with Motorola, he sought other positions within the Company.  Rein Dep. at 485-89.

98.     Rein contacted Janiece Webb, with whom Rein had worked on the potential client ExpressLINK, to determine whether she had any available positions in the Integrated Electronic Systems Sector  ("IESS") group.  Rein Dep. at 368-69.  Webb did not have a job opening, but told Rein it was possible that she might have openings in the future.  Rein Dep. at 485-86. When Webb sent an e-mail to Stark requesting feedback on Rein's performance, Stark suggested that Webb speak with Rein's direct manager, Kofman.  Stark Dep. 158-60.  When Ms. Webb called him, Kofman provided his opinion of Rein's strengths and weaknesses as an employee. Kofman Dep. at 305-06, 316.  Kofman and Stark both believed that Kofman had a responsibility

as a Motorola manager to give a balanced and truthful answer about Rein's performance to a prospective hiring manager within the Company.  Kofman Dep. at 317; Stark Dep. at 165-66.

99.    Other than Kofman's conversation with Webb, neither Kofman, Stark nor Tobin was contacted by anyone at Motorola who was seeking to hire Rein.  Kofman Dep. at 320-21; Stark Dep. 10-11, 157-58, 166; Tobin Aff., ¶ 18.

100.    Rein also had discussions or interviews for additional positions within Motorola, and flew to Philadelphia at the company's expense to interview for a position.  Rein Dep. at 487-89.

101.    Motorola submitted Rein's name to its Leadership and Talent program, which sometimes looks for opportunities to redeploy executives within the company who are looking for new positions for various reasons.  Rein Dep. 490-91, 500-01; Tobin Aff., ¶ 16.

102.    Ultimately, Rein did not receive any offers within Motorola before accepting a new position at a different company, GTSI, in October 2004, at a salary of $150,000 and a 25% bonus.  Plaintiff's Answers to Interrogatories No. 7, 9, Rein. Dep. at 578.

**Z.    Plaintiff Contacts Russell Reynolds for Job Search Assistance.**

103.    Following notice of his termination, Rein also contacted Tim Henn and Paul Zellner at Russell Reynolds to determine whether the firm was aware of any jobs for which he might be a suitable candidate.  Rein Dep. at 184, 482; Zellner Dep. at 63-66.

104.    Tim Henn returned Rein's calls and let him know that he would keep his eyes open for suitable opportunities for Rein.  Rein Dep. at 185-86.  On May 4, 2004, Zellner responded to Rein's email.  Rein Dep. Ex. 41.

105.    Zellner considered Rein a good candidate, but was not aware of any placements for which Rein was a suitable candidate.  Zellner Dep. at 56, 59, 65.

106.    Neither Stark, Kofman nor Tobin ever spoke with any Russell Reynolds representative about Rein's termination or job performance.  Kofman Dep. at 325-26; Stark Dep. at 10; Zellner Dep. at 50; Tobin Aff., ¶ 18.

107.    Zellner never spoke to anyone at Motorola regarding Rein's performance or termination.  Zellner Dep. at 44-45.  He never spoke to Kofman after the firm placed Kofman at Motorola in 2002.  Zellner Dep. at 52.  He has had no dealings with Motorola at all since placing Rein with the Company in 2002.  Zellner Dep. at 68.

108.    Rein is not aware of anyone at Motorola's IMS department even knowing that Rein had an ongoing relationship with Russell Reynolds.  Rein Dep. at 483.

**AA.    IMS Interviews for Additional Delivery Personnel.**

109.    In 2004, after Rein's termination, Kofman wrote a job requisition for a new delivery employee for IMS and interviewed to fill the position.  Kofman Dep. at 258.  The primary candidate considered, Jim Cheetle, had fifteen or twenty years of work experience.  Kofman Dep. at 259-61, 265.

110.    However, in late 2004 Kofman and Stark made the decision not to fill the position, because the group was once again re-focused -- this time away from providing consulting services.  Kofman Dep. at 263; Brice Dep. at 127.

**BB.    Motorola Disbands IMS Altogether Later in 2004.**

111.    Motorola eventually disbanded IMS altogether between late 2004 and early 2005.  Kofman Dep. at 327; Stark Dep. at 42, 45; Brice Dep. at 128.

112.    Some of the former IMS members have moved to other parts of Motorola while others have resigned or been terminated by the Company.  Kofman Dep. at 327, 329-30; Brice Dep. at 128-29, 132-33.

Respectfully submitted,


MOTOROLA, INC., CLYDE KOFMAN,
and JUERGEN STARK,

By their attorneys,

/s/ Kristin Glennan McGurn
Richard L. Alfred (BBO# 015000)
Kristin G. McGurn (BBO# 559687)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:     (617) 946-4800


Dated:  August 1, 2006



<u>Certificate of Service</u>

I hereby certify that a true copy of the above document was served
upon the attorney of record for each party by ECF and first class mail
on August 1, 2006.

/s/ Kristin G. McGurn
Kristin G. McGurn

21