## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAY S. REIN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CIVIL ACTION NO. 04-12580 NG |
| | ) |
| MOTOROLA, INC., CLYDE KOFMAN | ) |
| and JUERGEN STARK | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF KRISTIN G. MCGURN IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Kristin G. McGurn, Esq., deposes and says:

1.      I am an attorney admitted to practice in this District and am a partner at the law firm of Seyfarth Shaw LLP, counsel for Defendants, Motorola, Inc., Clyde Kofman and Juergen Stark.  Based on my knowledge as counsel in this action, I submit this declaration in support of Defendants' Motion for Summary Judgment.

2.      Attached as Exhibit A is a true and correct copy of excerpts of the deposition of Jay S. Rein.

3.      Attached as Exhibit B is a true and correct copy of excerpts of the deposition of Juergen Stark.

4.      Attached as Exhibit C is a true and correct copy of excerpts of the deposition of Clyde Kofman.

5.      Attached as Exhibit D is a true and correct copy of excerpts of the deposition of Clay Brice.

6.      Attached as Exhibit E is a true and correct copy of excerpts of the deposition of Paul Zellner.

7.      Attached as Exhibit F is a true and correct copy of Exhibit 5 to the deposition of Jay S. Rein.

8.      Attached as Exhibit G is a true and correct copy of Exhibit 7 to the deposition of Jay S. Rein.

9.      Attached as Exhibit H is a true and correct copy of Exhibit 8 to the deposition of Jay S. Rein.

10.     Attached as Exhibit I is a true and correct copy of Exhibit 17 to the deposition of Jay S. Rein.

11.     Attached as Exhibit J is a true and correct copy of Exhibit 19 to the deposition of Jay S. Rein.

12.     Attached as Exhibit K is a true and correct copy of Exhibit 23 to the deposition of Jay S. Rein.

13.     Attached as Exhibit L is a true and correct copy of Exhibit 28 to the deposition of Jay S. Rein.

14.     Attached as Exhibit M is a true and correct copy of Exhibit 29 to the deposition of Jay S. Rein.

15.     Attached as Exhibit N is a true and correct copy of Exhibit 41 to the deposition of Jay S. Rein.

16.     Attached as Exhibit O is a true and correct copy of Exhibit 43 to the deposition of Jay S. Rein.

17.     Attached as Exhibit P is a true and correct copy of Exhibit 45 to the deposition of Jay S. Rein.

18.    Attached as Exhibit Q is a true and correct copy of Exhibit 46 to the deposition of Jay S. Rein.

19.    Attached as Exhibit R is a true and correct copy of Exhibit 8 to the deposition of Clyde Kofman.

20.    Attached as Exhibit S is a true and correct copy of Exhibit 10 to the deposition of Clyde Kofman.

21.    Attached as Exhibit T is a true and correct copy of Exhibit 11 to the deposition of Clyde Kofman.

22.    Attached as Exhibit U is a true and correct copy of *Nason v. Revlon,* C.A. No. 98-1949 (Mass. Super. Dec. 28, 2000).

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 1, 2006


By_____/s/ Kristin G. McGurn_____


---

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document was served upon the attorney of record for the plaintiff via ECF and by mailing a copy of same, postage prepaid, to John G. H. Coster, Attorney at Law, 92 State Street, Suite 900, Boston, MA  02109 on August 1, 2006.

/s/ Kristin G. McGurn

---

# EXHIBIT A
# PART 1

1

1    CERTIFIED ORIGINAL            Volume:    I
     LEGALINK BOSTON

2                                  Pages:    1-225

3                                  Exhibits:  1-14

4              UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF MASSACHUSETTS

6              Civil Action No. 04-12580 NG

7    - - - - - - - - - - - - - - - - - - - - - - - x

8    Jay S. Rein,

9                    Plaintiff,

10        v.

11   Motorola, Inc., Clyde Kofman,

12   and Juergen Stark,

13                   Defendants.

14   - - - - - - - - - - - - - - - - - - - - - - - x

15

16          DEPOSITION OF JAY STUART REIN

17          Tuesday, August 16, 2005

18               10:23 a.m.

19            SEYFARTH SHAW LLP

20          World Trade Center East

21        Two Seaport Lane, Suite 300

22        Boston, Massachusetts 02210-2028

23

24   Reporter:  Lori-Ann London, RPR

Jay Stuart Rein

08/16/2005

31

1       Q    Do you still have that computer?

2       A    Yes.

3       Q    Okay.  Did you produce anything aside

4   from past tax records, pay stubs, and copies of

5   e-mails?

6       A    I don't think so.

7       Q    Okay.  Did you search anywhere other

8   than on your computer for documents in response to

9   that request?

10      A    I may have searched for benefits books

11  or, you know, any policy or procedure documents

12  that may have been provided to me.

13      Q    And where would you have maintained

14  those?

15      A    If I was given them by Motorola, I would

16  have maintained them in a file, a personal file.

17      Q    During your employment with Motorola,

18  you worked from your home at Holliston; is that

19  correct?

20      A    Yes.

21      Q    Was that true for the entire tenure at

22  Motorola?

23      A    When I wasn't on site at Motorola,

24  correct.

Jay Stuart Rein

08/16/2005

41

```
 1        Q      Did you ask anyone -- any third parties
 2   to produce documents back to you for purposes of
 3   responding to Motorola's requests?
 4        A      No.
 5        Q      Did you have any assistance in looking
 6   for documents responsive to the requests?
 7        A      No.
 8        Q      Would you -- did you maintain documents
 9   pertaining to Motorola at anyplace other than your
10   home office in Holliston?
11        A      No.
12               MS. McGURN:   I'm going to mark
13   another document as Exhibit 3 and ask if you can
14   identify it.
15               (Document marked as Exhibit No. 3.)
16               (Document exhibited to witness.)
17        A      This says "Employment Agreement."
18        Q      Do you recognize the document?
19        A      I recognize it as Motorola's Employment
20   Agreement.
21        Q      Is that your signature on the bottom of
22   the page?
23        A      Yes, it is.
24        Q      And did you sign this document on or
```

Jay Stuart Rein                                                    08/16/2005

42

1   about June 24th, 2002?

2        A    On June 24th, 2002.

3        Q    Did that coincide with the start of your

4   employment with Motorola?

5        A    Yes.

6        Q    And directing your attention to

7   subparagraph 3, was it your understanding that

8   upon termination you were expected to deliver

9   documents and records and other items pertain --

10  or materials belonging to Motorola?

11       A    As I read that now, yes.

12       Q    Did you have that understanding at the

13  time?

14       A    On June --

15            MR. COSTER:  Objection.

16       A    On June 24th, 2002?

17       Q    Right.

18       A    Yes.

19       Q    And did you maintain that understanding

20  at the time you terminated your -- or your

21  employment was terminated at Motorola?

22            MR. COSTER:  Objection.

23       A    At the time my employment was terminated

24  at Motorola on February 23rd, yes.

Jay Stuart Rein                                                      08/16/2005

43

1       Q    Okay.   What about in the March or April

2   time period?

3       A    Nobody from Motorola was talking with

4   me --

5       Q    Okay.

6       A    -- in the April time period.

7       Q    What do you mean by that?

8       A    When discussions terminated and I sought

9   counsel, there was no more designated -- no one --

10   there was nobody for me to -- I was not in active

11   dialogue with any representatives from Motorola to

12   return any materials to.

13       Q    Did you understand that to relieve you

14   of your obligations to return Motorola's items?

15       A    Those items are prepared and ready to be

16   returned to Motorola --

17       Q    Okay.

18       A    -- when an individual is identified.

19       Q    Okay.   How old were you at the time that

20   you were hired by Motorola?

21       A    38 -- 38?   38.

22            MR. COSTER:   Do the math.

23       A    I have to do the math.

24       Q    What's your date of birth?

44

```
 1        A    January 1st, 1964.

 2        Q    Okay.  What's your Social Security

 3   number?

 4        A    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.

 5        Q    Are you presently married?

 6        A    Yes.

 7        Q    What's your spouse's name?

 8        A    Amy.

 9        Q    How long have you been married to Amy?

10        A    11 and a half years.

11        Q    Were you previously married?

12        A    No.

13        Q    Do you have children with Amy?

14        A    Yes.

15        Q    How many children?

16        A    Three.

17        Q    What are their names?

18        A    Lauren, Marni, Sydney.

19        Q    How old is Lauren?

20        A    Nine.

21        Q    How old is Marni?

22        A    Seven.

23        Q    And how old is Sydney?

24        A    Four.
```

Jay Stuart Rein                                                    08/16/2005

47

 1    employer?

 2         A    I've never complained about the terms

 3    and conditions of my employment to any former

 4    employer.

 5         Q    Have you ever complained about the

 6    circumstances of the termination of your

 7    employment?

 8         A    I've had discussions regarding

 9    circumstances of a termination of employment.

10         Q    With whom?

11         A    Epsilon.

12         Q    What were the nature of those

13    discussions?

14         A    The nature of the discussions were

15    regarding a -- was regarding payoff of an earn-out

16    resulting from the sale of the company.

17         Q    With whom did you have those discussions

18    at Epsilon?

19         A    With the CEO of the acquiring company.

20         Q    And what were you seeking?

21         A    I was seeking some percentage of an

22    18-month earn-out.

23         Q    Had it been earned at the time of your

24    termination?

Jay Stuart Rein

08/16/2005

48

```
 1              MR. COSTER:  Objection.
 2       A    The groundwork and the sales initiative
 3  had been put in place to earn it.
 4       Q    Was it payable at the time of your
 5  termination?
 6       A    I'm sorry, what...
 7       Q    Was it due and payable to you at the
 8  time of your termination?
 9       A    A percentage of it could have been due
10  and payable at the discretion of the CEO.
11       Q    What were the circumstances of your
12  termination from Epsilon?
13       A    The company was sold, the CEO left after
14  the sale, and all remaining executives brought in
15  to execute the sale of the company after the
16  company was acquired were terminated.
17       Q    Did you join Epsilon for the purpose of
18  executing the sale?
19       A    Yes.
20       Q    Did you understand at the time that you
21  joined the company that you would be terminated
22  upon the consummation of the sale?
23       A    In a venture capital turnaround, it's
24  widely known that in many situations post
```

Jay Stuart Rein

08/16/2005

49

1    acquisition, post transaction, terminations do

2    occur.

3         Q    But did you anticipate that yourself

4    when you joined the company?

5         A    I anticipated at some period of time

6    post transaction it could occur.

7         Q    When was that termination from Epsilon?

8         A    It was towards the end of 2001,

9    beginning of 2002.

10        Q    And what was the result of your

11   discussions with the CEO of the acquiring company

12   regarding your request for a payoff?

13        A    There was no response.

14        Q    So you received no payment?

15        A    Correct.

16        Q    Did you receive any form of severance as

17   a result of your termination from Epsilon?

18        A    Yes.

19        Q    What was the nature of that severance

20   agreement or severance deal?

21        A    I don't recall.  I don't recall the

22   exact details.

23             MR. COSTER:  And to the extent, and

24   I don't know if there was, there was some sort of

Jay Stuart Rein

08/16/2005

52

1    Q    What is it?

2    A    It's a memo to Rodney Hedeen, the CEO of

3    the acquiring company of Epsilon.

4    Q    And is your signature on the second page

5    of Exhibit 5?

6    A    Yes.

7    Q    And is this a document that you prepared

8    on or about April 12, 2002?

9    A    Yes.

10    Q    Is this -- does this document reflect

11    your communications with Rodney Hedeen regarding

12    your request for a payoff of an earn-out resulting

13    from work you had done at Epsilon?

14    A    This document reflects the discussion

15    that we talked about a few questions back.

16    Q    Okay.  Relating to your communications

17    with Rodney Hedeen --

18    A    Yes.

19    Q    -- about a bonus payout following your

20    termination from the company?

21    A    Yes.

22    Q    And this is -- aside from this letter,

23    did you have any other communications with Rodney

24    about that issue?

Jay Stuart Rein

08/16/2005

53

1      A      Not that I can recall.

2      Q      Okay.  In your letter at page 1, in the

3   third paragraph you indicate that Mike Iaccarino

4   made the decision to reorganize you off the

5   executive team within his rights.  Is that an

6   accurate depiction of your communication with

7   Rodney?

8      A      That's what I wrote then.

9      Q      Okay.

10      A      I don't recall exactly what my thinking

11   was three plus years ago.

12      Q      Okay.  What did you mean when you said

13   in the first bulleted paragraph that nobody

14   indicated that there was any intention of not

15   retaining you?

16      A      We were told on the day of the

17   acquisition, if I recall correctly, that the

18   acquiring company wanted the executive team to

19   remain intact to continue to do the job that was

20   necessary at Epsilon.

21      Q      But you understood that in venture

22   capital situations it's not uncommon for executive

23   teams to ultimately be reorganized off the team at

24   some point following the acquisition; is that an

Jay Stuart Rein

08/16/2005

67

```
 1        A    I haven't been on site very much.  I
 2   started the job on August 1st --
 3        Q    Okay.
 4        A    -- today is August 15th.
 5        Q    Right.  But you viewed it as a -- a
 6   better opportunity and attained the position
 7   because you viewed it as such, is that fair,
 8   better opportunity than GTSI presented to you?
 9        A    Yes.
10        Q    And how long do you anticipate remaining
11   with Worldspan?
12        A    I have no date of plans when I
13   anticipate leaving Worldspan.
14        Q    Okay.  Between February -- or let's say
15   April 2004 and October 2004, did you work at any
16   other place of employment?
17        A    No.
18        Q    Prior to joining Motorola in June of
19   2002, where did you work?
20        A    Epsilon.
21        Q    And as we saw through Exhibits 3 and 4,
22   your employment with Epsilon terminated in January
23   of 2002; is that right?
24        A    Exhibit 3 is a Motorola.
```

Jay Stuart Rein

08/16/2005

68

1     Q     Sorry, Exhibit 4 and 5.

2     A     Yes.

3     Q     Did you search for employment between

4     the time that you were let go from Epsilon and the

5     time that you secured your position at Motorola?

6     A     Yes.

7     Q     With what other employers did you seek

8     employment?

9     A     I don't recall.

10     Q     Did you collect unemployment benefits

11     during that period?

12     A     Yes.

13     Q     What was the value of the benefits that

14     you received?

15     A     I do not recall, standard Massachusetts

16     calculated benefits.

17     Q     Did you receive the full amount of

18     benefits to which you were entitled?

19              MR. COSTER:  Objection.

20     A     I don't know.

21     Q     Okay.  During your history of

22     employment, were there any other periods during

23     which you collected unemployment benefits?

24     A     From when to when?

73

1           I'm sorry, that was for Logica?

2      Q    Right.

3      A    Yeah, I think it was in the 160s.

4      Q    Where did you work before Logica?

5      A    AT&T Solutions.

6      Q    What was your position there?

7      A    Senior manager.

8      Q    What were your duties as senior manager?

9      A    Delivery of technology consulting and

10   solutions to clients of AT&T.

11     Q    During what period of time did you serve

12   in that role for AT&T --

13          MR. COSTER:  Objection.

14     Q    -- AT&T Solutions, sorry.

15     A    I think it was March or April of '94 --

16   wait a minute -- '96 to May of '98.

17     Q    And where was that position located?

18     A    Washington, D.C.

19     Q    Did you live in that area when you

20   worked for AT&T?

21     A    Yes.

22     Q    Where did you reside?

23     A    In North Potomac, Maryland.

24     Q    Do you or your wife have family in that

Jay Stuart Rein

08/16/2005

80

```
 1        A    The last employer listed on the document
 2   is Epsilon, yes.
 3        Q    Have you updated your resume since your
 4   employment terminated with Motorola?
 5        A    Yes.
 6        Q    And have you updated your resume since
 7   your employment terminated with GTSI?
 8        A    My employment didn't terminate with
 9   GTSI.
10        Q    Okay.  Since your departure from GTSI?
11        A    Yes.
12        Q    What is field service mobility?
13        A    Where do you see that?
14        Q    I don't see it.  I'm just asking you a
15   question.
16             MR. COSTER:  She's moving on to
17   another --
18        A    Field service mobility is a term that we
19   used at Motorola.
20        Q    What does it mean?
21        A    Facilitating and enabling work processes
22   and activities for a decentralized work force not
23   physically tied to a network or other company's
24   systems and applications.
```

Jay Stuart Rein

08/16/2005

83

1  Motorola, were you considering any other

2  opportunities at that time in June of '02?

3        A    Don't recall.

4        Q    And how were you introduced to the

5  opportunity at Motorola?

6        A    By a recruiter.

7        Q    Who was that?

8        A    Russell Reynolds.

9        Q    Had you previously worked with Russell

10  Reynolds?

11        A    No.

12        Q    Who at Russell Reynolds did you deal

13  with?

14        A    A fellow by the name of Paul Zellner.

15        Q    How were you introduced to Zellner?

16        A    I don't recall.

17        Q    Did you initiate the contact with

18  Russell Reynolds?

19        A    I may have.

20        Q    Do you recall when you first made

21  contact with Zellner?

22        A    It was sometime between January of 2002

23  and June of 2002.

24        Q    Do you recall how long before you

Jay Stuart Rein

08/16/2005

87

```
 1    addition to interviewer?

 2        A    No.

 3        Q    So if you had dealings with her, it

 4    would have been in the setting of an interview?

 5        A    I don't recall.

 6        Q    Okay.

 7        A    I mean, she was -- if I recall

 8    correctly, she was head of HR for the group at the

 9    time, so I had dealings with her.  I don't recall

10    if it was interview dealings or if it was about

11    the on boarding process, filling out forms, but in

12    the first days and maybe before I mean she was an

13    active part of the process.

14        Q    Okay.

15        A    I just don't recall at which point.

16        Q    And who was slated to be your supervisor

17    or manager if you were to accept that position?

18        A    I did accept the position.

19        Q    But at the time of the interview, of the

20    folks with whom you interviewed --

21        A    Right.

22        Q    -- was one of them going to be your

23    manager?

24        A    Len DeBarros.
```

Jay Stuart Rein

08/16/2005

88

1      Q      What was his title at that time?

2      A      I believe he was a senior vice

3  president.

4      Q      And if you can generalize in order to

5  move things along, did you have an understanding

6  of the other three people with whom you

7  interviewed?

8      A      Understanding of what their roles were?

9      Q      Right.

10      A      I knew what their roles were, but I

11  didn't know their job descriptions and what they

12  were hired to do.

13      Q      What was your understanding?

14      A      Mr. Luzardo was responsible for Latin

15  American sales and all the staff for Motorola

16  Professional Services in the Americas.

17  Mr. Fernandez I believe was -- he was an attorney

18  in training.  He -- I think he had contracts,

19  proposals, bid reviews.  Miss Indonie was

20  responsible for business development, market

21  communications.  Miss Lopez was responsible I

22  believe for HR and the recruiting process.

23      Q      How did Mr. -- did Mr. DeBarros during

24  the interview describe to you the position that

# EXHIBIT A
# PART 2

Jay Stuart Rein                                          08/16/2005

89

1    you would join or obtain if you were to get the

2    job?

3        A    I believe so.

4        Q    What did he say?

5        A    I don't recall his exact words.

6        Q    Do you recall generally what he

7    described to you?

8        A    Motorola was interested in starting a

9    professional services organization.  Motorola was

10   interested in leaders from diverse backgrounds.

11   Motorola was not interested in people who had 20

12   and 30 years of television and radio experience

13   but had good business sense, good business skills,

14   and the capability to be complemented by

15   Motorola's years of experience with those subject

16   matter experts to do something different in the

17   marketplace than just sell product.

18       Q    And what was the different thing they

19   were looking to do?

20       A    They wanted value added.  They didn't

21   want to be a spec sheet sale organization.  They

22   wanted to have services, applications, and other

23   necessary solutions wrapped around the Motorola

24   core product and technology.

90

```
 1         Q     Did anyone else describe for you the

 2   position?

 3         A     I believe I heard similar stories from

 4   all of the interviews.

 5         Q     Similar interviews consistent with --

 6         A     Yes, consistent, correct, thank you.

 7         Q     Did anyone provide a reference to you

 8   for purposes of your job application at Motorola?

 9         A     Yes.

10         Q     Who was that?

11         A     Well, actually, Russell Reynolds went

12   out and sought references.

13         Q     Is that Mr. Zellner?

14         A     Um-hm.

15         Q     From whom did Russell Reynolds seek

16   references?

17         A     I do not recall.

18         Q     Do you know if they got any?

19         A     I assume so.

20         Q     Do you know from whom?

21         A     I do not.

22               MS. McGURN:  I'll mark another

23   document as Exhibit 7.

24               (Document marked as Exhibit No. 7.)
```

Jay Stuart Rein                                                    08/16/2005

91

1                    (Document exhibited to witness.)

2       Q      Do you recognize the document we've

3  marked as Exhibit 7?

4       A      Yes.

5       Q      What is it?

6       A      Application for Employment.

7       Q      And did you prepare the application in

8  connection with your efforts to obtain employment

9  with Motorola?

10       A      No.

11       Q      When did you prepare the application?

12       A      On my first day of employment.

13       Q      Okay.  And that date is referenced on

14  page 5 of the document as 6/24/02?

15       A      Yes.

16       Q      And is that your signature on that same

17  page?

18       A      Yes.

19       Q      And your signature also appears on the

20  following page -- I'm sorry -- your initials

21  appear on the following page; is that right?

22       A      These are all my signatures.

23       Q      Okay.

24       A      There's three signatures here.

Jay Stuart Rein

08/16/2005

92

1     Q     Okay.  Directing your attention to

2 page 3 of the document that we've marked as

3 Exhibit 7, which is Bates stamped No. 5, do you

4 see that Motorola requested permission to contact

5 employers, prior employers?

6     A     Um-hm.

7     Q     And you declined to give that permission

8 on each former employer listed on pages 3 and 4 of

9 Exhibit 7, and then as to some changed your mind?

10    A     No, these are my initials.  I gave

11 permission.

12    Q     As to AT&T Solutions, did you give

13 permission?

14    A     No.  It says no.

15    Q     Why was that?

16    A     I didn't give permission because I

17 wouldn't have even known who to give permission --

18 who to point them to.

19    Q     Is that because the group was disbanded?

20    A     Correct.  There was nobody there I knew

21 of that would have been a valid person to contact.

22    Q     Why is it that you initially marked

23 Epsilon --

24              MR. COSTER:  Objection.

Jay Stuart Rein                                                        08/16/2005

93

1       Q      -- if you recall?

2       A      I don't recall, but I think the

3   important thing to note is I gave permission.

4       Q      Ultimately?

5              MR. COSTER:   Objection.

6       A      Well, this document was filled out and

7   turned in immediately.  I did not take this back,

8   review it or seek anything; I gave permission.

9       Q      Okay.  And do you have an understanding

10  of whether Motorola pursued references from each

11  of those companies?

12      A      I have no knowledge what Motorola did

13  with this information.

14      Q      Okay.  What was the title of the

15  position into which you were hired at Motorola?

16      A      Principal.

17      Q      And what were your roles, what were your

18  duties as principal?

19      A      Going back to my earlier statement,

20  sale, delivery of value-added services and

21  solutions and applications to Motorola customers

22  or clients or new clients.

23      Q      How many people were in the MPS group

24  when you joined the company, when you joined the

Jay Stuart Rein                                              08/16/2005

94

 1   group?

 2        A    I think we had sum total of around 200

 3   plus people.

 4        Q    Did you consider the group to be a

 5   startup?

 6        A    Yes.

 7        Q    When had it been formed?

 8        A    My understanding was it came together as

 9   MPS about three or four months before my joining.

10        Q    And you had worked in startups before?

11        A    I had worked at other companies before.

12        Q    Were any of those considered by you to

13   be startups?

14        A    I will go back to an earlier question.

15   Define startup.  Startup can take different shapes

16   or roles.

17        Q    To the extent that you viewed MPS as a

18   startup.

19        A    I viewed MPS as a new division.

20        Q    Had you worked in new divisions of

21   companies before?

22        A    Yes.

23        Q    Which ones, which companies?

24        A    Logica.

Jay Stuart Rein                                                    08/16/2005

                                                                          95

1        Q    What was the business model of MPS at

2    the time that you joined?

3                 MR. COSTER:  Objection.

4        A    Define business model.

5        Q    Did you have an understanding of how the

6    MPS group was organized at the time that you

7    joined?

8        A    Organized?

9        Q    Yeah.

10       A    From a org chart perspective?

11       Q    Hierarchical sense.

12       A    Yes.

13       Q    And what was your understanding?

14       A    That's a pretty broad question.  Can

15   you --

16       Q    Do you have an understanding of how the

17   MPS group was organized hierarchically?

18                MR. COSTER:  Objection.

19       A    You want me to list the org chart I --

20       Q    Yes.

21       A    Kevin Loosemore was responsible for MPS.

22       Q    Okay.

23       A    Len DeBarros, Americas MPS report

24   underneath Len DeBarros, the principals of

Jay Stuart Rein                                                    08/16/2005

96

1    organization reported to him, of which I was one

2    of.

3         Q    How many others were there?

4         A    I do not know how many there were around

5    the globe.

6         Q    More than five?

7         A    Yes.

8         Q    How many more than five, roughly?

9         A    I don't know.

10             MR. COSTER:  Objection.

11        Q    Aside from DeBarros reporting to

12   Loosemore, do you have an understanding of any

13   other components of the organizational structure

14   of MPS at the time that you joined?

15             MR. COSTER:  Objection.  You can

16   answer.

17        A    I'm not sure I understand.

18        Q    Okay.  Did the organizational structure

19   that you were aware of incorporate any other

20   managers or persons to whom MPS employees were

21   reporting aside from DeBarros and Loosemore?

22        A    I reported to Len DeBarros.

23        Q    Um-hm.

24        A    I'm still not sure of your question.

Jay Stuart Rein                                                    08/16/2005

97

1        Q    Did anyone else considered to be a part

2   of the MPS group report to anyone other than Len

3   DeBarros or Kevin Loosemore?

4             MR. COSTER:  Objection.

5        A    Yes.

6        Q    Who were the persons to whom MPS

7   employees reported aside from Loosemore and

8   DeBarros?

9             MR. COSTER:  Again, objection.

10  Again, if you can answer.

11       A    There was an entire operation in Europe

12  who reported to someone whose name I do not recall

13  who reported -- there was a smaller organization

14  in Asia who reported.  They had a couple people

15  come and go from the office that also reported to

16  Loosemore.  So DeBarros had peers around the world

17  and each of his peers including himself --

18       Q    And the total employee number roughly at

19  that time was 200?

20       A    I don't recall the exact number, but I

21  believe it was in the 200 range.

22       Q    And that covered regions including the

23  Americas, Europe, and Asia?

24       A    Worldwide MPS.

Jay Stuart Rein

08/16/2005

98

1    Q    Did your role ever change during the

2    tenure of your employment with Motorola?

3              MR. COSTER:  Objection.  You can

4    answer if you understand.

5    A    I -- my responsibilities remained the

6    same.

7    Q    Okay.  And did you hold any other

8    position aside from principal during your tenure

9    at Motorola?

10   A    No.

11   Q    What was your base compensation when you

12   started with Motorola?

13   A    It was either 190 or 192 per year.

14   Q    Did you receive any stock or options?

15   A    Yes.

16   Q    What was the nature of those awards or

17   grants?

18   A    There was awards, stock options that

19   were given to me as signing options.

20   Q    Um-hm.

21   A    I do not recall whether they had a four

22   -- three, four, or five years vesting percentages,

23   same thing, strike price so on and then there were

24   subsequent options granted to me over my tenure.

Jay Stuart Rein

08/16/2005

101

1    individuals that made a list.

2        Q    Do you recall the criteria for getting

3    on that list?

4        A    No, I do not.

5        Q    In addition to the base salary and sign-

6    on options that you received when you joined

7    Motorola, did you receive any other bonus

8    eligibility?

9             MR. COSTER:  Objection.

10       A    Did I receive any other bonus?

11       Q    Upon employment with Motorola, were you

12   eligible for bonus?

13       A    Yes.

14       Q    On what basis?

15       A    Performance.

16       Q    Did you learn from Motorola a particular

17   range of bonus to which you could become entitled?

18       A    I believe the range was in the

19   45 percent target.

20       Q    Okay.  Did your salary change over time

21   during the tenure of your employment with

22   Motorola?

23       A    Yes.

24       Q    How did it change?

102

```
 1        A    Upwards.

 2        Q    In what way?

 3        A    There was an increase given to me.  I

 4   don't know the exact percent.

 5        Q    Do you know when?

 6        A    I assume it was after my first year

 7   anniversary or it could have been at the change of

 8   calendar from '02 to '03.  I can't recall the

 9   exact time.

10        Q    Is that the only salary increase you

11   received?

12        A    Yes.

13        Q    Aside from the incentive bonus that you

14   described, did you receive any other bonus during

15   your tenure at Motorola?

16        A    Yes.

17        Q    When was that?

18        A    I believe it was in January of 2004.

19        Q    What was the value of that bonus?

20        A    $14,000, I believe.

21        Q    Aside from that bonus did you receive

22   any others during your tenure?

23        A    I don't think so.

24        Q    Okay.
```

105

1      to?

2          A     He reported to Chris Galvin.

3          Q     **Who is Chris Galvin?**

4          A     He's the CEO and chairman of the

5      company.

6                    THE STENOGRAPHER:  Can I have a

7      minute?

8                    MS. McGURN:  Sure.

9                    (Off record.)

10         Q     **Did you consider it significant that**

11     **Loosemore, the head of the unit, was reporting in**

12     **to the CEO?**

13         A     It didn't mean anything to me.

14         Q     **Okay.  Did you have an understanding at**

15     **the time that you were interviewing for the**

16     **position or upon -- immediately upon your arrival**

17     **at Motorola that Motorola was trying to turn MPS**

18     **into a sector on par with other business units**

19     **like CGISS?**

20         A     I don't recall.

21         Q     **Did you have an understanding that**

22     **Motorola was trying to elevate its service**

23     **offerings into its own business unit at that time?**

24         A     My understanding is we wanted to make

Jay Stuart Rein

08/16/2005

106

1    professional services a significant business for

2    Motorola.

3         Q    And significant in the sense of separate

4    from any other sector, its own sector?

5         A    No, significance -- the only thing

6    significance meant to us is we were shooting for

7    in three- to four-year period of time a hundred

8    million in revenue to the company.

9         Q    And was developing revenue through

10   services a new idea for Motorola, a new focus?

11        A    I do not know the focus of Motorola for

12   the time prior to my joining them.

13        Q    And you didn't develop an awareness of

14   that during your tenure?

15        A    Don't recall.

16        Q    You mentioned earlier that during the

17   interview process Len DeBarros described that it

18   wanted MPS to be a value-added group.  What did

19   you mean by that, value added?

20        A    What I believe I meant by that is

21   Motorola traditionally sells product in the

22   marketplace.  If the product has the

23   specifications of what the buyer wants and the

24   right price, a sale is made.

Jay Stuart Rein                                                          08/16/2005

107

```
 1              Value added implies there are other

 2    services, expertise, consulting -- consultancies

 3    or others that can be wrapped around that product

 4    to make -- to allow Motorola to be more successful

 5    in the sales process, for Motorola to be more of a

 6    partner to its clients versus a product to its

 7    clients.

 8         Q    And that that process would itself

 9    generate higher revenue for the company?

10         A    Yes.

11              MS. McGURN:  I'm going to mark

12    another document, which will be Exhibit 8.

13              (Document marked as Exhibit No. 8.)

14              (Document exhibited to witness.)

15         Q    Do you recognize the document that we've

16    marked as Exhibit 8?

17         A    Yes.

18         Q    What is it?

19         A    It looks like the confirmation of

20    employment offer from Motorola to me.

21         Q    And is that your signature on the

22    accepted line?

23         A    Yes.

24         Q    And you received this on or about
```

Jay Stuart Rein                                                    08/16/2005

108

1    June 12th and indicated your acceptance of the

2    offer by signing this document?

3         A    Yes.

4         Q    And the document outlines your base

5    salary, sign-on options, and incentive target

6    about which you previously testified?

7         A    Yes.

8              MS. McGURN:  I'm going to mark

9    another document as Exhibit 9.

10             Off the record.

11             (Off record.)

12             (Document marked as Exhibit No. 9.)

13             MS. McGURN:  Back on the record.

14        Q    Directing your attention to the document

15   that we've marked as Exhibit 9, which I'll

16   represent on the record is a series of grants

17   dated respectively July 1st, 2002, September 9th,

18   2002, December 20th, 2002, and May 6, 2003, ask

19   you if you can identify these documents.

20        A    Motorola, Inc. award documents issued to

21   me.

22        Q    Do you recall receiving these documents

23   in the course of your employment at Motorola?

24        A    I think I recall providing these

Jay Stuart Rein                                                    08/16/2005

120

1   of compensation for --

2        A    I had an understanding that I was at the

3   top end of the E-15 compensation scheme.

4        Q    Okay.  And how did you develop that

5   understanding?

6        A    By asking Mr. DeBarros.

7        Q    How did you negotiate -- did you

8   negotiate over that range?

9             MR. COSTER:  Objection.

10       Q    Did you negotiate over your

11  compensation, your base salary?

12       A    We had discussions before I accepted the

13  offer.

14       Q    And what were the nature of those

15  discussions?

16       A    I don't recall.

17       Q    Do you recall how you -- did you

18  initiate discussions regarding salary?

19       A    I -- honestly there was an offer put to

20  me.  I don't know what the nature of the

21  discussions were.  There were discussions between

22  Mr. DeBarros and myself.

23       Q    Okay.  Do you recall whether the salary

24  -- base salary that you were offered changed as a

Jay Stuart Rein

08/16/2005

121

1    result of those discussions?

2        A    I do not believe it did.

3        Q    Did you ever see a job description for

4    your position?

5        A    No.

6        Q    How would you describe your duties as a

7    principal for MPS?

8        A    My duties as a principal for MPS were

9    described to me as multifunction, sell new

10   opportunities in the marketplace, coordinate and

11   deliver the services that are sold, seek out based

12   on that delivery additional opportunities to

13   further permeate an organization.  So one simple

14   way to describe it is one of the program

15   management.

16       Q    Were you assigned to a particular

17   sector?

18       A    When I started the company --

19       Q    Um-hm.

20       A    -- we reported to corporate.  We were

21   not part of a sector.

22       Q    Thank you for the clarification.

23            Were you assigned to a particular

24   industry vertical?

Jay Stuart Rein

08/16/2005

122

```
 1        A    Oh.  No.

 2        Q    Were you assigned to any particular

 3   regions or clients?

 4        A    No.

 5        Q    Did you develop clients on your own in

 6   any particular industry vertical?

 7        A    I developed clients on my own, yes.

 8        Q    Okay.  Did they focus on any particular

 9   industry vertical?

10        A    One was in --

11             MR. COSTER:  Objection, and maybe

12   you understand, I don't know what industry

13   vertical means.

14             MS. McGURN:  Okay.  He seems to be

15   answering the question.

16             MR. COSTER:  If he does -- all

17   right.

18        A    One was in state government, one was

19   developing in the automotive space, and there were

20   a number of existing client opportunities that

21   were already work in process that needed some

22   senior level attention.

23        Q    And what were those works in process?

24        A    Manufacturing.
```

# EXHIBIT A
# PART 3

Jay Stuart Rein                                                    08/16/2005

127

1        Q    Did -- what were the opportunities that

2   you were -- had responsibility for that

3   contributed to the quota goals for the team when

4   they were set in October of '03?

5             MR. COSTER:   Objection.

6        A    That were going to contribute?

7        Q    Right, that you put on the table as

8   contributing to the team goal.

9        A    That were going -- I mean, they couldn't

10  contribute until they were sold --

11       Q    Understood.

12       A    -- and delivered.

13       Q    Right.  And these were prospective

14  opportunities that were on the table?

15       A    Um-hm.

16       Q    Is that true for every member of the

17  team?

18       A    Nobody had any -- at that point in time

19  in October there was no revenue coming in from any

20  of us.

21       Q    Okay.  And what were the opportunities

22  that you put on the table that you thought were

23  going to contribute to the team goal?

24       A    There was an additional opportunity in

Jay Stuart Rein

1    individual performance on those opportunities was

2    not in accordance with those goals that were set

3    that it would affect individuals within the group,

4    not --

5        A    It would affect individuals and the

6    team.  If any one individual didn't perform, since

7    the group is so small, unless another individual

8    was way over-performing, the team would be judged

9    as missing its goals.

10            MS. McGURN:  Can I take a quick

11    break?

12            (Off record.)

13            MS. McGURN:  Sorry about the break.

14            THE WITNESS:  Okay.

15        Q    You mentioned in a prior answer that the

16    group was initially a part of corporate, the MPS

17    group?

18        A    Okay.

19        Q    Is that accurate?

20        A    That was my understanding, yes.

21        Q    And did that change at some point?

22        A    Yes.

23        Q    In what way did it change?

24        A    I believe we now -- at some point in

131

1   time we began to report to the CGISS organization.

2        Q    What was the impact on the group of that

3   change?

4        A    At first?

5        Q    Um-hm.

6        A    I believe there was no impact.

7        Q    Okay.  Was there subsequent impact?

8        A    Well, the group started as 200 people,

9   wound up being five people.  So I would say there

10  was significant impact.

11       Q    Um-hm.  And during what period of time

12  was DeBarros your supervisor?

13       A    From the time I joined the company until

14  the time he left the company.

15       Q    When was that?

16       A    I don't recall when he left, sometime in

17  2003, the middle of 2003.

18       Q    Okay.  How old is Len DeBarros?

19       A    I do not know his age.

20       Q    Did you get along with him?

21       A    Yes, very much.

22       Q    Did you have a good working relationship

23  with him?

24       A    I believe so.

Jay Stuart Rein                                                      08/16/2005

132

1    Q    Do you believe he treated you fairly?

2    A    I have nothing to indicate that he

3    treated me unfairly.

4    Q    Okay.  What was the -- after Len

5    DeBarros left, who became your supervisor?

6    A    We were in a state of flux for some

7    period of time.

8    Q    What do you mean when you say "state of

9    flux"?

10    A    The company was -- MPS was going through

11    some reorg, so we sat for some period without a

12    supervisor.

13    Q    When was that period?

14    A    Immediately following his departure.

15    Q    What were the circumstances of his

16    departure?

17    A    He left for personal reasons.  I don't

18    know the specific details.

19    Q    Do you know if Loosemore remains with

20    the company?

21    A    No, Loosemore does not remain with the

22    company.

23    Q    When did he leave?

24    A    He left sometime early in 2003.

Jay Stuart Rein                                                    08/16/2005

134

1        A    I don't believe so.  We were told,

2   Continue business as usual.

3        Q    Was the impact of that move to end the

4   approach of attempting to develop services as a

5   revenue generator in an independent business unit

6   or sector?

7                  MR. COSTER:  Objection.

8        A    If it was, we were not told.

9        Q    Okay.  And you didn't interpret it to be

10  for that reason?

11       A    No.

12       Q    Okay.  How many people were affected or

13  let go during this reorganization from the MPS

14  group?

15       A    I don't know of any.

16       Q    Okay.  How was the MPS group affected by

17  the reorganization once it was put into CGISS?

18       A    How it was affected from what I

19  observed --

20       Q    Um-hm.

21       A    -- I was not part of the decision-making

22  procession --

23       Q    Right.

24       A    -- what I observed was the team in

Jay Stuart Rein                                           08/16/2005

135

1    Europe -- I don't know -- actually I do not know

2    what happened to the team in Europe.  I do not

3    know what happened to the team in Asia.  The team

4    in the Americas was split between two sectors, one

5    was CGISS -- I don't remember -- and there was

6    another sector that --

7         Q    Has an acronym that nobody recalls?

8         A    There were about 52 or 53 of us

9    remaining in the Americas, 26 of us went to CGISS,

10   another 26 went to --

11        Q    GTSS?

12        A    Yes.  Thank you.

13        Q    And did you -- you indicated that you

14   aren't aware of any people losing their jobs in

15   connection with that reorganization?

16        A    When that reorganization occurred, the

17   people I kept in touch with were the people that

18   went to CGISS --

19        Q    Okay.

20        A    -- that group of 26.  I do not recall

21   any knowledge of anybody getting RIF'd from that

22   group.

23        Q    In that group?

24        A    From that 26.

137

1    Q    Okay.  And were you concerned about the

2  -- MPS group's continued existence at any point in

3  2003?

4    A    I was concerned about the MPS's group's

5  ability to meet its objectives established in

6  2003.

7    Q    And when you say established in 2003,

8  what do you mean?

9    A    Established in October of 2003.

10   Q    Prior to the time period October 2003,

11 between the time of Mr. Loosemore's departure --

12   A    Um-hm.

13   Q    -- and October 2003, were you concerned

14 about M -- the MPS group's continued existence?

15   A    Yes.

16   Q    At what point were you concerned?

17   A    During the time from Mr. DeBarros'

18 departure until a time where we had a home and we

19 had met with the leaders of that new home.

20   Q    And when was that?

21   A    In October of 2003.

22   Q    And who was the leader that you met

23 with?

24   A    Juergen Stark.

Jay Stuart Rein                                                08/16/2005

138

1       Q     Okay.  Did you talk to anyone during

2   that period following Mr. DeBarros's departure and

3   prior to October 2003 about your concerns?

4       A     Anyone...

5       Q     Anyone at all.

6       A     Yes.

7       Q     Did you talk to anyone within the MPS

8   group?

9       A     We talked amongst ourselves plenty, yes.

10      Q     And specifically discussed your

11  concerns?

12      A     Yes.

13      Q     Did other MPS employees express similar

14  concerns?

15      A     Yes.

16      Q     Who were those people?

17      A     The team at that period of time existed

18  of myself --

19      Q     Um-hm.

20      A     -- John Gillardi -- I mean, I could go

21  through -- I mean, Clay Brice, Michael Humpleby,

22  Clyde Kofman, Paul Lanci, and then, you know,

23  there were others, but that was the core team of

24  most senior people --

Jay Stuart Rein                                                    08/16/2005

139

```
 1        Q     Okay.

 2        A     -- within the group.

 3        Q     And of those people, did anyone other

 4   than you express concern about MPS's continued

 5   existence?

 6        A     Yes.

 7        Q     Did each of those people express

 8   concern?

 9        A     I don't know all of their conversations

10   with all the people that --

11        Q     I'm asking about conversations with you.

12        A     Yes.

13        Q     Did each of those people express

14   concerns to you?

15        A     I'm sure they did.

16        Q     Did you discuss those concerns -- your

17   concerns during that time period following

18   DeBarros' departure and October 2003 with anyone

19   aside from your wife outside of Motorola?

20        A     Yes.

21        Q     Who?

22        A     Russell Reynolds.

23        Q     When was that -- when were those

24   conversations or that conversation?
```

Jay Stuart Rein

08/16/2005

140

1    A    I'm sure there was a conversation in and

2    around the time that Mr. DeBarros left.

3    Q    Okay.  And what was the nature of that

4    conversation?

5    A    That Mr. DeBarros had left.

6    Q    Did you initiate that call?

7    A    Yes, I did.

8    Q    Did you say anything other than

9    Mr. DeBarros has left?

10   A    I do not recall the details of the

11   conversation.

12   Q    Did you call to discuss the concerns

13   that you had developed as a result of his

14   departure?

15   A    I called to discuss the current state of

16   the MPS group for which I was recruited to.

17   Q    Were you looking for other opportunities

18   at that time?

19   A    No.

20   Q    What was the purpose for your call?

21   A    To talk to the people that had a piece

22   of the responsibility for placing me there to see

23   if they had a feel for what Motorola's plans were.

24   Q    Okay.  Did they have a feel for what

Jay Stuart Rein

08/16/2005

141

```
1   Motorola's plans were; did they express it to you?
2       A    They did not.
3       Q    Okay.  Do you recall what Russell -- was
4   it Zellner that you were talking to at this time?
5       A    Yes.
6       Q    Do you recall what Zellner said in
7   response to your discussion about Mr. DeBarros'
8   departure?
9       A    No, I do not.
10      Q    Do you recall anything that was said on
11  that call?
12      A    We discussed a number of items.
13      Q    Okay.  Did you discuss anything else
14  pertaining to the concerns that you developed as a
15  result of Mr. DeBarros' departure?
16      A    No.
17      Q    What were the other items that you
18  discussed?
19      A    Discussed other opportunities that they
20  may know of within Motorola or elsewhere.
21      Q    Did they use any other company names?
22      A    Not that I recall.
23      Q    So they didn't identify particular
24  opportunities in that call?
```

Jay Stuart Rein

08/16/2005

143

1   my work prior to coming with CGISS was either with

2   CGISS or BCS or one of the other sectors.

3       Q    But following the March 2003 time frame

4   you were no longer an independent group, you were

5   in fact rolled into the groups with which you had

6   previously worked, particularly CGISS; is that

7   fair?

8                MR. COSTER:  Objection.

9       A    I don't know what independent or not

10  means.  I mean, we were part of Motorola.  We had

11  different reporting on an org chart.  You know, I

12  don't know the rationale why.

13      Q    Okay.  And you didn't detect a change in

14  the business model at that time of that

15  reorganization?

16      A    Mr. DeBarros did not direct us to

17  operate in any different way when we moved into

18  CGISS with him.

19      Q    Aside from Mr. DeBarros' direction,

20  though, did you have an awareness or an

21  understanding of any C-change in the model for the

22  group?

23      A    Any what change?

24      Q    Any type of change, any --

Jay Stuart Rein                                                    08/16/2005

144

```
 1          A    The direction from the senior leader of
 2    the group was business as usual.
 3          Q    Did you have any responsibility for
 4    developing individual or team-oriented goals for
 5    MPS at this time prior to October 2003 but after
 6    Mr. DeBarros departed?
 7          A    No, but -- sorry, prior to 2003 --
 8          Q    October 2003.
 9          A    Right.
10               -- and after he left --
11          Q    Right.
12          A    -- was I responsible for...
13          Q    Developing any business plans either
14    individually or for the group.
15          A    The direction that we were given after
16    DeBarros' departure was keep doing what we're
17    doing until Juergen Stark can get around to paying
18    attention to us.
19          Q    And were there goals in place prior to
20    Mr. DeBarros' departure that you were shooting for
21    as a team and as an individual within MPS?
22          A    I believe there were, but I don't ever
23    believe they were documented.
24          Q    Do you recall what the goals were for
```

Jay Stuart Rein

08/16/2005

145

1    you?

2            MR. COSTER:  Objection.

3        A    There might have been -- there might

4    have been a goal set at the beginning of 2003.  I

5    don't remember how many millions of dollars it

6    was.  I don't remember the specifics.  I know

7    there were discussions with DeBarros.

8        Q    Do you recall whether you hit that goal

9    in 2003?

10       A    As an individual or as a team?

11       Q    Either.  As an individual first.

12       A    As an individual, no.

13       Q    As a team?

14       A    No.

15            MS. McGURN:  Mark another document

16    as Exhibit 10.

17                (Document marked as Exhibit No. 10.)

18                (Document exhibited to witness.)

19       Q    Directing your attention to the document

20    that we've marked as Exhibit 10, I'm going to ask

21    you if you can identify -- strike that.

22            Do you recognize the document?

23       A    I recognize it looking at it.  I don't

24    have any recollection of it without reading it.

Jay Stuart Rein

08/16/2005

146

1     Q    What do you recognize it to be?

2     A    It's multiple communications back and

3  forth between a number of individuals on the MPS

4  team and Tom Niersbach.

5     Q    Who's Tom Niersbach?

6     A    Tom Niersbach was the MPS controller.  I

7  think he was controller, CFO, controller.  He had

8  financial responsibility.

9     Q    Did he act as the leader of the MPS

10  group at any period of time during 2003?

11     A    At some point a couple to a few weeks

12  after DeBarros' departure we were told that he had

13  some level of responsibility for us until Stark

14  became engaged.

15     Q    And did you have an understanding of

16  what that level of responsibility was?

17     A    I had an understanding of what that

18  level of responsibility was based on what he told

19  me.

20     Q    Which was what?

21     A    He did not want the job; he had moved on

22  to another job; there were other things he wanted

23  to do; but he would fill the void until Stark was

24  hired or someone was hired and came up to speed.

Jay Stuart Rein

08/16/2005

147

1     Q     To whom did Niersbach report during this

2  time?

3     A     I do not know.

4     Q     How old was Niersbach?

5     A     I do not know.

6     Q     Did you get along with him?

7     A     Yes, I did.

8     Q     Did you have a good working relationship

9  with him?

10     A     I believe I did.

11     Q     Do you believe he treated you fairly?

12     A     I believe he did.

13     Q     Directing your attention to the middle

14  of the page of Exhibit 10, which is an e-mail from

15  you to Gillardi, Lanci, and Kofman dated July 1st,

16  2003 --

17     A     Um-hm.

18     Q     -- you indicate, "I don't think he gets

19  it.  We cannot continue to operate like this under

20  his guidance."  Do you see that section?

21     A     Yes, I do.

22     Q     And do you see the response from

23  Gillardi just above that --

24     A     Yes.

Jay Stuart Rein

08/16/2005

154

1    DeBarros was primarily developed by DeBarros, so I

2    do not know what his thinking was as to when and

3    how heads would be added and why.

4         Q    Okay.  When you had your discussion with

5    Zellner about DeBarros' departure, did you talk to

6    him about the possibility of your leaving

7    Motorola?

8         A    No, I expressed concern with the future

9    existence of MPS.

10        Q    Were you concerned that MPS might be

11   disbanded?

12        A    Yes.

13        Q    And you discussed that with Zellner?

14        A    I believe so.

15        Q    Did you discuss the possibility that you

16   might resign?

17        A    No.

18        Q    Directing your attention back to the

19   document that we marked as Exhibit 1, and

20   specifically on page 19, second to last paragraph,

21   it says, "In May of 2003 Zellner and Rein had a

22   discussion about the departure of Len DeBarros and

23   its potential impact on Rein's department.  Rein

24   and Zellner discuss the possibility of Russell

Jay Stuart Rein

08/16/2005

155

1    Reynolds helping Rein find another position should

2    the MPS group disband or should Rein resign."

3              Is it your testimony that you didn't

4    discuss the possibility of resigning?

5        A    I did not discuss the possibility of

6    resigning.  The discussion with Zellner was about

7    Zellner could not help me to find another job

8    unless the group was disbanded or should I resign,

9    because that would be considered poaching if he

10   helped me find another job after he placed me

11   within the company.

12       Q    Did you agree to contact him if the

13   group was disbanded or you ultimately decided to

14   resign?

15       A    That conversation was left I believe

16   along the lines of if Motorola no longer had a

17   position for me, the group was completely

18   disbanded and the role was wiped out, or I

19   resigned on my own, that I should definitely

20   contact him.

21       Q    Okay.  Directing your attention back to

22   the document that we marked as Exhibit 10, are

23   these e-mails that you sent from your Motorola

24   networked computer and received from that same

Jay Stuart Rein

08/16/2005

158

1    where we were adrift within CGISS.  So it was us

2    without a supervisor, and then Niersbach I believe

3    had some reporting responsibility, and then Stark

4    was hired.

5         Q    When was Stark hired?

6         A    I don't know exactly when.

7         Q    When did you become aware that he would

8    take responsibility for the group?

9         A    There was an announcement that went out

10   sometime in August of 2003.

11        Q    Did you at that time after August of

12   2003 report directly to Stark?

13        A    Yes.

14        Q    During what period of time did you

15   report to him?

16        A    We were told we had reporting

17   responsibility to him when he joined, and we were

18   told, Continue business as usual until he had time

19   to focus on us as the team.

20        Q    Did he have other teams for which he

21   assumed responsibility when he was hired in

22   August?

23        A    I believe he did.

24        Q    And what were those other teams?

# EXHIBIT A
# PART 4

159

1      A    I don't know all the other teams he had

2    responsibility for.

3      Q    Do you know any of them?

4      A    ISD.   That's the big one that I know of.

5      Q    And when you say big one, what do you

6    mean?

7      A    That took up a majority of his time.

8      Q    How big is that division?

9      A    I do not know.

10      Q    Bigger than MPS?

11      A    Yes.

12          MR. COSTER:   Can we take a five- or

13    ten-minute break?

14          MS. McGURN:   Sure.

15          (Off record at 2:19 p.m.)

16          (Back on the record at 2:48 p.m.)

17          MS. McGURN:   Back on.

18      Q    During your -- the period during which

19    you directly reported to Stark, did you have

20    dealings with him yourself?

21      A    Yes.

22      Q    What were the nature of those dealings?

23      A    There was one meeting in particular that

24    I recall regarding the ExpressLink opportunity.

Jay Stuart Rein                                                08/16/2005

169

1      Q      What is the first such statement that he

2   made?

3      A      On or around February 23rd in a meeting

4   with him to discuss the actions to terminate me

5   from Motorola, I asked him how he could terminate

6   an employee with a solid track record, solid

7   performance reviews relative to his peers, someone

8   that doesn't have any negative comments in his

9   performance file, virtual or hard or whatever it

10  would be, and he made a comment after that that

11  didn't seem fair.

12     Q      What was his comment?

13     A      "If you would like, I can create a file

14  that says bad things about your performance and

15  then we'll have what we need."

16     Q      Did he?

17     A      I do not know if he did or not create

18  those files.

19     Q      Are there any other statements that

20  you're referring to?

21     A      In that meeting, no.

22     Q      Are there any other meetings?

23     A      Yes.

24     Q      What was the next such meeting?

Jay Stuart Rein                                              08/16/2005

170

 1        A    He called my house on or around

 2   March 18th asking me why I had not signed the

 3   waiver and accepted the severance package.  He

 4   also indicated that he got a sense that I might be

 5   challenging the system.  He warned me that I would

 6   be burning bridges, and he indicated to me that if

 7   I retained counsel on this matter, he would hire

 8   an army of lawyers to come after me and a handful

 9   of HR people, and he would take all severance

10   packages off of the table and make nothing

11   available to me.

12        Q    You said that he indicated that to you.

13   I'm interested in what he said.  What words did he

14   use?

15        A    Those were his words exactly.

16        Q    Do you recall any other words that he

17   used during the 3/18 teleconference?

18        A    Actually, I do.  At the beginning of the

19   conference when I picked up the phone he asked

20   that the conference be considered off the record

21   and he didn't want the conversation to be

22   repeated.  My response to him was, I can't do

23   anything off the record because I don't know the

24   topic; tell me what it's about and we'll discuss.

Jay Stuart Rein                                                    08/16/2005

171

1    He said, I do not want to have a conversation that

2    will be repeated and come back to me.  I said,

3    Then let's end the conversation and not have it.

4    He did proceed into the conversation that I

5    previously described for you even though I said

6    the conversation would not be considered off the

7    record from my perspective.

8         Q    Did he say anything else during that

9    call?

10        A    No.

11        Q    What else did you say during that call?

12        A    I asked him if he was calling me because

13   he wanted to negotiate.  He indicated he was

14   calling me to tell me he thought it was bad

15   business judgment on my part to be challenging the

16   severance that was offered to me.

17        Q    Did he tell you why he thought it was

18   bad business judgment?

19        A    Because he said I would be burning

20   bridges and making many enemies of Motorola if I

21   did.

22        Q    Did you say anything else to him during

23   that call?

24        A    The only thing I asked him is when he

Jay Stuart Rein

08/16/2005

172

1   said he wanted to offer some advice, you know,

2   don't burn the bridges and so on, I asked him the

3   question of why I should accept his words as ones

4   that were seemingly coming from someone who was

5   trying to act like a mentor or a friend when I had

6   virtually, you know, little -- when I had very

7   little interaction with him, why was he calling me

8   at home to offer this advice up where we didn't

9   have a relationship that -- that drove that kind

10  of discussion.  The call also occurred around 8:30

11  at night on that evening, so it was off business

12  hours, but he was calling as Juergen Stark, the

13  Vice President of Motorola.

14      Q    Did you say anything else to him during

15  that call?

16      A    No.

17      Q    Do you recall anything else about the

18  2/23 conversation?

19      A    Yes.

20      Q    What else do you recall about that

21  conversation?

22      A    We spent about an hour together and

23  after -- at the close of the conversation he asked

24  me to not leave town.  He said, Please stick

173

1    around.  Let me do some investigating.  Let me do

2    some talking to some people.  Let me call your

3    peers if you say your peers are in support of you.

4    If you say what you -- you know, that this is

5    wrong, let me do some research.  Please don't

6    leave town.  Go back to the hotel, call my

7    assistant in the morning, and schedule an

8    afternoon meeting with me.  Let's come back

9    together on this before you leave.  Do not leave

10   town.

11        Q    Did you take that advice?

12        A    Yes, I did.

13        Q    Did you identify -- or did he identify

14   peers that he expressed to you he would contact in

15   the interim?

16        A    He asked me who he should contact.

17        Q    Who did you mention?

18        A    I indicated he could contact John

19   Gillardi, Clay Brice, Chuck Roarck, R-O-A-R-C-K,

20   maybe, but I said pick up the phone and call my

21   clients, call LA Safe, talk to people that know me

22   out on the street.

23        Q    And what was he seeking to learn?

24        A    Who Jay Rein was to the organization,

Jay Stuart Rein

08/16/2005

179

1    company with 30 people and very little revenue to

2    running an organization with hundreds of people.

3         Q    Okay.  Did the group discuss anything

4    else about bringing him on board in August?

5         A    That was pretty much it.

6         Q    Okay.

7         A    And we didn't see him from August till

8    October.

9         Q    Right.  And you understood that the

10   majority of his time was being spent on ISD at the

11   outset?

12        A    As he indicated to us when he introduced

13   himself to us.

14        Q    Did you have discussions with anyone at

15   Russell Reynolds regarding the company's decision

16   to bring him on board?

17        A    I don't believe so.

18        Q    Did you have any discussions with

19   Russell Reynolds in the October 2003 time frame

20   when you were preparing business plans for him?

21        A    I don't think so, no.

22        Q    Did you tell anybody at -- strike that.

23             Did you tell Kofman about your prior

24   discussions with Zellner following DeBarros'

Jay Stuart Rein                                                    08/16/2005

180

 1    departure?

 2         A    I don't believe so.

 3         Q    Did you tell anybody in the MPS group

 4    about those discussions with Zellner following

 5    DeBarros' --

 6         A    I don't know.  I can't recall.

 7         Q    Aside from discussions with Zellner

 8    about MPS reorgs, did you have any discussions

 9    with anyone else at Russell Reynolds regarding

10    reorgs at MPS?

11         A    Yes.

12         Q    With whom?

13         A    Tim Henn.

14         Q    When were those discussions?

15         A    He called me end of January, early

16    February, I don't recall when.

17         Q    What year?

18         A    '04.

19         Q    What was the purpose for his call?

20         A    He initiated the call.

21         Q    Um-hm.

22         A    What was told to me was Russell Reynolds

23    was having a meeting with Motorola to review the

24    past couple of years of activity.  They were -- he

184

1    Q    And it was -- and the changes were not

2    positive changes, were they?

3    A    Correct.

4    Q    Did you discuss with him during that

5    call any intention of leaving Motorola?

6    A    No.

7    Q    Do you recall anything else about that

8    conversation?

9    A    No.  It was about a four-minute

10   conversation.

11   Q    Okay.  You mentioned that he indicated

12   he'd get back to you.  Did he?

13   A    No, he did not.

14   Q    Did you follow up with him?

15   A    Yes, I did.

16   Q    And when was that?

17   A    It was after my termination with the

18   company.

19   Q    Okay.  How long after your termination

20   with the company did you follow up with Henn?

21   A    Immediately upon my termination with the

22   company I tried reaching out both to Henn and

23   Zellner.

24   Q    What do you mean you tried reaching out?

185

```
 1        A      Picked up the phone and called them.

 2        Q      Okay.  Did you reach Henn?

 3        A      No, I did not.

 4        Q      Did you leave a message?

 5        A      Yes, I did.

 6        Q      Did you reach Zellner?

 7        A      No, I did not.

 8        Q      Did you leave a message?

 9        A      Yes, I did.

10        Q      Did Henn return your message?

11        A      About three or four weeks later I did

12   get a call back from him.

13        Q      What did you say in your message to Henn

14   when you initially left it?

15        A      The discussion was about the fact that I

16   had been terminated.

17        Q      Okay.  Let me just be sure that we're

18   clear on the record.  I'm asking you what was the

19   message that you left for him initially?

20        A      Following up with him based on the

21   conversation that we had a number of weeks back,

22   and also to let him know that my status in

23   Motorola is changing, please give me a call.

24        Q      Okay.  And then in the three or four
```

186

1    weeks later when Henn followed up with you, what

2    was said during that call?

3        A    He mentioned a couple of other

4    opportunities within Motorola that he was working

5    on or getting ready to be working on based on some

6    people -- some senior folks he had placed.  He

7    thought those might be of interest and indicated

8    that he would also keep an eye out for me for

9    other opportunities that Russell Reynolds might

10   engage in.

11       Q    Did he mention any particular company

12   names?

13       A    At that point he did not.

14       Q    Did he at any point?

15       A    I don't believe so.

16       Q    And the other opportunities -- he said

17   he was getting ready with opportunities within

18   Motorola.  Did he tell you that he had any ready

19   opportunities?

20       A    No, he did not.

21       Q    What was the -- do you recall anything

22   else about that conversation?

23       A    No.

24       Q    What did you say in response to Henn

Jay Stuart Rein                                                    08/16/2005

189

1     for that group?

2          A     Shared responsibility, yes.

3          Q     With whom?

4          A     Kofman, Gillardi, Lanci.

5          Q     When did those efforts commence?

6          A     There was work put forward for a

7     presentation to Stark that was to occur.  It

8     occurred on either October 13 or 14 of '03.

9          Q     What was your contribution to that

10    presentation?

11         A     Very little.

12         Q     Do you recall having any contribution?

13         A     I tried having a lot of contribution.

14         Q     What do you mean by that?

15         A     I was overridden by Kofman.

16         Q     Okay.

17         A     The preparation that went forward on

18    October 14th was primarily crafted by Kofman and

19    nearly a hundred percent presented to Stark by

20    Kofman.

21         Q     I still haven't gotten an answer to the

22    question of what your contribution was to the

23    presentation, even if it was very little.  Was

24    there any?

Jay Stuart Rein                                                08/16/2005

193

1              MS. McGURN:   Sure.

2              (Off record.)

3         Q    Did you perceive Kofman's presence in

4    Schaumburg to be a benefit to the MPS group

5    because of his visibility to Juergen and,

6    therefore, the group's visibility through him?

7              MR. COSTER:   Objection.

8         A    At what point in time?

9         Q    Between the August through October time

10   period.

11        A    No.

12        Q    Did you perceive that at any point in

13   time prior to your termination?

14        A    Around the -- after the second

15   interaction with Juergen in October, yes, I did

16   for a brief period of time.

17        Q    What do you mean for a brief period of

18   time?

19        A    We had decided as a team that because of

20   Clyde's proximity to Juergen Stark that it could

21   benefit the group as we moved into 2004.

22        Q    And so you agreed as a result of that

23   proximity as a member of the group to put Clyde

24   forward as the leader of the group?

194

1                    MR. COSTER:  Objection.

2        A     Clyde was a peer of mine, so we -- I

3   could not promote him as the leader of the

4   group --

5        Q     Understood.  But --

6        A     -- but he could lead our team's

7   initiatives based on his proximity, and Stark

8   preferred someone local to Schaumburg versus not,

9   and Stark preferred someone from internal versus

10  going to look outside.

11       Q     Okay.

12       A     So there was only one answer that Stark

13  left us with at the end of the second meeting.

14       Q     Okay.  And that answer was that Clyde --

15  the group supported Clyde to lead the group's

16  initiatives --

17                   MR. COSTER:  Objection.

18       Q     -- is that fair?

19       A     The group supported Clyde to lead the

20  team.

21       Q     Okay.

22                   MS. McGURN:  I'll mark another

23  document as Exhibit 11.

24                   (Document marked as Exhibit No. 11.)

Jay Stuart Rein

08/16/2005

219

 1    presentation that I spoke to.

 2         Q    Do you recall what pieces those were?

 3         A    No, I do not.

 4         Q    What percentage of the meeting was

 5    occupied by the presentation made to Stark, was

 6    taken up by that; was 45 minutes of the hour the

 7    PowerPoint presentation?

 8         A    The majority of it.

 9         Q    Okay.  And what did Stark say in

10    response to the presentation?

11         A    He told us the meeting was a very big

12    disappointment; he was very disappointed in what

13    he saw; he would give us a second opportunity to

14    come back later in the week, rethink the business

15    model, rethink the presentation, come to him and

16    represent.  Based on the presentation he saw, he

17    said he was not willing to move forward, but he

18    was not ready to pull the plug, so please go off,

19    guys, work together and come back and let's

20    revisit this in a few days.

21         Q    Were you concerned at the end of that

22    meeting that he would pull the plug on MPS?

23         A    We all were.

24         Q    Okay.  And you had that concern going in

Jay Stuart Rein

08/16/2005

220

1    to the October 14th meeting, right?

2        A    We all knew that there was a chance that

3    we could come out of the meeting without a stated

4    goal of allowing us to continue forward.

5        Q    Okay.  What did he specifically say

6    about rethinking the business model?

7        A    I don't recall his exact comment.

8    Actually, I don't recall his comments.  He told us

9    there were certain things he needed to have

10   addressed.  I do not recall what those things

11   were.

12       Q    What did you anticipate doing in

13   response to his comments about the business model?

14       A    What we did was we went back to the

15   hotel room for the next two days, and as a team,

16   the presentation was rebuilt.

17       Q    Okay.  Was the business model rebuilt?

18       A    The present -- the whole concept of what

19   we were doing moving forward was re -- I don't

20   know -- we -- we changed nearly the entire

21   presentation to him.  I don't know what percent of

22   the business model changed.

23       Q    Okay.  What do you recall were your

24   contributions to the changes to the presentation

Jay Stuart Rein

08/16/2005

222

1    A    He was -- I was lead presenter.  Like he

2  was lead presenter on the 14th, then everybody

3  else was subordinate to him, I took lead presenter

4  on the 17th and he supported me.

5    Q    Okay.  And you indicated that those

6  meetings also were tense.  Were there arguments

7  during those meetings?

8    A    I believe they were less so than the

9  first go-around.

10    Q    Did the group express collective

11  concerns or individual concerns about whether

12  Stark would pull the plug on the group during the

13  meetings?

14    A    We knew we weren't going to get another

15  chance after the 17th; that if we were not

16  successful with him on the 17th, we were fairly

17  certain the group would probably live until the

18  end of the fiscal year and then be gone.

19    Q    Do you feel that Stark's assessment of

20  the work product on the 14th was a fair one?

21    A    I can't judge whether it was fair or

22  not.  I know he was not satisfied, so we had not

23  met his expectations going in.

24             MS. McGURN:  I think this is an

241

1    the financial losses and the poor project and

2    program management that was occurring upon my

3    arrival.

4         Q    Were you able to sell follow-on

5    services?

6         A    No, we were not.

7         Q    Did you seek to do so?

8         A    They were not interested in dealing with

9    us.  The relationship was trashed before I

10   arrived.  So we were looking for a graceful exit

11   strategy.

12        Q    Did you find one?  Were you able to

13   implement --

14        A    No, we found an exit strategy that

15   worked for both parties, yes.

16        Q    Okay.  Were you able to sell services to

17   ExpressLink?

18        A    I was in the process of selling to

19   ExpressLink upon my termination.

20        Q    What about LA Safe, were you able to

21   sell services to LA Safe?

22        A    Yes.

23        Q    What was the value of those services?

24        A    First project's value was somewhere

Jay Stuart Rein, Vol. 2                          08/26/2005

244

1    with others on that cleanup activity?

2        A    Yes.

3        Q    With whom?

4        A    Eric Abbott.  There was a fellow that

5    sold the engagement from MPS to Boeing.  I do not

6    recall his name right now.

7        Q    Okay.  Do you recall anyone else with

8    whom you worked on that?

9        A    Just the two of them, and Len DeBarros

10   was guiding me on that.

11       Q    What about ExpressLink, did you work

12   with anyone else?

13       A    Clay Brice, John Gillardi participated

14   occasionally in some of the business development

15   activity, and then I do not recall names, but

16   there was a team from Motorola Israel that had

17   technology that would -- went into that multiple

18   million dollar calculation.  So we were working

19   with the folks at Motorola Israel on that

20   opportunity.

21       Q    And was that -- is ExpressLink

22   opportunity similarly dependent on hardware and

23   software sales in addition to consulting services?

24            MR. COSTER:  Objection.  You can

# EXHIBIT A
# PART 5

Jay Stuart Rein, Vol. 2                                  08/26/2005

245

1    answer.

2        A    The goal on all of our opportunities was

3    consulting first, entrench ourselves if we could;

4    that's the value-added.  The hardware and software

5    is where the volume, the big-dollar items start to

6    kick in.

7        Q    Right.  So when you refer to a multiple

8    million dollar opportunity at ExpressLink, are you

9    incorp -- you're incorporating --

10       A    Yes, correct, that was based on hardware

11   and software calculations.

12       Q    And at the time of your termination had

13   ExpressLink committed to making those purchases?

14       A    No.

15       Q    Did you work with anyone else on

16   LA Safe?

17       A    Did I mention Clay Brice?

18       Q    You haven't gotten to -- we hadn't

19   gotten to LA Safe yet.

20       A    Okay.

21       Q    So Clay Brice?

22       A    Clay Brice --

23       Q    Yeah.

24       A    -- worked and John Gillardi participated

Jay Stuart Rein, Vol. 2                               08/26/2005

248

1    regarding travel associated with the UPS

2    opportunities?

3         A     Regarding -- I don't understand the

4    question.

5                    MR. COSTER:  Objection.

6         Q     Do you recall any disputes with Lanci

7    regarding travel arrangements for meetings with

8    UPS?

9                    MR. COSTER:  Objection.

10        A     I -- no, I do not.

11        Q     Okay.  You didn't get along with Clyde

12   Kofman, did you?

13                   MR. COSTER:  Objection.

14        A     I wouldn't state that as a -- I wouldn't

15   respond yes if you're referring to an entire

16   period of time.

17        Q     During what period of time would you

18   characterize yourself as not getting along with

19   him?

20        A     I would say the relationship wasn't

21   optimal during the last six months of my tenure.

22        Q     And by not optimal, what do you mean?

23        A     I'd say we didn't see eye to eye on how

24   our business was evolving.

Jay Stuart Rein, Vol. 2                                08/26/2005

250

1       Q    Okay.  Did they relate only to the

2  nature of how the business was evolving or did

3  they relate to other things as well, differences

4  of opinion?

5       A    Where else would they...

6       Q    I'm asking.

7       A    I had no personal dealings with him, so

8  they would only be reflected in business dealings.

9       Q    Okay.  So during that last six months

10 prior to leaving Motorola, did you think you had a

11 good working relationship with Clyde?

12      A    Prior to being terminated by Motorola I

13 believe that the relationship was not ideal.

14      Q    Okay.  How often did you speak to other

15 members of MPS about that perception?

16           MR. COSTER:  Objection.

17      Q    Strike that.

18           Did you speak to others in MPS about

19 that perception, that your relationship with Clyde

20 was not ideal?

21      A    Others had discussions -- no, I never

22 had discussions that my relationship with Clyde

23 was less than ideal with anybody.

24      Q    You never spoke to anyone in MPS about

252

1    particular point in time.

2         Q    Did you initiate conversations relating

3    to that issue?

4         A    I'm sure I may have initiated some of

5    those conversations.

6         Q    Did you ever complain to anyone in a

7    management role about Kofman?

8                   MR. COSTER:  Objection.

9         A    Not until after my termination.

10        Q    Okay.  So while you continued to be

11   employed by Motorola, you never complained to

12   Stark about Kofman?

13        A    No.

14        Q    And did you complain to anyone in HR

15   about Kofman?

16        A    Not until after my termination.

17        Q    Okay.  Did you believe -- prior to your

18   termination did you believe that Kofman had

19   treated you fairly?

20        A    Prior to my termination?

21        Q    Um-hm.

22        A    Yes.

23        Q    Okay.  After the October meetings that

24   you've described, did you look for work outside

253

1    Motorola?

2         A    No.

3         Q    When did you start looking for work

4    outside Motorola?

5         A    I did not start looking for work outside

6    of Motorola until after my termination.

7         Q    Okay.  Were others in MPS looking for

8    work outside Motorola, to your knowledge, after

9    the October meetings?

10        A    I do not know what the others were

11   involved in.

12        Q    Okay.  You mentioned at the last session

13   that Stark thought the initial October 14th

14   meeting was a big disappointment?

15        A    Um-hm.

16        Q    What did he say specifically that he

17   didn't like about that meeting?

18        A    I think his exact words might have been,

19   I am very disappointed in the time we've just

20   spent together.  This is not the caliber of work

21   and what I expected to hear from this team today,

22   but I am willing to give you another shot.  Get

23   with Helen, who I believe is his assistant, and

24   let's schedule -- if this meeting was on a

258

1       Q      Right.

2       A      -- but if it was after the meeting, I

3    would assume it was the final.

4       Q      Okay.

5       A      If it was before, it could be a draft.

6       Q      Okay.

7       A      But the time stamp is absent.

8       Q      Okay.  Do you recall taking the laboring

9    oar in preparation of the October 17th

10   presentation to Stark?

11      A      I'm sorry, do I recall the...

12      Q      Taking the most responsibility of the

13   team members for purposes of putting together the

14   presentation for the 17th?

15                   MR. COSTER:  Objection.

16      A      It was still a team effort --

17      Q      Okay.

18      A      -- for the 17th.

19      Q      Okay.  Do you recall your contributions

20   to that presentation?

21      A      To the actual presentation to Stark

22   itself, yes, I do.

23      Q      Directing your attention to the document

24   we've marked as Exhibit 17, can you identify your

Jay Stuart Rein, Vol. 2                                   08/26/2005

259

1    contributions in the presentation?

2        A    During the presentation I would say I

3    probably held most of the dialogue direct to Stark

4    during this presentation representing the

5    collaborative effort of the team during those

6    discussions.

7        Q    Okay.  I'm directing your attention to

8    the document and asking you if you can identify

9    content in the document that you recognize as your

10   contribution.

11       A    The content in this document in order to

12   arrive at the table with Stark was blessed in

13   contributions from the entire team.

14       Q    Okay.  Do you recall anything

15   specifically that you contributed that the team

16   then blessed?

17       A    Yes.

18       Q    What was that?

19       A    Some portion of slide 3, a major portion

20   of slide 5.  I contributed content to slide 6, as

21   did everybody else.  The team drafted the content

22   for slide 8, and I'm fairly confident that I

23   created the view represented.  Team contributed

24   content to slide 9, and I'm fairly confident I

Jay Stuart Rein, Vol. 2                           08/26/2005

260

1    contributed the view.  10 and 11 I believe were

2    bullet points we all crafted together as a team.

3    12 is a format of a slide that we carried over

4    from I believe the Len DeBarros days that we

5    recrafted into something for IMS for Mr. Stark.

6    13, I believe I contributed a majority of that.

7    Think Build Manage on page 14 is entirely my

8    framework which I brought to me from prior to

9    joining Motorola, the content surrounding it and

10   the bullet points were developed by us, the cycle

11   is mine.  15 is a collaborative effort underneath

12   the framework of Think Build Manage is mine.  16 I

13   believe was a joint slide.  I believe 17 was

14   crafted by Lanci.  18 was a joint slide, I

15   believe.

16        Q    Is it fair to say in this presentation

17   on the 17th you committed to team and individual

18   goals for the end of 2003 and 2004?

19             MR. COSTER:  Objection.

20        A    There were no individual goals

21   specifically pegged to particular individuals in

22   this presentation, but as a team, we committed and

23   agreed to a group number that would be delivered.

24        Q    Were individual goals ultimately arrived

Jay Stuart Rein, Vol. 2                          08/26/2005

261

1    at?

2        A    Do not recall.

3        Q    Directing your attention to page 2 of

4    the slide presentation, which has a 282 at the

5    bottom of the page --

6        A    Um-hm.

7        Q    -- it indicates that the team will focus

8    on field service mobility in energy and utilities.

9    Did the team decide upon a strategy that would

10   have him focussing in those two industry

11   verticals?

12       A    The energy -- what do we call it --

13   energy and utilities industry vertical was a

14   vertical that was interesting and exciting to the

15   CGISS organization, as their sales force was

16   spending time there.  At that point all we knew or

17   had was the fact that that interest existed, so we

18   listed out the clients in the back of the

19   presentation for the slide that Lanci created as a

20   list of prospects, but I believe at that point in

21   time we may have only had active discussions with

22   one, and we had not fleshed out the plan for how

23   we would do this.

24       Q    Did the issue of fleshing out the plan

267

1    nonmobility?

2         A    The reason it could be there --

3              MR. COSTER:  Don't speculate if you

4    don't know.

5         A    I'm not certain.

6         Q    Okay.  Were there components of the

7    LA Safe opportunity that were nonmobility?

8         A    No.

9         Q    Okay.  Do you view that to be a mistake?

10             MR. COSTER:  Objection.

11        A    No.

12        Q    Okay.  And LA Safe was an opportunity on

13   which you were working at that time?

14        A    With others.

15        Q    Okay.  What does it mean, the line down

16   from there, that the team is going to fully

17   articulate field service mobility offers?

18        A    On page 2 there's a bullet point that

19   has field service mobility as the first bullet

20   point in executive summary.

21        Q    Um-hm.

22        A    That's about as detailed information as

23   we had as the direction that we thought we needed

24   to head as a team.  So to state fully articulate

Jay Stuart Rein, Vol. 2                          08/26/2005

268

1    the field service mobility offering, we had to

2    state what -- what our value proposition was going

3    to be to those clients, why it existed, how we

4    would sell it and over what period of time.

5         Q     Was that --

6         A     Again, it's the plan.

7         Q     Okay.  The plan going forward?

8         A     Correct.

9         Q     Had that been less than fully

10   articulated prior to this?

11        A     This was the most articulate document

12   that we had at this point in time.

13        Q     For the group?

14        A     Yes.

15        Q     Prior to that the group did not have a

16   more articulate manner of expressing its value

17   proposition?

18        A     No, that's not true.

19        Q     Okay.

20        A     For Mr. Stark and what he wanted to do

21   and where we needed to go with him, this was the

22   most articulate document we had.

23        Q     Okay.  And what did you intend to do to

24   fully articulate that offer?

1    you?

2         A    He demonstrated that reaction in two

3    ways.  He told the group that was in the room that

4    he was very pleased with the presentation he just

5    received relative to what he had seen from us a

6    few days earlier.  He also told us that he thought

7    we had a very realistic plan and a good

8    opportunity.  He indicated there were some

9    challenges, that he would like to see progress,

10   and we will revisit progress toward this plan at

11   the end of June of 2004, and he thanked us very

12   much for persisting and coming back to him with

13   something he thought was a far better product than

14   what he had received earlier.  That was No. 1.

15        Q    Okay.

16        A    He left the room.  Before we had packed

17   up our materials and walked out, he came back to

18   the room again, and he sat down and he said, Guys,

19   I'm serious.  I don't want you to be worrying

20   about your jobs.  I don't want you to be worrying

21   about security here.  Go do your job.  Make this

22   happen.  You've got a runway between now and June

23   where you shouldn't have to worry about support of

24   the company.  Make the progress happen, and we'll

274

 1    be -- we'll have a good meeting in June.  So

 2    please don't worry that my -- it was something to

 3    the effect of, Please believe me that I am

 4    serious, you have my support, go make this happen

 5    with my full support, and do not worry about your

 6    jobs.

 7        Q    You indicated that he thought that it

 8    was a far better plan than had been presented on

 9    the 14th.  Was he specific with respect to what he

10    thought was far better about it?

11        A    No, not that I recall.

12        Q    You also mention that he described it as

13.   a realistic plan.  Had he described the plan

14    presented on the 14th as something other than

15    that?

16        A    I don't recall.

17        Q    You mention that he talked about

18    challenges.  What did he say specifically that

19    they were?

20        A    I do not recall.

21        Q    During this presentation on the 17th,

22    you proposed, did you not, that the team would

23    secure six think engagements valued at $150,000

24    each, and 7 million in revenue by the end of 2004?

275

1                 MR. COSTER:  Objection.

2        A    I did not.  The team did.

3        Q    **Okay.  The team proposed those revenue**

4    **targets?**

5        A    Correct.

6        Q    **And those engagement targets?**

7        A    That's what it states.

8        Q    **Were you optimistic that the team could**

9    **meet those numbers?**

10       A    They were aggressive, but that was the

11   plan that we had agreed to.

12       Q    **And Stark told you to go and execute on**

13   **the plan at the end of the meeting, right?**

14       A    Yes.

15                MS. McGURN:  I'll mark another

16   document as Exhibit 18.

17                (Document marked as Exhibit No. 18.)

18                (Document exhibited to witness.)

19                MR. COSTER:  Let me just ask.  I

20   note this document has been stamped confidential.

21   Does that indicate that you want it to fall within

22   the confidentiality order that we previously

23   agreed to, or is that something that Motorola did?

24                MS. McGURN:  It is something -- it

Jay Stuart Rein, Vol. 2

08/26/2005

290

1    no longer associated with the Latin American

2    group?

3        A    Well, we referred to this as 22 FTEs of

4    MPS up top, that evolved into five or six FTEs for

5    IMS, and the Latin America group went to a fellow

6    apparently by the name of Jeff Spathe.

7        Q    And you recall that that happened after

8    October 21st?

9        A    Somewhere around that I believe it did.

10        Q    Do you know if there were reductions in

11    force associated with that move?

12        A    I believe there might have been.

13        Q    Do you know how many?

14        A    No.

15        Q    Do you know any particular individual

16    who was RIF'd in connection with that move?

17        A    I don't know specific individuals.

18        Q    And the same page indicates that a WAN

19    IP group would be headed by Tony Marshall; is that

20    right?

21        A    That's what it says, correct.

22        Q    Do you recall that that occurred after

23    October 21st?

24        A    Yes, I do.

291

1    Q    Was that group distinct from the mission

2    critical network solutions group?

3    A    I -- what is the mission critical

4    network solutions group?

5    Q    Do you recall that a group was formed

6    headed by Paul Lanci that was called NCNS?

7    A    I do not have recollection of that

8    specific NCNS acronym being used.

9    Q    Do you recall that Lanci at or around

10   this time was put in charge of a group?

11   A    Yes.

12   Q    And do you recall the nature of the

13   business of that group?

14   A    It's the WAN IP integration group.

15   Q    Okay.  So notwithstanding the fact that

16   you don't understand the acronym or don't recall

17   the acronym or the name mission critical network

18   solutions, you understood that Paul Lanci was spun

19   off into a separate group?

20   A    Correct.

21   Q    Okay.  And that was part of the WAN IP

22   integration group?

23   A    Yeah, I mean, as it reads here.

24   Q    Okay.  But you don't have any

Jay Stuart Rein, Vol. 2                                    08/26/2005

292

1    independent recollection of where Lanci ended up?

2         A    When they spun off, we no longer

3    operated with them as part of our daily business

4    model.

5         Q    And you lost track of Lanci?

6         A    So I did not continue to keep track.

7         Q    Okay.  Of the five or six -- five MPS

8    employees, IMS employees we'll call them now,

9    remaining on the left margin of this page

10   reporting to Juergen Stark, how many of them were

11   principals?

12        A    Three.

13        Q    Leaving Brice and Humpleby as

14   nonprincipal members of that group?

15        A    Principal was a title.

16        Q    Understood.

17        A    They were key members of the group.

18        Q    Okay.

19        A    Well, principal was the title.

20        Q    Right.

21        A    Three people with the title.

22        Q    Right.

23        A    We were all key members of the group.

24        Q    But they were not principals?

Jay Stuart Rein, Vol. 2

08/26/2005

293

1    A    Principals, correct.

2    Q    Okay.  You indicated, directing your

3  attention back to the October 17th meeting, that

4  Stark left the meeting at some point and then

5  subsequently returned; is that right?

6    A    He left the meeting at the conclusion of

7  the meeting, and he came back within minutes of

8  his departure.

9    Q    Okay.  How many minutes?

10    A    Probably within three to four minutes.

11    Q    Okay.  And during that time did the

12  group carry on discussions about the presentation?

13    A    The group was elated, if I recall, that

14  we had an opportunity to proceed forward within

15  Motorola.

16    Q    Meaning you were elated that the group

17  had survived and was not going to be disbanded; is

18  that right?

19    A    Correct.

20    Q    And how do you know that the group was

21  elated?

22    A    We all -- we were at a table no larger

23  than this table here in the room, and we were able

24  to look each other in the eye and be very excited.

Jay Stuart Rein, Vol. 2

08/26/2005

294

1      Q    Okay.  And you were personally happy

2  that the presentation had gone well and the group

3  was not disbanded?

4      A    I was personally excited.

5      Q    Okay.  And when Stark came back several

6  minutes later, he told you guys to go out and

7  execute on the plan; is that right?

8      A    He told us that I believe the first time

9  he left.

10     Q    Okay.  And he reiterated that when he

11  came back?

12     A    He said, Look, guys, you may have doubts

13  about our seriousness -- my seriousness of keeping

14  you.  I am serious.  I do want you guys to focus

15  on the plan.  Do not worry about existence.  Do

16  not worry about jobs.  We will have to revisit

17  this of course down the line, but stay focussed,

18  generate the results I believe you're all capable

19  of.

20     Q    Okay.  Was it like a pep talk to get you

21  guys to go out and execute on the plan that you

22  just proposed?

23            MR. COSTER:  Objection.

24     A    I don't know if it was a pep talk.

# EXHIBIT A
# PART 6

Jay Stuart Rein, Vol. 2                                    08/26/2005

295

1    Q    Okay.  But he was reflecting that he

2    would understand if you had doubts about his level

3    of commitment?

4    A    I believe, I do not know what he

5    believed, I believe he knew how bad a meeting we

6    had the Tuesday before, he knew we worked very

7    hard to get to that Friday meeting on the 17th,

8    and he wanted to make sure that we knew that he

9    was in support of us as a team.

10   Q    Okay.  But he didn't promise you that

11   you would remain employed by Motorola until

12   June 30th, did he?

13   A    He actually said to us, Do not worry

14   about your employment here.  We will revisit the

15   numbers, the performance, the trends on -- at the

16   end of the second quarter.

17   Q    Okay.  So you expected that there would

18   be a reassessment?

19   A    The reassessment was not to occur until

20   June 30th of 2004.

21   Q    But he told you to go out and execute on

22   the plan?

23   A    Yes.

24   Q    So if you had not executed on the plan

296

1    prior to June 30th, 2004, did you understand that

2    there might be reassessment during that period as

3    well?

4              MR. COSTER:  Objection.

5         A    If we did not execute, of course anybody

6    could reassess, but we were moving forward after

7    October 17th.

8         Q    Okay.  And when he said, Don't worry

9    about your place at Motorola, was he speaking to

10   you personally or was he speaking to the MPS group

11   in terms of its not being disbanded?

12        A    He was speaking to all five of us in the

13   room.

14        Q    Okay.  After he walked out, did you --

15   the five of you in the room continue to discuss

16   his comments?

17        A    I do not believe so.

18        Q    Okay.  You packed up and left?

19        A    No.

20        Q    What happened next?

21        A    We talked about who was going to create

22   the shell for the follow-up discussions.

23        Q    Okay.  And you were selected?

24        A    Yes.

Jay Stuart Rein, Vol. 2                          08/26/2005

297

1    Q    And the follow-up discussions -- strike

2    that.

3              The shell was what we marked as

4    Exhibit 18?

5    A    I believe so.

6    Q    Okay.  Aside from discussing who was

7    going to create the shell for the follow-on

8    discussions with Stark, did the group have any

9    discussions at that time about what steps the

10   group would take to meet the goals set forth in

11   the plan?

12   A    I believe so.

13   Q    What were those discussions?

14   A    I don't recall the specifics of those

15   discussions.

16   Q    What do you recall generally?

17   A    I recall we took away -- we needed to

18   create a document that was going to address

19   Juergen's needs as a result of the meeting on the

20   17th.

21   Q    How did he make those needs known?

22   A    He probably stated them to us in the

23   meeting.

24   Q    Okay.  And as a result of him -- do you

Jay Stuart Rein, Vol. 2                                    08/26/2005

298

1    recall what he stated?

2         A    I do not.

3         Q    Okay.  But as a result of whatever he

4    stated, you created the shell that is

5    Exhibit 18 --

6         A    Correct.

7         Q    -- in response to whatever it was that

8    he stated?

9         A    I assume so.

10        Q    Okay.  Aside from creating the shell,

11   though, and responding to whatever it was that

12   Stark indicated at the 17th meeting that he

13   needed, did the group talk in any other way about

14   what steps the group would take to meet the goals

15   set forth in the plan?

16        A    If I look at this document on page 2, it

17   says --

18        Q    This document is Exhibit 19?

19        A    Exhibit 19.

20             -- it says at the conclusion of our

21   meeting with Juergen Stark on October 17th there

22   were three items which were requested of the team.

23   So in reading this now, the assumption is these

24   were requested of the team by Stark, and then you

Jay Stuart Rein, Vol. 2                                    08/26/2005

304

1    that you might not meet the goals that were set

2    forth in the October 17th presentation?

3         A    We were setting forward expectations

4    with management as to the upside potential and

5    downside risk of the group, and we were doing this

6    immediately post the October 17th presentation.

7         Q    Was model two a new concept as compared

8    to the October 17th presentation?

9              MR. COSTER:  Objection.

10        A    My recollection of model two was that if

11   we had additional FTEs in the group we would also

12   have additional potential for greater revenue and

13   additional engagements and break-even earnings.

14        Q    Were you requesting by this component of

15   the presentation that Stark authorize you to take

16   on more heads for the group?

17        A    I believe we were showing Mr. Stark as a

18   team what the spectrum of operating results could

19   be for us based on different head count.

20        Q    Did you have any understanding at that

21   time that he was planning to add heads to the MPS

22   group?

23        A    No, this I believe was a representation

24   if we moved to model two what we might be able to

Jay Stuart Rein, Vol. 2                    08/26/2005

307

1       A      During these specific presentations?

2       Q      **Yeah.**

3       A      No.

4       Q      **Did you discuss that issue with him at**

5  **any time?**

6       A      I don't believe there was a need to

7  discuss additional delivery heads until we had

8  successfully shown him that we could sell.

9       Q      **And you hadn't yet done that?**

10      A      We had sold small engagements that we

11 were able to deliver amongst ourselves but not to

12 this order of magnitude.

13      Q      **Did you view yourself to have sufficient**

14 **delivery support to deliver what was committed to**

15 **in the October presentations?**

16      A      If we were successful --

17             MR. COSTER:  Objection.  Go ahead.

18      A      Think engagements could be primarily

19 delivered amongst ourselves.  Billed engagements

20 by the nature of their size need additional

21 resource.  We had to successfully as a team of

22 five sell the think engagements first.  Then as

23 think engagements evolved to become billed

24 engagements, we would have the ability with the

308

1    business supporting us to go ask for additional

2    delivery heads.

3         Q    Is that what you in fact did?

4         A    We didn't have the engagements sold yet,

5    so we did not do that.

6         Q    Had you done that previously, relied on

7    the business sector to provide assistance with

8    billed engagements?

9         A    Both when we were in corporate and in

10   CGISS.

11        Q    So as a result of these meetings in

12   October with Stark, what did you personally do or

13   set out to do to meet the commitments set forth in

14   the presentations?

15        A    As a team, we coordinated often about

16   top -- about opportunities each of us as

17   individuals and as packs then we were dealing with

18   and we continued to proceed forward.

19        Q    Okay.  I'm asking what you personally

20   did, though.  Aside from your meetings with groups

21   and discussions with the group about these issues,

22   what did you personally do to set out to meet

23   those expectations?

24        A    Personally I was told to continue on

310

1    group about that issue then?

2        A    (Witness nodded.)

3        Q    Yes?

4        A    Yes.

5        Q    Following the October presentations to

6    Stark, did the group discuss any concerns about

7    the pressure to generate additional business and

8    achieve profitability?

9        A    Yes.

10       Q    When was the first such conversation?

11       A    I don't recall when.

12       Q    How many conversations like that did

13   you -- do you recall having?

14       A    There were a number of conversations

15   that occurred.  I don't recall the frequency.

16       Q    With whom?

17       A    Some were in small groups, one-on-ones,

18   some were the entire group on the phone together

19   or in meetings together.

20       Q    How many small group meetings do you

21   recall?

22       A    I have no recollection.

23       Q    How many one-on-one meetings do you

24   recall?

311

1      A     I have no recollection.

2      Q     **With whom did you have these**

3   **discussions?**

4      A     As I said, I know there were times I may

5   have discussed it with Gillardi; then there are

6   times I may have discussed it with Brice; then

7   there were times the three of us may have

8   discussed it; there were times Humpleby may have

9   been with us or I may have had discussion with

10  Humpleby.   There were also times there may have

11  been all five of us together on the phone

12  including Kofman, myself, Gillardi, Brice,

13  Humpleby.

14     Q     **And what were the nature of those**

15  **discussions?**

16     A     That we need to get -- we need to start

17  generating results.  We need to have a succinct

18  plan to generate those results.  That before we

19  knew it June 30th was going to be upon us, and if

20  we did not have significant results to show post

21  October of 2003 to June 30 of '04, we would

22  probably not -- none of us would be happy with the

23  potential consequences of what could occur to the

24  group.

312

1      Q     What did you anticipate those

2   consequences to be?

3      A     As we've discussed in the past, the

4   potential consequences were for a review of the

5   group's performance through June 30th and a

6   decision not to continue the new MPS or the IMS

7   group beyond the June 30 time period.

8      Q     Did you -- when -- when did these

9   conversations begin, if you -- in connection with

10   the October time frame?  How soon after October

11   did they commence?

12      A     I would say the discussions occurred

13   after October and anywhere up to my point of

14   termination.

15      Q     So immediately after the meeting these

16   types of things were discussed, we've got to get

17   going?

18      A     There was a sense of urgency to get

19   going.

20      Q     Okay.  And you also mentioned we need a

21   succinct plan.  What did you mean by that?

22      A     In prior presentations there were long

23   lists of prospective clients, there were lists of

24   existing business development, including LA Safe

1    and others, but as there were only five resources

2    or five FTEs in the group, we needed to quickly

3    figure out what we were going to go after with

4    what resource over what period of time and what

5    results we expected for that effort.  We had to

6    make business decisions.

7        Q    And you recall making those business

8    decisions?

9        A    I'm sure we did, yes.

10        Q    Do you recall it, though?

11        A    Yes.

12        Q    And what were the business decisions

13    along those lines that you recall making with

14    respect to pursuit of particular opportunities?

15                MR. COSTER:  Objection.

16        A    I recall that the group encouraged me to

17    continue forward with ExpressLink and to continue

18    forward with LA Safe.

19        Q    Do you recall anything else about

20    business decisions that the group made with

21    respect to executing on the plan?

22        A    We were going to work with the CGISS

23    group as a team on some energy and utilities

24    opportunities as well.

Jay Stuart Rein, Vol. 2

08/26/2005

316

1    in reliance on what he said?

2          A     I went to work the next day.

3          Q     Okay.  At that time in October of 2003

4    you previously indicated that you were not looking

5    for outside employment?

6          A     That's correct.

7          Q     Okay.  And you didn't have any other job

8    offers at that time, did you?

9          A     Correct.

10         Q     Okay.  And you hadn't told Stark that

11   you were looking for employment outside of

12   Motorola at that time, did you?

13         A     I don't believe so.

14         Q     Okay.  So the comments that he made on

15   October 17th were not in connection with any other

16   offer of employment that you had outside of

17   Motorola, right?

18               MR. COSTER:  Objection.

19         A     I'm not sure I know what you mean.

20         Q     His comments -- he didn't make his

21   comments because he thought you had a job

22   opportunity somewhere else, did he?

23               MR. COSTER:  Objection.

24         A     I don't know exactly what he was

320

1    with prospective clients, and if he was meeting

2    with prospective clients and trying to sell, we

3    did not have much knowledge -- we did not have

4    knowledge of that.

5        Q    Did you ask him to share that

6    information with you?

7        A    Yes.

8        Q    And what was his response?

9        A    I'm working on things within Motorola in

10   Schaumburg that you all don't see and understand.

11       Q    Okay.  Did you have any other

12   discussions along those lines with Kofman about

13   what he was working on?

14       A    Yes.

15       Q    What were the nature of those

16   discussions?

17       A    I do not recall the specific time, but I

18   had a very specific discussion one-on-one with

19   Clyde over the phone where I had indicated to him

20   my concern about the velocity of activity, the

21   volume and velocity of activity towards achieving

22   our goals, and with him as the presumed leader of

23   the group, I was expecting additional guidance and

24   direction from him.  He told me this was not my

321

1    place to question his authority.

2         Q    Had you been questioning his authority?

3         A    I was not questioning his authority.  I

4    was expressing to him my concerns about the volume

5    and velocity of activity to get us to the

6    June 30th date with successful metrics.

7         Q    Were you talking about the volume and

8    velocity of his activity?

9         A    The volume and velocity of the sum total

10   of all of our activity.

11        Q    Because at that time you were concerned

12   that there wasn't enough volume or velocity to

13   meet the goals?

14        A    Correct.

15        Q    And you were looking to him to guide you

16   and give you direction?

17        A    Correct.

18        Q    And you referred to him as the presumed

19   leader.  Is that -- was he in fact appointed the

20   leader by that point?

21        A    Remember we appointed him the leader

22   because of his physical location.

23        Q    I do understand.  I remember.

24        A    Presumed -- use presumed however you

322

1    may.  He was the leader of the group.

2         Q    Okay.  I'm asking you how you used the

3    word presumed because at that time he was in fact

4    the leader.

5         A    Strike the word presumed.  I don't know

6    how I used it.

7         Q    Okay.  Did he say anything else to you

8    aside from asking you not to question his

9    authority?

10        A    Yes.

11        Q    What else did he say?

12        A    He threatened me.

13        Q    In what way did he threaten you?

14        A    I had indicated to him that we needed to

15   get our act together and start cranking up the

16   volume and velocity of activity, and that if under

17   his leadership this didn't start to occur, that I

18   or others in the group might be forced to have a

19   discussion with Stark about maybe we made a

20   mistake in appointing him as the leader of the

21   group.  He then responded with if I choose to do

22   that, then he will take the appropriate actions

23   necessary that he has to as it relates to this

24   group.

Jay Stuart Rein, Vol. 2                                    08/26/2005

323

1      Q      Did you understand what he meant by

2  that?

3      A      He -- my understanding was he would

4  exercise his leadership position to affect my role

5  within the group.

6      Q      What did he say?

7      A      He said if you go to Stark with your

8  issues, then I will go to Stark with my story.

9      Q      Did he say anything else?

10     A      No, that was the end of the

11  conversation.

12     Q      And that was -- is that the language

13  that he used that you perceived to be threatening?

14     A      That is my recollection of it.

15     Q      And your perception of that language was

16  that he would go to Stark with a story about your

17  performance?

18     A      Was that if I went to Stark, he would be

19  right behind me in the door as the leader of the

20  group and tell a story.

21     Q      And did he tell you what that story

22  would be?

23     A      No, we -- the conversation ended at that

24  point.

Jay Stuart Rein, Vol. 2

08/26/2005

324

1    Q    Okay.  Did he indicate that he was --

2    strike that.

3              Did you go to Stark and discuss with

4    him your concerns about volume or velocity under

5    Kofman's leadership?

6    A    No, I did not.

7    Q    Did you discuss this conversation that

8    you had had with Kofman with anyone else?

9    A    I may have.

10    Q    With whom?

11    A    With my wife.

12    Q    Okay.  Anyone else?

13    A    Probably with Gillardi and Brice.

14    Q    Why do you say that?

15    A    I don't recall the specifics but I'm

16    sure I had a conversation about it.

17    Q    When was this conversation?

18    A    These conversations may have been in the

19    December, Jan -- December 2003, January 2004 time

20    frame.

21    Q    After the -- so when you say these

22    conversations, you mean both the conversation in

23    which you were asking Kofman to give you more

24    insight into what he was working on and this

Jay Stuart Rein, Vol. 2

08/26/2005

337

1    that the group in total was headed towards those

2    goals.

3        Q    Why not?

4        A    Again, because of the volume and

5    velocity of activity and leadership being provided

6    to us, I did not feel that we were headed in the

7    right direction to meet the goals for 2004 or

8    intermediate goals by June 30th of '04.

9        Q    Did that cause you to develop concerns

10   that business changes might occur prior to June?

11       A    No, it did not.

12       Q    Did you personally feel that you were

13   meeting your goals to -- that you were on target

14   for meeting your goals for that nine-month period?

15               MR. COSTER:  Objection.

16       A    I personally believe that I was carrying

17   my weight.

18       Q    Did you feel like your goals were being

19   met?

20               MR. COSTER:  Objection.

21       A    I believed I had a potential -- I

22   believed I had a chance of meeting those goals,

23   yes.

24       Q    Did you develop for yourself a set of

Jay Stuart Rein, Vol. 2

08/26/2005

340

```
 1        Q    ISD stands for Integrated Solutions

 2   Division?

 3        A    I believe so.

 4        Q    And what is the relationship between ISD

 5   and IMS?

 6        A    IMS I believe was the new acronym for

 7   what we also referred to as the new MPS.

 8        Q    You previously testified I think that

 9   you continued to refer to yourself as MPS; is that

10   right.

11        A    No.  We were -- we were MPS.

12        Q    Um-hm.

13        A    For some period of time we were the new

14   MPS.

15        Q    Um-hm.

16        A    And then earlier you asked me about IMS,

17   which I believe I confused that with ISD.

18        Q    Okay.  That's what I'm getting at.

19        A    IMS is Integrated Mobility Solutions.

20        Q    Right.

21        A    At one point I believe it was also

22   Innovative Mobility Solutions.

23        Q    Okay.

24        A    We were rebranding ourselves.
```

341

1      Q      Right.

2      A      We no longer wanted to be part of an

3    acronym that seemingly didn't work, which was MPS.

4      Q      Okay.   Thank you.

5              MS. McGURN:  Do you want to take a

6    break for lunch?  I'm about to mark another

7    document.  We can do that or --

8              MR. COSTER:  If you're at a place

9    that makes sense --

10             MS. McGURN:  I'll wait on the

11   exhibit and we'll break for lunch.

12             MR. COSTER:  Okay.

13             MS. McGURN:  Off the record.

14             (Lunch recess taken at 12:10 p.m.)

15             (Exhibits 21-48 were marked.)

16             (Back on the record at 12:50 p.m.)

17             MS. McGURN:  Okay.  Back on the

18   record.

19     Q      I'm going to show you a document that

20   we've marked as Exhibit 21.

21             (Document exhibited to witness.)

22             THE WITNESS:  So this is the --

23             MS. McGURN:  Yeah.

24             THE WITNESS:  We didn't get to --

# EXHIBIT A
# PART 7

Jay Stuart Rein, Vol. 2                          08/26/2005

346

1        Q      Okay.  So is the answer to the question

2    no?

3        A      I had no conversations with anybody.

4        Q      So that's a no?

5        A      I had no conversations with anybody.

6        Q      Were the employees of the MPS group on

7    the sales incentive plan at Motorola in 2003?

8        A      I don't know which plan we finally ended

9    up on at the end of 2003.

10       Q      Were you at any point on the SIP in

11   2003?

12       A      I believe we were SIP in 2004.

13       Q      Okay.

14       A      Sorry.  No, sorry.  In 2002.

15       Q      Okay.

16       A      I know we were SIP in 2002.

17       Q      Okay.  And did you receive any SIP bonus

18   in 2002?

19       A      For 2002 performance, I know I received

20   a bravo bonus.

21       Q      But not an SIP bonus?

22       A      I do not believe I received an SIP bonus

23   nor did anybody in this group.

24       Q      Were the employees in MPS at any point

Jay Stuart Rein, Vol. 2                    08/26/2005

347

1    on the MIP?

2         A    My recollection of conversations was

3    that Kofman wanted us to be on MIP versus SIP.

4         Q    When were those conversations?

5         A    They occurred at numerous times, and I

6    do not recall specific dates, throughout 2003 and

7    into 2004.

8         Q    Okay.  Do you believe that they would

9    have taken place after -- in or after October of

10   2003 or...

11        A    I think there were conversations

12   before --

13        Q    Okay.

14        A    -- and after.

15        Q    Thank you.

16             And what were the substance of those

17   conversations?

18        A    Kofman wanted us to be on MIP.

19        Q    Why?  Did he say why?

20        A    Because the bonus payout -- my

21   understanding of the way Motorola works is the

22   bonus payouts for those who are on MIP are not

23   judged by sales performance; they're based on

24   corporate metrics and goals.  There is very little

Jay Stuart Rein, Vol. 2                                08/26/2005

348

1   influence of sales activity over the MIP payout at

2   the individual level.

3        Q    Did he anticipate that that would -- did

4   he tell you that he anticipated that moving to MIP

5   would result in a higher bonus for the employees

6   in the group?

7        A    No, I believe it would have yielded a

8   lower bonus for the employees in the group, but I

9   don't have a full understanding of all the metrics

10  of MIP.

11       Q    And do you recall specific discussions

12  in which he conveyed that it would result in a

13  lower bonus?

14       A    I do not recall those discussions.

15       Q    Okay.  Did you have an understanding as

16  the year of 2003 closed of whether you would be

17  receiving a bonus of any kind from Motorola for

18  that year?

19       A    I'm sorry, did I have what?

20       Q    At the end of 2003 --

21       A    Yeah.

22       Q    -- did you have an understanding that

23  you would be receiving a bonus from Motorola?

24       A    No, I did not.

Jay Stuart Rein, Vol. 2                                    08/26/2005

349

1        Q     Did you believe that you would not be?

2        A     I believed that I would not be, as I

3   believed none of us would be.

4        Q     Okay.  And did that concern you?

5              MR. COSTER:  Objection.

6        A     A bonus payment is based on effectively

7   an agreement made to meet certain goals and

8   objectives.  The group had not met for the full

9   year goals and objectives previously signed into

10  by Len DeBarros.  So the expectation was we would

11  not be receiving it.

12       Q     Okay.  Did you in fact receive a bonus

13  for 2003?

14       A     I did not receive a bonus for 2003.

15       Q     Did you have an understanding that

16  notwithstanding the fact that the group had not

17  met goals for 2003 Motorola wanted to compensate

18  the group in some way?

19       A     For its performance in 2003?

20       Q     For the 2003 calendar year.

21       A     I did not have that understanding.

22       Q     Aside from the bravo or that you

23  previously testified about, did you receive

24  -- strike that.

350

1          You previously testified that you

2    received a bonus in January of 2004; is that

3    correct?

4         A     Correct.

5         Q     Who notified you that you would be

6    receiving that bonus?

7         A     Kofman did.

8         Q     What did he say?

9         A     That the company has agreed to pay a

10   bonus, and that bonus amount is for $14,000; that

11   was, I guess -- I don't know what other people

12   made.  My assumption is it's based on some

13   calculation.  And we're calling this a retention

14   bonus because the company wants us to remain

15   focussed and excited to continue to strive to

16   achieve our goals in 2004.

17               Another part of the explanation

18   given to me was since other folks in what was then

19   the old MPS for which we were no longer affiliated

20   with were going to be receiving bonus since they

21   were on MIP for 2003, and, again, we want to pay

22   you in 2004 to not be discouraged about the past

23   and to stay focussed on the future.

24        Q     So Kofman used the words "retention

Jay Stuart Rein, Vol. 2                        08/26/2005

351

1    bonus"?

2        A    Yes.

3        Q    Did he -- was anyone else with you

4    during this conversation?

5        A    I don't recall if it was a one-on-one

6    over the phone or if it was to all of us.

7        Q    Okay.  Do you -- you indicated that your

8    bonus was 14,000.  You understood that others

9    received a bonus as well.  Who were those others?

10       A    The others would have been Kofman,

11   Gillardi, Brice, and Humpleby.

12       Q    And you indicated that others in the old

13   MPS also -- strike that.

14            You indicated that others in old MPS

15   were on MIP and, therefore, were compensated in

16   2003?

17       A    My understanding is that is true.

18       Q    Is that what Kofman told you?

19       A    No, I had an understanding by talking

20   with other people about that.

21       Q    Okay.  So going back to the conversation

22   that you had with Kofman, did he tell you that

23   because others from the old MPS on MIP would be

24   receiving a payment that was a reason for paying

Jay Stuart Rein, Vol. 2                                    08/26/2005

352

1    the new MPS group in January of '04 a bonus?

2         A    I recall specific words about they want

3    -- Motorola wants this group to remain focussed

4    through 2004 --

5         Q    Right.  I'm --

6         A    -- and that is reasoning for them to be

7    able to figure out how to give us a retention

8    bonus.

9         Q    But I'm focussed on whether or not

10   Kofman said, or whether you simply had an

11   awareness, that old MPS folks who were on MIP

12   would be -- were being compensated?

13        A    I had an awareness.

14        Q    Okay.  And Kofman did not use those

15   words during that meeting?

16        A    I do not recall.

17        Q    Okay.  So focussing on the meeting, what

18   other words did Kofman use during that meeting to

19   explain that bonus to you?

20        A    That was pretty much it.

21        Q    Okay.  Did you have any discussions with

22   other MPS members regarding the receipt of those

23   bonuses?

24               MR. COSTER:  Objection.

Jay Stuart Rein, Vol. 2                          08/26/2005

357

1      Q      Okay.  Do you recall discussing with

2   Stark the possibility of handing off the

3   ExpressLink opportunity to another Motorola

4   division?

5      A      As I read through this e-mail now,

6   specifically bullet point No. 2, the reason we may

7   have met -- that Clay, Brice, and I may have met

8   with Janiece was that we were at this point in

9   time looking for another group that was interested

10   in continuing this opportunity.

11      Q      Were you looking for opportunities to

12   transition to that group yourself?

13      A      Not specifically, no.

14      Q      Was that a possibility that was under

15   consideration?

16      A      It was not under consideration that I

17   should be going at this point.  My direction was

18   there's a significant amount of financial

19   opportunity for Motorola with ExpressLink.  This

20   may not fit with our goals and objectives, so

21   please work intracompany to find other groups that

22   might be interested, because as good corporate

23   citizens, this is a good Motorola opportunity, it

24   may not be good for IMS, so please help us to

Jay Stuart Rein, Vol. 2                           08/26/2005

358

1    figure this out.

2         Q    And what was your understanding about

3    why it might not fit within the IMS plan?

4         A    Because the direction that we were

5    heading in based on what I recall from looking at

6    documents from October 17th and October 20th and

7    21st was we were to continue to work these warm

8    leads, but there may be an evolving focus for

9    energy and utilities and a continued focus on

10   field service mobility as we discussed a week and

11   a half ago.

12        Q    And this -- and ExpressLink didn't fall

13   into the category of field service mobility or

14   energy utility industry vertical?

15        A    No, this -- this -- this field mobility,

16   field service mobility, is not energy and

17   utilities.

18        Q    Okay.  Did you have any discussions with

19   Kofman or Stark relating to the substance of this

20   e-mail -- of your e-mail following your sending of

21   it?

22        A    I don't recall specific discussions

23   following the clip that goes from February 3rd to

24   the middle of the next page, but apparently there

368

1    opportunities during the week that you took on

2    vacation?

3         A    I was on a cruise ship over that

4    vacation period.

5         Q    Thank you.

6              Following your vacation did you

7    travel to Chicago for business?

8         A    Yes, I did.

9         Q    What was the purpose of the meeting in

10   Chicago?

11        A    Two days before my departure on vacation

12   there were some meetings scheduled with some

13   consultants that had been helping us figure out

14   marketplace direction, and there were other folks

15   from Motorola included.  They wanted to have that

16   meeting with all of us the week of my vacation due

17   to the fact that I was going to be on vacation,

18   and at Kofman's suggestion they scheduled the

19   meeting for I believe 11:00 a.m. on Monday,

20   February 23rd so that I could be a participant in

21   those discussions.

22        Q    During the week that you were working

23   with transitioning ExpressLink to Janiece Webb,

24   did you discuss with her the possibility of you

Jay Stuart Rein, Vol. 2                            08/26/2005

369

1   and/or Clay transitioning to her team?

2       A    I do not recall.

3       Q    Did you discuss that possibility with

4   Clay?

5       A    Don't recall.

6       Q    Did you discuss it with Kofman?

7       A    I don't recall.

8       Q    Were you considering it?

9            MR. COSTER:   Objection.

10      A    I don't recall.

11      Q    Was there any point at which you were

12  considering it prior to your termination?

13      A    I was not considering a move to Janiece

14  Webb's group until February 23rd when I contacted

15  her to set up a meeting to discuss opportunities

16  within her group.

17      Q    Okay.  Did you -- when did you learn

18  that your employment with Motorola had been

19  terminated?

20      A    February 23rd.

21      Q    How did you learn that?

22      A    When I arrived at the airport, I turned

23  on my -- in Illinois I checked voice mail and

24  there were a number of voice mail messages from

Jay Stuart Rein, Vol. 2                        08/26/2005

370

1    Clyde Kofman to call him, so I did.

2        Q    Were you checking voice mail during your

3    vacation?

4        A    No, I was not.

5        Q    Do you recall whether any of those voice

6    mail messages were left during your vacation?

7        A    I recall a time stamp on one that was

8    left on Sunday evening, February 22nd.

9        Q    When was your flight?

10       A    I'm sorry?

11       Q    When was your flight to Chicago?

12       A    It was a 6:00 a.m. or 6:30 a.m. flight

13   on Monday, the 23rd.

14       Q    Okay.  You didn't receive that voice

15   mail before getting on the flight obviously; is

16   that fair?

17       A    I don't recall.

18       Q    When -- how many messages do you recall

19   there being on your voice mail from Kofman?

20       A    I think there were two on my cell phone,

21   and there might have been one on my home office

22   number.

23       Q    Did you call Kofman back?

24       A    I called him on Monday morning at about

Jay Stuart Rein, Vol. 2

08/26/2005

371

1    7:30 a.m. Illinois time, central time.

2        Q    **Did you reach him?**

3        A    Yes, I did.

4        Q    **What did he say?**

5        A    He told me that he has decided to

6    terminate my employment with the company.

7        Q    **Did he say anything else?**

8        A    Yes, he did.

9        Q    **What did he say?**

10       A    He told me there was a financial

11   imbalance in the salaries of the group.  He told

12   me he has made a decision to terminate me.  He

13   told me that he could hire two less-expensive, two

14   younger heads for delivery services that were

15   badly required by the group, and then he told me I

16   should contact Peter Tobin, he gave me his phone

17   number, and that was the end of the conversation.

18       Q    **Did you say anything?**

19       A    I sat there and listened in shock.

20       Q    **Did you say anything?**

21       A    I do not recall.

22       Q    **Do you recall anything else that he said**

23   **during that conversation?**

24       A    Those are the words that I do recall.

Jay Stuart Rein, Vol. 2                              08/26/2005

372

1      Q    You recalled he said he could hire

2  younger employees?

3      A    For the salary imbalance that exists

4  with my salary, he could hire two younger, less-

5  expensive employees.

6      Q    He used the word "younger"?

7      A    Yes, he did.

8      Q    Did you -- what did you do after having

9  this conversation with Kofman?

10     A    Well, I picked up the phone and called

11  Peter Tobin and left a voice message for him since

12  I did not get him live.

13     Q    Had you worked with him previously?

14     A    Never heard the name before previous to

15  this.

16     Q    Okay.  What was your voice mail message

17  to Tobin?

18     A    I do not recall.

19     Q    Do you recall the substance of what you

20  said to him?

21              MR. COSTER:  Objection.  Asked and

22  answered.

23     A    The substance was I was told to call him

24  by Clyde Kofman; I've been terminated by the

373

1    company; he's my next contact.  Please give me a

2    call.  Here's my cell phone number.  I expect that

3    was the substance of my voice mail message to him.

4         Q    What did you do next?

5         A    I called Juergen Stark's office and I

6    spoke to his assistant, and I asked for a meeting

7    with him as soon as possible on his schedule.

8         Q    What did she say?

9         A    She scheduled me for a meeting that I

10   believe then occurred around 4:00 that same day.

11        Q    And was that the meeting that you

12   previously testified about in which you met with

13   Stark and asked him to speak to your colleagues?

14        A    That was the meeting that I had with him

15   on February 23rd at 4:00.

16        Q    Did you talk to anyone else regarding

17   the phone call that you had received -- the phone

18   conversation that you had with Kofman?

19        A    Yes, I did.

20        Q    Who was that?

21        A    John Gillardi and Clay Brice.

22        Q    Were you with them in person?

23        A    Yes, I was.

24        Q    Were you at the airport with them?

377

1    daughter to get it, didn't receive anything, and I

2    believe I sent him an e-mail expressing my concern

3    of what he had -- what he was demonstrating to my

4    daughter about payment for those cookies.

5         Q    Do you recall any other communications

6    with him following your termination?

7         A    No, I do not.

8         Q    Did you tell Gillardi and Brice -- or

9    strike that.

10              Did Gillardi or Brice ask you the

11   reason that you were terminated?

12        A    Yes, they did.

13        Q    And what did you say?

14        A    I told them I was told it was because of

15   a financial imbalance in the salaries of the

16   members of the group.

17        Q    Did you say anything else?

18        A    That's -- that's the general nature of

19   what I can recall.

20        Q    Okay.  Did you tell them anything about

21   Kofman hiring younger employees?

22        A    I do not recall.

23        Q    Did you tell them that you thought your

24   termination was motivated by age bias?

378

1      A    I -- again, I was spinning.  I do not

2   recall --

3      Q    Okay.

4      A    -- what I said to them at that point.

5      Q    Did you tell Kofman during the

6   conversation you had with him that you thought

7   your termination was unlawful?

8      A    I told him that I was going to contact

9   Juergen and pursue this; that I did not think this

10  was fair and appropriate.

11     Q    Okay.  So you recall a response to

12  Kofman?

13     A    There may have been something, yes.

14     Q    Okay.  And what you recall about your

15  response was that you were going to follow up with

16  Stark?

17     A    I recall following up with Stark, and

18  there may have been something mentioned about I'm

19  going to follow up.

20     Q    Okay.

21     A    I don't recall -- in a situation like

22  that, there's thoughts running through your mind

23  and there's words that are said, and I -- you

24  know, at that point in time and even now I'm not

379

sure which was which.

     Q    How are you sure about Kofman's words during that conversation?

     A    Because I do --

         MR. COSTER:  Objection.

     A    I can be uncertain about my thoughts, but I know what I heard there.

     Q    Okay.

     A    And I also wrote them down I believe and had them on a piece of paper in front of me as I recounted his exact words to Stark that night at 4:00 in his office.

     Q    Have you produced those notes in connection with this litigation?

     A    I did not save that piece of paper.

     Q    Did you take notes of any other conversation that you had relating to your termination from Motorola?

     A    I don't believe so.

     Q    Did you have those notes with you when you met with Stark?

     A    I may have.

     Q    Did you show them to him?

     A    I don't think so.

380

```
 1        Q     Where were those notes taken?  On

 2   what -- did you take them on a calendar?

 3        A     No.

 4        Q     Piece of paper?

 5        A     Probably a straight piece of paper.

 6        Q     You mentioned that following your 4:00

 7   p.m. meeting with Stark on the 23rd you had a

 8   subsequent meeting with him relating to your

 9   termination; is that right?

10        A     Yes.

11        Q     And that meeting was on the 24th?

12        A     Yes.

13        Q     And during that meeting Stark told you

14   that he intended to support his manager's

15   personnel decision; is that right?

16        A     My recollection is he told me he was not

17   going to question the decisions of his managers.

18        Q     Okay.  Do you -- did Stark tell you that

19   he thought that Kofman had made the wrong

20   decision?

21        A     He did not indicate whether the decision

22   was right or wrong.  He merely indicated he would

23   not question it.

24        Q     But he indicated to you that he was --
```

# EXHIBIT A
# PART 8

381

1    the reason for that follow-up meeting was to

2    permit Stark to, as you requested, do some

3    investigating about who Jay Rein was to the

4    organization; is that right?

5        A    He had asked me for the names of people

6    to contact so he could do some discovery, if we

7    can use that word, about what was going on.

8        Q    Okay.  And -- but you indicated

9    previously that you don't know who he spoke to

10   during that time period?

11       A    I don't know who he spoke to.

12       Q    Okay.  Did you ever tell anyone that

13   your -- that the decision -- your decision to

14   leave Motorola was a mutual one?

15       A    I'm sorry?

16       Q    Did you ever tell anyone outside of

17   Motorola -- strike that.

18            Did you ever tell anyone that your

19   decision to leave Motorola was a mutual decision?

20       A    No.

21            (Document exhibited to witness.)

22       Q    Can you identify the document that we've

23   marked as Exhibit 24?

24       A    It's a memo from me to Amit Bir, follow

383

1    I'm trying not to be disruptive.  I am trying to

2    be professional and allow people to get on with

3    their lives as I wind up moving to something else.

4        Q    Okay.

5        A    This doesn't mean I agreed to the

6    mutuality of the departure.  It means I'm trying

7    to be respectful of the remaining Motorola

8    employees.

9        Q    Like who?

10       A    Like Amit.

11       Q    Okay.  Did you talk to Stark about the

12   financial imbalance that Kofman described?

13       A    Yes, I did.

14       Q    When was that?

15       A    February 23rd.

16       Q    Okay.  And what did he respond with

17   respect to that issue?

18       A    I recall there was some conversation

19   where I mentioned to him my salary.  I also

20   mentioned to him what I believed Kofman's salary

21   was.  And I indicated to him if there is any

22   financial imbalance because of salary levels in

23   the group it's not necessarily being generated by

24   my head versus another head in the group.

384

1    Q    Meaning Kofman?

2    A    Correct.

3    Q    What did he reply?

4    A    His comment to me was, I don't know how

5    Clyde got that salary, that all happened before I

6    came here, and over time something will be worked

7    out.

8    Q    What did you take that to mean?

9    A    I didn't take it to mean anything.

10         MR. COSTER:  Objection.

11   Q    Okay.  How did you become aware of

12   Kofman's salary?

13   A    I think he may have told us in a meeting

14   sometime in 2002 when we had joined.

15   Q    Who's we?

16   A    I believe there may have been -- when we

17   were a group, it might have been Gillardi, Brice,

18   myself, and Clyde at a dinner sometime early on in

19   our careers.

20   Q    But at the time you had this

21   conversation with Stark you didn't then know what

22   Kofman's current salary was, did you?

23         MR. COSTER:  Objection.

24   A    I knew what Clyde's salary was from when

389

1       Q    Describe Motorola's system of

2   performance reviews.

3       A    I don't have detailed knowledge of the

4   system of performance reviews.

5       Q    What was your experience?

6       A    My experience was it was a system

7   managed electronically.  It was a system to which

8   I as the employee went in, put input as to what I

9   had done, maybe input as to how I think my

10  performance was, and then my supervisor went in

11  and made their comments, then there was an active

12  discussion and dialogue about it.  There were

13  changes that may or may not be made based on that

14  discussion, and then there's an electronic

15  approval and signature process that occurs.

16      Q    Okay.

17      A    There's also another process of

18  gathering input outside of the process

19  electronically -- I don't recall the name of the

20  system -- where as long as more than three people

21  respond to the input you see the results of that

22  but you cannot see who submitted their input to

23  it, and that data can be presented to the manager

24  doing the review for the benefit of the review

390

1    process.

2        Q    Do you know if that latter process is

3    called an RPA?

4        A    No, it is not called an RPA.

5        Q    Do you know the name of that process?

6        A    I do not.

7        Q    Do you know if that process is called --

8        A    It's got the word leadership in it;

9    that's all I know.

10       Q    Okay.  We'll get to it.

11            Did it -- it had a peer review

12   component to it?

13       A    Yes.

14       Q    Were those performance reviews in your

15   experience signed off on or approved as you've

16   described it in Q1 of the year following the

17   calendar year that was being reviewed?

18            MR. COSTER:  Objection.

19       A    I don't recall.

20       Q    Okay.  How many times were you reviewed

21   during your tenure at Motorola?

22       A    I had a review for 2002 performance.  I

23   had a review for 2003 performance.  I believe

24   there are also quarterly or semiannually

Jay Stuart Rein, Vol. 2                          08/26/2005

402

1            MR. COSTER:   -- a year apart.

2            MS. McGURN:   That's fair.  Let me

3    state on the record that I marked Exhibit 25

4    containing a series of documents, one being the

5    2002 review and the next being 2003 review.  Thank

6    you for clarification.

7            MR. COSTER:  And do you want him to

8    go through both of those now?

9            MS. McGURN:  No, I don't think it's

10   necessary.  I think once we get the form down --

11           MR. COSTER:  Okay.

12           MS. McGURN:  -- it will be clear

13   with respect to both.

14       A    Now, in behaviors, envision, edge,

15   energize, boldness, ethics, I believe these are

16   company --

17       Q    **Right.**

18       A    -- desired behaviors --

19       Q    **Right.**

20       A    -- to which we are supposed to put in

21   our description of how we met those behaviors.

22       Q    **Okay.**

23       A    So I believe I entered the description.

24       Q    **Okay.**

406

1    of a principal-led business model, Jay needs to

2    demonstrate these in the 2003 plan year.

3              Did you agree or disagree with Len's

4    comment there?

5        A    I have to read the entire paragraph to

6    understand the context of his comment.

7              MR. COSTER:  I'm sorry, what page

8    are we on?

9              MS. McGURN:  Page 8.

10             MR. COSTER:  And where are we on

11   page 8?

12             MS. McGURN:  Second to last line.

13             MR. COSTER:  Okay.  Thank you.

14       Q    And the question, just so you have it in

15   mind while you read, is did you agree or disagree

16   with his comment.

17       A    I agreed with it.

18       Q    Okay.  Turning your attention to

19   page 10, did you agree with the manager's comments

20   at the top of the page that Jay needs to improve

21   executing to the sales plan and envision the sales

22   forecast; these will be key targets to meet in

23   2003?

24       A    Yes.

Jay Stuart Rein, Vol. 2                                    08/26/2005

412

1    review procedures with respect to your performance

2    prior to his retirement; is that right?

3         A    Correct.

4         Q    But you don't know for sure, do you,

5    whether that process that he undertook is

6    contained within this Exhibit 25?

7         A    I can't tell.

8         Q    Okay.

9         A    I can't confirm.

10        Q    Okay.  But what do you recall

11   specifically about Len DeBarros reviewing your

12   performance in the first quarter of 2003?

13        A    In the first quarter of 2003 I recall

14   somewhere in a document, and I -- wait.  Hang on.

15   I recall very positive comments about closing that

16   first piece of LA Safe business.  I recall

17   comments that he also made in a document because

18   he knew he was leaving regarding the four times

19   bonus so that it would carry on beyond him.

20             THE WITNESS:  Did you find it?

21        Q    Is your counsel directing you to the

22   language?

23        A    Page 7.  Yes, these are the -- sorry,

24   these are the comments here.

Jay Stuart Rein, Vol. 2                                    08/26/2005

413

1        Q    But are these comments that you entered?

2        A    No.

3        Q    Okay.  So you perceive these to be

4   comments that Len entered?

5                MR. COSTER:  Why don't you take a

6   minute and read it and then answer the question.

7                (Witness perusing document.)

8        A    Some of this looks like it's mine.  The

9   second paragraph, "I am planning."

10       Q    Right.

11       A    There's reference to Jay Rein in the

12   third party.  There's reference to I.

13       Q    Do you refer to yourself in the third

14   person in documents like this?

15       A    No.

16       Q    Some people do.  Just asking you.

17       A    That's a Seinfeld episode.

18                MR. COSTER:  That's exactly what I

19   was thinking.

20       Q    So paragraphs two and three under

21   comments on page 7 both refer to you in the first

22   person; is that fair?

23       A    Yes, they do.

24       Q    And in fact they refer to Len DeBarros

414

1    in the bottom paragraph there in the third person

2    referencing his --

3         A    That's the way it appears to read.

4         Q    Okay.  I think we need not beat this

5    horse.

6         A    Okay.

7         Q    But suffice it to say, that the second

8    portion of the review which is dated October 9th

9    was done by Thomas Niersbach; is that fair?

10        A    Correct.

11        Q    And you understand -- you recall having

12   performance-related discussions with Niersbach --

13        A    Niersbach.

14        Q    -- Niersbach in or about that time in

15   October 2003?

16        A    No, I don't believe there was any --

17   there was a general discussion with the group,

18   this is how I'm going to be finalizing the

19   performance review so I can finally move on to my

20   job --

21        Q    Right.

22        A    -- but I do not --

23        Q    You don't recall meeting with him

24   independently?

415

1      A      There was no one-on-one discussion about

2   performance and relative criteria.  It was, it is

3   out on the system, read it, enjoy it, I'll see you

4   later.

5      Q      Okay.  Directing your attention to page

6   two of the exhibit --

7      A      Um-hm.

8      Q      -- in the middle of the page under

9   business goal two it says, My individual quota for

10  2003 is set at 5 million in bookings and 3 million

11  in billings.  My personal financial commitment to

12  support the 2003 goal for the enterprise team is

13  3.3 million in bookings and 1.4 in billings.

14              Do you recall establishing those

15  goals for yourself in 2003?

16     A      My recollection is that for a principal

17  at an E-15 level on SIP, if I recall correctly,

18  5 million and 3 million are the corporate

19  established quota --

20     Q      Okay.

21     A      -- and DeBarros, when we looked at what

22  the quota is versus the realities of a startup

23  business and finding new business, developing it,

24  selling it, winning it, delivering it, was

1      A    Yes, I do.

2      Q    Do you recall --

3           MR. COSTER:  Well, keep reading.

4    Due to the limited resources who understand the

5    business development cultivation process.

6      Q    In the Professional Services arena.

7           Do you recall having discussions

8    with your manager about your concern that that

9    might interfere with your success in your job in

10   2003?

11     A    Yes, I do.

12     Q    With whom did you have those

13   discussions?

14     A    There were a number of discussions over

15   the course of 2003 that we were short on solution

16   architects.

17     Q    What does that mean?

18     A    Solution architect is an individual that

19   typically has a deep rooted subject matter

20   expertise in a particular arena.  So to go one

21   step further, someone like myself that might find

22   an opportunity in a particular arena, we would

23   bring a solution architect who might have a vision

24   of how to technically connect all the various

418

1   technical components to make something come to

2   life.  We had at the time one or two solution

3   architects to be divided amongst all of the

4   principals that actually understood what they were

5   doing, which -- which put us in a constrained

6   position to sell.

7        Q    Did you rely on other business sectors

8   to provide those employees with expertise?

9        A    At one point in time we had those

10  employees with that expertise within MPS.

11       Q    Okay.  And then the group was

12  reorganized and downsized, right?

13       A    And then we did not have those specific

14  resources available to us.

15       Q    And so the question is:  Did you at that

16  point rely on other employees within Motorola in

17  other divisions with those expertises?

18       A    I can't tell when this comment was

19  written --

20       Q    Okay.

21       A    -- so I don't --

22       Q    Do you recall doing that at some point

23  during your tenure?

24       A    Doing what?

Jay Stuart Rein, Vol. 2                          08/26/2005

421

1      Q    Directing your attention to page 9, the

2    very bottom of the page it says, EG head count

3    which I envisioned would assist in various funnel

4    development and delivery activity was continuously

5    disapproved, hence limiting success.

6                Did you discuss with your manager

7    your concern that you -- that head count for

8    development and delivery were impeding your

9    personal success?

10     A    Actually, I believe I was encouraged to

11   put this in by Tom Niersbach.

12     Q    Okay.  You previously testified that you

13   don't recall any discussions with Niersbach

14   specifically related to your individual

15   performance review?

16     A    No, I did not.

17     Q    What do you recall about that

18   conversation with Niersbach?

19     A    Let me restate.  When this performance

20   review was completed by Niersbach --

21     Q    Um-hm.

22     A    -- he and I did not have a one-on-one

23   conversation about the content that was finally

24   entered upon signature.  That's what I think I

1    testified to.

2        Q      Okay.  But prior to your --

3        A      Prior to this --

4        Q      Okay.

5        A      -- while we were having group

6    discussions about the fact that he was going to

7    normalize us and send us all through to Stark

8    looking about the same, we all had head count

9    requirements that we were requesting in there, and

10   my statement just previously was I believe he

11   encouraged us to put this into the document as

12   part of our personal input and as part of my

13   personal input if we felt that this was going to

14   cause us to not be as successful going forward.

15       Q      Did he say why?

16       A      Because it was a fact.

17       Q      And you believed it to be true; it was

18   interfering with your success?

19       A      Well, if you look at some of the numbers

20   that we showed from previous documents, if we had

21   additional head count, we could potentially be

22   more successful in the selling model preceding

23   delivery.

24       Q      Okay.  Those were your projections?

Jay Stuart Rein, Vol. 2

08/26/2005

423

1      A     Those were the group's projections.

2      Q     Right.  And do you recall anything else

3  about your discussion with Niersbach about

4  incorporating this type of language in your

5  review?

6      A     Not specifically.

7      Q     Was it -- did you intend it to be a

8  signal to your manager to highlight the need for

9  additional development and delivery personnel?

10              MR. COSTER:  Objection.

11     A     Motorola has a section here which is

12  entitled "Things that may make my success more

13  difficult in the future."  Motorola encourages us

14  to put these things in --

15     Q     No, I understand that.

16     A     -- so we can have a discussion about it.

17  So this was not a signal; this was for purposes of

18  having a discussion.

19     Q     Okay.  And did you subsequently have

20  that discussion?

21     A     Niersbach had moved on, and he believed

22  he completed his responsibility to the group.

23     Q     Did you have that discussion with Kofman

24  after he took over?

Jay Stuart Rein, Vol. 2

08/26/2005

424

1        A     We had discussions with Stark about head

2   count during the October 14th and October 17th

3   meetings.

4        Q     Do you recall any discussions with

5   Kofman pertaining to your performance relating to

6   that issue prior to -- at any point?

7        A     I recall discussions amongst the entire

8   group.

9        Q     I'm asking about Kofman, though.

10       A     I recall --

11             MR. COSTER:   Kofman is a member of

12   the group.

13       Q     I just want to be clear, and I'm going

14   to do this on the record because I'm trying to get

15   answers to specific questions, and I'm sympathetic

16   to the fact that you have a plane at 4:00 to

17   catch, but I need you to answer the questions that

18   I ask in order for this to proceed smoothly.   I'm

19   doing the best I can.

20       A     I'm answering, but I feel like you're

21   getting testy with me.

22       Q     I'm not trying to get testy, and I

23   apologize if I've appeared to be testy, but I am

24   trying to get the answers to the question that I

425

1    ask, and what I asked was --

2        A    The answer is yes, there was a

3    conversation with Kofman about the fact that we

4    have not been able to add heads.

5        Q    Okay.  But the question pertained to

6    your performance reviews.  Did you have a

7    conversation in the context of your performance

8    reviews with Kofman about how the absence of

9    delivery and development heads was impeding your

10   performance?

11       A    Yes.

12       Q    When was that conversation?

13       A    On or around in the first two weeks --

14   second or third week of January --

15       Q    Okay.

16       A    -- of 2004.

17       Q    Okay.  So the review discussion that you

18   had on the phone with Kofman relating to 2003

19   performance incorporated a discussion of that

20   issue; is that fair?

21       A    The discussion was about the challenges

22   to which we faced in 2003 --

23       Q    Um-hm.

24       A    -- that made it a difficult year for us.

Jay Stuart Rein, Vol. 2

426

1      Q     And incorporated in that discussion was

2   the issue --

3      A     I do not recall the specifics of that

4   discussion.

5      Q     Do you recall that it dealt with that

6   issue?

7      A     I recall it's in the document.  So if

8   Clyde and I reviewed the document as we were

9   supposed to have, I assume that we have discussed

10  this.

11     Q     But you don't independently recall that

12  discussion?

13     A     I recall the discussion about his

14  summary comments that he put in here specifically

15  as what he wanted me to take away from our

16  discussion on this topic.

17     Q     Okay.  And what about his summary topics

18  do you recall discussing with him?

19     A     Again, that it was a difficult year in

20  2003 with our new home, with our new leadership,

21  and with the right direction, 2004 was potentially

22  going to be a very good year for Jay Rein as his

23  comment -- manager's comments on page 12, 2003 was

24  a challenging year, many changes and little

**EXHIBIT A
PART 9**

427

1   leadership direction contributed to the

2   challenges.  2004 brings an opportunity for Jay's

3   capabilities to come through more clearly and for

4   MPS to continue to create value for CGISS, and it

5   says signed by Kofman on January 13th of '04.

6       Q    Do you understand Kofman to have added

7   any other text to this review for 2003?

8       A    Beyond this?

9       Q    Right, beyond that summary comment,

10  which I think you referred to yourself as summary.

11      A    This is where the document closed out,

12  we electronically signed it and moved on.

13      Q    Okay.  And so the answer is no, you

14  don't have --

15      A    If -- if you've got -- I have not seen

16  any other documents.

17      Q    In this document you're not aware of any

18  other place on which Clyde contributed text?

19          MR. COSTER:  Okay.  That's a

20  different question.

21      A    That's a different question than what

22  you just asked me.  You asked me if after this

23  comment was there any other place he added after

24  this comment.

Jay Stuart Rein, Vol. 2                              08/26/2005

428

1    Q    I didn't mean to put it in a context of

2    before and after.  What I'm asking is aside from

3    -- I should have phrased it differently -- aside

4    from this comment --

5    A    Well, if you look after the section on

6    top of page 11 that's signed by Tom Niersbach, for

7    the next section which starts out for the summary

8    there's no manager comments there, there's no

9    manager comments under what I demonstrated for

10   behaviors.  So for results, no manager comments.

11   Behaviors, no manager comments.  No manager

12   comments.  No manager comments down until the last

13   one that we see there.

14   Q    So the answer is no?

15   A    So this is the sum total of the guidance

16   I received, yes.

17   Q    Okay.  Did you talk to Kofman -- aside

18   from what it says here, do you recall speaking

19   with Kofman about any other guidance or any other

20   input that he had relating to your 2003

21   performance --

22   A    Yes.

23   Q    -- during that conversation in January

24   of 2004?

429

1      A    Yes.

2      Q    What do you recall?

3      A    Basically this was a wrap-up to 2003.

4    We don't have to look at this anymore.  Let's move

5    forward to 2004.  Basically this was -- I believe

6    his comments were, I don't have much to add at

7    this point.  Your comments are very similar to the

8    comments I've given to your peers.  And I believe

9    this discussion also occurred around the same time

10   that the retention bonus was given.  So it was all

11   in a very positive light of moving forward.

12     Q    Okay.  What did he say specifically

13   about the evaluation being similar to your peers?

14     A    Specifically I do not recall.

15     Q    Do you recall him using those words,

16   "similar to your peers"?

17     A    Yes.

18     Q    Do you recall how you replied on that

19   topic?

20     A    I think at this point the 2003 review

21   for me was sort of a moot point, we were moving

22   forward into our new year, so I do not recall my

23   reply.

24     Q    Okay.  Do you recall discussing

449

1    it.

2        A    I heard you.  That was my answer to the

3    question.

4        Q    So the question is:  Prior to your

5    termination you had not complained; is that fair?

6        A    Well, I don't know if I was terminated

7    on the 23rd --

8        Q    That's fair.

9        A    -- since Stark asked me to come back on

10   the 24th --

11       Q    That's fair.

12       A    -- to talk with him.

13       Q    Prior to the 23rd you had made no

14   complaints about age discrimination or perceived

15   age bias?

16       A    That's correct.

17       Q    Okay.  You don't contend, do you, that

18   any of your performance evaluations were motivated

19   in any way by age bias or age discrimination, do

20   you?

21       A    I do not know.

22       Q    It's not your contention in this lawsuit

23   that they were, is it?

24       A    That my performance --

450

1      Q    Right.

2      A    -- reviews were motivated based on age?

3      Q    Right.

4      A    No.

5      Q    Okay.  When did you begin to consider

6 employment opportunities with Invoke?

7      A    I didn't -- they approached me.

8      Q    Um-hm.

9      A    So I did not actively pursue them.

10     Q    When did you begin to consider

11 opportunities with their company?

12     A    I began to seriously consider those

13 opportunities at the beginning of January.

14     Q    Okay.  What caused you to seriously

15 consider them at that time?

16     A    At that time I was waiting to hear the

17 results of my performance review and how things

18 were going to evolve for the coming year.

19     Q    Were you concerned about the results of

20 the review?

21     A    No.

22     Q    What were you waiting for?

23     A    I was waiting for confirmation of where

24 I sat within the organization and how I was

451

1    regarded by the leadership.

2        Q    What leadership are you referring to?

3        A    Clyde Kofman and Juergen Stark and

4    anybody else that would have participated in my

5    performance review.

6        Q    What do you mean by confirmation

7    regarding where you sat?

8        A    In a performance review, if we went back

9    to the document, it tells you whether you exceeded

10   or didn't exceed goals.

11       Q    So you mean rating, where you --

12       A    Right, I was rated well.

13       Q    Um-hm.  When did Invoke first pursue

14   you?

15       A    They approached me in the December time

16   period.

17       Q    Who did?

18       A    Simon Blanks.

19       Q    And he's the same recruiter with whom

20   you had previously worked at another company?

21       A    Previously worked with him at another

22   company, yes.

23       Q    At that time had he broken out on his

24   own?

Jay Stuart Rein, Vol. 2                          08/26/2005

452

 1          A    No, at that time he was an employee of

 2   Invoke.

 3          Q    Okay.  Thank you.

 4               And what did he say in December?

 5          A    He was engaged in a great opportunity

 6   and thought there would be a wonderful opportunity

 7   for me to join him.

 8          Q    How did he describe the opportunity?

 9          A    I do not recall the details.

10          Q    Do you recall what he said you would be

11   doing?

12          A    I would be responsible for selling and

13   delivering value-added services.

14          Q    What did you reply during that

15   conversation in December?

16          A    I listened.  I didn't --

17          Q    Did you say anything else?

18          A    I didn't reply.  I listened.

19          Q    You said nothing during the call?

20          A    I --

21          Q    Did you reply substantively to his

22   pursuit --

23          A    I don't know what --

24          Q    -- of your interest --

453

```
 1        A     What is a substantive reply?  I

 2   listened.  I said, It's interesting, Simon.  If we

 3   want to get together, you can give me a call, but

 4   I'm happy right now where I am.

 5        Q     Okay.  And at some point you began to

 6   consider moving over to Invoke; is that right?

 7        A     No, at some point I continued to listen

 8   to what Invoke was saying.  I never -- I never

 9   considered the move to Invoke.

10        Q     Okay.  And did at some point you receive

11   an offer?

12        A     I received an offer.

13        Q     And when was that?

14        A     It was at the beginning of 2004.

15        Q     And did you prior to receiving that

16   offer interview with Simon or someone else at

17   Invoke for the position?

18        A     I met with them, yes.

19        Q     With Simon?

20        A     Yes.

21        Q     With anyone else?

22        A     Yes.

23        Q     Who?

24        A     Mr. Corey Torrence.
```

Jay Stuart Rein, Vol. 2                           08/26/2005

454

1       Q     Did you at the time of your interview

2    not intend to take a position with Invoke?

3       A     The time of the interview was an

4    opportunity for me to listen to what someone else

5    had to offer to me and then to weigh the learnings

6    of that experience with the current job

7    opportunity that I had.

8       Q     Meaning the job at Motorola?

9       A     Yes.

10      Q     Do you recall what salary you were

11   offered at Invoke?

12      A     There was a total compensation package;

13   it had numerous components to it.

14      Q     Do you recall what they were?

15      A     There was salary, there was bonus, there

16   was guaranteed bonus, there was equity ownership

17   in the company, and then there were stock options

18   in the company.

19      Q     Do you recall the value -- did you value

20   those collectively for yourself when weighing the

21   opportunity?

22      A     You cannot value -- it's hard to value

23   stock options and equity ownership in a privately

24   held company.

Jay Stuart Rein, Vol. 2                              08/26/2005

455

1      Q     Okay.  Aside from those intangibles, did
2  you value the other compensation or remuneration
3  that you were being offered?
4      A     There were numbers associated with
5  salary and bonus.
6      Q     Do you recall what the total comp
7  package was for you?
8      A     I don't.
9      Q     Okay.  You indicated that you -- strike
10  that.
11              You received an offer which you
12  declined; is that right?
13      A     I did not decline it immediately.
14      Q     Okay.  When did you receive the offer?
15      A     Sometime in the first week or so of
16  January, but before the performance review and
17  before the retention bonus discussion with
18  Motorola.
19      Q     Did you share with Kofman that you had
20  had an interview and received an offer?
21      A     No.
22      Q     Did you share it with anyone at
23  Motorola?
24      A     I do not believe so.

Jay Stuart Rein, Vol. 2                          08/26/2005

456

1        Q      Do you recall discussing that issue with

2    Stark when the offer came in in January?

3        A      I discussed that offer with Stark on the

4    23rd.

5        Q      I'm asking about January.

6        A      So I answered.  I -- I --

7        Q      No?  The answer is no?

8        A      No.

9        Q      So you don't know whether had you

10   discussed it with Kofman or Stark they might have

11   encouraged you to take it, do you?

12       A      I can't assume what they would have said

13   to me.

14       Q      Okay.  Directing your attention to the

15   document we've marked as Exhibit 28, I'll ask if

16   you can identify it?

17              (Document exhibited to witness.)

18       A      This looks like a letter from Invoke to

19   me.

20       Q      Is it your offer of employment?

21       A      It looks like it.

22       Q      Do you see on the last page of the

23   document it says, The offer -- in the last

24   paragraph -- The offer will expire on

457

1    January 12th, 2004?

2        A    Um-hm.

3        Q    Did you accept -- did you decline the

4    offer prior to that time?

5        A    No, I did not need to.

6        Q    Why?

7        A    Because I believe there may have been a

8    number of iterations of this document, so that

9    date wound up getting pushed.

10        Q    Did you produce any of those other

11    iterations in connection with this litigation?

12        A    I don't believe I have access to them

13    anymore.

14        Q    Did you at one point maintain them?

15        A    Yes.

16        Q    Did you destroy them?

17        A    No.

18        Q    Why do you no longer have access to

19    them.

20        A    Because they were on a hard drive on my

21    wife's HP Pavilion computer that died.

22        Q    Okay.  Fair enough.  Those computers.

23             Does this offer accurately reflect

24    the compensation structure with respect to salary

Jay Stuart Rein, Vol. 2                          08/26/2005

458

1    and benefits --

2        A    I believe that there was some --

3        Q    Let me finish the question, if you

4    would.

5             -- that you ultimately were -- that

6    was the final offer that you were ultimately

7    considering?

8        A    No.

9        Q    How is it different?

10       A    If I recall, there may have been some

11   improvement to ownership and salary and bonus.

12       Q    What was the nature of the improvement

13   that you recall?

14       A    Positive.  I don't recall specifics.

15       Q    So do you recall whether the base was

16   going to be more than 120, 120,000 per year?

17       A    Again, I don't recall, but we were in

18   active discussions about improvement of base and

19   bonus and stock, and there were subsequent

20   documents traded.

21       Q    Do you recall how many subsequent

22   versions of this -- of the offer there were?

23       A    There might have been one more.

24       Q    Do you recall approximately when you

Jay Stuart Rein, Vol. 2                           08/26/2005

459

1    received that?

2        A    It may have been -- it may have been

3    right after -- I mean, it was -- it was happening

4    very fast because they were eager to have me join

5    them, so there wasn't a protracted discussion.

6        Q    Do you recall how the base -- sorry --

7    the bonus was enhanced in the subsequent version?

8        A    It may have been improved by $10,000 or

9    so.  I --

10       Q    What about the salary, can you put a

11   value around the improvement?

12       A    You mean the total comp?

13       Q    On the salary piece.

14            MR. COSTER:  You mean -- are you

15   referring to the base salary?

16       Q    Right.

17       A    Which --

18       Q    Sorry.  Paragraph 3, annualized rate of

19   120 per year.  You're saying you have a

20   recollection that that might have improved by

21   10,000?

22       A    Yes, correct.

23       Q    And directing your attention down, it

24   appears that there's an incentive referred to if

Jay Stuart Rein, Vol. 2                                08/26/2005

462

1        A     Yes, I did.

2        Q     Did you interview with anyone other than

3   Simon, Corey, and David?

4        A     Yes, I did.

5        Q     With whom?

6        A     I interviewed with a number of

7   principals at Bain Venture Capital.

8        Q     Who were they?

9        A     I do not recall their names.

10       Q     Do you see in the first -- second

11  sentence you say, At this point it looks as if

12  we're just a bit apart from where I had to be

13  compensation-wise --

14       A     Um-hm.

15       Q     -- and where the economics for my

16  position needed to be on behalf of Invoke and its

17  stakeholders?

18       A     Um-hm.

19       Q     Did you convey in this e-mail to Simon

20  and others that the reason for your declining the

21  offer was based on compensation?

22       A     This is, again, very -- restate your

23  question.

24       Q     Did you convey to them in this e-mail

Jay Stuart Rein, Vol. 2                          08/26/2005

463

1   that the reason that you declined the offer was

2   because of compensation?

3       A    Because of the compensation I desired

4   from them I was declining the offer.

5       Q    Okay.  And that was the reason that you

6   stated to them in this e-mail, right?

7       A    This is a communication from me to them,

8   yes.

9       Q    And what did you mean by that statement?

10      A    What I meant by this statement is my

11  opportunity appeared to be greater where I am

12  versus coming to you, so, therefore, I decline

13  your offer.

14      Q    When you said the compensation that you

15  wanted from them, what do you mean?

16      A    I had been an employee at Motorola for

17  over a year and a half.

18      Q    18 months, um-hm.

19      A    I was looking at the variables and the

20  indicators for my continued employment at Motorola

21  all the way from Stark comments to we're going to

22  look at you again in June of '04, retention bonus,

23  performance review from Clyde.  When I looked at

24  those and weighed that against somewhat of an

Jay Stuart Rein, Vol. 2

08/26/2005

473

Q    Okay.  So you think that's the reason that you were terminated?

A    That's one of the reasons.

Q    What's the other reason?

A    I think that's -- that's the reason. That's a reason.

Q    Is that -- is that the only reason?

A    I'll have to think about it.  You're throwing a lot of questions at me.

Q    Okay.  You can think about it.  Take your time.

A    I think that's the key reason.

Q    Do you think there were any other reasons?

A    If there were, if it was performance related, never indicated to me, so I've got to look at that as the key reason.

Q    Okay.  Did you understand that you were an employee at will at Motorola; do you have an understanding of what that means?

A    Yes, I think I previously testified to that last time, last week.

Q    Okay.  And you understood that you were an employee at will?

Jay Stuart Rein, Vol. 2                                08/26/2005

474

1         A    Yes.

2         Q    As you sit here today, do you believe

3    that Kofman's decision to terminate you was based

4    on your age?

5         A    I heard Kofman make a statement to me

6    that said he could hire two people for less money,

7    cheaper, and younger people than me.

8         Q    I'm asking --

9         A    As I sit here today, yes, I believe so.

10        Q    But you don't believe that that's the

11   only reason, because you believe the other reason

12   is that he had an opportunity to strike; is that

13   fair?

14        A    So there are multiple reasons.

15        Q    Okay.  That's what I'm asking you.

16             Aside from the comment that you

17   heard Stark make relating to hiring less expensive

18   delivery personnel, do you have any other reason

19   to believe --

20             MR. COSTER:  Objection.

21        Q    Okay.  Let's -- I'll rephrase the

22   question.

23             Aside from that comment from Kofman,

24   do you have any other reason to believe that the

Jay Stuart Rein, Vol. 2                          08/26/2005

475

1    decision to terminate you from Motorola was

2    motivated at least in part by age?

3        A    Say that -- I've got to make sure I'm --

4        Q    Sure.

5        A    My answer -- connect all those dots

6    again.

7        Q    Okay.  Aside from the conversation with

8    Kofman --

9        A    Which conversation with Kofman?

10       Q    -- in which you allege that he said to

11   you that he could hire less-expensive and younger

12   delivery personnel --

13       A    Yes.

14       Q    -- aside from that conversation, is

15   there any other reason why you think your

16   termination from Motorola was motivated at least

17   in part by your age?

18       A    Well, I already talked about Kofman

19   deciding to take me out of the equation when I

20   challenged him.

21       Q    Did that have to do with age?

22       A    I do not know.

23       Q    Did you perceive it to have to do with

24   age at the time?

Jay Stuart Rein, Vol. 2                           08/26/2005

476

```
 1        A    At the time, no.

 2        Q    Do you as you sit here today perceive

 3   that component of your -- the reason for your

 4   termination to have anything to do with age?

 5        A    The retaliation component?  I mean,

 6   taking me out as I described it?

 7        Q    Right.

 8        A    I do not know.  I do not know what he's

 9   thinking.

10        Q    No, I'm asking your perception.  Do you

11   perceive that to be based on your age?

12        A    That being -- again, what's the that?

13   There's him that --

14        Q    A component of his -- the component of

15   your termination that pertains to your allegation

16   that he had an opportunity to strike, did you

17   perceive that at the time or as you sit here today

18   to be based on your age?

19        A    That, no.

20        Q    Thank you.

21             So aside from the comment that we've

22   been referring to from Kofman relating to hiring

23   less-expensive and younger delivery personnel, is

24   there any other reason for you to believe that
```

# EXHIBIT A
# PART 10

477

1    your termination was motivated by age

2    discrimination or age bias?

3         A    I don't -- I do not think so.

4         Q    Okay.  You don't contend that younger

5    employees at Motorola were treated more favorably

6    than you?

7         A    I don't contend that younger employees

8    were treated more favorably than me?  I don't

9    know.  There's a hundred thousand employees in the

10   company.  I do not know how younger employees are

11   treated.

12        Q    Is it your contention that you perceived

13   yourself to be treated less favorably than younger

14   employees?

15        A    No.

16        Q    Okay.  Aside from the comment that we've

17   been discussing that you allege Kofman made about

18   hiring less-expensive and younger delivery

19   personnel, did he make any other age-related

20   remarks during your tenure at Motorola?

21        A    Not that I can recall.

22        Q    Did Stark ever make any age-related

23   remarks?

24        A    Not that I know of.  And, actually, it's

Jay Stuart Rein, Vol. 2                              08/26/2005

                                                                    480

1          Q    What do you mean may have been discussed

2    when you were introduced?

3          A    We all had a number of meetings,

4    dinners, went out for drinks, where we were all

5    getting to know each other.

6          Q    Okay.  And at that --

7          A    It may have come up in a very nonchalant

8    discussion.

9          Q    Okay.  But do you recall specifically

10   that it did?

11         A    I do not know.

12         Q    Do you contend that you were ultimately

13   replaced by a younger employee?

14         A    I do not know what happened at Motorola

15   after I departed.

16         Q    Okay.  Are you aware of any hiring

17   freezes in effect following your departure?

18         A    No, I am not.

19         Q    Were you told prior to your departure

20   that there were cost considerations that were

21   affecting hiring at Motorola?

22         A    No.

23         Q    Were you at any point before May of 2003

24   informed that Motorola divisions were freezing

482

1      Q    Let me direct your attention back to the

2   document we marked at the first session as

3   Exhibit 1, which are your interrogatory responses

4   to Motorola's interrogatory requests, and

5   specifically directing your attention to page --

6   forgive me, hold on -- 18 of the interrogatory

7   response.

8      A    Page 18?

9      Q    Right.

10          Subpart 1 says, Motorola wrongfully

11  interfered with Rein's advantageous relationship

12  with Russell Reynolds; do you see that?

13     A    Yes.

14     Q    How do you contend Motorola interfered

15  with your relationship with Russell Reynolds?

16     A    Prior to the February/March of 2004 time

17  frame, I had a relationship and a communication

18  pattern that had developed with Russell Reynolds

19  to exist every three to four months.  Just general

20  nature, hi, how's it going, just good discussion,

21  good relationship.  That all seemed to come to an

22  abrupt halt immediately following Russell

23  Reynolds' desire to understand what had transpired

24  with the MPS group since my hiring.  For their

483

1    preparation for a meeting with Motorola, they

2    asked me questions and I answered to help them

3    out, and after that meeting and after my

4    termination, I was no longer successful at

5    maintaining the communication and relationship

6    that had developed over almost a two-year period

7    with Russell Reynolds.

8        Q    Did anyone at Motorola in the MPS

9    division know that you had an ongoing relationship

10   at that time with Russell Reynolds?

11       A    I do not know.

12       Q    Did you tell Kofman that you had an

13   ongoing relationship and spoke to them every three

14   to four months?

15       A    I may have.

16       Q    Do you recall specifically telling him

17   that?

18       A    No, but he was brought in by Russell

19   Reynolds, too, and we both acknowledged that, and

20   I think he knew that I maintained contact with

21   Paul Zellner.

22       Q    Do you recall telling him that you had

23   contact with Paul Zellner?

24       A    I had a lot of conversations with Clyde.

485

1    Solutions?

2        A    Not MCNS --

3        Q    **Okay.**

4        A    -- I believe SAS, but that that acronym

5    didn't exist when I was there.

6        Q    **Okay.  Are you familiar with the acronym**

7    **IESS?**

8        A    She was part of the IESS group --

9        Q    **Okay.**

10       A    -- but she was carving her -- she was in

11   a start-up mode in the company as well.

12       Q    **And you were looking to join that start-**

13   **up mode with her?**

14       A    After my termination I started looking

15   in a number of places.

16       Q    **Okay.  And one of them was with Janiece?**

17       A    One of them was with her.

18       Q    **In that start-up operation?**

19       A    Correct.

20       Q    **And what did you do to pursue that**

21   **opportunity?  Was there an opportunity there ready**

22   **for you to assume a position?**

23       A    She had -- my understanding based on

24   what she told me, she had head count that was

1    waiting in the wings to be filled, and upon

2    successful meetings with Ed Zander and approvals,

3    she would be able to begin to fill those senior

4    positions.

5         Q     Okay.  But they hadn't yet been

6    approved; is that right --

7         A     I -- I --

8         Q     -- based on what she told you?

9         A     At that point in time she was getting

10   ready to have a meeting with Zander within the

11   next few weeks.

12        Q     And she told you that she would seek

13   approvals but she didn't have them at that point;

14   is that fair?

15        A     If the company was going to grow, they

16   would give her those approvals --

17        Q     Okay.

18        A     -- and then we would have resumed

19   discussions.

20        Q     Did you seek employment opportunities

21   within Motorola with anyone other than Janiece?

22        A     Yes.

23        Q     Who?

24        A     I was seeking a leadership role within

Jay Stuart Rein, Vol. 2                          08/26/2005

487

1    the BCS sector, broadband communication sector.

2        Q    With whom were you working to pursue

3    that opportunity?

4        A    Matt Aiden was the key leader, the key

5    vice president, within that group that I was

6    talking to.

7        Q    And you refreshed your recollection

8    using Exhibit 1?

9        A    I wanted to make sure I had the last

10   name correct.

11       Q    Okay.  And do you recall --

12       A    And there was another woman I believe

13   that Matt reported to.

14       Q    What was her name?

15       A    That's the -- that's really the name I

16   was looking for.  I do not recall her name.  She

17   was an ex-colleague of Len DeBarros from another

18   division of Motorola in years past.

19       Q    Okay.  Do you recall seeking employment

20   with any other Motorola groups?

21       A    I had discussions that ended pretty

22   quick with a fellow by the name of Warren

23   Holtzberg.

24       Q    Do you know what group he worked with?

Jay Stuart Rein, Vol. 2                          08/26/2005

488

         1          A    He was the key leader in Motorola

         2    Venture Capital, if that's the right name for the

         3    group.

         4          Q    And why do you say they ended pretty

         5    quick?

         6          A    I was not getting return phone calls

         7    from him --

         8          Q    Okay.

         9          A    -- nor e-mails from him.

        10          Q    Do you recall whether Matt Aiden or this

        11    woman in BCS advised you that there was an

        12    available position?

        13          A    They brought me down to Pennsylvania

        14    twice to interview and meet with them.

        15          Q    Did either of them tell you that there

        16    was an available position?

        17          A    There was an available position.

        18          Q    Do you know the title of that position?

        19          A    I don't know the title.  It was the

        20    leader of the professional services organization

        21    that they wanted to start within BCS.

        22          Q    Another start-up?

        23          A    BCS was an established business.  They

        24    wanted value-added services within their

Jay Stuart Rein, Vol. 2                          08/26/2005

489

1   organization.

2       Q    And would the value-added services have

3   been considered by you to be a start-up within

4   that organization?

5       A    The value-added services --

6            MR. COSTER:  Objection.  If you

7   understand --

8       Q    The professional services group that

9   you're referring to.

10      A    Not exactly, because I believe they were

11  going to take existing personnel and resource and

12  organizations and realign them under -- they had

13  value-added services; they were reorganizing it to

14  be more effective.

15      Q    Okay.  Did you have discussions with any

16  other group seeking internal Motorola

17  opportunities following your termination

18  discussion with Kofman?

19      A    Those were the only -- I'm sorry, repeat

20  the last --

21      Q    Following your termination discussion

22  with Kofman.

23      A    Those were the only three that I was

24  successful in opening the door up at.

Jay Stuart Rein, Vol. 2                          08/26/2005

490

```
 1        Q    Did you attempt to open the door
 2   elsewhere?
 3        A    I tried using a process that I learned
 4   about at Motorola that should have helped me to do
 5   that.
 6        Q    Was that the leadership and talent
 7   supply meetings?
 8        A    The leadership and talent supply pool or
 9   meeting, yes, something like that.
10        Q    Okay.  How did you gain an understanding
11   of that pool?
12        A    Someone who was a 30-some-odd-year
13   retiree of Motorola --
14        Q    Can we call that person Len?
15        A    No.
16        Q    Okay.
17        A    We can call that person Art --
18        Q    Okay.
19        A    -- Cipolla --
20        Q    Okay.
21        A    -- asked how -- you know, if I was
22   introduced to this leadership and talent supply
23   group and how effective it was working for me, and
24   I had no idea of what he was talking about, and he
```

Jay Stuart Rein, Vol. 2                              08/26/2005

491

1   told me what to ask for.  I brought that

2   information back in to Motorola and asked why

3   nobody proactively told me at an executive level

4   15 position this was available to me.

5        Q    What did Art -- when did Art retire?

6        A    I believe -- I don't recall if he

7   retired at the end of '02 or sometime in early

8   '03.

9        Q    Had he been party to these meetings or

10  this pool when he was employed by Motorola?

11       A    I have no idea.

12       Q    Okay.  What did he tell you specifically

13  about the pool?

14       A    He told me that the pool meets every

15  other week or sometimes every week.  Senior

16  leaders from all of the sectors bring existing

17  senior positions that they're looking to fill to

18  the table.  At the same time they all bring to the

19  table, to that discussion, talent that happens to

20  be available for one reason or another to those

21  discussions to see if there are any internal

22  matches that may make sense.

23       Q    Did you ever confirm for yourself that

24  these meetings were in fact weekly or bi-weekly?

Jay Stuart Rein, Vol. 2                          08/26/2005

500

1      A      Because I did not know Peter Tobin but

2    from this interaction of my termination, and I

3    confirmed after discussions with Art Cipolla with

4    Ornella Indonie and others that there was this

5    leadership and talent supply pool, and Ornella and

6    Art as a retiree were encouraging me to

7    participate; that it's a very helpful and useful

8    process.

9      Q      Okay.

10     A      So it was inconsistent -- Peter's

11   comments were inconsistent with what other

12   Motorolans were telling me.

13     Q      Were there any other Motorolans with

14   whom you discussed this leadership and talent pool

15   prior to making contact with the pool?

16     A      No.

17     Q      Aside from encouraging you to

18   participate, what did Ornella Indonie say to you

19   about the pool?

20     A      That was it.

21     Q      Okay.   When did the conversation with

22   her take place?

23     A      Somewhere between my termination and the

24   month that it took me to get engaged.

501

1      Q    Within those three weeks?

2      A    Yes.

3      Q    Okay.  Directing your attention --

4      A    No, it's not within the three -- it

5 wasn't three weeks until I learned about -- it

6 took me three weeks after February 24th was when I

7 finally learned about this from Art.

8      Q    Okay.  So you may have missed one or two

9 meetings according to your calculation?

10     A    Well, and then I missed another one or

11 two according to when I was finally introduced to

12 the woman.

13     Q    And you understood the meetings to be

14 bi-weekly, as I understand you're saying?

15     A    Um-hm, yes.

16     Q    Directing your attention to the next

17 document we've marked as Exhibit 33.  I'll ask if

18 you can identify it.

19            (Document exhibited to witness.)

20     Q    Can you identify the document?

21     A    It's a -- it's a two part e-mail, first

22 from me to Peter Tobin, that asks about a group

23 that meets, can you advise me what the group is

24 about and how to get involved.  It goes out on

Jay Stuart Rein, Vol. 2                          08/26/2005

508

1          A     I -- I honestly don't recall.

2          Q     Is it your contention that anyone

3     interfered with your efforts to secure or to seek

4     opportunities with Motorola Ventures, BCS, or

5     IESS?

6          A     Yes.

7          Q     Who?

8          A     Kofman.

9          Q     How?

10         A     With IESS if that's the SAS or -- I'm

11    going to refer to IESS as Janiece Webb.

12         Q     Um-hm.

13         A     With her.

14         Q     What do you contend that he did?

15         A     He told her that I was not a team

16    player, he told her that I was not a good fit for

17    the group and he would not recommend her taking me

18    on.

19         Q     How do you know this?

20         A     She told me.

21         Q     Did she tell you anything else that he

22    said?

23         A     No.

24         Q     Did she tell you whether there were

Jay Stuart Rein, Vol. 2                          08/26/2005

509

1     -- strike that.

2                 When did you have this conversation

3     with Janiece?

4          A    I don't recall specifically, but -- I

5     don't recall the specific date.

6          Q    Was it --

7          A    It somewhere predates a memo that I sent

8     to Stark and Kofman asking them to not interfere.

9          Q    Okay.  Was it roughly in the March or

10    April time frame, as you recall, of 2004?

11         A    I think it was probably in the March

12    time frame.

13         Q    Okay.  Do you recall anything else about

14    that conversation with Janiece?

15         A    The way the conversation went, general

16    flow was she still has not had her meeting with Ed

17    Zander.

18         Q    So there was no position available, no

19    approvals, right?

20         A    She didn't -- she was waiting for her

21    meeting with Ed Zander.  This is the words I

22    recall.

23         Q    Um-hm.

24         A    She was hopeful, she's had some

Jay Stuart Rein, Vol. 2                         08/26/2005

541

1        Q     And when was that conversation?

2        A     I -- that conversation did not occur

3    till the 24th.

4        Q     Okay.  So a day later?

5        A     Um-hm.

6        Q     And during that conversation what did

7    Peter Tobin say?

8        A     He said he was very busy and he would

9    not be able to get me the involuntary separation

10   package till later in the week.

11       Q     Did he say anything else?

12       A     At that point he didn't say anything

13   else.

14       Q     Did you say anything to him?

15       A     Yes, I did.

16       Q     What did you say?

17       A     I told him that I was terminated on

18   Monday, the 23rd.  We're talking on Tuesday, the

19   24th.  He doesn't have the details of the

20   separation package, he won't get it to me because

21   he's busy, but I'm leaving Chicago on Tuesday

22   night and I need to have an understanding of what

23   I have available to me; that it's seemingly

24   unacceptable that I could be given his name and he

Jay Stuart Rein, Vol. 2                    08/26/2005

542

1    doesn't have the details of what's happening, what

2    should happen, and what the numbers should be.

3        Q    Okay.  How did he rely?

4        A    He said to me he heard that; he'll see

5    what he can do to make things happen sooner and

6    get back to me.

7        Q    And when did they happen?  When did you

8    receive --

9        A    I don't believe I received anything

10   until that Friday at my home address.

11       Q    Do you recall anything else that he said

12   during that conversation?

13       A    No, I do not.

14       Q    Do you recall anything else that you

15   said during that conversation?

16       A    No, I do not.

17       Q    I'll direct your attention to another

18   document we've marked as Exhibit 43.  Can you

19   identify it?

20             (Document exhibited to witness.)

21       A    It's a document dated February 25th to

22   me, which is the severance.  It looks like it is

23   the components of the involuntary separation

24   package.

Jay Stuart Rein, Vol. 2                          08/26/2005

543

1          Q     And you believe -- did you receive this

2    by mail?

3                     MR. COSTER:   If you remember.

4          A     I do not recall how I received this.

5          Q     Okay.  Did you communicate at all with

6    Peter Tobin by e-mail?

7          A     Ever?

8          Q     Yes.

9          A     Yes.

10         Q     Okay.  Upon your receipt of this

11   document we've marked as Exhibit 43, did you call

12   Peter to discuss its contents?

13         A     I believe so.

14         Q     When was that?

15         A     I don't recall.

16         Q     What do you recall about that

17   conversation?

18         A     Peter and I had quite a few

19   conversations, and I don't recall specifics of

20   that conversation.

21         Q     Okay.  Do you recall generally what

22   happened during that conversation?

23         A     Probably during that first conversation

24   he laid out the details of this package, but I do

Jay Stuart Rein, Vol. 2                          08/26/2005

544

1    not recall.

2        Q    Okay.  Did you ask Motorola to enhance

3    the package for you?

4        A    Yes, I did.

5        Q    In what way did you ask them to enhance

6    it?

7        A    I don't believe I remember specific

8    details.

9        Q    Did you ask them to extend your

10   termination date?

11       A    Yes, I did.

12       Q    And did they do that even prior to

13   offering you the ISP -- sorry -- the involuntary

14   separation package that's outlined in Exhibit 43?

15       A    Not that I understood, no.

16       Q    Okay.  Directing your attention to the

17   second paragraph, it says, "Please note"?

18       A    Second paragraph, yeah.

19       Q    "While finalizing the details of the

20   severance benefits with our HR team subsequent to

21   our telephone discussion, we have made the

22   decision to adjust your employment termination

23   date from Monday, March 15th, as previously

24   communicated to you by Clyde Kofman, to the end of

# EXHIBIT A
# PART 11

545

1    that workweek, Friday, March 19th."

2              Do you recall a discussion with

3    Peter in which you addressed that issue with him?

4         A    Yes.

5         Q    Was that the conversation that you

6    previously testified about that took place on

7    February 25th?

8         A    I don't believe so.

9         Q    What do you recall about that

10   conversation?

11        A    If I recall correctly -- first of all,

12   it's a four-day extension; we're not talking about

13   four months.

14        Q    Right.

15        A    I believe this was to accommodate MOT,

16   M-O-T, shares that I had been contributing to that

17   may have had a vesting -- you know, if my

18   termination occurred before a certain date, they

19   would give me my money back.  If my termination

20   occurred after a certain date, then I would get

21   shares instead of my money back.

22        Q    And you were looking for shares?

23        A    I was contributing money to the company

24   in every paycheck for the benefit of shares.

549

1          A    Again, I don't have this as fact; this

2     was my put to him to -- to discover.

3          Q    **Put to Peter, right?**

4          A    Right.

5          Q    **And how did you gain any awareness of**

6     **Camacho's situation?**

7          A    Someone had indicated to me that I

8     should check and see what Camacho was receiving

9     possibly if it indeed happened.

10         Q    **And did you ever discover what he got?**

11         A    No, I did not.

12         Q    **Did you -- strike that.**

13              Directing your attention to the next

14    document that we've marked as Exhibit 45 --

15              (Document exhibited to witness.)

16         Q     **-- do you recognize the document?**

17         A    It's a memo from Chris -- I believe it's

18    Christine Theros, Vice President of Human

19    Resources, to me regarding a separation and

20    release agreement.

21         Q    **And did this result from your**

22    **negotiations with Peter Tobin?**

23         A    I would assume so.

24         Q    **And did you -- you were offered, were**

Jay Stuart Rein, Vol. 2                           08/26/2005

550

1    you not, an opportunity to remain on payroll

2    through May 31st?

3         A    That's what the letter says, correct.

4         Q    Did you in fact remain on payroll

5    through that period of time?

6         A    I do not believe so.

7         Q    Okay.  But you remained on payroll,

8    didn't you, during the negotiations relating to

9    enhancing the severance package, right?

10        A    I do not know.

11        Q    Okay.  Why is that?

12        A    Because I have no knowledge whether I'm

13   on their payroll systems or not.

14        Q    Okay.  Did you receive compensation from

15   them reflecting payroll earnings after

16   February 24th, 2004?

17        A    I assume I did, but I don't know if it's

18   because I'm on the payroll system or they were

19   beginning to fulfill the terms of this agreement

20   which I had not agreed to yet.

21        Q    Okay.  So you have no awareness at this

22   point of whether you received both an enhanced

23   payroll term as well as an involuntary separation

24   package from Motorola?

551

1              MR. COSTER:   Objection.

2       A     That's not what I said.

3       Q     Okay.

4       A     This is a separation and release

5  agreement which I did receive from Motorola for my

6  signature.

7       Q     Exhibit 45?

8       A     Correct.

9       Q     And I understand that you never signed

10 it?

11      A     That is correct.

12      Q     Okay.  The question, though, was:  Do

13 you have an understanding of whether you received

14 both an involuntary separation package from

15 Motorola and an extension of your time on payroll

16 after February 24th, 2004?

17             MR. COSTER:   Objection.

18      A     Let me be clear.  The extension of the

19 time on payroll was not a financial enhancement to

20 this package at all.  The financial components

21 from the involuntary severance package to this

22 March 11th package remained constant.

23      Q     Okay.  But you in fact remained on

24 payroll past the initial date for the termination

552

1 of your employment?

2  A Again, I do not know whether I was on

3 their payroll system or not.

4  Q Do you know the amount of any

5 involuntary severance plan that you received from

6 Motorola when you did ultimately depart from the

7 company?

8  A I'm sorry, when I did...

9  Q Ultimately depart from the company.

10  A I believe that the amount that I

11 received is reflective of the standard involuntary

12 separation package.

13  Q And when was it that you ultimately

14 departed from the company?

15   MR. COSTER:  Objection.

16  A I don't know when I departed from the

17 company.

18  Q Okay.  You don't have a present

19 awareness of when you were considered to no longer

20 be receiving Motorola payroll?

21  A Okay.  I know that the moment I

22 indicated to Motorola I would not be signing and

23 seeking counsel, I was turned off from the system;

24 no more e-mails, no more communication.  I don't

Jay Stuart Rein, Vol. 2                          08/26/2005

553

1    know if that happens to be the exact date that I

2    was terminated by Motorola or not.

3        Q    That was the -- you were communicating

4    to them that you were not going to accept the

5    enhanced package, and in exchange for that, sign a

6    release that was reflected in Exhibit 45; is that

7    fair?

8        A    The release is in Exhibit 43 and 45.

9        Q    Okay.  And did Peter Tobin explain to

10   you that the release was in exchange for the

11   enhancement of the severance package?

12       A    The release is a standard release.

13   Whether you have a severance package or not, you

14   have to sign that -- you're supposed to sign that

15   release by --

16       Q    Did you sign a release?

17       A    -- Motorola's desires.

18            No, I did not.

19       Q    And you got the package -- you got an

20   involuntary separation package of some magnitude,

21   right?

22            MR. COSTER:  Objection.

23       A    The release was for an additional two

24   weeks of severance pay; the release was not for

554

1    the eight and a half weeks.

2        Q    Right.  Okay.  And you got the eight and

3    a half weeks, right?

4        A    I got the package that was required

5    without signing the release.

6        Q    Yeah.

7             Directing your attention to another

8    document we've marked as Exhibit 46.

9             (Document exhibited to witness.)

10        Q    Do you recognize it?

11        A    This is a memo -- an e-mail from me to

12    Peter Tobin on March 15th.

13        Q    And in this e-mail do you accurately

14    characterize your conversation in numbered

15    paragraph 8 with Juergen Stark on February 24th?

16             (Witness perusing document.)

17        A    It's a representation of it.  I don't --

18    I mean, this was written by me, again, a year and

19    a half ago.

20        Q    Do you recall, did Stark say that the

21    heads would be less costly and probably younger?

22        A    No, Kofman said that to me on

23    February 23rd.

24        Q    Okay.  Stark did not say that, right?

Jay Stuart Rein, Vol. 2                         08/26/2005

557

1       A    Again, I had numerous conversations with

2   Peter Tobin.  I do not recall the substance of

3   that specific conversation.

4       Q    Directing your attention to another

5   document we've marked as Exhibit 47, can you

6   identify it?

7                (Document exhibited to witness.)

8       A    There's two e-mails here, one on

9   April 6th from me to Peter Tobin, one on April 6th

10  a few hours later from me to Peter Tobin.

11      Q    Do you recall discussions with Peter

12  Tobin relating to extending the termination --

13  extending your payroll status through May 31st?

14      A    Based on reading these e-mails, I do.

15      Q    Okay.  And you understood that the

16  March 11th enhanced separation package in fact

17  reflected the results of that negotiation, right?

18      A    No, there's a difference between on

19  payroll status, being paid, and separation

20  package.  This discussion with Peter Tobin was for

21  the purposes of facilitating a transfer for me

22  from one department to another.  If the other

23  departments were not successful in securing their

24  head count prior to May 31st and the company was

Jay Stuart Rein, Vol. 2                              08/26/2005

558

1    going to do whatever they did to me in whatever

2    system, I would be at a point where I would not be

3    able to come back into that division and retain

4    all past benefits, including stock options,

5    levels, salary and so on.  So this discussion was

6    not about severance per se.  It was about keeping

7    a job within Motorola and retaining benefits as I

8    did so.

9         Q    For continuity?

10        A    Continuity is a good word.  Thank you.

11        Q    Okay.  And Peter indicated to you that

12   the continuity that he was willing to agree to was

13   for a very short period of time, right, as

14   evidenced in his e-mail to you dated April 6?

15        A    He's indicating that if there was word

16   from another group that said a couple days or

17   maybe a few weeks, but not any more, they could

18   consider continuity, they could consider an

19   extension.

20        Q    And did you agree to that approach?

21             MR. COSTER:  Objection.

22        A    I read this e-mail.  I'm not sure I

23   agreed to it.

24        Q    Directing your attention to the next

Jay Stuart Rein, Vol. 2                          08/26/2005

573

1    damages in this case, how do you value that bonus

2    potential?

3         A    My assumption was, and my reason for

4    staying with Motorola, was that we were going to

5    be successful in meeting our goals.  So the way I

6    valued that was sometime in 2005 we would receive

7    that 45 percent, if we remained on SIP, we would

8    have received that 45 percent.

9         Q    But at that point you weren't on SIP; is

10   that right?

11        A    No, I believe when I was terminated we

12   were still an SIP shop.

13        Q    But you hadn't previously received an

14   SIP bonus from the company at all, had you?

15        A    We went through a -- again, we went

16   through a lot of changes in '02 and '03.  We had

17   not received an SIP bonus --

18        Q    Okay.

19        A    -- but the company did recognize the

20   work that we did through other bonuses.

21        Q    Right.  Like the bonus you received in

22   January of '04, right?

23        A    Like the bravo bonus I received in '03.

24        Q    Okay.  Do you have any other economic

574

1    losses that you allege you suffered as a result of

2    Motorola's termination of your employment?

3        A    Aside from what we listed?

4        Q    Yeah, salary options and bonus.

5             MR. COSTER:  I'm going to object to

6    the term "economic."  I don't know if that's

7    entirely clear what you mean by that.

8        Q    Any damages.  Do you have any other

9    losses that you attribute to Motorola's

10   termination of your employment?

11       A    Those are the direct losses I attribute

12   to Motorola's termination.

13       Q    Okay.  Directing your attention to --

14   strike that.

15            How do you value the losses in the

16   category of salary options and bonus potential for

17   purposes of assessing your damages in this case?

18            MR. COSTER:  Are you asking what the

19   number is?

20            MS. McGURN:  Um-hm.  How does he

21   value the number.

22       A    The value of the salary --

23       Q    Um-hm.

24       A    -- that I did not receive from Motorola,

Jay Stuart Rein, Vol. 2                              08/26/2005

578

1            MR. COSTER:   2005, April 8, 2005.

2       A    Yes, I was employed by GTSI.

3       Q    Okay.  And the salary -- the

4  calculations that are contained within the

5  interrogatory responses are based on your GTSI

6  remuneration, right?

7       A    Of $150,000 per year.

8       Q    And 25 percent incentive bonus?

9       A    Correct.

10      Q    Okay.  And the 112 in bonus that you

11 calculate in subpart one on page 5, 112 in bonus

12 is 45 percent, that's the 45 percent bonus that

13 you're referring to?

14            (Witness perusing document.)

15      A    I guess so.  I mean --

16      Q    Okay.  Did you exercise any options

17 following your termination from Motorola?

18      A    I only exercised -- there was one

19 tranche of options that I believe I had up to 90

20 days to exercise.

21      Q    Did you?

22      A    Yes, I did.

23      Q    Do you recall the price?

24      A    No, I do not.

Jay Stuart Rein, Vol. 3                          01/13/2006

714

1      A.    Yes.

2      Q.    And you used your laptop to prepare client

3   presentation PowerPoints, correct?

4      A.    Yes.

5      Q.    Are there any other PowerPoint

6   presentations that you can recall, aside from client

7   presentations and October presentations for Stark,

8   that you prepared on your Motorola laptop?

9      A.    Again, prospective client presentations --

10   this is the same question.  Presentations and

11   discussions based around partners of Motorola to

12   help us win business.

13      Q.    So those four categories?

14      A.    Yes.

15      Q.    Aside from the October presentations to

16   Stark, did you prepare other PowerPoints for him?

17      A.    Yes.

18      Q.    What were those?

19      A.    I believe that there was a presentation

20   about ExpressLink and whether we should continue

21   forward with that opportunity or not.

22      Q.    When was that?

23      A.    I don't recall.

24         MR. COSTER:  I don't mean to interrupt, but

# EXHIBIT B
# PART 1

1

Volume: I

Pages: 1-194

Exhibits: 1-12

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CA No. 04-12580 NG

- - - - - - - - - - - - - - - - - - - -x

JAY S. REIN,

                    Plaintiff,

vs.

MOTOROLA, INC., CLYDE KOFMAN and

JUERGEN STARK,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF JUERGEN STARK

September 7, 2005

12:00 p.m.

Law Office of John G.H. Coster

92 State Street

Boston, Massachusetts

Reporter:  Nancy L. Russo

10

1   human resources department about this litigation?

2       A.   No.

3       Q.   How about the individual that you report to

4   at Motorola?

5       A.   Other than him knowing I'm here today, no, no

6   detailed discussion.

7       Q.   Can you think of anyone else within Motorola

8   you may have spoken to about this litigation?

9       A.   I don't recall anyone else.  My secretary

10  obviously knows about today and scheduling and all

11  that.

12      Q.   Okay.  Have you ever been contacted by a

13  potential employer of Mr. Rein after he left Motorola?

14      A.   No.

15      Q.   Can you recall ever having spoken to anyone

16  else about Jay Rein since he left the Motorola

17  organization?

18      A.   No, other than the folks we talked about

19  before -- legal and that kind of thing.

20      Q.   Do you know who Russell Reynolds Associates

21  is or are?

22      A.   Yes.

23      Q.   Have you ever spoken to anyone at Russell

24  Reynolds Associates about Jay Rein?

Juergen Stark

09/07/2005

11

1      A.    No.

2      Q.    Do you know who Paul Zellner is?

3      A.    The name does not ring a bell.

4      Q.    So, I take it as best you can recall, you

5 have never had any professional dealings with

6 Mr. Zellner; is that correct?

7      A.    I don't believe so.

8      Q.    Have you ever used Russell Reynolds to help

9 identify or recruit a potential employee for a position

10 at Motorola?

11      A.    Yes.

12      Q.    On how many occasions have you done that?

13      A.    At least two occasions that I can recall.  I

14 have a good relationship with the firm, by the way.

15      Q.    When you say you have a good relationship

16 with the firm, what do you mean by that?

17      A.    I have used them in the past for recruiting

18 purposes at Motorola and possibly even before that.

19      Q.    So you think at some prior employer you may

20 have used Russell Reynolds to assist you in finding a

21 potential employee for a vacancy?

22      A.    I don't believe so, but it's possible.

23      Q.    Is there a particular individual that you

24 normally deal with at Russell Reynolds?

Juergen Stark                                                    09/07/2005

35

1    Q.   Do you know what manager you would be taking

2    over for?

3    A.   Yes, Jim Witeck.

4    Q.   Was Mr. Witeck still at Motorola?

5    A.   Yes.

6    Q.   Had he been promoted or transferred?  Why was

7    he no longer in that role, if you know?

8              MS. MCGURN:    Objection.

9    A.   I don't know leading up to my hire.  I know

10   subsequent to my hire that he retired.

11   Q.   What was Mr. Witeck's title or position

12   within Motorola?

13   A.   General manager of the integrated solutions

14   division or ISD for short.

15   Q.   Then you said they would also be a new

16   component of the job as well in addition to assuming

17   Mr. Witeck's duties; is that correct?

18   A.   Yes.

19   Q.   What would this new component involve?

20   A.   Also running strategy in business development

21   for what is called the sector overall.

22   Q.   What specifically is the sector overall?  Is

23   there a particular division that is associated with?

24   A.   Yes.  The sector that is responsible for the

36

1    commercial and government solutions part of Motorola.

2        Q.    Is that CGISS?

3        A.    Yes.

4        Q.    Would you be, therefore, in charge of that

5    entity or that division?

6        A.    No.   I was responsible for strategy and

7    business development for that -- it's called the

8    sector, but you're calling it division.

9        Q.    Okay.   Did that mean you were in charge of

10   specific departments within CGISS?   I'm trying to

11   understand how it was organized.

12       A.    Sure.   I had two responsibilities, running

13   ISD, a division and operating division and managing a

14   group that was responsible for strategy and business

15   development.   There was a preexisting group that

16   reported in to me.

17       Q.    Now, with respect to the group that is

18   responsible for business development, was that the

19   MPS group or was the MPS group a subdivision of that

20   group?

21       A.    No, it was not.   We were still talking about

22   pre-hire.   The MPS group was introduced as a

23   responsibility either shortly before my hire or shortly

24   thereafter -- right around the time of my hire -- as a

Juergen Stark                                                                    09/07/2005

37

1    third responsibility.

2        Q.    So the MPS group would not be considered part

3    of the business development group; is that correct?

4        A.    Correct.

5        Q.    I take it that Motorola extended you an offer

6    or you wouldn't be sitting here this afternoon; is that

7    correct?

8        A.    Yes.

9        Q.    And you accepted that offer?

10       A.    Yes.

11       Q.    When did Motorola offer you the position?

12       A.    Late May or early June of '03.

13       Q.    Was it anticipated that you would start

14   immediately or was there some period for you to

15   disengage from Center Post?

16       A.    Yes.  There was a transition plan that was

17   then put into motion.

18       Q.    What was your actual start date at Motorola?

19       A.    My actual start date was July 7th.

20       Q.    Does Center Post continue to exist today as a

21   separate entity or organization?

22       A.    Yes, it does.

23       Q.    Does Motorola still have an interest or

24   investment in Center Post?

Juergen Stark                                                    09/07/2005

42

1              MS. MCGURN:    Objection.

2        A.    I don't understand the question.

3        Q.    Sure.  You said he had responsibilities at

4   least until October to manage as far as direct

5   responsibilities for managing the MPS group and after

6   October presumably he didn't have those

7   responsibilities; is that correct?

8        A.    Correct.

9        Q.    Did someone else assume those duties?

10       A.    Yes, Clyde Kofman.

11       Q.    Does the MPS group continue to exist today?

12       A.    No.

13       Q.    Is there something called the IMS group?

14   Does that exist today?

15       A.    No.

16       Q.    When did the MPS group cease operating as a

17   separate group?

18              MS. MCGURN:    Objection.  Do you mean

19   under any name?

20       A.    That's what I'm trying to -- it's not a

21   simple question to answer.

22       Q.    Did there come a point in time when the MPS

23   group was identified in some other way or reconfigured

24   in some way?

43

1          MS. MCGURN:    Objection.

2     A.    Yes.

3     Q.    When did that happen?

4     A.    I'm trying to think of the date here, the

5 month.  I believe in mid 2004 a piece of the group was

6 given new responsibilities inside of the public safety

7 group.  And at the end of 2004 or early 2005, the

8 remaining part of the group was absorbed into the

9 enterprize organization.

10     Q.    At the time you started at Motorola, do you

11 know how large the MPS group was, how many employees it

12 had?

13     A.    I believe roughly 20 to 22.

14     Q.    Did there come a point in time when that

15 number became substantially reduced?

16     A.    Yes.

17     Q.    When did that happen?

18     A.    I believe in Q1 of '04 -- I don't remember

19 the exact month.  It's not a simple yes or no question.

20 A portion of the group Latin America was moved under

21 the Latin American organization, I believe, in Q1 of

22 '04.  I'm not positive about that date.

23     Q.    What happened to the remaining portion of the

24 group?

Juergen Stark

09/07/2005

44

1      A.    So one part went to public safety.  The Latin

2    America part went to Latin America and the remaining

3    group of roughly six people remained reporting in to me

4    under Clyde's leadership.

5      Q.    That would be the group Mr. Rein worked in?

6      A.    Correct.

7      Q.    You think that happened, as best you can

8    recall, the end of '03 or first quarter of '04?

9      A.    Yes.

10      Q.    Let's focus in particular on the portion of

11    the MPS group that Mr. Rein and Mr. Kofman were a part

12    of.  Did that group then somehow reconfigure or

13    dissolve at some later point in time?  Let me ask it a

14    better way.  What happened to that group after Q1 of

15    '04?

16      A.    I want to clarify one thing.  The

17    restructuring had in Q4 of '03, the move to Latin

18    America.  So that group of six MPS people roughly, give

19    or take one or two, remained around through the end of

20    2004 roughly time frame wise and then was absorbed as

21    it is today into the enterprise group.

22      Q.    That happened at the end of '04; is that

23    correct?

24      A.    End of '04, early '05.

45

1    Q.    Now, what is the enterprise group?

2    A.    The enterprise group is a combination of an

3    existing business and some new pieces added like this

4    group of six chartered to go after enterprise

5    customers -- corporations.

6    Q.    What is an enterprise customer?

7          MS. MCGURN:    Objection.

8    A.    Enterprise customer is a corporation that is

9    not a government entity and not a consumer

10   -- individual consumer.  So corporations versus

11   government.

12   Q.    So does the MPS group, these five or six

13   individuals, no longer exist as a separate kind of

14   group or body?

15   A.    Correct.

16         MS. MCGURN:    Objection.

17   Q.    Who do the members of the former MPS group

18   now report to?

19         MS. MCGURN:    Objection.

20   A.    Again, we're speaking of the small group of

21   six, right?

22   Q.    Yes.

23   A.    They are now distributed although, I believe,

24   several still report to Clyde Kofman.

Juergen Stark

09/07/2005

47

1    Q.    Do you recall prior to mid October having any

2    specific interactions with Mr. Rein within the MPS

3    group?

4    A.    I have no specific recollection.  I believe I

5    did interact with him prior to that October meeting.

6    One piece of context is I had at the time 700 plus

7    people reporting to me.  This was a very small part of

8    my priorities and responsibilities.

9    Q.    Would it be fair to say between your start

10   date at Motorola and mid October of 2003, the bulk of

11   the managerial responsibilities for the MPS group was

12   assumed by Mr. Niersbach?

13   A.    Yes, correct.

14   Q.    Do you have any specific recollection of

15   Jay Rein giving you a Powerpoint presentation with

16   respect to a particular opportunity he was pursuing

17   with Express Link?

18   A.    I don't have any specific recollection.  I do

19   have a general recollection that that did happen, yes.

20   Q.    As best you can recall, what happened in that

21   interaction where he discussed the opportunity at

22   Express Link with you?

23   A.    I have no recollection honestly.

24   Q.    Do you recall telling him to move forward

Juergen Stark

09/07/2005

49

1    for 2004, what do you mean?

2        A.    For my collective group putting together

3    financial plans, budgets, et cetera, for 2004.   It

4    happened in the October time frame.

5        Q.    Did you establish a particular budget for

6    each group; is that correct?

7        A.    That meeting as part of normal process to get

8    a view of the plans for the following year that then

9    get combined into an overall plan.

10       Q.    As part of that process, would that involve

11   groups doing forecasting about the potential business

12   that they anticipated being able to generate for the

13   following fiscal year?

14       A.    Yes, it would.

15       Q.    As part of that process, were decisions being

16   made relating to the staffing of these particular

17   groups?

18       A.    Not staffing, per se, but financials overall,

19   yes.

20       Q.    In your mind, was one of the purposes of this

21   meeting to determine whether the MPS group would

22   continue as an entity going forward?

23       A.    Yes.

24       Q.    If you made the decision that the MPS group

Juergen Stark

09/07/2005

50

1  would not continue as an entity going forward, what

2  would have happened to the members of the MPS group?

3          MS. MCGURN:    Objection.

4      A.    I don't know.

5      Q.    Would they potentially have been terminated

6  by Motorola?

7      A.    Possibly.

8      Q.    What were the other alternatives?

9      A.    Redeploy.

10     Q.    So it is really just those two, isn't it?

11  You find another position for them within the

12  organization or they would have been terminated?

13          MS. MCGURN:    Objection.

14     A.    Correct.

15     Q.    Was the MPS group operating under a

16  particular business model or defined objectives in the

17  October time frame that you can recall?

18          MS. MCGURN:    Objection.

19     A.    I'm not sure I know what you mean.

20     Q.    What was their overall strategy or goal as

21  far as generating business for Motorola?

22     A.    Their overall strategy and goal was to

23  generate business for Motorola in the professional

24  services arena.

52

1    solutions?

2        A.    Sure.    Mobility solutions means technology

3    devices that employees of businesses would use when

4    they are out in the field or otherwise unconnected by

5    wires.

6        Q.    Was it anticipated they were primarily

7    selling services or products?

8            MS. MCGURN:    Objection.

9        A.    Primarily services with the goal to pull

10   through products.

11       Q.    Was it, therefore, envisioned that the MPS

12   group would partner with other parts of the company in

13   conjunction with providing the services?

14           MS. MCGURN:    Objection.

15       A.    Less so the services.    More so the product

16   part of it.

17       Q.    Was it anticipated that the MPS group itself

18   would have the technical expertise necessary to provide

19   these services or would it again rely on the resources

20   of the Motorola organization to provide that technical

21   expertise?

22           MS. MCGURN:    Objection.

23       A.    Some should be in the group, but some would

24   come from other parts of Motorola.

53

1    Q.    Would it be fair to say they were expected to

2    work with other groups within Motorola to provide

3    mobility solutions to prospective customers?

4    A.    I'm not sure I understand.  They were

5    expected to work with other groups within Motorola.

6    They should be capable of providing some level of the

7    services themselves as a team, but when there were

8    highly technical or product deployment type of things,

9    that would then come from other parts of Motorola.

10   There was not a well established business model yet,

11   though, around this.  This was still experimental.

12   Q.    Was there still some effort to identify who

13   would be the likely customers for these services?

14   A.    Yes.

15   Q.    Was there at this time some effort to

16   identify specifically the types of services the group

17   would be providing to potential customers?

18   A.    Yes.

19   Q.    Were the individuals in the MPS group people

20   like Mr. Rein, Mr. Kofman and Mr. Gillardi, were they

21   considered salesmen, consultants, technical people or

22   all of the above.  I'm trying to get a handle.

23           MS. MCGURN:    Objection.  Considered by

24   Mr. Stark?

Juergen Stark                                                    09/07/2005

54

1              MR. COSTER:    Sure.

2         A.    To some extent all of the above.  They were

3    considered like partners in a professional services

4    firm.  So selling engagements and doing the front end

5    of the work.

6         Q.    So there was a sales component and then a

7    component of actually providing the consulting services

8    itself?

9         A.    Absolutely.

10         Q.    Was it anticipated that the people within the

11    MPS group itself would work in teams or work

12    individually?

13         A.    Both.

14         Q.    At the time of your initial meeting with the

15    MPS group, did they have specific sales goals they were

16    expected to achieve?

17         A.    Leading up to the meeting or subsequent to

18    the meeting?

19         Q.    Leading up to the meeting.  Let's do it that

20    way.

21         A.    Yes.

22         Q.    Were those individual sales goals or were

23    those sales goals for the group?

24         A.    Both.

Juergen Stark                                    09/07/2005

57

1    money at that time, to the best of my recollection.

2    And it was tracked separately by me at least and by the

3    financial people.  I don't know technically how it was

4    tracked in the system.

5         Q.   So, from your prospective, you were aware it

6    was not making money?

7         A.   That is correct.

8         Q.   Prior to the meeting you had in October, did

9    you have an opinion one way or the other whether the

10   MPS group should be disbanded?

11        A.   No.  I was being open minded.

12        Q.   It's my understanding you met with the MPS

13   group on two separate days.  Does that comport with

14   your memory as well?

15        A.   Yes.

16        Q.   With respect to the first presentation, what

17   do you recall about the first presentation that was

18   made to you by the MPS group?

19                   MS. MCGURN:   The October time frame?

20                   MR. COSTER:   Yes.

21        A.   I believe you are referring to the meeting on

22   the 17th?

23        Q.   Yes.

24        A.   I don't recall specifically about the

Juergen Stark                                                        09/07/2005

58

1   meeting, but I recall being clearly disappointed with

2   the results.

3       Q.   Why were you disappointed?

4       A.   The presentation lacked specifics both about

5   prior performance and prior accomplishments and future

6   plans.

7       Q.   Do you recall who actually presented the MPS

8   group's plans in that first meeting?

9       A.   No, I don't.  I believe it was a team effort,

10  though.

11      Q.   Do you remember any particular individual

12  leading the presentation on behalf of the team?

13      A.   No.

14      Q.   Other than being disappointed with the

15  presentation, do you recall any other specifics of what

16  transpired in the first presentation?

17              MS. MCGURN:    Objection.

18      A.   No specifics but to do for the group was to

19  come back in a short time frame and give me another run

20  through with more specifics to meet my needs.

21      Q.   Did you tell the group you were disappointed

22  with the presentation that they had made?

23      A.   Yes.

24      Q.   What else do you specifically recall telling

Juergen Stark

09/07/2005

59

1    the group?

2        A.    I don't recall any specifics other than

3    asking them to re-do what they have done and come back

4    in a short amount of time again.

5                    (Recess taken.)

6    BY MR. COSTER:

7        Q.    I would like to briefly back up for a minute.

8    I think you testified previously that at least on

9    several occasions that you can recall while you were at

10   Motorola you used Russell Reynolds or some other

11   executive placement firm or executive recruiter to fill

12   positions; is that correct?

13       A.    Yes.

14       Q.    I take it that these recruiters or placement

15   firms charge a fee to the company for assisting them in

16   filling a position; is that correct?

17       A.    Yes.

18       Q.    Generally from your experience what is the

19   cost associated with using an executive search firm?

20   Is it a percentage of the employee's salary?

21       A.    Yes, generally a percentage of the employee's

22   salary.

23       Q.    Is it a fairly standard percentage or does it

24   vary with the placement?

# EXHIBIT B
# PART 2

67

1    cost of the hardware and software associated with the

2    sale.

3        Q.    So the first entry is the actual sales or the

4    revenue generated by the group?

5        A.    Correct.

6        Q.    The second "HW, slash, SW" depicts the costs

7    of the hardware or software provided by Motorola; is

8    that correct?

9        A.    Yes.

10        Q.    Then the third category "MPS labor" is an

11    attempt to break out the labor costs from Motorola's

12    perspective?

13                MS. MCGURN:    Objection.

14        A.    Again, I am interpreting the chart.    Yes,

15    that's how I read it.

16        Q.    With respect to gross margin, what is that

17    calculation?

18        A.    That is the revenue sales minus hardware

19    software minus labor.

20        Q.    Okay.

21        A.    I think that math works.

22        Q.    I believe your testimony was that at the

23    conclusion of the first meeting, you indicated to the

24    group that you were disappointed and you asked them to

68

1    go back and prepare another presentation; is that

2    correct?

3        A.    Correct.

4        Q.    Why did you do that?

5        A.    I thought the presentation lacked specifics

6    both about prior accomplishments and future plans.

7        Q.    Did you want to give them another opportunity

8    to prepare a presentation to you?

9        A.    Yes.  Let me expand one other reason.  Both

10    specifics were missing and the plan didn't seem bold

11    enough for the group of senior executives that were

12    responsible for this business.

13        Q.    Okay.  At the conclusion of the first

14    presentation based on what you had seen, was there some

15    doubt in your own mind about whether you would

16    authorize the MPS group to continue forward as an

17    ongoing entity?

18        A.    Yes.

19        Q.    Did you meet with the MPS group a couple of

20    days later for a second presentation?

21                MS. MCGURN:    Objection.

22        A.    Yes.

23        Q.    What do you recall about that second

24    presentation made by the MPS group?

Juergen Stark                                                    09/07/2005

73

1    presentation that was made to you?

2        A.    No other specifics.

3        Q.    Do you recall who was the employee or if

4    there was one particular individual who led the

5    presentation on the second presentation?

6        A.    I don't remember.

7        Q.    By the end of the second presentation, had

8    you made a decision about whether you wanted the MPS

9    group to moved forward as a separate entity?

10                  MS. MCGURN:    Objection.

11        A.    Yes.  We agreed that the group would move

12    forward based on the second presentation.

13        Q.    What specifically do you recall telling the

14    group as far as that is concerned?

15        A.    I don't remember any of the specifics.  I

16    know that I was satisfied enough with the effort to, in

17    essence, let the experiment continue with the group.

18        Q.    Do you remember any specific discussions

19    about what the future of the MPS group would be within

20    Motorola at the conclusion of the second meeting?

21        A.    I do recall that we agreed to check back in

22    with each other mid '04 a good point to get a re-read

23    of the business in addition to doing normal monthly

24    reviews of where things stood.

76

```
 1        A.    Yes.

 2        Q.    What specifically did you do to communicate

 3   to them that they had the support of the company going

 4   forward?

 5        A.    I don't recall specifics.  I believe I did

 6   give them a pep talk after the second presentation also

 7   in response to having a tough first meeting with them

 8   where I wanted them to feel better about the work they

 9   had done.

10        Q.    Do you recall what you said in the pep talk

11   you gave them?

12        A.    No.

13        Q.    Did you want the employees to believe they

14   would be given a reasonable opportunity to make the MPS

15   group work and be an profit center -- to use that

16   word -- to be profitable for Motorola?

17              MS. MCGURN:    Objection.

18        A.    Yes.  There are two questions in there.

19        Q.    Did you want the members of the MPS group to

20   believe that they would have a reasonable opportunity

21   to improve their performance?

22        A.    Yes.

23        Q.    What, if anything, did you say to them to

24   encourage them to believe that they would have a
```

Juergen Stark                                                    09/07/2005

77

1    reasonable opportunity to improve their performance?

2        A.    I don't recall any specifics.

3        Q.    Did you tell them that they would be given

4    until June 30th to demonstrate positive trends in

5    business activities for the group?

6        A.    I don't recall the specific language.  I do

7    recall agreeing that we would have a formal checkpoint

8    in addition to the monthly reviews midyear.

9        Q.    Did you indicate June 30th or around that

10   time frame would be the next time Motorola would

11   revisit whether the MPS group should continue to

12   operate as a separate entity?

13           MS. MCGURN:    Objection.

14       A.    Again, I don't recall the specifics, but I

15   know that time frame midyear was what we had agreed on.

16       Q.    Did you intend for the employees to rely on

17   the statements you made to them during this meeting?

18           MS. MCGURN:    Objection.

19       A.    I don't understand what that means.

20       Q.    You made certain statements to them

21   concerning, for example, that you would check in with

22   them again on June 30th -- the June 30th time frame.

23   Did you intend or want employees to rely on the

24   statements that you made to them?

78

1              MS. MCGURN:    Objection.

2        A.    I intended the June 30th time frame to be a

3    point in time where we could recalibrate and also do a

4    course correction if it made sense to do so midyear.

5    You can't do it later in the year because it's too late

6    to do anything.  You can't do it much earlier because

7    the team doesn't have time to produce.

8        Q.    With respect to the compensation of the

9    members of the MPS group, did you have any involvement

10   or input into their compensation?

11       A.    Up until that point, no.  I was aware of the

12   compensation of at least one individual in the group

13   and obviously had input into the compensation decisions

14   moving forward.

15       Q.    At some point in January of 2004, did you

16   have any input in the decision to pay a retention bonus

17   to any members of the MPS group?

18       A.    It wasn't a retention bonus but, yes, I had

19   input into the decision to pay them an amount of money

20   to make up for the fact that they would not be getting

21   money under the normal Motorola bonus plan.

22       Q.    Did each of the employees in the MPS group

23   receive this bonus that you referred to?

24       A.    I believe so, yes.

Juergen Stark                                                      09/07/2005

79

1      Q.    That would include Mr. Rein?

2      A.    Yes.

3      Q.    Do you know how Motorola characterized that

4    bonus to employees?

5              MS. MCGURN:    Objection.

6      A.    I don't know how Motorola characterized it to

7    the employees.

8      Q.    Who would have been responsible for making

9    that characterization on Motorola's behalf?

10     A.    The HR department.

11     Q.    Is there a particular individual in the

12   HR department that would make that characterization?

13     A.    Peter Tobin.

14     Q.    Were you the individual that suggested that

15   Mr. Rein and the other members of the MPS group receive

16   a bonus in January 2004?

17     A.    No.    I don't believe I was the person who

18   suggested it.

19     Q.    Whose suggestion was it?

20     A.    I don't recall.

21     Q.    Do you remember having any discussions with

22   anyone within Motorola about whether these employees

23   should receive a bonus in January 2004?

24     A.    Yes.

Juergen Stark                                                           09/07/2005

80

1      Q.    Who did you have discussions with?

2      A.    I believe with Peter Tobin, possibly Clyde

3   Kofman.

4      Q.    Did you speak with them individually or

5   together?

6      A.    I don't recall.  I do recall feeling it was

7   unfair that the group would get nothing on the normal

8   Motorola bonus plan, and I did eventually approve

9   paying them something.

10     Q.    Do you know who initially suggested they be

11  paid a bonus?

12     A.    I don't recall.

13     Q.    What do you recall about your discussions

14  with Mr. Tobin on this topic?

15     A.    No specifics.  I recall sitting down with

16  maybe Peter Tobin and Clyde Kofman -- I don't

17  remember -- and having a very quick discussion whether

18  I would approve moving forward with something like that

19  and I agreed to move forward.

20     Q.    Did Mr. Tobin indicate to you whether he

21  thought it appropriate to pay members of the MPS group

22  a bonus?

23     A.    Yes.

24     Q.    What do you recall him saying on that topic?

Juergen Stark                                                    09/07/2005

82

1    action items.  I don't remember what they were.

2                    (Exhibit No. 3 marked for

3    identification)

4                    (Discussion off the record.)

5    BY MR. COSTER:

6        Q.    I show you what's been marked as Exhibit 3 to

7    your deposition.  If you could take a minute to review

8    it.

9        A.    (Witness complies.)   Okay.  Now I remember.

10       Q.    Does this in any way refresh your

11   recollection that there was some additional material

12   provided to you by the MPS group after the second

13   meeting you had with him in October?

14       A.    Yes.  This jogs my memory.

15       Q.    Okay.  Was one of the things you asked the

16   MPS group to do, was it to identify an individual who

17   should run the group?

18       A.    Yes.

19       Q.    Why did you feel it was necessary for them to

20   identify an individual to run the group?

21       A.    Because Tom wanted to move out of the role

22   and do something else.  So I had five or six senior

23   executives and felt like I didn't want to have all them

24   reporting to me directly.  So someone needed to take

83

1    the manager's spot.

2        Q.    What did you anticipate this individual's

3    responsibilities being as far as management of the

4    group itself?

5        A.    To have full responsibility for the business

6    results, the management and the decision making for the

7    group.

8        Q.    Did you anticipate them making decisions

9    about what business the group should pursue?

10       A.    Only to the extent that it would be

11   consistent with overall plans for the group but, yes,

12   within those parameters, yes.

13       Q.    The overall plans having been what was

14   established at the end of the second meeting with you;

15   is that correct?

16       A.    Yes, and practical course corrections along

17   the way.

18       Q.    Did you envision this individual having

19   authority to independently hire employees into the

20   group?

21       A.    Yes, if the head count was approved.

22       Q.    But they would have to obtain approval to

23   hire additional people?

24       A.    Yes.

Juergen Stark

09/07/2005

84

1      Q.    From whom would they have to obtain approval?

2      A.    From the CFO and, if necessary, from me.

3      Q.    Did you anticipate this individual having

4    authority to discipline employees within the group?

5      A.    Yes, of course.

6      Q.    Did you anticipate them having authority to

7    terminate individuals?

8      A.    Yes.

9      Q.    In your view, would the person if there was

10   someone from within the group who was designated as a

11   manager, would that be a promotion for the individual?

12     A.    Promotion as to mean -- there was no salary

13   or grade change, so in that regard, no.  But from a

14   hierarchical prospective, yes.

15     Q.    You didn't anticipate there being any

16   additional compensation being paid to this individual?

17     A.    Correct.

18     Q.    Did you anticipate that the person, the

19   manager, would come from within the group itself or

20   would be someone that would be hired outside?

21     A.    No.  I specifically asked them -- the group

22   themselves -- to identify a manager.

23     Q.    In your experience having been in the

24   corporate world for a number of years, would it be fair

Juergen Stark                                                    09/07/2005

85

1   to say it's somewhat unusual for a group of employees

2   to identify who among them is going to be become their

3   manager?

4              MS. MCGURN:    Objection.

5       A.   Yes.  It's unusual.  There are two reasons

6   for it:  One is this group was still an experiment

7   overall.  And, number two, this was one percent roughly

8   of my total responsibilities.  So for us to go through

9   the effort to find an outside candidate like that did

10  not make sense.

11      Q.   Was there a reason you, yourself, didn't

12  designate the person to assume the managerial role?

13      A.   Yes.  I wanted the group who had been working

14  as a team to make that designation very intentionally

15  so they would all support the leader of the group

16  versus me designating it and creating bad feelings.  It

17  was an unorthodox approach but, in this case, given the

18  experimental nature of it, I thought it made sense.

19      Q.   When you met with the MPS group, was there

20  any discussion of exactly what this individual's role

21  or duties or responsibilities would be?

22      A.   I don't recall any specific discussion, but

23  everyone knows what it means to be a manager of the

24  group.  That should be clear to anybody who has worked

86

1    for any amount of time.

2        Q.    Directing your attention to the following

3    page of this exhibit which appears to be some sort of

4    an organizational chart; is that correct?

5        A.    Yes.

6        Q.    Particularly looking at the far left-hand

7    column it says "Intelligent Mobility Solutions to

8    Juergen Stark five or six FTE's" and it has the people

9    in the MPS group; is that correct?

10       A.    Yes.

11       Q.    Now, in this organizational chart they were

12   providing to you, there does not seem to be any

13   indication or it seems to indicate each of those

14   individuals report directly to you; is that correct?

15       A.    According to the chart, yes, but that is not

16   the purpose of the chart.

17       Q.    So you didn't understand that as being some

18   indication on the part of the MPS group that they

19   thought they would all continue to be under your

20   direction?

21       A.    Correct.  And I'm reading the chart again and

22   it clearly says "Follow-up item #1" which was the

23   allocation of the heads.

24       Q.    So you didn't understand that as an

Juergen Stark

09/07/2005

87

1    indication that they thought they were working under

2    you?

3        A.    Correct.  This was not a work chart.  It is

4    where these people line up.

5        Q.    Now, directing your attention to page 277, it

6    says "Follow-up to Item #3.  Who will lead the IMS

7    Group?" It says "The "core" team of IMS which is

8    migrating from MPS believes that Clyde Kofman should

9    lead the new IMS group;" is that correct?

10       A.    Correct.

11       Q.    Do you know recall having any discussions

12   with any members of the MPS group about why Mr. Kofman

13   was chosen to lead the group?

14       A.    I don't recall.

15       Q.    Did you agree with their decision to

16   designate Mr. Kofman as the manager of the new IMS

17   group?

18       A.    Yes.

19       Q.    After the second October meeting you had with

20   the MPS group, did you continue to oversee their

21   operations?

22       A.    Yes.

23       Q.    What specifically do you recall doing in

24   conjunction with your oversight responsibilities of the

Juergen Stark                                                    09/07/2005

88

1    group?

2        A.    Limited, but regular updates from Clyde

3    Kofman and ad hoc interactions when and if needed.

4        Q.    How frequently do you recall receiving

5    updates from Mr. Kofman after October of 2003?

6        A.    I believe monthly.  Although, in some cases,

7    my CFO would do the review instead of me.

8                    (Recess taken.)

9    BY MR. COSTER:

10       Q.    Before we took a break, you were testifying

11   that you had monthly meetings with Mr. Kofman to get

12   updates on the progress of the MPS group; is that

13   correct?

14       A.    Meetings or would review -- like he did a one

15   page or couple of pages.

16       Q.    Would sometimes these meetings be

17   face-to-face or on other occasions would he provide you

18   with written documentation?

19       A.    Always written documentation, sometimes

20   face-to-face meetings.  I don't recall specifically how

21   many of which.  And in some cases I wouldn't do it.

22   The CFO of my group would do it.

23       Q.    So he would meet with the CFO?

24       A.    If I couldn't make it or had some other

Juergen Stark

09/07/2005

107

1    Q.   Directing your attention to the first email

2    in this series, the top of the page.  Is this an email

3    you received from Mr. Kofman on or about February 3rd?

4    A.   Yes.

5    Q.   Had you had any discussions with Mr. Kofman

6    about Jay Rein prior to receiving this email?

7    A.   I don't recall.

8    Q.   Do you recall having any discussions

9    immediately after receiving this email with Mr. Kofman

10   about Jay Rein?

11   A.   I don't recall.

12   Q.   Okay.  Directing your attention to the third

13   sentence in his email, it says "I have concerns over

14   his" -- and I think he is referring to Jay Rein --

15   "ability to stay focused."  Did you understand what

16   Kofman meant by this statement?

17   A.   I'm not sure I know what you mean.  I know

18   what that sentence means and what it implies about Jay,

19   yes.

20   Q.   What was your understanding of what

21   Mr. Kofman was saying about Mr. Rein?

22   A.   My understanding is he is saying that Jay

23   has -- he has concerns about Jay's ability to stay

24   focused on a set of opportunities that fit with the

Juergen Stark

09/07/2005

113

1     Q.   As best you can recall, what was the

2   substance of your conversation with Mr. Kofman?

3     A.   The substance was the group needed to be

4   restructured.  It was too top heavy, essentially a

5   consulting firm with only partners and no associates to

6   do work.  So Clyde would be pursuing to restructure the

7   group.

8     Q.   Did he tell you how he wanted to restructure

9   the group?

10     A.   By letting one of existing folks go.

11     Q.   Did he tell you if he had selected someone

12   for termination?

13     A.   Eventually, yes.  I don't know if it was in

14   that first meeting or if we agreed on the approach and

15   he came back with the recommendation.

16     Q.   How did he feel or did he feel that

17   restructuring the group would be beneficial to the

18   MPS group?

19     A.   I don't know how he felt.  He communicated --

20     Q.   Did he tell you he believed restructuring the

21   group would be beneficial?

22     A.   Yes.

23     Q.   Did he tell you why he felt restructuring

24   would be beneficial?

Juergen Stark                                                                09/07/2005

114

 1        A.    Because the group would be more balanced in

 2   having at least some people to do the day-to-day

 3   tactical work versus essentially only having kind of

 4   principals on the team.

 5        Q.    When you say the day-to-day tactical work,

 6   what are you referring to?

 7        A.    Once an engagement was closed to not use

 8   senior executive resources to do the tactical work with

 9   the customers.

10        Q.    In its most pragmatic terms, what do you mean

11   by tactical work?  What kinds of work are we talking

12   about?

13        A.    Being on site with the customer, reviewing

14   their materials, developing, doing the analysis, then

15   working with the more senior folks that develop

16   recommendations.

17        Q.    Would these be characterized as performing

18   consulting services for the customer?

19        A.    Sure.

20        Q.    So he felt separate consultants needed to be

21   hired within the group?

22        A.    Well, every professional services firm has

23   partners and associates and the idea was to more

24   reflect that kind of a model.

Juergen Stark

115

1     Q.   Was there a feeling on his part or did he

2    express a belief that the group needed more people to

3    be delivering services in the February 2004 time frame?

4             MS. MCGURN:   Objection.

5     A.   Two questions in that.

6     Q.   Did he indicate to you that he believed the

7    group needed more people delivering services in the

8    2004 time frame?

9     A.   Yes.

10     Q.   How many ongoing projects did the MPS group

11   have in the 2004 time frame?

12     A.   I don't remember.

13     Q.   Was it more than four?

14     A.   I honestly don't remember.

15     Q.   Are you aware of there being a problem in the

16   February 2004 time frame with the group delivering

17   services to the customers it had?

18     A.   I remember that we were reliant on borrowing

19   resources from other parts of Motorola, not a

20   sustainable model.

21     Q.   Was that because the MPS group lacked the

22   technical skills necessary to perform the services or

23   you just didn't have enough bodies within the group or

24   was there some other reason?

# EXHIBIT B
# PART 3

Juergen Stark                                                                09/07/2005

116

1          MS. MCGURN:   Objection.

2      A.   Do you want to restate that?

3      Q.   Sure.  Did Mr. Kofman tell you why he felt

4  that they were having difficulty delivering services?

5      A.   Because we were borrowing -- for the more

6  junior level work, we were borrowing resources.

7      Q.   Did Mr. Kofman tell you why the company

8  needed to borrow resources from other parts of

9  Motorola?

10     A.   Because -- I'm not sure I understand.

11     Q.   Is it that --

12     A.   We were closing engagements and somebody

13  needed to go do the work then.

14     Q.   Do you need to borrow people because you have

15  a shortage of manpower within the MPS group or because

16  you had a deficiency in expertise or for some other

17  reason?  There are a numbers of reasons you might want

18  to borrow employees or need to borrow employees from

19  elsewhere within Motorola, and I'm trying to ascertain

20  which of those reasons were applicable here.

21     A.   So I would characterize it as a poor

22  allocation of resources using expensive senior

23  executives to do junior level work.

24     Q.   So was it a feeling the people within the

Juergen Stark                                                      09/07/2005

117

1    group currently were overqualified for some of the

2    tasks they were performing?

3        A.   Yes.

4        Q.   And there was a need to hire less experienced

5    less qualified people to perform those services?

6                    MS. MCGURN:    Objection.

7        A.   Less experienced.

8        Q.   Did you agree with Mr. Kofman's assessment?

9        A.   Yes.

10       Q.   Did you agree that a position needed to be

11   eliminated?

12       A.   Yes.

13       Q.   Did you agree that additional less

14   experienced personnel needed to be hired for the MPS

15   group?

16       A.   I agreed that that conceptually made sense as

17   a good forward plan, yes.

18       Q.   Following the termination of Mr. Rein's

19   employment, was there an effort made to hire less

20   experienced individuals in to the MPS group?

21       A.   I don't recall.  I believe we waited to see

22   if the work was materializing.

23       Q.   So would it be fair to say that in the

24   February 2004 time frame you were unsure whether

Juergen Stark

09/07/2005

118

1    additional less experienced employees needed to be

2    hired?

3                    MS. MCGURN:    Objection.

4        A.    No.

5        Q.    So would it be fair to say you believe that

6    less experienced employees needed to be hired in

7    February of 2004?

8        A.    Not in February of 2004, but at some point

9    that kind of rebalance model made sense.    That I did

10   believe, yes.

11       Q.    So was it your intention to wait a period of

12   time before attempting to hire additional less

13   experienced individuals?

14       A.    I didn't have an intention at the time.    It

15   was Clyde's business to manage.    I agreed with the

16   concept of what he was doing and left the details up to

17   him.

18       Q.    Would he have needed your authority to hire

19   additional less experienced individuals into the group?

20                   MS. MCGURN:    Objection.

21       A.    He would not have needed my authority.    He

22   would have needed approval for the head count.

23       Q.    How is that different?

24       A.    Fair enough.    So it's a procedural question.

124

1      Q.    Did he identify any individuals that

2  Mr. Rein had difficulty working with?

3      A.    I don't remember if we discussed the

4  specifics.

5      Q.    Do you recall him telling you in what way

6  Mr. Rein was difficult to -- had difficulty working

7  with other employees?

8      A.    The only specific I can remember is -- the

9  impression I got from the conversation was can be

10  abrasive.   I do remember feeling comfortable that Clyde

11  had substantial cause to kind of have Jay be the one

12  that would be leaving the group.

13      Q.    I recognize your interactions with Mr. Rein

14  were limited, but during your interactions with

15  Mr. Rein, did you find him abrasive?

16      A.    I have no basis for judgement.   Too limited.

17      Q.    Based on your limited interactions with him,

18  did you find him difficult to work with?

19      A.    I couldn't judge.   So I can't answer that.

20      Q.    You didn't have enough information?

21      A.    No.   I didn't have enough information to have

22  an opinion.

23      Q.    But it would be fair to say that you can't

24  think of an occasion where you had difficulty working

125

1    with Mr. Rein?

2            MS. MCGURN:    Objection.

3        A.    Correct.

4        Q.    Now, with respect to Kofman's statement that

5    Mr. Rein had difficulty working with other employees

6    within the group itself, the MPS group, or was this

7    with other employees outside the MPS group at Motorola?

8            MS. MCGURN:    Objection.

9        Q.    Or did he identify with what group of

10   employees or individuals Mr. Rein had difficulty

11   working with?

12       A.    I don't remember the specifics, but I

13   remember in general difficulty working inside and

14   outside of the group.

15       Q.    So your memory is that Mr. Kofman told you

16   that Jay Rein also had difficulty working with the

17   other members of the MPS group?

18       A.    Yes.

19       Q.    Were there discussions about anybody outside

20   of Rein being the person to have their position

21   eliminated?

22       A.    I don't recall.

23       Q.    Based on your conversations with Mr. Kofman,

24   did you agree with his recommendation that it should be

126

1    Jay Rein whose position was eliminated?

2         A.   Yes.

3         Q.   Did you authorize him to eliminate Mr. Rein's

4    position?

5         A.   Yes.

6         Q.   Was human resources involved in any

7    discussions you had with Mr. Kofman concerning the

8    elimination of Mr. Rein's position?

9         A.   I don't recall if they were ever involved in

10   those initial conversations, but certainly they were

11   involved with Peter and Clyde and I along the way

12   here -- primarily with Clyde.

13        Q.   With respect to the discussions you had about

14   potentially hiring two less experienced individuals for

15   the MPS group, did you have any discussions with the

16   CFO about that issue?

17        A.   I am not sure what you mean.

18        Q.   I think you said at some point the CFO would

19   potentially become involved with these kinds of

20   staffing decisions if someone was going to be hired.

21   And my question to you is since you and Mr. Kofman were

22   discussing potentially hiring two additional employees

23   for the MPS group, if you ever had any discussions with

24   the CPO about that possibility?

132

1   conversation before, too many senior people and not

2   much junior people.

3       Q.   Did he explain how those mix issues made it

4   difficult to deliver more than one consulting

5   engagement at a time?

6       A.   I don't recall specifically what we

7   discussed, but I understand exactly what this point is

8   here.

9       Q.   What's your understanding?

10      A.   My understanding is we had too few junior

11  people on the team and we couldn't handle more than one

12  engagement at a time.  Quite frankly, I don't remember

13  how we did one engagement at a time.  Some of the folks

14  must have been more junior.  I don't even remember who

15  those were.

16      Q.   What does that refer to one engagement at a

17  time?

18      A.   We only have enough people to have one

19  customer engagement under way at a given time.

20      Q.   Directing your attention to the top of the

21  following page it says -- second sentence says "Further

22  complicating these organizational mix and skill issues

23  is a continuing behavioral issue with Jay Rein."  Do

24  you understand what Mr. Kofman is referring to when he

Juergen Stark                                                    09/07/2005

134

1    of all, what are RPA materials?

2        A.    I think RPA stands for relative performance

3    assessment and both the RPA and the 4 E's plus one

4    leadership are the standard Motorola process for

5    assessing performance.

6        Q.    During your conversations with Mr. Kofman,

7    did he indicate to you he had reviewed those materials

8    relating to Jay Rein?

9        A.    Yes.

10       Q.    Did he indicate what specifically in those

11   materials led him to believe that Mr. Rein did not

12   exhibit the 4E's plus one leadership behaviors

13   required?

14       A.    I don't remember those specifics.

15       Q.    Did you, yourself, independently review

16   either the RPA materials or feedback from four through

17   six CGISS go to market team members?

18       A.    No.

19       Q.    Let's focus on that second one, "Feedback

20   from four through six CGISS go to market team members,"

21   do you know what he is referring to there?

22       A.    What type of people?

23       Q.    I don't know what that is.  He is referring

24   to feedback from four through six CGISS go to market

Juergen Stark                                                    09/07/2005

135

1    team members.    Who are the CGISS go to market team

2    members?

3         A.    CGISS is the overall sector.    Go to market

4    team members imply customer facing team members.    There

5    are two groups in this context that would have had

6    that.    One is the SMD group which was selling alongside

7    of IMS, and the other place would have been IMS.    I

8    don't remember whether this meant both.    It certainly

9    would imply the SMD group.

10        Q.    So you think he is at least referring to

11   feedback he got from individuals within the SMD group?

12        A.    Correct.

13        Q.    You don't know which specific individual he

14   is referring to, do you?

15        A.    No.

16        Q.    Do you know on what occasions Mr. Rein worked

17   with members of the SMD group?

18        A.    It would be part of his normal day-to-day job

19   to work with those resources.

20        Q.    Okay.    You said it could also refer to

21   members of the IMS group; is that correct?

22        A.    It could, yes.

23        Q.    The IMS group is also what we have been

24   referring to as the MPS group?

Juergen Stark

09/07/2005

136

1    A.    I don't think it does, but it could.

2    Q.    He gives examples of what he uses as

3  Mr. Rein's behavioral issues.  It says "Edge - poor

4  respect for others, often confrontational and

5  argumentative."  Did you ever discuss that with

6  Mr. Kofman during your meetings with him?

7    A.    We certainly discussed the specific issues

8  and I have a distinct recollection of this because the

9  RPA, the feedback from other people in the 4E's plus

10  one leadership are fact based ways for Clyde to have an

11  assessment of Jay's performance outside of Clyde's own

12  experience.

13    Q.    Did he show you any of those materials as

14  part of your discussions?

15    A.    I don't recall.  He may have.

16    Q.    Did he give you specifics as to what he had

17  found in the RPA materials?

18    A.    I don't remember what level of specificity we

19  discussed, but enough of a level for me to be

20  comfortable with the decision.

21    Q.    Did he give you any specific examples of

22  Mr. Rein showing poor respect for others or being

23  confrontational or argumentative?

24    A.    I don't remember specifics, but I do

Juergen Stark

09/07/2005

145

1    by phone or was it a face-to-face meeting or email?

2        A.    I don't remember.  I believe it was either a

3    phone call or face to face.

4        Q.    Do you know where Jay Rein was physically

5    located when he was told his employment was being

6    terminated?

7        A.    I didn't know at the time, but I know from

8    these proceedings that it was at the airport

9    apparently.

10       Q.    Do you recall ever having a face-to-face

11   meeting shortly after Mr. Rein was terminated

12   concerning the decision?

13       A.    I believe I had a face-to-face meeting, yes.

14   I'm not positive that it wasn't a phone call, but I do

15   know I would have made time to have a meeting with him

16   if he requested it.

17       Q.    So you did have some conversation?

18       A.    I'm sure I had conversation with him, yes.

19       Q.    And you're not sure if it was by phone or if

20   it was in person?

21       A.    I think it was in person, but it may have

22   been by phone.

23       Q.    Do you recall anyone else being present when

24   you had this conversation with Mr. Rein?

Juergen Stark                                                    09/07/2005

146

```
 1        A.    I don't recall.

 2        Q.    Was it a single conversation?

 3        A.    I believe I had multiple conversations with

 4   Jay after he was notified and I would have frankly

 5   taken the time to -- I would have given him some time

 6   if he needed it.

 7        Q.    With respect to the first contact you had

 8   with Mr. Rein, as best you can recall, what was the

 9   substance of your conversation with him?

10        A.    I don't remember the details, but I do

11   remember that he complained about being terminated and

12   accused Clyde of doing it just because he and Clyde

13   didn't get along.  That was the substance I remember.

14        Q.    What was your response when he said he felt

15   that Mr. Kofman had terminated him simply because they

16   didn't get along with one another?

17        A.    Again, I don't recall the specifics.  In

18   general I know my response was to support Clyde's

19   decision as the manager of the group, to let Jay know

20   if that was a relationship issue, that's a performance

21   issue and also to -- I believe either Jay suggested it

22   or I did it on my own initiative -- to call a couple of

23   the folks on the MPS team to just make sure there

24   wasn't something going on here that wasn't appropriate.
```

Juergen Stark

09/07/2005

147

1      Q.    So either he suggested you do that or you

2   volunteered you would do that?

3      A.    I know I took action to do that just to do my

4   diligence and make sure everything was legitimate.

5      Q.    After speaking with Rein, did you contact any

6   of the other individuals of the MPS group?

7      A.    I know I contacted at least Paul Lanci.  I

8   may have contacted one other person.  The only

9   conversation I know I had was with Paul Lanci.

10      Q.    Now, at the time you had this conversation in

11   February of 2004, was Paul Lanci part of the MPS group?

12      A.    I believe at that time he moved over to the

13   public safety group.  I'm not positive the sequence of

14   events.  I do know that I made a decision to call him

15   because I viewed that he would be the most objective of

16   the group because either he had moved out or was going

17   to be moved out.

18      Q.    And that was the reason you selected

19   Mr. Lanci?

20      A.    Yes.  And I believe I called one other

21   person, but I don't recall who it was or whether I did

22   for sure or not.  My goal was to substantiate the

23   fairness here and I know I accomplished that.

24      Q.    So you were the one who chose the person

Juergen Stark

09/07/2005

148

1    within Motorola to contact; is that correct?

2       A.   The person or people, yes.

3       Q.   But you specifically only remember contacting

4    Paul Lanci; is that correct?

5       A.   I have a vague recollection of making an

6    additional call, but I don't know who it was to.

7       Q.   With respect to your conversation with

8    Mr. Lanci, was this over the phone or in person?

9       A.   I don't know.

10      Q.   As best you can recall, what was the

11    substance of your conversation with Mr. Lanci?

12      A.   I don't remember the specifics.  I know the

13    conversation confirmed that Clyde's concerns about Jay

14    were valid.

15      Q.   Can you remember anything that specifically,

16    in your mind, confirmed the concerns Mr. Kofman had

17    previously voiced to you?

18      A.   Just concerns about his performance on the

19    team and getting along with others.  I don't remember

20    specific statements or examples.

21      Q.   Do you recall Mr. Lanci saying that Jay Rein

22    was difficult to work with?

23      A.   I don't remember if he used those terms

24    specifically, but that was the general content, yes.

Juergen Stark

09/07/2005

149

1      Q.   Do you recall if Mr. Lanci said that Jay Rein

2  was not a team player?

3      A.   I don't recall.  I want to clarify one thing.

4  I don't remember the specific conversation with Paul

5  Lanci.  I know that the conversations I had with Paul

6  and, I believe, with at least one other person

7  validated that Clyde's decision was appropriate, that

8  it wasn't a personal thing between him and Clyde which

9  was my sole objective in making the phone calls.  It

10  was not to second guess Clyde.

11      Q.   Did Mr. Lanci indicate that he had had some

12  difficulties or problems working with Mr. Rein as well?

13      A.   I don't remember.

14      Q.   Did Mr. Lanci confirm that Mr. Rein and

15  Mr. Kofman had had difficulty working with one another?

16      A.   I don't remember the specifics.  I'm sorry.

17      Q.   Do you recall anything else about the

18  conversation you had with Paul Lanci?

19      A.   No.

20      Q.   I think you indicated you think you spoke

21  with another individual as well, but you can't recall

22  who it was?

23      A.   Right.  Again, my objective was to quickly

24  and simply validate that everything was legitimate.  So

Juergen Stark

09/07/2005

150

1    it would have been short calls enough to give me

2    evidence that everything was fine.    Keep moving.

3        Q.    As best you can recall, how long did the

4    conversation with Mr. Lanci last?

5        A.    It would have been 15 minutes or less.

6        Q.    Do you remember the substance of the other

7    call you made at all?

8        A.    No, I don't.

9        Q.    In your mind, did that call also confirm the

10    comments Mr. Kofman made?

11        A.    Again, I don't remember.    I just remember the

12    collection of the work that I did subsequent, quick

13    diligence confirmed that everything was okay.    I don't

14    remember which pieces came from which calls.

15        Q.    Was this other call fairly short in duration?

16        A.    It would have been, yes.

17        Q.    Other than speaking to these two individuals,

18    did you do anything else to confirm in your mind some

19    of the criticisms Mr. Kofman had made regarding Rein's

20    performance?

21        A.    I don't believe so based on the fact I know

22    from my conversation with Clyde he reviewed the written

23    materials and I trusted him to do that.

24        Q.    After having this conversation with

Juergen Stark

09/07/2005

156

1          MS. MCGURN:    Objection.

2      A.    I don't remember.

3      Q.    At the time he indicated an interest in

4   pursuing opportunity, had you reached a decision in

5   your own mind whether you could support Mr. Rein's

6   efforts to find another position within Motorola?

7      A.    I don't know that I ever actually tried to

8   reach a decision.

9      Q.    During your conversation with Mr. Rein

10  shortly after his termination, did he indicate to you

11  that he never received any kind of warnings or

12  reprimands related to his performance?

13     A.    I believe so, yes.

14     Q.    Were you aware of him having received any

15  warnings or reprimands related to his performance?

16     A.    Was I aware prior to all this?

17     Q.    Yes.

18     A.    I don't know whether we discussed that or

19  not.  That's HR's responsibility frankly.

20     Q.    Do you recall telling Mr. Rein that, if

21  necessary, Motorola could create the paperwork

22  necessary to support his termination?

23     A.    I don't believe so.

24     Q.    Subsequent to Mr. Rein's termination did he,

Juergen Stark

09/07/2005

157

1    in fact, attempt to explore other opportunities within

2    the company?

3        A.    I believe so, yes.

4        Q.    Were you contacted by other people within

5    Motorola concerning Jay Rein after the decision had

6    been made to eliminate his position in the MPS group?

7        A.    Yes.

8        Q.    Who were you contacted by?

9        A.    Janiece Webb.

10       Q.    What do you recall about your conversations

11   with Miss Webb?

12       A.    I didn't recall prior to just these

13   proceedings, but I've seen the email stream that

14   directs her to talk to Clyde.  And I do remember my

15   mindset very clearly at the time was I'm not the one

16   who had any exposure to Jay.  That is Clyde's

17   responsibility.  So I wasn't going to weigh in on Jay's

18   fit or performance with other groups.

19       Q.    So you didn't express any opinion one way or

20   another about Mr. Rein?

21       A.    Correct.  And I remember this very

22   specifically because of the accusations later about

23   doing so which are not true.

24       Q.    Other than Miss Webb, were you contacted by

Juergen Stark

09/07/2005

158

1    anybody else at Motorola concerning Jay Rein?

2         A.    I don't think so.

3         Q.    Okay.

4                    (Exhibit No. 11 marked for

5    identification.)

6         Q.    I show you what's been marked as Exhibit 11

7    to your deposition.  Have you ever seen this document

8    before?

9         A.    Yes.

10        Q.    What is this document?

11        A.    This is an email from Janiece Webb to me.

12        Q.    So the initial contact is from her and it

13   says "Are you letting him go and what is your opinion

14   of him?"

15        A.    Correct.

16        Q.    Do you know why Miss Webb was asking you

17   about what your opinion of Mr. Rein was?

18        A.    Yes.  I presume he was looking for an

19   opportunity with her group.

20        Q.    Was there an opportunity available that

21   Mr. Rein was potentially qualified for within

22   Miss Webb's group?

23        A.    I have no idea.  I would have had no idea at

24   the time either.

# EXHIBIT B
# PART 4

159

1    Q.   Do you know today whether there was a

2    position available?

3    A.   I don't know.  I never looked into it.

4    Q.   Did Miss Webb ever indicate to you that she

5    was considering offering Mr. Rein a position within her

6    group?

7    A.   To my recollection, this was the only

8    interaction I had with anybody about Jay Rein outside

9    of the group and outside of his termination process.

10   And I remember this very distinctly because of the

11   accusation counter to that.

12   Q.   This is an email interaction between you

13   Miss Webb.  Do you recall having any conversations with

14   her about Mr. Rein?

15   A.   No, I don't.

16   Q.   So would it be fair to say the only

17   communication you recall having with Miss Webb is the

18   email we have marked as Exhibit 11 or a series of

19   emails?

20   A.   Yes.

21   Q.   Your response to her inquiry is "Yes, Clyde

22   Kofman who reports to me is letting him go.  I can give

23   you some thoughts if you want to call me, but I've had

24   very limited exposure to Jay."  You mentioned you can

160

1    give her some thoughts.  What were your thoughts about

2    Mr. Rein?

3                MS. MCGURN:    Objection.

4        A.    I don't know.

5        Q.    What were you referring to when you said in

6    your email to her "I can give you some thoughts if you

7    want to call me?"

8        A.    I didn't communicate any thoughts to her.

9        Q.    But my question is what were you referring to

10   when you said to her "I can give you thoughts if you

11   want to call me?"

12               MS. MCGURN:    Objection.  If you know,

13   you can answer.

14       A.    I don't know what I was thinking at the time

15   honestly.  I know obviously at that point in time I

16   knew of his performance reviews and the view of him,

17   but I didn't communicate that to Janiece.  Thinking

18   back, I would have tried to finesse it somehow with

19   her, but I never had the conversation.

20       Q.    As you sit here today, you can't recall what

21   you meant when you said "I can give you some thoughts

22   if you want to call me?"

23       A.    Correct.

24       Q.    Did she ever take you up on your offer and

165

1    from anyone else.

2        Q.    "Additionally, if you could please assist me

3    in toning down or neutralizing any further negative

4    comments that Clyde Kofman might offer with respect to

5    my team player abilities."  Were you aware of

6    Mr. Kofman telling anyone within Motorola that Jay Rein

7    was not a team player?

8        A.    Not until this email and I remember my

9    reaction to the email.

10       Q.    What was your reaction to the email?

11       A.    My reaction to the email was this is not my

12   job or my business to cover for Jay on performance

13   issues, and Clyde has a right to accurately portray

14   Jay's performance.

15       Q.    In your view, if Mr. Kofman was saying

16   that Jay Rein was not a team player, that was an

17   accurate portrayal of his performance?

18       A.    That's depends on the specifics of how he

19   communicated it.  If he communicated that Jay's prior

20   performance reviews and my experience with him and my

21   input from others on the team indicated that there are

22   some teamwork issues, that would be a fairly neutral

23   way to communicate there was an issue.  I think frankly

24   it would be very irresponsible to not communicate

Juergen Stark                                                    09/07/2005

166

1    internally if somebody has a development need to a

2    hiring manager whether it's this kind of performance

3    issue or something else.

4        Q.    Were you aware if Mr. Kofman was

5    communicating to others that Jay Rein was not a team

6    player?

7                    MS. MCGURN:    Objection.

8        A.    No, only through this email here.

9        Q.    Did you in any of your interactions with

10   Mr. Rein ever tell him you didn't think he was a team

11   player?

12       A.    I don't believe so.

13       Q.    Do you recall ever telling anyone else within

14   Motorola that you didn't believe Jay Rein was a team

15   player?

16       A.    No, I don't believe so.

17       Q.    Did Mr. Kofman ever tell you he didn't

18   believe Jay Rein was a team player?

19       A.    Of course.

20       Q.    That was the conversation you have previously

21   testified to; is that correct?

22       A.    Yes.   I don't know if he used the term team

23   player or not, but the teamwork issues clearly were a

24   key point of discussion.

175

1    represented to someone at Motorola that he was going to

2    sign the document?

3        A.    Absolutely.   I was upset with Peter for

4    communicating before he had something in writing that

5    it was finished.

6        Q.    Now, in addition to discussing with Mr. Rein

7    the possibility he would be kept on the payroll for a

8    period of time, did you have any other discussions with

9    him during this meeting?

10       A.    The other thing I remember in the spirit of

11   trying to help him was giving him some personal advice

12   kind of off the record from Motorola that just to not

13   burn bridges on his way out which I felt strongly was a

14   bad thing to do was to make everyone mad.

15       Q.    What made you believe Mr. Rein might be

16   burning bridges with Motorola?

17       A.    Just the way he was acting with Peter Tobin

18   specifically with Clyde.   And I don't remember other

19   specifics at that point, but I had the sense he was

20   taking a -- frankly, an abrasive attitude toward

21   leaving.   And I hate to say it, but it was consistent

22   with the feedback I had gotten about him as well.   And

23   I wanted to give him advice just don't do that.   It's

24   not a good career move.

176

1    Q.    What specifically about his interactions with

2    Mr. Tobin were abrasive, as far as you know?

3    A.    I don't remember the details honestly.  I

4    know that Peter had conversations with me about his

5    interactions and just the difficulty of working with

6    Jay.  And I also don't remember specifically if there

7    was a big factual stream of evidence to suggest it was

8    happening or it was more my gut feeling it was going to

9    start happening.  And with the best of intentions, I

10   wanted to advise Jay to leave on good terms.

11   Q.    Other than a general sense that his

12   interactions with Mr. Tobin were abrasive what, if

13   anything, led you to believe Mr. Rein was burning his

14   bridges with Motorola?

15                MS. MCGURN:    Objection.

16   A.    I think I just answered that.  I don't recall

17   the specifics of it.  I just know that I had a vague

18   recollection, general impression that he was either

19   going to or started handling this in a bad way.

20   Q.    Now, was this after you had learned that

21   Mr. Rein was not going to sign the release that

22   Motorola requested?

23   A.    No, I don't believe so.  I think this was

24   prior.

181

1    efforts to obtain an enhanced severance package?

2        A.    I don't remember the details.  I remember we

3    had been trying or did accommodate to some degree what

4    he was requesting, but either he came back and asked

5    for more and we said no -- which I would have

6    supported -- or we made some accomodation and he didn't

7    accept it.  I do seem to recall that we tried to do a

8    little for him, though, along the way here.

9        Q.    At the time you contacted Mr. Rein, were he

10   and Motorola still negotiating his potential severance

11   benefits?

12               MS. MCGURN:    Objection.

13       A.    Yes.

14       Q.    And they still presumably had not reached an

15   agreement as to what those benefits would be; is that

16   correct?

17       A.    That's my understanding, yes.

18       Q.    Was that the fact he had been unable to reach

19   an agreement with Motorola, did that in part lead you

20   to believe he was burning his bridges with the company?

21               MS. MCGURN:    Objection.

22       A.    Not necessarily.

23       Q.    Did you feel he was being overly aggressive

24   in his negotiations with Motorola as far as the

Juergen Stark

09/07/2005

182

1    severance package was concerned?

2              MS. MCGURN:    Objection.

3        A.    I don't know how he was feeling.

4        Q.    I'm asking if you believe he was being overly

5    aggressive in his negotiations of Motorola concerning

6    his severance package.

7              MS. MCGURN:    Objection.

8        A.    Not necessarily.

9        Q.    You testified you felt he was being abrasive.

10   In what way did you feel he was being abrasive in his

11   interactions with Motorola?

12             MS. MCGURN:    Objection.

13       A.    Again, as I said before, I don't know how

14   much of this I felt before or saw it coming.  I wanted

15   to help prevent it.  I do remember somewhere along the

16   way -- I don't know if it was before or after the

17   meeting or the call with Jay, Peter citing difficulty

18   working with Jay.

19       Q.    You testified a minute go that you saw it

20   coming.  What are referring to?

21       A.    I said I'm not sure how much was pre this

22   call or how much was my fear it could be coming, that

23   it could be getting more difficult.  And one of the

24   unique things here is that part of the reason for doing

Juergen Stark

09/07/2005

183

1    the termination was he had a track record of being

2    difficult to work with.  That was then substantiated

3    either before the call or afterwards by Peter and I

4    just worried that it was going to get worse.  And,

5    frankly, it wouldn't have necessarily mattered to

6    Motorola but, in my opinion, it would have hurt Jay.

7         Q.    You said you feared it could be coming and it

8    could get worse.  What are you referring to?

9         A.    Jay creating a set of bad relationships on

10   his way out.

11        Q.    What specifically do you mean when you say

12   bad relationships?

13        A.    Making Peter mad at him, making Clyde mad at

14   him, making me mad at him on the way out.  People, I

15   assume, any future employers would want to call to get

16   a reference on him.

17        Q.    What were you concerned he might do that

18   would make you and Mr. Kofman and Mr. Tobin angry at

19   him?

20        A.    Again, input from Peter that he was difficult

21   to work with.  It doesn't necessarily translate into

22   being overly aggressive, but something wasn't working

23   well there.  And later on during the process -- I don't

24   know if it was before the call or not -- there were at

184

1    least two cases where I thought he was being deceitful

2    which is another way to burn bridges on the way out.

3         Q.   I think you testified that one way he was

4    being deceitful is that he had agreed to sign a release

5    and then not sign it; is that correct?

6         A.   According to Peter Tobin, yes.

7         Q.   But he never told you he would sign a

8    release?

9         A.   Correct.

10        Q.   Is there another way you felt Mr. Rein was

11   being deceitful?

12        A.   Yes.  In an email stream with him when Peter

13   was on vacation he, in my opinion, tried to trick me

14   into a set of date calculations that I wasn't familiar

15   with and it wasn't my job to be on top of the details

16   where I felt he was trying to pull a fast one on me

17   when Peter was on vacation when Peter was responsible

18   for negotiating the deal with Jay and it wasn't my

19   responsibility.

20        Q.   When you say a set of date calculations, what

21   exactly are you referring to?

22        A.   There was a communication to him -- I know

23   because I have seen the documents -- that established

24   the deadline 21 days after March 11th.  Peter went on

Juergen Stark

09/07/2005

185

1  vacation at the end of March.  I don't remember if it

2  was for a week or two and Jay then engaged with me --

3  again, not my job or responsibility to get into the

4  details on these things -- and tried to get me to

5  extend the deadline, something that we had been working

6  for months with Jay on or at least a month and a half,

7  and tried to communicate to me that technically the

8  deadline didn't expire until some point in April -- I

9  don't remember the exact math -- clearly

10  misrepresenting when he was actually communicated the

11  separation agreement or whatever got sent to him.

12       Q.   What is the deadline you're referring to?

13       A.   The deadline for him to sign the separation

14  agreement and receive the enhanced separation

15  agreement.  Again, I don't know the details of what he

16  was getting or what he would have got.

17       Q.   Was this a separate conversation you had with

18  him or was it an exchange of emails?

19       A.   It was an exchange of emails.

20       Q.   Was this after the telephone conversation you

21  previously testified to?

22       A.   Yes, I believe so at least.  It may have been

23  around the same date.

24       Q.   Okay.  What was your understanding of why he

Juergen Stark

09/07/2005

186

1    was -- what was he doing with the deadline again?

2        A.    My interpretation was he was either

3    intentionally or accidently trying to mislead me into

4    agreeing the actual deadline was sometime in April

5    after March 30th when in reality it wasn't.  So in

6    Peter's absence, he was trying to get me to okay an

7    extension when it wasn't a legitimate request.

8        Q.    When you contacted Mr. Rein to discuss him

9    burning his bridges with Motorola, do you know what

10   time you placed the telephone call?

11       A.    I don't remember.

12       Q.    Did you tell him you wanted your conversation

13   with him to be off the record?

14                MS. MCGURN:    Objection.

15       A.    I don't recall using those words.  I have

16   seen what has been alleged.  And I believe the personal

17   advice part of that conversation, I could have very

18   easily used words like that.

19       Q.    The personal advice portion, that was telling

20   him not to burn his bridges?

21       A.    Yes.

22       Q.    Did you ask him why he hadn't accepted the

23   company's severance package?

24       A.    I don't recall.  I know we discussed this

Juergen Stark

09/07/2005

187

1    idea of trying to accommodate his desire to be on the

2    payroll longer.

3        Q.    Did you tell him you were concerned that he

4    was contemplating bringing some sort of a lawsuit

5    against Motorola?

6        A.    I know that is what he alleged.  I don't

7    recall ever having a conversation about legal or

8    lawyers.

9        Q.    Did you tell him that if he retained counsel,

10   Motorola would hire an armory of lawyers?

11       A.    I don't believe so, no.

12       Q.    Did you tell him that if he refused to sign

13   the severance package and release Motorola, that he

14   would be burning his bridges with the company?

15       A.    No.

16       Q.    Did you tell him that if he didn't agree to

17   release his claims against Motorola, he wouldn't

18   receive any severance at all?

19       A.    I don't believe so.  I think it's clearly

20   established what he gets and what he doesn't get if he

21   signs or doesn't sign.  So that's a decision he was in

22   his full rights to make.

23       Q.    Did you threaten that Motorola would withhold

24   any severance from him if he didn't release the

# EXHIBIT C
# PART 1

1

1          Volume: I

2          Pages: 1-218

3          Exhibits: 1-8

4

5          UNITED STATES DISTRICT COURT

6          FOR THE DISTRICT OF MASSACHUSETTS

7          CA No. 04-12580 NG

8   - - - - - - - - - - - - - - - - - - - -x

9   JAY S. REIN,

10                          Plaintiff,

11  vs.

12  MOTOROLA, INC., CLYDE KOFMAN and

13  JUERGEN STARK,

14                          Defendants.

15  - - - - - - - - - - - - - - - - - - - - x

16

17          DEPOSITION OF CLYDE KOFMAN

18          September 14, 2005

19          10:30 a.m.

20          Law Office of John G.H. Coster

21          92 State Street

22          Boston, Massachusetts

23

24          Reporter:  Nancy L. Russo

Clyde Kofman                                                        09/14/2005

33

1        A.    I recall talking about HR matters.

2        Q.    When you say HR matters, are you referring to

3    compensation and benefits?

4        A.    I recall talking about benefits.

5        Q.    At some point you presumably also had

6    conversations with somebody about compensation; is that

7    correct?

8        A.    I must have.

9        Q.    Do you recall who you had those discussions

10   with?

11       A.    I believe I had compensation conversations

12   with the recruiter.

13       Q.    That would be Ms. Carlson; is that correct?

14       A.    Yes.

15       Q.    What do you recall about your discussions

16   with Ms. Carlson about the compensation of the

17   position?

18       A.    To the best of my recollection, she was the

19   negotiator between me and the company.

20       Q.    Now, it's my understanding that you were

21   classified as an E-15 person within the Motorola

22   organization; is that correct?

23       A.    Yes.

24       Q.    Those classifications, those relate to salary

50

1       Mr. Zellner?

2            A.   Once.

3            Q.   What was the occasion for you to deal with

4       Mr. Zellner?

5            A.   I was brought over to Russell Reynolds'

6       office during my interview process with Motorola and

7       they introduced me to him.

8            Q.   Was he one of the people you met with or were

9       you still introduced to him?

10           A.   I don't recall.

11           Q.   Other than that single meeting or

12      introduction, have you ever had any other conversations

13      with Mr. Zellner, if you can recall?

14           A.   No.

15           Q.   Can you recall anyone else within the Russell

16      Reynolds organization other than what you already

17      testified to that you had dealings with?

18           A.   No.

19           Q.   What was your start date at Motorola, if you

20      can recall?

21           A.   It was in July of '02.

22           Q.   Was Mr. Rein at Motorola yet when you started

23      or not?

24           A.   I believe he was.

Clyde Kofman                                                                    09/14/2005

51

1      Q.    What was your title when you started at your

2    employment at Motorola?

3      A.    My title was managing principal.

4      Q.    As you understood it, what were your duties

5    as managing principal?

6      A.    Can you ask that again, please?

7      Q.    Sure.  What were your job duties as a

8    managing principal within the Motorola organization?

9      A.    At the time I was hired, some were still to

10   be defined and the rules that were defined were to help

11   build the business.

12     Q.    What portions of your job responsibilities

13   were still to be defined?

14               MS. MCGURN:    Objection.

15     A.    Scope of responsibilities.

16     Q.    What needed to be defined about the scope of

17   your responsibilities?

18               MS. MCGURN:    Objection.

19     A.    MPS was a new organization and there were

20   lots of open questions.

21     Q.    I understand that, but specifically with

22   respect to the scope of your responsibilities, what

23   needed to be defined?

24     A.    Areas of focus.

52

1    Q.    Anything else that you can recall?

2    A.    Not at this time.

3    Q.    When you say areas of focus, what do you

4    mean?

5    A.    The types of clients I would pursue.

6    Q.    When you say it was your -- another one of

7    your responsibilities was to help build the business,

8    how was it anticipated that you would assist in -- let

9    me strike that.

10         What particular business were you

11   responsible for helping to build?

12   A.    The professional services business.

13   Q.    What were your specific responsibilities in

14   helping to build the professional services business?

15   A.    Having been a partner in a large professional

16   services organization I was asked to help think through

17   and establish various practices, financial practices,

18   contracting practices, development practices, delivery

19   practices, things that would make the business

20   successful.

21   Q.    At the time you were hired, who did you

22   report to?

23   A.    Len DeBarros.

24   Q.    Who, if anyone, reported to you?

Clyde Kofman                                                          09/14/2005

64

1    correct?

2        A.   I believe that is true, yes.

3        Q.   Was it anticipated that he would be the

4    permanent person responsible for managing the MPS

5    group?

6                MS. MCGURN:    Objection.

7        A.   I don't believe so.

8        Q.   So it would seem that he was going to be

9    someone who would be temporarily responsible for the

10   group; is that correct?

11               MS. MCGURN:    Objection.

12       A.    That's what I recall.

13       Q.   How long did Mr. Niersbach maintain some sort

14   of managerial responsibility over the MPS group?

15       A.    Several months.

16       Q.   During that period of time, do you know how

17   frequently Mr. Niersbach met with the MPS group?

18       A.    I don't recall.

19       Q.   Was it a great deal or was it infrequently?

20       A.    I don't recall.

21       Q.   You have no idea how long he managed that

22   group, correct?

23               MS. MCGURN:    Objection.

24       A.    I don't recall.

Clyde Kofman                                                    09/14/2005

67

1      A.    I think I testified that Stark started

2  sometime in the summer.  DeBarros departed before that

3  it is what I recall.

4      Q.    When Mr. Stark began working for Motorola, he

5  became the manager of the MPS group; is that correct?

6              MS. MCGURN:    Objection.

7      A.    I recall MPS was one of his responsibilities

8  among many when he joined the company.

9      Q.    At least during the first few months

10  Mr. Stark was responsible, was he providing a lot of

11  leadership direction for the MPS group?

12              MS. MCGURN:    Objection.

13      A.    I recall that Mr. Stark had a number of

14  responsibilities and while MPS was important, it wasn't

15  his number one or two activities.

16      Q.    So for at least the first several months

17  would it be fair to say his intentions seemed to be

18  focused elsewhere

19      A.    He focused on other areas at that time, yes.

20      Q.    Did Mr. Niersbach ever give you a performance

21  evaluation during the time he was responsible for the

22  MPS group?

23      A.    I believe he did a checkpoint with me, yes.

24      Q.    What do you recall about that evaluation?

Clyde Kofman

09/14/2005

72

1    that.

2                The personnel action forms I have for

3    Mr. Rein, Mr. Brice, Mr. Humpleby, Mr. Gillardi and

4    yourself, are those the individuals who made up the

5    MPS group at the end of 2003?

6         A.    Those individuals made up the North American

7    MPS group, yes.

8         Q.    Directing your attention to the performance

9    evaluations for each of those individuals for the year

10   2003, would it be accurate to say that they are

11   identical?

12                MS. MCGURN:    Objection.

13        A.    Could you restate that?

14        Q.    Directing your attention to the performance

15   evaluations for the end of the year 2003 for each of

16   the members of the MPS group, would it be fair to say

17   those performance evaluations are identical?

18        A.    Looking at each of the pages here, they all

19   use the same words "meets expectations."

20        Q.    So would it also be fair to say focusing on

21   Mr. Rein's performance evaluation for the year 2003,

22   there is nothing in this particular document that

23   indicates that his performance was being evaluated as

24   either better than or worse than any other individuals

Clyde Kofman

09/14/2005

73

1    in the MPS group; is that correct?

2                    MS. MCGURN:    Objection.

3        A.    There is not enough information on this form

4    for me to state that.

5        Q.    But based on the information in the form,

6    there is no indication that his performance is being

7    evaluated any differently than any other members of the

8    MPS group; is that correct?

9                    MS. MCGURN:    Objection.

10       A.    Not that I can tell.

11                   (Exhibit No. 2 marked for

12    identification.)

13       Q.    If you could take a minute to briefly go

14    through this document that's been marked as Exhibit 2

15    to your deposition and contains a title "Leadership

16    Assessment Multi-Rater Feedback Report."

17       A.    Okay.

18       Q.    Have you ever seen a form of documents like

19    what's been marked as Exhibit 2 before?

20       A.    There are some parts that are familiar, yes.

21       Q.    Do you know what this document is or is used

22    for within the Motorola organization?

23       A.    I believe this is a report, although I can't

24    say for sure that looks like -- it says here "strengths

Clyde Kofman

09/14/2005

77

1    something you completed or is that something someone

2    else completed if you can tell by reviewing the

3    document?

4        A.    I can't tell from reading the document.    It

5    is my recollection Tom would have been the person

6    providing input on these types of things for '03.

7        Q.    But, again, as to who put down -- there

8    appears to be, for example, a component where the

9    primary manager is evaluating the four E's with respect

10   to Mr. Rein, correct?

11       A.    Yes.

12       Q.    And I'm trying to ascertain with respect to

13   this particular document who was the primary manager

14   who was putting those numbers in?

15       A.    To the best of my knowledge, that was

16   Niersbach.

17       Q.    As best you can recall, you also prepared an

18   evaluation of Mr. Rein's performance using this format

19   for the year 2003?

20            MS. MCGURN:    Objection.

21       A.    I was responsible, if I recall correctly, to

22   fill out the final evaluation using various inputs and

23   I believe this was one of the inputs.

24       Q.    As far as you can tell, the document I have

Clyde Kofman

09/14/2005

78

1    marked as Exhibit 2 to your deposition is not the one

2    that you prepared; is that correct?

3         A.    I don't believe I prepared this.

4              (Discussion off the record.)

5         Q.    So is it your testimony that the information

6    contained in this document would have been something

7    that you utilized in making a performance evaluation of

8    Mr. Rein?

9         A.    Yes.

10        Q.    Is it also your testimony that the

11   information contained on this document is not

12   information you, yourself, inputted?

13        A.    That's my recollection, yes.

14        Q.    When we were off the record, you referred to

15   something called an RPA.  What is an RPA?

16        A.    An RPA stands for relative performance

17   assessment.

18        Q.    Okay.  So that is what those initials stand

19   for.  What is a relative performance assessment?

20        A.    It's an assessment of your strengths and

21   weaknesses compared to others across the four E's.

22              MS. MCGURN:    For the record, I think I

23   used that term.

24        Q.    So is the employee being compared to his

Clyde Kofman

09/14/2005

79

1    peers in the evaluation process?

2        A.    I have not attended RPA sessions.  We since

3    have done away with the RPA process.  This time I

4    didn't participate in that, but when I look on page 76,

5    it says that there are bars -- whether or not it all

6    works here.  You can get evaluated by your direct

7    reports, your dotted line manager, your primary manager

8    plus you do your own self-evaluations.  So there are

9    multiple inputs that determine where you are and that

10   is part of the process as I recall.

11       Q.    How often do RPA's occur within Motorola when

12   they were taking place?

13       A.    I have filled them out myself obviously in

14   the past, but it's a once a year effort.

15       Q.    Have you ever filled them out as a manager of

16   another employee?

17       A.    I have.

18       Q.    Is this document an RPA?

19       A.    I don't know.

20       Q.    Did you ever fill out an RPA with respect to

21   Mr. Rein when you had managerial responsibility over

22   him?

23       A.    I don't recall doing that, no.

24       Q.    So in what ways did you evaluate Mr. Rein's

Clyde Kofman                                                    09/14/2005

80

1    performance when you were a manager?

2         A.    I took over management responsibilities late

3    in the year, and I was asked to close out the

4    performance management process and finalize the

5    performance level.

6         Q.    So what did you do to close out the

7    performance management process with respect to

8    Mr. Rein?

9         A.    I reviewed documentation that existed for '03

10   on performance such as this Leadership Assessment

11   Multi-rater Feedback Form.  I believe I talked to

12   Niersbach to get his input and that's -- those are the

13   steps I recall.

14        Q.    Did you prepare any written documentation in

15   conjunction with your evaluation of Mr. Rein?

16        A.    I don't recall specifically.  I do recall I

17   put some summary comments in the performance management

18   system.

19        Q.    Did you do anything else in conjunction with

20   your performance evaluation of Mr. Rein at the end of

21   2003 that would produce written documentation or a

22   written record of some kind?

23        A.    Not that I recall.

24        Q.    Did you ever discuss the information

81

1   contained on Exhibit 2 with Mr. Neirsbach?

2        A.   I may have, yes.

3        Q.   Do you have a specific recollection about any

4   discussions with Mr. Neirsbach concerning the

5   information contained on Exhibit 2?

6        A.   It seems to me that looking at Exhibit 2

7   which starts on page 75 and goes on to page 76, that

8   appears to be the manager and direct report

9   prospective's.  It's a two by two that looks at both

10  hidden strengths and blind spots.  And I recall asking

11  Tom about what was in those categories and what was

12  behind those areas.

13       Q.   What do you recall Mr. Neirsbach telling you

14  about the information contained in those categories?

15       A.   I don't recall specifically other than this

16  was a -- there seemed to be more blind spots than

17  strengths in this evaluation and a blind spot is

18  defined here as both manager and direct report rating

19  lower than self-evaluation report.

20       Q.   Well, focusing your attention on the blind

21  spots which is -- I think you said page 76.

22       A.   I was referring to the top right corner of

23  the chart here that started on the previous page, was

24  cut off and continued on this page.

Clyde Kofman

09/14/2005

85

1    Q.   If I could direct your attention to page 96

2   of the document -- you're on it.

3    A.   Yes.

4    Q.   In particular, the column on the left-hand

5   side middle of the page it says "blind spots."

6    A.   Yes.

7    Q.   I take it that identifies a number of areas

8   this survey are considered to be blind spots; is that

9   correct?

10    A.   That's how I interpret it at this point.

11    Q.   And that is where the evaluation of an

12   individual diverges from -- strike that.

13         That's where there is a disparity

14   between evaluations; is that correct?

15    A.   I think there is more to it.  I think it's

16   disparity in the direction of the employee has a higher

17   evaluation than the manager does of him compared to

18   strengths which is the opposite where the employee

19   believes they are not as strong as their manager does.

20    Q.   Directing your attention to the first entry

21   in that blind spots where the manager evaluates

22   Mr. Rein on the category of energized as a zero.  I

23   take that as a fairly low rating; is that correct?

24    A.   I believe that's the way to interpret it,

Clyde Kofman
09/14/2005

90

1      Q.   Do you have a specific recollection as you

2  sit here today whether you did that or not?

3      A.   I don't recall.

4      Q.   Did there come a point in time in mid

5  October of 2003 that the MPS group was scheduled to

6  meet with Mr. Stark?

7      A.   I believe we met with him in October, yes.

8      Q.   At that point in time, was Mr. Stark the

9  individual who was responsible for managing the group?

10     A.   Yes.

11     Q.   Was this the first substantive meeting that

12 the group had with Mr. Stark that you can recall?

13     A.   That sounds about right, yes.

14     Q.   What was your understanding of the purpose of

15 the meeting between Mr. Stark and the MPS group?

16     A.   I believe there were several objectives.

17 One, he wanted to understand what we were.  Second, if

18 I remember correctly, he wanted to understand what we

19 had done.  And, third, and most importantly, feedback

20 from that meeting indicated that he wanted to know what

21 we were going to do going forward.

22     Q.   Now, at the time the MPS group was scheduled

23 to meet with Mr. Stark, did you have any quotas or

24 bench marks that the group was trying to meet as far as

LegaLink Boston
(617) 542-0039

Clyde Kofman

09/14/2005

91

1    performance or revenue or sales are concerned?

2         A.   I recall that MPS as an entity coming in to

3    '03 had a number for all MPS.  And at some point in mid

4    2003, we were dispersed into several different

5    positions.  And what was left as far as our goal, I

6    don't remember the exact number at this point.

7         Q.   Would it be fair to say that at least at this

8    point in mid October of 2003, the MPS group had been

9    having some difficulty generating business for

10   Motorola?

11        A.   The group was behind a plan, yes.

12        Q.   In your mind, was there some question about

13   whether the group would be going forward after your

14   meeting with Mr. Stark?

15        A.   No.

16        Q.   So you didn't understand the purpose of this

17   meeting or one of the purposes for Mr. Stark to make a

18   determination whether the MPS group would continue

19   going forward in the year 2003 and beyond?

20        A.   I viewed it as an opportunity for

21   Mr. Stark to understand what was there and to

22   understand what it could be is how I understood the

23   purpose of the meeting.

24        Q.   Do you understand that he would be evaluating

Clyde Kofman                                                    09/14/2005

98

1    A.    Some point late in the year Stark reorganized

2    the group and split us into several groups.

3    Q.    The group you were in, did that have a

4    particular name associated with it?

5    A.    I think we had two.  We were vacillating

6    between continuing the MPS name or calling ourselves

7    IMS which stood for Intelligent Mobility Solutions.

8    Q.    Okay.  Let's for the purposes of

9    classification refer to the IMS to distinguish it from

10   the old MPS group which is larger.  Now, the meeting

11   you were having to prepare for your first presentation

12   with Mr. Stark, were all the members of the IMS group

13   present at that meeting?

14   A.    I don't recall.

15   Q.    Did all the members of the IMS group

16   participate in that meeting to prepare for the

17   presentation?

18   A.    I don't know.

19   Q.    Do you remember other than having discussions

20   about -- I think you said how the group would be

21   organized going forward -- any other discussions in

22   preparation for the meeting with Mr. Stark?

23        MS. MCGURN:    Objection.

24   A.    I recall talking about providing Stark a

Clyde Kofman

09/14/2005

115

1    A.    What I recall is Mr. Stark said you guys have

2  more work.    These are not his exact words.    My

3  impression I got was you guys missed the mark a little

4  bit.    You need to focus more on specifically what you

5  can do going forward.

6    Q.    Did Mr. Stark indicate to you how the initial

7  presentation had missed the mark?

8    A.    All I recall is he wanted more specifics

9  about what he wanted to do next year meaning '04.

10    Q.    So he wanted you to come back and give

11  greater detail forward looking about what the group

12  would do the following year; is that correct?

13              MS. MCGURN:    Objection.

14    A.    As I testified, he wanted more specifics

15  about what we could do moving forward.

16    Q.    Other than telling you that he wanted more

17  specifics and that he felt you missed the mark, do you

18  recall anything else that happened in your meeting with

19  Mr. Stark on the presentation?

20    A.    No.

21    Q.    Was a subsequent presentation scheduled at

22  the conclusion of your initial presentation with

23  Mr. Stark?

24    A.    It was scheduled at some point.    When it was

# EXHIBIT C
# PART 2

122

1    to Mr. Stark?

2        A.    No.   I believe the first model was presented,

3    but the economics didn't work.

4        Q.    Do you know what side of the issue Mr. Rein

5    individually came down on?

6                    MS. MCGURN:    Objection.

7        A.    No.

8        Q.    What about with respect to your position

9    which of those two models did you think was the better

10   alternative?

11                   MS. MCGURN:    Objection.

12       A.    I'm not sure I had a strong opinion either

13   way that I can remember.

14       Q.    Other than there being a discussion about

15   which of those two models would be proposed to

16   Mr. Stark in this presentation, do you remember there

17   being any other discussions about how the IMS group

18   would be organized or operated going forward?

19       A.    The only conversation I recall at some point

20   and the timing I'm unclear on, but sometime in the

21   fourth quarter I recall Stark saying, okay.  I got the

22   plan.  I'm paraphrasing.  But I can't have all you guys

23   reporting to me.  So tell me who you think should run

24   the group.  Something to that effect.

Clyde Kofman

09/14/2005

125

1    ideas and suggestions to Mr. Stark?

2        A.    I don't recall.

3        Q.    Again, directing your attention to slide two.

4    What does this slide depict?

5        A.    Well, the headline says "Getting started" and

6    the first sentence says "Focus on those organizations

7    with a large mobile work force where information flow

8    impacts the business processes." So it would appear to

9    be a narrowing of the -- as you asked earlier were

10   there restrictions on who we can sell to. And this

11   would appear to be a statement of focus on what we were

12   going to do.

13       Q.    Do you understand that from this point

14   forward you were being restricted to pursuing business

15   that fell within the category of field service

16   mobility?

17       A.    I clearly remember sometime in the fourth

18   quarter that the decision was made we should focus on

19   field service mobility. Whether it was at the end of

20   this meeting or sometime thereafter, it occurred.

21       Q.    Was that a decision that was made by

22   Mr. Stark?

23       A.    Ultimately it was his decision, yes.

24       Q.    Now, there also appears to be some revenue

128

1      A.   As I said, I clearly remember that I believe

2   we needed to fullfil the commitments related to not

3   dropping the ball.

4      Q.   Then it says "Continue pursuit of mobility

5   related offers."  Did you agree that was an appropriate

6   strategy for the IMS group going forward?

7      A.   My interpretation, if I recall, the continued

8   pursuit was continued mobility related to field

9   services as it says in the point above.

10      Q.   Did you believe that was an appropriate goal

11   for the IMS group?

12      A.   I believe that focusing on field services was

13   appropriate.

14      Q.   I noticed one of the items identified as a

15   mobility related offer is Express Link.  Do you agree

16   that Express Link was a mobility related offer?

17      A.   In the broad definition mobility it's

18   included in the definition of field service mobility.

19   It's not covered by that.

20      Q.   So you don't agree that the Express Link is a

21   mobility related offer?

22            MS. MCGURN:   Objection.

23      A.   What I said was mobility is a broad term, a

24   subset is field service mobility as defined on the

129

1    previous page large mobile work force.   I don't believe

2    Express Link fell under the mobility umbrella.

3        Q.    So you do agree it was a mobility related

4    offer?

5        A.    Yes.

6        Q.    Did you agree at this particular time one of

7    the things the IMS team needed to do to be successful

8    was continue to pursue mobility related offers?

9        A.    I don't believe I knew very much about the

10   opportunity at that time.

11       Q.    So you didn't have an opinion one way or the

12   other whether it made sense to continue pursuing

13   mobility related offers.

14       A.    I don't believe I had enough information at

15   that time.

16       Q.    So I take it, then, that you didn't have

17   enough information to know whether it was one of the

18   things the IMS team needed to do to be successful was

19   to specifically pursue the Express Link opportunity; is

20   that correct?

21       A.    Yes.

22       Q.    What portions of this particular slide six

23   that identified what the IMS team needed to do to be

24   successful did you agree with and did you support?

130

1              MS. MCGURN:    Objection.

2         A.    The page speaks to developing the field

3    service mobility offer which I supported as I stated

4    earlier.  Articulating the mobility offer is on this

5    page which I agreed to.  I agreed to continue pursuits.

6    I had personal knowledge of the Service Master

7    situation, Otis Elevator, Exelon and Allstate

8    opportunities.  I supported those.

9         Q.    Were those field service mobility related

10   offers?

11        A.    Yes.

12        Q.    So the only nonfield service mobility related

13   offer was Express Link?

14        A.    In that list of five, yes.

15        Q.    What is the difference between a mobility

16   related offer and a field service mobility related

17   offer?

18        A.    If you turn back to page two in this document

19   we define field service as containing large mobile work

20   forces.  So the difference in my mind is mobility could

21   be connecting things that are assets, not people.  So

22   tracking containers, tracking vehicles, et cetera

23   versus tracking the worker.  So we were focused on

24   field service which is how do those professionals in

Clyde Kofman                                                    09/14/2005

131

field do their job better with the information being

pushed out.  That's how I distinguished the two.

    Q.    So, then, I take it that the Express Link

opportunity did not have a large mobile work force.

    A.    At the time that this was pulled together, I

knew very little about it.  I have come to learn over

time as I understand it today it had more to do with

yard management and tracking of vehicles within the

yard than mobile work forces out in the field.

    Q.    So, again, your understanding is that Express

Link did not have a large mobile work force; is that

correct?

                MS. MCGURN:    Objection.

    A.    That's my understanding today.

    Q.    And that is why it does not fall within the

definition of field service mobility; is that correct?

                MS. MCGURN:    Objection.

    A.    That was my understanding.

    Q.    Directing your attention to page 289,

slide 15.  It appears to identify three possible

offerings for the IMS group going forward; is that

correct?

    A.    Yes.

    Q.    During this presentation to Mr. Stark, did

Clyde Kofman                                                    09/14/2005

133

1        Q.    But you don't recall whether that happened at

2    the conclusion of your presentation with Mr. Stark?

3        A.    That is correct.  I don't recall.

4        Q.    With respect to the presentation itself that

5    was made -- the Stark second presentation, what do you

6    recall about that presentation?

7        A.    I recall the meeting -- not his words -- my

8    words were satisfactory with Mr. Stark.  He seemed to

9    accept the direction we were going, said something to

10    the effect of let's revisit this in six months.

11        Q.    When you say he accepted the direction you

12    were going, there were a number of alternatives that

13    were presented to him, did he accept the direction of

14    pursuing mobile asset management and tracking at this

15    meeting?

16                MS. MCGURN:    Objection.

17        A.    I don't recall.  What I do recall is at some

18    point the decision was to focus on field service

19    mobility.  The documents support that.  That's what he

20    accepted.

21        Q.    So you don't recall whether he specifically

22    indicated that he was accepting the direction to

23    continue pursuing the Express Link opportunity?

24        A.    I don't recall that being discussed in the

134

1    meeting specifically.

2        Q.   What specifically do you recall Mr. Stark

3    saying about the direction the company was -- the IMS

4    group was to pursue at the conclusion of the second

5    presentation?

6        A.   I remember encouraging us to stay focused.

7    He was supportive of field service mobility.

8        Q.   Do you recall Mr. Stark saying anything else

9    to the IMS group at the conclusion of the second

10   presentation?

11       A.   I don't recall other than what I have stated

12   earlier.

13       Q.   Do you recall Mr. Stark telling the group

14   that they would have until the end of June to meet

15   certain bench marks that they had previously

16   established?

17       A.   I recall Mr. Stark saying something to the

18   effect I'll revisit this in six months.

19       Q.   As best you can recall, what did he

20   specifically say about revisiting it in six months?

21            MS. MCGURN:   Objection.

22       A.   As I said, something to the effect of we can

23   revisit this plan in six months.

24       Q.   Do you recall Mr. Stark saying the group

Clyde Kofman

09/14/2005

135

1    would have until June 30th to demonstrate positive

2    trends in business activity?

3        A.    I don't specifically remember that statement.

4        Q.    When he said he would revisit this in six

5    months, what did you understand that to mean?

6        A.    And to clarify, I think he said about six

7    months.

8        Q.    Okay.  What did you interpret that to mean?

9        A.    That he wanted us to focus and do our best to

10   deliver plan and he was going to stay close to it.

11       Q.    But specifically about the six-month time

12   what did you understand him to mean we would revisit --

13       A.    The only thing I can recall thinking was that

14   was a reasonable amount of time to check back enough

15   for us to get some traction but not too far where we

16   could fall off the tracks if we missed.

17       Q.    Exactly what did you understand he would be

18   revisiting in approximately six months?

19       A.    How we were doing against the plan he had

20   just reviewed.

21       Q.    Did you understand that to mean that would be

22   the next time he would evaluate the MPS as a group and

23   their performance?

24       A.    No.

Clyde Kofman                                                09/14/2005

136

1      Q.   Do you recall Mr. Stark leaving the room and

2  coming back in again?

3      A.   Say that again.

4      Q.   Do you recall Mr. Stark leaving the room and

5  then coming back in again a minute or two later?

6      A.   You know, there was a meeting sometime in the

7  fourth quarter where he came back and said something to

8  the effect, good job, guys.  Let's go make this work or

9  something to the effect.  Kind of a pep talk.

10     Q.   In the meeting that he gave, as you

11 characterized it as a pep talk, what do you recall him

12 specifically saying?

13     A.   Something to the effect of good job.  Let's

14 go make this work.

15     Q.   Let's go make this work referring to what?

16          MS. MCGURN:   Objection.

17     Q.   What did you understand him to mean when he

18 said let's go make this work?

19     A.   That we had a good plan, the P&L model and

20 focus on field service and he wanted to see us execute

21 and do well.

22     Q.   Did you have an understanding that the

23 company would give you an opportunity to execute

24 against the plan you had presented?

Clyde Kofman                                                          09/14/2005

140

 1       A.    I remember that in the fourth quarter of '03

 2   we had to answer this range of questions, but I don't

 3   specifically remember which meeting and the date that

 4   these questions came up.

 5       Q.    Directing your attention to item number

 6   three, do you recall what Mr. Stark said about needing

 7   to lay out the organizational structure of the group?

 8       A.    What I recall him saying is he couldn't have

 9   all you guys report to me.  So figure out a leader.

10       Q.    Was there any discussion at that time as to

11   what the duties and responsibilities of the person

12   appointed as the leader of the MPS group would be?

13       A.    Actually, I recall now, he said pick a leader

14   among yourself and if you can't, I can go outside and

15   get someone.  So he gave us a choice.

16       Q.    So another alternative was that Motorola

17   would hire someone to come in and serve in the

18   leadership role; is that correct?

19       A.    Yes.

20       Q.    Again, my specific question to you is, do you

21   recall what Mr. Stark said about -- if he said anything

22   at all about what the duties and responsibilities of

23   the individual who was designated as the leader of the

24   group would be?

Clyde Kofman

09/14/2005

143

1    It made sense initially because I was physically

2    located and it would get revisited later.

3         Q.   Do you recall who among the group supported

4    you for the leadership position?

5         A.   Ultimately they all did.

6         Q.   Do you recall who initially supported you?

7         A.   No.

8         Q.   Do you recall who initially supported

9    Mr. Rein?

10        A.   No.

11        Q.   Do you recall who suggested that there be

12   some caveats on your position?

13        A.   No.

14        Q.   Specifically directing your attention to

15   page 271, does this document set forth some of the

16   caveats that were initially suggested on your

17   leadership position?

18        A.   Yes.

19        Q.   Do you recall why the group wanted to place

20   caveats or some members of the group wanted to place

21   caveats on your leadership position?

22        A.   No.

23        Q.   Other than what you have testified to, do you

24   recall any discussions about the caveats that were

Clyde Kofman                                                      09/14/2005

144

1    proposed to be placed on your leadership position

2    within the group?

3        A.   No.  The only discussions I recall were I was

4    uncomfortable taking the leadership position with the

5    caveats and I would have supported others.  But then

6    ultimately -- it was my recollection that Jay did not

7    want the position and ultimately the team decided to

8    ask me to take it and make that recommendation to

9    Mr. Stark.

10       Q.   Is there a particular reason that you

11   initially did not want any caveats placed on your

12   leadership of the IMS group?

13       A.   I thought it would be very difficult for an

14   individual to have responsibility with no authority.

15       Q.   Was that your understanding of what the

16   results of those caveats would be?

17       A.   In essence, yes.

18       Q.   So what kind of duties or responsibilities

19   did you want to have in order to accept the leadership

20   position within the group?

21       A.   I believe any successful leader needs the

22   ability to run the business the way he or she fits and

23   have ultimate responsibility for the success but also

24   the ability to make the decision on how to run them.

Clyde Kofman                                                          09/14/2005

148

1    lead the group?

2        A.    I don't recall at this time.

3        Q.    Was there any discussion of your being

4    located in Chicago -- in the Chicago offices being an

5    important factor in designating you to be the leader of

6    the IMS group?

7        A.    This document suggests that the group felt

8    that physical location was important.  After looking at

9    it, I recall there was some discussion that my

10   proximity to Stark was important.

11       Q.    Do you recall there being any other factors

12   that the group thought important in designating you to

13   be the leader of the IMS group?

14       A.    I'm sure there are others, but at this time I

15   don't recall what they are.

16       Q.    So I take it that eventually the group agreed

17   that they wanted to designate you a leader without the

18   caveats that had previously been imposed; is that

19   correct?

20       A.    That's my recollection.

21       Q.    Did the group subsequently communicate that

22   to Mr. Stark?

23       A.    Yes.

24       Q.    Was there any discussions about bringing an

Clyde Kofman

09/14/2005

149

1    outside person to be the leader of the group?

2        A.    Yes.

3        Q.    What do you recall about those discussions?

4        A.    The discussions were between Stark and myself

5    after the team had recommended me.  He said he was

6    still considering an outsider.  Several weeks later he

7    said he stopped the outside search and he was going to

8    accept me as leader.

9        Q.    When he said he was considering retaining

10   someone from outside what, if anything else, do you

11   recall about his discussions about that topic?

12       A.    Nothing.

13       Q.    Did he tell you why he was considering hiring

14   someone else?

15       A.    Not that I can recall.

16       Q.    Would this individual have been solely

17   responsible for managing the IMS group?

18               MS. MCGURN:    Objection.

19       A.    I don't know.

20       Q.    When Mr. Stark subsequently indicated to you

21   that he had rejected the alternative of hiring someone

22   from outside, did he tell you why?

23       A.    Not that I can recall.

24       Q.    What was the time period between your initial

Clyde Kofman

09/14/2005

150

1    conversation with Mr. Stark and the subsequent

2    conversation where he indicated that you would be made

3    the leader of the IMS group?

4            MS. MCGURN:    Objection.

5        A.    This whole conversation took place in the

6    fourth quarter, but the specific weeks elude me right

7    now.

8        Q.    Do you know when you officially became the

9    manager of the IMS group?

10       A.    I believe it was sometime in December when he

11   suggested that I was the permanent guy.

12       Q.    Did you ever have any discussions with

13   Mr. Stark about what your managerial responsibilities

14   would be with respect to the IMS group?

15       A.    I do recall meeting with Stark sometime in

16   December to engage in expectations about the group and

17   he shared that he was looking for me to lead the group,

18   but I don't recall any details about what would come

19   with that other than what I thought a leader needs to

20   do.

21       Q.    Did you indicate in your conversations with

22   Mr. Stark that you believe as a leader you needed to

23   have certain authority?

24       A.    No.

Clyde Kofman                                                    09/14/2005

151

1          Q.   Did you ever have any discussions with

2   Mr. Stark about what your responsibilities would be as

3   the designated leader of the MPS group?

4                MS. MCGURN:    Objection.

5          A.   I certainly had conversations with Stark

6   about the group and he was holding me responsible for

7   the group achieving the business plan and I

8   interpreted, if I recall correctly, that I had the

9   responsibility to lead the group as I saw fit to go do

10  that.

11         Q.   As a result of being designated the leader of

12  the MPS group, did your title change?

13         A.   Yes.

14         Q.   What was your new title?

15         A.   General manager.

16         Q.   Did your compensation change in any way?

17         A.   No.

18         Q.   Did your duties change now that you became

19  manager of the group?

20         A.   Certainly.

21         Q.   What did you understand your duties to be?

22         A.   In the past I have been an individual

23  contributor.  Now I have responsibility for a small

24  team to execute off the plan that we have presented to

Clyde Kofman

09/14/2005

152

1    Stark.

2        Q.    Did you see this as simply being additional

3    duties as far as your responsibilities within the

4    Motorola organization?

5        A.    I looked at it as an opportunity for the team

6    to be successful.  We had been unfocused.  We had been

7    without proper leadership for a while.  I looked at it

8    as an opportunity to help the team be successful.

9        Q.    Did you see yourself still having sales and

10   business development and consulting responsibilities as

11   far as the IMS team is concerned?

12       A.  ·  Yes.

13       Q.    So is it fair to say from that perspective

14   your duties -- you didn't lose any duties as a result

15   of your being designated to be the manager of the

16   IMS team?

17                MS. MCGURN:    Objection.

18       A.    My duties became more focused and I was a

19   working manager.

20       Q.    Once you became the leader/manager of the

21   IMS group, did you have responsibility for evaluating

22   the performance of the other individuals within the

23   group?

24       A.    Yes.

Clyde Kofman

09/14/2005

153

1    Q.    Did you at the conclusion of 2003 evaluate

2    the performance of the members of the IMS group?

3              MS. MCGURN:    Objection.

4    A.    I concluded their performance management

5    summaries.

6              (Exhibit No. 6 marked for

7    identification.)

8    Q.    I show you what's been marked as Exhibit 6 to

9    your deposition.    Do you recognize this document?

10   A.    I have not seen a printed version, but it

11   appears to be a printed version or electronic version

12   of the performance management tool.

13   Q.    You previously talked about being responsible

14   for preparing the performance management summaries.    Is

15   this what you were referring to?

16   A.    Yes.

17   Q.    Did you, in fact, prepare or have input into

18   a performance management summary of Mr. Rein's

19   performance at the end of 2003?

20   A.    Yes.

21   Q.    My understanding is at the time you prepared

22   this summary, you had only been Mr. Rein's manager or

23   had the position for the head of the IMS group for a

24   few weeks; is that correct?

# EXHIBIT C
# PART 3

Clyde Kofman                                                    09/14/2005

154

1      A.    Yes.

2      Q.    Now, when you and Mr. Rein were both

3  principals within the IMS group, you testified you

4  didn't have occasion to work with him; is that correct?

5                MS. MCGURN:    Objection.

6      A.    My title at the time when I joined was

7  managing principal.  And I did testify earlier that we

8  had not had occasion to be in client -- sales

9  opportunities together.

10     Q.    Other than preparing for meetings with

11  Mr. Stark and responding to his request for

12  information, on what other occasions did you have to

13  work with Mr. Rein?

14     A.    There were several over the past year.  We

15  had planning meetings as an MPS group as a whole under

16  Mr. DeBarros.  We had the transition meetings where we

17  participated with Mr. DeBarros when he moved from

18  corporate into CGISS.  We had monthly operations review

19  with some frequency under Len.  We had team leaders.

20  So there were a number of occasions where Rein and I

21  were working together to help build the business even

22  though our client responsibilities were, for the most

23  part, separate.

24     Q.    Now, directing your attention to Exhibit 6,

155

1    pages 59 through 66.

2        A.    So those ten pages?

3        Q.    I don't know if that is ten.  The heading on

4    the document is "2003 PC.TXT."  What I would like to do

5    is direct your attention to employee -- on page 66 it

6    says "employee signed on 07 May 03.  And I just want to

7    confirm my understanding that this is a portion of the

8    performance review that would have been prepared by

9    someone other than yourself; is that correct?

10       A.    Yes.

11       Q.    Let's, again, focusing on those first seven

12   pages, is there anywhere where there appears to be the

13   input of Mr. Rein's then manager?

14       A.    It's very difficult for me to --

15       Q.    As you look at this document today, you're

16   not sure if there is any input from Mr. Rein's manager

17   and if there is, what portion is from Mr. Rein's

18   manager?

19            MS. MCGURN:    Objection.

20       A.    I'm sure there is input from the manager, but

21   nothing jumps out at me in those six pages.

22       Q.    If you could take a moment to review and see

23   if you can find anything that represents input from

24   Mr. Rein's manager.

Clyde Kofman                                                    09/14/2005

156

1          MS. MCGURN:    Recognizing that it was

2   not his input.

3          MR. COSTER:    I understand.

4      A.    I don't notice any.

5      Q.    Now, directing your attention to pages 66

6   through 69 -- and I'm focusing again on 69, the top of

7   the page it says "Employees signed on October 9, '03,

8   manager signed by Thomas C. Niersbach." Do those four

9   pages reflect the input that Mr. Neirsbach had on

10  Mr. Rein's performance evaluation or at least for the

11  period of time Mr. Neirsbach was Mr. Rein's manager?

12          MS. MCGURN:    Objection.

13     A.    The best of my knowledge, on page 69 there

14  are sections called manager comments which are not

15  filled in.

16     Q.    Do you see any section between pages 66

17  through 69 that reflect comments made by Mr. Neirsbach

18  relating to Mr. Rein's performance?

19          MS. MCGURN:    Objection.

20     A.    Without the indication of manager comments,

21  I'm not able to tell who made these comments.

22     Q.    Then directing your attention from page 00069

23  through 00074, do those appear to be the portion of the

24  performance review that you were involved in preparing?

Clyde Kofman

09/14/2005

157

1    A.    Page 70 is where it seems to be my input.    It

2    says that I signed it on January 13 and manager

3    comments were comments that I provided in this

4    evaluation.

5    Q.    Could you indicate for me which are the

6    comments on page 00070 were comments that you made

7    relating to Mr. Rein's performance?

8    A.    In the manager comments section.    "2003 was a

9    challenging year, period.    Many changes and little

10    leadership direction contributed to the challenges,

11    period.    2004 brings an opportunity for Jay's

12    capabilities to come through more clearly and for MPS

13    to continue to create value for CGISS."

14    Q.    Other than what you just read, do you see any

15    other comments you made in Mr. Rein's performance

16    review?

17    A.    Not that I can see.

18    Q.    There is a section above which says "Manager,

19    after dialogue the joint summary is."    Do you know

20    what, if any, input you had in the joint summary?

21    A.    I don't, no.

22    Q.    With respect to -- again, directing your

23    attention to the section that says "manager, colon,

24    after dialogue the joint summary is.    MX performance

Clyde Kofman                                                          09/14/2005

158

1    consistently meets predefined goals while using the

2    expected 4 font, color red, e font s and always one

3    behaviors."  Do you agree Mr. Rein's performance for

4    this period consistently met predefined goals?

5        A.    I recall that I had to chose a performance

6    level as I stated earlier.  I chose met expectations

7    and I believe this is computer generated wording of

8    what that means.

9        Q.    So your evaluation, are you agreeing that

10   Mr. Rein met expectations with respect to the

11   four E's plus one behavior; is that correct?

12       A.    No.  What I am agreeing to is that I rated

13   Jay as meets expectations.

14       Q.    If I could direct your attention to the

15   second sentence in that paragraph, "At times this

16   individual's performance may exceed expectations."  Do

17   you agree with that statement in what is characterized

18   as a joint summary?

19       A.    What I recall was there were several choices

20   to choose from.  I don't have the exact words.  Some

21   were meets expectations, exceeds expectations, did not

22   meet expectations.  My judgement at the time was

23   looking at '03 knowing the limited period of time I had

24   with Jay, that meets expectation was the right rating

159

1   for Jay at this time.

2        Q.    My question to you is, again, focusing on

3   this paragraph which appears to be a portion of his

4   performance evaluation, do you agree with the statement

5   "At times this individual's performance may exceed

6   expectations?"

7        A.    I'm not sure I had enough input at the time

8   to agree or disagree with that statement.

9        Q.    Okay.  Do you agree with the next statement

10  contained in this what is characterized as a joint

11  summary "Overall the performance that the individual

12  demonstrates accomplishes the job?"

13       A.    I recall looking at the choices and believing

14  that "meets expectations" was the most appropriate, the

15  one I felt was right for Jay's evaluation.

16       Q.    With all due respect, do you agree with the

17  statement "Overall the performance that the individual

18  demonstrates accomplishes the job?"

19       A.    At that time I had very little managerial

20  time with him, and I felt that meets expectations was

21  the right performance level to give him.

22       Q.    At that time being January 14, 2004 -- is

23  that correct -- January 13?

24       A.    I took over leadership sometime in December.

160

1    So from a leadership standpoint, it was weeks or months

2    that he was under my direct control.  I had experiences

3    with him prior to that, no question.  But as a leader,

4    it was a short period.

5        Q.    Again, I'm just trying to understand whether

6    you agreed at the time or disagreed at the time with

7    the statement that "Overall the performance of the

8    individual demonstrates accomplishes the job?"

9        A.    I don't know what I was thinking at that time

10   other than I felt -- what I recall was meets

11   expectations of the choices I had was the right

12   category.  That's what I recall.

13       Q.    So you don't know whether you agreed or

14   disagreed with that statement at the time?

15       A.    Right.

16       Q.    And finally, the joint summary says "The

17   individual is a solid performer who is recognized as

18   effective by management team and key work partners."

19   At the time you prepared this performance evaluation of

20   Mr. Rein, did you agree with that statement?

21       A.    Again, what I recall believing was after

22   looking at the choices "meets expectations" was the

23   right answer.  That's what I recall.

24       Q.    Again, would it be fair to say that you don't

Clyde Kofman                                                    09/14/2005

161

1    recall today whether or not you agreed with that final

2    statement that Mr. Rein is a solid performer who is

3    recognized as effective by management team and key work

4    partners?

5         A.   I don't recall whether I agreed or disagreed

6    at the time.

7         Q.   But certainly you did sign the performance

8    evaluation that contained those statements?

9         A.   Yes.

10        Q.   Directing your attention to the subsequent

11   paragraph "managers comments," those were the comments

12   that you specifically remember inputting into the

13   performance evaluation?

14        A.   Yes.

15        Q.   Other than those -- I think it's three

16   sentences, do you recall any other information you

17   inputted into Mr. Rein's performance evaluation at the

18   end of 2003?

19             MS. MCGURN:    Objection.

20        A.   Not at this time.

21        Q.   Directing your attention to the statement

22   "Little leadership direction contributed to the

23   challenges," what are you referring to when you say

24   little leadership direction?

Clyde Kofman                                                    09/14/2005

162

1      A.    I believe I was referring to the fact that

2    during calendar year '03 there were many months the MPS

3    team did not have a leader where MPS was a significant

4    portion of his or her job responsibilities.

5      Q.    So is it your understanding for at least a

6    substantial period of time the MPS group was not being

7    closely supervised by any manager?

8      A.    What I recall is that we had Tom Niersbach.

9    We had Juergen Stark both who are leaders during

10   periods of '03, both who had other responsibilities at

11   that time had higher priority than MPS.

12     Q.    The final sentence of this evaluations says

13   "2004 brings an opportunity for Jay's capabilities to

14   come through more clearly."  What did you mean by this

15   statement?

16     A.    I felt at the time, if I recall correctly, as

17   I stated earlier, 2003 was a challenging year for the

18   entire group.  And my hope was with the focus on field

19   service mobility, the leadership I was asked to

20   provide, that in that environment my interpretation

21   more stable than the previous year, Jay would have an

22   opportunity to see what he could do -- his

23   capabilities.

24     Q.    What capabilities were you referring to when

Clyde Kofman                                                    09/14/2005

169

1    did you want to encourage him to believe that he would

2    be given the opportunity to help the group improve its

3    performance results in the upcoming year?

4                    MS. MCGURN:    Objection.

5         A.    I don't recall what my desires were at that

6    time.

7         Q.    At this point in time, were you concerned

8    that members of the group may be discouraged about

9    their future at Motorola and look for alternate

10   positions?

11        A.    After assuming leadership of the group in

12   December, I recognized that we had a difficult year and

13   that if there was anything I could do to improve the

14   morale for the team, I would do that.

15        Q.    Was there anything in particular you tried to

16   do to improve the morale of the IMS team as their new

17   manager?

18        A.    I went to bat for the team and was able to --

19   although the team had not hit its targets, I provided a

20   performance bonus for the team.

21        Q.    Was that something you did to help keep the

22   morale of the team high?

23        A.    Yes.

24        Q.    And that was one of the purposes of giving

Clyde Kofman                                                    09/14/2005

170

1    them additional bonuses; is this correct?

2         A.    It was less about morale than it was about

3    fairness.

4         Q.    So, as I understand it, there were two

5    components to the reasons.  One was morale and one was

6    fairness; is that correct?

7         A.    Fairness being the overriding factor.

8         Q.    Okay.  We kind of got into the performance

9    bonus and that was something you did to increase

10   morale.  Is there anything else you did during this

11   time period to try to increase or maintain morale among

12   the IMS group?

13        A.    Continue the focus group and continue to

14   focus the vision of the field service mobility and work

15   with the team members to stay focused.

16        Q.    Did you believe that keeping the IMS team in

17   tact was important to the future success of the group?

18        A.    I'm not sure what you mean.

19        Q.    Were you concerned in people began to resign

20   or leave the IMS group that would have an impact on

21   your ability to meet your goals?

22        A.    We were a small team of five people.  I felt

23   it would be difficult as a team to reach our aggressive

24   targets and where we needed to operate as a team to be

Clyde Kofman                                                    09/14/2005

171

1    successful.

2        Q.    And so that included keeping the team in tact

3    and not losing any members to resignation; is that

4    correct?

5                    MS. MCGURN:    Objection.

6        A.    At what point in time are you asking the

7    question?

8        Q.    January of 2004.

9        A.    I don't recall.  I can tell you what I was

10   thinking in February, but I don't recall January.

11       Q.    What were you thinking in February?

12       A.    After having the group now for the better

13   part of two months, looking at the market place,

14   looking at the challenges we had to deliver and meet

15   our plan for the second half of the year, I concluded

16   that we had an organizational mix issue, one where we

17   had a mismatch of resources, too many business

18   development resources and not enough delivery to be

19   able to meet the commitments we had to the company.

20       Q.    But, again, focusing on your January of 2004

21   time frame.  I believe your testimony previously is in

22   2003 both Mr. Loosemore and DeBarros left the company;

23   is that correct?

24       A.    Yes.

Clyde Kofman                                                     09/14/2005

173

1    performance in the year 2004?

2                    MS. MCGURN:    Objection.

3         A.   I can't recall if that was in my mind or not

4    at the time.

5         Q.   Do you recall doing anything to encourage the

6    IMS group to believe they would have a reasonable

7    opportunity to improve the group's performance in 2004?

8         A.   What I recall is not that specific.  I recall

9    that I was focused on the plan, focus on field service

10   and trying to sort through how the team as a whole

11   could achieve it.  So I was focused on the team at that

12   point.

13        Q.   Having been focused on the team, was there

14   anything you would try to do to encourage them to

15   believe they would have the opportunity to improve the

16   group's underlying performance in 2004?

17        A.   All I recall is that we were strong as a team

18   and I encouraged us to work together.

19        Q.   I think a few minutes ago you testified that

20   one of the things you did to improve morale was to

21   arrange for a bonus to be paid to the IMS group; is

22   that correct?

23        A.   I believe I testified that morale was a

24   portion of it, but it was really a fairness situation

Clyde Kofman                                                    09/14/2005

174

1    that I thought needed to be corrected.

2        Q.    Let me back up and start with the initial

3    question.  Who made the initial suggestion that

4    the members of the IMS group should receive a bonus in

5    January of 2004?

6        A.    I don't recall when the bonus was paid.  I

7    thought it was '03.  I was the one who took the

8    initiative to see inequity in the system and take

9    responsibility to see if I could correct it.

10       Q.    Why did you believe that it was inequitable

11   for members of the IMS group not to receive a bonus

12   whether it's the conclusion of 2003 or January of 2004?

13       A.    There were some 20 odd people who came to

14   CGISS back in April of '03.  There were people who were

15   being paid on incentives tied to sales plans and some

16   being tied to incentives based upon what we call

17   management plans.  The management plans were linked to

18   the overall performance of the company and the sector,

19   sales plans were tied to individual sales goals.  The

20   team as a whole did not perform in '03.  The folks on

21   management who were the delivery folks supporting the

22   sales folks were to receive bonuses.  I felt that the

23   sales folks had worked just as hard as the delivery

24   folks and by no faulty of their own because the

Clyde Kofman

09/14/2005

175

1   challenges we faced, the business plan itself we were

2   not able to achieve.  So I went to management and said

3   I believe that we need to correct that in equity and

4   believe we should make a payoff to both the people on

5   management as well as sales.

6       Q.    I think you talked about delivery folks

7   versus sales folks.

8       A.    The delivery folks were on the management

9   plan.

10      Q.    I see.  I take it that none of the members of

11  the IMS group were on the management plan; is that

12  correct?

13      A.    That's what I recall.

14      Q.    Were all the members of the IMS group

15  considered to be part of the sales force?

16      A.    I can't say for sure, but the majority were.

17      Q.    Who did you approach with your suggestion

18  that members of the IMS group should receive a bonus?

19      A.    Initially the rewards organization to

20  understand options on how we could do it and then

21  ultimately I approached Stark because he had to

22  authorize it.

23      Q.    Who did you speak to in the rewards section

24  or department?

Clyde Kofman

09/14/2005

176

1     A.   One of the HR individuals.

2     Q.   **Briefly what do you recall discussing --**

3 **saying to them about the bonus?**

4     A.   In essence what I just said to you.  I

5 described the situation.  I described what I saw was

6 inequity and that I believe the right thing to do is to

7 try and do something to close the equity up.

8     Q.   **Do you know how this bonus was characterized**

9 **to Mr. Rein and the other members of the IMS group?**

10    A.   I believe so, yes.

11    Q.   **How was it characterized?**

12    A.   That '03 was a tough year and in order to

13 provide compensation for the hard work and to provide

14 fairness compared to the other team members coming in,

15 this was a bonus for that.

16    Q.   **Was there any kind of adjective attached to**

17 **the performance bonus and sales bonus that you recall?**

18    A.   I don't recall using an adjective other than

19 a fairness bonus.  Others may have.

20    Q.   **Are you aware of anyone at Motorola**

21 **characterizing this as a retention bonus?**

22    A.   I have heard that term.

23    Q.   My question is, are you aware of anyone at

24 Motorola characterizing this bonus payment to the

Clyde Kofman                                    09/14/2005

177

1    IMS group as a retention bonus?

2                    MS. MCGURN:    Objection.

3        A.    I don't believe that people characterized it

4    within Motorola as a retention.    I certainly did not do

5    it that way.    Whether others did, I can't speak to.

6        Q.    I think you testified a minute ago you

7    certainly heard the term retention bonus at Motorola;

8    is that correct?

9        A.    Yes, as part of this whole process that term

10   has come to my attention.

11       Q.    When was the first time you heard the term

12   retention bonus?    Was it prior to this litigation?

13                   MS. MCGURN:    Objection.

14       A.    It may have been.

15       Q.    Does Motorola have a bonus they characterized

16   as a retention bonus?

17                   MS. MCGURN:    Objection.

18       A.    I don't know for sure.

19       Q.    What is your understanding of what a

20   retention bonus is at Motorola?

21       A.    I don't have an understanding of a retention

22   bonus at Motorola.    I do have an understanding I have

23   come to learn subsequent to this discussion or actually

24   previous to the discussion because we're having it

LegaLink Boston
(617) 542-0039

Clyde Kofman                                                      09/14/2005

178

1    right now is that in an effort to accelerate payment

2    and to accommodate the limited coding structure within

3    the HR system, they chose a category called retention.

4    So it was a HR system flagging versus anything else, as

5    I understand it.

6        Q.   So it's your understanding that HR

7    characterized the bonus being paid to the IMS group as

8    a retention bonus?

9        A.   I have come to the understanding that is how

10   it was designated in the system.

11       Q.   At the time you were having discussions with

12   HR, did you discuss how this bonus should be

13   characterized?

14       A.   As I testified earlier, my discussions with

15   HR were I felt there was an inequity.  I described the

16   inequity and they we needed to do something to right

17   the wrong, fix the inequity.  Those were the types of

18   words that I used with them, but I left it up to them

19   on how to code it in the system.

20       Q.   Are you aware of HR having discussions with

21   anyone else at Motorola about this bonus that was to be

22   paid to the IMS group?

23       A.   I believe they talked to Tom Niersbach.

24       Q.   Are you familiar with the substance of their

Clyde Kofman

09/14/2005

179

1   discussions with Mr. Niersbach?

2       A.   No.

3       Q.   Is Mr. Niersbach someone who would have to

4   approve the payment?

5       A.   No.  I don't recall, but I think Stark had to

6   approve it.

7       Q.   Who did you say you spoke to in HR again?

8       A.   One of the HR rewards fellows.

9       Q.   You don't recall the name?

10      A.   Jeff Shaft.

11      Q.   Do you know who was responsible for actually

12  coding the bonus as a retention bonus?

13      A.   No.

14      Q.   When did you first become aware that the

15  bonus had been coded as a retention bonus?

16      A.   As I said earlier, I don't recall when that

17  was.

18      Q.   Were you one of the individuals who received

19  the bonus?

20      A.   Yes.

21      Q.   When you got the bonus, how was it

22  characterized by Motorola?

23      A.   It showed up in my check as extra money.  It

24  wasn't communicated to me because I knew it was coming

# EXHIBIT C
# PART 4

180

1   unlike -- I called the other guys.  That's what I

2   recall.

3       Q.   So you didn't notice at the time you received

4   the bonus whether human resources was characterizing it

5   as a retention bonus or making some other

6   characterization?

7       A.   If there was a designation to that effect, I

8   didn't pay attention to it.  I looked at the dollar

9   figure.

10      Q.   Did you ever at any time prior to Mr. Rein's

11  termination make an effort to indicate to members of

12  the MPS group that this was not a retention bonus?

13      A.   As I stated earlier, I personally called the

14  members of the IMS team including Paul Lanci.  He was a

15  member of IMS.  He was one of the folks who I felt were

16  treated in an unfair way.  I called them each and

17  explained the situation as I have here today and said

18  as a result, good news.  We were able to persuade the

19  corporation to fund a small bonus for the efforts we

20  put in in '03.

21      Q.   Do you have an understanding, as you sit here

22  today, what kinds of bonuses Motorola characterizes as

23  retention bonuses?

24           MS. MCGURN:    Objection.

181

1      A.    I can't speak to Motorola.  What I can tell

2  you is that from where I sit today, one of the fellows

3  who received this bonus was a fellow whose last day of

4  employment was December 31, '03.  So he was let go, but

5  he still received the bonus.

6      Q.    Who was that gentleman?

7      A.    Auerillo Lobanton.

8      Q.    Who is Mr. Lobanton?

9      A.    He was a member the original MPS team out of

10 Latin America.  While the MPS team went forward, there

11 was a decision not to continue Latin American

12 operations.

13     Q.    Were you involved in that decision in any

14 way?

15     A.    No.

16               (Recess taken.)

17 BY MR. COSTER:

18     Q.    As I understand your testimony, it was

19 certainly by the middle of December that the decision

20 had been made and finalized that you were going to be

21 the leader of the MPS group; is that correct?

22     A.    Yes.

23     Q.    As leader, what were the new reporting of the

24 group -- what were the new reporting relationships?

Clyde Kofman                                                    09/14/2005

182

1        A.    The team members reported to me.

2        Q.    And then you reported to Mr. Stark; is that

3    correct?

4        A.    Yes.

5        Q.    Once you became the manager or the leader of

6    the MPS group and, again, this is focusing on the end

7    of 2003 through Mr. Rein's employment, how frequently

8    did you meet with Stark, if you can recall?

9        A.    I tried to provide him updates periodically.

10   I know there was a December update where I sat down

11   with him.  I know going forward I gave him a minimum

12   quarterly.  I don't recall if they were monthly.  The

13   bottom line was when I needed him, he made time for me.

14       Q.    If I can try and get an understanding of your

15   managerial responsibilities for the group versus

16   Mr. Stark's.  Who of the two of you established

17   particularly in this time frame, again, end of '03 and

18   the first quarter of '04, who would be responsible for

19   establishing the direction the group was going to go

20   forward?

21       A.    The majority of the responsibilities were

22   mine.  I submitted a financial plan to Mr. Stark which

23   he needed to approve and he did and then the execution

24   of that plan and all the responsibilities that came

Clyde Kofman                                                    09/14/2005

183

1    with it were mine.

2        Q.    As far as the kinds of businesses or

3    opportunities the IMS group was going to pursue in the

4    end of '03 and the first quarter of '04, who was making

5    those decisions?

6        A.    You know, it was a -- they were my decisions

7    with input from the team.

8        Q.    During this period of time, again, end of '03

9    and the first quarter of '04, were there decisions made

10   to change the direction the IMS group was going in?

11                  MS. MCGURN:    Objection.

12       A.    I don't recall.

13       Q.    I think you've mentioned that you recalled

14   having a meeting in mid December of '03 with Mr. Stark;

15   is that correct?

16       A.    In December, yes.

17       Q.    As best you can recall, what was discussed

18   during that meeting?

19       A.    I don't have the specifics, but I think we

20   went through kind of the things we were trying to focus

21   on, immediates actions we wanted to take to stabilize

22   the group, things I was doing to learn because prior

23   to -- a week or two or whatever mid December I wasn't

24   the leader.    So it was just a status report.

Clyde Kofman                                                          09/14/2005

188

1      Q.   With respect to the second paragraph

2   "Successfully completed delivery of phase II of the

3   LA Safe project," was that Mr. Rein's project?

4      A.   Yes.

5      Q.   Directing your attention to the third

6   sentence "If opportunities arise outside of core

7   offerings, IMS representatives will pass along leads to

8   local CGISS account team."  What does that mean?

9      A.   So it says "Successfully completed delivery

10   of the phase II of the LA Safe project."  It goes on to

11   say "Additional opportunities will be monitored for

12   alignment with IMS focus."  So the team will monitor

13   and if LA Safe -- my interpretation was LA Safe says we

14   want more work, we would see if they fit within the

15   focus of field service mobility.  If they did not, we

16   would refer them to other parts of Motorola.

17      Q.   So at this point in time December of 2003,

18   had a decision been made that the IMS group was only

19   going to be pursuing field service mobility work going

20   forward?

21      A.   As I testified earlier, clearly by the end of

22   the year we had made a decision to focus on field

23   service.  Whether it was at the meetings in October, at

24   this point I don't recall when it was made, but we

189

1    clearly sometime in the fourth quarter made that

2    decision.

3         Q.   So when this particular sentence refers to

4    core offerings, does that refer to field mobility

5    services?

6         A.   I believe it does.

7         Q.   Directing your attention to the final

8    paragraph on this page "Engaged jointly with SMD VDC."

9    What is VDC?

10        A.   Stands for Venture Development Corporation.

11        Q.   Is that an outside company or entity?

12        A.   Yes.

13        Q.   What does Venture Development Corporation do?

14        A.   They are an analyst organization that focuses

15   on the rugged mobile computing market which is akin to

16   field service mobility.

17        Q.   So they are a consulting company that has a

18   specialty in field service mobility?

19        A.   They call it rugged mobile computing, but

20   yes.

21        Q.   That is your understanding is it's similar to

22   what Motorola characterizes as field service mobility?

23        A.   Similar, yes.

24        Q.   Was VDC a consultant that had been retained

Clyde Kofman                                                    09/14/2005

197

1          A.    Several.

2          Q.    **What is the first meeting or discussion, if**

3    **you can recall?**

4          A.    I don't recall that in any form or sequence.

5          Q.    **As best you can recall, what were the**

6    **substance of your discussions with Mr. Rein as far as**

7    **pursuing Express Link as a potential client of the**

8    **IMS group?**

9          A.    I recall that Express Link was an opportunity

10   that he had been working on prior to the formation of

11   IMS, that he had interest in continuing to pursue it,

12   that the scope of the work was in the area of yard

13   management.  He thought it was a strong opportunity.

14   We discussed that it was outside our area of focus

15   called field service mobility.

16               He wanted to continue to pursue that.  I

17   facilitated a meeting with Mr. Stark so that he would

18   have an opportunity to make his view known to Stark

19   which occurred.  Mr. Stark stood by the earlier

20   decision of field service mobility focus and we agreed

21   at that meeting while it was a good opportunity, we

22   should look for other folks within Motorola who might

23   be interested in picking that opportunity up.

24         Q.    At the time you were having these

Clyde Kofman                                          09/14/2005

198

1    discussions, had Express Link generated any revenue for

2    IMS or Motorola?

3        A.    Not that I'm aware of, no.

4        Q.    Did Mr. Rein give you any estimates or

5    projection of what he anticipated the potential revenue

6    being from Express Link?

7        A.    I'm sure he did, but I don't recall the

8    numbers.

9        Q.    At the time bench marks and goals were

10   established for the IMS group in October of 2003, was

11   the potential business that Express Link would generate

12   used to help establish those bench marks and goals?

13       A.    Not that I recall.

14       Q.    At any time when projections or estimates

15   were made of the revenue that the IMS group hoped to

16   achieve in the 2004 time frame, were the potential

17   revenues that Mr. Rein hoped to realize from Express

18   Link included in those targets or bench marks?

19       A.    I don't know.

20       Q.    Other than working on the opportunity Express

21   Link, were you aware of Mr. Rein working on any other

22   opportunities on behalf of the IMS group?

23               MS. MCGURN:    In December, January?

24               MR. COSTER:    Yes.

Clyde Kofman

09/14/2005

199

1        A.    I recall he had an ongoing relationship with

2   LA Safe for an opportunity later in the year.

3        Q.    **Would it be fair to say that certainly in the**

4   **December, January, February time frame, you were aware**

5   **that Mr. Rein was pursuing business with Express Link?**

6        A.    I was aware he was pursuing it and on a

7   number of occasions I communicated my desire for him to

8   transition that opportunity and focus on field service

9   mobility.

10       Q.    **When is the first occasion that you indicated**

11  **to Mr. Rein that you felt he should transition his**

12  **efforts towards business related to field service**

13  **mobility?**

14       A.    Late December, early January time frame.

15       Q.    **What, in particular, can you recall about**

16  **that particular conversation with Mr. Rein?**

17       A.    I just recall a telephone conversation.  It

18  seemed to last about an hour.  We talked about a number

19  of topics.  Jay was looking for more information on

20  where the group was going, how we were going to meet

21  our plans.  We talked about what he was working on.  I

22  talked about what I thought we should do.  I explained

23  that the most important thing we could do was focus.

24  We were a small team and we needed to work together and

Clyde Kofman                                              09/14/2005

200

1    focus was critical.  Otherwise, we would get

2    distracted.

3         Q.    Now, in the January -- you had this

4    conversation in early January; is that correct?

5         A.    I said late December, early January.  I don't

6    know when it was.

7         Q.    In that time frame, had the IMS group

8    identified any likely prospects or potential customers

9    for its field mobility services -- products or

10   services?

11        A.    Yes.

12        Q.    What potential customers had been identified?

13        A.    ServiceMaster, Terminix, some utility

14   clients.

15        Q.    The ServiceMaster and Terminix opportunities,

16   those were opportunities being pursued by you; is that

17   correct?

18        A.    Yes.

19        Q.    Did you need Mr. Rein's assistance to pursue

20   those activities?

21        A.    I needed assistance to deliver on them, and I

22   got assistance from the other team members both in

23   selling and delivery on that.

24        Q.    Did you also feel that you needed Mr. Rein's

Clyde Kofman                                                    09/14/2005

201

1    services to help you deliver to that prospect?

2        A.    I don't believe that Mr. Rein was involved at

3    that point in time.

4        Q.    I think you mentioned another field service

5    mobility customer that was being pursued in the

6    December, January time frame in addition to Terminix

7    and the other opportunity you mentioned?

8        A.    I said that there were several utility

9    clients that other team members were pursuing.

10       Q.    As far as you know, did those team members

11   need Mr. Rein's assistance in pursuing those

12   opportunities?

13       A.    I don't know what they were thinking at the

14   time.  I can't say.

15       Q.    Were you aware of any field service mobility

16   opportunity that was not being pursued by IMS that

17   Mr. Rein could have focused his efforts on?

18       A.    I do recall that at some point after the year

19   he was asked to support a field service opportunity

20   with a third party company and he did.  I believe he

21   spent a little time there.

22       Q.    Were you dissatisfied with his support

23   efforts with respect to that field service opportunity?

24       A.    Somewhat.

Clyde Kofman                                           09/14/2005

202

1      Q.    In what respect were you unhappy with his

2   performance in that area?

3      A.    I felt that at times he had difficulty

4   working with some of the other people who were trying

5   to pursue that opportunity.

6      Q.    What particularly was that opportunity, what

7   customer was that?

8      A.    I don't recall the actual paying customer.

9   There was a third party that was fronting the

10  opportunity.

11     Q.    Who was the third party?

12     A.    Apachetta.

13     Q.    Who within the IMS organization was in charge

14  of or responsible for pursuing those opportunities?

15     A.    I think Jay took the lead on that.

16     Q.    And who was Mr. Rein working with in pursuing

17  that opportunity?

18     A.    Members from SMD, members from the outside

19  company, members from Motorola strategy.

20     Q.    Outside company, who are you referring to?

21     A.    Apachetta.

22     Q.    I think you testified that you heard Mr. Rein

23  had difficulty working with others in that opportunity;

24  is that correct?

Clyde Kofman                                                    09/14/2005

203

1     A.    What I recall was receiving some feedback --

2     I don't recall from whom -- and seeing some note that

3     struck me as a little harsh.

4     Q.    With respect to the feedback, do you know

5     from what entity you received the feedback?  Was it SMD

6     or the outside company or Motorola strategy?

7     A.    On this particular one I don't recall.

8     Q.    Who or what is Motorola strategy?

9     A.    The folks in the company that are responsible

10    for setting our strategic direction.  There were people

11    from -- I don't recall exactly who was involved, but it

12    was people who are responsible for setting the

13    strategic direction for the company.

14    Q.    Do you recall from which of those entities

15    you received the feedback?

16    A.    I don't on this particular occasion.

17    Q.    Do you remember what the substance of the

18    feedback was?

19    A.    What I testified earlier just that some of

20    the interactions were difficult and one of the

21    communications was harsh.

22    Q.    I think you testified a minute ago that you

23    remembered seeing some note that struck you as harsh;

24    is that correct?

Clyde Kofman                                                          09/14/2005

204

1      A.    Yes.

2      Q.    Is that an email or a memorandum?  I don't

3  understand what you are referring to.

4      A.    It would be an email.

5      Q.    It was an email that Mr. Rein prepared?

6      A.    That's what I recall, yes.

7      Q.    Do you recall what the substance of the email

8  was?

9      A.    What I recall it was just some commentary

10  about the situation and his prospective which I found,

11  as I said earlier, somewhat harsh.

12     Q.    To whom was this email directed?

13     A.    I don't recall the specifics of the

14  addressees or anything else.

15     Q.    Were you copied on this email?

16     A.    I believe I was.

17     Q.    Do you recall when Mr. Rein prepared this

18  email?

19     A.    Sometime in '03.

20     Q.    When did you become aware of this email?

21     A.    Around the same time.

22     Q.    Were you aware of this email at the time you

23  gave Mr. Rein his performance review in January of '04?

24     A.    No, I don't believe I was.

Clyde Kofman                                                    09/14/2005

209

1    know whether he thought it was inside or outside the

2    scope of field services.  Therefore, it's difficult for

3    me to answer whether he agreed with my view or not.

4        Q.    So you don't know whether Mr. Rein believed

5    it was appropriate for him to be continuing to pursue

6    the Express Link opportunity in February of '04?

7        A.    As I mentioned earlier, I knew that Mr. Rein

8    felt strongly it was an opportunity that Motorola

9    should pursue.  That's why we took it to Stark.  After

10   that, we transitioned it.

11       Q.    Was there eventually a meeting between

12   Mr. Rein and Stark concerning the Express Link

13   opportunity?

14       A.    Yes.

15       Q.    Do you recall when that meeting occurred?

16       A.    Sometime in January, I believe.

17       Q.    Were you present or did you participate in

18   that meeting?

19       A.    I was present.

20       Q.    What do you recall about the discussions with

21   Stark concerning the pursuit of the Express Link

22   opportunity?

23       A.    I recall Jay presenting the business

24   opportunity, the size of the opportunity in the market

Clyde Kofman                                                    09/14/2005

                                                                    210

1    and suggesting that we should pursue it.  I recall

2    Mr. Stark saying that while it may be a large

3    opportunity, we need to focus and we should pass it on.

4         Q.   After Mr. Stark made that determination, did

5    Mr. Rein make an effort to transition that opportunity

6    to some other group or entity within Motorola?

7         A.   I believe he did.

8                   (Exhibit No. 8 marked for

9    identification.)

10        Q.   I show you what's been marked as Exhibit 8 to

11   your deposition.  Do you recognize this document?

12        A.   I don't recognize it, but as I look at it, it

13   seems I prepared it.  So it's coming back.

14        Q.   Was this another update that you prepared for

15   Mr. Stark to give him an idea of what was happening in

16   the IMS or the MPS unit?

17        A.   It's unclear to me from looking at this

18   whether or not this ever went to Stark.  It was

19   addressed to all the guys, but I don't know if Stark

20   saw it.

21        Q.   The introductory sentence refers to a meeting

22   that occurred the prior week.  Do you recall that

23   meeting?

24        A.   Vaguely.

Clyde Kofman                                                      09/14/2005

211

1    Q.   What was discussed at that meeting?

2    A.   I remember we had a meeting sometime in

3  January to kind of rally as a team and come together

4  and say, okay, what are we going to do to win.  That is

5  what recall about that meeting.  And as I look at these

6  notes, these were some of the take away's.

7    Q.   Is it fair to say these were particular

8  assignments for members of the group going forward?

9    A.   I can't say they were assignments.  It says

10 follow-up items here so --

11   Q.   Directing your attention to the paragraph

12 entitled "Field service mobility definition and

13 solution components."  This item represents MPS's best

14 thinking on what we mean by field service and the range

15 of solution we will pursue to help clients win in FSM."

16 At this point in time, was the IMS group still

17 attempting to identify or to define what they meant by

18 field service mobility?

19   A.   It seems to me that we had a pretty good idea

20 of what it was, but we needed to formalize the

21 documentation and build it out a little.

22   Q.   I note that Mr. Brice is assigned to prepare

23 that document; is that correct?

24   A.   That's what it says here.

LegaLink Boston
(617) 542-0039

Clyde Kofman                                                    09/14/2005

212

1      Q.   Do you recall whether he, in fact, did

2   prepare a document that outlined the definition of

3   field service mobility?

4      A.   I don't recall.

5      Q.   With respect to the Express Link opportunity,

6   this item is a summarization of the effort regarding

7   Express Link.  Do you recall whether you asked

8   Mr. Rein to prepare a summarization of his efforts to

9   develop the Express Link opportunity?

10     A.   Well, I'm just looking at what it says here

11  and this says that in preparation for a meeting with

12  Stark to determine whether or not it fits or does not

13  fit with our IMS strategy, and Jay was asked to take

14  the lead on that, yes.

15     Q.   Do you recall whether he actually prepared

16  any written summarization of his efforts regarding

17  Express Link?

18     A.   Yes.  I think it refers to what I testified

19  to a few minutes ago, that was the meeting we had.

20  This would suggest to me the meeting took place on the

21  20th.

22     Q.   And, again, the meeting that is being

23  referred to on January 20th with Juergen Stark, that

24  was the meeting you just testified to where the Express

Clyde Kofman

09/14/2005

213

1    Link opportunity was discussed?

2        A.    Whether it occurred on the 20th or sometime

3    shortly after, yes, but this is the same meeting I

4    referred to.

5        Q.    Then there is an additional paragraph "Skill

6    profile for additional hires."  What is that referring

7    to?

8        A.    I believe it's fairly clear, but it was

9    becoming clear as we were getting into January that

10   from a model standpoint -- business model -- that we

11   needed if we were going to hit our plan additional

12   delivery resources.  And this was meant to begin to

13   think about the skills that we would need if we were

14   going to bring additional team members on.

15       Q.    So would it be fair to say that at this point

16   in time, there was some discussion that you were

17   contemplating hiring additional individuals into the

18   IMS group?

19       A.    I think it's fair to say that we knew we

20   needed access to additional skills to deliver.  At this

21   point, I don't believe we had run any economic models

22   just to see if we could afford it, to see if we could

23   borrow people inside.  So this was an initial

24   recognition that we needed additional skills to win.

# EXHIBIT C
# PART 5

222

1     MR. COSTER:  This is a continuation of the

2    deposition of Mr. Kofman.

3    BY MR. COSTER:

4        Q    I'm going to remind you, Mr. Kofman, that you

5    are still under oath from your prior deposition.  I'm

6    not going to ask the court reporter to reswear you,

7    but you are still under oath from when we started the

8    previous day.

9            I have a couple of preliminary questions in

10   just going through the transcript I just need to

11   clear up.  First, I don't think I ever asked you how

12   old are you, Mr. Kofman?

13       A    43 years old.

14       Q    Now, during the first day of your testimony,

15   you talked about having a social relationship with a

16   gentleman named Mr. Sigurdson, is that correct?

17       A    Yes.

18       Q    Okay.  I think you also talked about having

19   conversations with him where you discussed

20   transforming companies, changing from a product to a

21   service company, is that correct?

22       A    I believe so.

23       Q    Okay.  Now, in those conversations you had

24   with Mr. Sigurdson, did you ever talk about

230

1      A    Okay.   The question is?

2      Q    In conjunction with your testimony that you

3   had on page 174, you talked about two different kind

4   of employees within CGISS, delivery folks and sales

5   folks.   These are your words.

6           I'm trying to understand who were the sales

7   folks within the CGISS organization that you're

8   referring to?

9      A    So to try to help clarify, there are two

10  types of incentive plans at the company that I'm

11  aware of.   One is a sales incentive plan, which is

12  for individuals who carry quota and are compensated

13  incentives based on their ability to relieve that

14  quota.

15     Q    Are those the sales folks you were referring

16  to?

17     A    They are the sales folks.

18     Q    And within the MPS organization, would that

19  be the principals within MPS?  Were they considered

20  sales folks under your definition?

21     A    Yes.

22     Q    Any other people within the CGISS

23  organization who were considered sales folks?

24     A    I don't know.

Clyde Kofman, Vol. 2                           10/21/2005

231

1    Q    Who were the delivery folks you were

2  referring to in the testimony?

3    A    The second category folks are employees of

4  Motorola who are on the management incentive plan who

5  are rewarded a bonus based upon the performance of

6  the individual business units as well as the

7  corporation.  That varies by level.

8    Q    Were there delivery folks within the CGISS

9  organization?

10   A    There were folks within CGISS on the

11 management plan, yes.

12   Q    And these are the individuals that you

13 characterized in your testimony as delivery folks, is

14 that correct?

15   A    Yes.

16   Q    And did members of the MPS group work with

17 these delivery folks in conjunction with providing

18 services to potential clients?

19   A    It's not limited to delivery folks.  There's

20 a number of other functions that might be within the

21 management plan.  I use that delivery as kind of a

22 category.  But the sales principals that were at SIP

23 did work closely at times with the folks in MPS or in

24 management plans, absolutely.

234

1    other principals on the salesmen side.

2        Q    Was that bonus characterized as retention

3    bonus?

4        A    I believe all the bonuses were characterized

5    the same in the HR system.

6        Q    What group or division did Mr. Lobanton work

7    in?

8        A    Motorola professional services.

9        Q    Was he a member of the MPS group?

10       A    Yes.

11       Q    Was he someone that reported to you?

12       A    No.

13       Q    Who did he report to?

14       A    Tom Neirsbach.

15       Q    And were you responsible for Mr. Lobanton

16   receiving a retention bonus?

17       A    I was involved in that.

18       Q    What was your involvement in Mr. Lobanton

19   receiving a retention bonus?

20       A    The MPS group was divided into three groups.

21   I was asked to take the North American group going

22   forward.  A small group was segmented and put into a

23   government group.  And then the Latin America folks

24   were treated separately.  That was the decision that

235

1    was made in the November, December time frame.

2         The conversation I had with HR and rewards

3    about the equity conversation extended to all the

4    original participants within CGISS and MPS, not just

5    my small group.

6    Q    So it's your understanding that all the

7    employees who were in the -- the principals who were

8    in the Latin American group received retention

9    bonuses, is that correct?

10   MS. McGURN:  Objection.

11   THE WITNESS:  No, that's not correct.

12   BY MR. COSTER:

13   Q    Could you help me out then?  Which employees

14   within the Latin American group received retention

15   bonuses?

16   A    The folks in the Latin American group who

17   were -- who received the bonus, I would not

18   characterize as a retention bonus -- would have

19   included those who did not achieve their sales plan.

20   Q    So did all the employees within the Latin

21   American group who did not achieve their sales plan

22   receive a bonus if you don't want to use the word

23   retention?

24   A    I believe so.

236

1    Q    I think you testified that there was also a

2    third group within the MPS organization, is that

3    correct?

4    A    Yes.

5    Q    And what group is that?

6    A    It was named mission critical network systems

7    or solutions.

8    Q    Okay.  And did all the employees who did not

9    receive a sales bonus receive some other kind of

10   bonus in early 2004?

11   A    I don't recall when it was paid out, but I

12   believe they were treated the same.

13   Q    Okay.  Mr. Lobanton, did he resign from the

14   company or was his employment terminated?

15   A    I don't know the circumstances.  I know he

16   left the company.  I'm not sure exactly how to

17   characterize it.

18   Q    I think you testified that your best

19   recollection is it's in the December time frame?

20   A    I believe he left at the end of the year,

21   yes.

22   Q    And did he receive this bonus prior to

23   leaving or after he left?

24   A    I don't recall.

Clyde Kofman, Vol. 2                          10/21/2005

239

1    management opportunity at ExpressLINK.

2              I guess my question to you is, did you want

3    the MPS group to continue to be involved in pursuing

4    that opportunity?

5        MS. McGURN:  Objection.

6        THE WITNESS:  I recall indicating to the team,

7    the MPS team that we should focus our efforts on

8    field service mobility opportunities.

9    BY MR. COSTER:

10       Q   Did you consider the ExpressLINK opportunity

11   to be a field service mobility opportunity?

12       MS. McGURN:  Objection.

13       THE WITNESS:  I don't believe I did.

14   BY MR. COSTER:

15       Q   So then would it be fair to say that you did

16   not want Mr. Rein and the MPS group to continue

17   pursuing the ExpressLINK opportunity?

18       MS. McGURN:  Objection.

19       THE WITNESS:  My recollection is that ExpressLINK

20   was outside the scope of what we were trying to

21   accomplish.

22   BY MR. COSTER:

23       Q   Okay.  And does that mean that you did not

24   want Mr. Rein to continue pursuing the ExpressLINK

240

1    opportunity?

2        MS. McGURN:  Objection.

3        THE WITNESS:  I believe I requested the folks to

4    transition this opportunity.

5    BY MR. COSTER:

6        Q    And directing your attention to

7    paragraph two, it says there is another group within

8    IESS that might be interested in the consumer-based

9    aftermarket telematics opportunity with ExpressLINK.

10   For this opportunity, we are trying to schedule a

11   introduction between IESS and ExpressLINK.

12           Did you want Mr. Rein to continue pursuing

13   that opportunity within the MPS group?

14       A    I don't recall.

15       Q    Third paragraph talks about one other outcome

16   of our interactions with Janiece generated some

17   unexpected opportunity.  Her group has two

18   enterprises opportunity which has been generated by a

19   prospective acquisition candidate, a software entity

20   in the SCM space, for Motorola, Inc.

21           When he refers to Aventis Pharmaceuticals

22   and Timberland, did you want Mr. Rein in the MPS

23   group to pursue those opportunities?

24       A    I don't recall those opportunities.

245

1    Mr. Rein was pursuing in the February of '04 time

2    frame?

3        A    The only one that stands out was, as we

4    discussed last time, Allied Safe.

5        Q    In bullet point four of this document, you

6    reference the evolving CGISS and FSM strategy.  As

7    best you can recall in February of 2004, what was the

8    evolving CGISS and FSM strategy?

9        MS. McGURN:  Objection.  I think you said you

10   reference.

11       THE WITNESS:  This is Mr. Rein's note.

12   BY MR. COSTER:

13       Q    Let me rephrase the question.  Mr. Rein

14   references the evolving CGISS and FSM strategy.  Do

15   you know what he's referring to?

16       A    No.

17       MR. COSTER:  Can you mark this as Exhibit No. 10?

18              (Deposition Whereupon Exhibit No. 10 was

19               marked for identification.)

20   BY MR. COSTER:

21       Q    I'm showing you what's been marked as Exhibit

22   No. 10 to your deposition.  This is an e-mail that

23   you wrote to Mr. Stark on our about February 3rd,

24   2004.  Do you recognize this e-mail?

Clyde Kofman, Vol. 2                              10/21/2005

246

```
 1        A    I recall it.

 2        Q    Okay.  Directing your attention to the third

 3   sentence in the main body of the top e-mail.  It

 4   says, I have concerns -- referring to Mr. Rein, I

 5   have his concerns over his ability to stay focused.

 6   What did you mean by this?

 7        A    As I look at this memo, what I believe -- I

 8   believe that I was referring to the fact that

 9   Mr. Rein was continuing to pursue opportunities that

10   were outside of the field service strategy we laid

11   out.

12        Q    And what specific opportunities was he

13   pursuing that were out of the field service mobility

14   area?

15        A    Based upon this memo, it would seem to be

16   ExpressLINK.

17        Q    And had you specifically told him to stop

18   pursuing the ExpressLINK opportunity?

19        A    I believe I did, yes.

20        Q    And had he ignored your direction to stop

21   pursuing the ExpressLINK opportunity?

22        A    I'm not sure.

23        Q    Other than the fact that he was working on

24   the ExpressLINK opportunity, is there anything else
```

Clyde Kofman, Vol. 2                          10/21/2005

253

1    made the decision to terminate Mr. Rein's employment?

2        A    I did.

3        Q    And prior to making that decision, did you

4    have any discussions with anyone else within

5    Motorola?

6        A    Yes.

7        Q    Who did you have discussions with?

8        A    Mr. Stark.

9        Q    When do you recall discussing with Mr. Stark

10   your -- the termination of Mr. Rein's employment?

11       A    I don't recall the exact date, but it was

12   sometime in the February time frame, I believe.

13       Q    In your own mind, when did you come to the

14   conclusion that it would be appropriate to terminate

15   Mr. Rein's employment?

16       A    I don't have an exact date or time, but

17   somewhere in the February time frame.

18       Q    Did you have the authority to terminate

19   Mr. Rein's employment on your own or did you have to

20   get some sort of authorization or approval from

21   someone else within the Motorola organization?

22       A    I believe as a manager that it was my right

23   to terminate on my own, but I think it's prudent

24   business practice to collaborate with your boss at

Clyde Kofman, Vol. 2                              10/21/2005

                                                                 254

1    the time and give him an insight to your thinking and

2    let him be aware of it.  If he chose to have a

3    different point of view, discuss it, so --

4         Q    Other than having discussions with Mr. Stark

5    about your decision to terminate Mr. Rein's

6    employment, did you have discussions with anyone else

7    within Motorola?

8         A    Yes.

9         Q    Who else did you talk to?

10        A    Peter Tobin.

11        Q    And who is Mr. Tobin?

12        A    Peter was the director of HR for the MPS

13   group.

14        Q    Anyone other than Mr. Tobin and Mr. Stark?

15        A    Not that I recall.

16        Q    As best you can recall, what were your

17   discussions -- what was the substance of your

18   discussions with Mr. Stark concerning your decision

19   to terminate Jay Rein's employment?

20        A    The substance was that he had asked me to

21   take the group over.  I had some time to look at our

22   business plan, look at our business model, evaluate

23   how we were going to try to achieve our plan.  I

24   thought it was prudent to make some changes because

255

1    we had an organizational mix issue.  In the context

2    of presenting my plan, I laid out for Mr. Stark my

3    rational for making changes to the group.

4        Q    What was your rational for making changes to

5    the group?

6        A    I felt that we had an organizational mix

7    issue.  I felt that we needed to focus on a

8    particular area which we had agreed to call the field

9    service mobility.  I felt that we needed to generate

10   leads and we had several methods to do that,

11   including the VDC as well as direct business

12   development.

13            But I was concerned that in order to hit our

14   business plan that we were -- we didn't have the

15   delivery capability to execute on the engagements we

16   were trying to sell and felt that we should shift our

17   mix from heavy business development to more balance

18   between business development and delivery.

19       Q    I think you testified, among other things,

20   that you -- one of the concerns you had was the

21   ability of the MPS group to focus on a particular

22   area, is that correct?

23       A    I don't recall testifying on the group having

24   an inability, no.

Clyde Kofman, Vol. 2                          10/21/2005

256

1          MR. COSTER:  Why don't we have the court reporter

2     go back and read the prior answer to this.

3                    (From the record above, the reporter read

4                     the following:

5                     "A  I felt that we had an organizational

6                      mix issue.  I felt that we needed to

7                      focus on a particular area which we had

8                      agreed --")

9          MR. COSTER:  I'm going to stop you there.

10    BY MR. COSTER:

11         Q    How did your need to focus on a particular

12    area impact your decision to fire Mr. Rein?

13         A    The thinking about focusing the group on a

14    particular area had to do with our mix of people.  As

15    we narrowed our focus into the area of field service

16    mobility, I felt that we could adequately address the

17    lead development through less people, direct people

18    with some outside help from VDC.  If we had been

19    focused on three or four different areas, I might

20    have felt that we needed four feet on the street.

21         Q    In your view, did terminating Mr. Rein help

22    the group focus on a particular area?

23         A    It was -- How do I say this?  The decision to

24    terminate Mr. Rein was a decision based upon the fact

Clyde Kofman, Vol. 2                          10/21/2005

257

1   that we had a mix problem.  We were out trying to

2   sell engagements in field service mobility.  I had

3   some concern if we landed those engagements that we

4   wouldn't be able to deliver against them.  I felt we

5   had an imbalance in the number of resources outside

6   developing leads compared to those that could

7   execute.

8           I had suggested to Mr. Stark a prudent thing

9   to do was to -- as we narrow our focus, shrink our

10  efforts on direct business development, augment with

11  outside and bring in some more delivery folks when we

12  sell engagements as a way to balance our delivery to

13  hit a plan.

14      Q    Part of your proposal was to shrink the

15  efforts to -- on business development of the MPS

16  group?

17      A    The term shrink, what I meant by that was, we

18  had three primary people focused on business

19  development.  I was going to eliminate one of the

20  positions on business development so we had two folks

21  primarily focused, have some alternative ways to

22  generate business.  So not shrink the total

23  development of business, just the direct component,

24  and find resources who could execute to help fulfill

1    our plan.

2        Q    So did Mr. Stark agree with that

3    recommendation on your part?

4        A    Yes.

5        Q    Okay.  And so then he authorized you to hire

6    additional delivery people?

7        A    He and I spoke.  He agreed that he authorized

8    me to hire one and said as more business comes in,

9    you could hire the second because I asked for two.

10        Q    And was there any discussion about what the

11    salary grade or title of this delivery person would

12    be?

13        A    I'm trying to recall.  I believe we talked

14    about delivery folks at -- I don't recall the exact

15    grade, but they were, you know, not people fresh out

16    of college but with some experience.

17        Q    And after Mr. Stark authorized you to hire an

18    additional delivery person, what did you do next to

19    pursue that?

20        A    At some point, we -- at some point, I wrote a

21    job requisition and put it in our requisition system

22    to go look for a new employee.

23        Q    Do you recall when you did that?

24        A    No.

Clyde Kofman, Vol. 2                          10/21/2005

259

1     Q    Would it have been in the February 2004 time

2   frame?

3     A    It would have been in the first half of '04,

4   but I don't recall the month.

5     Q    And when you say you put it in job

6   requisition, is this something that then goes to the

7   human resources department?

8     A    Yes.

9     Q    And do you know what efforts human resources

10  or Motorola made to fill that delivery position?

11    A    I know we spoke to one or two individuals as

12  I recall.

13    Q    Did you use any executive placement or

14  recruiting company to help fill that position?

15    A    No.

16    Q    Did you participate in the interviews of any

17  prospective applicants for that position?

18    A    I only specifically recall one applicant, and

19  yes, I participated in the interview.

20    Q    How did Motorola advertise this position?

21    A    I don't know.

22    Q    As far as you can recall, you only

23  interviewed one potential applicant?

24    A    There may have been others, but I recall

Clyde Kofman, Vol. 2                               10/21/2005

260

1    specifically one.

2        Q    And did you extend a job offer to this one

3    applicant?

4        A    We did not.

5        Q    Do you remember who that individual was?

6        A    Yes, Jim Cheetle (phon).

7        Q    And at the time you interviewed him, was

8    Mr. Cheetle an employee of Motorola?

9        A    No.

10       Q    Do you know how Mr. Cheetle came to the

11   attention of Motorola?

12       A    Yes.  He was a contact that we had in the

13   marketplace.

14       Q    Was Mr. Cheetle somebody you knew?

15       A    There were several people, including myself,

16   who had met him.

17       Q    How did you know Mr. Cheetle?

18       A    I met him through business development

19   opportunities at his employer Sears.  He was in

20   charge of field service mobility for their IT group.

21       Q    And you contacted Mr. Cheetle to let him know

22   that Motorola was trying to fill this position?

23       A    Yes.  Let me take that back.  HR may have

24   contacted him first.  I don't recall who did.

Clyde Kofman, Vol. 2                              10/21/2005

261

1    Q    Did you recommend to HR that they contact

2  Mr. Cheetle?

3    A    I believe I did, yeah.

4    Q    And did Mr. Cheetle then apply for the

5  position or did HR contact Mr. Cheetle or Motorola

6  contact Mr. Cheetle?

7    A    I don't recall how the process worked.  I do

8  recall that I spoke to him on the phone about the

9  opportunity.

10    Q    Were you the individual who advised him that

11  this opportunity existed at Motorola?

12    A    I don't know.  Someone else may have.

13    Q    Other than Mr. Cheetle, are you aware of

14  anyone else applying for this position?

15    A    I'd have to check the records.  I don't

16  recall.

17    Q    Do you know why Mr. Cheetle was not

18  offered -- or was he?  Was Mr. Cheetle offered the

19  position by Motorola?

20    MS. McGURN:  Objection.

21    THE WITNESS:  No.

22  BY MR. COSTER:

23    Q    Do you know why Mr. Cheetle was not offered

24  the position?

# EXHIBIT C
# PART 6

Clyde Kofman, Vol. 2                    10/21/2005

263

1        Q    When did Mr. Cheetle interview or apply for

2    the position?

3        MS. McGURN:   Objection.

4        THE WITNESS:  Mid '04.

5    BY MR. COSTER:

6        Q    Why did Motorola decide not to fill the

7    position?

8        A    To the best of my recollection, we were able

9    to identify resources that we could leverage from

10   existing groups to help us deliver on our

11   engagements.

12       Q    Had those resources been in existence at the

13   time you made the decision to terminate Mr. Rein's

14   employment?

15       A    I don't know.

16       Q    Well, do you know what, if anything, had

17   changed in late '04 that led you to believe that you

18   could fulfill the delivery or delivery needs through

19   resources from existing groups?

20       MS. McGURN:   Objection.

21       THE WITNESS:  I recall that there was also a

22   decision made in late '04 to refocus the MPS group

23   and not focus on consulting so we needed to have

24   delivery resources right away.

265

1       MS. McGURN:  Objection.

2       THE WITNESS:  I recall that he -- you know, he

3   had 15 or 20 years of work experience, so that I

4   would imagine he's between those numbers if he's got

5   15 or 20, but I don't know how old he is.

6   BY MR. COSTER:

7       Q    Other than what you've already testified to,

8   is there any other reason you made the decision to

9   terminate Jay Rein's employment?

10      A    There were several factors that caused this.

11  The primary factor was the organizational mix issue.

12  Then it came down to, after we decided we had a

13  business mix issue, which individual.  The initial

14  factor there was Jay's limited experience in field

15  service mobility that contributed to the decision.

16      Q    What led you to believe that Mr. Rein had

17  limited experience in field service mobility?

18      A    I believe he shared that with me at one

19  point.

20      Q    He told you he had limited ability -- limited

21  experience in field service mobility?

22      A    I don't recall if he told me, but I know from

23  interactions with him that, as compared to another

24  fellow on the team, he had less experience.

Clyde Kofman, Vol. 2                          10/21/2005

266

1      Q    In your view, who did he have less -- what

2  individual had more experience than Mr. Rein?

3      A    John Gillardi.

4      Q    Any other reason you chose to terminate

5  Mr. Rein's employment?

6      A    The only other one that came to consideration

7  was some concerns over behavior.

8      MR. COSTER:   Could I have this marked as the next

9  exhibit?

10              (Whereupon Deposition Exhibit No. 11 was

11                 marked for identification.)

12  BY MR. COSTER:

13     Q    I'll show you what's been marked as

14  Exhibit 11 to your deposition, dated April -- well,

15  I'm sorry.  Your e-mail to Mr. Stark is dated, which

16  is the bottom half of the first page, February 11,

17  2004.  It says, attached it is a two-page update.  If

18  possible, please review before our 1:30 discussion

19  tomorrow.

20              Did you send Mr. Stark this e-mail on or

21  about February 11th, 2004?

22     A    Yes.

23     Q    Was this after you had made the decision to

24  terminate Mr. Rein's employment?

272

1      A    Again, what I'm struggling with is that there

2  were three factors that were interrelated between

3  geography, delivery and expertise.  I felt those

4  there were three problems and I laid out a solution.

5      Q    With respect to each of those three problems,

6  how did terminating Mr. Rein's employment help solve

7  those problems?

8      MS. McGURN:  Objection.

9      THE WITNESS:  I don't believe that the

10 termination of Mr. Rein in and of itself would have

11 solved the problems.  There has to be more to the

12 solution.  That's why it was a -- there was a plan

13 that said we needed to fix the organizational mix and

14 eliminate Mr. Rein's position, but at the same time

15 embark on a search for additional resources to help

16 us win.  They go hand and hand.  I can't separate the

17 two.

18 BY MR. COSTER:

19     Q    Would simply have hiring another delivery

20 person solved the problems that you identified in

21 this memorandum?

22     MS. McGURN:  Objection.

23     THE WITNESS:  I don't believe so.

24

Clyde Kofman, Vol. 2                               10/21/2005

273

1    BY MR. COSTER:

2        Q    Why not?

3        A    I don't believe it would have helped us

4    achieve our business plan.

5        Q    When you say achieve our business plan, what

6    are you referring to?

7        A    We had revenue goals.  We had profit goals.

8    We had client engagement goals.  Just adding

9    resources I don't think would have been prudent.

10       Q    So you don't think that would have helped you

11   with your revenue goals?

12       MS. McGURN:  Objection.

13       THE WITNESS:  I don't think it would have helped

14   us with all the goals; revenue, profit, growth.

15   BY MR. COSTER:

16       Q    Well, would it have helped you with your

17   revenue growth goals?

18       A    I can't -- I don't know.  I'm not --

19       Q    Do you think hiring an additional person

20   would have helped you with your additional growth

21   goals?

22       MS. McGURN:  Objection.

23       THE WITNESS:  I don't know.

24       MS. McGURN:  Calls for a witness to speculate.

Clyde Kofman, Vol. 2                        10/21/2005

276

1    time.

2    BY MR. COSTER:

3        Q    And in fact, it would be fair to say that all

4    your recommendations were not implemented, is that

5    correct?

6        A    We didn't execute on them all, no.

7        Q    In fact, you really had two primary

8    recommendations, terminating Mr. Rein and hiring an

9    additional delivery person, isn't that correct?

10       MS. McGURN:   Objection.

11       THE WITNESS:   Okay.

12   BY MR. COSTER:

13       Q    Well, no, you tell me.  This is your

14   recommendation?

15       A    I mean, we needed to solve the organizational

16   mix issue.  The organizational mix issue would be

17   solved by eliminating a senior position that was

18   focused on business development and hiring some less

19   experienced folks on delivery.  That was the plan.

20           That plan was contingent upon a number of

21   factors, including our growth, acceptance in market,

22   continued belief of Motorola to be involved in the

23   professional service plan.

24       Q    But the only component of your plan that was

277

1    implemented was the termination Mr. Rein, is that

2    correct?

3        A    We implemented the hiring plan.  We didn't

4    choose to hire the people.  We did go down the path,

5    yes.

6        Q    Directing your attention to the top of the

7    third page of the document, I'll read to you the

8    opening two sentence.  In an effort to accelerate our

9    progress, deepen our domain expertise and minimize

10   our delivery risk, I believe changes to the group are

11   necessary.  Further complicating these

12   organization -- excuse me, these organizational mix

13   and skill issues is a continuing behavioral issue

14   with Jay Rein.  Did I read that correctly?

15       A    Yes.

16       Q    And what is the behavioral issue you were

17   referring to with respect to Jay Rein?

18       A    I recall that Jay at times had difficulty

19   getting along with others.

20       Q    Okay.  And can you think of specific

21   circumstance in which Mr. Rein had difficulty getting

22   along with others?

23       A    Nothing jumps out right now at this

24   particular moment.

280

1    testimony?

2        A    Yes.

3        Q    And is that the information you reviewed that

4    led you to believe or come to the conclusion that --

5    one of the things that you reviewed that led you to

6    the conclusion that Mr. Rein had certain behavioral

7    issues?

8        A    It was part of it, yes.

9        Q    And what in particular, focusing on that

10   section, led you to believe that Mr. Rein had certain

11   behavioral issues?

12       A    Just a moment, please.

13           This section is entitled blind spots where

14   the manager and/or the direct reports rate the person

15   being rated lower than the individual himself or

16   herself rate.  This had eight different areas where

17   Mr. Rein appeared to rate himself higher than either

18   the manager and/or reports.  And that caused me some

19   concerns because it's just a pattern where he felt

20   that his behavior was better than others.

21       Q    Now, in going through each of these

22   categories, would it be accurate to say that the

23   direct reports rating of Mr. Rein is closer to

24   Mr. Rein's rating of himself than to the manager's

Clyde Kofman, Vol. 2                    10/21/2005

282

1    lower than Mr. Rein's rating.  That's why it's in

2    blind spots, but oftentimes, it is higher than the

3    manager.

4        Q    Is there an occasion when it's not higher

5    than the manager's rating?

6        MS. McGURN:  Objection.

7        THE WITNESS:  It doesn't appear to be, no.

8    BY MR. COSTER:

9        Q    And who was the manager rating Mr. Rein

10   performance in this review?

11       A    Tom Neirsbach.

12       Q    And how long did Mr. Neirsbach supervise

13   Mr. Rein?

14       A    I don't know.  Four, five, six months.

15       Q    And do you know how closely Mr. Neirsbach

16   worked with Mr. Rein?

17       A    I don't.

18       Q    Did you make any effort to speak with

19   Mr. Neirsbach about his ratings or evaluations of

20   Mr. Rein?

21       A    I don't recall.

22       Q    Within Motorola's rating scale, a 2 or a 2.5,

23   is that a fairly good rating?

24       MS. McGURN:  Objection.

Clyde Kofman, Vol. 2                          10/21/2005

283

1      THE WITNESS:  I don't know.  According to the

2    scale here, 2 is effective, 1 is adequate, 0 is

3    infective.

4    BY MR. COSTER:

5       Q   So is there a single category that the direct

6    report did not rate -- that the direct report rated

7    Mr. Rein as being less than effective?

8       MS. McGURN:  Objection.

9       THE WITNESS:  I don't know.

10      MS. McGURN:  The document speaks for itself,

11   but --

12      THE WITNESS:  I'd have to go through every single

13   category.

14   BY MR. COSTER:

15      Q   There's none in the blind spots, is that

16   correct?

17      A   None in the blind spots.

18      Q   Are there any other materials that you

19   reviewed in making your decision that there were

20   behavioral issues with respect to Mr. Rein?

21      A   Not that I recall.

22      Q   I think you also mentioned feedback in here

23   from four to six CGISS go to market team members, is

24   that correct?

Clyde Kofman, Vol. 2                           10/21/2005

284

1      A    Yes.

2      Q    Do you recall who you spoke to?

3      A    Not all of them, no.

4      Q    Any of the four to six CGISS go to market

5    members that you spoke with?

6      A    I recall obtaining feedback from Paul Lanci

7    and Chris Banakis.

8      Q    And Chris Banakis?

9      A    Yes.

10     Q    Well, at the time you spoke to Mr. Lanci, was

11   he a member of the MPS group?

12     A    I don't recall.

13     Q    Who was Chris Banakis?

14     A    He's a sale leader in the S & D organization.

15     Q    What occasion did Mr. Banakis, if you know --

16   or interaction did he have with Mr. Rein?

17     A    I don't recall.

18     Q    What do you recall about your conversation

19   with Mr. Banakis relating to Jay Rein?

20     A    Nothing specific, just that he had shared

21   some feedback with me along the way that at times Jay

22   was difficult working in a team.

23     Q    Can you specifically remember what feedback

24   Mr. Banakis shared with you indicating that Jay Rein

Clyde Kofman, Vol. 2                     10/21/2005

285

1    was difficult?

2        A   No.

3        MS. McGURN:   Objection.

4        THE WITNESS:   I don't recall specifically.

5    BY MR. COSTER:

6        Q   Now, Mr. Lanci, on what occasions did he have

7    to work with Mr. Rein, if you know?

8        A   At one point, he was a member of MPS.

9        Q   Again, my specific question is what occasions

10   did he have to work with Mr. Rein?

11       A   I don't know the specifics.

12       Q   Do you remember the substantiveness of the

13   conversations of the feedback you received concerning

14   Jay Rein?

15       A   Not at this time.

16       Q   Do you recall speaking to any other members

17   of the MPS group concerning Jay Rein?

18       A   I don't recall, no.

19       Q   Would it be fair to say that those were --

20   and I'm specifically referring to Mr. Gillardi, for

21   example, and Mr. Brice that those were two employees

22   that worked fairly closely with Mr. Rein, is that

23   correct?

24       A   I know Mr. Brice worked closely with

Clyde Kofman, Vol. 2                              10/21/2005

286

1    Mr. Rein.  I don't know how close Gillardi did.

2        Q    They were both members of the MPS group?

3        A    Yes.

4        Q    That was the same group Mr. Rein was a member

5    of?

6        A    Yes.

7        Q    At this time, there were, I think, only five

8    employees in the MPS group, is that correct?

9        A    Yes.

10       Q    Did you get feedback from Mr. Gillardi about

11   what his experiences were with Mr. Rein?

12       MS. McGURN:  Objection.

13       THE WITNESS:  I don't recall if I did, no.

14   BY MR. COSTER:

15       Q    Did you get feedback from Mr. Brice about

16   what his experiences have been with Mr. Rein?

17       MR. McGURN:  Objection.

18       THE WITNESS:  I don't recall, no.

19   BY MR. COSTER:

20       Q    Did you get feedback from Mr. Humpleby about

21   what his experiences have been with respect to

22   Mr. Rein?

23       MS. McGURN:  Objection.

24       THE WITNESS:  I don't recall doing that, no.

287

```
 1   BY MR. COSTER:

 2       Q    Other than Mr. Lanci and Mr. Banakis, do you

 3   recall getting feedback from any other member of the

 4   CGISS group concerning Mr. Rein?

 5       MS. McGURN:   Objection.

 6       THE WITNESS:   We're clear the memo says four to

 7   six, but I don't recall specific conversations with

 8   the individuals.

 9   BY MR. COSTER:

10       Q    You also mentioned your own experiences with

11   Mr. Rein.   What in your own experience led to you

12   believe Mr. Rein had behavioral issues?

13       A    I think what I said here was that my own

14   experience as well as the feedback from go to market

15   folks that Jay does not exhibit the four Es, plus one

16   leadership behaviors required of someone at his

17   level, and I go on to describe what I meant by that.

18           I'm not sure I'd characterize him as

19   behavioral issues as much as not being consistent

20   with the behavioral guidelines.   I think as we talked

21   about in my earlier deposition, we talked about the

22   Apacheta situation.   You took me through a series of

23   questions on that.   And just general interactions

24   with Jay.   I don't recall the specifics.   I had
```

Clyde Kofman, Vol. 2                          10/21/2005

301

1        MR. COSTER:  Why don't we take a five-minute

2    break.

3                    (Recess taken.)

4        MR. COSTER:  Back on the record.

5    BY MR. COSTER:

6        Q    Who contacted Jay Rein to inform him that his

7    employment was being terminated?

8        MS. McGURN:  Objection.

9        THE WITNESS:  I believe I did.

10   BY MR. COSTER:

11       Q    And how did you get ahold of Mr. Rein?

12       A    We spoke on the phone.

13       Q    And what do you recall saying to him?

14       A    I recall saying something to the effect of we

15   have an organizational mix challenge in the group,

16   and in the best interest of trying to help MPS be

17   successful that we need to make -- we're going to be

18   making some changes and your position is being

19   considered for elimination.

20       Q    Did you say it was being considered for

21   elimination or had been eliminated?

22       A    I believe I said being considered.

23       Q    And at the time, had a decision been made to

24   eliminate Mr. Rein's position?

305

1    A    Not at that time, no.

2    Q    And what was your response to Mr. Rein

3    telling you that he was going to explore other

4    opportunities within Motorola?

5    A    Okay.

6    Q    And what, if you can recall, was the next

7    communication you had concerning Jay Rein exploring

8    the other organization?

9    A    I had very little contact with him after our

10   conversation explaining the process we were going

11   through.  I do recall a conversation -- I don't know

12   when it was, but it was after this -- from another

13   manager of the company who wanted to discuss an

14   opportunity she had and Jay.  We had a quick

15   conversation.  I recall that.  Other than that, I'm

16   not sure there was a whole lot of conversation.

17   Q    Who was the manager that you had this

18   discussion with?

19   A    Janiece Webb.

20   Q    And do you recall when you had this

21   discussion with her?

22   A    It was sometime after the termination, but I

23   don't recall when.

24   Q    And what did she tell you about this

306

1    opportunity within her group?

2       A   I don't remember the specifics.  I asked her

3    about the opportunity.  She described the opportunity

4    for me, what she was looking for from skill and

5    experience.  I told her my opinion, what I thought

6    Jay strengths were, what he was good at and the areas

7    I thought he could improve in.  That was the extent

8    of the conversation.

9       Q   Did she tell you that she was considering

10   Mr. Rein for this opportunity?

11      A   I don't recall.

12      Q   Did she tell you why she was contacting you?

13      A   I believe she said she was calling because

14   she had some -- she had an opportunity and she wanted

15   some more background on Jay.

16      Q   Did she indicate that Mr. Rein was interested

17   in this opportunity?

18      A   I don't recall.

19      Q   And what specifically do you recall telling

20   her about Mr. Rein?

21      A   Again, I went through what I thought he did

22   well and then areas for improvement, but I don't

23   recall the specifics at this time.

24      Q   Do you recall any of the specifics as far as

316

1        MS. McGURN:  Objection.

2        THE WITNESS:  That's what the memo says.  I did

3    not share this memo.  You asked me what I said to him

4    on the phone which I don't recall how I characterized

5    it.

6    BY MR. COSTER:

7        Q    **This is something you wrote.  I'm trying to**

8    **understand if indeed it accurately reflects your**

9    **state of mind at the time you wrote it?**

10       A    I believe it does accurately reflect my state

11   of mind at the time I wrote it.  If Jay wanted it do

12   that, I would have followed it.

13       Q    **And when Ms. Webb subsequently contacted you**

14   **about a month later indicating that Mr. Rein had**

15   **expressed an interest in working in her group, do you**

16   **feel you supported him in that opportunity?**

17       A    I feel I gave her my honest feedback of his

18   strengths and things to work on.

19       Q    **When you wrote the memo in early February,**

20   **did you feel that you could support Jay Rein seeking**

21   **a position within Ms. Webb's group?**

22       A    I think I would have given the same answer in

23   February as I did in March.  I would have given any

24   future perspective employer within Motorola because I

317

1    think I have a responsibility to give a balanced

2    answer, so --

3        Q    At the time you wrote in early February that

4    you were willing to help Mr. Rein explore an

5    opportunity within Ms. Webb's group, did you feel

6    Mr. Rein would be a good addition to Ms. Webb's

7    group?

8        MS. McGURN:  Objection.

9        THE WITNESS:  I have no idea because I didn't

10   understand at all what she might or may not have been

11   looking for.

12   BY MR. COSTER:

13       Q    Did you feel that you would be comfortable in

14   recommending Mr. Rein for a position within Motorola?

15       MS. McGURN:  Objection.

16       THE WITNESS:  Without understanding what that

17   position is, I have trouble recommending anybody

18   because I think that could come back and -- I think

19   it's irresponsible to say on a broad basis.

20   BY MR. COSTER:

21       Q    Well, in early February of 2004, did you feel

22   that Mr. Rein possessed the four Es and leadership as

23   Motorola characterizes those factors?

24       MS. McGURN:  Objection.

# EXHIBIT C
# PART 7

Clyde Kofman, Vol. 2                                      10/21/2005

318

1     THE WITNESS:  You know, it's -- I don't know.

2   BY MR. COSTER:

3     Q   Well, do you feel that you could support an

4   employee to transfer into another group that doesn't

5   possess the four Es in leadership as Motorola

6   characterizes those qualities?

7     MS. McGURN:  Objection.

8     THE WITNESS:  Again, I'd like more particulars.

9   It's hard for me -- I'd like to know the

10  circumstances.  I can't answer the question.

11  BY MR. COSTER:

12    Q   Do you think there's some circumstances you

13  could support an employee who does not possess the

14  four Es and leadership for another opportunity within

15  Motorola?

16    MS. McGURN:  Objection.

17    THE WITNESS:  I don't think that's what I said.

18  I'm simply stating I don't know.

19  BY MR. COSTER:

20    Q   Okay.  So you can't answer the question one

21  way or another?

22    A   That's correct.

23    MR. COSTER:  Let's mark this as the next exhibit.

24          (Whereupon Deposition Exhibit No. 13 was

319

1                 marked for identification.)

2    BY MR. COSTER:

3        Q    I'm showing you what's been marked as the

4    next exhibit to your deposition.  It's an e-mail from

5    Mr. Rein to you dated March 24.  Have you ever seen

6    this e-mail before?

7        A    Yes.

8        Q    And it indicates that apparently you made

9    time to speak with Mr. Rein on March 24th of 2004, is

10   that correct?

11       A    Yes.

12       Q    And do you recall the substance of your

13   conversation with Mr. Rein on that date?

14       A    Parts of it, I guess, is coming back to me as

15   I look at this but not the entirety.

16       Q    What parts of your conversations with

17   Mr. Rein do you recall?

18       A    It says here that -- Jay's words are, you

19   told me during our call that you would do the best

20   you can to assist in this matter.  I recall Jay

21   asking for my support.  I told him I'd do what I

22   could.  That's really all I recall.

23       Q    I'm directing your attention to the last

24   paragraph.  It says, going forward, I'm going to

Clyde Kofman, Vol. 2                              10/21/2005

                                                          320

1    assume that the next time a hiring manager or anyone

2    interested in learning about me as a potential

3    employee calls and asks you for your thoughts, you

4    will not slander my team playing abilities or other

5    performance over my 21 months of employment here at

6    Motorola.

7           Do you know what Mr. Rein is referring to in

8    that paragraph?

9       MS. McGURN:  Objection.

10      THE WITNESS:  No.

11   BY MR. COSTER:

12      Q   Do you know what led Mr. Rein to conclude

13   that you had slandered his team playing abilities?

14      MS. McGURN:  Objection.

15      THE WITNESS:  No.

16   BY MR. COSTER:

17      Q   After -- Strike that.

18          Other than Ms. Webb, did anyone else within

19   Motorola contact you about Jay Rein and his

20   qualifications for a potential position within the

21   organization?

22      A   No.

23      Q   In the February, March, April time frame of

24   2004 other than what you've just testified to, do you

321

1    recall having any additional conversations with

2    people within the Motorola organization concerning

3    Jay Rein?

4        A    No.

5        Q    Did you have any involvement in discussions

6    Jay Rein had with Motorola concerning his severance

7    package?

8        A    What was the question?

9        Q    Sure.  Did you have any involvement in the

10   discussions between Motorola and Jay Rein concerning

11   his severance package?

12       A    Not substantive.  I mean, as the manager,

13   they kept me informed of the situation, but that was

14   not handled by me.

15       Q    Okay.  Did you have any -- recall any

16   specific discussions with Mr. Tobin concerning

17   negotiations between Motorola and Jay Rein concerning

18   his severance?

19       A    Not that I recall.

20       Q    Do you recall having any specific discussions

21   with Mr. Stark concerning negotiations between Jay

22   Rein and the company relating to his severance

23   package?

24       A    I don't recall it.

Clyde Kofman, Vol. 2                    10/21/2005

323

1    amounts by Motorola?

2        A    No.

3        Q    Did you after your decision to terminate

4    Mr. Rein have discussions with any member of the MPS

5    group about the termination of Mr. Rein's employment?

6        A    Yes.

7        Q    Who do you recall discussing that decision

8    with?

9        A    All I recall is that I told each of the team

10   members that we were -- we had an organizational mix

11   problem and that we were addressing it and that as

12   part of addressing it that we'd eliminated Jay's

13   position.

14       Q    Prior to making the determination that the

15   group had an organizational mix problem, did you

16   speak with any of the other group members to get

17   their input into that decision?

18       MS. McGURN:    Objection.

19       THE WITNESS:    No, not that I recall at least.

20   BY MR. COSTER:

21       Q    After advising members of the MPS group

22   that -- of your view that the group had had an

23   organizational mix problem, did you have any

24   discussions with them about that view?

325

1      A    Not that I can recall.

2      Q    Since Mr. Rein's employment has been

3   terminated, have you ever been contacted by a

4   prospective employer concerning Jay Rein?

5      A    Other than -- No.

6      Q    Okay.  Have you ever spoken with anyone at

7   Russell Reynolds concerning Mr. Rein?

8      A    No.

9      Q    Since Mr. Rein's termination, have you met

10   with any employee of the Russell Reynolds'

11   organization?

12      A    Yes.

13      Q    Who have you met with?

14      A    Eric Sigurdson.

15      Q    And that's based upon your personal and

16   social relations with him?

17      A    Yes.

18      Q    Have you ever met with him or had an

19   interaction with him in a professional capacity since

20   Mr. Rein's termination?

21      A    As part of our interactions, we occasionally

22   talk about business, but that's the extent of it.

23      Q    Have you had any discussions with

24   Mr. Sigurdson about Jay Rein?

326

1        A    No.

2        MS. McGURN:   Objection.

3   BY MR. COSTER:

4        Q    Have you had any discussions with

5   Mr. Sigurdson about Mr. Rein's claims against you and

6   Motorola?

7        MS. McGURN:   Objection.

8        THE WITNESS:   I don't believe I have, no.

9   BY MR. COSTER:

10       Q    Other than Mr. Sigurdson, have you had

11  contact with any other employee of Russell Reynolds?

12       A    No.

13       Q    Are you aware of a gentleman named Mr. Henn

14  ever met with representatives of Motorola to discuss

15  reorganizations that were occurring within the MPS

16  group?

17       A    I'm not aware of those.

18       Q    Have you ever had any contact with Mr. Henn

19  other than to the extent he may have been involved in

20  your Russell Reynolds recruitment of you for a

21  position in the MPS group?

22       MS. McGURN:   Objection.

23       THE WITNESS:   Not that I can recall.

24

Clyde Kofman, Vol. 2                          10/21/2005

327

1    BY MR. COSTER:

2        Q    Is the MPS group still in existence?

3        A    No.

4        Q    What happened to it?

5        A    We dissolved the group.

6        Q    When did you dissolve the group?

7        A    Late last year, early this year.

8        Q    Who made the decision to dissolve the group?

9        A    Several people; myself, Juergen Stark, Jeff

10   Miller.

11       Q    Why was that group dissolved?

12       A    Simply that in the current state of the

13   business we were building, consulting was not a

14   priority.

15       Q    When the group was dissolved, what happened

16   to the remaining members of the MPS group?

17       A    They were absorbed by the enterprise mobility

18   team.

19       Q    So what is your current position within the

20   Motorola organization?

21       A    I'm part of the enterprise mobility team.

22       Q    Do you have a title or job description?

23       A    Vertical solutions and alliances.

24       Q    Briefly what do you do in your involvement of

328

1    vertical solutions and alliances?

2        A    Articulate specific problems by word of the

3    industry and identify solutions that we think will

4    address them and help manage some of our large

5    alliances.

6        Q    Are you not doing any consulting work, is

7    that correct?

8        A    That's correct.

9        Q    Are you doing any business development work

10   for Motorola?

11       A    It's more solution development than business

12   development.

13       Q    Does anybody currently report to you?

14       A    Yes.

15       Q    Who?

16       A    John Pomerleau, Steve Raseman and Tim

17   VanGoethem.

18       Q    Who do you report to?

19       A    Mark Davies.

20       Q    What's Mr. Davies' position?

21       A    He is the global head of enterprise strategy

22   of business development marketing.

23       Q    What happened to -- Well, let me rephrase the

24   question.

329

1          Does Mr. Gillardi still work in the Motorola

2    organization?

3        A    No.

4        Q    What happened to Mr. Gillardi?

5    MS. McGURN:    Objection.

6    THE WITNESS:    He chose to accept a position at

7    Microsoft.

8    BY MR. COSTER:

9        Q    So he resigned from his position at Motorola?

10       A    Yes.

11       Q    Prior to his resignation, what was his

12    position at Motorola?

13       A    He was a business development manager for the

14    utility industry.

15       Q    Does Mr. Humpleby still work for Motorola?

16       A    No.

17       Q    What happened to Mr. Humpleby, if you know?

18    MS. McGURN:    Objection.

19    THE WITNESS:    His position was eliminated.

20    BY MR. COSTER:

21       Q    And when did that occur?

22       A    Within the last month or so.

23       Q    What did his position -- what was his

24    position at the time it was eliminated?

330

1      A    He was doing delivery work for end-to-end

2    solutions.

3      Q    And what group or division for Motorola was

4    he working?

5      A    He was part of the enterprise mobility team.

6      Q    Is that where you ended up after the MPS

7    group dissolved?

8      A    Yes.

9      Q    Now, in February of 2004, did the consultant

10   company that Motorola retained, did they provide the

11   MPS group with a list of qualified leads?

12     A    They provided CGISS because it was a joint

13   effort between MPS, but yes, they provided a list.

14     Q    Did the MPS group pursue those leads?

15     A    Some of them.

16     Q    Was the MPS group able to generate any

17   business as a result of pursuing those leads?

18     A    Nothing of significance that I could recall.

19     Q    Did the MPS group meet it's -- Well, strike

20   that.

21          After Mr. Rein's employment was terminated,

22   did the MPS group revise any of its goals or quotas

23   or numbers?

24     MS. McGURN:  Objection.

# EXHIBIT D
# PART 1

1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2        FOR THE DISTRICT OF MASSACHUSETTS
```

CERTIFIED ORIGINAL
LEGALINK BOSTON

```
 5  CIVIL ACTION FILE NO.  04-12580 NG

 6

 7

 8

 9  JAY S. REIN,

10            Plaintiff,

11       vs.

12  MOTOROLA, INC., CLYDE KOFMAN,

13  and JUERGEN STARK,

14            Defendants.

15

16

17

18

19              DEPOSITION OF

20               CLAY BRICE

21           October 13th, 2005

22              10:00 a.m.

23           1545 Peachtree Street

24             Atlanta, Georgia

25     Mary Kay Ashley, CCR-B-792, RPR
```

Clay Brice                                      10/13/2005

7

1    your ability to testify here today?

2         A.    No.

3         Q.    How old are you, Mr. Brice?

4         A.    31.

5         Q.    What did you do to prepare for your

6    deposition here this morning?

7         A.    I reviewed some documents, Power

8    Points, old e-mails from the time period of,

9    you know, between October and April of '03 and

10   '04, just to reacquaint myself from the time

11   period.

12        Q.    Did you do anything else in

13   conjunction with preparing for your deposition

14   here this morning?

15        A.    No.

16        Q.    Did you meet with anybody at Motorola

17   without your counsel present to discuss your

18   potential testimony here this morning?

19        A.    No.

20        Q.    I think you mentioned you reviewed

21   some documents.  There were some Power Point

22   documents that you recall reviewing; is that

23   correct?

24        A.    Yes.

25        Q.    And there was some e-mails; is that

Clay Brice                                          10/13/2005

39

1        A.    ExpressLINK is a company in southern

2   California that sold after-market products to

3   auto dealerships.

4        Q.    Would these be parts, automotive

5   parts?  What kind of products, I guess, is a

6   better way to ask the question?

7        A.    ExpressLINK's main business was

8   after-market warranty solutions for financial

9   departments to sell to consumers.

10       Q.    So we're talking about extended

11  warranties of one kind or another?

12       A.    That is what I would call it, yes.

13       Q.    ExpressLINK, was that an existing

14  customer of Motorola at the time you and Mr.

15  Rein were working on this project?

16       A.    No.

17       Q.    So was this a business that you and

18  Mr. Rein had developed and brought in for

19  Motorola?

20       A.    It was an opportunity that Jay and I

21  were working on to bring into Motorola.

22       Q.    What specifically were you and Mr.

23  Rein doing with respect to the ExpressLINK

24  project?

25       A.    Jay and I were doing basic sales and

42

1              MS. MCGURN:   Objection.

2              THE WITNESS:   The opportunity with

3    ExpressLINK was leveraging potential solutions

4    being developed or acquired through third-party

5    opportunities in a group called Asset

6    Visibility withinside Motorola.   It was deemed

7    -- Asset Visibility solutions in early '04 was

8    a Phase 2 effort for Motorola Professional

9    Services, or IMS, as it was called at that

10   point, and, thus, it was decided that it was an

11   effort in which IMS should not focus on.   Thus,

12   we were asked to hand it off to the Asset

13   Visibility organization if they were interested

14   to continue to pursue it.

15   BY MR. COSTER:

16        Q.   Who made the decision that it was not

17   a business that the IMS group wanted to pursue?

18              MS. MCGURN:   Objection.

19              THE WITNESS:   Would you restate the

20   question?

21              MR. COSTER:   Sure.

22   BY MR. COSTER:

23        Q.   I think you testified that a decision

24   was made that this was not a business

25   opportunity that the IMS group wanted to

Clay Brice                                          10/13/2005

43

1   pursue; is that correct?

2       A.   Yes, that is correct.

3       Q.   And I'm trying to understand who made

4   that decision.

5            MS. MCGURN:  Objection.

6   BY MR. COSTER:

7       Q.   If you know.

8       A.   Clyde Kofman, Jay Rein, and myself

9   met with Juergen Stark to propose this

10  opportunity to Juergen to get guidance on

11  whether it should be an opportunity we should

12  focus on, and Juergen Stark provided the

13  guidance that it was an area that if Asset

14  Visibility wanted to pursue to allow them to

15  pursue it, and assist them in the hand-off of

16  that opportunity.

17           However, with the limited band width

18  of IMS, that we should remain focused on field

19  service mobility offerings with which this

20  opportunity did not fall within.

21      Q.   Is this an opportunity that Mr. Rein

22  wanted to continue pursuing within IMS?

23           MS. MCGURN:  Objection.

24           THE WITNESS:  In my opinion it is an

25  opportunity that Jay saw a real revenue

Clay Brice                                              10/13/2005

45

1    continue to pursue it.

2        Q.    What about Mr. Kofman, did he support

3    continuing to pursue this opportunity within

4    IMS?

5             MS. MCGURN:   Objection.

6             THE WITNESS:   Based on conversations

7    that I had with Clyde, it is of my opinion that

8    Clyde did not see this as being a priority for

9    IMS to pursue, and he, based on those

10   conversations, made it clear that he -- he's

11   the one that set up the meeting with Juergen

12   around this topic to get resolution on whether

13   we should be spending time on it.

14   BY MR. COSTER:

15       Q.    Did he set up that meeting because

16   there was a disagreement between himself and

17   you and Mr. Rein about whether to continue

18   spending time on this opportunity?

19             MS. MCGURN:   Objection.

20             THE WITNESS:   I would characterize --

21   I don't know all the intentions of why the

22   meeting was set up.   I would characterize my

23   understanding of why we were meeting with

24   Juergen was that Jay and I felt it was an

25   opportunity we could continue to pursue, and

54

1          Let me maybe confirm that.  It does

2    have some salaries about midway down the page.

3    Are those accurate salaries for you for the

4    dates indicated, as best you can recall?

5          A.   Yes.

6          Q.   I also note a designation, and this

7    only goes up to 3/28/2005 that your ES group is

8    E12.  Is that is a salary grade?

9               MS. MCGURN:  Objection.

10              THE WITNESS:  I'm sorry?

11   BY MR. COSTER:

12        Q.   If you look again at the box in the

13   middle of the page, five boxes over, there is

14   something that I think says PS group, and then

15   it has four entries, E12.  Do you see that?

16        A.   Yes.

17        Q.   Let me ask you is it your

18   understanding that that's your salary grade?

19        A.   I would characterize it more of that

20   E grades are job positions, as well as salary

21   bands.

22        Q.   In what way is an E grade a job

23   position?

24              MS. MCGURN:  Objection.

25              THE WITNESS:  Could you restate the

55

1    question?

2              MR. COSTER:  Sure.

3    BY MR. COSTER:

4        Q.    I'm trying to understand your

5    testimony.  You said that in addition to being

6    salary grades, they are also job positions, and

7    I'm trying to understand what you mean by

8    that.

9        A.    E grades represent different bands

10   and different job positions withinside of

11   Motorola.  Therefore, if you are a manager you

12   could be within certain E grades.  If you're a

13   director or senior director they have different

14   E grades associated with them for the type of

15   job they are.

16       Q.    But would it be accurate to say that

17   at least for the dates shown on this document,

18   your E grade, you were an E12 grade; is that

19   correct?

20       A.    Yes.

21       Q.    What's your understanding of the

22   salary band for an E12 grade, if you know?

23       A.    I don't recall.

24       Q.    But, again, as far as you know your

25   salary was within that E12 grade on the dates

Clay Brice

10/13/2005

65

1        Q.    I'll try.   I don't know that I can.
2    In your view, as far as generating revenue for
3    Motorola, had the MPS group been successful in
4    2002 and 2003?
5        A.    I would characterize that the MPS
6    organization had not met its revenue goals on a
7    successful basis.   However, it was succeeding
8    in changing the mind-set and the culture about
9    how to be successful with mobility solutions in
10   the Enterprise.
11       Q.    Was it your understanding that one of
12   the things that would be discussed at the
13   meeting with Mr. Stark would be whether the MPS
14   group would continue going forward as a
15   separate entity within Motorola?
16            MS. MCGURN:   Objection.
17            THE WITNESS:   I don't recall.
18   BY MR. COSTER:
19       Q.    At this point in time, again leading
20   up to the meeting with Mr. Stark, was there
21   concern in your mind about whether you would
22   continue to have a position within the Motorola
23   organization in the next few months?
24       A.    I would characterize the timeframe
25   leading up to the Juergen Stark meeting as

Clay Brice                                              10/13/2005

79

1   goals, were they revenue goals, or were they

2   some other kind of goal or deliverable?

3       A.   I do not recall the specifics, but I

4   do -- they were both revenue targets and

5   bookings targets that we had for '04.

6       Q.   Do you know how those revenue and

7   booking targets were developed?

8       A.   I do not.

9       Q.   Do you recall if there were

10  particular dates associated with those targets?

11      A.   I don't recall.

12      Q.   Do you know whether the MPS group met

13  its '04 revenue and bookings targets?

14      A.   I don't recall.

15      Q.   At the conclusion of the second

16  meeting in October of 2004 with Mr. Stark --

17      A.   2003.

18      Q.   2003, excuse me, thank you, did you

19  personally believe that the MPS's group's

20  future within the Motorola organization was

21  more secure than it had been immediately prior

22  to this meeting?

23      A.   No.  I'd characterize it still as

24  uncertain about how Motorola Professional

25  Services was going to be successful inside of

80

1    Motorola.

2        Q.   How about at the conclusion of by the

3    end of November when some more specifics had

4    been presented to Mr. Stark about the goals of

5    the MPS group?

6        A.   I would say in my opinion the

7    uncertainty on how we were going to be

8    successful remained.  I believe through

9    indirect channels that the opinion that I held,

10   as well as other members of the group like John

11   and Jay, was that Juergen was affording us the

12   opportunity to continue to prove ourselves in

13   '04.

14       Q.   You said through indirect channels.

15   What do you mean by that?

16       A.   I cannot tell you specifics on why I

17   feel that or how those communications came by,

18   whether it was through conversations with

19   individuals or just the grapevine of corporate

20   America.  That was just the impression that I

21   had.

22       Q.   Do you have a particular time period

23   for how long, to use your words, the group

24   would have to prove itself?

25       A.   No.

Clay Brice                                        10/13/2005

82

1    ExpressLINK opportunity.  This was in, I guess,

2    late '03 and early '04.  Do you know whether

3    Mr. Kofman was aware that the two of you were

4    pursuing this engagement?

5        A.   Yes, he was aware.

6        Q.   At the time that you were working on

7    it did he have any objection to your pursuing

8    this engagement?

9            MS. MCGURN:  Objection.

10           THE WITNESS:  I would say during the

11   period of late '03, the mid-November, December,

12   and the early January, February timeframe,

13   Clyde had shared his reservations towards

14   whether this was an opportunity that the team

15   should continue to pursue.

16   BY MR. COSTER:

17       Q.   When you say he shared his

18   reservations, do you recall specifically what

19   he said about continuing to pursue the

20   ExpressLINK opportunity?

21       A.   Not specifically.

22       Q.   Did he, in this timeframe, ever

23   direct you and Mr. Rein specifically to stop

24   pursuing that opportunity?

25       A.   Clyde never specifically told us to

83

1    stop pursuing the opportunity prior to the

2    Juergen meeting.  After the Juergen meeting I

3    would say Clyde didn't say stop working on it.

4    However, during subsequent conversations

5    obviously phrase the situation as in, "You know

6    where Juergen stands and I stand, and this is

7    obviously something we need to transition."

8        Q.    After Mr. Kofman and Mr. Stark had

9    made their position clear on where they stood

10   about pursuing the ExpressLINK opportunity, did

11   you and Jay begin transitioning it to another

12   group within Motorola?

13       A.    Yes.

14       Q.    What specifically did you do to

15   transition it?

16       A.    We met with Janiece Webb, we met with

17   David Greer, had subsequent couple of either

18   follow-up client with the client, I can't

19   remember whether it was with or without, but

20   basically to say to transition the opportunity

21   and then leave it up to them whether they would

22   want to pursue it.

23       Q.    Did you or Mr. Rein ever have the

24   opportunity to get feedback from ExpressLINK

25   whether they were happy with the work and the

Clay Brice

10/13/2005

97

1      Q.   Sure.  I'm trying to understand if

2  the kinds of work you were doing with Mr.

3  Kofman remained constant over time, or did it

4  ever change or evolve in any way?

5      A.   Could you be more specific?

6      Q.   I don't know that I can.  I'll try.

7  I think you've testified that in early '04 you

8  were working on some specific projects with Mr.

9  Kofman that really had to do with the internal

10  structure and direction of the IMS group; is

11  that correct?

12      A.   Yes.

13      Q.   And what I'm trying to understand is

14  at a point in time did you finish work on those

15  projects, or did they taper off and did you

16  begin to do other things within the IMS group?

17      A.   I would say that beginning in '04 the

18  IMS strategy and planning was continuing to

19  evolve, so that didn't just fade away.  I mean,

20  there was always work to be done and always

21  repositioning and creating solutions and

22  continually evolving them, so that work

23  continued.

24        I would say that obviously the work

25  changed because we became more market focused,

Clay Brice                                    10/13/2005

106

1    important thing that needed to be done, as far

2    as making the IMS group a viable and strong

3    entity within Motorola?

4              MS. MCGURN:  Objection.

5              THE WITNESS:  I would say priorities

6    or importance would be dependent upon the

7    individual you asked.  In my opinion, based on

8    the goals that were communicated as far as

9    revenue targets, it was critical for us to

10   figure out obviously how to reach those revenue

11   targets, which would require us to identify

12   potential clients that we could close business

13   with, but that's my opinion.

14   BY MR. COSTER:

15        Q.   Now, again, focusing in the late

16   '03/early '04 timeframe, are you aware of the

17   IMS group having any problems delivering on the

18   services it had contracted for with the various

19   projects or engagements it was involved in?

20        A.   I would say in late '03 there was a

21   concern that if we were to continue to deliver

22   multiple simultaneous consulting projects, that

23   we did not have the resources to deliver them.

24              However, it was also made aware that

25   we had currently not had a situation to have

107

1    simultaneously delivered projects.  However, if

2    we were going to grow and meet the targets for

3    2004, then we would need to figure out with a

4    way to ramp-up or bring in additional resources

5    in order to reach those numbers, if we were

6    going to achieve them through consulting

7    service projects.

8         Q.   So would it be fair to say that it

9    was not a current problem within the IMS

10   organization, but it was anticipated that it

11   could become a problem if the IMS organization

12   were in a position to meet the goals that had

13   been established for 2004?

14             MS. MCGURN:  Objection.

15             THE WITNESS:  I would say that in

16   November of '03 it was not an existing problem

17   for that month, but it was easily foreseeable

18   that it could quickly become a problem.

19   BY MR. COSTER:

20        Q.   How could it have become a problem?

21        A.   It could have quickly become a

22   problem if we closed two deals in the month of

23   January and didn't have the resources to

24   deliver.

25        Q.   Were there two particular engagements

116

 1    directing your attention specifically to page

 2    M0096 of that document.

 3              There is a box or category called

 4    Blind Spot(s) that appears to have ratings on a

 5    number of different factors for Mr. Rein, and

 6    there's one which is a rating for M, which,

 7    again, my understanding is manager, a second

 8    rating which is a DR, which is, I think, a

 9    direct report, and S, which stand for self,

10    which is Mr. Rein's own rating of his abilities

11    in this particular category.

12              Now, I notice again there is a rating

13    by a DR, direct report.  Do you know, is that

14    you?  Is that a rating that you made of Mr.

15    Rein in 2003?

16         A.   I do not know.

17         Q.   Did Mr. Rein have any direct reports

18    in 2003?

19         A.   Not that I'm aware of.

20         Q.   Other than yourself, did Mr. Rein

21    work closely with anyone else on these various

22    engagements he was working on within the IMS

23    group?

24              MS. MCGURN:  Objection.

25              MR. COSTER:  Let me try to rephrase

117

1    it.

2    BY MR. COSTER:

3        Q.    Other than yourself are you aware of

4    any other individuals that Mr. Rein worked

5    closely with, as far as the specific

6    engagements L.A. Express and ExpressLINK, that

7    he was working on in the 2003 and 2004

8    timeframe?

9        A.    I am not aware of Jay working with

10   anyone else within IMS in the timeframe of 2003

11   and early 2004.

12       Q.    Well, let me then get your take on

13   some of these categories.  With respect to the

14   phrase or category of "Uses personal leadership

15   and influence to motivate people," it's my

16   understanding there's a scale of zero to 4,

17   zero being the lowest possible rating and 4

18   being the highest, it's indicated here that

19   somebody gave Mr. Rein a rating of 2.

20              Would you agree, on a scale of zero

21   to 4, with that assessment of Mr. Rein's

22   performance in this particular area?

23              MS. MCGURN:  Objection.

24              THE WITNESS:  Could you restate the

25   question?

Clay Brice

118

1          MR. COSTER:  Sure.

2     BY MR. COSTER:

3          Q.   I'm just trying to understand that

4     clearly with respect to this particular

5     category, someone who indicated they were a

6     direct report of Mr. Rein rated him as a 2 on a

7     scale of zero to 4, and I'm just trying to

8     understand, based on your interactions with Mr.

9     Rein, with respect to this category how you

10     would rate him?

11          A.   If I understand the question, I think

12     in a roundabout way you're trying to ask me

13     what I would rate Mr. Rein on this category,

14     "Uses personal leadership," whether that was

15     me or not.  I would say it's fair and accurate

16     to say it was a 2.

17          Q.   What about on the category, "Rallies

18     people around common goals, builds team

19     spirit"?

20          A.   Which one?

21          Q.   That's the second one.

22          A.   No, I understand.

23          Q.   You're not sure whether you're the

24     person who rated him or not.  Let me ask you,

25     as you sit here today, how would you rate Mr.

# EXHIBIT D
# PART 2

119

1    Rein's performance on this category?

2        A.    I would say the 2.5 is a fair and

3    accurate rating, and I would also add that I

4    did provide a computer feedback on Mr. Rein at

5    some point in 2003.

6        Q.    So you think that, in fact, these

7    ratings may be your ratings?

8            MS. MCGURN:  Objection.

9            THE WITNESS:  I don't know if they

10   are mine.

11   BY MR. COSTER:

12       Q.    But you did at some point provide

13   them.  With respect to the next category,

14   "Delivers on commitments to customers," how

15   would you today rate Mr. Rein on this quality

16   or factor?

17       A.    On a scale of zero to 4, I think a 2

18   or a 3 is fair.

19       Q.    How about, "Keeps promises to other

20   Motorolans, meets deadlines and delivers"?

21       A.    I can't disagree with the 2.5.

22       Q.    How about, "Keeps the organization

23   focused on executing the plan and meeting

24   short-term objectives"?

25       A.    I think 2 is a fair answer.

Clay Brice                                    10/13/2005

120

1        Q.    How about, "Tells the truth, honest"?

2        A.    Based on my experience I think a two

3    and a half is fair.

4        Q.    How about, "Demonstrates constant

5    respect for people regardless of position,

6    membership in any group or culture, or other

7    difference"?

8        A.    I cannot disagree with two and a

9    half.

10       Q.    How about, "Takes his or her share of

11   responsibility for problems, doesn't blame

12   others"?

13       A.    Fair answer would be two and a half.

14       Q.    In the 2003/early 2004 timeframe, are

15   you aware of anyone within the IMS group who

16   worked as closely as you did with Jay Rein?

17            MS. MCGURN:  Objection.

18            THE WITNESS:  I do not know.

19   BY MR. COSTER:

20       Q.    Do you know what interactions or what

21   occasions Mr. Rein had to work with Mr. Lanci?

22            MS. MCGURN:  Objection.

23            THE WITNESS:  Unaware.

24   BY MR. COSTER:

25       Q.    Are you aware of them working on any

126

1      A.   I would say in my opinion there was a

2    need for both business development resources

3    and potentially additional delivery resources.

4      Q.   Did Mr. Kofman ever discuss with you

5    the idea of eliminating a principal and

6    replacing him with two or three employees who

7    would focus more on delivery?

8      A.   No.

9      Q.   I take it you weren't consulted about

10   the decision to terminate Mr. Rein's

11   employment; is that correct?

12     A.   That is correct.

13     Q.   In the timeframe late January, early

14   February, did Mr. Kofman ever speak to you

15   about Jay Rein's work performance?

16     A.   Not that I'm aware of.

17     Q.   Again, in the January/February

18   timeframe of 2004, were you ever contacted by

19   Mr. Stark to ask what your experiences had been

20   working with Jay Rein?

21     A.   Not that I'm aware of.

22     Q.   After Jay was notified that his

23   employment was being terminated, did you have

24   any involvement in his efforts to find other

25   positions within the Motorola organization?

Clay Brice

10/13/2005

127

1  A. No.

2  Q. Did anyone, in conjunction with Jay's

3 efforts to find another position within

4 Motorola, did anyone ever contact you to find

5 out what your experiences had been working with

6 Jay Rein?

7  A. Not that I recall.

8  Q. After Jay's employment was terminated

9 were there any changes that occurred within the

10 IMS group?

11  A. I'm sorry.  Could you repeat the

12 question?

13  Q. Sure.  After Jay's employment was

14 terminated and he left Motorola, did any

15 changes take place within the MPS group?

16   MS. MCGURN:  Objection.

17   THE WITNESS:  Could you be a little

18 more specific?

19   MR. COSTER:  Sure.  That's a fair

20 request.

21 BY MR. COSTER:

22  Q. Were there any changes in personnel?

23 Were any employees hired after Mr. Rein's

24 employment was terminated?

25  A. No.

                                                                  128

1          Q.    Does the IMS group exist as an entity

2     today?

3          A.    No.

4          Q.    What happened to it?

5                MS. MCGURN:   Objection.

6                THE WITNESS:   Could you be more

7     specific?

8                MR. COSTER:   Sure.

9     BY MR. COSTER:

10         Q.    Well, was it disbanded?   Was it

11    eliminated?   Was there a bit of reorganization

12    that took place?

13         A.    After Jay Rein's departure in

14    February, we continued to exist really under

15    the MPS name versus the IMS moniker, and worked

16    with the SMD channel.

17               The latter part of '04, the

18    organization was starting to evolve into the

19    Enterprise organization.   Upon the announcement

20    that Jeff Miller would take the interim role as

21    Enterprise GM, at that point MPS no longer

22    existed.   We became absorbed into the evolving

23    Enterprise organization.

24         Q.    What is the Enterprise organization

25    made up of?

Clay Brice                                              10/13/2005

129

```
 1        A.   The Enterprise organization is a
 2   Motorola business organization focused on
 3   providing mobility solutions to Enterprise
 4   clients that don't fall under the government
 5   umbrella.
 6        Q.   In the past I've seen the acronym
 7   CGISS.  What is CGISS?
 8        A.   CGISS was an acronym standing for
 9   Government Industrial Systems Sector, I
10   believe.
11        Q.   Is CGISS still in existence?
12        A.   The acronym CGISS is not used any
13   longer.  Upon Ed Zander's, the CEO of
14   Motorola's organizational adjustments made, I
15   believe in late '04, there were four business
16   units created, networks, devices, connected
17   home, and GEMS, which stands for Government and
18   Enterprise Mobility Solutions.
19        Q.   Does the Enterprise organization come
20   within the GEMS division?
21        A.   Yes.
22        Q.   The Enterprise organization, is that
23   a new unit that was created as part of this
24   reorganization in '04?
25        A.   It was a new unit created withinside
```

Clay Brice

10/13/2005

132

1   said, there wasn't an official organizational

2   announcement.  At that point we all still

3   retained reporting -- we all, John Gillardi,

4   myself, and Mike Humpleby, continued to report

5   to Clyde Kofman and assumed more of a

6   solution/architecture type role for the

7   Enterprise organization as it evolved.

8       Q.    Did there come a point in time when

9   you and the other former members of IMS stopped

10  reporting to Mr. Kofman?

11      A.    I stopped reporting to Mr. Kofman on

12  July 1st, 2005.

13      Q.    Do you know with respect to Mr.

14  Gillardi and Mr. Humpleby what their

15  relationship was with Mr. Kofman from late '04

16  to the present time?

17          MS. MCGURN:  Objection.

18          THE WITNESS:  I guess I don't know

19  the specifics enough to answer the question.

20  BY MR. COSTER:

21      Q.    Well, does Mr. Gillardi still work at

22  Motorola?

23      A.    No.

24      Q.    When did he leave the company?

25      A.    Summer of '05.

Clay Brice
10/13/2005

133

1        Q.    At the time he left was he part of

2   the Enterprise organization?

3        A.    Yes.

4        Q.    Do you know what his title or

5   position was?

6        A.    Titles and positions didn't really

7   change during that period.  However, his

8   responsibilities were more focused on

9   developing business within the utilities

10  practice.

11       Q.    At the time he left did he still

12  report to Mr. Kofman?

13       A.    I don't know if he directly reported

14  to Mr. Kofman at that point or not.

15       Q.    What about Mr. Humpleby, is he still

16  an employee of Motorola?

17       A.    According to my knowledge, no.

18       Q.    Do you know when Mr. Humpleby left

19  Motorola's employment?

20       A.    I believe Mr. Humpleby's employment

21  has ended sometime within the last month or so.

22       Q.    With respect to Mr. Gillardi, do you

23  know was his employment terminated or did he

24  resign?

25       A.    He left Motorola.

Clay Brice

141

1    important to build consensus around a plan to

2    present to Mr. Stark?

3              MR. COSTER:  Objection.

4              THE WITNESS:  Don't know.

5    BY MS. MCGURN:

6         Q.   Prior to that timeframe, so October,

7    November of 2003, had you identified delivery

8    resources or delivery support to be a problem

9    for you personally within the MPS team?

10        A.    Prior to that time I am sure I shared

11   the opinion that if we were to scale our

12   consulting services business to the ability to

13   bring in multimillion dollars worth of

14   consulting engagements, it was an impossibility

15   to service that with five resources.

16        Q.   Did you express frustration that time

17   that you spent yourself on delivering on

18   engagements kept you from business development

19   opportunities?

20              MR. COSTER:  Objection.

21              THE WITNESS:  Yes.

22   BY MS. MCGURN:

23        Q.   You mentioned that Stark encouraged

24   MPS to transition the ExpressLINK opportunity

25   to the Asset Visibility group; is that right?

Clay Brice
10/13/2005

144

1    Q.    How long did you work with him on

2  that practice?

3    A.    I worked with the mobility solution

4  team for approximately two years, of which none

5  of that time was directly reporting to John

6  Gillardi.

7    Q.    As between Mr. Gillardi and Mr. Rein,

8  who did you perceive to have more experience in

9  the classic field service mobility sense?

10          MR. COSTER:  Objection.

11          THE WITNESS:  Could you restate the

12  question?

13  BY MS. MCGURN:

14    Q.    As between Mr. Gillardi and Mr. Rein,

15  who of them did you perceive to have more

16  experience in the classic field service

17  mobility sense?

18          MR. COSTER:  Objection.

19          THE WITNESS:  In my opinion if you

20  were to characterize mobility solution

21  experience, not including field service in

22  that, John Gillardi had more direct experience

23  in mobility solutions.  However, no one on the

24  team had specific experience in classic field

25  service.  Well, strike that.  Incorrect.  Start

Clay Brice

10/13/2005

145

1   over.

2          John had more experience in mobile

3   solution practice and building methodologies

4   than Mr. Rein.  Both of them had consulting

5   experience.  The only person on our team who

6   had classic field service mobility experience

7   was Michael Humpleby.

8   BY MS. MCGURN:

9          Q.   You testified earlier that your

10   recollection of the first presentation in

11   October to Mr. Stark, which you did not attend

12   --

13          A.   Correct.

14          Q.   -- was that Kofman led that initial

15   meeting.  From where did you derive that

16   impression?

17          A.   Conversations with Mr. Gillardi and

18   Mr. Rein.

19          Q.   Were you aware that Motorola took

20   steps following Mr. Rein's termination to set

21   in motion the process for hiring delivery

22   personnel into MPS?

23          A.   What do you mean by steps?

24          Q.   Are you aware of any action that

25   Motorola took following Jay's departure to

Clay Brice

10/13/2005

164

```
 1        Q.   Now, with respect to the decision as

 2   far as what the IMS group would focus on going

 3   forward, this is in the February, 2004

 4   timeframe, was a decision made that the IMS

 5   group would focus on mobility solutions or

 6   field service mobility solutions?

 7             MS. MCGURN:   Objection.

 8   BY MR. COSTER:

 9        Q.   Or was it some third type of

10   business?

11        A.   In late January, early February, from

12   my recollection, based on a number of

13   conversations debated, it was decided for a

14   number of reasons that the first priority

15   primarily was to pursue field service mobility

16   solutions.

17        Q.   And I want to make sure I

18   understand.  Your testimony is that the only

19   individual within the IMS group that had

20   significant field service mobility experience

21   at that time was Mike Humpleby; is that

22   correct?

23             MS. MCGURN:   Objection.

24             THE WITNESS:   I would characterize

25   the only person who had significant experience
```

165

1    in deploying and building a field service

2    solution was Michael Humpleby.  However, I know

3    for a fact that John Gillardi and myself had

4    field service mobility experience from our

5    prior work at Ernst & Young.

6           It was just not centered -- it was

7    not -- it was more on the sales, marketing,

8    solution, development, and less on the

9    hard-core implementation of those solutions.

10   Ours was more on the, to clarify and add,

11   strategic side of that.

12        Q.   Do you know what experience Jay Rein

13   had in the area of field service mobility?

14        A.   I can't recall.

15        Q.   Do you know what experience Clyde

16   Kofman had in the area of field service

17   mobility?

18        A.   I cannot recall.

19           MR. COSTER:  I think I'm done.

20           MS. MCGURN:  I'm done.

21           (Whereupon, the deposition was

22   concluded.)

23

24

25

# EXHIBIT E

1
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
2                      CA NO. 04-12580

3     JAY S. REIN,                    )
                                      )
4                    Plaintiff,       )
                                      )
5            -vs-                      )
                                      )
6     MOTOROLA INC., CLYDE KOFMAN     )
      and JUERGEN STARK,              )
7                                     )
                     Defendants.      )
8

9          Deposition of PAUL ZELLNER, taken before

10    KIMBERLY A. KOHS, C.S.R., R.P.R., and Notary Public,

11    pursuant to the Federal Rules of Civil Procedure for

12    the United States Courts pertaining to the taking of

13    depositions for the purpose of discovery, at 45th

14    Floor, 55 East Monroe, Chicago, Illinois, commencing

15    at 10:00 a.m., on the 21st day of October, 2005.

16

17

18

19

20

21

22

23

24

Paul Zellner                                    10/21/2005

11

1      Q    Could you briefly describe what your duties

2   are as a managing director within the Russell

3   Reynolds organization?

4      A    As managing director, I'm responsible for

5   soliciting business, generating searches.   I'm

6   responsible for executing those searches, which means

7   recruiting candidates and working with the client and

8   the candidate through the process of interviewing an

9   ultimate selection, negotiation of offer.

10         Thirdly, I have some administrative

11   responsibilities for helping coordinate the

12   development of different search practices within the

13   firm.   Three things; generating business, completing

14   assignments and administrative things.

15      Q    Okay.   So generating business, those would be

16   corporate clients for whom you do recruitment?

17      A    Right.

18      Q    And I take it Motorola is a client of the

19   company, is that correct?

20      A    Yes.

21      Q    And is that a client that you have primary

22   contact with or do numerous people within Russell

23   Reynolds have primary contact with the Motorola

24   organization?

Paul Zellner                                    10/21/2005

15

1      A    Yes, he was.

2      Q    **And do you know briefly what his involvement**

3   **was?**

4      A    Briefly.  Tim was involved at the early

5   stages of helping solicit and frame out the project

6   for recruiting for MPS.  Tim also was involved in the

7   execution of some of that work, execution meaning

8   helping find some of the candidates who we represent

9   to Motorola.  That was Tim's involvement.

10     Q    **You testified a minute ago that he's**

11  **soliciting and framing out the project.  What does**

12  **that mean?**

13     A    What that means is that Tim was -- in some

14  manner, Tim became aware of the need and worked with

15  the hiring managers at Motorola to help develop the

16  position specification that we used.  And I used to

17  help assess candidates who we thought might be right

18  for the role.

19            Tim also had an ongoing role in our

20  regular status calls and activities with the hiring

21  managers at Motorola.  He was aware of the pipeline

22  of candidates that we were presenting.  He took an

23  active role in helping service, communicate and make

24  sure that our engagement met their expectations.

Paul Zellner                                      10/21/2005

16

1    Q    Did you also participate in those status

2  calls with Motorola?

3    A    Yes.

4    Q    On Motorola's end, who was participating in

5  those status calls?

6    A    I don't remember all the names.  If you ask

7  me names, I might be able to tell you who.  It's been

8  two-and-a-half years.  I can't remember all of them.

9    Q    Sure.  Was Mr. de Barros, Len de Barros was

10 he an individual who participated in those status

11 calls?

12   A    Yes.

13   Q    Was he the primary contact at Motorola?

14   A    I would say -- when I think of primary, I

15 think of frequency, who was on the calls most often.

16 I would think Len was the ultimate hiring manager, so

17 more frequently on those calls were people in the HR

18 function.  There was a woman.

19   Q    Anna something or other?  It will probably be

20 on one of the documents.

21   A    They did have an HR group of their recruiters

22 who was supporting Len from their point of view.  Len

23 would be on them sometimes but not all the time, if

24 that helps.

Paul Zellner

10/21/2005

27

1        I think it's likely that this document

2   includes notes on people that were being assessed for

3   the role that Jay was hired for and it probably

4   includes names and activity related to some of our

5   other sourcing work also in SISG.

6        Q    Do you know whether Russell Reynolds was

7   involved in recruiting a gentleman named Clyde Kofman

8   for a position within the MPS group?

9        A    Yes, we were.

10        Q    How about a gentleman named John Gillardi?

11        A    I don't remember.

12        Q    How about a gentleman named Clay Brice?

13        A    I don't remember that name either.

14        Q    How about a gentleman named Michael Humpleby?

15        A    No, I don't remember that name.

16        Q    Let me direct your attention back to what

17   we've marked as Exhibits No. 3.  There's something

18   under lead associate there, something that says

19   source name, entry source name and then a colon.

20   What does that reflect?

21        A    It reflects, if we know it, the individual

22   whom provided the name to us.  As I said earlier,

23   we're in the marketplace asking people whom they

24   think are right for a role.  We try to record keep

Paul Zellner                                    10/21/2005

44

1    Mr. de Barros as well?

2        A    I'm fuzzy on whether -- I think I did.  I

3    honestly can't be sure if it was at that same time.

4        Q    Did you ever have an occasion to follow-up

5    with Mr. de Barros to find out if he was satisfied

6    with the placement you made of Jay Rein?

7        A    Not after that, no.

8        Q    Do you think you met Mr. de Barros on that

9    occasion or not?

10       MS. McGURN:  Objection.

11   BY MR. COSTER:

12       Q    As best you can recall.

13       A    It's a guess, so I'll say --

14       MS. CHRISTENSEN:  Don't guess.

15       THE WITNESS:  I'm sure I met Jay, but I don't

16   remember for sure if Len was there.

17   BY MR. COSTER:

18       Q    Do you recall ever getting any feedback from

19   Mr. de Barros how Jay Rein was doing at his position

20   at Motorola?

21       A    No.

22       Q    Do you recall ever getting feedback from

23   anyone else within the Motorola organization about

24   how Jay Rein was doing within the company?

45

1      A    No.

2      Q    Does Russell Reynolds make any effort after

3   its placed a candidate as an organization to follow

4   up to see whether the client was happy with the

5   services they performed and was happy with the

6   candidate?

7      A    On the first part of that question, yes.  On

8   the second part, no, we don't have -- we do have a

9   feedback process to ask if the client was happy with

10  our search process, you know, felt that it was

11  managed properly.  That first part, you know, are

12  they happy with the way the search went.  On the

13  candidate themselves, we don't follow up later on and

14  say were you happy with who you hired.

15     MR. COSTER:  Could you mark this as Exhibit 10?

16          (Whereupon Deposition Exhibit No. 10 was

17           marked for identification.)

18  BY MR. COSTER:

19     Q    I'll show you what's been marked as Exhibit

20  No. 10 to your deposition.  Is this a letter -- Well,

21  let me strike that.

22          What is this document?

23     A    This appears to be a letter from our chief

24  executive Hob Brown sent -- maybe it's an e-mail sent

49

1   communications, you were contacted by Mr. Rein again

2   who had at that point some concerns about what was

3   happening at Motorola?

4      MS. McGURN:   Objection.

5   BY MR. COSTER:

6      Q   You said you testified that approximately six

7   months after those preliminary conversations, you had

8   some additional communications from Mr. Rein, is that

9   correct?

10     MS. McGURN:   Objection.

11     THE WITNESS:   What I wanted to describe is two or

12  three phone calls with Jay during which his -- it's

13  not like an all at once cliff where he became

14  unhappy.   I think there was a progression of concern

15  about the ability to achieve what he and the rest of

16  the group were charged to do, not for lack of trying,

17  but for lack of -- you know, there's just -- support,

18  culture, market readiness, call it what you want, but

19  a feeling that there were a number of issues present

20  that were making it increasingly difficult for that

21  group to be successful, and therefore, Jay to be

22  successful.   It progressed.

23     Q   Do you recall when those conversations took

24  place, the dates?

Paul Zellner

10/21/2005

50

1      A    No.

2      Q    Did you have contact with anyone else within

3   the Motorola organization during the time that Jay

4   Rein was employed at Motorola?

5      A    I don't recall.

6      Q    Can you recall ever having any discussions

7   with Motorola about Jay Rein and his performance

8   within the organization?

9      MS. McGURN:    Objection.

10      THE WITNESS:    No, no.

11   BY MR. COSTER:

12      Q    When did you learn that Mr. Rein's employment

13   at Motorola had been terminated?

14      A    I don't remember the date honestly.

15      Q    Was it a year ago or a month ago or --

16      A    It wasn't a month ago.  I don't remember when

17   I first learned.  It wasn't a month, and I don't

18   remember if it was a year.

19      Q    Did you ever have any discussions with anyone

20   within the Motorola organization about their decision

21   to terminate Jay Rein?

22      A    No.

23      Q    Did Russell Reynolds, if you know, play any

24   role in recruiting a gentleman named Juergen Stark to

Paul Zellner                                              10/21/2005

52

1    A    Yes.

2    Q    Have you had any conversations or contact

3    with Mr. Kofman after that meeting?

4    A    No, no.

5    Q    Who was the colleague who I think in your

6    words was managing Mr. Kofman through the process?

7    A    Kelly Carlson.

8    Q    Who is Ms. Carlson?

9    A    Kelly is a former associate of Russell

10   Reynolds.  She's no longer employed there.

11   Q    Did she report to someone within the

12   organization?

13   A    Kelly would have -- Yes, she would have

14   reported to the office managing director as did I,

15   the same person.

16   Q    Was Ms. Carlson then someone else who was

17   involved in recruiting candidates for the MPS group

18   for Motorola?

19   A    Yes.

20   Q    And did she work with Mr. Henn or under

21   Mr. Henn?

22   A    With.

23   Q    Do you know if Mr. Henn also had involvement

24   in recruiting Clyde Kofman for the MPS group?

Paul Zellner                                          10/21/2005

56

1    Mr. Rein and his qualifications within your database,

2    Russell Reynolds's database?

3        A    Yes.

4        Q    After placing Mr. Rein at Motorola, are you

5    aware of Russell Reynolds considering Mr. Rein for

6    any other position that might be available that they

7    were recruiting for?

8        A    I'm not aware.

9        Q    Are you aware if Mr. Rein's qualifications --

10   Excuse me.  Let me rephrase that.

11           Are you aware if Mr. Rein's background and

12   experience made him qualified for any positions that

13   you were involved in recruiting since his termination

14   from Motorola?

15       A    I'm not aware of any searches that we -- or I

16   was involved in that Jay would have been qualified.

17       Q    That's either that you were doing or that

18   anyone else within the Russell Reynolds' organization

19   that you were aware of was doing?

20       A    Right, that I'm aware of.  You understand I

21   can't speak --

22       Q    I understand.  It's a big company.

23       A    Right.

24       Q    Now, as we were talking, Russell Reynolds has

Paul Zellner

10/21/2005

59

1     Q   Yes.

2     A   My recollection is there probably was only

3  one of those after he left, not many, that it was Jay

4  describing -- the point was Jay saying, Paul, would

5  you keep an eye open for me.  We would have had some

6  discussion about what he might have been interested

7  in, what his strategies might have been on his

8  search.  I would have acknowledged that and to the

9  best of my ability·try to keep alert for

10  opportunities that would have been right for Jay.

11  That was probably a five-minute, ten-minute

12  conversation.

13     Q   Since that conversation, have you been aware

14  of any opportunities that would be a good fit for

15  Mr. Rein?

16     A   No.

17  MR. COSTER:  I'd like to have this marked as

18  Exhibit No. 11.

19           (Whereupon Deposition Exhibit No. 11 was

20            marked for identification.)

21  BY MR. COSTER:

22     Q   I'll show you what's been marked as Exhibit

23  No. 11 to your deposition.  Have you ever seen this

24  document before?

Paul Zellner

10/21/2005

63

1     A   Yes.

2     Q   Again, did you receive it on or about May 4th

3  of 2004?

4     A   Yes.

5     Q   It appears to refer to a message.  Do you

6  recall leaving Jay a message of any kind?

7     A   I don't recall it, but I must have.

8     Q   He indicates that he will call you.  Do you

9  recall him contacting you on or around this date?

10    A   Not specifically.

11    Q   Do you recall speaking to him at all, you

12  know, in conjunction with these efforts to speak with

13  you?

14    A   Yeah, I do.  As I mentioned earlier, I wasn't

15  sure of the dates, but I do remember that Jay and I

16  had at least one conversation after he left Motorola.

17  It may have been this conversation that sort of

18  sequenced all these messages back and forth to help

19  try and find time to talk where he described -- where

20  we talked about his search strategy, what he wanted

21  to do and asked me for my help.

22    Q   Other than what you already testified to, do

23  you recall anything else about that one conversation

24  you had with Mr. Rein?

64

1      A    No.

2      MR. COSTER:  If I could have this marked as

3  Exhibit No. 14.

4                  (Whereupon Deposition Exhibit No. 14 was

5                  marked for identification.)

6      THE WITNESS:  Okay.

7  BY MR. COSTER:

8      Q    I'll show you what's been marked Exhibit

9  No. 14 dated July 29, 2004.  It's an e-mail from Jay

10  Rein to Mr. Zellner.  Do you recall receiving this

11  e-mail on or about the 29th of July of 2004?

12     A    Yes.

13     Q    Directing your attention to the second

14  sentence of the e-mail, it says, since I have not

15  been successful maintaining a dialogue with you since

16  my departure from Motorola for reasons I just cannot

17  figure, I thought I would provide you with a quick

18  update.  Do you agree that you and Mr. Rein had not

19  been successful in maintaining a dialogue since his

20  departure from Motorola?

21     A    Well, again, that's a subjective question

22  because what is a dialogue.  We had communicated

23  through a series of calls, e-mails, so I -- Is that a

24  dialogue?  I can only assume that it didn't mean

Paul Zellner

10/21/2005

65

1    dialogue to Jay.

2    Q    Well, after he was let go from Motorola, were

3    you willing to work with him again as a potential

4    candidate for other positions?

5    A    Yes.

6    Q    And did you feel that he still would be a

7    good qualified candidate if his position matched the

8    experience and background that a particular company

9    wanted?

10    A    Yes.

11    Q    And did you make any effort to cultivate or

12    continue your relationship with Mr. Rein after he had

13    been let go by Motorola?

14    A    Yes, I responded to his omens and was

15    responsive to his calls and e-mails at least in my --

16    from the standard that I try to judge those things

17    against.

18    Q    In your view, you disagree with Mr. Rein?    In

19    your view, you were responsive to the e-mails and

20    telephone calls that he made to you?

21    A    It's a matter of degree.    I feel that we did

22    have communication.    It's clear Jay didn't see it the

23    same way in terms of level or what he might have

24    desired from that.    In situations where we are aware

Paul Zellner

10/21/2005

66

1    of an individual but not aware of an opportunity, you

2    know, my effort, my standard is to try to just at

3    least acknowledge the communication as a minimum.

4        Beyond that between searches where there's

5    not a fit, it's a perplexing dilemma where you

6    cannot -- you just can't satisfy some people.

7    Because we're engaged by companies to help find

8    candidates, it's difficult in other situations to be

9    able to -- we can't promise that we're going to place

10   people.  We don't make that promise.  We try to be

11   courtesy and responsive.

12       Q    Well, do you recall specifically what you did

13   to be courtesy and responsive to the e-mails and

14   telephone calls you were receiving from Mr. Rein?

15       A    Well, it was to acknowledge them.  To the

16   best of my ability and my schedule to find the time

17   to talk and try to understand where Jay was at and

18   what he was trying to do.  He did clearly communicate

19   that.

20       Q    What did you do to acknowledge the e-mail

21   communications and telephone calls you were receiving

22   from Mr. Rein?

23       A    What did I do?  Responded to the e-mails and

24   coordinated our calendars so we could talk.

Paul Zellner

10/21/2005

68

1   relationship.  I believe we are as a firm.  I have no

2   idea what the specifics are, though.

3       Q    You personally are not currently involved in

4   any recruiting for Motorola, is that correct?

5       A    That's correct.

6       Q    After placing Mr. Rein, have you had any

7   other business dealings with Motorola?

8       A    No.

9       Q    How is it that you and Mr. Rein were matched

10  up with one another in the recruiting process?

11      MS. CHRISTENSEN:  It's been asked and answered

12  also.

13  BY MR. COSTER:

14      Q    You need to still answer the question.

15      A    I don't recall how I came to Jay initially,

16  so I -- I just don't know.  I don't remember.

17      MR. COSTER:  I think I'm done.  Give me two

18  minutes to go through my notes.  I'm done.

19                      EXAMINATION

20  BY MS. McGURN:

21      Q    I just have a very few questions, sir.  I'd

22  like to start by introducing another document that we

23  could mark as Exhibit 15.

24              (Whereupon Deposition Exhibit No. 15 was

Paul Zellner

10/21/2005

70

1      Q    Are they notes taken in connection with your

2    efforts to recruit Jay Rein for the position at MPS

3    within Motorola?

4      A    Yes.

5      Q    Do you believe that they are notes of -- that

6    purport to memorialize conversations with Mr. Rein?

7      MR. COSTER:  Objection.

8      THE WITNESS:  I don't remember if they were

9    conversations.  I don't remember.

10   BY MS. McGURN:

11     Q    Okay.  Would it have been a violation of

12   Russell Reynolds' policy for you to attempt to place

13   Jay Rein in a position outside Motorola prior to

14   learning of his termination from the company?

15     A    Yes.

16     MS. McGURN:  I have nothing further.

17     MS. CHRISTENSEN:  Thank you very much.  I do not

18   have any questions.

19                    *  *  *  *  *

20

21

22

23

24

# EXHIBIT F

JAY S. REIN

J. Rein

EXHIBIT NO. 5
8-16-05
L. LONDON

April 12, 2002

Rodney Hedeen
CEO
The Relizon Company
220 E. Monument Avenue
Dayton, Ohio 45402-1223

Dear Rodney:

I am writing you this letter today with two purposes. First is to congratulate the Epsilon/Relizon Team on the Pharmaceutical Sample Compliance win at Schering-Plough. Second is to present a perspective on the first of the three retention bonus payouts that occurs on May 2, 2002 for Epsilon employees who had unvested options on November 2, 2001.

I heard the news on Saturday March 30 of the company's win with Schering-Plough. It took five months to get to the finish line, but the term of the deal and the dollars, from what I hear on the street, are certainly worth the sales investment. This win, the intake and reporting of paper-based prescription drug sampling data, was the model that Patricia Howe and I were on the road to creating between the sales team at Relizon and Epsilon's resources in the Pharmaceutical space. And while I am not employed by Epsilon, I am certainly pleased that something that was started under my leadership can now evolve to (1) produce additional revenue for the company, (2) produce additional EBITDA, as this type of business typically produces great cash flow when implemented properly and (3) secure additional employment opportunities for the team operating under the direction of Maureen McCormack. Once again, congratulations!

As related to the upcoming retention bonus payout due to be paid on May 2, 2002 to employees of Epsilon who had unvested shares on the day of the acquisition, the following is meant to appeal to a sense of fairness and good business practice. Recall that on December 17, 2001, Mike Iaccarino made the decision to reorganize me off the executive team and out of the company – all within his right to do so. My last day with the company was December 31, 2001, just two days shy of the two month anniversary of the acquisition of Epsilon by Relizon. That two month anniversary was effectively one-third of the way into earning the first retention payout, or one-ninth of the way into earning the full value of the retention payout. Wouldn't it seem fair to make payment of one-third of the first payment that was worked and effectively earned?

I use the word fair because:

- On November 2, 2001, the day of the acquisition of Epsilon by Relizon, nobody indicated that there was any intention of me not being retained to continue on as a leader at Epsilon,

- I did forgo other employment opportunities before and after November 2, 2001, based on the positive team spirit that was portrayed by you, Corey Torrence and other Relizon leaders I was interacting with,

- If you look at the recent win at Schering-Plough, along with a number of other pipeline opportunities, including others at Schering-Plough, Novartis, etc., I was an early contributor to initiating these opportunities,

– 2 –                                                   April 12, 2002

- I do think that there may be opportunities in the future for me to refer business to Epsilon. I have a lot of respect for the value of the business model that we evolved at Epsilon in 2000 and 2001.

I hope that this letter and the request within can be given some form of consideration.

Please feel free to contact me if you wish to discuss further.

Sincerely,

Jay S. Rein

CC: Joe Lipscomb, The Carlyle Group

MI000444

# EXHIBIT G

J. Rein
EXHIBIT NO. 7
8-16-05
L. LONDON

**MOTOROLA**

# Application for Employment

Motorola Inc. is an Equal Opportunity/Affirmative Action Employer and fully complies with all applicable federal, state and/or local laws, orders and regulations. All qualified applicants will receive consideration for employment without regard to age, sex, race, color, national origin, ancestry, religion, disability, marital or veteran status.

| last name | first name | middle initial | date |
|---|---|---|---|
| REIN | JAY | S | 06-24-02 |

| street address | city | state | zip |
|---|---|---|---|
| 75 Johnson Drive | Holliston | MA | 01746 |

| social security number | home phone | business phone |
|---|---|---|
| 139 44 5984 | ( 508 ) 893 6405 | ( ) |

position applied for or type of work preferred.

which shift do you prefer?                    which location do you prefer?

Please mark the appropriate boxes:    under 18? ☐ yes ☒ no

## Personal History

Motorola has a legal obligation to employ only persons who can produce documentation that indicates their identity and authorization to work in the United States. This policy is required by the Immigration Reform and Control Act of 1986 (IRCA). The responsibility for compliance with IRCA is very important to Motorola. Therefore, in order for Motorola to determine whether you are authorized to work and are eligible for hire, please mark the "yes" or "no" box.

Do you currently have unrestricted employment authorization that will allow you to work with any employer in the United States? ☒ yes ☐ no

As part of its application process, Motorola asks each applicant whether he or she has been convicted of a felony. Conviction of a crime does not constitute an absolute bar to employment. Underlying circumstances at the time of the offense will be taken into account.

Have you ever been convicted of a felony? ☐ yes ☒ no

If yes, please explain

Have you ever worked for the Department of Defense or the U.S. Government or served in the armed forces? ☐ yes ☒ no

If yes, please provide:

| dates of service | branch/department/service | highest rank held |
|---|---|---|
| / / — / / | | |

000003

## Personal History

Were you referred to Motorola by one of the following?  Please check one.

☐ advertisement      ☐ referral      ☒ agency      ☐ job fair      ☐ write-in      ☐ college recruitment      ☐ other

If you previously worked at Motorola and/or its subsidiaries in any capacity (e.g., as an employee, consultant, contractor or temporary employee), please provide:

| dates | location/facility | name used | badge number |
|---|---|---|---|
| /  /  -  /  / | | | |

Is there any other information that may be of value in considering your application? (Please do not include any information that may indicate your age, sex, race, color, national origin, ancestry, religion, physical or mental disability unrelated to job requirements, marital or veteran status.)

## Education

| high school (name and location) | degree earned | field of specialty | graduate? |
|---|---|---|---|
| Ramapo Senior HS   Spring Valley, NY | | | ☒ yes ☐ no |
| college (name and location) | degree earned | field of specialty | |
| Univ. of Vermont  Burlington, VT | BS | Mathematics | ☒ yes ☐ no |
| graduate (name and location) | degree earned | field of specialty | |
| New York Univ.   New York, NY | MBA | Finance | ☒ yes ☐ no |
| other (name and location) | degree earned | field of specialty | |
| | | | ☐ yes ☐ no |
| other (name and location) | degree earned | field of specialty | |
| | | | ☐ yes ☐ no |

## Patents Granted or Pending

It is only necessary to list the title of such inventions and their purpose.

I represent that the invention identified in the _____ pages I attached hereto comprise all the unpatented inventions that I have made or conceived prior to my application for employment by Motorola; all such inventions shall be excluded from any agreement with Motorola.

If there are no such unpatented inventions to be excluded, initial here_____

000004

## Employment Record

Give a complete record of your experience starting with your present or most recent position (attach additional sheets if necessary).

**employer** EPSILON

**employment dates** 12/99 - 12/01

**street address** 50 Cambridge Street    **city** Burlington    **state** MA    **zip** 01803

**starting position** Vice President / Gur    **starting salary**

**present position** 11    **present salary**    **other compensation**

**present duties and responsibilities**

See resume

**reason for leaving**

**supervisor's name**    **title**    **phone** (781) 685 6000

May we contact this employer? yes no    JSC

---

**employer** LOGICA

**employment dates** 5/98 - 12/99

**street address** 32 Hartwell Avenue    **city** Lexington    **state** MA    **zip**

**starting position**    **starting salary**

**final position**    **final salary**    **other compensation**

**final duties and responsibilities**

See resume

**reason for leaving**

**supervisor's name**    **title**    **phone** (    )

May we contact this employer? yes no    JSK

**Employment Record**

employer ▸ AT&T SOLUTIONS

employment dates 4/96 - 5/98

state ____ zip ____

street address ▸

city

Washington DC

starting position ▸

starting salary

final position ▸

final salary

other compensation

final duties and responsibilities ▸

*See resume*

reason for leaving ▸

supervisor's name ▸

title

phone ( )

May we contact this employer? ☐ yes ☒ no

---

employer ▸ ACCENTURE

employment dates 12/93 - 4/96

state ____ zip ____

street address ▸

city

Dallas

TX

starting position ▸

starting salary

final position ▸

final salary

other compensation

final duties and responsibilities ▸

*See resume*

reason for leaving ▸

supervisor's name ▸

title

phone ( )

May we contact this employer? ☒ yes ☐ no

000006

## Professional Work References

List only persons we may contact at this time.

name ▸ _____ title : _____

address ▸ _____ business phone : ( )

name ▸ _____ title : _____

address ▸ _____ business phone : ( )

name ▸ _____ title : _____

address ▸ _____ business phone : ( )

name ▸ _____ title : _____

address ▸ _____ business phone : ( )

## Motorola's Drug-Free Workforce Policy

It is Motorola's policy to employ a workforce that is drug free and to provide a workplace free from the illegal manufacture, distribution, possession and use of drugs. All candidates offered a position with Motorola must consent to and pass a drug test as a condition of employment. Motorola will maintain the confidentiality of the test results and any information a candidate furnishes in connection with the pre-employment drug testing process, in accordance with applicable law.

Consent For Drug Testing

You hereby consent to a urinalysis and/or other drug screening to determine the presence of drugs or their metabolites in your system. You also consent to the release of these tests and any information furnished in connection with the pre-employment drug testing process to Motorola, in accordance with applicable law. You hereby release and agree to hold Motorola, the collection facility, the testing laboratory and their employees and agents and the Medical Review Officer harmless from any liability to you based on the testing procedure or the reporting of the test results. You also understand that any offer of employment is contingent upon your passing this pre-employment drug test.

signature ▸ _JSD_____ printed name _JAY REIN_____ date _06-24-0Y____

000007

## Agreement

Read this carefully as it applies to actions Motorola may or may not take regarding your employment.

The information contained in this application is true to the best of your knowledge and belief. You understand that any misrepresentation of fact, as stated or implied, given in your application or other employment documents, interview(s) or during your employment may be sufficient reason for not hiring you and/or immediate dismissal.

You understand and agree that all information furnished in this application may be verified by Motorola or its authorized representative. You waive any right you may have to be notified by any individuals and organizations named or referred to in this application prior to the release of any employment information to Motorola.

You hereby authorize all individuals and organizations named or referred to in this application and any law enforcement organization to give Motorola all information relative to such verification. You hereby release such individuals, organizations and Motorola from any and all liability for any claim or damage resulting therefrom.

You understand that, if employed by Motorola and as a condition of your employment by Motorola, you must furnish proof that you are at least 18 years old and authorized to work in the United States. In addition, you will be required to execute certain agreements with Motorola (profit sharing participation, inventions and code of conduct, copies of which are available upon request) and you may be required, at the option of Motorola, to obtain through the auspices of Motorola and at its expense, a U.S. government security clearance.

You understand that, if hired, you are required to comply with all current and amended Motorola communications regarding any rules, regulations, policies, and/or procedures, which may or may not affect your employment with Motorola. You further understand that Motorola may change and/or amend any of these items at any time and in any way without notice to you.

You understand that Motorola is not obligated to provide employment and that you are not obligated to accept employment. Nothing in this application nor in any prior or subsequent oral or written statement is intended to create any contract of employment or to create any rights in the nature of a contract of employment. This application does not bind either party for a specific period of time regarding employment. You understand that no one other than the Motorola, Inc. Executive Vice President and Director of Human Resources has any authority to enter into any agreement contrary to the foregoing. If hired, nothing in this application shall restrict your right as an employee nor the right of Motorola as an employer to terminate your employment at any time.

| signature | witness | date |
|---|---|---|
| JS | Diane Kuckoles | 06-24-02 |

## Non-Disclosure Agreement

In consideration of this potential employment opportunity with Motorola, I agree to the following:

1. During and after this potential employment opportunity, I will not disclose Motorola confidential information to others or use Motorola confidential information for any purpose other than evaluating employment with Motorola; 2. "Motorola Confidential Information" includes but is not limited to research and/or development projects and related data, designs, products, processes, customer and supplier lists, employee data, cost and pricing data and sales plans; 3. "Motorola Confidential Information" does not include information that I can demonstrate is known to the public without breach of a confidentiality obligation; and 4. I will not remove from Motorola premises any documents, file records, correspondence, notes or other papers (including copies) relating to the business of Motorola except with permission of an authorized Motorola representative, and in such case, I will promptly return such items to Motorola upon request.

| signature | witness | date |
|---|---|---|
| JS | Diane Kuckoles | 06-24-02 |

00000.8

# EXHIBIT H

 **MOTOROLA**



J. Rein
**EXHIBIT NO.** 8
8-16-05
L. LONDON

June 12, 2002

Mr. Jay Rein

Dear Mr. Rein

We are pleased to confirm our employment offer to you as to work in Motorola, Inc. in the position of Principal for North America, with a Job Grade E-15, in the Motorola Professional Services group, reporting to Len de Barros. Please let us know within one week of this letter if you accept the following offer.

We would like to point out that this offer is contingent upon satisfactory results from your pre-employment drug test. In addition we would like to advice you that Motorola associates are subject to universal drug testing during the course of their employment as part of our Drug Free Workforce Policy.

1. Your base salary will be $ 190,000.00 per year, paid bi-weekly.
2. Sign-on Stock Options: 20,000 options (vested 25% per year).
3. Sales Incentive Target: 45%

4. Health care coverage effective on first day of work for you and your family will be provided through CCN provider network, and prescription drug plan, including optional dental coverage at a very low cost.

5. We will also provide Basic Life Insurance of twice your basic pay at no cost to you. You can purchase additional coverage at a very low cost.

6. You are eligible to participate in the Saving Plan for all Motorola associates. The description of the Plan will be provided to you in our orientation Program.

We look forward to welcome you to Motorola, Inc. If you have any questions, please contact me at (954) 267-5035.

Cordially,

_____

Ana María López Guillén
Director of Human Resources
Motorola Professional Services-Americas

_____
Accepted

**"AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER"**

000016

# EXHIBIT I

**From:** Rein Jay-REIN
**Sent:** 10/17/2003
**To:** Kofman Clyde-KOFMAN
**Cc:**
**Bcc:**
**Subject:**

---------------------------------------------

Jay S. Rein, Principal
Motorola Professional Services
508-893-6926 - office
847-761-4814 - fax
617-899-2699 - cell
Rein@Motorola.com

1 Attachment



MI2-000281

**Intelligent Mobility Solutions**

October 17, 2003

---

## Executive Summary
## Getting Started

- Field Service Mobility – Focus on those organizations with a large mobile workforce where information flow impacts the business processes

- The IMS Team will sell and deliver 6 ($150K) "THINK" engagements (wedge)
  - Mobility roadmaps and business cases
  - Business Architecture alignment for Mobility (people/process/device,application)
  - Technical Architecture Frameworks and Best Practices for Mobility

- The IMS Team will further deliver $7M in revenue by end of 2004 comprised of 1 or 2 integration projects with the following characteristics:
  - 3500 Field Service Technicians @ 1600 per unit (rugged PDA/Tablet)
  - Or 10,000 mobile workers @ $550 per unit (Smart Phone)

- The individuals within IMS will sell and deliver as a team
  - Focus on 10 – 15 qualified prospects within Field Service Mobility in the Energy/Utilities industry vertical (see page 17)
  - Detailed offerings will be built out to articulate the IMS value-add and our "product"
  - Tools such as conceptual prototypes will be built to demonstrate the offer
  - The IMS Team will leverage existing Motorola account base

Motorola Confidential and Proprietary

2

MI2-000282

## 2004 Financial Summary

### Supporting Statistics

| People | FTEs | Utilization | Rates | Margin |
|---|---|---|---|---|
| Principals | 4 | 22% | $ 2,000/day | 25% |
| Business Consultants | 2 | 54% | $ 1,800/day | 50% |
| Motorola Internal Resources – Blue Money | 1.5 | 22% | $ 1,600/day | 40% |
| Hardware/Software | | | | 20% |

### Financial Metrics

| (millions) | IMS (annual) | Q1 |
|---|---|---|
| Bookings | $ 7.3M | $ 150k |
| Billings | $ 6.9M | $ 0 |
| Budget | $ 1.95M | $ .5 M |
| Margin | ($ 150K) | ($ 800K) |

Motorola Confidential and Proprietary

3

## 2004 Numbers

10/17/2003

| IMS – Field Service Mobility Projected Pro Forma Earnings - 2004 Planning | | | | | |
|---|---|---|---|---|---|
| ($000, Except Per Person) | | | | | |
| | | | 2004 | | |
| Gross Fees | | | $ 970 | | |
| Fee Adjustments | | | 49 | 5.0% | |
| Net Labor Fees | | | 922 | | |
| | | | | | |
| Hardware/Equipment | | | $ 5,000 | | |
| Software | | | $ 1,000 | | |
| Hosting/Managing | | | $ - | | |
| Other Service Fees | | | $ - | | |
| Net Other Fees | | | 6,000 | | |
| | | | | | |
| Total Net Fees | | | 6,922 | | |
| | | | | | |
| Employee Payroll/Benefits - Dedicated | | | 1,853 | | |
| Purchased CGISS Resources - Employee Payroll/Benefits - (Blue Money) | | | 319 | | Margin % |
| Hardware | | | 4,000 | | 20% |
| Software | | | 800 | | 20% |
| Direct Non-Payroll | | | 104 | | |
| Net Costs | | | 7,076 | | |
| | | | | | |
| Margin before allocations | | | (154) | | |

Motorola Confidential and Proprietary

4

2

MI2-000283

## Why The IMS Team will Succeed? – What is Different?

| IMS |
|---|
| Focus on Offers with Defined Solutions |
| 1 or 2 Medium Deals to Win |
| Warm Leads From Existing Account Teams |
| "High & Early" Approach |
| TEAMWORK – Hunt in Packs |
| Prototyped Solutions Tied to Offers |
| Contingent-Fee Pilots |
| Team Fully Integrated into Motorola |
| Enthusiastic Leadership |

Motorola Confidential and Proprietary

5

## What the IMS Team Must Do to Be Successful; The Tactical Approach to Q4 2003 and Q1 2004

- Q4 '03 Activities
  - Fulfill non-Mobility commitments
    - LA SAFE, Sears, Kay Comm / Citgo
    - Transition Revenue & Resources to WAN/ISD group
  - Fully articulate the Field Service Mobility Offer
  - Investigate:
    - Mobile Asset Management & Tracking
    - Mobile Video Based Solution Offer
  - Secure access to skills not currently on the IMS Team
  - Develop solution prototypes tied to the Field Service Mobility Offer
  - Continue pursuit of Mobility-related offers
    - ServiceMaster
    - OTIS Elevator
    - ExpressLINK
    - Exelon
    - Allstate
  - Qualify "Suspect" to "Prospects" in Energy & Utilities Vertical AND pursue with Field Service Mobility offering

- Q1 '04 Activities
  - Develop relationships with Prospects through *Solution Selling* techniques – requiring the IMS Team to spend significant time at the client site
  - WIN reference client

Motorola Confidential and Proprietary

6

3

MI2-000284



**Further Details**



## Anticipated Sales Cycle



Motorola Confidential and Proprietary

9

## Challenges

- **Skills**
  - Issue: Skills from other parts of Motorola will be needed when the project or pursuit requires subject matter expertise
  - Resolutions: Identify skills and groups in Q4; execute an agreement with identified group(s); utilize executive sponsorship
- **Internal awareness**
  - Issue: Many parts of CGISS do not know who we are and the value we deliver, enterprise market only
  - Resolutions: Create an internal marketing document that conveys the IMS value and differentiation; present IMS message to sales teams
- **P&L Conflicts**
  - Issue: Working with other Motorola Groups may create ineffective transfer pricing due to competing P&Ls
  - Resolution: Utilize executive sponsorship
- **Hardware & Software/Applications**
  - Issue: The Mobility Solutions envisions cannot be 100% sourced with Motorola hardware & software
  - Resolutions: Develop strategic relationship and/or acquire non-Motorola Best-of-Breed components
- **Marketplace Perceptions**
  - Issue: IMS will be not be recognized in the marketplace as the only services organization focusing on mobile solutions
  - Resolutions: Leverage the Motorola brand by hosting executive forums; deliver the IMS point of view in major publications; participate in trade show speaking engagements

Motorola Confidential and Proprietary

10

5

MI2-000286

## The IMS Hypothesis About The Mobility Marketplace

- Nobody has provided end-to-end, full service consultative-lead services as described in the "mobility space"

- Corporations, the Enterprise, are [again] on the cusp of dealing with what "mobility" will mean to them... as related to People, Process, Devices, Software and Infrastructure.  Few companies are blazing trails BUT most are confused and sitting on their investment dollars

- The value-added of IMS could assist Motorola in creating shareholder value for Motorola, Motorola's prospective clients and Motorola's existing clients

- There are no clear "owners" of this niche called IMS in Motorola and the marketplace

- It is not difficult to defend a strategy of *Mobility* as a Motorola Company – it makes sense relative to Motorola's past 75 years

Motorola Confidential and Proprietary

11

## The IMS Team Will Help Clients Navigate The Mobility Continuum



The IMS Point of View:

Motorola Confidential and Proprietary

Level Mobility Integration

12

6

MI2-000287





MI2-000288

### What Will IMS in the Longer-Term Vision
### *THINK / BUILD / MANAGE* Within Three Possible Offerings

- Offer 1 – Field Service Mobility
  - Targeted at the Field Service Function and its people
  - Disconnects from traditional dial-up, end-of-day synchronization
  - Creates BPR opportunity with very real ROI for client
  - Requires best-of-breed tools – hardware, software, NOC; some in Motorola's sweet spot

- Offer 2 – Mobile Asset Management & Tracking
  - Targeted at untethered and decentralized assets
  - Facilitates the integration of data (→ Knowledge) in business processes in ways that were not possible in the past
  - Creates BPR opportunity with very real ROI for client
  - Requires best-of-breed tools – hardware, software, NOC; some in Motorola's sweet spot

- Offer 3 – Mobile Video-Based Solutions
  - Targeted at opportunities where video unleashes "pent-up value"; value can equal revenue, cost avoidance and/or security & insurance
  - Introduces the value of "seeing" something versus "hearing" and/or "calculating"
  - Requires best-of-breed tools – hardware, software, NOC; some in Motorola's sweet spot

Motorola Confidential and Proprietary

15

---

### Who is IMS?
### Skills Required to Deliver an[y] Offer

- The following skills are required in varying degrees to fulfill an offer

- Required resources for any particular offer depend upon whether you are in THINK, BUILD or MANAGE mode of engaging a client opportunity

- A skill required does not imply an FTE. There are individuals who have skills that span Device and Software expertise

- These skills exist within Motorola. Not all of these skills exist within MPS today



Motorola Confidential and Proprietary

16

MI2-000289

**The Energy and Utilities Industry Vertical is a Good Fit for Mobile Technology**

IMS Representative Suspect List

- National Grid
- ConEdison
- PSEG
- Amerada Hess
- Keyspan
- PPL
- AES
- Progress Energy
- Duke Power
- Southern Company
- Mastec
- TVA
- AEP Power
- First Energy

- CMS Energy
- DTE Energy
- Mid American Energ
- XCEL
- Entergy
- TXU
- Reliant Energy
- PG&E
- El Paso Energy
- Edison International
- GO 1
- Exelon
- Sempra Energy

Motorola Confidential and Proprietary

17

---

**IMS as a Start-up**
**What Tools, Props,… are Required to Successfully Sell**

- As a Start-up, IMS would require the following resources from Motorola CGISS in addition to salaries & benefits

  - Marketing / PR
    - Access to editors of major journals for buy-line, quotation and other "placement" opportunities
    - Collateral creation
    - Access to Direct Mail and other campaign development tools

  - Access to
    - Mobile Device Players
    - Software Application Developers / Integrators
    - Multiple Network Expertise

  - Resources to develop a prototypical model within an Offer
    - A tangible demonstration is more powerful than PowerPoint Slides
    - Working solutions establish credibility quickly

Motorola Confidential and Proprietary

18

9

MI2-000290

# EXHIBIT J
# PART 1

CONFIDENTIAL

**From:** Rein Jay-REIN
**Sent:** Tuesday, October 21, 2003 5:00 PM
**To:** Gillardi John-GILLARDI; Kofman Clyde-KOFMAN; Lanci Paul-CSLC42
**Subject:** PPT Versions of Last Two JS Interactions

-----------------------------------------

Jay S. Rein, Principal
Motorola Professional Services
508-893-6926 - office
847-761-4814 - fax
617-899-2699 - cell
Rein@Motorola.com



CONFIDENTIAL

# Intelligent Mobility Solutions

Follow-up Information

For

Juergen Stark

October 21, 2003

MI000273

# Follow-up to 10/17/2003 Meeting with Juergen Stark

- At the conclusion of our meeting with Juergen Stark on 10/17/2003, there were three items which were requested of the team

1. "Layout" where the 22 heads will reside should/when we move forward with these plans.

2. Identify the range of financial results which could be expected for the Intelligent Mobility Solutions Group.

3. Identify who should run the group.

2

Motorola Confidential and Proprietary

# Follow-Up Item #1
## What Happens to the existing 22 FTEs of MPS

- Based upon our assessment of skills and capabilities, along with demand, there are three major groupings for the 22 FTEs.



**MPS Today**
22 FTEs

**Intelligent Mobility Solutions**
to Juergen Stark
5 or 6 FTEs
- Gillardi
- Kofman
- Rein
- Brice
- Humpleby
- **Lanci**

**WAN/IP Integration**
to ISD Tony Marshall
9 or 10 FTEs
- Abbott
- Black
- Combs
- Franklin
- Lanci
- Mooney
- Moore
- Roark
- Swearingen
- Marisel Neyra

**Latin American Resources**
to Jeff Spaeth
7 FTEs
- Camacho
- Castillejo
- Kossenko
- Lobaton
- Moreno
- Fernando Olmos
- Michael Wasserman

Paul Lanci can add value to both the IMS Team and the WAN/IP Team. Paul's assignment will be resolved as discussions with Tony Marshall evolve.

The "sale" of the WAN/IP Integration Team to Tony Marshall and the Latin American Resources to Jeff Spaeth will be the responsibility of Juergen Stark.

3

Motorola Confidential and Proprietary

# Follow-Up Item #2
## What are the Range of Financial Results to Consider for IMS



**Upside Potential**
- More THINKS
- More BUILD...
- ...than Plan

**2004 Model 2**
- 15 FTEs
- 7.5 FTEs Energy & Utilities Vertical Focus
- Field Services Mobility
- 7.5 FTEs Transportation & Shipping Vertical
- Asset Management & Tracking
- 8 - 10 THINK ENGAGEMENTS
- 1 - 2 BUILD ENGAGEMENTS
- ~$11.5M Revenue
- Breakeven Earnings

**2004 Model 1 (presented 10/19)**
- 7.5 FTEs
- Energy & Utilities Vertical Focus
- Field Services Mobility Offer
- 5-6 THINK ENGAGEMENTS
- 1 BUILD ENGAGEMENT
- ~$7.0M Revenue
- ~$(0.2)M Earnings

**Downside Exposure**
- 3 THINK ENGAGEMENTS
- 0 BUILD
- $0.5M Revenue
- ~$(1.8)M Earnings

4

Motorola Confidential and Proprietary

MI000276

# Follow-Up Item #3
## Who will lead the IMS Group?

The "core" team of IMS which is migrating from MPS, believes that Clyde Kofman should lead the new IMS Group.

5

Motorola Confidential and Proprietary

# Intelligent Mobility Solutions

October 17, 2003

MI000278

# Executive Summary
## Getting Started

- Field Service Mobility – Focus on those organizations with a large mobile workforce where information flow impacts the business processes

- The IMS Team will sell and deliver 6 ($150K) "THINK" engagements (wedge)
  - Mobility roadmaps and business cases
  - Business Architecture alignment for Mobility (people/process/device,application)
  - Technical Architecture Frameworks and Best Practices for Mobility

- The IMS Team will further deliver $7M in revenue by end of 2004 comprised of 1 or 2 integration projects with the following characteristics:
  - 3500 Field Service Technicians @ 1600 per unit (rugged PDA/Tablet)
  - Or 10,000 mobile workers @ $550 per unit (Smart Phone)

- The individuals within IMS will sell and deliver as a team
  - Focus on 10 – 15 qualified prospects within Field Service Mobility in the Energy/Utilities industry vertical (see page 17)
  - Detailed offerings will be built out to articulate the IMS value-add and our "product"
  - Tools such as conceptual prototypes will be built to demonstrate the offer
  - The IMS Team will leverage existing Motorola account base

2

Motorola Confidential and Proprietary

# 2004 Financial Summary

## Supporting Statistics

| People | FTEs | Utilization | Rates | Margin |
|---|---|---|---|---|
| Principals | 4 | 22% | $ 2,000/day | 25% |
| Business Consultants | 2 | 54% | $ 1,800/day | 50% |
| Motorola Internal Resources -- Blue Money | 1.5 | 22% | $ 1,600/day | 40% |
| Hardware/Software | | | | 20% |

## Financial Metrics

| (millions) | IMS (annual) | Q1 |
|---|---|---|
| Bookings | $ 7.3M | $ 150k |
| Billings | $ 6.9M | $ 0 |
| Budget | $ 1.95M | $ .5 M |
| Margin | ($ 150K) | ($ 500K) |

3

Motorola Confidential and Proprietary

MI000280

# 2004 Numbers

| IMS - Field Service Mobility Projected Pro Forma Earnings - 2004 Planning | | 10/17/2003 |
|---|---|---|
| ($000, Except Per Person) | | |
| | 2004 | |
| Gross Fees | $ 970 | |
| Fee Adjustments | 49 | 5.0% |
| Net Labor Fees | 922 | |
| | | |
| Hardware/Equipment | $ 5,000 | |
| Software | $ 1,000 | |
| Hosting/Managing | $ - | |
| Other Service Fees | $ - | |
| Net Other Fees | 6,000 | |
| | | |
| Total Net Fees | 6,922 | |
| | | |
| Employee Payroll/Benefits - Dedicated | 1,853 | |
| Purchased CGISS Resources - Employee Payroll/Benefits - (Blue Money) | 319 | |
| Hardware | 4,000 | 20% |
| Software | 800 | 20% |
| Direct Non-Payroll | 104 | |
| Net Costs | 7,076 | |
| | | |
| Margin before allocations | (154) | Margin % |

4

Motorola Confidential and Proprietary

# Why The IMS Team will Succeed? – What is Different?

5

| IMS |
| --- |
| Focus on Offers with Defined Solutions |
| 1 or 2 Medium Deals to Win |
| Warm Leads From Existing Account Teams |
| "High & Early" Approach |
| TEAMWORK – Hunt in Packs |
| Prototyped Solutions Tied to Offers |
| Contingent-Fee Pilots |
| Team Fully Integrated into Motorola |
| Enthusiastic Leadership |

Motorola Confidential and Proprietary

# What the IMS Team Must Do to Be Successful; The Tactical Approach to Q4 2003 and Q1 2004

- Q4 '03 Activities
  - Fulfill non-Mobility commitments
    - LA SAFE, Sears, Kay Comm / Citgo
    - Transition Revenue & Resources to WAN/ISD group
  - Fully articulate the Field Service Mobility Offer
  - Investigate:
    - Mobile Asset Management & Tracking
    - Mobile Video Based Solution Offer
  - Secure access to skills not currently on the IMS Team
  - Develop solution prototypes tied to the Field Service Mobility Offer
  - Continue pursuit of Mobility-related offers
    - ServiceMaster
    - OTIS Elevator
    - ExpressLINK
    - Exelon
    - Allstate
  - Qualify "Suspect" to "Prospects" in Energy & Utilities Vertical AND pursue with Field Service Mobility offering

- Q1 '04 Activities
  - Develop relationships with Prospects through *Solution Selling* techniques – requiring the IMS Team to spend significant time at the client site
  - WIN reference client

Motorola Confidential and Proprietary

6

## Further Details

MI000284

# The Financial Implications for Motorola?
## A 30,000' View



Motorola Confidential and Proprietary

MI000285



# Anticipated Sales Cycle

Motorola Confidential and Proprietary

# Challenges

- ## Skills

  Issue:    Skills from other parts of Motorola will be needed when the project or pursuit requires subject matter expertise

  Resolutions: Identify skills and groups in Q4; execute an agreement with identified group(s); utilize executive sponsorship

- ## Internal awareness

  Issue:    Many parts of CGISS do not know who we are and the value we deliver, enterprise market only

  Resolutions: Create an internal marketing document that conveys the IMS value and differentiation; present IMS message to sales teams

- ## P&L Conflicts

  Issue:    Working with other Motorola Groups may create ineffective transfer pricing due to competing P&Ls

  Resolution:  Utilize executive sponsorship

- ## Hardware & Software/Applications

  Issue:    The Mobility Solutions envisions cannot be 100% sourced with Motorola hardware & software

  Resolutions: Develop strategic relationship and/or acquire non-Motorola Best-of-Breed components

- ## Marketplace Perceptions

  Issue:    IMS will be not be recognized in the marketplace as the only services organization focusing on mobile solutions

  Resolutions: Leverage the Motorola brand by hosting executive forums; deliver the IMS point of view in major publications; participate in trade show speaking engagements

10

Motorola Confidential and Proprietary

# The IMS Hypothesis About The Mobility Marketplace

- Nobody has provided end-to-end, full service consultative-lead services as described in the "mobility space"

- Corporations, the Enterprise, are [again] on the cusp of dealing with what "mobility" will mean to them... as related to People, Process, Devices, Software and Infrastructure. Few companies are blazing trails BUT most are confused and sitting on their investment dollars

- The value-added of IMS could assist Motorola in creating shareholder value for Motorola, Motorola's prospective clients and Motorola's existing clients

- There are no clear "owners" of this niche called IMS in Motorola and the marketplace

- It is not difficult to defend a strategy of *Mobility* as a Motorola Company – it makes sense relative to Motorola's past 75 years

11

Motorola Confidential and Proprietary

# The IMS Team Will Help Clients Navigate The Mobility Continuum

The IMS Point of View:



Motorola Confidential and Proprietary

# IMS Integrates...

…Complex Business Requirements of a Mobile Worker or Asset With a Realistic
Approach to a Complicated Mobile Technology Landscape



13

Motorola Confidential and Proprietary

# EXHIBIT J
# PART 2

# IMS Will Deliver the Full Project Lifecycle for Mobile Solutions



➤ Mobility Roadmap Development
➤ Business Case Development
➤ Business Architecture
➤ Alignment for Mobility
➤ Mobile Technology Architecture Frameworks
➤ Best Practices for Mobility

➤ Architecture Integration
➤ Process Design
➤ System Design and Development

➤ Hosted Solutions
➤ Technology Mgt
➤ Break/Fix

14

Motorola Confidential and Proprietary

# What Will IMS in the Longer-Term Vision
## *THINK / BUILD / MANAGE* Within Three Possible Offerings

- Offer 1 – Field Service Mobility
  - Targeted at the Field Service Function and its people
  - Disconnects from traditional dial-up, end-of-day synchronization
  - Creates BPR opportunity with very real ROI for client
  - Requires best-of-breed tools – hardware, software, NOC; some in Motorola's sweet spot

- Offer 2 – Mobile Asset Management & Tracking
  - Targeted at untethered and decentralized assets
  - Facilitates the integration of data (→ Knowledge) in business processes in ways that were not possible in the past
  - Creates BPR opportunity with very real ROI for client
  - Requires best-of-breed tools – hardware, software, NOC; some in Motorola's sweet spot

- Offer 3 – Mobile Video-Based Solutions
  - Targeted at opportunities where video unleashes "pent-up value"; value can equal revenue, cost avoidance and/or security & insurance
  - Introduces the value of "seeing" something versus "hearing" and/or "calculating"
  - Requires best-of-breed tools – hardware, software, NOC; some in Motorola's sweet spot

15

Motorola Confidential and Proprietary

MI000292

## Who is IMS?
## Skills Required to Deliver an[y] Offer

- The following skills are required in varying degrees to fulfill an offer

- Required resources for any particular offer depend upon whether you are in THINK, BUILD or MANAGE mode of engaging a client opportunity

- A skill required does not imply an FTE. There are individuals who have skills that span Device and Software expertise

- These skills exist within Motorola. Not all of these skills exist within MPS today



16

Motorola Confidential and Proprietary

# The Energy and Utilities Industry Vertical is a Good Fit for Mobile Technology

IMS Representative Suspect List

- National Grid
- ConEdison
- PSEG
- Amerada Hess
- Keyspan
- PPL
- AES
- Progress Energy
- Duke Power
- Southern Company
- Mastec
- TVA
- AEP Power
- First Energy

- CMS Energy
- DTE Energy
- Mid American Energ
- XCEL
- Entergy
- TXU
- Reliant Energy
- PG&E
- El Paso Energy
- Edison International
- GO 1
- Exelon
- Sempra Energy

17

Motorola Confidential and Proprietary

MI000294

## IMS as a Start-up
## What Tools, Props,… are Required to Successfully Sell

- As a Start-up, IMS would require the following resources from Motorola CGISS in addition to salaries & benefits

  - Marketing / PR
    - Access to editors of major journals for buy-line, quotation and other "placement" opportunities
    - Collateral creation
    - Access to Direct Mail and other campaign development tools

  - Access to
    - Mobile Device Players
    - Software Application Developers / Integrators
    - Multiple Network Expertise

  - Resources to develop a prototypical model within an Offer
    - A tangible demonstration is more powerful than PowerPoint Slides
    - Working solutions establish credibility quickly

18

Motorola Confidential and Proprietary

MI000295

# EXHIBIT K



J. Rein
EXHIBIT NO. 23
8-26-05
L. LONDON

-----Original Message-----
**From:** Rein Jay-REIN
**Sent:** Wednesday, February 04, 2004 10:51 AM
**To:** Stark Juergen-AJS131
**Cc:** Kofman Clyde-KOFMAN
**Subject:** Direction

Juergen, thanks for the response,

The latest direction [from Clyde] based upon the impending flood of activity associated with Field Service Mobility, is to:

1. transition the ExpressLINK yard management opportunity this Friday to Janiece Webb, during a tbs conference call --> and be done,
2. transition the consumer-based telematics platform opportunity to IESS's After-Market Group during a [tentatively scheduled call] next Monday between that group and ExpressLINK --> and be done,
3. as Janiece or other groups might call out a need for MPS-like services, surface those opportunities for timely review and consideration before any time and resources of MPS are committed,
4. as opportunities arise in the marketplace for Motorola, Inc., which are not aligned with the evolving CGISS FSM strategy, ignore or quickly push to non-MPS colleagues within Motorola,
5. focus 100% on the evolving FSM effort for CGISS.

As opportunities evolve which differ from the above bullet points we will engage you for your advice.


Regards,
JSR
----------------------------------------

**Jay S. Rein**
Motorola Professional Services
*Architects of Intelligent Mobility Solutions*

508-893-6926 - office
847-761-4814 - fax
617-899-2699 - cell
Rein@Motorola.com


   -----Original Message-----
   **From:** Stark Juergen-AJS131
   **Sent:** Wednesday, February 04, 2004 10:29 AM
   **To:** Rein Jay-REIN
   **Cc:** Clyde Kofman (E-mail)
   **Subject:** RE: Update on ExpressLINK as promised

**M00103**

OK, work with Clyde on the right direction here.

-----Original Message-----
**From:** Rein Jay-REIN
**Sent:** Tuesday, February 03, 2004 3:36 PM
**To:** Stark Juergen-AJS131
**Cc:** Clyde Kofman (E-mail); Clay Brice (E-mail); Janiece S Webb (E-mail); Greer David-G19617
**Subject:** Update on ExpressLINK as promised

Juergen,

Yesterday, Clay Brice and I spent a fair amount of time with Janiece Webb and other colleagues at Deer Park.  Here is an update on the status of various opportunities:

1. Janiece and her immediate Team are interested in pursuing the Yard Management Opportunity at ExpressLINK.  At the conclusion of various meetings this week with WhereNet and other prospective partners in the RFID Tag Solution Space, Janiece expects to contact us with potential next steps.  It is not yet clear whether we will merely hand this opportunity off OR whether there is a paid-for potential for myself and Clay to remain engaged.  As we learn more and have choices to make, we will evaluate the best next steps for MPS and present those opportunities for your consideration.

2. There is another group within IESS that might be interested in the consumer-based, aftermarket telematics opportunity with ExpressLINK.  For this opportunity, we are trying to schedule an introduction between IESS and ExpressLINK.  If IESS is interested, we will quickly transition to this group which is more appropriately organized to develop and manage this opportunity.  If this group in IESS is not interested after a meet and greet with ExpressLINK, MPS will quickly divest ourselves of this aspect of the ExpressLINK relationship and move on.

3. One other outcome of our interactions with Janiece generated some unexpected opportunity. Her group has two enterprise opportunities which have been generated by a prospective acquisition candidate (a software entity in the SCM space) for Motorola Inc.  Janiece may need some professional services assistance with mobility opportunities at both Aventis Pharmaceuticals and Timberland, Inc. -- both in the *THINK* phase of client engagement.  I have asked Janiece to forward information on these opportunities to us.  If there is a way for us to assist her team while also propagating MPS's focus on Field Service Mobility Solutions, we will quickly assess the opportunities and present them to you for your consideration.

If you have any questions, please feel free to call... else we will contact you when we have meaningful and relevant information for you to review.

JSR

-------------------------------------------

**Jay S. Rein**
Motorola Professional Services
*Architects of Intelligent Mobility Solutions*

508-893-6926 - office
847-761-4814 - fax
617-899-2699 - cell
Rein@Motorola.com

M00104

6/21/2005

# EXHIBIT L

 **Invoke**
Solutions

Invoke Solutions, Inc.
82 North Summit Street
Tenafly, NJ 07670
201-227-9555 Main
201-227-9526 Fax
www.invoke.com

January 5, 2004

Mr. Jay Rein
75 Johnson Drive
Holliston, MA 01746-2244



Dear Jay:

I am very pleased to offer you the position of Vice President of Channels & Solutions Innovation at Invoke. This letter provides you with a summary of the terms and conditions of your anticipated employment. We hope that you choose to join the Invoke team and look forward to a mutually beneficial relationship.

1.    **Position**.  Your initial position will be Vice President of Channels & Solutions Innovation, and you will work from our Boston office and report directly to Simon Blanks. As an Invoke employee, we expect that you will perform any and all duties and responsibilities normally associated with your position in a satisfactory manner and to the best of your abilities at all times. Your performance will be reviewed formally after six months of employment, and on a periodic basis thereafter.

2.    **Starting Date/Nature of Relationship**.  If you accept this offer, your employment with Invoke will begin on January 19, 2004. No provision of this letter shall be construed to create an express or implied employment contract, or a promise of employment for any specific period of time. Your employment with Invoke is at-will employment, which may be terminated by you or Invoke at any time for any reason.

3.    **Compensation, Equity and Benefits**.  Your initial base pay shall be at an annualized rate of $120,000 per year (less customary deductions for federal and state taxes and the like), to be paid to you on a bi-weekly basis.

In addition to your base pay you will participate in the Invoke Channels Commission Plan. This plan has yet to be defined and you and I will finalize this plan during your first week of employment with the firm. If we reach the 2004 Channel revenue and client plan you will be paid an additional $100,000 above your base pay. If we exceed the plan there will be a super performance bonus that will be directly aligned with my super performance bonus. Any amounts you earn under the Commission Plan shall be payable within thirty (30) days after the end of the month during which they are earned during your employment with Invoke. The Company may alter or terminate your participation in the Commission Plan (or any Company commission plan) with respect to any period after December 31, 2004.

000242

It is expected that sometime over the course of 2004 [possibly early 2005], Invoke will adjust your annual salary upward to reflect "market rates" for your assumed position and its responsibilities.

During the first six (6) months of your employment with the Company, you will be provided a monthly non-recoverable draw in the amount of $5,000 (less customary deductions for federal and state taxes and the like) pursuant to the Commission Plan. The amounts of any non-recoverable draw payments shall be counted against, and shall not be in addition to, any commissions you earn pursuant to the Commission Plan.

Subject to approval by the Company's Board of Directors (or an appropriate Committee appointed by the Board of Directors), Invoke will grant you an option (the "Option") pursuant to the Company's 2001 U.S. Stock Option Plan (the "Option Plan") and a written stock option agreement(s) (based on the Company's existing form of stock option agreement) to purchase a number of shares of the Company's common stock, $ ___ par value per share (the "Common Stock"), representing (___) of the number of shares of Common Stock outstanding (calculated on a fully-diluted basis) as of the date of such grant, with an exercise price equal to the fair market value of the Common Stock on the date of grant as determined by the Board of Directors. Assuming you remain employed by the Company, the Option shall vest with respect to 25% of the shares on the first anniversary of the grant date and as to an additional 6.25% of the shares on the last day of every third month thereafter until the Option is vested with respect to all of the Shares. In the event that a more favorable vesting schedule is negotiated or provided for any employee at Invoke (or its successors), that schedule shall be the schedule that supercedes the vesting schedule outlined above. It is estimated that the above calculation is equal to at least 0.5% ownership of Invoke.

These Options shall be treated as an incentive stock option to the greatest extent possible under applicable law.

In addition to salary and commissions, you may take advantage of various benefits offered by Invoke, including 10 days of paid vacation per year and Invoke's group medical plan, dental plan, eye care plan, life insurance, AD&D coverage and 401(k) plan. Invoke benefits, of course, may be modified or changed from time to time at the sole discretion of the Company, and the provision of such benefits to you in no way changes or impacts your status as an at-will employee. Where a particular benefit is subject to a formal plan (for example, medical insurance), eligibility to participate in and receive any particular benefit is governed solely by the applicable plan document. Should you ever have any questions about Invoke benefits, you should ask the Office Manager for a copy of the applicable plan document.

4.    **Termination & Severance.** If at any time your employment with Invoke (or its successors) is terminated for any reason other than cause, you will receive a one-time severance payment equal to three times your then current monthly salary. In addition, you will be eligible for continued participation, paid for by the company, in the company group medical, dental, life insurance and AD&D plan for a period of up to six months. The payments for these benefits will be terminated sooner than six months should you become employed earlier than six months from your last day of employment. At the conclusion of six months participation in such plans, if you

000243

are not yet employed, Invoke will present to you the appropriate information so you may participate and pay for COBRA coverage and other Life Insurance coverage in order to provide medical care and security for you and your family.

In the event that a more favorable Termination & Severance schedule is negotiated for any employee at Invoke (or its successors), that schedule shall be the schedule that supercedes the Termination & Severance schedule outlined above.

Your termination shall not affect earned salary, commission, bonus or other payments earned by you up to you last day of employment with the company.

5.    **Before You Start**.  Your employment with Invoke is conditioned on your eligibility to work in the United States.  On your first day, you must complete an I-9 Form and provide the Office Manager, Mary Tedesco with any of the accepted forms of identification specified on the I-9 Form.  A copy of an I-9 Form is enclosed for your information.

6.    **Confidentiality, Non-Competition and Work Product**.  The Company considers the protection of its confidential information, proprietary materials and goodwill to be extremely important.  Given the confidential nature of various aspects of our business, you may not discuss the fact or terms of this offer or any employment discussions with anyone other than a member of the Invoke management team and members of your immediate family (and, if relevant, your recruiting firm, financial advisor or lawyer).  In addition, as is true of all Invoke employees, you will be required to sign and return an agreement relating to confidentiality, non-competition and work product by no later than your first day of work as a condition of this offer of employment. A copy of that agreement is enclosed for your consideration.

7.    **Miscellaneous**.

Currently, the company anticipates leasing office space in and around the Metrowest Suburbs of Boston.  Regardless of where this office space is finally located, now or in the future, parking for your car, when you need to spend time at the office, will be made available at no cost to you.

As part of enabling your success here at Invoke, we will provide you with a Laptop/Tablet PC for you to use for company business.  We will also make available all necessary printing devices, copy and fax machine and related office supplies.  If it becomes necessary for you to spend a majority of your time working out of a home-based office when you are not working at a client location, the company will make arrangements for all necessary technology and voice and data connectivity so that your home-based office can operate as effectively and seamlessly as any other office environment.

All travel and related expenses associated with the performance of your regular duties as Vice President of Channels and Solution Innovation will be fully reimbursed to you by the company when all receipts are presented to the company for reimbursement.

000244

It is our desire to have you accept this offer letter and begin work as soon as possible. We understand that you have already made prior commitments to time away from work, including January 26-28 and February 16-20. These dates will not be deducted from your annual vacation allotment and any calculations regarding salary, commission, bonus or other will not be negatively affected by your absence during these dates.

This letter constitutes our entire offer regarding the terms and conditions of your prospective employment with Invoke. It supersedes any prior agreements, or other promises or statements (whether oral or written) regarding the offered terms of employment. The terms of your employment shall be governed by the law of the State of New York.

You may accept this offer of employment and the terms and conditions hereof by signing the enclosed additional copy of this letter. Your signature on the copy of this letter and your submission of the signed copy to me will evidence your agreement with the terms and conditions set forth herein. This offer will expire on January 12, 2004, unless accepted by you prior to such date. We are excited to offer you the opportunity to join Invoke and we look forward to having you aboard. We are confident that you will make an important contribution to our unique and exciting enterprise.

Sincerely,


Simon Blanks
Vice President of Sales, Channels and Marketing


Acknowledgment:

I _____ have read, understand, and accept employment on the terms and conditions outlined in this letter. I am not relying on any representations made to me by anyone other than as set forth above.


_____
Signature


_____
Date


000245

# EXHIBIT M

**From:** Rein Jay-REIN
**Sent:** Sunday, January 18, 2004 9:59 PM
**To:** Simon Blanks (E-mail)
**Cc:** Corey Torrence (E-mail); David J. Rubinstein (E-mail)
**Subject:** Thank You

Simon,

Hope you had a successful trip with Millward Brown over in Europe.

At this point, it looks as if we are just a bit apart from where I had to be [compensation-wise] and where the economics for my position needed to be on behalf of Invoke and its stakeholders.

Therefore, thank you for considering me for the opportunity to join the leadership team at Invoke. If opportunities evolve and it does make sense, please do not hesitate to call me. And if my situation changes maybe I too will give you a call, and we can explore what might exist at that point in time.

Take Care,
JSR

―――――――――――――――

**Jay S. Rein**
Motorola Professional Services
*Architects of Intelligent Mobility Solutions*

508-893-6926 – office
847-761-4814 – fax
617-899-2699 – cell
Rein@Motorola.com



000246

# EXHIBIT N

*J. Rein*

EXHIBIT NO. 41
*8·26·05*
L. LONDON

**Date:**    Tue, 4 May 2004 06:03:12 -0700 (PDT)

**From:**    "Jay Rein" <jaysrein@yahoo.com>  ⌘View Contact Details

**Subject:**  RE: Another Attempt at Reestablishing Contact

**To:**     "Paul Zellner-Chicago" <PZellner@russellreynolds.com>

Thank you for the message.  I will call you this afternoon.
JSR

*Paul Zellner-Chicago <PZellner@russellreynolds.com>* wrote:
Jay,

I should be back in the saddle and reachable Monday.   My office number is 312-993-0716.

Sorry I have
-----Original Message-----
**From:** Jay Rein [mailto:jaysrein@yahoo.com]
**Sent:** Tuesday, April 27, 2004 10:45 AM
**To:** Paul Zellner-Chicago
**Subject:** Another Attempt at Reestablishing Contact

Paul,

Yesterday I left a message with your assistant in an effort to make contact [via phone].  Do you
have some time to talk later today?  I am leaving my office now for a quick lunch meeting but I am
available for the remainder of today.

Regards,
JSR

*Jay Rein <jaysrein@yahoo.com>* wrote:
Date: Tue, 6 Apr 2004 13:11:43 -0700 (PDT)
From: Jay Rein
Subject: Reestablishing Contact
To: Paul Zellner

Paul,

Over the past couple of months I have being trying to reestablish contact with you, especially in
light of the recent developments here at Motorola Professional Services and my imminent
departure from Motorola.

I don't want to come across as a pest and I understand that your business is improving and creating a very busy work day for you.  Is there any reason why we shouldn't pick up on where we left off [almost two years ago] when you were assisting in the recruiting effort for Len DeBarros?  During that period in time, I believe that we both came to appreciate and respect each other - what I viewed as the start of a long-term relationship.

Let me know your thoughts...  I hope all is well!

*Regards,*

**Jay S. Rein**

*Mobile    617-899-2699*
*Office    508-893-6926*
*Home    508-893-6925*
*Email    jaysrein@yahoo.com*

000212

# EXHIBIT O

 **MOTOROLA**



February 25, 2004

Jay Rein
75 Johnson Drive
Holliston, MA 01746

Dear Jay,

In follow up to our telephone discussion yesterday afternoon, the following summarizes the severance pay that will be provided to you in conjunction with the termination of your employment from Motorola. To assist in your transition from Motorola, I have also listed pertinent benefits information in this letter, since many changes in the benefits plans take effect upon your employment termination date. A package containing "hard copy" of this letter, along with other reference documents, is being mailed to your home address today via Fed Ex.

Please note, while finalizing the details of the severance benefits with our HR team subsequent to our telephone discussion, we have made the decision to adjust your employment termination date from Monday, March 15, as previously communicated to you by Clyde Kofman, to the end of that workweek, Friday, March 19.

*Severance Pay*

| | |
|---|---|
| Basic Severance: | $31,677.00 |
| Supplemental Severance (requires signing General Release): | $ 7,453.00 |
| Total Severance (if supplemental selected): | $39,131.00 |

Indicated below are the provisions for determining Basic and Supplemental Severance under the Involuntary Severance Plan. In this, as in any documentation regarding this activity, the Involuntary Severance Plan document will be the final source governing clarity of all questions and determinations.

Based on your Employment Termination Date and your Service Club date, you will receive the following benefits under the Basic Severance Allowance:

| Years of Service | Basic Severance Allowance |
|---|---|
| 0 to less than 10 | 8.5 weeks of pay |
| 10 or more | 1 week of pay per year of service |

Credit for partial years of service will be granted based on completed months of service as of your Employment Termination Date.

Based on your Employment Termination Date and your Service Club Date, you will receive the following benefits under the Supplemental Severance Allowance if the General Release is signed and returned to Human Resources within the required time frame (and not revoked):

| Years of Service | Supplemental Severance Allowance |
|---|---|
| 0-6 | 2 weeks of pay |
| 7 | 2.5 weeks of pay |
| 8 | 3.5 weeks of pay |
| 9 to less than 10 | 4.5 weeks of pay |
| 10 to less than 20 | 1 week of pay per year of service |
| 20+ | 2 weeks of pay per year of service |

Credit for partial years of service will be granted based on completed months of service as of your Employment Termination Date.

Severance allowance is taxable income and will be taxed at the 28% federal tax rate, plus any applicable state and FICA taxes.

000076

A sample General Release form is included in the information packet that is being mailed to your home address today. The actual General Release is prepared by Motorola's Legal Department, and will be mailed to you under separate letter within the next few days.

## Vacation

Remaining and accrued vacation will be paid within 3 weeks of your Employment Termination Date and sent to your home address.

## Medical Coverage

Your current active medical coverage will continue through the end of month in which your Employment Termination Date occurs.

### Non-Retiree

- If you were a participant in the Health Advantage Plan or an HMO you are eligible for medical continuation at the regular active employee rate under the Involuntary Severance Plan through the end of the month in which your severance period ends.

| Years of Service* | Basic Severance Medical Benefits | Supplemental Severance Medical Benefits (with Release) | Total Severance Medical Benefits Available |
|---|---|---|---|
| 0 to less than 10 | 2 months | 2 additional months | 4 months |
| 10 or more | Through end of month in which Basic Severance period ends. | Through end of the month in which Supplemental Severance period ends. | Through end of the month in which total severance period ends. |

*Based on completed years and completed months of service.

- Payment at the regular active employee rate must be received by the first of each month, starting with payment for the month following your Employment Termination Date. For example, if your Employment Termination date is March 14 and you have Health Advantage Plan Family Coverage, you must submit payment of $99 before April 1, 2004, in order to continue medical coverage.
- Subsequent payments should be made for as long as you choose to continue medical coverage through your severance period whether or not you receive a bill. Submit payment, underlined{referencing your Social Security Number}, to:

      Motorola Premium Payments
      P.O. Box 4306
      Carol Stream, IL 60197-4306

## COBRA

- In addition, once your medical coverage ends, you will automatically receive a packet of benefits-related information from the Motorola Rewards Administration Center (RAC) regarding continuing coverage under Federal Law known as COBRA (Consolidated Omnibus Budget Reconciliation Act). For your information, the current COBRA rates are enclosed.
- You will have 60 days from the day coverage would otherwise end (or from the day the notice is sent to you, if later) to choose continuation coverage. If you do not choose to continue coverage, you should make the appropriate election on the election form and return it to the RAC.
- If you elect benefit coverage, the benefits will begin the first of the month after your continued medical coverage under the Involuntary Severance Plan ends, provided payment is made within 45 days of your election.
- Your first payment must include the cost of coverage for the entire period from the date coverage ended through the date of the payment. Subsequent contributions are due on the first of the month whether or not you receive a bill. Please contact the Rewards Administration Center (RAC) at 1-800-421-3973 if you have any questions or do not receive the packet.

## Dental Coverage

- Your coverage under the **Motorola Dental Plan** automatically stops at midnight on the last day of the month your employment with Motorola ends. In approximately 3 weeks you will receive a packet of information regarding continuing dental coverage under COBRA. Please contact the Rewards Administration Center at 1-800-421-3973 if you have any questions or do not receive the packet.

000017

3

## Reimbursement Accounts

- Health Reimbursement Account (HRA) contributions will stop as of the last day of the last pay period before your Employment Termination Date. However, eligible expenses must be incurred by the last day of the month in which your Employment Termination Date occurred.
- Any HRA eligible expenses incurred after the last day of the month in which your Employment Termination Date occurred will not be eligible for reimbursement, unless you elect to continue HRA coverage through COBRA (available only through the end of the year in which you terminate). If you participate in HRA, you will receive COBRA information directly from the RAC shortly after your Employment Termination Date.
- Expenses for your Dependent Care Account (DCA) will be reimbursed through the end of the plan year, regardless of termination date, up to the amount that had been deducted from your pay at the time of termination.
- The Rewards Administration Center (RAC) in Phoenix, Arizona must receive requests for reimbursement of eligible HRA and DCA expenses incurred in 2003 no later than April 1, 2004. For eligible expenses incurred in 2004, the same rule applies, however submission deadline is April 1, 2005. All claims should be sent to the Motorola Rewards Administration Center, P.O. Box 29005, Phoenix, AZ 85038-9005. Questions should be directed to the RAC at 1-800-421-3973.

## Other Insurance

- Your insurance coverage under Base Life, Supplemental Life, and Dependent Life will be discontinued on the last day of the month in which employment ends. There are conversion rights for Base Life, Supplemental Life, and Dependent Life Insurance. You must apply for the conversion within 31 days of your termination date. Refer to the "Life Goes On" pamphlet in your folder. Completed applications should be sent to Mutual of Omaha at the address on the back of the application. Questions should be directed to the RAC at 1-800-421-3973.
- Accidental Death & Dismemberment, Travel Accident, Short Term Disability and Long Term Disability Insurance end on your last day worked. There are no conversion rights.
- Your participation in Long-Term Care Insurance can continue with no change in level of coverage or premiums. Arrangements can be made for direct premium billing by contacting CNA at 1-800-213-1237.

## Pension Plan

- You are eligible for the Pension Plan once you have completed one year of service and have worked at least 1,000 hours. You are 100% vested (entitled to receive a benefit) after 5 years of completed service or age 60 with 1 year of completed service.
- Your Payment Options (Benefits under $5,000 are paid in lump sum if vested):

<u>Portable Plan (Payable upon termination):</u>
-Lump sum payment
-Single Lifetime Annuity
-Lifetime with 10 years Certain Annuity
-Joint and Survivor Annuity with 50%, 75%, or 100% to survivor

<u>Traditional Plan (Payable at age 55 or older):</u>
-Single Lifetime Annuity
-Lifetime with 10 years Certain Annuity
-Joint & Survivor Annuity with 50%, 75%, or 100& to survivor

- Your final Pension benefit will be calculated 31 days after your Employment Termination Date. You will not be able to request a distribution until the final calculation has been done. For all information regarding your Pension Plan distribution options you must contact the Participant Service Center at 1-800-585-5100.

## 401(k) Profit Sharing Plan

- If the vested value of your 401(k) Profit Sharing Plan account is $5,000 or less, the funds will automatically be paid to you with the appropriate taxes withheld. If you wish to execute a direct rollover you must contact the Participant Service Center at 1-800-585-5100 within 30 days of your termination.

## 401(k) Profit Sharing Plan-continued

- If you do not request a payment option, your vested balance will be held in the Plan until you request a method of payment. If you have terminated employment and you reach age 70 _, the Plan requires that you begin taking distributions by April 1st of the following year.
- If the vested value of your account is greater than $5,000, you may choose one of the following payment options:

| Hired Before 1-1-96 | Hired After 1-1-96 |
|---|---|
| -Lump Sum | -Lump Sum |
| -Direct Rollover | -Direct Rollover |
| -Partial Distribution | -Partial Distribution |
| -Installments | -Combination of above |
| -Combination of above | |

- If you would like to withdraw or transfer the funds, you will need to contact the Participant Service Center at 1-800-585-5100 or visit http://www.retirementpassport.com/0823.
- All payments will be mailed to your home. If you request a direct rollover to another qualified plan, it will be your responsibility to forward the check on to your rollover institution.
- If you currently have a loan from your 401(k) Profit Sharing account you will have 30 days from your termination date to pay any outstanding loan balances. If you do not pay off your loan balance, the outstanding loan balance plus interest will automatically be considered taxable income to you in the year you terminate. You will receive a 1099 Form from Northern Trust and will have to include this amount as income on your April tax return. Questions on loan repayment should be directed to the Participant Service Center at 1-800-585-5100.

## MOTshare

- If you leave Motorola prior to the end of a current MOTshare offering period, you will be withdrawn from the Plan and any accumulated payroll deductions from the current offering period will be returned to you without interest.
- Your MOTshare account will be retained with Salomon Smith Barney until it is closed (request a stock certificate for your shares, sell your shares, transfer your account to another broker, etc.).
- If you have questions about your shares you may contact Salomon Smith Barney at 1-877-211-1821 or visit http://www.benefitaccess.com.

## Incentive Pay Plan

- Your participation in the Incentive Pay Plan will end as of your termination date. You must be on the "active" payroll through the last day of December to be eligible for an incentive payment.
- If you are on the Sales Incentive Plan, incentive payments will be prorated for the quarter.

## Stock Options

Separation of employment will impact your ability to exercise stock options granted you by the Corporation. This does not include any stock you own either through MOTshare or stock acquired through Motorola's Profit Sharing and Investment Plan. Please review any information provided you by the Motorola Stock Option Department. These include:

- Optionee Detail Report – lists all options you have been granted, those that have been exercised, and those that are still available for exercise.
- Right to Exercise Stock Options After Separation of Employment with Motorola – is a termination matrix outlining how your stock options are impacted various types of terminations.

Any question you may have regarding your stock options should be directed to the Motorola Stock Options Department and/or your personal financial counselor/planner.

## Change of Address

If you have a change of address please call the Employee Solution Center at 1-877-874-7721 as soon as possible. Several pieces of information, including your W-2 form, will be forwarded to you by mail.

5

*Motorola Employee Credit Union*
If you are a current **Motorola Employee Credit Union** (MECU) member you may continue membership for life. Contact the MECU at (847) 576-5199 if you need to make alternate arrangements for loans, canceling accounts, or change of address.

*Outplacement*
You will receive outplacement assistance. Our outplacement provider, Drake Beam Morin (DBM), has offices located nationwide. We have arranged for a representative from DBM to contact you later this week to further explain the services.

Please call me at my office (847-576-8746), at your convenience, if you would like to review the contents of this document in greater detail.


Peter J. Tobin
Director of Human Resources
CGISS – ISD / IMS / GMSG / Strategy / Finance

000010

# EXHIBIT P

J. Rein
EXHIBIT NO. 15
8-26-05
L. LONDON

March 11, 2004

Mr. Jay Rein
75 Johnson Drive
Holliston, MA 01746

Re:   Separation and Release Agreement

Dear Jay:

    This will confirm our agreement with respect to your separation of employment effective May 31, 2004. Please read this letter carefully and return a signed copy to me if you agree with the conditions set forth herein. If you sign this agreement, it will operate as a binding contract between you and Motorola.[1]

    1.   Motorola agrees that you shall not be required to report to work beginning March 15, 2004. In exchange for your execution and non-revocation of the agreements contained herein, Motorola agrees to keep you on payroll until the effective date of your separation. Between March 15 and your separation date, Motorola will allow you to keep your access to its computer network, as well as your office space and office tools, including voicemail (subject to all applicable policies), as if you remained actively employed. In addition to signing and returning a signed copy of this letter to me, you will reaffirm this agreement by signing and not revoking **Attachment A**. Any accrued and unused vacation pay owed to you by Motorola will be paid separately and is not a part of this Separation agreement.

    2.   Motorola agrees to provide you career continuation services from Drake Beam Morin for a period of three months from the effective date of your separation.

    3.   You agree that neither this agreement nor the act of entering into the agreement constitutes an admission by Motorola of any: (a) violation of any statute, law, regulation, order or other applicable authority; (b) breach of contract, actual or implied; or (c) commission of any tort.

    4.   You give up, release, and waive any and all claims you have or might have, of any kind, on behalf of yourself or any other person or entity, against Motorola or its agents relating in any way to your employment with Motorola, and your separation from employment, or any event, that occurred on or before the date you sign this letter. These claims include specifically, but are not limited to, any claim under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Older Workers Benefit Protection Act, the Family and Medical Leave Act, and any federal, state, or local statute or ordinance; and any claim arising under any common law principle or public policy; and any claim under Motorola's Human Resources policies. You understand that you are not waiving any claim or right that cannot be waived by law.

    5.   You acknowledge that, by signing this letter, you are giving up any claim or right to receive payments or benefits under any Motorola voluntary or involuntary severance plan.

    6.   You acknowledge that you remain bound by the Employment Agreement you previously signed, and promise to return to Motorola, on or before your last day of employment, all Motorola proprietary and confidential materials and information, and all other Motorola property in your possession. You further agree to maintain the confidentiality of Motorola's confidential and proprietary information. You

---

[1] As used in this letter, "you" and "your" refers to yourself and your spouse, attorney(s), agents, heirs and representatives. "Motorola" means Motorola, Inc., its subsidiaries, affiliate companies, joint ventures, and the respective directors, officers, agents, employees and successors of each of them.

also acknowledge that the effect of your separation and this letter on your

Mr. Jay Rein
Page 2

coverage, rights and duties under any Motorola benefit or compensation plans depends on the terms of those plans, and the interpretation of the appropriate plan administrator, not this letter.

7. You agree not to apply for or accept employment or work in any capacity (e.g., as a consultant, contractor, or temporary employee) at any Motorola facility for a period of twelve (12) months following the effective date of your separation.

8. You agree that the terms of this agreement and the discussions that led to its creation and execution are to remain strictly confidential and shall not be disclosed or communicated to any person, unless disclosure is required by law or a court order. You may, however, disclose the terms of this agreement to your tax preparer and immediate family members, who must maintain the confidentiality of this agreement. A breach of this provision shall be considered a material breach.

9. You promise that you will not make disparaging remarks about Motorola, or its products, policies or employees.

10. At the time of your separation, you will be eligible, under a federal law known as COBRA, to continue your current Motorola health benefits -- at your expense -- for a period of up to eighteen (18) months. Note, however, that in order to ensure proper coverage under COBRA, it is your responsibility to apply for COBRA continuation, to pay the premiums and to maintain eligibility under COBRA and the applicable plan.

11. Among the claims you agree will be waived by signing this letter is any claim that Motorola has discriminated against you because of your age. Under the law we must give you twenty-one (21) days to decide whether or not you want to accept this offer. You understand and agree that any material change to the initial terms of this letter agreement shall not restart the running of this twenty-one (21) day period. Also, if you sign this letter, you will have seven (7) days afterward to revoke this agreement, if you so desire, by notifying me in writing at Motorola, Inc., 1301 E. Algonquin Road, Schaumburg, IL 60196, within the seven (7) day revocation period. If you timely cancel or revoke this agreement, you agree to return to Motorola the monetary value of the period during which you will be allowed to remain on payroll beyond the previously established separation date of March 19, 2004, within 30 days of the date of revocation.

If you sign this letter agreement, it will become a legal contract between you and Motorola with important consequences for both you and Motorola. In addition, your signature will be your acknowledgment that you have freely and voluntarily agreed to the terms in this letter and have not been coerced or subjected to any duress by Motorola to do so. In addition, your signature will be your acknowledgment that you are advised, by this writing, to consult with an attorney before signing this letter; that you have relied on your own judgment regarding the consideration being given for your promises and agreements and the language contained in this letter; that you have read and understand the terms of this letter; that the consideration you are to receive is in addition to any you are otherwise entitled to receive; that this letter resolves all matters between you and Motorola; that it has been individually negotiated and is not part of a group incentive or other termination program; that you understand that this letter includes a general release of claims against Motorola; and that no statements made by Motorola have in any way coerced or unduly influenced you to sign this letter.

If this offer is acceptable to you, please sign where indicated below and return it to me. Your signature below means you have freely and voluntarily agreed to the terms of this letter. If you have questions, please feel free to contact me.

000063

Very truly yours,

Chris Theros
Corporate Vice President and Director, Human Resources,
CGISS

I accept and agree to all of the above:

_____
Jay Rein
Social Security or Commerce ID #_____
Date: _____

000034

**ATTACHMENT A**
SECOND WAIVER

1. In consideration for the promises made by Motorola in the Separation and Release Agreement dated January 6, 2004, to which this is Attachment A, I hereby release, acquit, and forever discharge Motorola (as defined in the attached letter) of and from any and all, known or unknown, actions, causes of action, or claims of whatever nature I may have arising out of or related to my employment by Motorola and my separation therefrom, from the date of my Separation and Release Agreement with Motorola through the date I sign this Attachment A, including but not limited to, any claim under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Older Workers Benefit Protection Act, the Family and Medical Leave Act, and any federal, state, or local statute or ordinance; and any claim arising under any common law principle or public policy; and any claim under Motorola's Human Resources policies. I understand that I am not waiving any claim or right that cannot be waived by law, including the right to file an administrative charge of discrimination.

2. I acknowledge that I have been advised in writing by Motorola to consult with an attorney before signing this waiver, that I had at least twenty-one (21) days to consider this waiver before signing it, and that I will be able to revoke this waiver for up to seven (7) days after signing it. If I do decide to revoke this waiver I will advise Chris Theros, Motorola, Inc., 1301 E. Algonquin Road, Schaumburg, IL 60196, by letter postmarked within the seven (7) day period.

3. I warrant and represent that I have relied solely on my own judgment and that of any legal counsel I have consulted regarding the consideration for and the language of this waiver; that I have been given sufficient time to consider this waiver and to consult with counsel of my own choosing; and that no statements made by Motorola have in any way coerced or unduly influenced me to execute this waiver.

Jay Rein

_____

Social Security or Commerce I.D.#_____

Date _____
(To be signed after [insert effective separation date], 2004)

000035

# EXHIBIT Q

**Rein Jay-REIN**

J. Rein
EXHIBIT NO. 46
8-26-05
L. LONDON

| From: | Rein Jay-REIN |
|---|---|
| Sent: | Monday, March 15, 2004 11:59 AM |
| To: | Tobin Peter-APT010 |
| Subject: | My notes from our discussion today |
| Sensitivity: | Private |

Tracking:    **Recipient**        **Delivery**

Tobin Peter-APT010 Delivered: 3/15/2004 11:59 AM

Again, it is my hope and desire to find alternative opportunities within Motorola, yet as we agreed, this path must also be worked.

Thank you for your help.

JSR

_____

1)   On October 17, 2003 Juergen Stark indicated to me and my colleagues of MPS that he was in full support of the MPS Business Plan for 2004, submitted to him on this same day.  He indicated that he supported the Plan and the Team (of five individuals, including myself) that presented the Plan.  At the same time, he also indicated that we will have to take a hard look at the results that the team has generated by June 30, 2004 and if the commitments made by MPS on October 17 were not being met, we would have to make some hard decisions about the future of the group.  As a follow-up to this meeting, Juergen Stark returned back to the same meeting room ten minutes after the meeting ended, where the MPS Team was still meeting, and reiterated the following... I mean it guys, I want you all to be excited about the future and that I really do support you and the vision for MPS.  The interpretation of these interactions with Juergen Stark is that MPS has until June 30, 2004 to generate significant results against the Plan submitted on October 17, 2003.

2)   On January 2, 2004, Motorola paid to me a $14,000 Retention Bonus, as indicated on the January 2, 2004 payroll stub.

3)   On January 13, 2004, Clyde Kofman added the following comment to my PC Summary for 2003... "2003 was a challenging year. Many changes and little leadership direction contributed to the challenges. 2004 brings an opportunity for Jay's capabilities to come through more clearly and for MPS to continue to create value for CGISS."  The *many changes and little leadership direction* refer to the fact that in 2003, MPS lost the executive leadership and support of Kevin Loosemore, Len DeBarros and the highest levels of support from support of Ed Breen (who departed Motorola in 2002).  Also, for a period of time from May 2003 through August 2003, MPS was without a committed leader and executive support.

4)   On January 18, 2004, I turned down an offer to become an executive at a Bain Ventures portfolio company.  I made this decision based upon verbal commitments from Juergen Stark made October 17, 2003, a "Retention Bonus" paid to me at the start of 2004, and Clyde's written PC Summary comments and other oral commitments in support of the business plan presented to Juergen Stark in 2003.  This opportunity with Bain Ventures no longer exists today as the position has filled by another individual.

5)   On February 13, 2004, Juergen Stark makes the following comments in an email to all of the employees for which he has responsibility... "It has been an exciting and positive January from several perspectives. First and hot off the presses, we made our numbers for the month, which is fantastic!  We met the commitment we made to ourselves and to CGISS/Motorola, and I expect this trend to continue.  Thank you for your efforts to meet our customer commitments, close orders, deploy projects and control spending!"

000142

6) Up to my last day of work before commencing a one-week vacation on February 14, 2004, there was no indication that my career with Motorola was in jeopardy. In fact, various meetings with a consultant (VDC) performing work on behalf of MPS were intentionally scheduled for February 23 in order to ensure that I was back from vacation and available to participate in these meetings.

7) On February 23, my first day back from vacation, Clyde Kofman informed me via phone that I was being terminated. This occurs upon my landing at O'Hare for the previously mentioned meetings with VDC. Clyde Kofman indicated... we have decided that there is a salary imbalance and the group is top-heavy so we have decided to target your position for elimination. Please call HR for more details on your separation package.

8) On February 24, Juergen Stark indicated to me that indeed, my position was being eliminated because the group leader has decided to take my salary, which is paying me for (1) business development and (2) delivery of Mobility Solutions, and hire up to two additional delivery FTE's at a much lesser salary - the implication being that the heads would be less costly than me and probably younger. He indicated that there is a "level" and salary imbalance within MPS and that by eliminating my position and hiring less expensive personnel some of this imbalance would be eliminated. As my performance on-the-job at Motorola "Consistently Met Performance Expectations" Juergen Stark and Clyde Kofman could have explored [at least] two alternative options to alleviate the salary and level imbalance. Option (1) could have been to ask me to assume greater responsibility - increasing the overall efficiency of operation MPS. Option (2) could have been to ask me to take a short-term salary reduction until group revenue and utilization improved to a point where my salary level could be reinstated. Neither of these options were presented to me. As one more point of reference, my salary is not the highest salary of the group that creates the supposed salary imbalance. The next highest salary of an employee at the same E15 level within MPS is more than 50% greater than my salary.

9) It was also indicated to me during this meeting with Juergen Stark, that by eliminating my position, he would do away with the problem of [my] operating out of a home-office in Holliston, MA, a situation that he never liked. In fact, Juergen also indicated that he did not like the fact that my peers resided and worked in St. Louis, Atlanta and Virginia. As related to myself, I never knew that this situation was a problem for Juergen Stark. My home-office was part of my condition of employment when recruited to Motorola Professional Services by Russell Reynolds under the prior leadership of Kevin Loosemore and Len DeBarros. If the home-office was a problem, no one ever indicated this to me and as one potential remedy, no one ever asked me if I would consider relocating in order to "solve" this problem.

10) At this same meeting with Juergen Stark, I raised the fact that all my PC reviews from 2002 and 2003 were without negative comments surrounding my performance or behavior on the job at Motorola. I have never been put on a performance improvement plan and never been coached or counseled about modifying my on-the-job behavior or performance.

11) Finally, I feel as though I have not been treated fairly and appropriately represented in Motorola's bi-weekly Leadership and Talent Supply call at which E14/E15 level positions are discussed and reviewed relative to internally qualified candidates. While I might be systematically represented amongst the thousands of E14/15 employees within Motorola, it might have been much more professional and effective if HR immediately (on or around February 23, 2004) made an introduction for me to meet with Paula Hubbard, the CGISS HR representative for this committee. With this introduction I could have had an opportunity to begin to dialog with hiring leaders within Motorola, facilitated by Paula Hubbard. My first introduction with Paul Hubbard is not scheduled to occur until March 15, 2004 - a full three weeks after my initial notification of termination.

---

All of the above points when considered together, are the basis for my issues below:

1) The rehiring of skills [which I possess] at a lower salary level without discussing reasonable alternatives,

2) No attempt to previously indicate problems and offer remedies associated with my office location,

3) Oral commitments made and broken, regarding a June 30, 2004 milestone to review progress of the MPS Team towards the Business Plan,

4) The payment of a retention bonus and my subsequent decision to forego a significant non-

Motorola employment opportunity based upon written performance reviews and commitments to allow the MPS group to generate results for Motorola.

**Jay S. Rein**
Motorola Professional Services
*Architects of Intelligent Mobility Solutions*

508-893-6926 - office
847-761-4814 - fax
617-899-2699 - cell
Rein@Motorola.com

000144

3/17/2004

# EXHIBIT R

**From:** Kofman Clyde-KOFMAN
**Sent:** 01/19/2004
**To:** Rein Jay-REIN; Gillardi John-GILLARDI; Brice Clay-ACB115; Humpleby Michael-HUMPLEBY
**Cc:**
**Bcc:**
**Subject:** MPS Kick-off Session Takeaways and To Do's

MPS TEAM:

As a follow up to our meeting last week, this note summarizes key takeaways from the meeting as well as items requiring follow up.

To start, I want to thank each of you for participating in our session. I feel as though we made good progress and our objectives are clearer, but we still have a long way to go to reaching our financial commitments. As we discussed during the session there are a few key actions items that require follow up to better position us to win in 2004. Listed below are the action items and responsible party along with due dates. Please review the list and let me know if you have any questions. Otherwise, please submit to me the materials on the dates listed below. After review and discussion with the responsible party we will socialize with the entire group

Follow up Items

Self-Directed Business Development Plan -- A plan that outlines what and how we could approach development of new business outside of the VDC, Sector Referral or SMD Client Mining channels. Jay Rein - Due Date Jan. 23rd. 2004.

Clarity on New Offerings -- This item represents finalizing MPS offerings for THINK engagements as well as other complimentary services offered by CGISS (i.e., alignment between MPS and CGISS). This item also includes updating the Mobility Evolution chart to focus on strategy and simplify the chart. John Gillardi - Due Date Jan 31st, 2004.

Field Service Mobility (FSM) Definition and Solution Components -- This item represents MPS's best thinking on what we mean by Field Service and the range of solutions that we will pursue to help clients win in FSM. Clay Brice - Due Date Jan 23rd, 2004.

Express Link Opportunity - This item is the summarization of the effort regarding Express Link in preparation for a meeting with Juergen Stark. Meeting objective is to present broad opportunity to CGISS and obtain clarity on how it fits, or does not fit into Enterprise Mobility Strategy and what group is best suited, if any, to own this opportunity going forward. Jay Rein and Clay Brice own preparing for the meeting. Meeting Scheduled for Tuesday, January 20th, 2004 with Juergen Stark.

MPS 2004 PC Goals and Incentive Plan - This item represents building out how the incentive plan aligns with the team goals for 2004. Clyde Kofman - Due Date February 28th, 2004

Skill Profile for additional Hires -- This item represents a listing of critical skills and experiences we need as a team to complement our existing skills and experiences to win in the market. All Team Members - Due Date - Jan. 31st, 2004 All team members to submit a list of critical skills and description of experiences required and potential target companies to go find the resources.

Additionally, all team members are asked to reserve February 11th - 13th for Sales Training in Chicago. This training will be conducted in conjunction with SMD Resources.

Let's Stay Focused on Go Win in 2004.

CLYDE



# EXHIBIT S

**From:** Stark Juergen-AJS131
**Sent:** 02/04/2004
**To:** Kofman Clyde-KOFMAN
**Cc:**
**Bcc:**
**Subject:** RE: Heads Up — Express Link

---

ok

-----Original Message-----
From: Kofman Clyde-KOFMAN
Sent: Tuesday, February 03, 2004 7:13 PM
To: 'Stark Juergen-AJS131'
Subject: Heads Up — Express Link


Juergen,

I read Jay's note below. I plan on calling him tomorrow to discuss several points in the note. I have concerns over his ability to stay focused. I have drafted the note below in red (not sent) to give you a heads up on my thinking. I will discuss the situation with Jay, and will follow up with a note to document the conversation. If Jay has interest in pursuing a different career path, than I will support the exploration.

Stay Tuned.

CLYDE


-----Original Message-----
From: Rein Jay-REIN
Sent: Tuesday, February 03, 2004 3:36 PM
To: Stark Juergen-AJS131
Cc: Kofman Clyde-KOFMAN; Brice Clay-ACB115; Webb Janiece-CNTL99; Greer David-G19617
Subject: Update on ExpressLINK as promised

Juergen,

Yesterday, Clay Brice and I spent a fair amount of time with Janiece Webb and other colleagues at Deer Park. Here is an update on the status of various opportunities:

1. Janiece and her immediate Team are interested in pursuing the Yard Management Opportunity at ExpressLINK. At the conclusion of various meetings this week with WhereNet and other prospective partners in the RFID Tag Solution Space, Janiece expects to contact us with potential next steps. It is not yet clear whether we will merely hand this opportunity off OR whether there is a paid-for potential for myself and Clay to remain engaged. As we learn more and have choices to make, we will evaluate the best next steps for MPS and present those opportunities for your consideration.

2. There is another group within IESS that might be interested in the consumer-based, aftermarket telematics opportunity with ExpressLINK. For this opportunity, we are trying to schedule an introduction between IESS and

EXHIBIT
Kofman 10
10-21-05  KK
PENGAD 800-631-6989

ExpressLINK. If IESS is interested, we will quickly transition to this group which is more appropriately organized to develop and manage this opportunity. If this group in IESS is not interested after a meet and greet with ExpressLINK, MPS will quickly divest ourselves of this aspect of the ExpressLINK relationship and move on.

3. One other outcome of our interactions with Janiece generated some unexpected opportunity. Her group has two enterprise opportunities which have been generated by a prospective acquisition candidate (a software entity in the SCM space) for Motorola Inc. Janiece may need some professional services assistance with mobility opportunities at both Aventis Pharmaceuticals and Timberland, Inc. — both in the THINK phase of client engagement. I have asked Janiece to forward information on these opportunities to us. If there is a way for us to assist her team while also propagating MPS's focus on Field Service Mobility Solutions, we will quickly assess the opportunities and present them to you for your consideration.

If you have any questions, please feel free to call... else we will contact you when we have meaningful and relevant information for you to review.

JSR

---------------------------------------------

Jay S. Rein
Motorola Professional Services
Architects of Intelligent Mobility Solutions

508-893-6926 - office
847-761-4814 - fax
617-899-2699 - cell
Rein@Motorola.com

Jay,

Thanks for following up on the ExpressLINK opportunity. As you know, this opportunity, while potentially attractive to Motorola, is outside the focus area of MPS. I recognize you have a great deal of time invested in this account and it seems as though you have passion around the asset tracking solutions.

Please let me know if you are interested in pursuing these type of opportunities full time. If yes, I will explore with Janiece the opportunity for you to work in her group. If no, than please stay focused on Field Service Opportunities. Specifically,

Point 1 - Yard Management is not of interest to MPS, even if there is a paid engagement, as it is a distraction;

Point 2 — I believe we have done a solid job of being a good corporate citizen and do not want us to continue to expend energy looking for others across Motorola who might be interested. Janiece is aware of the opportunity and can adequately shop it around IESS. I am concerned about this thing never ending; and

Point 3 — Please follow up on these opportunities to quickly evaluate any linkage to Field Service Mobility and discuss them with me so I can determine how they best fit into the pipeline.

Call me if you have any questions. Otherwise, I look forward to learning more about any potential Field Service opportunities.

CLYDE

MI2-000375

# EXHIBIT T

REDACTED

-----Original Message-----
From: Kofman Clyde-KOFMAN
Sent: Wednesday, February 11, 2004 5:38 PM
To: Stark Juergen-AJS131
Subject: Pre-read IMS Update -- CONFIDENTIAL

Juergen,

Attached is a 2 page update. If possible, please review before our 1:30 discussion tomorrow.

See you then.

CLYDE

_____

1 Attachment



EXHIBIT
Kofman 11
10-21-05   KK

MI2-000424

IMS Update
February 2004

The Intelligent Mobility Solutions Consulting Group (IMS) was formed as an off-shut of the old Motorola Professional Services (MPS) organization in December 2003. Its mission is to provide strategic advisory services to clients interested in Field Service Mobility (FSM). While, it is uncertain whether this business can be profitable on a standalone basis, its value to CGISS lies in its ability to help clients think through mobility challenges thereby accelerating adoption and creating "pull through" opportunities for other CGISS products and services. Additionally, the value of this group lies in developing a new, more consultative face to enterprise clients, where Motorola thinks clients first and products next.

Since December, we have had some early success but still have a long way to go. Highlights include:

- Secured first FSM consulting engagement (~ $100,000) -- Terminix Mobility Roadmap
- Generated ~ $150,000 of pull through revenue (2/3 hardware, 1/3 deployment services) at 50+% margins
- Leveraging Terminix deliverable into foundation for thought leadership

Also, during this time (I took over the group in mid-December) I have worked to better understand the market opportunities, customer needs, existing operating model and current resources. Through interviews, discussions, market analysis and personal observation several complicating factors arose. Key complications and mitigation plan include:

| Complications | Mitigation Plan |
|---|---|
| Broad market focus with limited resources | Identified key area of focus - that is Field Service Mobility within a few verticals – utilities, transportation and service companies |
| Potential competition with other internal CGISS organizations | Established IMS as a cost center, with revenue targets to eliminate internal conflicts |
| Limited funnel with slow velocity | Engaged leading mobility research firm to accelerate lead generation -- 15 qualified FSM leads due by late February |
| Difficult to build a team with geographic dispersion of resources - five resources, five cities | See below |
| Difficult to deliver more than one consulting engagement at a time due to mix issues - top heavy in resources | See below |
| Limited Field Service Domain expertise | See below |

MI2-000425

IMS Update
February 2004

In an effort to accelerate our progress, deepen our domain expertise and minimize our delivery risk, I believe changes to the group are necessary. Further complicating these organization mix and skill issues is a continuing behavioral issue with Jay Rein. Considering all of these points, I plan to execute the following items to address the organizational mix and skill issues:

1. Immediately eliminate Jay Rein's (E -15) position. The group is top heavy, and adequate leverage cannot be achieved. Eliminating one of the two E15 positions will enable formation of effective delivery teams. As this position is being eliminated at this grade level, Jay Rein will be terminated as a result. I do not recommend keeping Jay in this group in a lower grade level, nor do I recommend attempting to move him to another E15 position. Based on review of the 2003 RPA materials, feedback from 4 - 6 CGISS Go to Market team members and my own experiences, it is clear that Jay does not exhibit the "4e's +1" leadership behaviors required of Motorola staff at his grade level. Examples include:
   □ Edge – poor respect for others - often confrontational and argumentative - speaks in absolutes, tends to rub others the wrong way
   □ Execute – inability to stay focused and at times his actions and words comes across as desperate (i.e., focused on saving his job first)
2. Immediately embark on a search for 2 - 3 Chicago based delivery type resources (E -11 to E -13 grade levels) with strong analytical and logic skills as well as Field Service Domain expertise. Work with HR to line up potential candidates. These positions will permanently replace the E15 position eliminated above.

We have many hills to conquer as we build this business, and the actions articulated above, along with the earlier described mitigation plans will help keep us focused and deliver on our commitments.

I look forward to discussing these point as well as others with you on February 12th, 2004.

# EXHIBIT U

13

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

SUPERIOR
COURT
CIVIL ACTION
NO. 98-1949

WILLIAM T. NASON and
JANICE E. NASON

vs.

REVLON a/k/a NORTH AMERICAN
REVSALE, INC.

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiffs, William T. Nason ("Mr. Nason") and his wife, Janice E. Nason ("Mrs.

Nason"), brought this action against Mr. Nason's former employer, Revlon a/k/a North American

Revsale ("Revlon"), alleging age discrimination under G.L. c. § 151B.[1]  Defendant now moves

for summary judgment.  For the reasons set forth below, the motion for summary judgment is

allowed.

### Background

The following are the undisputed material facts.  In 1993, Revlon, a cosmetic and beauty

care company, underwent a reorganization of its Beauty Care Division, which distributed and

sold its products.  The division was broken into three territories: the East, the South-Central and

the West.  The East territory was further subdivided into two regions: the Northeast and the Mid-

Atlantic/Southern.  Prior to the reorganization, Mr. Nason, an employee of Revlon since 1973,

had been a District Manager responsible for sales and managing employees and brokers.  As a

---

[1] Mrs. Nason's claim is for loss of consortium arising out of the alleged discrimination.



result of the reorganization, he was demoted to the position of a Territory Manager (TM) and his only responsibility was to sell beauty care products to those accounts in the Northeast Region which were assigned to him. Additionally, Mr. Nason was required to report to the District Manager in his region.

In October 1995, Revlon instituted more changes to its sales operations. In an attempt to create a smaller salesforce which focused only on its large accounts, Revlon reorganized the Beauty Care Division once again and reduced the number of salespeople in that division. Any accounts with a small sales volume or which distributed products through a broker or wholesaler were "outsourced" to brokers and wholesalers. Those accounts were no longer managed or sold by Revlon salespeople.

As a result of the second reorganization of the Beauty Care Division, all Territory Manager and District Manager positions were eliminated. New Regional Account Manager ("RAMs") positions were created. The primary responsibility of the RAMs, similar to that of the previous Territory Manager position, was to sell to the large key accounts. The RAMs were not responsible for managing salespeople or brokers, nor did they have any employees reporting to them.

Prior to the second reorganization, there were a total of ten (10) Territory Managers (TMs) in the East, including Mr. Nason, and two (2) District Managers. Of the ten (10) TMs, four (4) TMs were over forty (40) years old and six (6) TMs were under forty (40) years old. After the second reorganization, only three (3) TMs were retained as RAMs. One of the TMs retained was over forty years old and managed two of Revlon's largest accounts, which together generated more than 1.9 million dollars in sales. The other two (2) TMs were under forty (40) years old. Mr. Nason, who was fifty-eight (58) years old and managed some of Revlon's

smallest accounts, was not retained. One (1) District Manager, who was over forty (40) years old, was also retained as a RAM. Mr. Nason's discharge constitutes the basis of this action.

## Discussion

### I. Summary Judgment Standard

This court grants summary judgment when there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. *Cassesso v. Commissioner of Correction*, 390 Mass. 419, 422 (1983); *Community Nat'l Bank v. Dawes*, 369 Mass. 550, 553 (1976); Mass. R. Civ. P. 56(c). If the pleadings, depositions, answers to interrogatories and admissions on file, along with affidavits, if any, demonstrate there are no genuine issues of material fact, summary judgment is appropriate. Mass. R. Civ. P. 56(c).

The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. *Pederson v. Time, Inc.*, 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party's case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 726 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact in order to defeat the motion. *Pederson, supra* at 17.

### II. Age Discrimination Under G.L. c. 151B § 4

In Count I of the complaint, Mr. Nason alleges that Revlon discriminated against him on the basis of his age, in violation of G.L. c. 151B § 4. Revlon contends that Mr. Nason has failed

to satisfy the requirements of stage one of the three-stage process delineated in Massachusetts caselaw for proving a case of discrimination. *See generally Abramian v. President & Fellows of Harvard College*, 432 Mass. 107 (2000); *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122 (1997). In stage one of the process, the employee must establish a prima facie case of discrimination, thus creating a presumption of unlawful discrimination. In the second stage, the employer "may articulate a non-discriminatory reason for the discharge decision coupled with supporting evidence that its proffered reason was the 'real reason.'" *Brownlie v. Kanzaki Specialty Papers, Inc.*, 44 Mass.App.Ct. 408, 413 (1998). If the employer satisfies his burden at this second stage, "the presumption of the illegality of the employer's action 'vanishes,' [but] the plaintiff's prima facie case . . . remains as evidence in the case." *Id.* Thereafter, in stage three, the plaintiff is entitled to judgment if he/she "persuades the trier of fact that the employer's articulated justification is pretextual." *Kelley v. Airborne Freight Corp.*, 140 F.3d 335 (1st Cir. 1998). "The plaintiff carries his burden of persuasion with circumstantial evidence that convinces the factfinder that the employer's proffered explanation is not credible." *Id. But see Abramian*, 432 Mass. at 118 (Employer may counter effect of such evidence by showing that, even if his articulated reason for the adverse action is untrue, he had no discriminatory intent, or that his action was based on a different, nondiscriminatory reason).

To establish the stage one prima facie case of age discrimination based upon an employer's reduction in force, employees must show: 1) they were at least 40 years old; 2) they met their employer's legitimate job performance expectations; 3) they were terminated; and 4) the employer either did not treat age neutrally or retained younger persons in the same positions." *Flebotte v. Dow Jones & Co., Inc.*, 51 F.Supp.2d 36 (D. Mass. 1999). With respect to the fourth element, this Court alternatively has characterized the obligation of the plaintiff as one of proving

"that the employer did not treat age neutrally in the reduction in force or that the reduction in force had a disparate impact on employees over [forty]." *Plante v. Shawmut Bank, N.A.*, No. 95-0938, 1998 WL 408895, at *4 (Mass. Super. July 15, 1998)(Gants, J.) *citing Hidalgo v. Overseas Condado Insurance Agencies, Inc.*, 120 F.3d 328, 333 (1st Cir. 1997).

In the context of the fourth element, it has been held that "sporadic and temporary redelegation of former employees' duties to younger employees in the same position constituted 'retention' of younger employees in the same position, as required for older employees' prima facie case under the Massachusetts anti-discrimination statute." *Id.* (Supervisors transferred employees' primary functions to younger employees who had never performed those functions before the reduction in force). "[T]he relevant inquiry [in determining whether the fourth element has been satisfied] concerns the functions which the terminated employee performed in his 'position,' and what happened to these functions after termination." *Shenker v. Lockheed Sanders, Inc.*, 919 F.Supp. 55,60 (D. Mass. 1996). "In the context of a reduction in force, the redelegation must involve more than the decision to discontinue certain functions, the assignment of another employee 'to perform the plaintiff's duties in addition to [prior] duties,' or the 'redistribution among other existing employees already performing related work." *Id.* "The plaintiff must show that younger employees, who prior to the reduction in force were not performing the primary functions of the plaintiff's job, had these functions transferred to them." *Id.*

This Court concludes that, as a matter of law, plaintiff cannot satisfy either prong of the fourth element of the required prima facie case of age discrimination.[2] As to the first prong,

---

[2]In light of plaintiff's inability to meet the first stage of the order of proof required in employment discrimination cases, the Court does not reach Revlon's second contention that plaintiff is unable to show that the legitimate non-discriminatory reasons for his termination

plaintiff has not produced any evidence that Revlon failed to treat age neutrally in implementing its various reorganizations and reduction in salesforce. In fact, plaintiff himself testified at his deposition that TMs under the age of forty years were also dismissed and that no one in Revlon's management ever made statements indicating that they had animus toward older workers.

Likewise, plaintiff has not produced any evidence to satisfy the second prong of the fourth element. As stated previously, plaintiff must show more than the simple fact that younger persons continued to hold the same position. Plaintiff must show that "younger employees, who prior to the reduction in force were not performing the primary functions of the plaintiff's job, had these functions transferred to them." *Shenker*, 919 F.Supp. at 60. Before he was terminated, plaintiff was one of ten (10) Territory Managers who were responsible for selling to assigned accounts. Of the ten (10), four (4) TMs were over forty (40) years old and six (6) TMs were under forty (40) years old. After plaintiff was terminated, three (3) TMs were retained as Regional Account Managers (RAMs). Of those three retained, one (1) was over forty years old and the other two (2) were under forty years old. Thus, even though younger persons were retained in the same position, a TM over forty years old was also retained, leaving the proportion of TMs over forty (40) years old essentially the same.

Furthermore, plaintiff's primary functions were not transferred to younger employees who previously did not perform those same functions. Retained as RAMs, these former TMs essentially continued to have the same responsibility of selling cosmetic and beauty products to assigned accounts as they and plaintiff previously had had. To be even more accurate, only two of plaintiff's assigned accounts, representing twenty (20) percent of this total sales, were transferred to the TMs retained as RAMs. Since Revlon desired to focus on its largest accounts

offered by Revlon are a pretext for actual discrimination.

only, it outsourced its smallest accounts, including most of those accounts assigned to plaintiff,

to outside brokers. The RAM assigned to manage the outsourced accounts was a former District

Manager who was over forty.

What was true in *Plante* is true here:

> [The employee] does not dispute that [the employer] performed
> a true reduction in force of its [department]; it was not a sham
> intended to dismiss employees who would then be replaced
> without any overall reduction in its workforce. Since the purpose
> of a reduction in force for a business is generally either to eliminate
> business functions or to perform the same or similar functions with
> fewer employees (in other words, at lower cost), a departing employee's
> duties are commonly assumed (to the extent they remain) by someone
> else when there is a reduction in force. When it is undisputed that
> the employer's purpose was to eliminate to jobs rather than simply
> to replace a present employee, a prima facie case of age discrimination
> may not be established simply by showing that the surviving duties
> of the eliminated positions are being performed by younger employees,
> because this does not reasonably permit an inference of discrimination.
> *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312
> (1996). Indeed, to do so would ignore the distinction between a traditional
> termination and a reduction in force, and the related distinction between
> replacing an employee in his position versus abolishing a position and
> transferring those duties to other employees.

Accordingly, Mr. Nason cannot prevail on his employment discrimination claim.

## III. Mrs. Nason's Loss of Consortium Claim

Given this Court's determination that Mr. Nason does not have a viable age

discrimination claim, Mrs. Nason's claim for loss of consortium, contained in Count II, also

cannot stand. However, if Mr. Nason had met all of the elements required for a prima facie case

of age discrimination, Mrs. Nason's claim would still fail. Mr. Nason alleges only a violation of

the Massachusetts anti-discrimination statute and no separate common law claim for personal

injury. "The spouse of an alleged [] civil rights victim is not permitted an ancillary cause of

action for loss of consortium." *Tauriac v. Polaroid Corp.*, 716 F. Supp. 672, 673 (D. Mass. 1989).

## Order

For the foregoing reasons, defendant's motion for summary judgment is **ALLOWED**.

DATED: 12/28/00

By the Court,

Howard Whitehead
Justice of the Superior Court