# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JAY S. REIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 04-12580 NG |
| | ) | |
| MOTOROLA, INC., CLYDE KOFMAN | ) | |
| and JUERGEN STARK | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SUPPLEMENTAL DECLARATION OF KRISTIN G. MCGURN IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SANCTIONS

Kristin G. McGurn, Esq., deposes and says:

1.     I am an attorney admitted to practice in this District and am a partner at the law firm of Seyfarth Shaw LLP, counsel for Defendants, Motorola, Inc., Clyde Kofman and Juergen Stark.  In my capacity as counsel in this action, I submit this declaration in support of Defendants' Renewed Motion for Sanctions.

2.     Attached as Exhibit A is a true and correct copy of excerpts of the deposition of Charles Lehwald.

3.     Attached as Exhibit B is a true and correct copy of a letter dated October 19, 2005 to Attorney Coster.

4.     Attached as Exhibit C is a true and correct copy of the Code of Ethics published by the International Society of Forensic Computer Examiners and downloaded from its website.

5.     Attached as Exhibit D is a true and correct copy of an excerpt of Motorola's Code of Conduct, Exhibit 50 to Plaintiff's Deposition.

6.      Attached as Exhibit E are true and correct copies of the reporter's invoices for the Jay Rein and Charles Lehwald depositions.  On August 8, 2006, the reporters confirmed that the cost for expediting each transcript was $384.00 and $285.00, respectively.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 10, 2006

By____/s/ Kristin G. McGurn_____

---

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document was served upon the attorney of record for the plaintiff via ECF and by mailing a copy of same, postage prepaid, to John G. H. Coster, Attorney at Law, 92 State Street, Suite 900, Boston, MA  02109 on August 10, 2006.

/s/ Kristin G. McGurn

---

BOI 15794659.1

# EXHIBIT A

Charles Lehwald                                    06/21/2006



1

1                                  Volume: I

2                                  Pages: 1-190

3                                  Exhibits: 1-14

4

5                    UNITED STATES DISTRICT COURT

6                FOR THE DISTRICT OF MASSACHUSETTS

7                      CA No. 04-12580 NG

8

9       - - - - - - - - - - - - - - - - - - -x

10      JAY S. REIN,

11                                  Plaintiff,

12      vs.

13      MOTOROLA, INC., CLYDE KOFMAN and

14      JUERGEN STARK,

15                                  Defendants.

16      - - - - - - - - - - - - - - - - - - - x

17

18              DEPOSITION OF CHARLES LEHWALD

19                      June 21, 2006

20                        9:55 a.m.

21            Law Office of John G. H. Coster

22                     92 State Street

23                  Boston, Massachusetts

24            Reporter:  Nancy L. Russo

Charles Lehwald                                        06/21/2006

14

1      Q.    What is CCE?  I assume that stands for

2    something.

3      A.    Certified Computer Examiner.

4      Q.    What did you have to do in order to obtain

5    that certification?

6      A.    There were a number of hours you had to have

7    or a number of experience requirements and classroom

8    preparatory.

9      Q.    So you had to take some outside courses as

10    well?

11      A.    Yes.

12      Q.    When did you obtain this from the

13    International Society of Computer Forensic Examiners?

14      A.    2004.  I'm not exactly sure of the date.

15      Q.    Do you have any other outside certifications?

16      A.    No.

17      Q.    Going back to you were talking about your

18    employment at Alphabets, Inc.  How many employees did

19    Alphabets, Inc. have?

20      A.    Five.

21      Q.    Other than performing computer support for

22    Alphabets, Inc., did you do any other kind of work for

23    them?

24      A.    No.

94

1      A.   The help desk would have walked them through
2      that.
3           Q.   So they would contact them to alert them of
4      that?
5           A.   I don't know.
6           Q.   And from this --
7           A.   Correction.  There would be an error message
8      that would come up saying real-time failed to start.
9           Q.   So the computer at some point would pop up a
10     window to notify the user?
11          A.   Yes.
12          Q.   Can you tell from this trouble ticket whether
13     that issue was resolved?
14          A.   I can't tell from what we have here.
15          Q.   Did you ever have any dealings with Mr. Rein
16     when he was an employee of Motorola?
17                    MS. MCGURN:   Did you hear the question?
18          A.   No.
19          Q.   Did you ever have any dealings with Mr. Rein
20     when he was an employee of Motorola?
21          A.   No.
22          Q.   Have you ever met Mr. Rein personally?
23          A.   Not that I'm aware of, no.
24          Q.   Were you involved in providing any kind of

Charles Lehwald                                06/21/2006

142

1       A.   Because they were successful in recreating

2    99.99 percent of the data sectors on that drive.

