## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

**JAY S. REIN,**                                       )
                                                                  )
                      **Plaintiff,**                        )
                                                                  )
**v.**                                                            )          **Civil Action No. 04-12580 NG**
                                                                  )
**MOTOROLA, INC., CLYDE**                 )
**KOFMAN, and JUERGEN**                    )
**STARK,**                                                 )
                                                                  )
                      **Defendants.**                   )
_____)

### PLAINTIFF'S OPPOSITION TO DEFENDANTS
### MOTION FOR SUMMARY JUDGMENT

Plaintiff, Jay S. Rein ("Rein" or the "Plaintiff") hereby submits his Opposition to the Motion for Summary Judgment of Defendants Motorola Inc. ("Motorola"), Clyde Kofman ("Kofman") and Juergen Stark ("Stark")(collectively the "Defendants").

### Introduction

This action arises out Motorola's termination of Rein's employment in February of 2004. In his Amended Complaint, Rein alleges that Motorola, discriminated against him on the basis of his age, in violation of G.L.c. 151B and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 et seq. (Counts I and II); and that Kofman and Stark aided and abetted in such discrimination. (Counts III and IV). Rein also alleges that Motorola, Kofman and Stark retaliated against him for engaging in protected activity in violation of both G.L.c. 151B and the ADEA and violated the Massachusetts Civil Rights Act, G.L.c. 12 §11H. (Counts I through IV).

Rein has also brought breach of contract and promissory estoppel claims against Motorola based on its failure to honor certain specific commitments, promises and representations it made concerning his continued employment. Rein alleges that in reliance on these commitments he turned down a job offer from another employer. (Counts V and VI).

Finally Rein alleges that Kofman and Stark maliciously interfered with his advantageous relations with Motorola, and that Motorola interfered with his advantageous relations with Russell Reynolds, the executive placement firm that had originally recruited Rein for a position at Motorola. (Counts VII-IX).

Defendants' Motion for Summary Judgment seeks the dismissal of each of these claims. Defendants' Motion must be denied because, notwithstanding their assertion to the contrary, there are numerous material facts in dispute.

<u>**Argument**</u>

I.     <u>The Summary Judgment Standard</u>

Summary judgment is appropriate only when, based on the pleadings, affidavits and depositions, it is clear that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed R. Civ. P. 56(c)*.   A "genuine issue" is considered to exist with respect to material fact if "the evidence about that fact is such that a reasonable jury could resolve the point in favor of the non-moving party". *Rivera-Muriente v. Agosto-Aliciea*, 959 F.2d 349, 352 (1st Cir. 1992).

Summary judgment is particularly disfavored in discrimination claims based on disparate treatment because the question of the defendant's "state of mind is elusive and rarely established by other than circumstantial evidence." *Sullivan v. Liberty Mutual Ins. Co.,* 444 Mass. 34, 38 (2005); *Blare v. Husky Injection Molding Sys. Boston, Inc*., 419 Mass. 437, 439 (1995), *Swallow v. Fetzer Vinyards,* 46 Appx. 636, 643-44, 2002 U.S. App. Lexis 18171 (1st Cir. 2002).

Similarly, to the extent that Rein's claims for malicious interference with advantageous relations turn on the defendants' underlying state of mind, dismissing such claims by way of summary judgment is also disfavored. *G.S. Enterprise, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 276 (1991).

II.    <u>Rein is Entitled to a Trial on his Age Discrimination Claims Against The Named Defendants</u>[1]

Under the now well established burden shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L.Ed2d 668, 93 S.Ct. 1817 (1973)  the plaintiff has the initial burden of establishing a prima facie case of discrimination.  The burden then shifts to the employer to articulate some legitimate non-discriminatory reasons for its conduct and produce credible evidence to show that the reasons advanced were the real reasons.  *Sullivan,* 444 Mass. at 50.

If the employer is able to satisfy this burden, the plaintiff must show that the employer's explanation is a pretext for discrimination.  *McDonnel Douglas*, 411 U.S. at 802; *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-3, 257, 67 L.Ed.2d 207, 101 S.Ct. 1089 (1981). This may be accomplished by showing that the reasons advanced by the defendant for making the adverse decision are not true.  *Abramian v. President & Fellows of Harvard College*, 432 Mass. 107, 117 (2000); *Rodriguez v. SmithKline Beecham*, 224 F.3d 1, 8 (1st Cir. 2000); *Rossiter v. IBM,* 2005 U.S. Dist. Ct. Lexis 24543 (D.Mass. 2005).

In the instant case, Rein's has established a prima facie case of age discrimination, and, he has shown that the Defendants' purported non-discriminatory reasons for terminating him are not credible.

A.    <u>Rein Has Made Out a Prima Facie Case of Age Discrimination</u>

A plaintiff's initial burden of establishing a prima facie case is not intended to be onerous.  *Texas Dept of Community Affairs v. Burdine*, 450 U.S. 248, 252-3, 257, 67 L.Ed.2d 207, 101 S.Ct. 1089 (1981); *Sullivan,* 444 Mass. at 45.  It is meant to be a "small showing" that is "easily made".

---

[1] Defendants argue that the claims under G.L.c. 151B against the individual defendants must be dismissed because a supervisor cannot be held individually liable under the statute.  This assertion is patently false. *Ruffino v. State Street Bank & Trust Co.*, 908 F. Supp. 1019, 1047-47 (D. Mass. 1995)(noting that individuals may be held liable for any conduct prohibited by G.L.c. 151B); *Lemire v. Silva*, 104 F.Supp. 2d 80, 92-93 (D. Mass. 2000).  Moreover, although the Court of Appeal's decision in *Beaupre v. Cliff Smith & Assoc.*, 50 Mass. App. Ct. 480 (Mass. App. Ct. 2000) occurs in the context of a sexual harassment claim, nothing in either the Court's decision or the underlying language of G.L.c. 151B indicates that individual liability may only attach under these limited circumstances.  Subsequent courts have not interpreted this decision in such an unduly narrow fashion.  *See e.g. Dalrymple v. Town of Winthrop*, 50 Mass. App. Ct. 611, 621 (Mass. App. Ct. 2000).

*Sullivan,* 444 Mass. at 45, <u>quoting</u> *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003).

