# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
|
**JAY S. REIN,**                              )
                                              )
                                              )
                 **Plaintiff,**               )
                                              )
**v.**                                        )      **Civil Action No. 04-12580 NG**
                                              )
**MOTOROLA, INC., CLYDE**                     )
**KOFMAN, and JUERGEN**                       )
**STARK,**                                    )
                                              )
                 **Defendants.**              )
_____ )

## PLAINTIFF'S RESPONSE TO THE STATEMENT
## OF MATERIAL FACTS IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1 the plaintiff, Jay S. Rein ("Rein" or the "Plaintiff") hereby

submits this response to the Defendants' Statement of Material Facts in support of their Summary

Judgment Motion.

## FACTS MATERIAL TO DEFENDANTS'
## SUMMARY JUDGMENT MOTION[1]

I.      Plaintiff's Response to Defendants' Statement of Undisputed Facts

1.      Rein does not dispute the facts set forth in this paragraph ("Undisputed").

2.      Undisputed.

3.      It is undisputed that Kofman commenced working at Motorola in July of 2002

and that at the time of Rein's termination he was 42 years old.  Material facts are in dispute about

the nature and scope of Kofman's supervisory duties, as well as the circumstances that led to his

---

[1] Part I of this section consists of Plaintiff's response to defendants' statement of material facts identifying
which of these material facts are contested, together with citations to the record to support Plaintiff's
contention that these facts are in dispute.  Each number paragraph corresponds with the identically
numbered paragraph of Defendants' Statement of Material Facts in Support of Defendants' Motion for
Summary Judgment.   Part II of this section sets forth additional facts that the Plaintiff believes are material
to Defendants' Summary Judgment Motion.

assuming leadership of the MPS Group.  (Deposition of Jay S. Rein ("Rein Dep."), pgs 193-94,

pg. 321; Deposition of Clay Brice ("Brice Dep."), pgs. 89-92; Deposition of Clyde Kofman

("Kofman Dep."), pgs. 140-152).

4.    Undisputed.

5.    Undisputed.

6.    Undisputed.

7.    Undisputed.

8.    Undisputed.

9.    It is undisputed that Rein signed an Application for Employment on June 24,

2002.  At the time Rein signed this Application Motorola had already offered Rein a position,

which he accepted.  (Rein Deposition Ex. 8).  Rein signed the "Application" on the day he

reported for work.  (Rein Dep., pg 91).

10.    Disputed.  The statement is a legal conclusion, not a material fact.

11.    Undisputed.

12.    It is undisputed that on April 12, 2002 Rein wrote the CEO of Realizon.  The

remainder of this paragraph is disputed as it mischaracterizes the contents of this letter, which

never disputed that Realizon had a legal right to terminate him nor claimed that he was "entitled",

legally or otherwise, to anything.  (Rein Deposition Exhibit 5).

13.    Undisputed.

14.    Undisputed.

15.    Undisputed.

16.    Undisputed.

17.    It is undisputed that MPS did not meet its revenue goals in 2002.  It is also

undisputed that neither Rein, nor anyone else within the Rein's Group met their individual sales

goals or was eligible for a Sales Incentive Bonus.  (Rein Dep., pg. 346).  Rein did receive another,

performance based bonus from Motorola in 2002.  (Rein Dep., pg. 346.).

18.     It is undisputed that Rein received a performance review from Len DeBarros relating to his performance in 2002 and that the document marked as Exhibit A to the Affidavit of Peter Tobin ("Tobin Affidavit") is a copy of that review.  However, to the extent that paragraph 18 implies that Rein failed to meet sales and financial targets that were considered "key" or that he received a negative performance review from DeBarros, there are material facts in dispute. Thus, Plaintiff contends that DeBarros review was "very positive" and "very encouraging"; and that DeBarros viewed Rein as an individual who has "demonstrated that he can lead complex and large projects, with a focus on the Customer and with a large degree of both Energy and Passion". (Rein Dep., pg. 391; Exhibit A to Tobin Affidavit).  DeBarros also felt that Rein "has demonstrated that he can perform at a high level with little guidance and direction".  (Exhibit A to Tobin Affidavit).   To the extent that Defendants contend, either implicitly or explicitly, that Rein received anything other than an extremely positive performance review from DeBarros, there are material facts in dispute.

19.     Undisputed.

20.     It is undisputed that in March of 2003 the MPS Group was reorganized and that portions of the MPS Group were assigned to other divisions.  To the extent that Defendants contend that the MPS Group was "downsized" through substantial layoffs or reductions in force, there are material facts in dispute.  To Rein's knowledge, no employee lost their job as a result of the "downsizing" of the MPS Group.  (Rein Dep., pgs. 134-136).   Defendants have also failed to identify any employee who's employment was terminated as a result of this supposed "downsizing.

21.     It is undisputed that of the original MPS Group only about 26 members, including Rein and Kofman continued to operate as MPS.  To the extent that Defendants contend other members of the original MPS Group were terminated, rather than transferred to other departments or organizations, there are material facts in dispute.  (Rein Dep., pgs. 134-36; paragraph 20, above).

22.    Undisputed.

23.    Undisputed.

24.    It is undisputed that Rein contacted Russell Reynolds. To the extent that Defendants contend, either implicitly or explicitly that the purpose of Rein's contact was to utilize Russell Reynolds to find other potential positions, there are material facts in dispute. (Rein Dep., pg. 140).

25.    Undisputed.

26.    It is undisputed that Tom Niersbach had "some level" of interim responsibility for the MPS Group to "fill the void" until someone was hired to assume the management of the MPS Group. To the extent that Defendants contend that Niersbach exercised close supervision of Rein, or had any substantive knowledge of Rein's performance, there are material facts in dispute. (Rein Dep., pg. 146, 394-95).

27.    Undisputed.

28.    Undisputed.

29.    It is undisputed that, as of October 2003 the MPS Group was not profitable. To the extent Defendants contend that Rein was not generating revenue for the MPS Group, there are material facts in dispute, as Rein contends that he was in fact, generating revenue and had received enhanced sales credit for being the first Principal within MPS to generate revenue for the Group. (Rein Dep., pgs. 391-92, 412).

