UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAY S. REIN ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 04-12580 NG |
| ) | |
| MOTOROLA, INC., CLYDE KOFMAN ) | HEARING REQUESTED |
| and JUERGEN STARK ) | |
| ) | |
| Defendants. ) | |
| ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE RELATING TO MOTOROLA LEADERSHIP MULTI-RATER FEEDBACK REPORT**

Defendants Motorola, Inc. ("Motorola"), Clyde Kofman ("Kofman") and Juergen Stark ("Stark") (collectively, "Defendants") hereby submit their opposition to Plaintiff Jay Rein's ("Plaintiff" or "Rein") motion in limine for an order excluding evidence relating to Motorola's Leadership Multi-Rater Performance Assessment (hereinafter the "RPA"). In his motion in limine, Plaintiff argues that the Court should exclude the RPA because (i) Defendants cannot authenticate the document and (ii) Kofman, like Rein, testified that he had never seen the document. Plaintiff claims that it is therefore irrelevant to the layoff decision. Defendants respond that Thomas Niersbach ("Niersbach") will authenticate the RPA at trial. In addition, Defendants argue that it is one of the most relevant documents in the litigation and the jury has a right to see it.

## INTRODUCTION

Plaintiff, a former Motorola employee, was laid-off as part of a reorganization of his MPS business division in February 2004. Plaintiff alleges that his managers chose his job for elimination because of his age (40) in violation of the ADEA and M.G.L. 151B. Plaintiff also

BO1 15811049.1

alleges that his managers should be estopped from terminating him because they promised to employ him until at least June 2004. Finally, he alleges that his immediate supervisor, Kofman, interfered with his ability to get other jobs within Motorola after the job elimination.

There is no dispute between the parties that Niersbach managed Rein in 2003 before Defendants Stark and Kofman became his managers. As such, Mr. Niersbach was charged with assessing Rein's leadership skills in 2003.

The RPA document at issue in this motion is Rein's Leadership Relative Performance Assessment. In the "4-Es" component of the RPA, Motorola asked Rein to rate his own performance, and then asked his manager at the time, Niersbach, and a coworker, to rate Rein's performance in those same areas. Motorola refers to those areas where Rein rated himself higher than his manager or peers as Rein's "blind spots." According to the RPA, Rein's blind spots were in important areas including delivering on commitments to customers, demonstrating constant respect for people, keeping the organization focused on executing the plan, meeting key short-term objectives, and honesty.

When Kofman concluded in February 2004 that he needed to eliminate one of the highly-paid MPS Principal positions, he chose Rein's position for elimination based on several factors: (1) Rein was not adequately focused on the group's chosen area of "field service mobility" and had less experience in that area than John Gillardi; (2) **Rein's 2003 leadership assessment had revealed eight "blind spots" in key areas,** and (3) Kofman's belief, corroborated by feedback from coworkers, that Rein could be abrasive and difficult as part of a team. After reviewing Kofman's rationale, Stark agreed and approved the decision.

2

BO1 15811049.1

By this motion, Plaintiff seeks to exclude the document which reflects one of the three key legitimate business reasons Motorola chose Rein for layoff. As grounds for his motion, Plaintiff argues that since Kofman testified at his deposition that he had never seen the RPA document, Defendants cannot authenticate the document and this Court should exclude it from evidence. Plaintiff concedes in his motion that Defendants have identified Niersbach as the manager who prepared the manager RPA ratings. The only reason that there is no evidence that Niersbach prepared the RPA is that Plaintiff chose not to depose Niersbach. However, Niersbach will be testifying at trial and he can explain to the jury how he prepared the document and he will lay an appropriate foundation for it. As such, Rein's objection to the admissibility of this document is not ripe, and Plaintiff may raise it again after Neirsbach testifies if he still feels that Defendants have not laid an appropriate foundation.

