UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAY S. REIN )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MOTOROLA, INC., CLYDE KOFMAN )<br>and JUERGEN STARK )<br>)<br>Defendants. )<br>) | CIVIL ACTION NO. 04-12580 NG<br><br>**HEARING REQUESTED** |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE RELATING TO REIN'S EMPLOYMENT PRIOR TO MOTOROLA**

Defendants Motorola, Inc. ("Motorola"), Clyde Kofman ("Kofman") and Juergen Stark ("Stark") (collectively, "Defendants") hereby submit their opposition to Plaintiff Jay Rein's ("Plaintiff" or "Rein") motion in limine for an order excluding certain evidence relating to Rein's prior employment.  In his motion in limine, Plaintiff argues that Defendants are seeking to admit two documents for the sole purpose of "showing that it is Plaintiff's character to 'shake-down' former employers by claiming that they breached their oral commitments to him."  Defendants respond that they are not offering the documents to show Rein's propensity to threaten his former employers but rather to show that, before he came to work at Motorola, Rein understood the meaning of at-will employment, and the import of not earning, or being present, at the time his employer pays its bonuses.

**INTRODUCTION**

The relevant background information is as follows: Before he came to Motorola, Rein worked for Epsilon Data Management.  Epsilon terminated Rein on December 31, 2001 and he entered into the Separation and Release Agreement at issue in this motion on January 22, 2002

(attached hereto as Exhibit A). On April 12, 2002, Rein wrote a letter to Rodney Hedeen, CEO of the company that acquired Epsilon, the Relizon Company (attached hereto as Exhibit B), in which he stated in pertinent part:

> I heard the news on Saturday, March 30 of the company's win with Schering-Plough. It took five months to get to the finish line, but the term of the deal and the dollars, from what I hear on the street, are certainly worth the sales investment. **This win, with intake and reporting of paper-based prescription drug sampling data was the model that Patricia Howe and I were on the road to creating between the sales team at Relizon and Epsilon's resources in the Pharmaceutical space. And while I am not employed by Epsilon, I am certainly pleased that something that has started under my leadership can now evolve** to (1) produce additional revenue for the company, (2) produce additional EBITDA, as this type of business typically produces great cash flow when implemented properly and (3) secure additional employment opportunities for the team operating under the direction of Maureen McCormack. Once again congratulations!
>
> As related to the **upcoming retention bonus payout due to be paid on May 2, 2002 to employees of Epsilon who had unvested shares** on the day of the acquisition, the following is meant to appeal to a sense of **fairness and good business practice**. Recall that on December 17, 2001, Mike **Iaccarino made the decision to reorganize me off the executive team and out of the company- all within his right to do so**. My last day with the company was December 31, 2001, **just two days shy of the two month anniversary of the acquisition of Epsilon by Relizon. That two month anniversary was effectively one-third of the way into earning the first retention payout, or one-ninth of the way into earning the full value of the retention payout**. Wouldn't it seem fair to make payment of one third of the first payment that was worked and effectively earned? (emphasis added).

Defendants acknowledge that pursuant to Fed. R. Evid. 404(b), evidence of Rein's other lawsuits or demand letters are not admissible to show Rein's propensity to file lawsuits. Nonetheless, such evidence may be admissible for other purposes, such as proof of a plan, scheme, or modus operandi. Fed. R. Evid. 404(b). Similarly, the law in the First Circuit is well settled that a district court may admit evidence of a party's other bad acts if that evidence meets the requirements of both Fed. R. Evid. Rule 404(b) and Rule 403. Thus, to be admissible under Rule 404(b), "the evidence must have 'special relevance' to an issue in the case such as intent or

knowledge, and must not include 'bad character or propensity as a necessary link in the inferential chain.'" *Varoudakis,* 233 F.3d at 118 (quoting *United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996)); see also *United States v. Escobar-De Jesus*, 187 F.3d 148, 169 (1st Cir. 1999) (permitting the introduction of bad act evidence "if the evidence is relevant for purposes other than proof of a defendant's bad character or criminal propensity"). In addition, pursuant to Rule 403, the probative value of the bad act evidence must not be "substantially outweighed by the danger of unfair prejudice." *United States v. Tse*, 375 F.3d 148, 155 (1st Cir. 2004); Fed. R. Evid. 403.

