## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAY S. REIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v.+ | ) | CIVIL ACTION NO.  04-12580-NG |
| | ) | |
| MOTOROLA INC., CLYDE KOFMAN and JUERGEN STARK | ) | **HEARING REQUESTED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE FOR THE EXCLUSION OF LAPTOP EVIDENCE AND IN SUPPORT OF LIMITING JURY INSTRUCTION ON DAMAGES

Defendants Motorola, Inc. ("Motorola" or the "Company"), Clyde Kofman ("Kofman"), and Juergen Stark ("Stark") (collectively, "Defendants") hereby submit this supplemental brief in opposition to Plaintiff Jay Rein's ("Plaintiff" or "Rein") motion in limine seeking to exclude evidence relating to Rein's laptop computer.  This supplemental brief (i) responds to questions raised at the parties' pre-trial conference on November 9, 2006, concerning the scope of the Court's November 7, 2006 ruling ("Order") and (ii) establishes indisputably that Defendants knew that Plaintiff had failed to return his Motorola-issued laptop as of April 9, 2004.

At the pre-trial conference, the parties discussed this Court's Order, which holds that Rein's damages in this case are limited because he failed to timely return his Motorola-issued laptop, in violation of clearly articulated Company policies and the parties' express agreement. The Order states in part:

> Once the defendants **discovered** that Rein had failed to return his laptop computer after his discharge, they had an independent basis to reject his rehiring.  As such, Rein can have no damages after that point; he would have had no expectation of rehiring, much less continued employment after that date.  (emphasis added)

The Order left open the question of *when* Defendants knew that Plaintiff had failed to return the laptop, as well as what "other inferences … may be drawn concerning the condition of the computer." The Court has not yet addressed whether additional relief is warranted based on the fact that the computer's hard drive was erased and reformatted while it was in Rein's exclusive possession. Defendants submit this supplemental brief because the record evidence is clear that Defendants knew that Rein had violated Company policy and breached his agreement to return the laptop as of April 9, 2004. Similarly, the evidence reflects that Rein knew that he was obligated to return his laptop on or before his last day of employment at Motorola. Accordingly, based on the Order, Plaintiff's damages should be cut off as of April 9, 2004.

## BACKGROUND

On February 25, 2004, after Motorola informed Rein that it was eliminating his position, Motorola's Director of Human Resources, Peter Tobin, provided Rein with the details of his severance arrangement under the Company's Involuntary Severance Plan ("ISP"). (A copy of Tobin's February 25, 2004 letter to Rein is attached hereto as Exhibit A). On the very same date, Rein sent a response to Tobin by e-mail, and asked if he could negotiate a more generous severance arrangement allowing Rein to stay on Motorola's payroll until May 31, 2004. (A copy of Rein's February 25, 2004 email to Tobin is attached hereto as Exhibit B). In Rein's February 25th email, he acknowledged his obligation to return the laptop before his last day of work. He wrote:

> I am assuming that if you are successful in getting approval of this 'Individual ISP' that I will be able to utilize the Motorola Network, email and other resources to continue to communicate with others on my quest for future employment opportunities. **All associated resources belonging to Motorola would be returned upon the completion of the aforementioned time period.** (emphasis added).

Rein's negotiations with Tobin continued and, ultimately, Tobin agreed on behalf of Motorola to Rein's proposed terms. On March 11, 2004, Christine Theros, Corporate Vice President and Director of Human Resources, sent Rein a letter outlining Rein's enhanced, individual severance agreement, pursuant to which Rein would remain on payroll through May 2004. In this March 11th letter, Theros acknowledged Rein's request to retain his laptop and to utilize Motorola resources until his last day of Motorola employment. However, this letter also expressly reminded Rein of his obligation, and subsequent promise, to return *all* Motorola property on the last day of his employment. (A copy of Theros' March 11, 2004 letter to Rein is attached hereto as Exhibit C). Specifically, the letter states:

> **You acknowledge that you remain bound by the Employment Agreement you previously signed,[1] and promise to return to Motorola, on or before your last day of employment, all Motorola proprietary and confidential materials and information, and all other Motorola property in your possession**. You further agree to maintain the confidentiality of Motorola's confidential and proprietary information. (emphasis added).

Thus, it is clear that as of March 11, 2004, both parties explicitly understood and agreed that Rein was obligated to return the laptop on or before his last day of work with the Company.

## ARGUMENT

Despite the fact that Motorola agreed to Rein's proposal for enhanced severance and a delayed termination date, Rein notified the Company on April 8, 2004, that he would not sign the general release which was a condition of the enhanced severance agreement. The next day, Tobin acknowledged Rein's decision, and advised him that as a result of this decision, the Company would process Rein's separation under the terms of the initial severance offer, with a

---

[1] The Employment Agreement states in part: "Upon termination of my employment by Motorola [I understand and agree] to promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola, or any other materials which belong to Motorola." (A copy of the Employment Agreement is attached hereto as Exhibit D). In light of his extensive negotiations with Tobin, Rein cannot legitimately contend that his refusal to timely return the laptop was caused by Motorola's failure to explicitly, separately identify a "designated Motorola representative."

March 20, 2004 termination date.  (Copies of the April 8 and April 9, 2004 emails are attached

hereto as Exhibits E and F, respectively).  Therefore, Rein's termination became effective not

later than April 9, 2004, and Motorola then paid him all of the severance pay to which he was

entitled under the initial severance agreement.

### 1.    As of April 9, 2004, Motorola knew that Rein failed to return the laptop.

Based on the parties' correspondence, it is clear that on April 9, 2004, the day after Rein

had declined the enhanced severance, Defendants knew that Rein had not fulfilled his obligation

to return the laptop as promised and as Motorola policy required.  Thus, by the terms of this

Court's Order, Defendants discovered his violation on that date, and Rein's damages are cut off

as of April 9, 2004.  As of that date, Rein could have had no expectation that Motorola would

have reinstated or rehired him, because he had breached his promises and violated Motorola's

policy.

### 2.    Rein's failure to return the laptop after he started working in a competitive capacity further violated Company policy.

Even if the Court were unwilling to rule now that Motorola discovered Rein's breach of

policy on April 9, 2004, it must cut off Rein's damages as of October 2004.  Rein's laptop

contained Motorola's confidential proprietary information including but not limited to customer

information, requests for proposals, and sales and business plans.  Rein began working in a

competitive capacity with GTSI in October 2004, within months after he left Motorola, and yet

he still chose not to return Motorola's laptop containing proprietary information.  Once again, in

July 2005, Rein accepted a job at Worldspan working in a competitive capacity, while still

maintaining possession of Motorola's laptop and the proprietary information it contained.  Rein's

retention of Motorola's assets and its confidential and proprietary Company information while

working for competitors constitutes a clear violation of Company policy.[2]  Each of these

breaches of  policy, compounded by the unauthorized deletion and reformatting of the laptop's

hard drive while it was in Rein's exclusive possession, create separate reasons for Motorola to

refuse to rehire Rein, and each are independent reasons to cut off his damages.

> **3.    Rein's failure to supplement discovery provides further grounds for limiting his damages.**

On March 3, 2005, Motorola served its initial discovery requests.  In these requests, once

again, Motorola sought (among other things), to retrieve from Rein all items that he took with

him when he left the Company (*i.e.* the laptop and any relevant electronic evidence it contained).

Clearly, the Company knew that Rein had not returned these critical items and, through counsel,

continued to seek their return.

Motorola's initial discovery requests also sought information and documents concerning

Rein's post-Motorola earnings with GTSI and Worldspan.  To date, Rein has *never* given

Defendants definitive information regarding these earnings and entitlements and, in fact,

Defendants have received conflicting information about his base salaries at these subsequent

employers.  For example, Rein produced his offer letter from GTSI, which listed a base salary of

$150,000, and referenced option entitlements and incentive bonuses. (A copy of Rein's offer

letter is attached hereto as Exhibit J).  Motorola subpoenaed documents from Rein's current

employer, Worldspan, which reveal that in Rein's Worldspan application, Rein represented that

he had earned $195,000 at GTSI.  (A copy of excerpts from Rein's Worldspan Application is

---

[2] Copies of excerpts of  Motorola's Standard Operating Procedure E-62 regarding Appropriate Use of Computer Resources and Progressive Discipline Policies are attached hereto as Exhibits G and H, respectively.  SOP 62 establishes that an inappropriate use of such resources includes "disclosing confidential or sensitive information which is owned by or entrusted to Motorola to unauthorized recipients." The Progressive Discipline Policy states that the failure to secure Motorola materials under SOP 62 is a "Class III" infraction (a terminable offense). Motorola's Code of Business Conduct, attached hereto as Exhibit I, confirms that Motorola employees "have a responsibility to protect the Motorola assets entrusted to [them] from loss, damage, misuse or theft," and clarifies that "the obligation to preserve proprietary information continues even after employment ends."

attached hereto as Exhibit K). This is a significant admission because if Rein was earning $195,000 in October 2004, he had totally mitigated his damages resulting from the Motorola lay-off. Notably, in the Application Rein also identifies the disbanding of MPS as the reason for his termination from Motorola.