3       Q.   So a bad head could not zero out data or be

4    responsible for zeroing out data in your opinion?

5       A.   Not in my experience.

6       Q.   Focusing on the bad heads, did Kroll ever

7    indicate how many bad heads there were?

8            MS. MCGURN:    Objection.

9       A.   No.

10      Q.   I think you testified previously that you

11   didn't want to continue operating or investigating the

12   hard drive because you were concerned there were bad

13   heads, correct?

14           MS. MCGURN:    Objection.

15      A.   I was concerned with preserving the integrity

16   of the data.

17      Q.   Now, if there are damaged or bad heads on a

18   hard drive, does that affect the operation of the hard

19   drive?

20           MS. MCGURN:    Objection.

21      A.   Yes, it can.

22      Q.   Does it affect your ability to run software

23   on the hard drive?

24           MS. MCGURN:    Objection.

Charles Lehwald                                           06/21/2006

153

1    unallocated space data sectors being nothing but zero's

2    and the drive having been reformatted.

3        Q.   Is that a conclusion that you reached or is

4    that a conclusion Kroll reached initially?

5                MS. MCGURN:   Objection.

6        A.   This was my conclusion.

7        Q.   Was it based on the fact all the data Kroll

8    was able to extract appeared to be zero's?

9        A.   Yes.  My experience led me to believe that

10   based on all the zero's the drive had been wiped.

11       Q.   Now, going back to Exhibit 11, directing your

12   attention to page three of the report which is MSP0166,

13   the second bullet point "All unallocated data sectors

14   on the hard drive have a hex 0x00 pattern."  What does

15   that mean?

16               MS. MCGURN:   Objection.

17       Q.   If you know?

18       A.   That all data sectors are zero.

19       Q.   That is the equivalent to what you testified

20   that all the data -- unallocated data sectors appeared

21   to be zeroed out?

22       A.   Correct.

23       Q.   That is what led you to believe the hard

24   drive had been, as you put it, wiped; is that correct?

Charles Lehwald                                      06/21/2006

154

1                    MS. MCGURN:    Objection.

2        A.    From my original findings, yes.  Not the

3   findings from Kroll.

4        Q.    Do you know how a hard drive becomes wiped?

5                    MS. MCGURN:    Objection.

6        A.    Not particularly in this case.  There are a

7   number of utilities available on the Internet for

8   wiping drives.

9        Q.    So that's one way a hard drive can be wiped?

10       A.    Absolutely.

11       Q.    Are there other ways a hard drive can be

12   wiped, if you are aware?

13                   MS. MCGURN:    Objection.

14       A.    Not through the use of a third party utility

15   that I'm aware of.

16       Q.    Other than using a third party utility, are

17   there some other ways you could have a hard drive that

18   would look like the hard drive Kroll recovered from the

19   computer -- the data Kroll recovered from Mr. Rein's

20   computer?

21                   MS. MCGURN:    Objection.

22       A.    Can you rephrase?

23       Q.    Sure.  Other than a drive being wiped, is

24   there some other way that would account for the data

Charles Lehwald                                    06/21/2006

169

1      A.    Absolutely.

2      Q.    Do you know how long it takes for a battery

3   on a laptop computer that powers a BIOS clock to run

4   out?

5      A.    I don't know.

6      Q.    Do you know what happens to a BIOS clock or

7   the internal clock of a computer when the battery

8   powering it runs out?

9      A.    Can you restate that?

10     Q.    You said there is some sort of internal clock

11  on a laptop computer and it's powered by an internal

12  battery.  Like any battery eventually it can lose

13  power.  What I'm trying to ascertain is what happens

14  when the battery that is powering an internal clock

15  goes dead.

16          MS. MCGURN:    Objection.

17     A.    It has to be replaced.

18     Q.    What happens to the clock when the battery

19  powering it goes dead?

20          MS. MCGURN:    Objection.

21     A.    That depends on the manufacturer of the

22  computer.  Typically it's reset to the UNIX start date

23  which is January -- I think it's January 1st, 1970 or

24  the original date of manufacturer of a computer.

Charles Lehwald                                              06/21/2006

187

1    were damaged; is that correct?

2         A.    I would say it would be safe to assume the

3    heads were damaged at some point from the point in time

4    he last used his laptop to the time it was discovered

5    that they were damaged.

6         Q.    Do you know how the damage to the heads

7    occurred?