To make this "small showing", a plaintiff must demonstrate that: (i) he is a member of a class protected by G.L.c. 151B (and the ADEA); (ii) he performed his work at an acceptable level; (iii) his employment was terminated; and (iv) the employer sought to replace him with a younger employee. *McDonnel Douglas*, 411 U.S. at 802, *Abramian v.* 432 Mass. at 117 (2000). In the instant case, the Defendants concede that Rein has satisfied the first three elements. However, they contend that Rein cannot satisfy the final prerequisite and that he has therefore failed to make out a prima facie case.

There are two problems with Defendants' argument. First, it deliberately misrepresent the underlying facts in an effort to have the Court apply the wrong legal standard. Second, Defendants ignore direct evidence of discriminatory intent that, in and of itself, is sufficient to establish a prima facie case.

1.    <u>Rein Was Not Terminated as Part of a RIF</u>

Defendants contend that Rein's termination was the result of a reduction in force ("RIF"). (Defendants' Memorandum in Support of Motion for Summary Judgment ("Defendants' Memorandum"), pgs. 3-5). Unfortunately the Defendants' position ignores their own explanation of why Rein was terminated, which makes it clear that, <u>at the time Rein was fired</u>, his termination was not intended to be a reduction in force.

Thus, Kofman, the individual responsible for firing Rein, has repeatedly testified that he terminated Rein because the MPS Group had an "organizational mix" issue, and he intended to <u>replace</u> Rein with one to two "less experienced" employees. (Plaintiff's Response to Statement of Material Facts in Support of Defendants' Motion for Summary Judgment ("PMF"), ¶¶156, 161-63). Stark, Kofman's manager, has confirmed that Kofman's intention was to <u>replace</u> Rein. (PMF, ¶163).

Moreover, unlike in a traditional RIF situation, where the goal is to reduce costs by eliminating one or more positions, the decision to terminate Rein was not motivated primarily by a desire to save money. (Stark Dep., pgs. 119-20).

4

While it is true no one was ultimately hired to replace Rein, Kofman did make an effort to fill this position and interviewed one or two potential candidates.[2] (PMF, ¶¶175-76).   A job requisition prepared by Kofman confirms that on February 20, 2004 he prepared the paperwork necessary for Motorola to begin looking for a "<u>replacement</u>" for Rein.  (PMF, ¶175).

2.     <u>Rein Has Satisfied the Fourth Element of his Prima Facie Case</u>

Because Rein's termination was not the result of a RIF it is not necessary to focus on the age of the employees who remained in the MPS Group.[3]   Instead, the relevant inquiry is whether Motorola sought to replace Rein with a substantially younger employee.  *Knight v. Avon Product*, 438 Mass. 413, 425 (2003).

Rein has satisfied this requirement.  Motorola's own job requisition form confirms that the Defendants were seeking to <u>replace</u> Rein with an employee with a bachelors degree and "5-10" years of experience.   (PMF, ¶175 ).   A reasonable juror could infer from this information that Motorola was looking to replace Rein with an individual who as between 25 and 31 years of age - substantially younger than Rein.[4]

The testimony of both Kofman and Stark further confirms that Motorola intended to replace Rein with someone substantially younger.  Thus, notwithstanding the fact that they were being deposed in conjunction with an age discrimination claim and had presumably been extensively prepped by counsel, both Defendants left little doubt that the chief characteristics they were looking for in Rein's replacement was that he be younger than the Plaintiff.  Both repeatedly admitted that they intended to hire someone "less experienced" than Rein; and that the goal was to eliminate a "senior" person, so he could be replaced with a "junior" person.  (PMF, ¶¶163-64).  These remarks

---

[2] The fact that Motorola eventually abandoned its plan to hire 2-3 "less experienced", "junior" employees to replace Rein cannot retroactively turn Rein's termination into a RIF.  Clearly, the touchstone of a discrimination claim must be the defendant's motives and intentions at the time he takes an adverse action against the plaintiff.  In fact, based on Kofman's recollection that the decision not to hire additional employees was made in late 2004, it appears that Motorola abandoned its plan to replace Rein with a "less experienced" employee sometime after Rein filed a charge of discrimination with the MCAD in May of 2004.  (PMF, ¶178, Rein's Charge of Discrimination, dated May 5, 2004).

[3] Of course, with the exception of Kofman, they were all younger than Rein.

[4]  This potential 9-15 year differential more than satisfies the bright line test established by *Knight v. Avon Products*, 438 Mass. 413, 425 (2003).  <u>See also</u> *Williams v. Raytheon Co.*, 220 F.3d 16, 20 (1st Cir. 2000).

constitute strong circumstantial evidence of age discrimination.  *Bray v. Community Newspaper Co.*, 67 Mass. App. Ct. 42, 45-46 (Mass. App. Ct. 2006).

Kofman was even more blunt when he told Rein, at the time of his termination, that he intended to replace him with two "younger" employees.  (PMF, ¶161).  These discriminatory statements are "much stronger" than mere "stray remarks", and certainly are more than sufficient to make out a prima facie case of discrimination.  *Tuttle v. Brandies Univ.*, 2002 Mass. Super. Lexis 7, 414 (Mass. Super. Ct., 2002); *Fontaine v. Ebtec Corp.*, 415 Mass. 309, 314  n. 7 (1993) ("Ultimately for the jury to decide whether remarks were made, whether they indicated discriminatory intent, and how much weight should be given to them.").

B.      The Defendants Have Articulated Several Reasons in Support of Their
          Decision to Terminate Rein's Employment.

Since Rein has made out a prima facie case, the burden shifts to the Defendants to articulate non-discriminatory reasons for terminating the Plaintiff.  *Sullivan,* 444 Mass. at 50.  To satisfy this burden, the employer's reasons must be clear and reasonably specific, and be supported by facts that would justify a judgment for the employer.  *Ruffino v. State Street Bank & Trust Co.*, 908 F. Supp. 1019, 1045 (D. Mass. 1995).