30.    Undisputed.

31.    Undisputed.

32.    Undisputed.

33.    Undisputed.

34.    Undisputed.

35.    Undisputed.

36.    Undisputed.

37.     Undisputed.

38.     It is undisputed that the Group made a second presentation to Stark and that Stark made the decision not to disband the MPS Group.  To the extent that Defendants characterize the continuation of the MPS Group as an ongoing "experiment" there are material facts in dispute. Plaintiff contends that at the conclusion of this meeting Stark promised the Group that they would have Motorola's "full support" through at least June 30th; and that he did not want any member of the Group to be "worrying about security here" or "to worry about your jobs".  Plaintiff further contends that Stark assured him, and the other members of the MPS Group, that he didn't want anyone to worry about his "seriousness" or Motorola's "seriousness" in committing to the security of their jobs and to keeping the MPS Group intact - at least through the second quarter of 2004. (Rein Dep., pgs. 273-74, 294-95, 314-15).

39.     Disputed.  (See paragraph 38, above).

40.     Disputed.  (See paragraph 38, above).

41.     Undisputed.

42.      Disputed.  (See paragraph 38, above).

43.     It is undisputed that at the end of 2003 Rein's group was again reorganized. However, to the extent that Defendants contend that the MPS Group was again "downsized" through layoffs or reductions in force, there are material facts in dispute.  With the possible exception of a couple of employees in the Latin American Group, Rein is unaware of any employee being terminated.  (Rein Dep., pgs. 290-91).

44.     Undisputed.

45.     It is undisputed that Stark asked the IMS Group to select one of its own members to act as the group's liaison to Stark, although there are material facts in dispute concerning the nature and scope of Kofman's supervisory duties, as well as the circumstances that led to his assuming leadership of the group.  (Rein Dep., pgs 193-94, pg. 321; Brice Dep., pgs. 89-92; Kofman Dep., pgs. 140-152).  There are further material facts in dispute to the extent that

5

Defendants characterize the continuation of the group as an "experiment". (See paragraph 38, above).

46.    It is undisputed that Kofman was eventually selected to serve as the liaison between the group and Stark, although there are material facts in dispute concerning the nature and scope of Kofman's supervisory duties, as well as the circumstances that led to his assuming leadership of the group. Rein Dep., pgs 193-94, pg. 321; Brice Dep., pgs. 89-92; Kofman Dep., pgs. 140-152).

47.    Disputed. (See paragraphs 3, 45 and 46, above).

48.    Undisputed.

49.    It is undisputed that, after October, there were discussions within the IMS Group about where they should focus their efforts and what business they should pursue. However, to the extent that Defendants assert that Stark endorsed a plan "that called for the group to narrow its business focus to field service mobility", there are material facts in dispute. Plaintiff contends that during this period there were continued discussions about what business opportunities the group would pursue and that Rein was specifically encouraged to pursue additional opportunities with two clients he had been developing, ExpressLink and LA Safe. (Rein Dep., pg. 313, Rein Dep. Exhibit 17, pgs. 3, 8, Kofman Dep., pgs. 127-29).

50.    Undisputed.

51.    Undisputed.

52.    Undisputed.

53.    It is undisputed that Kofman gave Rein a performance review in January of 2004. Material facts are in dispute concerning what input, if any, Kofman included from Rein's prior managers. (Kofman Dep., pgs. 155-56, 166-67, Ex. No. 6 to Kofman Dep.). There are further material facts in dispute concerning whether Niersbach exercised close supervision of Rein, had any real knowledge of Rein's performance, or included any substantive comments to his performance review. (Rein Dep., pg. 146, 394-95).

54.     It is undisputed that these were the written comments Kofman included in Rein's 2003 performance review.  Rein also recalls additional verbal comments made by Kofman to the effect that "2004 was potentially going to be a very good year for Jay Rein".  (Rein Dep., pg. 426).

55.     Undisputed.

56.     Undisputed.

57.     Undisputed.

58.     Material facts are in dispute.  Defendants contend that it was Tom Niersbach ("Niersbach") who input the managers comments in Rein's 2003 4-E's Assessment.  Plaintiff contend that it is unclear from the facts who prepared the Assessment, and, for reasons set forth more fully in Part II, below believes it is unlikely that it was Niersbach.  (See Part II, Plaintiff's Additional Material Facts, ¶¶149-155).

There are also material facts in dispute about whether the 2003 Assessment revealed any "blind spots" in Rein's performance.  Thus, while one of Rein's managers gave the Plaintiff substantially lower ratings than Rein gave himself in a number of categories, the assessment of Rein's direct reports in each of these categories were substantially higher and substantially closer to Rein's own ratings than the ratings of the manager.  (Kofman Dep. Ex. 2)   Similarly, Brice, who worked closely with Rein, confirmed that in his view, the manager's ratings of Rein's performance in nearly all of these categories were too low and did not accurately reflect Rein's underlying performance.  (Brice Dep., pgs. 117-21).

59.     Undisputed.

60.     It is undisputed that on or about January 18, 2004, Rein sent Invoke an e-mail declining their job offer.  The contents of this e-mail speak for themselves.  There are material facts in dispute concerning the terms of Invoke's offer, which Plaintiff contends included a base salary of $120,000 per year, plus commission, a potential bonus of $100,000 per year, the

potential for a "super bonus" if Rein exceeded his plan, and other benefits.  (Rein Dep., Exhibit 28).

61.    Undisputed.

62.    Undisputed.

63.    Undisputed.

64.    Material facts are in dispute.  The bonus Rein, and the other members of the IMS Group received was a retention bonus, designed to encourage them to remain with the company and stay focused and excited about achieving the long-term goals established for the IMS Group. (Rein Dep., pgs. 350-52; Brice Dep., pgs. 99-100; Retention Bonus)

65.    Plaintiff lacks sufficient knowledge to respond to this paragraph.

66.    Material facts are in dispute about whether the IMS Group had an "organizational mix" problem with too many individuals being focused on business development and too few people dedicated to the delivery of services to customers.  Plaintiff contends that, given the fact that the IMS Group's efforts to develop new business had been largely unsuccessful, it was irrational to eliminate an employee devoted to business development and replace him with individuals who would be devoted to delivering services the Group had, as yet, been unable to sell.  (Rein Dep. pg. 152;  Brice Dep. pgs. 152-53).