Plaintiff also argues that since Kofman testified that he had never seen the final document, the RPA is irrelevant and it could not have formed the basis for Kofman's decision to choose Rein for layoff. Plaintiff conveniently ignores Kofman's other relevant deposition testimony as set forth below:

> Q: So is it your testimony that the information contained in this document would have been something that you utilized in making a performance evaluation of Mr. Rein?
>
> A: Yes.
>
> Q: Is it also your testimony that the information contained in this document is not information that you yourself inputted?
>
> A: That's my recollection. Yes.

Kofman Dep. at 78.

> Q: Did you ever discuss the information contained on Exhibit 2 with Mr. Neirsbach?
>
> A: I may have, yes.

3

> Q: Do you have a specific recollection about any discussions with Mr. Neirsbach concerning the information contained on Exhibit 2?
>
> A: It seems to me that looking at Exhibit 2 which starts on page 75 and goes on to page 76, that appears to be the manager and direct report prospectives. It's a two by two that looks at both hidden strengths and blind spots. And I recall asking Tom about what was in those categories and what was behind those areas.

Kofman Dep. at 81.

Once again Kofman testified as follows:

> Q: Did you ask Mr. Neirsbach why there appeared to be blind spots with respect to Mr. Rein's performance?
>
> A: We certainly talked about the fact that there were blind spots that suggested his view of—if I am correct that Tom Neirsbach filled this out—by definition his rating in these categories was lower than the individual itself. I inquired about that and he acknowledged that there were some.

Kofman Dep. at 82. Kofman also made clear that he was used to seeing the document on a computer screen. Kofman Dep. at 74.

Similarly, Rein himself testified that he participated in a process where various people, including peers, provided input electronically to performance assessments, and that he participated in electronic self-assessments. Rein Dep. at 389-90; 445-46; 735-6; 745.[1] When shown the RPA itself, Rein testified that he believed that Niersbach had printed the document for him. Rein Dep. at 432. Plainly, the RPA is a printout of a computer screen so Rein's observation that it is unsigned and that he does not recall seeing it in printed form are irrelevant.

There can be no question from the foregoing that Kofman relied on the information in the RPA which he learned from conversations with Niersbach who prepared it. Therefore, not only is the document relevant, but it is one of the seminal documents in this case and the jury has a right to see it and consider it.

---

[1] Excerpts of the Rein testimony are attached hereto as Exhibit A.

BO1 15811049.1

## CONCLUSION AND REQUEST FOR HEARING

For the foregoing reasons, Defendant respectfully requests that the Court deny Plaintiff's motion in limine and permit Defendants to introduce excluding evidence relating to Motorola's Leadership Multi-Rater Performance Assessment.

Defendants believe that a hearing will aid in the disposition of this Motion, and hereby request a hearing.

Respectfully submitted,

Dated: November 7, 2006

MOTOROLA, INC., CLYDE KOFMAN,
and JUERGEN STARK,
By their attorneys,

/s/ Kristin G. McGurn
Lynn A. Kappelman (BBO# 642017)
Kristin G. McGurn (BBO# 559687)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:    (617) 946-4800

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was served upon the attorney of record for the plaintiff via ECF and by mailing a copy of same, postage prepaid, to John G. H. Coster, Attorney at Law, 92 State Street, Suite 900, Boston, MA  02109 on November 7, 2006.

/s/ Kristin G. McGurn

BO1 15811049.1

# EXHIBIT A

```
                                                              226

                                    Volume:      II
1
    CERTIFIED ORIGINAL
2   LEGALINK BOSTON              Pages:       226-590

3                                   Exhibits:    15-49

4              UNITED STATES DISTRICT COURT

5           FOR THE DISTRICT OF MASSACHUSETTS

6              Civil Action No. 04-12580 NG

7   - - - - - - - - - - - - - - - - - - - - - - - x

8   Jay S. Rein,

9                    Plaintiff,

10       v.

11  Motorola, Inc., Clyde Kofman,

12  and Juergen Stark,

13                   Defendants.

14  - - - - - - - - - - - - - - - - - - - - - - - x

15

16          DEPOSITION OF JAY STUART REIN

17             Friday, August 26, 2005

18                   10:00 a.m.

19               SEYFARTH SHAW LLP

20             World Trade Center East

21           Two Seaport Lane, Suite 300

22          Boston, Massachusetts 02210-2028

23

24  Reporter:  Lori-Ann London, RPR
```