  In the instant case, Plaintiff sent the April 2002 letter to Hedeen after his termination, acknowledging that he understood the import of his at-will status. He also implicitly acknowledged that he understood that in order to be eligible for Epsilon's productivity bonus he had to earn it, and be employed when Epsilon distributed it. Nevertheless, Plaintiff appeals to Hedeen's sense of fundamental "fairness" and asks Hedeen to give him the future unearned bonus. Defendant seeks to admit these documents concerning Rein's post-termination negotiations with Epsilon management to show that Rein knew, before taking the Motorola job, the import of an at-will employment relationship. Moreover, Defendants expect to show that he understood when he began negotiating with Motorola for his enhanced severance after his layoff in February of 2004, the extent of his entitlements following termination.

  At issue in this case is whether, Rein should reasonably have construed Kofman's and Stark's comments as altering the at-will nature of his employment and guaranteeing him employment for a definite term and future entitlements. Rein's experience immediately prior to working for Motorola, and his knowledge of the fact that Motorola could fire him at any time and for any reason, is certainly relevant to whether it was reasonable for him to have construed

3

his manager's statements as employment guarantees. As such, pursuant to Rule 403, the probative value of these documents substantially outweighs the danger of unfair prejudice and this Court should admit them.

## CONCLUSION AND REQUEST FOR HEARING

For the foregoing reasons, Defendant respectfully requests that the Court enter an order denying Plaintiff's Motion in Limine concerning Rein's dealings with prior employers.

Defendants believe that a hearing will aid in the disposition of this Motion, and hereby request a hearing.

Respectfully submitted,

Dated: November 7, 2006

MOTOROLA, INC., CLYDE KOFMAN,
and JUERGEN STARK,
By their attorneys,
 /s/ Kristin G. McGurn
Lynn A. Kappelman (BBO# 642017)
Kristin G. McGurn (BBO# 559687)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:    (617) 946-4800

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was served upon the attorney of record for the plaintiff via ECF and by mailing a copy of same, postage prepaid, to John G. H. Coster, Attorney at Law, 92 State Street, Suite 900, Boston, MA  02109 on November 7, 2006.

/s/ Kristin G. McGurn

# Exhibit A



January 22, 2002

Mr. Jay Rein
75 Johnson Drive
Holliston, MA 01746

Re: Separation Agreement and Release

Dear Mr. Rein:

This Separation Agreement and Release (this "Agreement") is entered into by you and Epsilon Data Management, Inc. ("Epsilon") as a condition of your eligibility for benefits under the Epsilon Severance Pay Plan (the "Plan"). This Agreement, which includes without limitation revisions requested by you, replaces the agreement offered to you on January 3, 2002, and is Epsilon's final offer with respect to your severance arrangements. The terms of this Agreement are as follows:

1. **Separation Date.** Your employment with Epsilon ended on December 31, 2001 (the "Separation Date") under circumstances which qualify you to receive benefits under the Epsilon Severance Pay Plan (the "Plan"), as set forth herein, subject to your acceptance of this Agreement and your meeting in full your obligations under it.

2. **Severance Pay and other Severance Benefits.** In consideration of your acceptance of this Agreement and subject to your meeting in full your obligations under it,

   (a) Epsilon will provide you under the Plan eight (8) weeks of severance pay, at your final base rate of pay, subject to the provisions of Sections 5, 8, 9 and 10 of this Agreement.

   (b) After severance pay has been paid to you under the Plan, Epsilon will provide you an additional eight (8) weeks of severance pay.

   (c) Payment under Section 2(a) and then under Section 2(b) (collectively, the "Severance Pay") will be made as salary continuation, less taxes and other legally required deductions, payable at Epsilon's regular payroll periods, commencing on the next regular payday following the date this Agreement, signed by you, is received by the Human Resources Department of Epsilon.