Perhaps more important, however, the Worldspan documents plainly show that Rein's attorney, John Coster, helped him negotiate the terms of his Worldspan employment and options agreements in June 2005. (A copy of pertinent emails is attached hereto as Exhibit L). This is important since Attorney Coster repeatedly represented to counsel that he was unable to supplement Plaintiff's mitigation information because Plaintiff was traveling overseas. In fact, Rein's counsel has had access, for over a year, to at least some of the very information that Defendants sought and deserved. Plaintiff's failure to timely supplement damages discovery provides further grounds for limiting his damages at trial.

## **Conclusion and Request for Hearing**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's motion in limine, permit Defendants to introduce evidence at trial about Rein's failure to return his laptop computer, and issue a limiting jury instruction that cuts off Plaintiff's damages as of April 9, 2004.

Defendants believe that a hearing will assist in the resolution of this Motion, and hereby request a hearing.

DATED:  November 15, 2006

Respectfully submitted,

MOTOROLA INC., CLYDE KOFMAN
AND JUERGEN STARK

By their attorneys,

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was served upon the attorney of record for the plaintiff via ECF and by mailing a copy of same, postage prepaid, to John G. H. Coster, Attorney at Law, 92 State Street, Suite 900, Boston, MA  02109 on November 15, 2006.

/s/ Kristin G. McGurn

/s/ Kristin G. McGurn
Lynn A. Kappelman (BBO # 642017)
Kristin G. McGurn (BBO # 559687)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:      (617) 946-4800
Telecopier:     (617) 946-4801

BO1 15812377.1

# EXHIBIT A





EXHIBIT NO. 43
L. LONDON

February 25, 2004

Jay Rein
75 Johnson Drive
Holliston, MA 01746

Dear Jay,

In follow up to our telephone discussion yesterday afternoon, the following summarizes the severance pay that will be provided to you in conjunction with the termination of your employment from Motorola. To assist in your transition from Motorola, I have also listed pertinent benefits information in this letter, since many changes in the benefits plans take effect upon your employment termination date. A package containing "hard copy" of this letter, along with other reference documents, is being mailed to your home address today via Fed Ex.

Please note, while finalizing the details of the severance benefits with our HR team subsequent to our telephone discussion, we have made the decision to adjust your employment termination date from Monday, March 15, as previously communicated to you by Clyde Kofman, to the end of that workweek, Friday, March 19.

### Severance Pay

| | |
|---|---|
| Basic Severance: | $31,677.00 |
| Supplemental Severance (requires signing General Release): | $ 7,453.00 |
| Total Severance (if supplemental selected): | $39,131.00 |

Indicated below are the provisions for determining Basic and Supplemental Severance under the Involuntary Severance Plan. In this, as in any documentation regarding this activity, the Involuntary Severance Plan document will be the final source governing clarity of all questions and determinations.

Based on your Employment Termination Date and your Service Club date, you will receive the following benefits under the Basic Severance Allowance:

| Years of Service | Basic Severance Allowance |
|---|---|
| 0 to less than 10 | 8.5 weeks of pay |
| 10 or more | 1 week of pay per year of service |

Credit for partial years of service will be granted based on completed months of service as of your Employment Termination Date.

Based on your Employment Termination Date and your Service Club Date, you will receive the following benefits under the Supplemental Severance Allowance if the General Release is signed and returned to Human Resources within the required time frame (and not revoked):

| Years of Service | Supplemental Severance Allowance |
|---|---|
| 0-6 | 2 weeks of pay |
| 7 | 2.5 weeks of pay |
| 8 | 3.5 weeks of pay |
| 9 to less than 10 | 4.5 weeks of pay |
| 10 to less than 20 | 1 week of pay per year of service |
| 20+ | 2 weeks of pay per year of service |

Credit for partial years of service will be granted based on completed months of service as of your Employment Termination Date.

Severance allowance is taxable income and will be taxed at the 28% federal tax rate, plus any applicable state and FICA taxes.

000076

A sample General Release form is included in the information packet that is being mailed to your home address today. The actual General Release is prepared by Motorola's Legal Department, and will be mailed to you under separate letter within the next few days.

## Vacation
Remaining and accrued vacation will be paid within 3 weeks of your Employment Termination Date and sent to your home address.

## Medical Coverage
Your current active medical coverage will continue through the end of month in which your Employment Termination Date occurs.

### Non-Retiree
- If you were a participant in the Health Advantage Plan or an HMO you are eligible for medical continuation at the regular active employee rate under the Involuntary Severance Plan through the end of the month in which your severance period ends.

| Years of Service* | Basic Severance Medical Benefits | Supplemental Severance Medical Benefits (with Release) | Total Severance Medical Benefits Available |
|---|---|---|---|
| 0 to less than 10 | 2 months | 2 additional months | 4 months |
| 10 or more | Through end of month in which Basic Severance period ends. | Through end of the month in which Supplemental Severance period ends. | Through end of the month in which total severance period ends. |

*Based on completed years and completed months of service.

- Payment at the regular active employee rate must be received by the first of each month, starting with payment for the month following your Employment Termination Date. For example, if your Employment Termination date is March 14 and you have Health Advantage Plan Family Coverage, you must submit payment of $99 before April 1, 2004, in order to continue medical coverage.
- Subsequent payments should be made for as long as you choose to continue medical coverage through your severance period whether or not you receive a bill. Submit payment, referencing your Social Security Number, to:
-

> Motorola Premium Payments
> P.O. Box 4306
> Carol Stream, IL 60197-4306

## COBRA
- In addition, once your medical coverage ends, you will automatically receive a packet of benefits-related information from the Motorola Rewards Administration Center (RAC) regarding continuing coverage under Federal Law known as COBRA (Consolidated Omnibus Budget Reconciliation Act). For your information, the current COBRA rates are enclosed.
- You will have 60 days from the day coverage would otherwise end (or from the day the notice is sent to you, if later) to choose continuation coverage. If you do not choose to continue coverage, you should make the appropriate election on the election form and return it to the RAC.
- If you elect benefit coverage, the benefits will begin the first of the month after your continued medical coverage under the Involuntary Severance Plan ends, provided payment is made within 45 days of your election.
- Your first payment must include the cost of coverage for the entire period from the date coverage ended through the date of the payment. Subsequent contributions are due on the first of the month whether or not you receive a bill. Please contact the Rewards Administration Center (RAC) at 1-800-421-3973 if you have any questions or do not receive the packet.

## Dental Coverage
- Your coverage under the Motorola Dental Plan automatically stops at midnight on the last day of the month your employment with Motorola ends. In approximately 3 weeks you will receive a packet of information regarding continuing dental coverage under COBRA. Please contact the Rewards Administration Center at 1-800-421-3973 if you have any questions or do not receive the packet.

000477

## Reimbursement Accounts

- Health Reimbursement Account (HRA) contributions will stop as of the last day of the last pay period before your Employment Termination Date. However, eligible expenses must be incurred by the last day of the month in which your Employment Termination Date occurred.
- Any HRA eligible expenses incurred after the last day of the month in which your Employment Termination Date occurred will not be eligible for reimbursement, unless you elect to continue HRA coverage through COBRA (available only through the end of the year in which you terminate). If you participate in HRA, you will receive COBRA information directly from the RAC shortly after your Employment Termination Date.
- Expenses for your **Dependent Care Account (DCA)** will be reimbursed through the end of the plan year, regardless of termination date, up to the amount that had been deducted from your pay at the time of termination.
- The Rewards Administration Center (RAC) in Phoenix, Arizona must receive requests for reimbursement of eligible HRA and DCA expenses incurred in 2003 no later than April 1, 2004. For eligible expenses incurred in 2004, the same rule applies, however submission deadline is April 1, 2005. All claims should be sent to the Motorola Rewards Administration Center, P.O. Box 29005, Phoenix, AZ 85038-9005. Questions should be directed to the RAC at 1-800-421-3973.