8         A.    No idea.

9         Q.    How does damage to heads normally occur in

10   your experience?

11        A.    I don't know.

12              MS. MCGURN:    Objection.

13        Q.    You don't know what causes damage to heads;

14   is that correct?

15              MS. MCGURN:    Objection.

16        A.    Not implicitly, no.

17        Q.    When you say not implicitly, that causes me

18   concern.   What do you mean by not implicitly?

19        A.    Damaged heads can happen for a number of

20   reasons.

21        Q.    Such as?

22        A.    Dropping the drive, shipping the drive

23   potentially without it being securely in the laptop

24   because it was missing the EIDE adapter.    Sometimes

Charles Lehwald                                                   06/21/2006

188

1   heads just go bad.

2       Q.    How do heads go bad, through use?

3               MS. MCGURN:    Objection.

4       A.    Through use, duration of time.

5       Q.    In this case, you don't know which of those

6   explanations caused the damage to the heads?

7               MS. MCGURN:    Objection.

8       A.    No.

9       Q.    And you have no way of ascertaining which of

10  those potential sources or explanations for damage is

11  the accurate one?

12      A.    No.

13      Q.    Was there any evidence that Mr. Rein had done

14  something to tamper with the heads -- strike that.

15              Was there any evidence that the heads

16  had been tampered with?

17      A.    No.

18              MR. COSTER:    I have no further

19  questions.

20              (Whereupon the deposition was concluded at

21  4:15 p.m.)

22

23

24

# EXHIBIT B

# SEYFARTH
### ATTORNEYS
# SHAW LLP

World Trade Center East

Two Seaport Lane

Suite 300

Boston, MA 02210-2028

617-946-4800

fax 617-946-4801

www.seyfarth.com

Writer's direct phone
617-946-4858

Writer's e-mail
kmcgurn@seyfarth.com

October 19, 2005

**VIA HAND DELIVERY**

John Coster, Esq.
92 State Street
Boston, Massachusetts 02109

Re:     *Rein v. Motorola, et al*
        Civil Action No. 04-12580 NG

Dear John:

At your request I attach the Recovery Report that Motorola received from Kroll Ontrack, as well as Kroll's supporting data, including a file listing and Master File Table.

Please contact me at your earliest convenience to discuss this.

Sincerely,

SEYFARTH SHAW LLP

*Kristin G. Mc Gurn/dnl*

Kristin G. McGurn

KGM/dnl
Enclosure

cc:     Manuel Cuevas, Esq.
        Richard L. Alfred, Esq.

BRUSSELS

WASHINGTON, D.C.

SAN FRANCISCO

SACRAMENTO

NEW YORK

LOS ANGELES

HOUSTON

CHICAGO

BOSTON

ATLANTA

# EXHIBIT C



# The International Society of Forensic Computer Examiners®

## Certified Computer Examiner
### Fair and Impartial

**Thursday August 10, 2006**

About Us
Structure
Certification Board
Ethics Committee
Committees
Application
Code of Ethics
Certified Individuals
Policies
Fees
Forum
Sample Examination
Home
Sample PE
Contact
CCE Website
F.A.Q.

### CODE OF ETHICS AND PROFESSIONAL RESPONSIBILITY

**Intent of the Code of Ethics:**

A Code of Ethics is necessary for the protection of the certification process, the individual certificant and finally the client consumer.

Possible violations of the ISFCE Code of Ethics and Professional Responsibility are taken very seriously and will be vigorously pursued.

The ISFCE and all CCE certificants have the responsibility to maintain the CCE certification to the highest ethical standards and demonstrating integrity, impartiality, diligence &amp; professionalism in performance.

All CCE Certificants are required to help maintain the integrity of the CCE and the CCE process.

Applicants or CCE certificants who become aware of any violation of the Code of Ethics and Professional Responsibility must, as soon as reasonably possible, report such violation to the ISFCE.

**Applicants for the Certified Computer Examiner Certification (CCE):**

There are high ethical standards for all CCE applicants and certificants to abide by. All work to complete the CCE process must be done solely by the individual applicant. CCE applicants may not corroborate, work jointly, cheat or plagiarize others work to complete the CCE process. Merely setting up or belonging to groups, workgroups, chatrooms, listservers, etc. that discuss the CCE problems, grades, scores,the grading system or any issues in the CCE process that may assist in the completion of the CCE process, will be considered a violation of this code.

Applicants my not use nor infer that they are CCE certified, until such time as they are actually awarded the CCE certification. The CCE certification is only awarded to applicants after all parts of the examination process have been successfully completed and the certifying board approves the credentialing of the individual applicant. Thus it would be a violation of this code for an applicant to publicly indicate that he or she has "Passed" a particular part of the CCE.