Here, the Defendants have articulated three reasons for terminating Rein's employment. First, they contend that it was necessary to terminate a member of the MPS Group because there was an "organizational mix issue" and the group needed fewer "senior" "experienced" individuals focused on business development and more "junior" "less experienced" employees focused on delivering services.  (PMF, ¶¶156, 161-3).   Second, the Defendants claim that Rein was selected for termination because he did not have sufficient experience in the area of field service mobility.  (PMF ¶156). Finally, the Defendants contend that Rein's "continuing behavioral issues" warranted not only his selection for termination, but Kofman's subsequent failure to recommend him for any other potential positions within Motorola.  (PMF, ¶156).

Assuming arguendo that the Defendants have satisfied their obligations under the second prong of *McDonnell Douglas,* the burden now shifts back to the Plaintiff to show that the Defendants' justification are a pretext for discrimination. [5]

C.      The Motorola's Reasons for Firing Rein Are Not Credible

To establish pretext it is not necessary for Rein to disprove each and every justification advanced by the Defendants. He has met his burden if he can persuade the fact finder "that it is more likely than not that at least one reason was false". *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 505 (2001). In assessing the underlying credibility of the Defendants' explanations, "the fact finder may properly take into account weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's preferred legitimate reasons for its actions. *City of Salem v. Massachusetts Comm'n Against Discrimination*, 44 Mass. App. Ct. 627, 643 (1998); *Fuentes v. Perskie*, 32 F.3d 759, 765 (3rd Cir. 1994). In the instant case, each of the reasons advanced by the Defendants suffers from such inconsistencies and implausibility's.

1.      The MPS Group Did Not Have an "Organizational Mix Issue" that
        Required the Termination of Rein's Employment to Resolve

The underlying facts simply do not support Defendants' assertion that the MPS Group suffered from an "organizational mix" issue that necessitated the termination of Rein's employment.

First, at the time Rein was fired the MPS Group was not experiencing any difficulty delivering services to its customers - the area where it was struggling was sales and business development. Thus, the MPS Group did not meet its revenue goals for 2003. (PMF ¶142). In fact, in late 2003 or early 2004 Rein expressed serious concerns about the "volume and velocity" of business development activities that were occurring. (Rein Dep. 319-22, 324). It is precisely because the MPS Group desperately needed to increase sales that, several weeks before making the decision to

---

[5] At least one of Defendants' proffered explanations for terminating Rein arguably fails to satisfy their burden. Stripped of its obfuscating language, Defendants assertion that it had an "organizational mix issue" that necessitated replacing Rein with a "less experienced" "junior" employee appears to be an admission that Rein was fired because the Defendants wanted to replace him with someone younger.

terminate Rein, Kofman had retained an outside consultant to assist the MPS Group in its sales and business development activities.[6]  (PMF, ¶157).

These facts undercut the credibility of Defendants' explanation in two ways.  First, since the group had been unsuccessful in obtaining engagements, there was no need to hire additional "delivery people" to deliver on these non-existent engagements.   Second, because the Group was already struggling to meet its business development goals with three principals focusing on business development, eliminating one of these positions significantly decreased their chances for success.  In fact, in addition to Rein, Clay Brice, the only other member of the five person MPS Group deposed by the parties, confirmed that that the group needed more people engaged in business development, not fewer, and that terminating Rein "hampered" the group's business development and sales efforts. (PMF, ¶157).

Second, at the time Rein was fired, he was performing both a sales and a delivery function within the MPS Group.  His duties were both to "sell new opportunities in the marketplace" and to "coordinate and deliver the services that are sold".  (Rein Dep., pg. 125).   Even if the MPS Groups delivery obligations increased, Rein was fully capable of reducing the time he devoted to business development to focus on delivery.

Third, because he was engaged in both business development and the delivery of services, firing Rein certainly did not address Motorola's alleged need for additional "delivery" people.  In fact, it exacerbated the problem.[7]

Finally, the fact that, after firing Rein, Motorola never hired the "delivery" people it claimed to so desperately need, and was in fact able to fulfill its delivery obligations with its existing employees, destroys any remaining credibility this explanation had.  (PMF, ¶178).

---

[6] Rein was actually on his way to Chicago to attend a presentation by these consultants when he was notified of his termination.  (PMF ¶157).
[7] Even Kofman reluctantly conceded that firing Rein did not solve the problems the organizational mix problems that allegedly existed.  (Kofman Dep., pgs. 272, 276).

2.    <u>Rein was not Fired Because He Lacked Field Service Mobility Experience</u>

The assertion that Rein was fired because of his alleged lack of experience in the area of "field service mobility" is also not credible.  First, this supposed deficiency was not one of the reasons Kofman gave Rein for terminating his employment.  (Rein Dep., pgs. 371-2). Stark also has no memory of Kofman discussing this as a reason for terminating Rein.  (Stark Dep., pgs. 121-23, 130-31).  Defendants' failure to identify this as a supposed deficiency at the time of Rein's termination substantially undercuts its credibility. *Wooster v. Abdow Corp.* 46 Mass. App. Ct. 655, 672 (Mass. App. Ct. 1999)(development of more reasons for termination as discrimination claim proceeds supports a finding of pretext).

Moreover, Kofman conceded that he had no substantive knowledge of what field service mobility experience Rein possessed.  (PMF, ¶158).  In fact, Rein did have  experience in this area. (PMF, ¶158).

3.    <u>There is no Evidence that Rein Had "Behavioral Issues" that Supported Either His Termination from the MPS Group or Kofman's Refusal to Recommend Him for Alternate Positions within Motorola</u>

The final justification advanced for Rein's termination was that he had a number of "behavioral issues" that warranted not only his removal from the MPS Group, but also Kofman's refusal to recommend him for any other positions that were available within the company. The Defendants legitimately argue that a court may not act as "super personnel department" and review a manager's criticisms of an employee de novo. S*ee Mesnick v. General Electric Co.,* 950 F.2d 816, 825 (1st Cir., 1991).  However, they are also not obligated to simply defer to a manager's judgment.  If there are sufficient facts in the record from which a jury could infer that the manager's proferred assessment was false and not made in good faith, summary judgment must be denied. *Dragonas v. Sch. Comm. Of Melrose*, 64 Mass. App. Ct. 429, 444-45 (Mass. App. Ct. 2005).   In the instant case there is ample evidence from which a jury could find that Kofman's criticisms were not made in good faith.