Material facts are also in dispute about whether Kofman believed it was necessary to shift the mix to make it more balanced between business development and deliver.  At the time Kofman was supposedly concluding that the group needed fewer individuals to engage in business development and more employees to deliver services, the IMS Group was generating virtually no new business.  (Rein Dep., pgs. 320-21, 360-61, Rein Dep., Ex. 23).  In fact, Motorola had just retained the services of an outside consultant to assist its business development activities by identifying qualified leads.  (Kofman Dep., pgs. 242-44).

67.    Material facts are in dispute.  At the time Rein was employed the IMS Group was generating very little business.  Rein repeatedly expressed his concern about the "volume and the

8

velocity" of the Group's business development activities and that the Group needed to add additional employees focused on business development . (Rein Dep, pgs. 336-37). For example, in his 2003 Self- Assessment Rein specifically mentions his expectation that he there will be "additional resources to assist in the business development effort". (Rein Dep., Kofman Dep. Ex. 6, pg. 6). Rein also believed that there wasn't "a need to discuss additional delivery heads until we had successfully shown … that we could sell". (Rein Dep., pg. 306-08). Brice agreed that, the MPS Group needed more people like Rein who were focusing on business development. (Brice Dep., pgs. 125-26).

68.     Material facts are in dispute. (See paragraph 67).

69.     Material facts are in dispute. According to Kofman the raison d'etre for the elimination of Rein's position was so that he could be replaced with two to three "less expensive" employees who would be focused on delivery, rather than business development. (Kofman Dep., pgs. 256-57, 275-77). Yet, after terminating Rein, no additional employees were hired. (Kofman Dep., pgs. 275-77).

70.     Material facts are in dispute. Kofman was neither familiar with, nor made any effort to review the prior experience and skill sets of either of the two principals before selecting Rein for termination. (Kofman Dep., pgs. 285- 87).

71.     Material facts are in dispute. Kofman was not sufficiently familiar with either Rein's or Gillardi's background to make this assessment. (Kofman, pgs. 265-66). In fact, Rein did have experience in this area. (Rein Dep., pgs. 80-82). The only member of the IMS Group that had classic field service mobility experience was Michael Humpleby. (Brice Dep., pgs. 144-45).

72.     Material facts are in dispute. In October of 2003 the IMS Group agreed that Rein should continue pursuing the Express-Link opportunity, and this was part of the presentation they made to Stark. (Stark Dep., Ex. 2, pg. 3). Stark authorized them to go forward in accordance with the plan presented to him in October. (Stark Dep., pg. 73). As soon as Rein was directed to

9

transition this opportunity to another Group he did so, even though he did not agree with the decision. (Kofman Dep., pgs. 208-09).

73.    Material facts are in dispute. (See paragraph 58).

74.    Material facts in dispute. Other than a single e-mail written by Rein that he thought had a harsh tone, Kofman cannot recall a single example of Rein being "abrasive" or difficult to work with. (Kofman Dep,, pgs. 287-88). Kofman also cannot recall who he discussed Rein's supposed abrasiveness with, other than Banakis and Lanci. (Kofman Dep., pg. 285). He is also unable to recall the specifics of his conversations with Banakis, Lanci or any other individual. (Kofman Dep., pgs. 284-85). He is also unable to recall a specific example any or these individuals gave him of Rein being "abrasive". (Kofman Dep., pgs. 284-85). He also does not know on what occasions either Banakis or Lanci even worked with Rein. (Kofman Dep., pgs. 284-85). He also cannot recall getting any feedback at all from the other members of IMS Group, who would have interacted with Rein on a regular basis, about whether Rein was abrasive or difficult to work with. (Kofman, pgs. 285-86). Brice, the individual who worked most closely with Rein while he was at Motorola, stated that he had never heard anyone, either inside or outside complain about Rein's behavior. (Brice Dep., pgs. 121-22). In fact, Brice had an excellent working relationship with Rein, based on mutual respect and remains friends with him to this day. (Brice Dep., pgs. 121-22, 139). Brice had, however, heard others members of the group complain about Kofman being difficult to work with, and he agreed with this assessment. (Brice Dep., pgs. 134-36).

75.    Undisputed.

76.    It is undisputed that Kofman presented a plan to Stark that is embodied in an attachment to an e-mail Kofman sent to Stark on or about February 11, 2004. (Kofman Dep., Exhibit 11). The contents of this attachment speak for themselves.

77.    Undisputed.

78.     Material facts are in dispute.  Stark testified that he agreed  with Kofman's "overall concept" but deferred to Kofman concerning the details because it was Kofman's "business to manage".  (Stark Dep., pg. 118).  There are also material facts in dispute about whether this was Stark's true motive.

79.     Undisputed.

80.     It is undisputed that Kofman informed Rein of his termination on February 23, 2004.  There are material facts in dispute concerning the substance of this communication.  Rein contends that Kofman told him the company planned to replace him with two less expensive, *younger* individuals.  (Rein Dep., pgs. 371-72).  The Defendants vigorously dispute this assertion. (Defendants' Memorandum in Support of Motion for Summary Judgment, pg. 6).  For his part, Kofman testified that he felt Motorola needed to eliminate a "*senior position*" and "hire some *less experienced* folk", although he did not necessarily anticipate these folks would be "fresh out of college".  (Kofman Dep., pgs. 258, 276-77 [emphasis added]).  Similarly, Stark testified that Kofman's proposal was to replace Rein with a couple of "*junior level*" employees who were "*less experienced*" than Rein.  (Stark Dep., pgs. 116-119, 131-32 [emphasis added]).

81.     It is undisputed that Rein requested and received a meeting with Stark to discuss the termination of his employment.  There are material facts in dispute concerning the substance of that meeting.  Rein contends that when he pointed out that he had no negative comments concerning his performance in his file, Stark threatened him that such documents could be created after the fact if necessary.  (Rein Dep., pgs. 169).  Stark recalls Rein saying that there was nothing negative in his file concerning performance but does not "believe" he threatened to create a paper trail to support Rein's termination.  (Stark Dep., pgs. 156).

82.     It is undisputed that Stark told Rein he would look further into the termination decision.  Material facts are in dispute about what, if anything Stark actually did to investigate Kofman's criticisms of Rein.  It appears that Stark did not speak with any of the individuals Rein suggested or anyone who was currently part of the MPS Group.  (Stark Dep., pgs. 147-48, Rein

Dep., pgs. 173-74).  Stark was also unable to recall the substance of the one conversation he remembers having.  (Stark Dep., pgs. 147-49).