Jay Stuart Rein, Vol. 2                          08/26/2005

389

1    Q    Describe Motorola's system of
2    performance reviews.
3    A    I don't have detailed knowledge of the
4    system of performance reviews.
5    Q    What was your experience?
6    A    My experience was it was a system
7    managed electronically. It was a system to which
8    I as the employee went in, put input as to what I
9    had done, maybe input as to how I think my
10   performance was, and then my supervisor went in
11   and made their comments, then there was an active
12   discussion and dialogue about it. There were
13   changes that may or may not be made based on that
14   discussion, and then there's an electronic
15   approval and signature process that occurs.
16   Q    Okay.
17   A    There's also another process of
18   gathering input outside of the process
19   electronically -- I don't recall the name of the
20   system -- where as long as more than three people
21   respond to the input you see the results of that
22   but you cannot see who submitted their input to
23   it, and that data can be presented to the manager
24   doing the review for the benefit of the review

Jay Stuart Rein, Vol. 2                          08/26/2005

390

```
 1   process.
 2       Q    Do you know if that latter process is
 3   called an RPA?
 4       A    No, it is not called an RPA.
 5       Q    Do you know the name of that process?
 6       A    I do not.
 7       Q    Do you know if that process is called --
 8       A    It's got the word leadership in it;
 9   that's all I know.
10       Q    Okay.  We'll get to it.
11            Did it -- it had a peer review
12   component to it?
13       A    Yes.
14       Q    Were those performance reviews in your
15   experience signed off on or approved as you've
16   described it in Q1 of the year following the
17   calendar year that was being reviewed?
18            MR. COSTER:  Objection.
19       A    I don't recall.
20       Q    Okay.  How many times were you reviewed
21   during your tenure at Motorola?
22       A    I had a review for 2002 performance.  I
23   had a review for 2003 performance.  I believe
24   there are also quarterly or semiannually
```

1    the time of your termination?
2        A    No.
3        Q    Okay.  Did you ever receive -- strike
4    that.
5             Going back, when did you first
6    anticipate filling a lawsuit in relation to your
7    termination from Motorola?
8             MR. COSTER:  Objection.
9        A    Probably on or right after the phone
10   call where Stark called me at my house in March.
11       Q    Okay.  Did you ever receive feedback --
12   or you mentioned previously -- you testified
13   previously that you received peer feedback during
14   your tenure at Motorola?
15       A    It was through one of the leadership
16   directed survey tools.
17       Q    Okay.  I'll direct your attention to
18   another document, which is 27.
19            (Document exhibited to witness.)
20       Q    And ask if you can identify it.
21       A    It says Motorola Leadership Supply Web.
22       Q    Do you recognize it?
23       A    This was a document that I believe Tom
24   Niersbach printed for us.  This is not that peer

Q   And those were ratings that Motorola used?

A   Yes.

Q   To rate performance, right?

A   Um-hm.

Q   And those four Es were energize, execute, ethics, and what was the fourth; do you recall?

A   I do not recall.

Q   Okay.

A   Let's --

Q   That's fine. It's immaterial at this point.

    Do you see in that column underneath -- the row underneath where it says energize, leadership assessment energize --

A   Um-hm.

Q   -- it has -- the second to last column says "self-rating"?

A   Right.

Q   Do you recall performing a self-rating?