MI000437

(d) Epsilon will pay you a bonus for 2001 in accordance with the terms of its 2001 bonus policy for directors and above (the "2001 Bonus Policy"), payable at the time such bonuses are paid to other bonus policy participants. Epsilon hereby confirms that your "target bonus" under the 2001 Bonus Policy is twenty-five percent (25%) of your base salary of $189,000. Epsilon agrees that you are entitled to the full twenty-five percent (25%) of your target bonus that is attributable to your personal MBO's. The money available for bonus payments and the actual amount of your bonus payment shall be determined in accordance with the terms of the 2001 Bonus Policy. Bonus payouts have not been finalized and will be up to the discretion of the finance group in accordance with the terms of the 2001 Bonus Policy.

(e) If you were enrolled in Epsilon's group health plan on the Separation Date, Epsilon will contribute to the premium cost of that coverage the same dollar amount that it contributes for its active employees, until April 30, 2002 or, if earlier, until the date you become eligible for coverage under the health plan of another employer. In order to be eligible for Epsilon's contributions, however, you must pay the remainder of the premium cost by authorized payroll deduction during the Severance Pay Period. After Epsilon's contributions end, you may be eligible to elect to continue coverage in the health plan at your cost for a limited period of time under the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended ("COBRA"), by paying the full premium cost plus a small administrative fee.

(f) Epsilon will pay the cost of four months of outplacement services for you through Drake Beam Morin through a program selected by Epsilon. Payment will be made directly to Drake Beam Morin.

3. **Final Compensation.** On December 31, 2001, you were paid, at your final base rate of pay, for all work performed during the final payroll period of your employment, through the Separation Date, and have also been paid for the 82.5 hours of paid time off or "PTO" which you had earned but not used through the Separation Date. You acknowledge that, upon receipt of the payments described in the preceding sentence, you have been paid in full any and all compensation due to you from Epsilon, whether for services provided or otherwise, through the Separation Date and that, except as expressly set forth in Section 2 of this Agreement, immediately above, no further compensation is owed.

4. **Status of Benefit Participation.** If you were enrolled in Epsilon's group dental plan on the Separation Date, you are eligible for continued participation in that plan at your cost for a limited period of time after the Separation Date under the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended ("COBRA"). Your right to elect continued participation in Epsilon's group health plan under COBRA is described in Section 2 of this Agreement. Your

participation in all other Epsilon benefit plans will end as of the Separation Date, in accordance with the terms of those plans.

5. **Return of Company Property.** On December 31, 2001, you turned over to Epsilon's designee all of your job duties, responsibilities and authority. You represent and warrant that you have returned to Epsilon any and all documents, materials and information (whether in hardcopy, on electronic media or otherwise) related to the business (present or otherwise) of Epsilon and its Affiliates, including without limitation all customer lists, and all other property of Epsilon and its Affiliates in your possession or control, including without limitation keys, access cards, credit cards, computer, telephone and other office equipment. Further, you represent and warrant that you have not retained any copy of any document, material or information of Epsilon or any of its Affiliates. You agree that you will not, for any purpose, attempt to access or use any computer or computer network or system of Epsilon or any of its Affiliates. Further, you acknowledge that you have disclosed to Epsilon all passwords necessary or desirable to enable Epsilon to access all information which you have password-protected on any of its computer equipment or on its computer network or system. Epsilon's obligation to provide you Severance Pay is expressly conditioned on your return of all documents and other property of Epsilon and its Affiliates. Your return of all documents and other property of Epsilon and its Affiliates occurred on December 31, 2001.

6. **Assignment of Intellectual Property.** You hereby assign and agree to assign to Epsilon (or as otherwise directed by Epsilon) your full right, title and interest in and to all Intellectual Property, by which is meant all inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by you (whether alone or with others and whether or not during normal business hours or on or off Epsilon's premises) during your employment that relate in any way to the business, products or services of Epsilon or any of its Affiliates or to any prospective activity of Epsilon or any of its Affiliates or which make use of the trade secrets or other confidential information of Epsilon or its Affiliates or of facilities or equipment of Epsilon or any of its Affiliates. You agree to provide, at Epsilon's request, all further cooperation which Epsilon determines is necessary or desirable to accomplish the complete transfer of the Intellectual Property and all associated rights to Epsilon, its successors, assigns and nominees, and to ensure Epsilon the full enjoyment of the Intellectual Property.