## Other Insurance

- Your insurance coverage under Base Life, Supplemental Life, and Dependent Life will be discontinued on the last day of the month in which employment ends. There are conversion rights for Base Life, Supplemental Life, and Dependent Life Insurance. You must apply for the conversion within 31 days of your termination date. Refer to the "Life Goes On" pamphlet in your folder. Completed applications should be sent to Mutual of Omaha at the address on the back of the application. Questions should be directed to the RAC at 1-800-421-3973.
- Accidental Death & Dismemberment, Travel Accident, Short Term Disability and Long Term Disability Insurance end on your last day worked. There are no conversion rights.
- Your participation in Long-Term Care Insurance can continue with no change in level of coverage or premiums. Arrangements can be made for direct premium billing by contacting CNA at 1-800-213-1237.

## Pension Plan

- You are eligible for the Pension Plan once you have completed one year of service and have worked at least 1,000 hours. You are 100% vested (entitled to receive a benefit) after 5 years of completed service or age 60 with 1 year of completed service.
- Your Payment Options (Benefits under $5,000 are paid in lump sum if vested):

| Portable Plan (Payable upon termination): | Traditional Plan (Payable at age 55 or older): |
|---|---|
| -Lump sum payment | -Single Lifetime Annuity |
| -Single Lifetime Annuity | -Lifetime with 10 years Certain Annuity |
| -Lifetime with 10 years Certain Annuity | -Joint & Survivor Annuity with 50%, 75%, or |
| -Joint and Survivor Annuity with 50%, 75%, | 100& to survivor |
| or 100% to survivor | |

- Your final Pension benefit will be calculated 31 days after your Employment Termination Date. You will not be able to request a distribution until the final calculation has been done. For all information regarding your Pension Plan distribution options you must contact the Participant Service Center at 1-800-585-5100.

## 401(k) Profit Sharing Plan

- If the vested value of your 401(k) Profit Sharing Plan account is $5,000 or less, the funds will automatically be paid to you with the appropriate taxes withheld. If you wish to execute a direct rollover you must contact the Participant Service Center at 1-800-585-5100 within 30 days of your termination.

CC0678

## 401(k) Profit Sharing Plan-continued

- If you do not request a payment option, your vested balance will be held in the Plan until you request a method of payment. If you have terminated employment and you reach age 70 _, the Plan requires that you begin taking distributions by April 1st of the following year.
- If the vested value of your account is greater than $5,000, you may choose one of the following payment options:

| Hired Before 1-1-96 | Hired After 1-1-96 |
|---|---|
| -Lump Sum | -Lump Sum |
| -Direct Rollover | -Direct Rollover |
| -Partial Distribution | -Partial Distribution |
| -Installments | -Combination of above |
| -Combination of above | |

- If you would like to withdraw or transfer the funds, you will need to contact the Participant Service Center at 1-800-585-5100 or visit http://www.retirementpassport.com/0823.
- All payments will be mailed to your home. If you request a direct rollover to another qualified plan, it will be your responsibility to forward the check on to your rollover institution.
- If you currently have a loan from your 401(k) Profit Sharing account you will have 30 days from your termination date to pay any outstanding loan balances. If you do not pay off your loan balance, the outstanding loan balance plus interest will automatically be considered taxable income to you in the year you terminate. You will receive a 1099 Form from Northern Trust and will have to include this amount as income on your April tax return. Questions on loan repayment should be directed to the Participant Service Center at 1-800-585-5100.

## MOTshare

- If you leave Motorola prior to the end of a current MOTshare offering period, you will be withdrawn from the Plan and any accumulated payroll deductions from the current offering period will be returned to you without interest.
- Your MOTshare account will be retained with Salomon Smith Barney until it is closed (request a stock certificate for your shares, sell your shares, transfer your account to another broker, etc.).
- If you have questions about your shares you may contact Salomon Smith Barney at 1-877-211-1821 or visit http://www.benefitaccess.com.

## Incentive Pay Plan

- Your participation in the Incentive Pay Plan will end as of your termination date. You must be on the "active" payroll through the last day of December to be eligible for an incentive payment.
- If you are on the Sales Incentive Plan, incentive payments will be prorated for the quarter.

## Stock Options

Separation of employment will impact your ability to exercise stock options granted you by the Corporation. This does not include any stock you own either through MOTshare or stock acquired through Motorola's Profit Sharing and Investment Plan. Please review any information provided you by the Motorola Stock Option Department. These include:

- Optionee Detail Report – lists all options you have been granted, those that have been exercised, and those that are still available for exercise.
- Right to Exercise Stock Options After Separation of Employment with Motorola – is a termination matrix outlining how your stock options are impacted various types of terminations.

Any question you may have regarding your stock options should be directed to the Motorola Stock Options Department and/or your personal financial counselor/planner.

## Change of Address

If you have a change of address please call the Employee Solution Center at 1-877-874-7721 as soon as possible. Several pieces of information, including your W-2 form, will be forwarded to you by mail.

*Motorola Employee Credit Union*

If you are a current **Motorola Employee Credit Union** (MECU) member you may continue membership for life. Contact the MECU at (847) 576-5199 if you need to make alternate arrangements for loans, canceling accounts, or change of address.

*Outplacement*

You will receive outplacement assistance. Our outplacement provider, Drake Beam Morin (DBM), has offices located nationwide. We have arranged for a representative from DBM to contact you later this week to further explain the services.

Please call me at my office (847-576-8746), at your convenience, if you would like to review the contents of this document in greater detail.

Peter J. Tobin
Director of Human Resources
CGISS – ISD / IMS / GMSG / Strategy / Finance

# EXHIBIT B

[Rein Jay-REIN]  -----Original Message-----
**From:** Rein Jay-REIN
**Sent:** Wednesday, February 25, 2004 3:22 PM
**To:** Tobin Peter-APT010
**Subject:** Follow-Up to Our Call Today
**Importance:** High
**Sensitivity:** Confidential

Peter,

Thank you for taking my call earlier today and thank you for working on my behalf to assist in this transitionary period.  To restate what I think we both agreed you were going to work on:

- converting the 8.5 weeks plus the 2 weeks of "severance" lumpsum payout into an on payroll status whereby I could be considered an employee of record of Motorola through a to be determined date in June.
- for the same period of time, all eligible benefits (Oct 2003 --> March 2004 MotShare participation and similar) are made available to me as a regular employee.  I assume (though we did not discuss) that I would similarly pay Health, Dental, Life and other at group rates as I am today.
- upon completion of this time period, access to programs such as COBRA, rollover of my 401K, eligibility for MA Unemployment insurance, and Drake Beam Moran outplacement services (which we did not discuss) will be made available.
- Not Discussed, but I am assuming that if you are successful in getting approval of this "Individual ISP" that I will be able to utilize the Motorola Network, email and other resources to continue to communicate with others on my quest for future employment opportunities.  All associated resources belonging to Motorola would be returned upon the completion of the aforementioned time period.

As we talked, all of the above is being requested in order to provide me with an opportunity to [re]enter the marketplace without the prejudices often associated with an unemployed worker.  Additionally, resulting from various performance reviews and a retention bonus paid just weeks ago, I chose to forego a non-Motorola job opportunity, which today no longer exists.

I am looking forward to talking on Friday (or sooner) to hear how things are proceeding.

Sincerely,

JSR

_____

**Jay S. Rein**

508-893-6926 - office
617-899-2699 - cell
Rein@Motorola.com

000155

3/17/2004

# EXHIBIT C

CONFIDENTIAL

-----Original Message-----
**From:** Tobin Peter-APT010
**Sent:** Wednesday, March 10, 2004 4:29 PM
**To:** Rein Jay-REIN
**Subject:** Individual Separation Agreement
**Importance:** High

Jay,

In follow up to our telephone conversation this morning, I have obtained the written Individual Separation Agreement document (attached). Per our discussions, this agreement provides an alternative to the Involuntary Separation Plan benefits which were communicated to you on February 25, extending your employment with Motorola until the end of May, 2004.

Please review the document. If you are in agreement with the provisions of this alternative to the ISP package, please sign the document and return it to me. I will then secure the signature of Chris Theros, who will be the formal Motorola signatory.

This alternative approach is being offered in response to your request for this consideration. Please note the inclusion of paragraph # 8 of the document, which formalizes our verbal discussions concerning the critical issue of confidentiality as concerns the terms and conditions of the agreement.

A "hard copy" of this agreement will be mailed to you via overnight carrier.

If you have any questions, or would like to discuss the agreement, please contact me at 847-576-8746.