The Certified Computer Examiner (CCE)® is a trademarked phrase and may not be used without the specific written permission of the ISFCE. Any violation of the above provisions will result in the immediate removal from the process, revocation of any certification received and the forfeiture of any fee paid.  Additionally, criminal or civil charges may be files.

## A Certified Computer Examiner will at all times:

* Demonstrate commitment and diligence in performance of assigned duties.
* Demonstrate integrity in completing professional assignments.
* Maintain the utmost objectivity in all forensic examinations and accurately present findings.
* Conduct examinations based on established, validated principles.
* Abide by the highest moral and ethical standards and obey the by-laws of the ISFCE.
* When conducting examinations, obtain evidence or other documentation that will establish a reasonable basis for any opinion rendered.
*Testify truthfully in all matters before any board, court or proceeding.
* Avoid any action that would appear to be a conflict of interest.
* Comply with all legal orders of the courts.
* Strive to maintain professionalism in assigned duties.

* Thoroughly examine all evidence in a case unless the scope of the examination is limited by court order or other mandate.

**A Certified Computer Examiner will never:**

* Withhold any evidence that would tend to distort the truth.
* Reveal any confidential matters or knowledge learned in an examination without an order from a court of competent jurisdiction or with the express permission of the client.
* Express an opinion on the guilt or innocence of any party.
* Engage in any unethical or illegal conduct.
* Knowingly undertake an assignment beyond his/her skills.
* Misrepresent training, credentials or association membership.
* Show bias or prejudice in findings or examinations.
* Exceed authorization in conducting examinations.

©Copyright 2005 ISFCE All Rights Reserved
For more information feel free to Contact Us

# EXHIBIT D



Rein

EXHIBIT NO. 50
1/13/06
M. D. O'CONNOR



# CODE OF BUSINESS CONDUCT



Dear Fellow Motorolan,

We have been entrusted with an ethical legacy that defines Motorola to the world. We may change everything else as we grow and prosper in the years to come, but we will not compromise our high principles and high ethics.

Sustaining our reputation and striving always to earn trust are not only the right things to do, they are essential to our business success. Consistent and faithful adherence to our *Code of Business Conduct* is what we must all do to reach these goals.

This *Code* describes the responsibilities all Motorolans share. It highlights some legal obligations, and it will help you fulfill them. But obeying the law is a minimal standard. The *Code* includes the values and beliefs that are our foundation. Foremost among these are *Uncompromising Integrity* and *Constant Respect for People*. The revised *Code* does not change our values and key beliefs, but rather extends, clarifies and emphasizes them.

Every Motorolan should be familiar with the *Code of Business Conduct*. It offers many guidelines, but it cannot make decisions for you. One of the responsibilities we share is to seek guidance from management and other internal sources when we need it. You can get help from Motorola Ethics Committees around the world.

When we look back at ourselves a decade or two from now, will we be proud of the character and values reflected in what we see? I will do my utmost to see that we are proud. I know you will, too.



Christopher B. Galvin
Chairman and Chief Executive Officer

# CODE OF BUSINESS CONDUCT

*Our Responsibility as Motorolans*

# OUR KEY BELIEFS
## THE WAY WE WILL ALWAYS ACT

*Uncompromising Integrity*
*Constant Respect for People*



Ethics&Compliance

# CODE OF BUSINESS CONDUCT

## INTRODUCTION

*Times will change. Our products will change. Our people will change. Our customers will change. What will not change is our commitment to our key beliefs.*

### Key Beliefs

Key beliefs define who we are—as individuals and as a company. Our key beliefs have defined us for many years to each other, to our customers, our shareholders, our suppliers, our competitors, and our communities.

*Uncompromising integrity* means staying true to what we believe. We adhere to honesty, fairness and "doing the right thing" without compromise, even when circumstances make it difficult.

*Constant respect for people* means we treat others with dignity, as we would like to be treated ourselves. Constant respect applies to every individual we interact with around the world.

Each of us is expected to demonstrate these key beliefs in our work as Motorolans.

### Purpose of the Code of Business Conduct

This *Code of Business Conduct* is a guide to help Motorolans live up to Motorola's high ethical standards—and their own. It summarizes many of the laws that Motorola and all Motorolans are required to live by. The *Code* goes beyond the legal minimums, however, by describing the ethical values we share as Motorolans.