(a)    <u>Rein's alleged "behavioral issues"</u>

The Defendants contend that Rein had a number of behavioral problems which caused Kofman to reject the possibility of either keeping Rein within the MPS Group at a lower pay rate, or transferring him laterally within Motorola.  (PMF, ¶156).  According to Kofman, it was clear that Rein "does not exhibit the 4e's +1 leadership behaviors required of Motorola staff"[8] because he "lacked respect for others", was "often confrontational and argumentative", "tends to rub others the wrong way" and comes across as "desperate (i.e. focused on saving his job first)".  (PMF, ¶166).  Clearly, this is a devastating assessment of Rein's ability to work with others.  It is also patently false.

(b)    <u>Kofman Can Only Recall a Single Specific Example of Any of These Behaviors</u>

Kofman claims that these negative assessments of Rein are based both on his own personal experiences  and feedback from 4-6 other employees within Motorola.  (PMF, ¶166).  Neither assertion is credible.  At the time he made these assessments Kofman's personal interactions with Rein had been fairly limited and related primarily to a few planning and administrative meetings they had both attended.  (Kofman Dep., pgs. 60, 154).  He had also only been Rein's manager for approximately two months.

It is therefore not surprising that, with the exception of an e-mail Rein wrote that he thought had a "harsh" tone, Kofman is unable to recall a single specific example of any of Rein's behavioral issues.  (PMF, ¶167).  Kofman also cannot identify a single individual Rein had trouble getting along with.  (Kofman Dep., pg. 277, 287-89).  Moreover, although he claims to have spoken to 4-6 other employees about Rein's "behavioral issues" he can only recall two of them, and can remember nothing about the substance of these conversations.  (Kofman Dep., pgs. 284-86).

---

[8] Within Motorola this phrase apparently refers to certain qualities that are deemed necessary to be an effective employee.

(c)     Rein's Performance Reviews Make No Mention of these "Behavioral Issues"

Rein's written performance reviews disclose no reference whatsoever to the Plaintiff having any behavioral issues.  (PMF, ¶¶114-120, 125, 140).  In fact, these reviews are filled with nothing but praise for Rein's performance.[9]  (PMF, ¶¶114-120, 125, 140).

Rein confirms that the verbal feedback he received from his managers was always highly favorable.[10]  (PMF, ¶¶114, 116, 118, 120, 124).  At no time was Rein ever warned about his supposed "behavioral issues".  (PMF, ¶159)  Kofman concedes that, during the period of time he was Rein's manager, he never discussed any of his concerns about Rein's behavior.  (PMF, ¶141).[11]

(d)     Rein Had a Good Working Relationship With And Was Respected By the Other Members of the MPS Group and the Customers He Worked With.

Kofman's criticisms of Rein are also completely at odds with the opinions of those who worked with Rein. For example, Brice, the member of the MPS Group who worked most closely with Rein, testified that he never heard anyone, either within Motorola or  outside of the company complain about Rein's behavior.  (Brice Dep., pgs. 121-22).  He further testified that he and Rein had a "very good working relationship" that was "based off of mutual respect" and that they "both worked very well as a team".  (Brice Dep., pgs. 122).  In fact, Brice admitted that, even though he was still

---

[9] Noting, for example, that Rein "has demonstrated that he can lead complex projects, with a focus on the customer and with a large degree of both Energy and Passion"; and that he "consistently achieves high levels of commendable performance and is recognized as highly effective by management team and key work partners.  (PMF, ¶119).

[10] For example, during his initial review Rein was told that his performance "far exceeded" Motorola's preliminary expectations.  (PMF, ¶114).

[11] The only document that offers any support for Kofman's criticisms is "Leadership Assessment Multi-Rater Feedback Report" that contains some surprisingly low ratings of Rein's performance in the areas of leadership, team spirit and ethics by Rein's manager.   (PMF, ¶¶ 149- 153).  Although Defendants contend that Thomas Niersbach, Rein's former manager, "would have been" the individual who input these ratings, there is ample evidence that it was created by Kofman or Stark presumably to create some documentation to support his decision. For example, the document is undated.  It is unsigned.  Rein had never seen these ratings and they were never discussed with him.  There is no reference to them in any of Rein's performance reviews and it is inconsistent with and contradicts those reviews.  The manager's ratings in this area are substantially below not only Rein's own assessment of his performance, but that of his direct report. (Plaintiff's Material Fact, ¶¶149-153).  Moreover, it is highly unlikely Niersbach is responsible for these ratings.  He was an interim manager who had little interaction with any member of the MPS Group. In fact, because of his minimal personal knowledge about the underlying performance of any of the members of the MPS Group, he specifically told each of them they would each receive the same neutral review so they would all "look the same way" to their next manager.  (Plaintiff's Material Fact, ¶¶122-25).

employed at Motorola, he remained friendly with Rein and that they remained in contact.  (Brice Dep., pg. 139). [12]

Similarly, customers and potential customers that Rein worked with also had a high opinion of his leadership, his professionalism and his ability to work well with others.   Thus, Motorola has a mechanism by which customers and potential customers that Rein worked with could provide feedback on Rein's performance.  This feedback was also uniformly positive giving Rein solid rankings for his leadership and "effectiveness as a team member who you wish to continue to associate with".  (Rein Dep. Ex 27A).

(e)    Kofman's Criticisms of Rein Are Completely at Odds With His Own Prior
       Evaluations and Comments.

The most compelling evidence of Kofman's bad faith, however, is that his comments about Rein's alleged "behavioral issues" are completely at odds with his own earlier assessment of Rein. *See Ruffino State Street Bank & Trust Co.*, 908 F. Supp. 1019, 1046-47 (D. Mass. 1995) (inconsistent evaluations evidence of retaliatory motive)  Thus, although in mid-February of 2004 Kofman was claiming that Rein "does not exhibit the 4e's +1 leadership behaviors required of Motorola staff", less than a month earlier he had prepared a performance evaluation of Rein in which he agreed that Rein's performance "consistently meets predefined goals, while using the expected 4e's + 1 Always behaviors".  (PMF, ¶¶165-66).  This performance evaluation went on to state that at times Rein's performance "may exceed expectations" and that he was a "solid performer who is recognized as effective by team management and key work partners".  ((PMF, ¶165).