83.     Undisputed.

84.     Undisputed.

85.     Undisputed.

86.     It is undisputed that, other than terminating Rein, rather than one of the other, younger members of the IMS Group, Motorola treated him less favorably than younger employees at the company.

87.     Undisputed.

88.     It is undisputed that Motorola never hired any additional employees for the IMS Group.

89.     Undisputed.

90.     Undisputed.

91.     Material facts are in dispute.  Stark has no memory of how Rein was being "abrasive" in his negotiations with Motorola.  In fact, Stark testified that he was unsure if Rein was actually "abrasive" or rather it he merely had a "gut feeling" that Rein might become "abrasive".  (Stark Dep., pgs. 175-76).  Stark also did more than counsel Rein not to "burn his bridges", he specifically threatened Rein that if he failed to sign a release  and sought legal counsel, Motorola would not pay him any severance and would throw an "army of lawyers" at him. (Rein Dep., pgs. 559-60).  Similarly, Tobin's Affidavit contains nothing but the conclusory assertion that Rein was abrasive and is devoid of any specific facts to support this assertion. (Tobin Affidavit, ¶17).

92.     Undisputed.

93.     Undisputed.

94.     Undisputed.  However, Motorola subsequently claimed that they had overpaid Rein and initially claimed Rein was obligated to reimburse them.

95.     It is undisputed that Kofman was not involved in negotiating Rein's severance, other than continuing to be apprised of the discussions. (Kofman Dep., pg. 320). Material facts are in dispute about whether Kofman or Stark discussed the Plaintiff's age with Tobin. Kofman told Rein he wanted to replace him with "younger heads". (Rein Dep., pgs. 371-72). Kofman himself testified that he wanted to replace someone in a "senior position" with "some less experienced folk". (Kofman Dep., pgs. 258, 276-77). Similarly Stark testified that Kofman's proposal was to replace Rein with a couple of "junior level" employees who were "less experienced" than Rein. (Stark Dep., pgs. 116-119, 131-32).

96.     It is undisputed that on or about March 15, 2004 Rein sent Tobin an e-mail concerning his termination. This document speaks for itself.

97.     Undisputed.

98.     It is undisputed that Rein contacted Janiece Webb ("Webb") about potential positions within the Integrated Electronic Systems Sector ("IESS") group. There are material facts in dispute about whether a position was available. Webb told Rein that "she had a head count that was waiting in the wings to be filled", and that once she received final approval "she would begin to fill those senior positions". (Rein Dep., pgs. 485-86).

Material facts are also in dispute about whether Kofman provided Webb with an honest assessment of Rein's strengths and weaknesses. Thus, Kofman told Webb that Rein was not a "team player", would not be "a good fit" for the group, and that he recommended that she not offer him a position. (Rein Dep., pg. 508). Similarly, in his memorandum to Stark recommending that Rein be terminated, Kofman stated that " I do not recommend keeping Jay in this group in a lower level, nor do I recommend attempting to move him to another E-15 position". (Kofman Dep., Ex. 11, pg. 3). Yet, only a few weeks prior to this conversation, Kofman had prepared a draft e-mail he was planning to send to Rein stating that he was willing "to explore with [Webb] the opportunity for you to work in her group". (Kofman Dep., Ex. 10).

13

Similarly, in the joint summary of Rein's 2003 performance, Kofman agreed that Rein "consistently meets predefined goal while using the 4E's + Always 1 behaviors", and that Rein was "a solid performer who is recognized as effective by management and key work partners". (Kofman Dep., Ex. 6, pg. 12). Yet, notwithstanding the foregoing, Kofman testified that, in his opinion Rein did not demonstrate the 4E's +1 behaviors and that he did not feel he could recommend him for other positions within Motorola. (Kofman Dep., pgs 287, 290-91, Kofman Dep. Ex. 11, pg. 3). Kofman has been unable to offer any credible explanation for these numerous inconsistencies. (Kofman Dep., pgs. 290-94, 315-18).

99.    Material facts are in dispute. Webb did contact Stark about the possibility of hiring Rein. (Stark Dep., pgs. 157-160, Stark Dep., Ex. 11).

100.    Undisputed, although initially Rein had difficulty obtaining reimbursement from Motorola. (Rein Dep., pgs. 521-22, Rein Dep. Ex. 38).

101.    Undisputed that Motorola eventually Rein's name to its Leadership and Talent program. However, material facts are in dispute about whether Motorola made a good faith effort to help Rein utilize this program. Thus, neither Rein's supervisor nor the Human Resources Department even told him about the availability of this program, as they were supposed to do. (Rein Dep. pgs. 490-92). Moreover, Motorola discouraged him from trying to use this as a potential avenue for finding another job within Motorola, notwithstanding the fact that he had been told by other employees and former employees that it was a very helpful and useful program. (Rein Dep., pgs. 498-500). Finally, there was a delay of approximately four to five weeks between Rein's termination and when Motorola he was able to begin participating in the program. (Rein Dep., pgs. 498-99).

102.    To the extent that Defendants' imply that they continued to consider Rein for a possible position within Motorola through October of 2004, there are material facts in dispute. Once Rein rejected Motorola's severance package, the company denied him access to Motorola's

servers, disabled his laptop computer and cut off all further communication with him. (Rein Dep., pgs. 33-34, 42-44, 497-98, 527-28, Rein Dep. Ex. 32).

103.    Undisputed.

104.    Undisputed.

105.    Undisputed.

106.    It is undisputed that Stark, Kofman and Tobin contend that they never spoke with anyone at Russell Reynolds about Rein's termination or job performance. However, Kofman has testified that: (i) he is close personal friends with Eric Sigurdson, another principal at Russell Reynolds; (ii) their children go to school together; (iii) Mr. Sigurdson initially told him about the position within Motorola and helped to place him there; (iv) he frequently discussed business with Mr. Sigurdson, including the IMS Group. (Kofman Dep., pgs. 23-24, 41-45, 48).

107.    Undisputed.

108.    Material facts are in dispute. Kofman knew that both he and Rein had been recruited by Russell Reynolds and Rein believes that he "may have" told Kofman about his continuing relationship with Paul Zellner. (Rein Dep., pgs. 482-83).