A   I guess I did a self-rating in a different format or context, but --

Q   Which fed itself perhaps --

Jay Stuart Rein, Vol. 2                              08/26/2005

446

  A    Probably fed into this, correct.

  Q    Okay. And you recall doing self-assessments in connection with your performance evaluations, right?

  A    Yes.

  Q    Right. Okay. And is it your testimony that at no point while you were employed by Motorola it was identified for you that your self-rating was inconsistent with ratings that you had received from Motorola colleagues?

  A    Correct.

  Q    Was your ability to work on a team brought to your attention as a perceived deficiency or an area in which you rated yourself more highly than others who rated your performance?

           MR. COSTER: Objection.

  A    No.

  Q    Was your ability to rally people around common goals and build team spirit brought to your attention?

  A    No.

  Q    Was your ability to take your share of responsibilities without blaming others brought to

Jay Stuart Rein, Vol. 3                                       01/13/2006

735

Q. Did Motorola have performance management tools that you used while working as an employee with Motorola?

MR. COSTER: If you know what she's referring to.

A. I'm not sure what performance management tools are right here today.

Q. Did you conduct performance evaluations while an employee at Motorola?

A. I had no employees directly reporting to me for which I did their performance evaluation for them.

Q. Did you have any employees who were not directly reporting to you whom YOU evaluated nevertheless when you were an employee at Motorola?

A. I believe I provided input to other employees, yes.

Q. Did you use your lap to do that.

A. I used the Motorola system housed centrally to do it through my laptop.

Q. For whom did you provide evaluations?

A. I don't recall at this point in time.

Q. Do you recall whether it was only people subordinate to you, a principal position, or other

principals?

    A.   I don't recall if I ever provided feedback on other principals. I do recall not through the performance management system, but through some other tool, Len DeBarros asked me to appraise him as a superior.

    Q.   Did you understand that to be an ability to assess his leadership?

    A.   He was asking me to assess his performance as my boss.

    Q.   Did you do that using your laptop?

    A.   I did that using systems that Motorola had housed centrally. The laptop is just a conduit to get to Motorola systems, yes.

    Q.   So you used your laptop to access those online tools?

    A.   Yes.

    Q.   Did you similarly access Motorola online tools to self-assess your own performance while you were an employee at Motorola?

    A.   I'm sure I did.

    Q.   How did you do that? What tool did you use?

    A.   I don't recall the name of the tool that

1  was provided, but again, it was not a tool on my
2  laptop. My laptop allowed me to access it.
3      Q.  Did you save any of the work that you did
4  in your self-assessment to your hard drive?
5      A.  My recollection was the only save utility
6  available was a save to the central server. It was
7  not a save to the hard drive.
8      Q.  Did you ever print what you input into that
9  system?
10         MR. COSTER: Objection.
11     A.  I do not recall.
12     Q.  Did you print the evaluations that you did
13 of other employees?
14         MR. COSTER: Objection.
15     A.  I do not recall.
16     Q.  Did you use your laptop to provide focused
17 feedback while you were an employee at Motorola?
18         MR. COSTER: Objection. If you know what
19 she's referring to?
20     A.  I've used my laptop to solicit focused
21 feedback about myself.
22     Q.  And that was an electronic tool?
23     A.  Yes, to which we discussed in detail in
24 August of '05.

with Motorola about what you thought did well and what you thought did poorly as a leader of Motorola's MPS group?

A. I did my self-assessment as part of either a performance management tool or a leadership assessment tool or a self-assessment tool, there was a point of time in the year I had to go in and self-assess, because we went over those documents in excruciating detail last year, myself and my performance.

Q. And you used your Motorola laptop to do that?

A. Yes.

Q. And you --

A. Again, the only way I can access Motorola utilities is via the laptop.

Q. I understand.

A. Do we have to ask that for every question if I use the laptop?

Q. We might, but I don't think so.

A. That would seem like a waste of time on the record.

Q. I certainly understand that you used your laptop for certain functions, and we are here to