7. **Covenant not to Solicit.** You agree that, for the period of twelve (12) months immediately following the Separation Date, you will not, and will not assist anyone else to, (a) hire or solicit for hiring any employee of Epsilon or any of its Subsidiaries or seek to persuade any employee of Epsilon or any of its Subsidiaries to discontinue employment; (b) solicit or encourage any independent contractor providing services to Epsilon or any of its Subsidiaries to terminate or diminish its relationship with them; (c) solicit or encourage any of the customers

MI000439

of Epsilon listed below to terminate or diminish their relationship with Epsilon; or (d) seek to persuade any of the customers of Epsilon listed below to conduct with anyone else any database marketing services or other business or activity which such customer conducted with Epsilon in 2001 or discussed with Epsilon in 2001 in contemplation of such business or activity being performed in 2002.

The Epsilon customers referenced above include only:

1. American Express List Services
2. Bayer Pharmaceuticals
3. Colgate Oral Pharmaceuticals
4. Eisai Pharmaceuticals
5. Grand Circle Travel
6. IBM (Analytics work)
7. IKEA International (Helsingborg, Sweden)
7. Kaiser Permanente
8. Liberty Funds
9. Novartis Pharmaceuticals (database marketing services for the Anti-fungal & Foot Care Division)
10. Ross Products
11. Schering Plough (database marketing services for the Sample Accountability Division and the Allergy & Respiratory Care Division)
12. Staples
13. Tap Pharmaceuticals
14. Takeda Pharmaceuticals

8.  **Confidentiality and Non-Disparagement.** You agree that you will not disclose any of the terms of this Agreement except (i) to the extent required by law, (ii) to secure advice from a legal or tax advisor, or (iii) to your immediate family, on the understanding that they will not disclose the terms to others. Notwithstanding the foregoing, you shall advise any potential future employer of your obligations to Epsilon and its Subsidiaries under Sections 6 and 7 of this Agreement. You also agree that you will not disparage or criticize Epsilon or its Affiliates, their business, their management or their products or services. In the event of a violation of your obligations under Section 6, 7 or 8 of this Agreement, Epsilon's obligations under this Agreement and the Plan will, at its option, terminate, and you will be obliged, at Epsilon's request, to return all payments made to you, as described in Section 2 of this Agreement.

9.  **Release of Claims.** In consideration of the Severance Pay to be provided in accordance with the Plan and this Agreement, to which you are not otherwise entitled, you hereby release and forever discharge Epsilon and its Affiliates, all of the respective past and present officers, directors, shareholders, partners, members, managers, employees, agents and representatives of the foregoing, their successors and assigns, and all others connected with any of them, both individually and in their official capacities, from any and all causes of action, rights or claims which you have had in the past, now have, or might now have, whether known or unknown, through the date of your signing

of this Agreement, in any way resulting from, arising out of or connected with your employment by Epsilon or its termination or pursuant to any federal, state or local law, regulation or other requirement.

10. **Effect of Reemployment.** In the event that, while receiving Severance Pay under the Plan and this Agreement, you commence employment with Epsilon or any of its Affiliates or any successor of Epsilon or any of its Affiliates, all obligations of Epsilon under the Plan and this Agreement will cease, including without limitation its obligation to pay you the Severance Pay as described in Section 2 above.

11. **Definition.** For purposes of this Agreement, the following definitions shall apply:
1) "Affiliates" means all persons and entities directly or indirectly controlling, controlled by or under common control with Epsilon, where control may be by management authority, equity interest or otherwise.
2) "Subsidiaries" means all persons and entities directly or indirectly controlled by Epsilon where control may be by management authority, equity interest or otherwise.