Regards,

Peter

MI000306

J. Ken
EXHIBIT NO. 45
8-26-05
L. LONDON

March 11, 2004

Mr. Jay Rein
75 Johnson Drive
Holliston, MA 01746

Re:   Separation and Release Agreement

Dear Jay:

This will confirm our agreement with respect to your separation of employment effective May 31, 2004. Please read this letter carefully and return a signed copy to me if you agree with the conditions set forth herein. If you sign this agreement, it will operate as a binding contract between you and Motorola.[1]

1.   Motorola agrees that you shall not be required to report to work beginning March 15, 2004. In exchange for your execution and non-revocation of the agreements contained herein, Motorola agrees to keep you on payroll until the effective date of your separation. Between March 15 and your separation date, Motorola will allow you to keep your access to its computer network, as well as your office space and office tools, including voicemail (subject to all applicable policies), as if you remained actively employed. In addition to signing and returning a signed copy of this letter to me, you will reaffirm this agreement by signing and not revoking **Attachment A**. Any accrued and unused vacation pay owed to you by Motorola will be paid separately and is not a part of this Separation agreement.

2.   Motorola agrees to provide you career continuation services from Drake Beam Morin for a period of three months from the effective date of your separation.

3.   You agree that neither this agreement nor the act of entering into the agreement constitutes an admission by Motorola of any: (a) violation of any statute, law, regulation, order or other applicable authority; (b) breach of contract, actual or implied; or (c) commission of any tort.

4.   You give up, release, and waive any and all claims you have or might have, of any kind, on behalf of yourself or any other person or entity, against Motorola or its agents relating in any way to your employment with Motorola, and your separation from employment, or any event, that occurred on or before the date you sign this letter. These claims include specifically, but are not limited to, any claim under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Older Workers Benefit Protection Act, the Family and Medical Leave Act, and any federal, state, or local statute or ordinance; and any claim arising under any common law principle or public policy; and any claim under Motorola's Human Resources policies. You understand that you are not waiving any claim or right that cannot be waived by law.

5.   You acknowledge that, by signing this letter, you are giving up any claim or right to receive payments or benefits under any Motorola voluntary or involuntary severance plan.

6.   You acknowledge that you remain bound by the Employment Agreement you previously signed, and promise to return to Motorola, on or before your last day of employment, all Motorola proprietary and confidential materials and information, and all other Motorola property in your possession. You further agree to maintain the confidentiality of Motorola's confidential and proprietary information. You

---

[1] As used in this letter, "you" and "your" refers to yourself and your spouse, attorney(s), agents, heirs and representatives. "Motorola" means Motorola, Inc., its subsidiaries, affiliate companies, joint ventures, and the respective directors, officers, agents, employees and successors of each of them.

also acknowledge that the effect of your separation and this letter on your

Mr. Jay Rein
Page 2

coverage, rights and duties under any Motorola benefit or compensation plans depends on the terms of those plans, and the interpretation of the appropriate plan administrator, not this letter.

7.  You agree not to apply for or accept employment or work in any capacity (e.g., as a consultant, contractor, or temporary employee) at any Motorola facility for a period of twelve (12) months following the effective date of your separation.

8.  You agree that the terms of this agreement and the discussions that led to its creation and execution are to remain strictly confidential and shall not be disclosed or communicated to any person, unless disclosure is required by law or a court order.  You may, however, disclose the terms of this agreement to your tax preparer and immediate family members, who must maintain the confidentiality of this agreement.  A breach of this provision shall be considered a material breach.

9.  You promise that you will not make disparaging remarks about Motorola, or its products, policies or employees.

10. At the time of your separation, you will be eligible, under a federal law known as COBRA, to continue your current Motorola health benefits – at your expense – for a period of up to eighteen (18) months.  Note, however, that in order to ensure proper coverage under COBRA, it is your responsibility to apply for COBRA continuation, to pay the premiums and to maintain eligibility under COBRA and the applicable plan.

11. Among the claims you agree will be waived by signing this letter is any claim that Motorola has discriminated against you because of your age.  Under the law we must give you twenty-one (21) days to decide whether or not you want to accept this offer.  You understand and agree that any material change to the initial terms of this letter agreement shall not restart the running of this twenty-one (21) day period.  Also, if you sign this letter, you will have seven (7) days afterward to revoke this agreement, if you so desire, by notifying me in writing at Motorola, Inc., 1301 E. Algonquin Road, Schaumburg, IL 60196, within the seven (7) day revocation period.  If you timely cancel or revoke this agreement, you agree to return to Motorola the monetary value of the period during which you will be allowed to remain on payroll beyond the previously established separation date of March 19, 2004, within 30 days of the date of revocation.

If you sign this letter agreement, it will become a legal contract between you and Motorola with important consequences for both you and Motorola. In addition, your signature will be your acknowledgment that you have freely and voluntarily agreed to the terms in this letter and have not been coerced or subjected to any duress by Motorola to do so.  In addition, your signature will be your acknowledgment that you are advised, by this writing, to consult with an attorney before signing this letter; that you have relied on your own judgment regarding the consideration being given for your promises and agreements and the language contained in this letter; that you have read and understand the terms of this letter; that the consideration you are to receive is in addition to any you are otherwise entitled to receive; that this letter resolves all matters between you and Motorola; that it has been individually negotiated and is not part of a group incentive or other termination program; that you understand that this letter includes a general release of claims against Motorola; and that no statements made by Motorola have in any way coerced or unduly influenced you to sign this letter.

If this offer is acceptable to you, please sign where indicated below and return it to me. Your signature below means you have freely and voluntarily agreed to the terms of this letter. If you have questions, please feel free to contact me.

Very truly yours,

Chris Theros
Corporate Vice President and Director, Human Resources,
CGISS

I accept and agree to all of the above:

_____
Jay Rein
Social Security or Commerce ID #_____
Date: _____

000034

**ATTACHMENT A**
SECOND WAIVER

1. In consideration for the promises made by Motorola in the Separation and Release Agreement dated January 6, 2004, to which this is Attachment A, I hereby release, acquit, and forever discharge Motorola (as defined in the attached letter) of and from any and all, known or unknown, actions, causes of action, or claims of whatever nature I may have arising out of or related to my employment by Motorola and my separation therefrom, from the date of my Separation and Release Agreement with Motorola through the date I sign this Attachment A, including but not limited to, any claim under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Older Workers Benefit Protection Act, the Family and Medical Leave Act, and any federal, state, or local statute or ordinance; and any claim arising under any common law principle or public policy; and any claim under Motorola's Human Resources policies. I understand that I am not waiving any claim or right that cannot be waived by law, including the right to file an administrative charge of discrimination.

2. I acknowledge that I have been advised in writing by Motorola to consult with an attorney before signing this waiver, that I had at least twenty-one (21) days to consider this waiver before signing it, and that I will be able to revoke this waiver for up to seven (7) days after signing it. If I do decide to revoke this waiver I will advise Chris Theros, Motorola, Inc., 1301 E. Algonquin Road, Schaumburg, IL 60196, by letter postmarked within the seven (7) day period.

3. I warrant and represent that I have relied solely on my own judgment and that of any legal counsel I have consulted regarding the consideration for and the language of this waiver; that I have been given sufficient time to consider this waiver and to consult with counsel of my own choosing; and that no statements made by Motorola have in any way coerced or unduly influenced me to execute this waiver.

Jay Rein

_____

Social Security or Commerce I.D.#_____

Date _____
(To be signed after [insert effective separation date], 2004)

G00005

# EXHIBIT D

T. Rein
EXHIBIT NO. 3
8/16/05
L. LONDON

 **MOTOROLA**          # EMPLOYMENT AGREEMENT

In consideration of my employment, or continued employment by Motorola, or its subsidiaries (referred to separately or together as "Motorola") and the salary or wages paid to me, I understand and agree to the following provisions for the protection of Motorola property rights:

1. Not to disclose to Motorola, or to use in my work at Motorola (a) any confidential information belonging to others, including my prior employers (unless written authorization is first obtained), or (b) any prior inventions made by me which Motorola is not otherwise entitled to learn of or to use.

2. Not to use, or publish, or to otherwise disclose to others, either during or subsequent to my employment by Motorola, any confidential information of Motorola or its customers, except as my Motorola duties may require.

3. Upon termination of my employment, to promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola, or any other materials which belong to Motorola.

4. To assign and I hereby assign to Motorola as its exclusive property the entire right, title and interest in all my inventions, innovations, or ideas developed or conceived by me solely, or jointly with others, at any time during the term of my employment and which inventions, innovations, or ideas relate to the actual or anticipated business activities of Motorola, or result from, or are suggested by, work which I do for Motorola.