This *Code* is neither a contract nor a comprehensive manual that covers every situation Motorolans throughout the world might encounter. It is a guide that highlights key issues and identifies policies and resources to help Motorolans reach decisions that will make Motorola proud.

### Responsibility and Accountability

As Motorolans, each of us has the personal responsibility to make sure that our actions abide by this *Code of Business Conduct* and the laws that apply to our work. If you have any questions or concerns about illegal or unethical acts, check with management or the EthicsLine. Keep in mind that failure to abide by this *Code* and the law will lead to disciplinary measures appropriate to the violation, up to and including dismissal.

Each Motorolan is expected to read the entire *Code of Business Conduct*. No code can guarantee ethical behavior though. Only we can.

### Additional Responsibilities of Managers

Motorola managers are expected to lead according to our standards of ethical conduct, in both words and actions. Managers are responsible for promoting open and honest two-way communications. Managers must be positive activists and role models who show respect and consideration for each of our associates. Managers must be diligent in looking for indications that unethical or illegal conduct has occurred. If you ever have a concern about unethical or illegal activities, you are expected to take appropriate and consistent action, and inform your manager, the Law Department, or the EthicsLine.

# EXHIBIT E

LegaLink Boston
101 Arch Street, 3rd Floor
Boston, MA 02110
(617) 542-0039   Fax  (617) 542-2119

# I N V O I C E

| INVOICE NO. | INVOICE DATE | JOB NUMBER |
|---|---|---|
| 12023206 | 07/03/2006 | 1201-69693 |
| **JOB DATE** | **REPORTER(S)** | **CASE NUMBER** |
| 06/21/2006 | RUSSNA | |
| **CASE CAPTION** | | |
| Rein vs. Motorola | | |
| **TERMS** | | |
| Payment due upon receipt | | |

Kristin G. McGurn, Esq.
Seyfarth Shaw
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210

---

```
  1 CERTIFIED COPY OF TRANSCRIPT OF:                                   880.50
      Charles Lehwald

                                    TOTAL   DUE   >>>>                  880.50
                                                                    _____

  **Reporter's Jurat (Pursuant to Massachusetts Executive Order 455 (03-13), preparation,
  issuance and recording of notarized and certified document)
  LegaLink Boston now has a new payment address.  Please send your payments to:
  LegaLink Boston
  PO Box 3739
  Boston, MA  02241-3739
```

---

TAX ID NO. :  20-2665382                                              (617) 737-1900

*Please detach bottom portion and return with payment.*

Kristin G. McGurn, Esq.
Seyfarth Shaw
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210

```
Invoice No.:  12023206
Date      :  07/03/2006
TOTAL DUE  :     880.50


Job No.   :  1201-69693
Case No.  :
Rein vs. Motorola
```

Remit To:   **LegaLink, Inc., A Merrill Company.**
            **PO Box 3739**
            **Boston, MA 02241-3739**



LegaLink Boston        tel (800) 822-3376
320 Congress Street    tel (617) 542-0039
4th Floor              fax (617) 542-2119
Boston, MA 02210       www.legalink.com

LEGALiNK
A WORDWAVE COMPANY    GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

# I N V O I C E

| INVOICE NO. | INVOICE DATE | JOB NUMBER |
|---|---|---|
| 12021144 | 01/17/2006 | 1201-67665 |

| JOB DATE | REPORTER(S) | CASE NUMBER |
|---|---|---|
| 01/13/2006 | OCONMI | |

| CASE CAPTION |
|---|
| Rein vs. Motorola |

| TERMS |
|---|
| Payment due upon receipt |

Kristin G. McGurn, Esq.
Seyfarth Shaw
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210

```
ORIGINAL TRANSCRIPT OF:
   Jay Stuart Rein, Vol. 3                                          1,396.70

                                 TOTAL   DUE   >>>>                 1,396.70

**Reporter's Jurat (Pursuant to Massachusetts Executive Order 455 (03-13), preparation,
issuance and recording of notarized and certified document)
LegaLink Boston now has a new payment address.  Please send your payments to:
LegaLink Boston
PO Box 3739
Boston, MA  02241-3739
```

TAX ID NO.:  04-3302306                                      (617) 737-1900

*Please detach bottom portion and return with payment.*

Kristin G. McGurn, Esq.
Seyfarth Shaw
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210

```
Invoice No.:  12021144
Date      :  01/17/2006
TOTAL DUE :  1,396.70


Job No.   :  1201-67665
Case No.  :
Rein vs. Motorola
```

Remit To:    **LegaLink Boston**
             **PO Box 3739**
             **Boston, MA 02241-3739**