Moreover, prior to firing Rein, Kofman prepared an e-mail that he shared with Stark and planned to send to Rein, stating that he was willing to explore transferring Rein to a possible position within IESS (another division within Motorola with whom Rein had been working closely).  (PMF, ¶164).  Yet, only a few weeks later, in explaining to Stark his decision to terminate Rein, Kofman

---

[12] John Gillardi, the other principal who worked with Rein and Kofman in the MPS Group, also remains on friendly terms with Rein, and after Rein's termination remained in contact with one another.  (Rein Dep., pgs. 28-29).

stated that he did not support transferring Rein within Motorola because of his serious behavioral issues.  (PMF, ¶166).  In fact, when Kofman was subsequently approached by the manager of IESS about whether he would recommend Plaintiff for a position, Kofman deliberately destroyed Rein's chances by telling her that Rein was not a "good fit" for the position, not a "team player", and that he would "not recommend her taking [Rein] on".  (PMF ¶171; Rein Dep., pg. 508).  Given an opportunity to reconcile these obvious inconsistencies, Kofman was unable to do so.  (PMF ¶168).

III.     <u>Rein is Entitled to a Trial on His Retaliation and Civil Rights Claims</u>

        The Plaintiff has also brought separate claims against the Defendants for: (i) retaliation for engaging in activity protected by G.L.c. 151B; and, (ii) interference his civil rights by "threats, intimidation and coercion" in violation of G.L.c. 12 §11H.  These allegations are based on the fact that, after Rein challenged Motorola's decision to terminate him, Stark threatened Rein on two separate occasions to dissuade him from retaining counsel or bringing a lawsuit against Motorola.  Thus, when Rein indicated that there was nothing in his personnel file or his performance reviews to support Kofman's criticisms, Stark told Rein "I can create a file that says bad things about your performance and then we'll have what we need".  (Rein Dep., pg. 169).[13]

        Subsequently, when Rein refused to accept Motorola's offer of a modestly enhanced severance package, in return for signing a general release, Stark called him at home and made the following threat: "[Stark] indicated to me that if I retained counsel on this matter he would hire an army of lawyers to come after me and a handful of HR people, and he would <u>take all severance packages off the table and make nothing available to me</u>".  [Emphasis added].  (Rein Dep., pgs. 169-72).[14]

---

[13] A reasonable jury would be warranted in concluding that negative ratings in the "Leadership Assessment Multi-Rater Feedback Report" were the result of Stark making good on his threats.

[14] It is clear that this conduct, on its face violates the Older Worker's Benefit Protection Act ("OWBPA"), which specifically provides that an individual must be advised that he has the right to seek counsel prior to signing a waiver of his claims under the statute.  29 U.S.C. §626(f).  It is equally clear that Rein has a private right of action for this violation.  *Commonwealth v. Bull HN Info. Sys.*, 16 F.Supp.2d 90 105-08 (D. Mass. 1998).

Defendants contend that these threats, although clearly illegal, do not constitute retaliation because the Defendants failed to follow through on them, and not only paid Rein the minimum severance he was legally entitled to, but his full salary during negotiations.[15]  The facts do not support this assertion.  The Plaintiff contends that Motorola retaliated against him by failing to hire him for at least two positions for which he was qualified.  ((PMF, ¶¶169-73).  In fact, as discussed more fully in section VI, Kofman and Stark  intentionally and maliciously interfered with Rein's efforts to find alternate positions within Motorola.

The Defendants' argument is also not supported by the underlying caselaw.   Threats of retaliation are in themselves actionable.  *Commonwealth v. Bull HN Info. Sys.* 16 F.Supp. 2d 90, 108-09 (D. Mass. 1998)(holding that, like the instant case, where the threatened retaliation is itself illegal under OWBPA, it would be "absurd" to conclude otherwise).

Similarly, the Plaintiff has a viable cause of action under the Massachusetts Civil Right Act ("MCRA") G.L.c. 12 §11H.  This statute prohibits any person from interfering with or attempting to interfere, "by threats intimidation and coercion" with the "exercise or enjoyment by any other person …of rights secured by the constitution or laws of the United States".

In the instant case the Defendants attempted to interfere with Rein's legally protected right under OWBPA to contact and consultant with an attorney.  Moreover, although Motorola contends that Stark's comments were a "valid statement of Motorola's rights and the consequences of failing to sign a release" this argument completely mischaracterizes the substance of Stark's threats.  As both the Complaint, and Rein's own deposition testimony makes clear, Stark was not threatening to withhold merely the enhanced severance Motorola was offering the Plaintiff to induce him to sign a release, he was threatening to withhold <u>all</u> of Rein's severance, <u>including the standard severance</u>

---

[15] It should be noted that Rein was subsequently sued for a portion of the salary he received during these negotiations, on the grounds that Motorola had inadvertently overpaid him .  The Defendants eventually abandoned this claim in return for the Plaintiff agreeing not use their suit as evidence of retaliation, or to support any of his other claims against the Defendants.  However, this agreement does not give the Defendants carte blanche to mislead the Court.  The Plaintiff raises these facts solely to contradict the Defendants' implication that they intentionally paid Rein more than he was legally entitled to.

<u>package Rein was entitled to receive as a Motorola employee.</u>   Amended Complaint ¶36, Rein Dep.,

pgs. 169-70).  Threatening to withhold severance benefits that Rein was contractually entitled to

receive under Motorola's severance plan[16], clearly constitute the kind of "threats, intimidation and

coercion" covered under the statute.  *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 647-48

(2003)(economic coercion actionable under MCRA); *Lecrenski Bros. v. Johnson*, 312 F. Supp. 2d

117, 122-23 (D. Mass. 2004)(same) .

IV.    <u>Disputed Material Facts Preclude Granting the Defendants Summary Judgment On Plaintiff's</u>
       <u>Breach of Contract and Promissory Estoppel Claims</u>

Defendants contend that Rein's breach of contract claim must fail as a matter of law for two

reasons.  First, Defendants argue that because Rein signed a document entitled "Application for

Employment" which stated that, "nothing in this application nor in any prior or subsequent oral or

written statement is intended to create any contract of employment or to create any rights in the nature

of a contract of employment"[17], he is now precluded from arguing that he entered into a subsequent

oral contract with Motorola.