109.    Material facts are in dispute. It is undisputed that Kofman prepared a job requisition for an employee with "5-10 years of experience". (Job Requisition Form). Kofman is unsure whether Mr. Cheetle ever submitted an application for this position. (Kofman Dep., pgs. 260-61). Although Kofman had worked with Mr. Cheetle, he was not only able to estimate his age, he was unsure if he was under thirty or over sixty. (Kofman Dep. pgs. 264-65).

110.    Material facts are in dispute. After telling Rein his employment was being terminated so that the Motorola could retain two to three younger employees, Kofman was able to identify existing employees who could assist the IMS Group in delivering on its engagements. (Kofman Dep., pgs. 262-63).

111.    Undisputed.

112.    Undisputed.

II.    Additional Material Facts[2]

A.    Rein's Performance Under Len DeBarros

113.    Between June of 2002, when he commenced working at Motorola and mid-2003 Rein reported to Len DeBarros, a senior vice president in charge of the MPS Group.  (Defendants' Statement of Undisputed Facts ("Defendants' Undisputed Facts"), ¶¶15, 22).

114.    DeBarros and Motorola were initially extremely impressed with Rein's performance.  At the conclusion of his initial 120 day probationary period Rein was told that the company "loved him" and that his performance "far exceeded anything they thought they were getting during the interview process".  (Rein Dep., pgs. 447-48).

115.    During 2002 DeBarros reviewed Rein's performance quarterly.  (Rein Dep., pgs. 397-400).  These quarterly reviews resulted in the creation of a document prepared jointly by Rein and his manager reflecting their discussions and evaluating Rein's performance.  (Rein Dep., pgs. 389-91, , Rein Dep. Ex. 25).

116.     At the August checkpoint, Debarros reviewed Rein's performance and told him he saw "no issues that might interfere with" Rein's success in the job.  (Rein Dep. Ex. 25, pg. 6).

117.    At the October checkpoint, DeBarros again confirmed that there were "no known issues that might interfere with [Rein's] success".  (Rein Dep. Ex. 25, pg. 7).

118.    At the conclusion of 2002 DeBarros again met with Rein to review his performance for the year.  (Rein Dep., pgs. 390-91, Rein Dep. Ex. 25).  Once more Rein received a "very positive" performance review from DeBarros.  (Rein Dep., pg. 391).

119.    In the "Manager's Comments" section of the final written review of Rein's performance for 2002 DeBarros praised Rein for demonstrating "that he can lead complex projects, with a focus on the customer and with a large degree of both Energy and Passion".  (Rein Dep. Ex. 25, pg. 8).  DeBarros year end comments also note that Rein "has demonstrated

---

[2] Plaintiff will leave it to the Defendants to respond whether such facts are, for the purposes of this Motion, disputed or undisputed.

that he can perform at a 'high level', with little guidance and direction". (Rein Dep. Ex. 25, pg. 8).

After conferring together, Rein and DeBarros prepared the following joint summary of Rein's

overall performance for 2002:

> "ES Performance always meets and often exceeds predefined goals, while
> demonstrating expected 4 …E's + Always 1 behaviors. Individual consistently
> achieves high levels of commendable performance and is recognized as highly
> effective by management team and key work partners.

(Rein Dep. Ex. 25, pg. 10).

120.    DeBarros also performed another review of Rein's performance prior to his

departure in mid-2003. (Rein Dep., pgs. 391-92). This performance review by DeBarros was

also very positive, highlighting that Rein was the first member of the MPS Group to land

substantial business for Motorola. (Rein Dep., pg. 392). In fact, to reward Rein for his

performance DeBarros indicated that he would be given "four times sales credit" for bringing in

this business. (Rein Dep., pg. 392, 412, Kofman Dep. Ex. 6, pg. 7). DeBarros also noted that,

"2003 is shaping up to be a very successful year for Motorola Professional Services and for Jay

Rein". (Rein Dep., pg. 412-13, Kofman Dep. Ex. 6, pg. 7).

    B.    <u>Rein's Performance Under Tom Niersbach</u>

121.    After DeBarros departure in mid-2003 Tom Niersbach, MPS's controller

assumed temporary responsibility for managing the MPS Group. (Defendants' Undisputed Facts,

¶26, Rein Dep., pg. 146).

122.    Niersbach was not interested in having permanent responsibility for managing

the MPS Group, and reluctantly agreed to serve as an interim manager "to fill the void" until a

permanent manager could be hired for MPS. (Rein Dep., pgs. 146-48).

123.    Niersbach served as temporary manager for a couple of months. (Rein Dep., pgs.

396-96, Kofman Dep., pg. 64). During that period of time there was little leadership of the MPS

Group by Niersbach. (Kofman Dep. pg. 65). In fact, Clay Brice, who was also one of the

employees in the MPS Group, could not even recall whether Niersbach was responsible for managing the MPS Group. (Brice Dep., pgs. 51-53).

124.    Niersbach gave the members of the MPS Group a single quarterly performance review. He told them that, "because he didn't have any exposure to [their] activity" he was going to give each of them a neutral performance review so that they would all end up "looking the same way" to their next manager. (Rein Dep., pgs. 395-96, 313-14, 422). Kofman concedes that the only substantive comment he can recall receiving from Niersbach during his performance review was to "keep doing what you are doing". (Kofman Dep., pgs. 67-70).

125.    It is unclear what, if any, substantive comments Niersbach contributed to Rein's 2003 written performance review, although he did sign off on that portion of the review that stated, "Jay Rein will be an invaluable leader to CGIS and Motorola Inc.'s play in the enterprise space" and "I expect that with appropriate Executive Leadership the potential for Jay Rein to evolve as a leader within Motorola, Inc. will be discovered." (Kofman Dep. Ex. 6, pg. 11).

C.    Stark Becomes Responsible for the MPS Group and Must Decide Whether the Group Will Continue to Operate Going Forward

126.    On or about July 7, 2003 Juergen Stark commenced working for Motorola as a Corporate Vice President. (Stark Dep., pgs. 37-38). One of the groups Stark was responsible for overseeing was the MPS Group. (Stark Dep., pgs. 39-40).

127.    At the time Stark assumed responsibility for the MPS Group, it was losing money, not on track to meet its sales goals, and was not a profit center for Motorola. (Stark Dep., pgs. 55-57).