12. **Miscellaneous.** This Agreement constitutes the entire agreement and understanding between you and Epsilon concerning your employment, its termination and all related matters and supersedes all prior agreements or understandings, written or oral. This Agreement may not be amended and no breach shall be deemed to be waived unless in writing signed by you and an expressly authorized representative of Epsilon. The captions and headings in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

13. **Acceptance of this Agreement and Related Matters.** If you wish to accept this Agreement, you must do so after the Separation Date, but not later than January 22, 2002. You represent and warrant that you are signing this Agreement voluntarily and with a full understanding of its terms; that you have had a full and reasonable time to consider this Agreement before signing; and that, in signing this Agreement, you have not relied on any promises or representations, express or implied, that are not set forth expressly in this Agreement.

Intending to be legally bound, the parties have signed this Agreement under seal to take effect on the later of the date it is signed by you or by an authorized representative of Epsilon.

Sincerely,
Epsilon Data Management, Inc.

By: _[signature]_

Title _Head of Human Resources_

Date: _January 24, 2002_

ACCEPTED AND AGREED:

Signature: _[signature]_
Jay Rein

Date: January 22, 2002

MI000442

# Exhibit B

J. Rein
EXHIBIT NO. 5
8-16-05
L. LONDON

# JAY S. REIN

April 12, 2002

Rodney Hedeen
CEO
The Relizon Company
220 E. Monument Avenue
Dayton, Ohio 45402-1223

Dear Rodney:

I am writing you this letter today with two purposes. First is to congratulate the Epsilon/Relizon Team on the Pharmaceutical Sample Compliance win at Schering-Plough. Second is to present a perspective on the first of the three retention bonus payouts that occurs on May 2, 2002 for Epsilon employees who had unvested options on November 2, 2001.

I heard the news on Saturday March 30 of the company's win with Schering-Plough. It took five months to get to the finish line, but the term of the deal and the dollars, from what I hear on the street, are certainly worth the sales investment. This win, the intake and reporting of paper-based prescription drug sampling data, was the model that Patricia Howe and I were on the road to creating between the sales team at Relizon and Epsilon's resources in the Pharmaceutical space. And while I am not employed by Epsilon, I am certainly pleased that something that was started under my leadership can now evolve to (1) produce additional revenue for the company, (2) produce additional EBITDA, as this type of business typically produces great cash flow when implemented properly and (3) secure additional employment opportunities for the team operating under the direction of Maureen McCormack. Once again, congratulations!

As related to the upcoming retention bonus payout due to be paid on May 2, 2002 to employees of Epsilon who had unvested shares on the day of the acquisition, the following is meant to appeal to a sense of fairness and good business practice. Recall that on December 17, 2001, Mike Iaccarino made the decision to reorganize me off the executive team and out of the company – all within his right to do so. My last day with the company was December 31, 2001, just two days shy of the two month anniversary of the acquisition of Epsilon by Relizon. That two month anniversary was effectively one-third of the way into earning the first retention payout, or one-ninth of the way into earning the full value of the retention payout. Wouldn't it seem fair to make payment of one-third of the first payment that was worked and effectively earned?

I use the word fair because:

- On November 2, 2001, the day of the acquisition of Epsilon by Relizon, nobody indicated that there was any intention of me not being retained to continue on as a leader at Epsilon,

- I did forgo other employment opportunities before and after November 2, 2001, based on the positive team spirit that was portrayed by you, Corey Torrence and other Relizon leaders I was interacting with,

- If you look at the recent win at Schering-Plough, along with a number of other pipeline opportunities, including others at Schering-Plough, Novartis, etc., I was an early contributor to initiating these opportunities,

– 2 –                                                                                               April 12, 2002

- I do think that there may be opportunities in the future for me to refer business to Epsilon. I have a lot of respect for the value of the business model that we evolved at Epsilon in 2000 and 2001.

I hope that this letter and the request within can be given some form of consideration.

Please feel free to contact me if you wish to discuss further.

Sincerely,

Jay S. Rein

CC: Joe Lipscomb, The Carlyle Group

MI000444