5. To make and maintain written records of all inventions, innovations, or ideas referred to in paragraph 4 above and to submit promptly such records, and supplemental oral disclosures, to designated representatives of Motorola.

6. To execute all papers, and otherwise provide proper assistance, at Motorola's request and expense, during and subsequent to my employment by Motorola to enable Motorola or its nominees to obtain patents, copyrights, and legal protection for inventions or innovations in any country.

7. I represent that the inventions identified in the _____0_____ pages I attach hereto comprise all the unpatented inventions which I have made or conceived prior to my employment by Motorola, which inventions shall be excluded from this agreement. (It is only necessary to list the title of such inventions and the purpose thereof, but not details of the invention itself per paragraph 1(b)). IF THERE ARE NO SUCH UNPATENTED INVENTIONS TO BE EXCLUDED, EMPLOYEE INITIAL HERE ___JSR___.

8. I further represent that I have attached hereto a copy of any agreement which presently affects my compliance with the terms of this present agreement. (Such copy must specify the other contracting party or employer, the date of such agreement, the date of termination of any employment). IF THERE IS NO SUCH AGREEMENT, EMPLOYEE INITIAL HERE ___JSR___.

This agreement replaces any existing employee agreement between Motorola and me regarding patents and/or confidential information and shall be binding on my executors, administrators, heirs, legal representatives or assigns.

This agreement may not be modified except in writing with approval of an officer of Motorola.

| WITNESS | EMPLOYEE |
|---|---|
| SIGNATURE *Sharon Comer* | SIGNATURE *JSR* |
| TYPED OR PRINTED NAME  Sharon Comer | TYPED OR PRINTED NAME  JAY S. REIN |
| DATE  6-24-02 | DATE  6-24-02 |

**Distribution: White - Patent Dept, Canary - Personnel Folder, Pink - Employee Copy**

# EXHIBIT E

-----Original Message-----
**From:** Rein Jay-REIN
**Sent:** Thursday, April 08, 2004 2:57 PM
**To:** Tobin Peter-APT010
**Subject:**
**Importance:** High

Peter,

I have decided to not sign the Separation & Release Agreement.  At this point in time, I have decided to seek legal counsel with regard to my termination from Motorola.

Jay Rein

M00042

# EXHIBIT F

-----Original Message-----
**From:** Tobin Peter-APT010
**Sent:** Friday, April 09, 2004 8:41 AM
**To:** Rein Jay-REIN
**Subject:** Termination of Your Employment

Jay,
Per our previous discussions, in response to your decision not to sign and agree to the individualized employee separation agreement that was offered by Motorola, we will proceed with the termination of your employment as previously communicated in the letter sent to you, dated February 25, 2004, with separation benefits in accordance with Motorola's Involuntary Separation plan.
Peter

M00041

# EXHIBIT G

# MOTOROLA, INC.
## Standard Operating Procedure (SOP) E-62
## Appropriate Use of Computer Resources

Rein
EXHIBIT NO. 51
1/13/06
M. B. O'CONNOR

Effective Date: January 1, 1987
Revised Date: January 10, 2000

Revised By:     Appropriate Use of Computer Resources Task Force
Reviewed By:    Corporate Audit
                Corporate Contracts, Software & Technology Acquisition
                Corporate Human Resources
                Corporate Law
                Enterprise Information & Communications Security
                IT Desktop Solutions

Approved By:    Accounting Policy Council

## PURPOSE

1.0 To define the policy and responsibilities necessary to ensure appropriate, efficient and responsible use of computer resources.
2.0 To ensure that computer resources are used in compliance with applicable laws and software license agreements.
3.0 To define the privacy policy applicable to Motorola's computer resources.

## SCOPE

This policy applies to all employees and non-Motorolans using computer resources of Motorola or its subsidiaries. It applies whether access is on-site or from remote locations. Non-Motorola users who only use computer resources that are intended for public access are exempt from the provisions of this policy. This policy supercedes all prior versions of this SOP.

## CONTENTS

1.0 References
2.0 Definitions
3.0 Policy
4.0 Responsibilities
5.0 Appendix
    5.1. Examples of Appropriate and Inappropriate Use
    5.2. Required Usage Notice

## 1.0 REFERENCES

1.1. Human Resource Policies, including Progressive Discipline and Conduct Detrimental to Motorola's Interests, and Employee Handbooks
1.2. Code of Business Conduct
1.3. Internet Web Site Terms of Use and Privacy Policy
1.4. SOP E-60 Protection of Proprietary Information
1.5. Educational materials related to this policy

## 2.0 DEFINITIONS

2.1. Motorola Computer Resources are computers, peripherals, printers, plotters, scanners, modems, internal and external networks, electronic mail, facsimile devices/systems, paging devices/systems, and other computer devices/systems owned or leased by Motorola, whether used by employees, agents of Motorola, or authorized non-Motorolans. For purposes of this policy the scope also includes non-Motorola computer resources (e.g. Internet or business partner Computer Resources) when accessed via Motorola computer resources.

## 3.0 STATEMENT OF POLICY

1

4.4.3. Will participate and support investigations of potential inappropriate use as directed by responsible management as further described in paragraph 4.7 below.

4.5. Department managers and individuals responsible for non-Motorolans:

4.5.1. Must ensure individuals reporting to them are aware of all provisions of this policy before authorizing any access to computer resources.

4.5.2. Are responsible for the informed interpretation of the provisions of this policy, including the determination of the appropriateness of all non-business use by individuals reporting to them.

4.5.3. May not grant exceptions for those activities that are specifically prohibited in this policy.

4.6. Employees and authorized non-Motorola users:

4.6.1. Must comply with this policy.

4.7. Cyber Incident Response Team, Security departments, and Internal Control organizations:

4.7.1. Will participate in investigations as requested by the Human Resources or Law departments according to jointly-developed procedures.

5.0 APPENDIX

5.1. Examples of Appropriate and Inappropriate Use

Some examples of appropriate non-business uses of Motorola's Computer Resources include:

- Support of approved volunteer work in the community

- Doing homework for a continuing education course

- Compiling research for a project in a post-graduate program

- Conducting on-line banking

- Performing on-line financial management

- Doing on-line shopping

Some examples of inappropriate uses of Motorola's Computer Resources include:

- Disclosing confidential or sensitive information which is owned by or entrusted to Motorola to unauthorized recipients

- Misusing copyrighted material or other violation of copyrights held by Motorola or others

- Misusing trademarks or service marks of Motorola or other organizations

- Infringing on intellectual property rights

- Use for any illegal purpose

- Communicating in ways that disparage other companies' products or services (excluding objective reports of substantiated fact with limited internal distribution)

- Communicating information that could be perceived as official Motorola positions or endorsements without proper management approval

- Communicating using confrontational or improper language or using statements that are defamatory

- Creating, storing, transmitting, or viewing illegal, offensive or inappropriate material, including pornography

- Participating in any activity which could be interpreted as harassment, discrimination or intimidation of others

- Using electronic mail to transmit offensive or inappropriate materials, including pornography, inappropriate jokes or cartoons, and games

- Originating or distributing chain letters

3

# EXHIBIT H

## Progressive Discipline

### ▪Statement of Policy

This policy sets forth Motorola's process for dealing promptly with employees who violate policies, whose actions are disruptive to a normal business environment, or whose conduct may have a negative impact on the employment relationship or Motorola's reputation and standing in the community.

### ▪Scope

All Motorola employees based at locations within the United States.

### ▪Application

Discipline may occur in any case where an employee's actions appear to be detrimental to the operation of the business or to other employees. Infractions (a single incidence of misconduct) are grouped into three categories (Class I, Class II and Class III), based on relative seriousness.

Each infraction results in a determination of discipline level, based on its seriousness, previous discipline and a review of the circumstances of the infraction. This determination is within the discretion of management and human resources, and may include an analysis of employee's entire work record, including attendance and performance. Each situation is given individual consideration and depending on the specific circumstances may deviate from the examples set forth in this policy. For example, a severe Class II infraction may be handled as a Class III, or a record or pattern of previous Class I infractions may result in a decision to discipline pursuant to the steps set forth for a Class II infraction.

On occasion, an employee may have both conduct and performance issues. In such situations, the supervisor may use this process, a performance improvement plan or a combination of both.

Classes of Infractions

Class I: These are minor infractions which require corrective action. The discipline for Class I infractions is normally:

1st infraction - First Written Warning or Documented Verbal Warning
2nd infraction - Second Written Warning
3rd infraction - Final Written Warning
4th infraction - Termination of employment

Examples of Class I infractions include (but are not limited to): Inattention to duties; disorderly conduct; inappropriate attire; minor infractions such as smoking in areas not

CONFIDENTIAL

designated as smoking areas; misprocessing; isolated instances of failure to secure Motorola information under Motorola's Protection of Proprietary Information Standard Operating Procedure; abuse of personal privileges; and loitering.