Second, Motorola's contends that guarantees made concerning Rein's continued employment

were not sufficiently definite to create an enforceable contract; and that, in any event, Stark lacked

either actual or apparent authority to make such representations.

Neither of these arguments is persuasive.

A.    <u>Employment Application Does Not Preclude Motorola Entering Into a</u>
      <u>Subsequent Agreement With Rein</u>

Motorola contends that Rein's employment application constitutes a binding contract and that

a single phrase in this application precludes Rein from holding Motorola to the terms of a subsequent

oral contract it entered into with him.  There are several problems with this argument.

---

[16] *See* Motorola, Inc. Involuntary Severance Plan Summary Plan Description.
[17] Rein Dep. Exhibit 7.

First, Rein's employment application was precisely that, an application, it was not designed to and did not set forth any of the terms and conditions of his employment.[18]

Second, Rein did not sign this agreement until after Motorola had offered him a position, he had accepted, and he had actually reported for work. (Plaintiff's Material Fact, ¶9). It would therefore be perfectly reasonable for Rein to conclude that the entire section of the application entitled "Agreement" which sets forth "actions Motorola may or may not take regarding your employment" was no longer applicable to him. In fact, the final paragraph of this section, containing the language relied on by Defendants, starts with the following sentence, "You understand that Motorola is not obligated to provide employment and you are not obligate to accept employment." Given that Rein had already received a written offer and accepted it; and had actually reported for work, he would certainly be warranted in concluding that a single sentence in this application did not negate specific commitments made to him by Motorola and his managers nearly a year and a half later.[19]

B.    Motorola's Statements and Commitments to Rein Were Sufficiently
       Specific and Definite to be Enforceable.

Defendants contend, correctly, that vague statements of hope, standing alone, are too indefinite to give rise to an enforceable oral contract. *See e.g. Tennaro v. Ryder Sys., Inc.* 832 F. Supp. 494, 501 (D. Mass. 1993); *Webber v. Frelonic Corp.*, 1994 Mass. Super. LEXIS 28, at *6-7. Unfortunately, this line of cases has no relevance to the underlying facts here.

In the instant case, Stark made specific, definitive statements about the duration of Rein's employment. At the conclusion of a meeting with Stark who's very purpose was to determine if the MPS Group was to be disbanded, he specifically promised the members of the MPS Group that, at

---

[18] Indeed, this document was arguably superseded by numerous other documents Rein was asked to sign during the course of his employment with Motorola that contained different, and in some cases contradictory, terms and conditions of employment, including, *inter alia.,* (i) Motorola's offer letter (Rein Dep. Ex. 8); (ii) Motorola Employment Agreement (Rein Dep. Ex. No. 3); and (iii) Motorola Terms and Conditions Related to Employee Non-Qualified Stock (Rein Dep. Ex. 9).

[19] *Cf. Derrig v. Wal-Mart Stores, Inc.* 942 F. Supp. 49, 55 (D. Mass. 1996)(single disclaimer in Handbook patently inadequate to set off party's reasonable expectations based on other subsequent more specific representations); *Ferguson v. Host Int'l,* 53 Mass. App. Ct. 96, 103 (summary judgment should be denied because written disclaimers in manual could be viewed by jury as "functional equivalent of fine print" and disregarded).

16

least for the next eight months, they did not have to worry about losing their jobs. (PMF, ¶136). He assured them that he was serious about keeping them and that they did not have to worry about the security of their positions or their employment; and he promised that they would have until June 30, 2004 to produce results. (PMF, ¶136). These statements are both specific and contain a definitive term. On their face, they are sufficient to create an enforceable contract.

Even if there were some ambiguity about Stark's commitments to Rein and the other members of the MPS Group, the attendant conditions and circumstances surrounding Stark's statements leave little doubt about the underlying meaning of his words. *See e.g. Kravetz v. Merchants Distributors, Inc.*, 387 Mass. 457, 460-61 (1982)(Attendant circumstances may be considered to help clarify ambiguous or indefinite statements); *Vezina v. Mahoney & Wright Ins. Agency*, 40 Mass. App. Ct. 218, 224-25 (Mass. App. Ct. 1996)(same); *Frederick v. Conagra, Inc.*, 713 F. Supp. 41, 45 (D. Mass. 1989)(same).

In this case, prior to their meeting with Stark, there was considerable anxiety among the members of the MPS Group, both about the future of the Group itself, and their own future within Motorola. (PMF, ¶¶129-130, 132). At the conclusion of their first meeting with Stark, the fate of the MPS Group continued to remain uncertain, but Stark told the group that, before he "pulled the plug" they would be given the opportunity to make another presentation. (PMF, ¶132). The second presentation before Stark was far more successful and before adjourning the meeting he told the group that he would authorize them to continue operating going forward and would check back in mid 2004 to see "where business was at". (PMF, ¶135). He then adjourned the meeting and left the room. However, a few minutes later he returned specifically for the purpose of assuring the five remaining members of the MPS Group that they did not have to worry about the security of their own employment, and to promise they would have until June 30th to produce results. (PMF ¶136).

It is important to remember that these five employees were successful, highly compensated individuals, who were attractive candidates to prospective employers. Several of them, including Rein and Kofman, had been actively recruited for their positions at Motorola by Russell Reynolds,

who obviously charged the company a substantial fee for its services. (Defendants Statement of Undisputed Material Facts, ¶6, Kofman Dep., pgs. 23-24). Given the recent reorganizations of the MPS Group and the purpose of their meeting with Stark, these five remaining employees were very concerned about their future at Motorola. (PMF, ¶129). Having just made the decision to continue going forward, Stark needed to insure that the MPS Group remained intact, and that the members of this group did not begin looking for other jobs because they were concerned about the stability of their position at Motorola. His statements to the group concerning the underlying security of their positions, at least through June of 2004 was designed specifically to assuage their fears and dissuade them from exploring other opportunities.