128.    When Stark first started working at Motorola he was focused on other matters and had limited interactions with the MPS Group. (Kofman Dep., pgs. 67-68; Rein dep., pgs 158-59, 178-9, Stark Dep., pgs. 46-47). The first time he met with the MPS Group as a group was in October of 2003. (Stark Dep., pgs. 46-47).

129.     Prior to meeting with Stark, member of the MPS Group were worried about whether the MPS Group would be disbanded and the security of their jobs at Motorola.  (Rein Dep., pgs. 137-41, 154-55).  The members of the MPS Group frequently discussed these concerns among themselves.  (Rein Dep., pgs. 137-41).  Rein also discussed his concerns with Paul Zellner, the recruiter who had originally placed him with Motorola.  (Rein Dep., pgs. 154-55).

130.     The members of the MPS Group had cause to be concerned because prior  to this meeting Stark had not made a determination whether or not the MPS Group would be disbanded.  (Stark Dep., pgs. 57).

D.     The MPS Group Meets with Stark

131.     Prior to the meeting with Stark there were "intense" discussions within the MPS Group about whether Rein or Kofman should lead the presentation.  (Rein Dep., pgs. 206-08, 212-13).  Eventually Kofman was selected and he was the lead presenter in the initial meeting with Stark.  (Rein Dep., pgs. 189).

132.     Kofman's presentation did not go well, and Stark was clearly disappointed with it. (Stark Dep., pgs. 58-59, Rein Dep., pgs. 219).  Based on this presentation, there was some doubt in Stark's mind whether he would approve the MPS Group continuing to operate going forward.  (Stark Dep., pg. 68).  However, before deciding to "pull the plug" he agreed to give the group an opportunity to make another presentation.  (Rein Dep., pg. 219).

133.     This time, there was no debate about who would lead the group's presentation - it was Rein.  (Rein Dep., pgs. 220-22).  Everyone understood that it this presentation were not successful, it was likely that the MPS Group would be disbanded by the end of the year.  (Rein Dep., pgs. 222-23).

134.     The second presentation, led by Rein, was far more successful.  (Stark Dep, pgs. 68-69).

135.    At the conclusion of the meeting, Stark told the group that he was prepared to let the MPS Group continue operating going forward and that he would check back in mid-04' to see "where the business was at".  (Stark Dep., pgs. 74-75).

136.    A few minutes after adjourning the meeting and leaving the room, Stark returned. (Rein Dep., pgs.273, 293-94).  Upon returning, Stark specifically assured the members of the MPS Group that he was serious about keeping them.  He told them not to worry about the security of their jobs or their employment at Motorola and promised them that they would have until June 30th to produce results.  (Rein Dep., pgs. 273-74, 294-95, Stark Dep., pgs. 76-78).

137.    At the conclusion of the meeting the individual members of the MPS Group were "elated" that they were being given another eight months to make the MPS Group successful. (Rein Dep. pg. 293).

E.    Kofman Assumes Leadership of the MPS Group and Given Rein his Year End Performance Evaluation

138.    In late 2003 Stark asked the MPS Group to select one of its own members to act as the group's liaison to Stark.  (Stark Dep., pgs. 82-85).  Although some members supported Rein for this position, Kofman was eventually selected because of his physical proximity to Stark. (Kofman Dep., pgs. 141-43, Rein Dep., pgs. 193, 321).  Kofman formally assumed the role of leader in December of 2003.  (Kofman Dep., pgs. 149-50).

139.    In early 2004 Kofman reviewed Rein's performance.  (Kofman Dep., pg. 153, Kofman Dep. Ex. 6, pg 12).

140.    After conferring together Rein and Kofman agreed on the following joint written summary of Rein's performance for 2003:

> MX Performance consistently meets predefined goals, while using the expected  4E's + Always 1 behaviors.  At times this individuals performance may exceed expectations.  Overall, the performance that this individual demonstrates accomplishes the job.  The individual is a solid performer who is recognized as effective by management team and key work partners.

(Kofman Dep. Ex. 6).

141.    Kofman did not discuss with Rein any concerns he supposedly had about his performance.  (Kofman Dep., pg. 167).

F.    Motorola Makes Additional  Promises and Representations to Rein to Induce  Him to Remain with the Company and Remain Focused on Developing Business for the MPS Group.

142.    2003 had been an unstable year for the MPS Group.  Both the manager of the group, DeBarros, and his manager, Kevin Loosemore ("Loosemore") left the company - Loosemore for a position with another company.  (Rein Dep., pgs. 95, 132-33, 181).  The MPS Group itself had undergone considerable reorganization, going from 200 employees, to approximately 26 employees to 5 employees.  (Rein Dep., pgs. 93-94, 97, 134-35).  The MPS Group had lacked leadership and direction.  (Kofman Dep., pg. 65, Kofman Dep. Ex. 6).   The Group had not been able to achieve their goals for the year.  (Rein Dep., pg. 349, Stark Dep., pg. 65).  Until their meeting with Stark in October of 2003 the group was unsure whether they would continue to exist or be disbanded.  (Rein Dep., pgs. 137-41, 154-55).

143.    To eliminate any lingering uncertainty Rein might have about the security of his position at Motorola, to dissuade him from exploring potential opportunities with other companies, and to insure that the MPS Group did not lose a key employee, during Rein's 2003 performance review Kofman made specific oral and written representations about Rein's future with the company.  He told Rein that 2004 looked like it would be a very successful year for him at Motorola.  (Rein Dep., pg. 397, 426).  In his written performance evaluation of Rein, he promised him that, in 2004 Rein would be given "an opportunity for [his] capabilities to come through more clearly and for MPS to continue to create value for CGISS".  (Kofman Dep. Ex. 6, pg. 12).  Kofman wrote this because he believed that, while 2003 had been a challenging year for MPS, 2004 "would be more stable than the previous year, Jay would have the opportunity to see what he could do…".  (Kofman Dep., pg. 162).

144.    As further evidence that Motorola remained committed to Stark's prior promises that no further changes would be made to the MPS Group and that Rein, and the other members of the group, would be given until at least June 30, 2004 to show that they were making progress towards meeting their goals, Kofman arranged for members of the MPS group to receive a bonus in early January of 2004. (Kofman Dep., pgs. 169-171).  Kofman felt that such a bonus was necessary to "improve the morale for the team" to encourage the "team members [to] stay focused" and to insure that the small group of five people he managed remained intact so they could meet the aggressive goals that had been set for them.  (Kofman Dep., pgs. 169-72).