All types of Class I infractions will be cumulative to determine the appropriate disciplinary steps. Once a Class I infraction has occurred, any subsequent Class I infraction will result in the next level of disciplinary documentation.

First and Second Written Warnings and Documented Verbal Warnings will remain active for purposes of documentation level for a period of 12 months from the date of issue. Once an employee progresses to a Final Written Warning, the documentation and disciplinary level will remain active for 12 months from the date of issue. Commission of another Class I infraction, or any Final Written Warning of any nature, during the 12-month period from date of issue of a Final Written Warning may result in termination of employment.

Class II: These infractions are serious in nature. Depending upon its severity, the first infraction may not, standing alone, be grounds for termination of employment. The discipline for a Class II infraction is normally:

1st infraction - Final Written Warning
2nd infraction - Termination of employment

Examples of Class II infractions include (but are not limited to): Inappropriate conduct; disregard of safe work procedures; making offensive remarks, including remarks based upon an individual's race, color, religion, sex, national origin, age, disability, sexual orientation, gender identity or expression, or veteran's status; using abusive, profane or sexually graphic language; inappropriate use of cameras; failure to secure Motorola confidential and proprietary materials under Motorola's Protection of Proprietary Information Standard Operating Procedure; misuse of Motorola resources or equipment (e.g., computers, telephone, pager, email, internet, software) under Standard Operating Procedure E-62.

Class II infractions will remain active for the duration of employment. Any subsequent Final Written Warning, of any nature, may result in termination of employment.

Class III: These infractions are very serious in nature and normally result in immediate termination of employment.

Examples of Class III infractions include (but are not limited to): Disruption of the workplace; willful spoilage, destruction or waste of Motorola property; possession, use or sale of narcotics, alcohol, or any other controlled substances; firearms or other weapons on company property; theft; gambling on Motorola premises; unauthorized disclosure of confidential company information or trade secrets; violation of security regulations and policies; conviction of a felony (including deferred adjudication, probation or any similar resolution of a felony charge in accordance with any state law limitations); violent acts or

CONFIDENTIAL

threats of violence on Motorola property or toward a Motorola employee or the employee of a contractor; insubordination; job abandonment; harassment based upon race, color, religion, sex, national origin, age, disability, veteran, sexual orientation, gender identity or expression or any other status protected by law; falsification of Company documents (including employment application, work production records, timesheets, labor charging, travel requests, expense statements and documents related to illnesses and leaves of absence); making false accusations or providing untruthful information during any Company investigation; violation of Motorola's Code of Business Conduct.

Class III infractions that do not result in termination will remain active for the duration of employment. Any subsequent Final Written Warning, of any nature, may result in termination of employment.

Effect on Salary Increases and Eligibility for Promotion or Transfer

If an employee is issued a Final Written Warning, of any nature, he or she will not receive a merit or lump sum increase, and he or she will not be eligible to receive a promotion or to use the Career Management System (CMS) for a period of 12 months from the date of issue of the infraction.

Comprehensive Final Written Warnings

A Comprehensive Final Written Warning may be issued to an employee who has demonstrated a pattern or history of inappropriate behavior, attendance issues and/or other unacceptable conduct, but has not reached the point of termination under this policy.

Once an employee is issued a Comprehensive Final Written Warning, he or she will not receive a merit or lump sum increase, and he or she is ineligible to receive a promotion or to use the Career Management System (CMS) for a period of 12 months from the date of issue of the Comprehensive Final Written Warning.

Comprehensive Final Written Warnings will remain active for the duration of employment. Any subsequent Final Written Warning, of any nature, may result in termination of employment.

Illegal Conduct/Conduct Detrimental to Motorola's Interests

When an employee is charged or accused of violating the law or engaging in other conduct harmful to the general public interest, Motorola's action will vary depending on the individual circumstances of the case. Factors affecting Motorola's decision will include the seriousness of the allegations and the impact of the case on the employment relationship and Motorola's reputation in the community. In these situations, two members of management, one from the Human Resources Department and one from the Law Department, will review the circumstances and determine which of the following options is most appropriate under the circumstances:

CONFIDENTIAL

- Personal <u>Leave of Absence</u>
- Transfer to another department or facility
- Termination
- Other disciplinary action
- Non-scheduling the employee with or without pay while the Human Resource and Law Department investigate the case and determine the course of action.
- No action, pending further proceeding or final disposition of the charge(s).

The employee may be required, as a condition of continued employment, to provide information on the status of court or other public proceedings.

<u>Preliminary Evaluation Period/New Employee Disciplinary Process</u>

Motorola provides for a Preliminary Evaluation Period and expedited disciplinary process for new employees. For all new employees with less than six months of service as a regular Motorola employee from the most recent date of hire the typical discipline is:

**Class I infraction:**

1st infraction - Final Written Warning
2nd infraction - Termination of employment

**Class II or Class III infraction:**

1st infraction - Termination of employment

New Employees may also be terminated during this Preliminary Evaluation Period for documented unacceptable performance, inappropriate behavior or excessive unexcused absences.

After the six-month Preliminary Evaluation Period expires, the employee will be subject to the Progressive Discipline process described earlier in this policy. If an employee has received a Final Written Warning for a Class I infraction during the six-month Preliminary Evaluation Period, the Final Written Warning will subsequently be treated as a 2nd Infraction Written Warning for Class I infractions.

<u>Documentation and Approvals</u>

Issuance of Final Written Warnings (for any class of infraction), Comprehensive Final Written Warnings, and all terminations require the prior review and concurrence of a Human Resource representative. Employees are requested to acknowledge by signature that the disciplinary documentation has been reviewed with them. Employees will be provided a copy of Class I, II, III and Comprehensive Final Written Warnings. If the employee refuses to sign the documentation, this refusal will be documented by at least two members of management, one of who may be from the Human Resources Department.

CONFIDENTIAL

MSP0158

The employee will have the opportunity to explain his or her actions. If the employee disagrees with the disciplinary action, he or she may seek review of the action or termination through the Open Door process.

Documentation of a disciplinary action that is not reversed through the review process becomes a permanent part of the employee's Solutions Center file. Employees will be provided a copy of disciplinary documents that are placed in their employee file located at the Employee Solutions Center - Americas.

**Responsibilities**

Management - Managers are responsible for applying discipline consistent with this policy. Managers are also responsible for ensuring that employees do not receive a merit or lump sum increase or promotion when on a Class I Final Written Warning, Class II, Class III or Comprehensive Final Written Warning.

Employee - The employee is expected to comply with the requirements and expectations contained in any disciplinary documentation issued under this policy.

Human Resources - Approval of Final Written Warnings (for any class of infraction), Comprehensive Final Written Warnings and all terminations pursuant to this policy. Human Resources are responsible for transferring documentation to the employee file at the Employee Solutions Center - Americas.

Leadership & Talent Supply (LTS) - LTS is expected to ensure that no employee who is ineligible inadvertently uses the Career Management System in violation of this policy.

**Cross Reference**

- Attendance
- Code of Business Conduct
- Diversity and Equal Employment Opportunity
- Drug Free Workforce
- Open Door Process
- Personal Leave
- Reporting Relationships
- Senior Service
- Safe and Respectful Workplace
- Standard Operating Procedures E-62 - Appropriate Use of Computer Resources

**Version Date: 06/01/2005**
**Original Effective Date: 01/01/2002**

This policy does not constitute an employment contract or implied promise of any kind. The terms of this policy may be modified or eliminated by the Company at any time with or without notice. For more detailed information, see Notice to Employees Regarding Motorola's U.S. Human Resource Policies.

CONFIDENTIAL

MSP0159

Site Created: 1 January 2002
Page Last Modified: 1 October 2004
Send any US Human Resources Policies related comments to The US HR Policy Committee

Copyright © 2001 Motorola. All rights reserved.
Motorola Internal Use Only

CONFIDENTIAL

MSP0160

# EXHIBIT I



Rein
EXHIBIT NO. 50
1/13/06
M. D. O'CONNOR

# CODE OF BUSINESS CONDUCT



## OUR RESPONSIBILITY TO

# Shareholders

We will healthe the investment of our shareholders as if it were our own.

## OUR RESPONSIBILITY TO

# Competitors

We compete fairly and with integrity at all times.

### Protecting Motorola Assets

We have a responsibility to protect the Motorola assets entrusted to us from loss, damage, misuse or theft. Motorola assets, such as funds, products, or computers, may only be used for business purposes and other purposes approved by management. Motorola assets may never be used for illegal purposes.