It is against this factual backdrop that Motorola's subsequent payment of a retention bonus to Rein at the end of 2003 and his performance review must be interpreted. Although Motorola now attempts to minimize its characterization of this payment as a "retention" bonus, that is exactly the way both Motorola (in its paperwork) and Kofman (verbally) described the bonus to Rein. (PMF, ¶145). In light of this terminology, and the prior representations that had been made to Rein, a reasonable jury would certainly be justified in viewing this bonus as further evidence that Motorola was committed to "retaining" Rein.[20]

Finally, Kofman's written and verbal performance review of Rein, also renewed and reemphasized the prior commitments that had been made to Rein by Stark's promises and the retention bonus he had just received. Taken in isolation and out of context, Kofman's statement that 2004 "would be more stable than the previous year" and that Rein would be given "an opportunity for [his] capabilities to come through more clearly and for MPS to continue to create value for CGIS" might well be seen as too indefinite to create a binding obligation. However, the effect of these

---

[20] Kofman's own explanation of the purpose of this bonus is itself unintentionally revealing. Kofman repeatedly characterized this bonus as something he felt was necessary to encourage "team members to stay focused". Kofman never specifies what he felt was distracting Rein, or the other members of the MPS Group from the performance of their jobs, or why they needed some financial inducement over and above their generous salaries to remain focused. However, it is fairly obvious that Motorola's goal was to insure that Rein, and the other members of MPS, did not begin redirecting their efforts towards pursuing other employment opportunities.

representations were cumulative.  Kofman's statements reinforce Motorola's prior commitments, and these earlier promises give greater force to Kofman's subsequent performance review.

Given the context of Kofman's remarks, Rein was certainly warranted in interpreting Kofman's assurance that 2004 would be "more stable" than the previous year to mean that there would be no further reorganizations of the MPS Group; and Kofman's promise that he would be given an "opportunity for his capabilities to come through" to mean that he was not about to lose his job. Unfortunately, three weeks after making these commitments to Rein, Kofman did precisely what he had promised he would not do, he reorganized the MPS Group and he terminated Rein.

C.    Stark Had Actual and Apparent Authority to Bind Motorola

Defendants' assertion that Stark lacked actual or apparent authority to bind Motorola borders on the frivolous.  Stark was a Corporate Vice President at Motorola and was responsible for overseeing the MPS Group.  (PMF, ¶126).  He was perceived as having, and in fact did have, the authority to decide whether to disband the MPS Group or allow it to continue going forward.  In fact, the very purpose of the meetings the MPS Group had with Stark in October of 2003 were to persuade Stark to authorize the MPS Group's continued existence.  (PMF, ¶¶131-136).  By placing Stark in the position to decide the underlying fate of the MPS Group, Motorola clearly gave him apparent authority to make other commitments concerning these employees future with the company.  *DeVaux v. American Home Assurance Co.,* 387 Mass. 814, 819 (1983).  At the very least, the issue of whether the Plaintiff had a reasonable basis for believing that Stark had authority to bind Motorola must be left to the jury.  *Id.*

V.    Rein Has a Viable Claim for Promissory Estoppel

To prevail on his claim of promissory estoppel, Rein must show "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise … and which does induce such action or forbearance."  *Restatement (Second) of Contracts* §90; *Loranger Construction Corp. v. E.F. Hauserman Co.*, 6 Mass. App. Ct. 152, 154, *aff'd.* 376 Mass. 757 (1978). The Defendants argue that Rein has failed to show either that Motorola should reasonably have

expected Rein would rely on its promises, or that Rein did in fact rely on such promises.  Neither

argument is persuasive.

A.    <u>Motorola Not Only Should Have Reasonably Expected Rein To Rely On Its Promises, It
      Intended That Rein Rely On Them</u>

As set forth in Section IV.B above, there is compelling evidence that Defendants not only

expected Rein to rely on its specific representations that he would continue to have a job at Motorola

through at least June 30, 2004, they actually intended for him to rely on these statements.  Given the

recent departures of both Loosemore and Debarros for other positions outside the company, the recent

reorganizations of the MPS Group itself, and the remaining five members' obvious concerns about

their own futures with the company, Motorola needed to do something to insure that the MPS Group

remained intact.  With only five remaining employees and the aggressive sales goals that had been set

for the group going forward, the departure of even a single person would significantly impact the

group's overall success.  To insure that did not happen, Motorola made specific promises to induce

the members of the MPS Group not to pursue other employment opportunities that were potentially

available to them.

B.    <u>Rein Relied On Motorola's Promises And Representations To His
      Detriment</u>

Defendants contend that Rein can also not show either that he actually relied on Motorola's

representations, or, if he did rely on them, that his reliance was reasonable.  Motorola's preliminary

assertion, that Rein did not actually rely on these promises, is puzzling.  It is undisputed that, shortly

after these promises were made to Rein he turned down a job offer with another company.  (PMF,

¶148).  Moreover, Rein has specifically stated that his decision to turn down this position was in

reliance on the promises that had been made to him by Motorola about his future with the company.

(PMF, ¶148).  Clearly, even if the Defendants choose to disbelieve this testimony, there are disputed

facts which preclude the granting of summary judgment.

Defendants second argument is equally unpersuasive.  Essentially, Defendants contend that as

a "seasoned executive" Rein should have realized: (i) Stark was lying when he promised the MPS

Group that their positions were safe, at least through June of 2004; (ii) Kofman was not to be trusted when he indicated that, unlike 2003, when the MPS Group was reorganized twice, 2004 would be "more stable" and that Rein would be given an "opportunity for his capabilities to come through"; and, (iii) Motorola was deliberately mischaracterizing the $14,000 bonus he received as a "retention" bonus to mislead him.  Perhaps the trier of fact will respond sympathetically to these arguments and ultimately find them persuasive.  However, under this set of facts, where specific promises were made to Rein about his future, including how long his position would remain protected, the underlying reasonableness of Rein's reliance on is an issue that should be left to the jury.  *Aretakis v. General Signal, Inc.*, 2006 U.S. Dist. LEXIS 38058, *24-25 (D. Mass. 2006)(reliance ordinarily a question for the jury).