145.    Kofman told Rein that this bonus was a "retention" bonus, and this was how Motorola characterized this bonus in the paperwork that accompanied its payment.   (Rein Dep., pgs. 350-51, Retention Bonus).

146.    On January 5, 2005, shortly before receiving these assurances about his future at Motorola from Kofman and the retention bonus, Rein had received job offer from Invoke Solutions, Inc. ("Invoke").(Rein Dep., pg. 455, Rein Dep. Ex. 28).

147.    Invoke's job offer was for a position as Vice President of Channels & Solutions, with a base compensation of $120,000, plus commissions.  Under the company's commission plan, Rein would earn an additional $100,000 in commissions if he if he met his revenue targets, and would also have the opportunity to earn a "super bonus" over and above these payments. (Rein Dep. Ex. 28).

148.    On January 18, 2004, in reliance on the promises and assurances of he had received from Motorola, Rein turned down the position at Invoke.  (Rein Dep., pgs. 461, 463-65, Rein Dep. Ex. 29).

F.    Rein's 2003 Leadership Assesment Review

149.    At some point in time Rein, one of his direct reports and one of his managers completed a "Leadership Assessment Multi-Rater Feedback Report" (the "Leadership Assessment Report") relating to Rein' performance in 2003.  (Kofman Dep. Ex. 2).   The Leadership

22

Assessment Report is a shell document that is normally completed online using a computer. (Kofman Dep., pg. 74). It is undated, as are all of the specific entries. (Kofman Dep. Ex. 2). It is unsigned. (Kofman Dep. Ex. 2). It contains ratings by "self", "primary manager" and "direct report". (Kofman Dep. Ex. 2).

150.    Although Rein thinks he may have prepared some self-assessments in a different context that could have fed into this report, he had never seen this document before. (Rein Dep., pgs. 432-33, 441, 445-46).

151.    None of the negative ratings contained in this report were ever discussed with Rein and he was completely unaware of them. (Rein Dep., pgs. 446-47).

152.    Kofman cannot tell from reviewing the Leadership Assessment Report who inputted the manager's ratings, but thinks it "would have been Niersbach", and "doesn't believe [he] prepared" the Report. (Kofman Dep., pgs. 77-78).

153.    Whoever, inputted the manager's ratings, a number of these ratings relating to Rein's leadership, team spirit, and ethics were substantially lower than either Rein's self-rating or the rating of his direct report. (Kofman Dep. Ex. 2, pg. M00096). In each of the rating of Rein's direct report was substantially closer to Rein's self-assessment than to the rating Rein received from his manager. (Kofman Dep. Ex. 2, pg. M00096).

154.    Brice, who worked closely with Rein on a number of sales opportunities, does not recall if he was the direct report who contributed ratings to the Leadership Assessment Report. He does, however, agree with the ratings Rein received from his direct report. (Brice Dep., pgs. 117-20).

155.    Rein contends that it is unlikely that Niersbach input these ratings because:

    (i)    Kofman himself appeared unsure if Niersbach prepared this review. (Kofman Dep., pgs. 76-78, 82);

    (ii)    Niersbach was an interim manager, who was only responsible for the IMS Group for a few months and had little interaction with the individual members of the group. (Rein Dep., pgs. 146-48, Kofman Dep., pg. 64)

(iii)     Niersbach specifically told each of the members of the IMS Group that because he had only been an interim manager, he was going to give all the members of the group "the same review" and a "neutral" review because he "didn't have any exposure to our activity", that he "didn't want to have any responsibility for the group".  (Rein Dep., pgs. 395-96, 313-14, 422).

G.     The Reasons Given by Kofman for Terminating Rein's Employment Are Not Credible

156.     Kofman claims that he made the decision to terminate Rein's employment for the following reasons:

(i)     There was an "organizational mix issue" - the MPS Group needed fewer individuals focused on business development and two to three additional people focused on delivering services.  (Kofman Dep., pgs. 255-58).  This was the primary reason for terminating Rein's employment.  (Kofman Dep., pg. 265, Kofman Dep. Ex. 11).

(ii)     The MPS Group had decided they were going to focus on developing business in the area of field service mobility, and in Kofman's view Rein did not have sufficient experience in this area.  (Kofman Dep., pgs. 265-66).

(iii)     Rein's "continuing behavioral issues", including "poor respect for others", being "confrontational and argumentative", an "inability to stay focused" and the "blind spots" that had showed up in Rein's Leadership Assessment Report.  (Kofman Dep. Ex. 11, Kofman Dep., pgs. 280-81).

157.     None of the reasons Kofman gave for terminating Rein are credible.  At the time Rein was fired the MPS Group had been relatively unsuccessful at business development, and, both Rein and Brice testified that, if anything Motorola needed additional resources devoted to business development.  (Rein Dep, pgs. 336-37, Brice Dep., pgs. 125-26).  For example, Brice stated that terminating Rein only "hampered" the MPS Group's business development and sales efforts.  (Brice Dep., pgs. 125-26).  In fact, although Kofman now contends that the MPS Group needed fewer resources devoted to business development, shortly before terminating Rein he approved Motorola retaining an outside consultant to assist its business development activities by

identifying qualified leads. (Kofman Dep., pgs. 242-44). Ironically, Rein was actually on his way to Chicago to meet with these consultants when he was fired. (Rein Dep., pgs. 368-71).

Moreover, although the purpose of firing Rein was to make resources available to hire 2-3 "delivery people" and Kofman believed that group's "organizational mix issue" could only be solved by eliminating Rein's position and hiring 2-3 delivery folks, no additional delivery folks were ever hired. (Kofman Dep, Ex. 11, Kofman Dep., pgs. 276-77).

158.    Notwithstanding Kofman's supposed belief that Rein did not possess the same experience in the area of field service mobility as Gillardi, Kofman was not sufficiently familiar with either Rein's or Gillardi's background to make this assessment. (Kofman, pgs. 265-66). Rein did in fact have experience in this area. (Rein Dep., pgs. 80-82). Moreover, the only member of the IMS Group that had classic field service mobility experience was Michael Humpleby. (Brice Dep., pgs. 144-45).