### Proprietary Information

We will safeguard all proprietary information by marking information accordingly, keeping it secure, and limiting access to those who have a need to know in order to do their jobs. Proprietary information includes any information that is not generally known to the public and is helpful to Motorola, or would be helpful to competitors. It also includes information that suppliers and customers have entrusted to us. The obligation to preserve proprietary information continues even after employment ends.

### Inside Information and Securities Trading

Motorolans are not allowed to trade in securities or any other kind of property based on knowledge that comes from their jobs, if that information hasn't been reported publicly. It is against the laws of many countries, including the U.S., to trade or to "tip" others who might make an investment decision based on inside job information. For example, using non-public information to buy or sell Motorola stock, options in Motorola stock or the stock of a Motorola supplier or customer is prohibited.

### Accuracy of Company Records

We require honest and accurate recording and reporting of information in order to make responsible business decisions. This includes such data as quality, safety, and personnel records, as well as all financial records.

All financial books, records and accounts must accurately reflect transactions and events, and conform both to required accounting principles and to Motorola's system of internal controls. No false or artificial entries may be made. When a payment is made, it can only be used for the purpose spelled out on the supporting document.

### Recording and Retaining Business Communications

All business records and communications should be clear, truthful and accurate. Business records and communications often become public through litigation, government investigations and the media. We will avoid exaggeration, colorful language, guesswork, legal conclusions, and derogatory remarks or characterizations of people and companies. This applies to communications of all kinds, including e-mail and "informal" notes or memos. Records should always be retained and destroyed according to Motorola's record retention policies.

### Competitive Information

We must never use any illegal or unethical methods to gather competitive information. Stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited.

If information is obtained by mistake that may constitute a trade secret or confidential information of another business, or if we have questions about the legality of information gathering, we should consult the Law Department.

### Fair Competition and Antitrust

Motorola and all our employees are required to comply with the antitrust and unfair competition laws of the many countries in which we do business. These laws are complex and vary considerably from country to country. They generally concern:

- Agreements with competitors that harm customers, including price fixing and allocations of customers or contracts.

- Agreements that unduly limit a customer's ability to sell a product, including establishing the resale price of a product or service, or conditioning the sale of products on an agreement to buy other Motorola products and services.

- Attempts to monopolize, including pricing a product below cost in order to eliminate competition.

Motorolans who question whether an action may violate competition laws should talk to the Law Department.





# EXHIBIT J



GTSI Corp.
5901 Stonecroft Boulevard
Chantilly, VA 20151-1010
(703) 502-2000
www.GTSI.com



REVISED

October 11, 2004

Mr. Jay Rein
75 Johnson Drive
Holliston, MA 01746-2244

Dear Jay:

GTSI Corp. ("GTSI") is pleased to offer you the position of Senior Director, CRM. In this position, you will have broad responsibilities and will report directly to Scot Edwards. We would like your employment to commence as soon as possible, preferably by the Projected Start Date referred to below. We are optimistic that you will be able to make a significant contribution to GTSI.

Your total annual target compensation will be $187,500. This will consist of a base salary of $150,000 ($6,250 semi-monthly) plus participation in the Executive Incentive Compensation Plan. At 100% goal attainment, your annual target bonus under this plan will be $37,500 (25% of your base salary). At 200% goal attainment, your annual target bonus under this plan will be $75,000. Additionally, you will receive a $10,000 sign on bonus that will be paid as follows: Half ($5,000) will be paid within 30 days of your start date, and half ($5,000) will be paid after successful completion of your 120 day introductory period review. GTSI will discuss your incentive plan with you in more detail during your first three months of active employment.

Additionally, you will receive a one-time amount to be used for relocation purposes, not to exceed $20,000. These relocation monies must be used within 9 months of your original start date at GTSI Corp. You must provide evidence (receipts) of your relocation to the Washington, DC area if you choose to access these relocation monies. This fund is provided, in part, to help cover the cost of house hunting for you and your family. These costs may include airfare, lodging, rental car, or any related costs such as parking. Additionally, you may use this money to offset costs incurred while traveling between Holliston and the Washington, DC area.

Please understand that you will be required to repay these monies (sign on bonus and relocation amount), on a prorated basis, should your employment with GTSI end voluntarily or for "cause"[1] within twelve months from the date of payout.

---

[1] Cause – Termination by GTSI of an officer's employment for "Cause" means termination as a result of (i) acts or omissions involving unacceptable performance or conduct (examples of which include, but are not limited to: failure or refusal to perform assigned duties or to follow Company policies, as determined in the sole discretion of the Company; commission of sexual harassment; excessive absenteeism; unlawful use or possession of drugs or misuse of legal drugs or alcohol; misappropriation of a Company asset or opportunity; the offer, payment, solicitation or acceptance of any bribe or kickback with respect to the Company's business; the assertion, representation or certification of any false claim or statement to a Company customer; or indictment or conviction for any felony whatsoever or for any misdemeanor involving moral turpitude); or (ii) other conduct deemed by the Company to be inappropriate for an officer or harmful to the Company's interests or reputation.

As an additional incentive to you, prior to your relocation to the Washington, DC area, we agree to reimburse you up to $1,000 per month for customary and reasonable expenses incurred while traveling to and from Holliston. This plan expires January 21, 2005. You will need to submit reasonable documentation (receipts) for these expenses.

As part of your compensation package, we will recommend to the Compensation Committee of the Company's Board of Directors that the Committee, at its next meeting at which option grants are considered, grant to you a nonstatutory stock option ("Option"), effective as of the later of the date of such meeting (the "Grant Date"), to purchase 5,000 shares of the Company's Common Stock.

The exercise price will be equal to the closing price of the Company's Common Stock on the Grant Date or, if there has been no trading in the Company's Common Stock on the Grant Date, then the immediately preceding date upon which the Company's Common Stock is so traded (as reported the following business day in The Wall Street Journal). Your Option will vest and be exercisable, cumulatively, in four equal annual installments with the first installment vesting on the first anniversary of the date of grant, and will be subject to the terms and provisions of the stock option agreement evidencing the grant of the Option. Your Option shall expire, to the extent not previously exercised, upon the earlier of seven years from the grant date or three months after you cease to be a GTSI employee. Since this stock option offer is by law subject to approval by GTSI's Board of Directors or a Committee thereof, no one at GTSI can promise or ensure such approval. Nonetheless, I envision Committee approval without problem.

You will be eligible, on the first of the month following your hire date, to join the GTSI benefits plan which would include life insurance, comprehensive medical, dental and vision insurance for yourself and dependents on a contributory basis if you so elect. We will provide you with detailed information concerning your complete benefits package upon employment. You will be eligible for three weeks of vacation for each calendar year. This will prorate for partial years. As with all GTSI employees, you will be subject to all Company policies and procedures.

To comply with the Immigration Reform and Control Act, you will be required to verify employment eligibility by completing the enclosed form and presenting the requested documents on the first day of employment. Employment is contingent upon satisfactory references, successful completion of pre-employment drug screening, and the completion of a GTSI Corp. non-disclosure form.

Your employment at GTSI will be an "at will" relationship; that is, either party may end it at any time, for any reason. Neither this offer of employment, nor your acceptance, nor our maintenance of personnel policies, procedures, and benefits creates a minimum term of employment. Please also be advised that it is GTSI's policy that employees should discuss salary issues only with their manager. For the first 120 days of employment, you will serve an initial introductory period. As well, GTSI fully expects that you will perform your duties as required by your position and management. Your failure to do so may lead to disciplinary action up to and including termination.

The creation of enthusiastic customers by exceeding their expectations is a fundamental principle for GTSI and all its employees. In this regard, we rely on effective customer relationship management ("CRM"), as implemented through our contact database, as a unifying factor that manages all forms of communication with our customers, increasing the value of GTSI to our customers and the value of our customers to GTSI. To create enthusiastic customers in this manner, we need the support and commitment of each and every GTSI employee. We ask that you give us that support and commitment throughout your time at GTSI.

Page 3 of 3
Jay Rein--Revised
October 11, 2004

By executing this letter, you represent and warrant to GTSI that you are not currently subject to any express or implied contractual obligations to any of your former employers under any secrecy, non-competition or other agreements or understandings, except for any of which you have furnished copies or written summaries to me, prior to your execution of this letter.