VI.     <u>Kofman and Stark Intentionally Interfered with Rein's Advantageous Relations With Motorola</u>

To prevail on his claim for intentional interference with advantageous relations, Rein must show: (i) that he had an advantageous relationship with Motorola; (ii) the individual Defendants knowingly interfered with that relationship; (iii) the Defendants' interference, in addition to being intentional, was improper in motive or means; and (iv) he was harmed by the Defendants' actions. *Weber v. Community Teamwork, Inc.*, 434 Mass. 761, 781-84 (2001).  In addition, because Rein is brining his claims against fellow employees, he must show the Defendants' interference was motivated by "actual malice".  *Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 664 (1981).

Defendants initially contend that Rein cannot show that they actually interfered with his advantageous relationship with Motorola.  However, considering the fact that  Kofman recommended that Rein's employment be terminated, and that Stark approved his decision, this argument is not very persuasive.  (Defendants' Material Facts, ¶¶ 70, 77).  Moreover, there is credible evidence in the record that Kofman prevented Rein from securing at least one of several positions he had applied for within Motorola by telling the hiring manager that Rein was "not a good fit" and "not a team player"; and stating that he would "not recommend" her taking Rein on.  (PMF, ¶171).  In fact, Kofman

concedes that he was contacted by this manager about whether he would recommend Rein for a position and that he described the areas he "thought Rein could improve in".[21]  (PMF, ¶170).

Defendants' second argument is that, even if they did interfere with Rein's advantageous relations, the Plaintiff cannot show that such interference was improper in motive or means because they were not motivated by "actual malice".  Massachusetts courts have defined "actual malice" to mean "a spiteful, malignant purpose, unrelated to the legitimate corporate interests of the employer". *Weber*, 434 Mass. at 781; *Boothby v. Texon, Inc.,* 414 Mass. 468, 487 (1993).  Personal hostility and ill-will can constitute such actual malice.  *Weber,* 434 Mass. at 783 (personal hostility and ill-will satisfies actual malice requirement).

In this case, Rein can show that the individual Defendants interfered with his advantageous relations with Motorola by both improper motive and improper means.[22]  Rein has established that such interference was by "improper means" because Kofman: (i) justified the termination of his employment; and, (ii) prevented him from obtaining another position at Motorola, by making deliberate misrepresentations about Rein's character, leadership and ability to work with others. *Draghetti v. Chmielewski,* 416 Mass. 808, 816-17 (1994)(supervisor's knowingly false misrepresentations about an employee sufficient evidence of improper motive).  For example, three weeks after formulating with Rein a joint statement for insertion in Plaintiff's performance review stating that Rein "consistently meets predefined goals, while using the expected 4e's + 1 Always behaviors", Kofman justified his decision to terminate Rein by stating the exact opposite, that Rein "does <u>not</u> exhibit the 4e's +1 leadership behaviors required of Motorola staff" .  (PMF, ¶¶165, 166, 168).  Similarly, after indicating that if Rein was interested in transferring to a position within IESS he was willing explore "the opportunity for you to work in [that] group" with its manager, he

---

[21] Since Kofman had just written a memo criticizing Rein for showing "poor respect for others" and being "confrontational and argumentative"; and recommending that Rein not be considered for another position within Motorola, it seems reasonable to infer that Kofman's comments were sufficiently negative to insure that Rein did not get this position.  (PMF, ¶166).

[22] Plaintiff need only offer credible evidence of improper motive <u>or</u> improper means to prevail on his claim, not both.  *Draghetti v. Chmielewski,* 416 Mass. 808, 816 (1994).

subsequently told the manager of this group that Rein was not a "good fit" for the position, and that he would "not recommend her taking [Rein] on". (PMF, ¶¶164, 169-71)(Rein Dep., pg. 508). Kofman's deliberate misrepresentations also constitute evidence that his interference was motivated by actual malice and were unrelated to the "legitimate corporate interests of the employer".

There is also compelling evidence that Rein's age was a key factor in Kofman's desire to terminate him, and that Kofman therefore had a discriminatory motive for terminating Rein. Such a discriminatory motive constitutes actual malice. *Weber,* 434 Mass. at 781; *Bray v. Cmty. Newspaper Co.* 67 Mass. App. Ct. 42, 48 (2006). As already discussed at length in conjunction with Plaintiff's discrimination claim, there is ample evidence that Kofman's justifications for terminating Rein are a pretext. His irrational explanation for reorganizing the department, his inconsistent and contradictory evaluations of Rein's performance, and his inability to recall a single specific example of the behavioral issues that led him recommend that Rein not be transferred to another position, provide the finder of fact with ample grounds for inferring a discriminatory intent.

Finally, there is evidence that, because of Rein's age and experience, Kofman felt threatened by him.[23] Along with Kofman, Rein had always been perceived as the group's natural leader. That is why the only two individuals seriously considered to lead the presentation to Stark were Kofman and Rein (the two oldest and most experienced members of the Group). It is also why Rein was the other person the group considered appointing to assume management of the group. (PMF, ¶138). That Kofman ended up being selected solely based on his physical proximity to Stark merely added to Kofman's underlying insecurity. (PMF, ¶138).

Had Rein been substantially younger than Kofman, he would not have been seen as someone who was in a position to assume a leadership role, and Kofman would not have perceived him as a threat. What made Rein dangerous in Kofman's eyes was that, because he was the same age as Kofman, he could potentially be perceived by members of the MPS Group, and others within

---

[23] For example, when Rein complained to Kofman about his apparent lack of focus on business development, Kofman threatened to retaliate against Rein if he took this issue up with Stark. (Rein Dep., pgs. 320-24).

Motorola, as Kofman's peer.  It is for precisely this reason that Kofman not only fired Rein, but came up with his cockamamie suggestion that the MPS Group be reorganized in a way that would insure that Rein was replaced with a "less experienced" "junior" employee, who was substantially younger than Rein and would therefore lack the age, experience and gravitas to be seen as a potential challenger to Kofman's leadership.  In short, it was Rein's age that proved to be his ultimate undoing.

## **Conclusion**

     For the foregoing reasons, the Plaintiff respectfully requests that this Court deny Defendants' Motion in its entirety.

JAY S. REIN

By his attorney,

<u>/s/John G. H. Coster</u>
John G. H. Coster
(BBO #101450)
92 State Street, Suite 900
Boston, Massachusetts 02109
(617) 423-2224

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a true copy of the above document was served on the attorney of record by ECF and first class mail on September 15, 2006.

<u>/s/John G. H. Coster</u>

24