159.    With respect to Rein's supposed "behavioral issues", with the exception of a single e-mail whose tone Kofman felt was "harsh", he was unable to identify a single specific example of these supposed behavioral issues. (Kofman Dep., pgs. 287-88). Kofman also does not recall ever discussing these "behavioral issues" with Rein, either in the context of a performance review or otherwise, and Rein has testified that he never received any warnings from Kofman, or anyone else. (Kofman Dep. pg. 167, 300; Rein Dep. pgs. 168-9, 513).

H.    Age Was a Deciding Factor in the Decision to Terminate Rein's Employment

160.    With the exception of Kofman, who made the decision to terminate him, Rein was the oldest individual working in the MPS Group. (Defendants' Statement of Undisputed Fact, ¶85). Rein is also younger than Stark. (Defendants' Statement of Undisputed Fact, ¶84).

161.    Rein was told by Kofman that he was being fired so that he could be replaced by two less expensive, younger individuals. (Rein Dep., pgs. 371-72).

162. Kofman admitted that he believed Motorola needed to eliminate a "senior position" and "hire some less experienced folk", although he did not necessarily anticipate these folks would be "fresh out of college". (Kofman Dep., pgs. 258, 276-77).

163. Stark admitted that Kofman's proposal was to replace Rein with a couple of "junior level" employees who were "less experienced" than Rein. (Stark Dep., pgs. 116-119, 131-32).

I.    Kofman Maliciously Interferes With Rein's Effort to Find Another
      Position Within Motorola

164. On or about February 3, 2004 Kofman prepared an e-mail that he planned to send to Rein stating that he was "willing to explore with [Webb] the opportunity for you to work in her group". (Kofman Dep. Ex. 10). Kofman confirmed that, at the time he wrote this e-mail, he was willing to support Rein's transition to another group within Motorola. (Kofman Dep., pgs. 250-51). He also indicated to Stark that if Rein was interested in pursuing a "different career path" within Motorola he would "support the exploration. (Kofman Dep Ex. 10). Around this same time Kofman also asked Brice if he thought Rein would be interested in transferring to the IESS (Webb's) group.. (Brice Dep., pg. 158).

165. A few weeks prior to terminating Rein's employment, Korman also signed a written performance review of Rein that contained the following joint written summary of Rein's performance:

> MX Performance consistently meets predefined goals, while using the expected 4E's + Always 1 behaviors. At times this individuals performance may exceed expectations. Overall, the performance that this individual demonstrates accomplishes the job. The individual is a solid performer who is recognized as effective by management team and key work partners.

(Kofman Dep. Ex. 6).

166. Notwithstanding the foregoing, in the attachment to his February 11, 2004 e-mail recommending the termination of Rein's employment, Kofman stated that he did not recommend "attempting to move Rein" to another position with Motorola. (Kofman Dep. Ex. 11). Kofman

also stated that, based on his review of Rein's prior evaluations, discussions with 4-6 of Rein's co-workers and his own observations, "it is clear that Jay does not exhibit the 4e's +1 leadership behaviors required of Motorola staff at his grade level". (Kofman Dep. Ex. 11). Among other things, Kofman criticized Rein for showing "poor respect for others" being "confrontational and argumentative", and coming across "as desperate (i.e. focused on saving his job first). (Kofman Dep. Ex. 11).

167.    Kofman is unable to recall any specific examples of the behaviors identified in the attachment to this e-mail, other than a single e-mail Rein sent to a potential customer that he considered unduly "harsh". (Kofman Dep., pgs.277, 284-89).

168.    Kofman was also unable to explain or reconcile the apparent inconsistencies between Rein's 2003 performance review and his February 3rd e-mail to Stark on the one hand, and the statements contained in the attachment to the February 11, 2004 e-mail he sent to Stark recommending Rein's termination on the other hand. (Kofman Dep., pgs. 291-95).

169.    In March of 2004 Rein was actively exploring several potential opportunities within Motorola, including a position within the IESS group. (Rein Dep., pgs. 484-86). He was also seeking a potential position that was available in Motorola's BCS Group, and was flown down to Pennsylvania to interview for this position. (Rein Dep., pgs 486-88).

170.    Webb contacted Kofman and described the position she was trying to fill - describing the "skill and experience" she was looking for. (Kofman Dep., pgs. 306-07). Kofman told Webb his opinion of what Rein's strengths were and "the areas he thought Rein could improve in". (Kofman Dep., pgs. 306-07). He is unable to recall what he told Webb about the areas Rein needed to improve on. (Kofman Dep., pgs. 307-08).

171.    Rein subsequently learned from Webb that Kofman had told her that Rein was "not a team player", "not a good fit" for the position, and that he would "not recommend her taking me on". (Rein Dep., pg. 508).

172.    As a result of this conversation, Rein wrote a memorandum to Kofman requesting that he not "slander my team-playing abilities".  (Kofman Dep. Ex. 13, Rein Dep., pgs. 519-20).

173.    Despite his best efforts, Rein was unable to find another position within Motorola.  In fact, all the individuals he was discussing potential positions with stopped returning his calls.  (Rein 511-12, 527-30).

J.    Kofman Seeks To Replace Rein With A Younger Employee With 5-10 Years Of Experience

174.    Stark authorized Kofman to hire one additional person to replace Rein.  (Kofman Dep., pg. 258).

175.    Kofman prepared a job requisition seeking an employee with "5-10 years of experience" as a "replacement" for Rein.  (Job Requisition, Kofman Dep., pg. 258).

176.    Kofman interview at least one prospective applicant, as did the Human Resources Department.  (Kofman Dep., pgs 258-59).

177.    Kofman can only recall one specific candidate, who he had worked with before. He does not know this individuals age and is unsure if he is over 30 or under 60.  (Kofman Dep., pgs. 264-65).

178.    In late 2004 the decision was made not to hire an additional person because Motorola was able to identify resources from existing groups that could help them deliver on their engagements.  (Kofman Dep., pgs. 262-63).

JAY S. REIN

By his attorney,

/s/John G. H. Coster
John G. H. Coster
(BBO #101450)
92 State Street, Suite 900
Boston, Massachusetts 02109
(617) 423-2224

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served on the attorney of record by ECF and first class mail on September 15, 2006.

<u>/s/John G. H. Coster</u>