This letter contains our entire understanding with respect to your employment at GTSI. It supersedes all prior or contemporaneous representations, promises or agreements concerning this subject, whether in written or oral form, and whether made to or with you by any employee or other person affiliated with GTSI or any actual or perceived agent.  Any amendment of this offer or letter, now or in the future, requires the written acknowledgement of the VP, Human Resources, or her designee. This offer of employment will expire one week from the date of this letter.

Jay, we believe you will provide GTSI with the creativity and experience to contribute to continued GTSI growth.  We also believe that GTSI can provide you with opportunities for professional growth and financial return.  We look forward to the commencement of your employment with GTSI and expect a mutually fulfilling and rewarding relationship.

Please acknowledge your acceptance of this offer by signing the enclosed copy of this letter, and returning it to me as soon as possible along with your completed application of employment.

Sincerely,                                         Acknowledged/Accepted

Alan Bernstein                                     Jay Rein                    Date 10/18/04
Senior Manager of Recruiting
Human Resources

                                                   _____
                                                   Preferred name, if different from above

                                                   Projected Start Date:        October 18, 2004

# EXHIBIT K



**worldspan.**

#6696

| **Personal Information** | | |
|---|---|---|
| Date of Application: | 6/15/05 | |
| Last Name: | Rein | |
| First Name: | Jay | Social Security #: 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 |
| Middle Initial: | S | |
| Do you have a valid driver's license?: | Yes | Driver's License #: S41758096 |
| State/Province of Issuance: | MA | Driver's License Expiration Date: 1/1/2010 |
| Home Phone: | 508-893-6925 | |
| Cell Phone: | 617-899-2699 | |
| E-mail Address: | jaysrein@yahoo.com | |
| Current Address: | 75 Johnson Drive | |
| City: | Holliston | |
| State/Province: | MA | |
| Zip/Postal Code: | 01746 | |
| If not, state years at this address: | 2000 thru present | |

| | | |
|---|---|---|
| Address: | 12814 Doe Lane | From: 08/01/1996 |
| City: | North Potomac | To:   08/01/2000 |
| State/Province: | MD | |
| Zip/Postal Code: | 20878 | |

**General Information**

Your Work Visa Type, if Applicable:

Work Visa Number, if Applicable:

Position Applied For:  VP eCommerce

Have you ever worked for Worldspan, L.P./1 before? N

Do you have any friends or relatives working for Worldspan, L.P./1? N

Have you ever been convicted of or sentenced for any violation of the law? N

Are you legally authorized to work in the U.S.? Y

Are you able to work nights? Y

Are you able to work on holidays? Y

Are you able to work weekends? Y

How soon following notification can you report? TBD

Are you willing to relocate? Y

How did you learn about this job?  Other

Specify:  Recruiter - Trimarc Resources / Cliff West

## Employment Information

Are you currently working? Y

If yes, may we contact your employer?  N

| | |
|---|---|
| **Employer Name:** | GTSI Corp. |
| **Last Job Title:** | Senior Director CRM & Strategic Marketing |
| **Dates:** | 10/1/2004 to Present |
| **Describe Work Performed:** | Sales & Marketing Related |

| **Employer Address:** | 3901 Stonecroft Blvd. | **City:** | Chantilly |
|---|---|---|---|
| **State/Province, Zip/Postal Code:** | VA /20151 | **Employer Phone:** | 800-999-GTSI |
| **Salary:** | est. 195,000 per Year | | |

| | |
|---|---|
| **Bonuses/Commissions:** | targeted additional 25% |
| **Department:** | Marketing |
| **Supervisor Name:** | Mr. Scot Edwards |
| **Supervisor Title:** | CMO |
| **Supervisor Phone:** | 800-999-GTSI |
| **Supervisor E-mail:** | na |

**Contract and/or Temporary Assignment Information:**

| | | | |
|---|---|---|---|
| **Employer Name:** | | **Employer City:** | |
| **Employer Address:** | | **State/Zip:**  / | |
| **Employer Phone:** | | | |

| | |
|---|---|
| **Are you eligible for rehire?** | Y |
| **Reason for Leaving:** | recruited by Worldspan |
| **Please explain fully any gaps in your employment history:** | |
| **Have you ever been suspended, placed on probation, asked to resign, discharged or terminated by this employer?** | N |
| **If yes, please explain:** | |

Are you currently working? N

If yes, may we contact your employer?  N

| | | | |
|---|---|---|---|
| **Employer Name:** | Motorola Professional Services | | |
| **Last Job Title:** | Principal | | |
| **Dates:** | 6/1/2002 to 5/20/2004 | | |
| **Describe Work Performed:** | Value-added Technology Services | | |
| **Employer Address:** | Algonquin Road | **City:** | Schaumburg |
| **State/Province,** | | **Employer** | |

| | | | |
|---|---|---|---|
| **Zip/Postal Code:** | IL /60196 | **Phone:** | na |
| **Salary:** | 194,000 per Year | | |
| **Bonuses/Commissions:** | targeted at 45% | | |
| **Department:** | Various | | |
| **Supervisor Name:** | Leonard DeBarros (no longer employed at co.) | | |
| **Supervisor Title:** | SVP Americas | | |
| **Supervisor Phone:** | na | | |
| **Supervisor E-mail:** | na | | |

**Contract and/or Temporary Assignment Information:**

| | | | |
|---|---|---|---|
| **Employer Name:** | | **Employer City:** | |
| **Employer Address:** | | **State/Zip:** / | |
| **Employer Phone:** | | | |
| **Are you eligible for rehire?** | | Y | |
| **Reason for Leaving:** | | Group disbanded | |
| **Please explain fully any gaps in your employment history:** | | | |
| **Have you ever been suspended, placed on probation, asked to resign, discharged or terminated by this employer?** | | Y | |
| **If yes, please explain:** | | Motorola Professional Services was a start-up organization that evolved from 5 people to over 200 people and down to zero. | |

**Are you currently working?** N

**If yes, may we contact your employer?** N

| | | | |
|---|---|---|---|
| **Employer Name:** | Epsilon Data Management, Inc. | | |
| **Last Job Title:** | VP Client Services & GM | | |
| **Dates:** | 12/20/1999 to 2/1/2002 | | |
| **Describe Work Performed:** | Database Services & Solutions | | |
| **Employer Address:** | na | **City:** | Wakefield |
| **State/Province, Zip/Postal Code:** | MA /00000 | **Employer Phone:** | na |
| **Salary:** | 189,000 per Year | | |
| **Bonuses/Commissions:** | targeted at 40% | | |
| **Department:** | na | | |
| **Supervisor Name:** | Corey Torrence (no longer at co.) | | |
| **Supervisor Title:** | CEO | | |
| **Supervisor Phone:** | na | | |
| **Supervisor E-mail:** | na | | |

**Contract and/or Temporary Assignment Information:**

| | | | |
|---|---|---|---|
| **Employer Name:** | | **Employer City:** | |
| **Employer Address:** | | **State/Zip:** / | |
| **Employer Phone:** | | | |

# EXHIBIT L

## Moore, Leah

**From:**     peg.cassidy@worldspan.com
**Sent:**     Wednesday, November 08, 2006 9:31 AM
**To:**       Drummond, Alex
**Cc:**       john_coster@msn.com
**Subject:** Fw: Agreements

Peg Cassidy
770.563.7468
peg.cassidy@worldspan.com
----- Forwarded by Peg Cassidy/HDQ/WSP on 11/08/2006 09:30 AM -----
**Ninan Chacko/ATL/WSP**

| | To | Peg Cassidy/HDQ/WSP@WORLDSPAN |
| --- | --- | --- |
| 11/07/2006 06:07 PM | cc | |
| | Subject | Fw: Agreements |

Ninan Chacko
Chief Commercial Officer
Worldspan
300 Galleria Parkway, N. W.
Atlanta, GA  30339-3196  USA

Work: +1 770 563-5183
Cell: +1 404 247-0349
Fax:  +1 770 563-4801

e-mail: ninan.chacko@worldspan.com
----- Forwarded by Ninan Chacko/ATL/WSP on 11/07/2006 06:06 PM -----
**Bill Pippin/HDQ/WSP**

| | To | Jaysrein@yahoo.com, JohnCoster@msn.com |
| --- | --- | --- |
| 06/16/2005 02:02 PM | cc | |
| | Subject | Agreements |

Jay/John, please find below the Employment, Stock Option and Joinder Documents for your review.  Jay, please let me know if there is anything else you need on this and I will get it for you.  I do have a formal offer letter, which restates what is in the Employment Agreement, that I will get to you separately.  I may leave it at the hotel for you tomorrow.   John, if you, as Jay's Employment Attorney, have any questions, please feel free to contact Peg Cassidy, our General Counsel, at 770-563-7468.